**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 12-280-RGA |
| BANK OF AMERICA, N.A. and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, | ) | |
| | ) | |
| Defendants-Counterclaimants. | ) | |
| PI-NET INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-282-RGA |
| | ) | |
| JPMORGAN CHASE & CO., | ) | |
| | ) | |
| Defendant. | ) | |
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-355-RGA |
| | ) | |
| CITIZENS FINANCIAL GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR**
**PARTIAL SUMMARY JUDGMENT OF INDEFINITENESS**

Robert S. Saunders (ID No. 3027)
SKADDEN, ARPS, SLATE, MEAGHER &
    FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com

*Attorneys for Defendant JPMorgan Chase &
Co.*

Richard L. Horwitz (ID No. 2246)
David E. Moore (ID No. 3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware  19801
Tel.:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants Bank of America,
N.A.; Merrill Lynch, Pierce, Fenner & Smith
Incorporated; and Citizens Financial Group,
Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

NATURE AND STAGE OF PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ............................................................................ 1

STATEMENT OF FACTS .................................................................................. 3

ARGUMENT .................................................................................................... 5

I.      THE APPLICABLE LAW ........................................................................ 5

      A.      The Standard for Summary Judgment ................................................ 5

      B.      The Definiteness Requirement .......................................................... 6

      C.      Indefiniteness of Means-Plus-Function Claims .................................. 7

II.     "MEANS FOR PROCESSING," "COMPUTER SYSTEM . . . FOR
      PROCESSING," AND "MEANS FOR TRANSMITTING" ARE INDEFINITE
      BECAUSE NO CORRESPONDING ALGORITHMS ARE DISCLOSED ..................... 9

      A.      The "Means for Processing," "System for Processing," and "Means for
            Transmitting" Terms Should Be Governed by 35 U.S.C. § 112(f) ...................... 10

      B.      The Asserted "Means for Processing," "Computer System . . . for
            Processing," and "Means for Transmitting" Claims Are Not Supported by
            an Algorithm and Are Invalid for Indefiniteness ................................................. 13

III.    THE CLAIM PHRASES "KEEPING A TRANSACTION FLOW CAPTIVE"
      AND "ROUTED TRANSACTIONAL DATA STRUCTURE" ARE
      INDEFINITE ........................................................................................... 16

      A.      "Keeping A Transaction Flow Captive" Is Not Defined in the
            Specification Or Prosecution History, and Has No Generally Accepted
            Meaning in the Art ........................................................................................ 17

      B.      "Routed Transactional Data Structure" Is Not Defined in the Specification
            or Prosecution History, and Has No Generally Accepted Meaning in Art .......... 18

      C.      All Asserted Claims of the '500 and '158 Patents Are Invalid Because
            They Recite "Keeping A Transaction Flow Captive" or "Routed
            Transactional Data Structure" ....................................................................... 19

CONCLUSION ................................................................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Acacia Media Technologies Corp. v. New Destiny Internet Group*,
   405 F. Supp. 2d 1127, 1132-39 (N.D. Cal. 2005) ..........................................................20

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
   314 F.3d 1313 (Fed. Cir. 2003)........................................................................................20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ...........................................................................................................6

*Aristocrat Technologies Australia PTY Ltd. v. International Game Technology*,
   521 F.3d 1328 (Fed. Cir. 2008)..................................................................8, 9, 10, 14, 15

*Atmel Corp. v. Information Storage Devices, Inc.*,
   198 F.3d 1374, 1382 (Fed. Cir. 1999) .............................................................................16

*Automotive Technologies International, Inc. v. Delphi Corp.*,
   No. 08–11048, 2009 WL 2960698 (E.D. Mich. 2009).....................................................12

*B. Braun Medical, Inc. v. Abbott Laboratories*,
   124 F.3d 1419 (Fed. Cir. 1997)..........................................................................................8

*Biomedino, LLC v. Waters Technologies Corp.*,,
   490 F.3d 946 (Fed. Cir. 2007).......................................................................................7, 8

*Blackboard, Inc. v. Desire2Learn, Inc.*,
   574 F.3d 1371 (Fed. Cir. 2009).....................................................................................9, 16

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ...........................................................................................................6

*Dana Corp. v. United States*,
   174 F.3d 1344 (Fed. Cir. 1999).........................................................................................7

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
   412 F.3d 1291 (Fed. Cir. 2005)................................................................................6, 9, 21

*ePlus, Inc. v. Lawson Software, Inc.*,
   700 F.3d 509 (Fed. Cir. 2012)..................................................................................8, 9, 13

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
   673 F.3d 1361 (Fed. Cir. 2012).........................................................................................9

*Finisar Corp. v. DirecTV Group, Inc.*,
523 F.3d 1323 (Fed. Cir. 2008)................................................................14

*Harris Corp. v. Ericsson Inc.*,
417 F.3d 1241 (Fed. Cir. 2005)..................................................................8

*Inventio AG v. ThyssenKrupp Elevator Ams. Corp.*,
649 F.3d 1350 (Fed. Cir. 2011)................................................................10

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
382 F.3d 1354 (Fed. Cir. 2004)................................................................10

*Massachussetts Institute of Technology v. Abacus Software*,
462 F.3d 1344 (Fed. Cir. 2006)..........................................................10, 11

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ...............................................................................5, 6

*Medical Instrumentation & Diagnostics Corp. v. Elekta AB*,
344 F.3d 1205 (Fed. Cir. 2003)..................................................................8

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
545 F.3d 1359 (Fed. Cir. 2008)............................................................8, 14

*Noah Systems, Inc. v. Intuit Inc.*,
675 F.3d 1302 (Fed. Cir. 2012)........................................................2, 6, 8

*Oenga v. United States*,
91 Fed. Cl. 629 (2010)...............................................................................7

*Podobnik v. U.S. Postal Service*,
409 F.3d 584 (3d Cir. 2005).......................................................................6

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008)..................................................................7

*PureChoice, Inc. v. Honeywell International, Inc.*,
333 F. App'x 544 (Fed. Cir. 2009) .......................................................6, 20

*Rothschild Trust Holdings, LLC v. Citrix System [s], Inc.*,
491 F. Supp. 2d 1105 (S.D. Fla. 2007) ....................................................20

*Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*,
No. C 09-2651 MHP, 2010 WL 2292316 (N.D. Cal. June 7, 2010).............12

*Welker Bearing Co. v. PHD, Inc.*,
550 F.3d 1090 (Fed. Cir. 2008)................................................................10

*Widevine Technologies, Inc. v. Verimatrix, Inc.*,
    No. 2–07–cv–321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009)..............................11, 12

## STATUTES

35 U.S.C. § 112 ........................................................................................................ 2, 11, 12

35 U.S.C. § 112 paragraph 2 .............................................................................................8, 9

35 U.S.C. § 112 paragraph 6 ...........................................................2, 8, 9, 10, 11, 15, 16

35 U.S.C. § 112(b) ..................................................................................................... 3, 6, 21

35 U.S.C. § 112(d) ...............................................................................................................7

35 U.S.C. § 112(f)..................................................................................2, 7, 9, 10, 11, 12, 13

## RULE

Fed. R. Civ. P. 56(a).............................................................................................................5

## OTHER AUTHORITIES

*Supplementary Examination Guidelines for Determining Compliance With 35 U.S.C. 112
    and for Treatment of Related Issues in Patent Applications*,
    76 Fed. Reg. 7162-01, 7167 (Feb. 9, 2011) ....................................................................11

U.S. Patent No. 5,499,108 (filed Mar. 12, 1996)........................................................................12

## NATURE AND STAGE OF PROCEEDINGS

In March 2012, plaintiff Pi-Net International, Inc. ("Plaintiff" or "Pi-Net") filed

patent infringement complaints against the financial institutions in the above-captioned actions

(collectively, "Defendants").  The parties have begun to produce documents, but only limited

discovery has occurred to date.  Defendants sought leave to bring this motion in advance of the

time designated for case-dispositive motions because it concerns discrete issues of law that have

the potential to drastically streamline and reduce the scope of these cases.

## SUMMARY OF ARGUMENT

1.  Pi-Net asserts the following claims against one or more Defendants: claims 1-

7, 10-12, 14-17, and 35 from U.S. Patent No. 5,987,500 ("the '500 patent"); claims 1-6 and 11

from U.S. Patent No. 8,037,158 ("the '158 patent"); and claims 1-8 and 10-12 from U.S. Patent

No. 8,108,492 ("the '492 patent") (collectively, "the patents-in-suit").[1] The patents-in-suit have a

common specification that is wholly inadequate to support the asserted claims.  Although that

inadequate disclosure renders the patents-in-suit invalid on multiple grounds, this motion

addresses only the indefiniteness of certain claim terms.  Thirty of the thirty-three asserted

claims have at least one of the following deficiencies: (a) a means-plus-function term for which

no corresponding structure is disclosed; and/or (b) a term that is not defined in the specification

or prosecution history, and which lacks a generally accepted meaning in the relevant art.

2.  *Means-Plus-Function Terms That Are Insolubly Ambiguous Due to Lack of*

*Corresponding Algorithm.*  Claims 1-7 and 35 of the '500 patent recite a "means for processing a

transaction request" and "means for transmitting a transaction request from [a] transactional

---

[1]     Exhibits A through P to the Transmittal Declaration of Robert S. Saunders are cited as
"Ex. __."  The patents-in-suit are attached hereto as Exhibits A through C.

application." Claims 1-8 of the '492 patent similarly require a "computer system . . . for processing [a] transaction request in real time." Although not written in explicit means-plus-function format, the "computer system . . . for processing" limitation from the '492 patent should be treated as such because the term "computer system" does not connote sufficiently definite structure to one of ordinary skill in the art. Those claim phrases from the '500 patent and the '492 patent thus share two attributes: (a) they must satisfy the disclosure requirements of 35 U.S.C. § 112(f),[2] and (b) they require "processing" and "transmitting" functions that must be carried out by a computer. The Federal Circuit has held that "[c]omputer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation." *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1319 (Fed. Cir. 2012). Because the specification of the patents-in-suit discloses no such algorithm, claims 1-7 and 35 of the '500 patent and claims 1-8 of the '492 patent are invalid for indefiniteness.

3. *Claim Terms That Are Insolubly Ambiguous Due to Lack of Intrinsic Definition and Lack of Generally Accepted Meaning.* Two other claim terms are also indefinite: (1) "keeping a transaction flow captive," which is required by all asserted claims of the '500 patent; and (2) "routed transactional data structure," which is required by all asserted claims of the '158 patent. Those terms are insolubly ambiguous because they are not defined in the specification or prosecution history, and did not have a meaning that was generally accepted by persons of ordinary skill in the art—*i.e.*, no technical dictionary or other scientific publication known to Defendants offers a definition or guidance as to the meaning of those terms.

---

[2] The paragraphs of § 112 of the Patent Act were assigned lettered designations in the America Invents Act of 2011; prior to that time, § 112(f) was commonly referred to as § 112, ¶ 6.

4.   This motion thus presents two straightforward questions: (1) Does the specification of the patents-in-suit disclose an algorithm to execute the claimed "processing" and "transmitting" functions? and (2) Is there a definition in the specification or prosecution histories, or a commonly understood meaning, for the terms "keeping a transaction flow captive" and "routed transactional data structure"?  Because there can be no genuine dispute that these questions must be answered in the negative, Defendants respectfully submit that this Court should grant summary judgment that the claims of the patents-in-suit in which those terms appear are invalid for failure to meet the definiteness requirement of 35 U.S.C. § 112(b).

## STATEMENT OF FACTS

The three patents-in-suit all relate to a method and apparatus for providing a real-time, two-way electronic transaction over a network, such as the World Wide Web.[3]  Each of the patents-in-suit names Lakshmi Arunachalam as the sole inventor, and issued from related applications that purport to claim priority to a provisional application filed on November 13, 1995.  Although there is minor variation between the Abstract of the '500 patent and that of the '158 and '492 patents, the written description and figures of the patents-in-suit are the same.

Pi-Net asserts thirty-three claims from the patents-in-suit, of which thirty are subject to this motion: claims 1-7, 10-12, 14-17, and 35 from the '500 patent; claims 1-6 and 11 from the '158 patent; and claims 1-8 from the '492 patent.  Claim 1 of the '500 patent is

---

[3]   The '500 patent is entitled "Value-Added Network System for Enabling Real-Time, By-Directional [*sic*] Transactions on a Network," and was issued on November 16, 1999.  It is based on U.S. Appl. No. 08/879,958, which was filed on June 20, 1997.  The '158 patent is entitled "Multimedia Transactional Services," and was issued on October 11, 2011.  The '158 patent is based on U.S. Appl. No. 11/980,185, which was filed on October 30, 2007.  Finally, the '492 patent is entitled "Web Application Network Portal," and was issued on January 31, 2012.  It is based on U.S. Appl. No. 12/628,060, which was filed on November 30, 2009.  The prosecution histories for the patents-in-suit are attached as Exhibits D through F.

representative of the asserted apparatus claims, and discloses a "value-added network switch" comprised of three different "means," as shown below with the relevant terms emphasized:

> 1. A configurable value-added network switch for enabling real-time transactions on a network, said configurable value-added network switch compromising [*sic*]:
>
> means for switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, ***said value-added network service provider keeping a transaction flow captive***, said plurality of transactional services being performed interactively and in real time;
>
> ***means for transmitting a transaction request from said transactional application***; and
>
> ***means for processing said transaction request.***

Similarly, claim 1 of the '492 patent recites a "system" that includes a "value added network switch" for real-time transactions, and a computer system for "processing" transaction requests:

> 1. A system, comprising:
>
> a Web server, including a processor and a memory, for offering one or more Web applications as respective point-of-service applications in a point-of-service application list on a Web page;
>
> each Web application of the one or more Web applications for requesting a real-time Web transaction;
>
> a value-added network (VAN) switch running on top of a facilities network selected from a group consisting of the World Wide Web, the Internet and an e-mail network, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;
>
> a service network running on top of the facilities network for connecting through the Web server to a back-end transactional application;
>
> and a ***computer system*** executing the Back-end transactional application ***for processing the transaction request*** in real-time.

Claim 1 of the '158 patent is representative of the asserted method claims.  It is reproduced below, with the relevant terms emphasized:

1. A method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising:

providing a Web page for display on a computer system coupled to an input device;

providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;

accepting a first signal from the Web user input device to select the point-of-service application;

accepting subsequent signals from the Web user input device;

and transferring funds from the checking account to the savings account in real-time utilizing *a routed transactional data structure* that is both complete and non-deferred, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals.

On December 13, 2012, Defendants wrote to counsel for Pi-Net, identifying the bases for this motion, and seeking to meet and confer. (*See* Ex. G) In response, counsel for Pi-Net took the view that because this motion implicates questions of "claim construction," it is premature. (Ex. H) After Defendants' second attempt to meet and confer with Pi-Net's counsel was equally unavailing, (*see id.*), Defendants sought leave to bring this motion.

## ARGUMENT

### I.     THE APPLICABLE LAW

#### A.     The Standard for Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986). However, the "mere existence of some alleged factual dispute between the

parties will not defeat an otherwise properly supported motion for summary judgment"; only genuine factual disputes based on evidence in the record will preclude summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that the movant's burden can be "discharged by 'showing' . . . that there is an absence of evidence to support the nonmoving party's case").  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (holding that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

**B.    The Definiteness Requirement**

To be valid, a patent claim must "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b).  The Federal Circuit has repeatedly recognized that "[t]he primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, e.g., competitors of the patent owner, can determine whether or not they infringe." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302-03 (Fed. Cir. 2005) (internal quotation marks and citations omitted).  Thus, a claim satisfies the definiteness requirement "[i]f one skilled in the art would understand the bounds of the claim when read *in light of the specification.*" *PureChoice, Inc. v. Honeywell Int'l, Inc.*, 333 F. App'x 544, 548 (Fed. Cir. 2009) (emphasis added) (internal quotations and citations omitted).  In assessing whether a claim is indefinite, a Court may look to the claim language, written description, and prosecution history. *See Noah Sys., Inc.*, 675 F.3d at 1311–12.  Because dependent claims necessarily

6

incorporate all of the limitations of the independent claims from which they depend, a finding

that an independent claim is indefinite means that any claim that depends from it is also invalid.

35 U.S.C. § 112(d).

The question of indefiniteness requires the court to determine "whether allegedly

indefinite claim language is subject to construction," or whether it is "insolubly ambiguous."

*Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1319 (Fed. Cir. 2008).  As such, "[a] determination

that a patent claim is invalid for failure to meet the definiteness requirement . . . , is a legal

conclusion that is drawn from the court's performance of its duty as the construer of patent

claims, and indefiniteness, therefore, like claim construction, is a question of law."  *Biomedino,*

*LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007) (internal quotation marks and

citation omitted).  Because indefiniteness is a legal issue within the exclusive province of the

Court, it is uniquely amenable to resolution via summary judgment.  *Oenga v. United States*, 91

Fed. Cl. 629, 634 (2010) ("Questions of law are particularly appropriate for summary

judgment.") (citing *Dana Corp. v. United States*, 174 F.3d 1344, 1347 (Fed. Cir. 1999)).

### C.      Indefiniteness of Means-Plus-Function Claims

Section 112(f) of the Patent Act allows for "[a]n element in a claim for a

combination [to be] expressed as a means or step for performing a specified function without the

recital of structure, material, or acts in support thereof, and such claim shall be construed to

cover the corresponding structure, material, or acts described in the specification and equivalents

thereof."  35 U.S.C. § 112(f).  "[T]he scope of [a means-plus-function] claim limitation [must] be

defined by the structure disclosed in the specification plus any equivalents of that structure; in

the absence of structure disclosed in the specification to perform those functions, the claim

limitation would lack specificity, rendering the claim as a whole invalid for indefiniteness under

35 U.S.C. § 112 ¶ 2." *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.,* 521 F.3d 1328,

1331 (Fed. Cir. 2008).

      The structure corresponding to the function in a means-plus-function claim must

be "clearly link[ed] or associate[d] . . . to the function recited in the claim" by the specification or

prosecution history. *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed. Cir. 1997).

Additionally, the corresponding structure disclosed "must . . . show[] what is meant by that

[claim] language. If an applicant fails to set forth an adequate disclosure, the applicant has in

effect failed to particularly point out and distinctly claim the invention as required by [§ 112 ¶

2]." *Noah,* 675 F.3d at 1311–12; *see also Med. Instrumentation & Diagnostics Corp. v. Elekta

AB,* 344 F.3d 1205, 1211 (Fed. Cir. 2003) ("If the specification is not clear as to the structure that

the patentee intends to correspond to the claimed function, then the patentee has not paid that

price but is rather attempting to claim in functional terms unbounded by any reference to

structure in the specification."); *Biomedino,* 490 F.3d at 952 (noting that means-plus-function

claims are indefinite "when there is a total omission of structure") (citations omitted).

      Where a means-plus-function claim limitation is implemented by a computer, the

Federal Circuit "has consistently required that the structure disclosed in the specification be more

than simply a general purpose computer or microprocessor." *Aristocrat,* 521 F.3d at 1333.

Accordingly, the specification must "disclose an algorithm for performing the claimed function."

*Net MoneyIN, Inc. v. VeriSign, Inc.,* 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see also Harris Corp.

v. Ericsson Inc.,* 417 F.3d 1241, 1249 (Fed. Cir. 2005) ("[T]he corresponding structure for a §

112 ¶ 6 claim for a computer-implemented function is [an] algorithm. . . .")

      An algorithm is a set of instructions for a computer system to follow when

executing a particular function. *See, e.g., ePlus, Inc. v. Lawson Software, Inc.,* 700 F.3d 509,

519-20 (Fed. Cir. 2012).  The required algorithm can be expressed in any number of ways, but must provide step-by-step instructions for carrying out the claimed function, rather than just referring in general to the function itself or to the results of the function.  *See, e.g., Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1365 (Fed. Cir. 2012).  If the specification discloses no algorithm for the computer-implemented means to perform the claimed function, then the means-plus-function claim limitation lacks sufficient structure under § 112, ¶ 6 and is indefinite under § 112, ¶ 2.  *Aristocrat*, 521 F.3d at 1337–38.  Where no algorithm has been disclosed, the patentee cannot rely on expert testimony to rectify that failure. *See Default Proof Credit Card Sy*s., 412 F.3d at 1302 ("[T]he testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification.").

## II.  "MEANS FOR PROCESSING," "COMPUTER SYSTEM . . . FOR PROCESSING," AND "MEANS FOR TRANSMITTING" ARE INDEFINITE BECAUSE NO CORRESPONDING ALGORITHMS ARE DISCLOSED

The claims of the '500 and '492 patents use functional language for computer-implemented "processing" and "transmitting" limitations, but do not disclose structure for carrying out those limitations.  These claims should therefore be governed by 35 U.S.C. § 112(f). To avoid indefiniteness, the specification must disclose specific algorithms for "processing a transaction request" and for "transmitting a transaction request from [a] transactional application."  Because the specification fails to do so, the Court should grant Defendants' motion for summary judgment as to claims 1-7 and 35 of the '500 patent and claims 1-8 of the '492 patent.  *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1383-86 (Fed. Cir. 2009) (affirming summary judgment of indefiniteness for 35 claims that included a means-plus-function limitation that was carried out by a computer processor because the specification disclosed no algorithm for carrying out that function); *Aristocrat*, 521 F.3d at 1337-38 (affirming

summary judgment of indefiniteness because no algorithm was disclosed for a computer-implemented "control means").

A.   **The "Means for Processing," "System for Processing," and "Means for Transmitting" Terms Should Be Governed by 35 U.S.C. § 112(f)**

Claims 1-7 and 35 of the '500 patent require a "means for processing a transaction request," and a "means for transmitting a transaction request from [a] transactional application," with no additional recitation of structure for performing these functions in the claims themselves. There can be no dispute that these claims are in means-plus-function format, and that they therefore must satisfy the requirements of 35 U.S.C. § 112(f). *See, e.g., Welker Bearing Co. v. PHD, Inc.*, 550 F.3d 1090, 1096 (Fed. Cir. 2008) (noting that "a patentee's use of the word 'means' in a claim limitation creates a presumption that 35 U.S.C. § 112 paragraph 6 applies").

Claims 1-8 of the '492 patent require a "computer system . . . for processing [a] transaction request in real time," but do not refer directly to a "means." Where a term does not recite the words "means for," there is a rebuttable presumption that § 112(f) does not apply. *Inventio AG v. ThyssenKrupp Elevator Ams. Corp.,* 649 F.3d 1350, 1356 (Fed. Cir. 2011). That "presumption can be overcome if the challenger demonstrates that the claim term fails to recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function." *Id.* at 1356 (internal quotation marks and citations omitted). In fact, the Federal Circuit has held that a number of claim terms other than "means" can be likewise structurally generic, i.e., "a verbal construct that is not recognized as the name of structure and is simply a substitute for the term 'means for.'" *See Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1360 (Fed. Cir. 2004). For example, "[t]he generic terms 'mechanism,' 'means,' 'element,' and 'device,' typically do not connote sufficiently definite structure," and thus are construed in accordance with § 112(f). *Mass. Inst. of Tech. v. Abacus Software*, 462 F.3d

1344, 1353-54 (Fed. Cir. 2006).  Notably, the U.S. Patent Office identified "system for" as a "non-structural term[] that may invoke § 112, ¶ 6" in its *Supplementary Examination Guidelines for Determining Compliance With 35 U.S.C. 112 and for Treatment of Related Issues in Patent Applications,* 76 Fed. Reg. 7162-01, 7167 (Feb. 9, 2011).

While claims 1-8 of the '492 patent do not use the term "means," the "processing" limitation in those claims should, like those of the '500 patent, be governed by § 112(f).  The '500 patent and the '492 patent are related and share a common written description, and both claim 1 of the '500 patent and claim 1 of the '492 patent recite a multi-component system for performing "real time" transactions.  Indeed, the "processing" limitation in the claims of the '492 patent closely tracks that of the '500 patent:

| Claim 1 of '500 patent | Claim 1 of the '492 patent |
|---|---|
| "means for processing said transaction request" | "computer system executing the Back-end transactional application for processing the transaction request in real time" |

As the foregoing side-by-side comparison indicates, the word "means" from the '500 patent has been replaced by the equally generic term "computer system" in the '492 patent.  But this element of the '492 patent retains the same basic structure as claim 1 of the '500 patent, emphasizing that the unspecified "computer system" must be "for processing [a] transaction request."  The substitution of one generic term for another does not provide any meaningful structure for carrying out the claimed processing function.  Thus, although the term "means" does not appear in the '492 patent claims, the functional nature of this limitation requires that it nonetheless comply with 35 U.S.C. § 112(f).  *Mass. Inst. of Tech.*, 462 F.3d at 1353-54 (holding that "colorant selection mechanism for receiving said modified appearance signals" in a scanning device was a means-plus-function limitation); *Widevine Techs., Inc. v. Verimatrix, Inc.*, No. 2–07–cv–321, 2009 WL 3734106, at *14-15 (E.D. Tex. Nov. 4, 2009) (ruling that the phrase "a

first [and a second] device that is operative to perform [certain enumerated] actions" was a means-plus-function limitation and finding that the claim in question was invalid for failing to disclose a corresponding algorithm); *Automotive Techs. Int'l, Inc. v. Delphi Corp.*, No. 08–11048, 2009 WL 2960698, at *12-15 (E.D. Mich. 2009) (ruling that "system for adjusting deployment of said occupant restraint device" was a means-plus-function limitation).

Indeed, a very similar scenario was recently considered by the U.S. District Court for the Northern District of California. *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*, No. C 09-2651 MHP, 2010 WL 2292316, at *11-12 (N.D. Cal. June 7, 2010). In *Soque*, the question was whether the highlighted claim term should be governed by 35 U.S.C. § 112(f):

26. A document-driven system comprising

a document scanner, said scanner including a document sensor, and

a computer, said computer communicating with said document scanner, *said computer displaying, in response to the scanner sensing a document, a plurality of user-selectable options for processing image data from said scanner*, wherein said placement alone is sufficient to initiate display of said options.

*See id.* at *11; *see also* U.S. Patent No. 5,499,108 (filed Mar. 12, 1996) (emphasis added). The *Soque* court determined that although this claim did not expressly recite the term "means," it nonetheless should be treated as "means-plus-function," because it recited "a generic computer [that was] describe[d] . . . purely by its function." *Id.* at *11-12.

As in *Soque*, the claims of the '492 patent recite nothing more than a general purpose computer, which is defined exclusively in terms of its function (processing a specific type of transaction request). The patentee should not be permitted to avoid the disclosure requirements of § 112 by substituting the term "computer system" for the term "means," while retaining the exclusively functional nature of the claim limitation.

**B.**     **The Asserted "Means for Processing," "Computer System . . . for Processing," and "Means for Transmitting" Claims Are Not Supported by an Algorithm and Are Invalid for Indefiniteness**

The specification discloses no algorithm for carrying out either the "processing" or "transmitting" functions claimed in the '500 and '492 patents. None of the asserted claims or any other claim language offers any description of how the required "means" or "system" could complete the "processing" or "transmitting" functions. The remainder of the written description likewise provides no instructions for executing either function—no source code, no narrative description, and no flowchart outlining how to perform the "processing" or "transmitting" functions. This failure means that both the '500 and '492 patents' claims do not satisfy the requirements of § 112(f). *See, e.g.*, *ePlus*, 700 F.3d at 519-20 (holding that a patent claim directed to a "means for processing" was indefinite because the patent included "no instruction for using a particular piece of hardware, employing a specific source code, or following a particular algorithm" to carry out the "processing" step).

Rather than disclosing a set of instructions for executing the claimed functions, the patents-in-suit offer only a generic reference to computer processing, and a description of the "processing" and "transmitting" functions themselves. For instance, the specification names the two then best-known commercially available computers (IBM and Macintosh), as the sorts of computer systems on which "the present invention is implemented," and further identifies two different brands of processors (Intel and Motorola) for those computer systems. ('500 patent, col. 3:46-54; col. 4:5-10) In addition, the specification refers multiple times to "processing instructions," and notes that "the present invention is implemented as a software module, which may be executed on a computer system such as computer system 200 in a conventional manner." (*Id.*, col. 4:23-27, 4:39-39) This sort of generic disclosure, which is not linked to any of the claim limitations at issue, is insufficient. *See, e.g.*, *Net MoneyIN, Inc.*, 545 F.3d at 1367 (noting

13

that "[t]o avoid purely functional claiming in cases involving computer-implemented inventions, we have consistently required that the structure disclosed in the specification be more than simply a general purpose computer or microprocessor"); *see also Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340-41 (Fed. Cir. 2008) ("Simply reciting 'software' without providing some detail about the means to accomplish [the claimed] function is not enough."); *Aristocrat*, 521 F.3d at 1335-36 (affirming indefiniteness of means-plus-function claims requiring a processing step because the only "structure" disclosed to perform that step was a computer with "appropriate programming").

The specification also describes exemplary transaction requests that may be processed, such as when a customer requests that funds be moved from her checking account to her savings account. (*See, e.g.*, '500 patent, col. 7:4-12; *see also* col. 5:16-26.) But there is no example of what sort of instructions a computer would have to execute to carry out such a request. Similarly, the specification describes certain aspects of the processing function—e.g., where an employee's timecard is processed by accessing payroll information, such that "[t]he transaction is thus processed in real-time and the employee receives his paycheck immediately"—but there is no description of how to perform this "real-time" transaction. (*See* '500 patent, col. 7:31-40.) Merely identifying the types of processing *functions* that can be carried out in accordance with the claimed invention does not provide any insight whatsoever into the *structure* that carries out those functions.

The figures of the patents-in-suit likewise do not disclose an algorithm. For example, Fig. 8 is a "flow diagram illustrating one embodiment of the present invention":



Figure 8, however, not only does not identify the "processing" and "transmitting" functions, but

also lacks a description of *how* to carry out the listed steps.  This graphical representation cannot

constitute an algorithm for implementing either of the claimed functions because it is not a step-

by-step series of instructions for executing the claimed *processing* or *transmitting* functions.

*Aristocrat*, 521 F.3d at 1334-35 (rejecting the argument that "figures, tables, and related

discussion" can satisfy the requirements of § 112, ¶ 6 where they are "simply examples of the

results of the operation of an unspecified algorithm").

        Aside from the written description of the patents-in-suit, the prosecution history

offers no algorithm, no narrative description of instructions for carrying out the claimed

functions, and no graphical depiction of how to execute those instructions.  (*See* Exs. D-F)  For

instance, when claim 1 of the '492 patent was added during prosecution on May 9, 2011, the

patent applicant discussed where support could allegedly be found for several claim elements—

but not for the "computer system . . . for processing" limitation.  (*See* Ex. F at 246)  Moreover,

the patent applicant made no reference to any algorithm that could carry out the claimed

processing function, and provided no discussion as to what sort of instructions would have to be executed by the claimed "computer system." (*Id.*)

Any attempt to characterize the specification of the patents-in-suit or the prosecution history as disclosing an algorithm would thus be unavailing. Pi-Net cannot conjure an algorithm from a specification and prosecution history that do not include one—and it cannot use any extrinsic testimony to fill in this gap. *See Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1382 (Fed. Cir. 1999). Nor can Pi-Net rely on what one of ordinary skill would purportedly understand from the patent disclosure when the disclosure lacks a description of structure sufficient to perform the claimed function. *See Blackboard*, 574 F.3d at 1384 -1385 ("The question [of indefiniteness] is whether the specification contains a sufficiently precise description of the 'corresponding structure' to satisfy section 112, paragraph 6, not whether a person of skill in the art could devise some means to carry out the recited function."). Given the lack of an algorithmic structure for performing the claimed "processing" or "transmitting" functions, the Court should find that claims 1-7 and 35 of the '500 patent and claims 1-8 of the '492 patent are indefinite, and are therefore invalid.

## III.    THE CLAIM PHRASES "KEEPING A TRANSACTION FLOW CAPTIVE" AND "ROUTED TRANSACTIONAL DATA STRUCTURE" ARE INDEFINITE

Just as the specification for the patents-in-suit fails to disclose any algorithm or other set of instructions for carrying out the claimed "processing" and "transmitting" functions, so too does the specification and prosecution history fail to define two claim terms: (1) "**keeping a transaction flow captive**" (found in all asserted claims of the '500 patent); and (2) "**routed transactional data structure**" (found in all asserted claims of the '158 patent). Because these terms also lack a generally accepted meaning in the art, they are insolubly ambiguous, and render the claims in which they appear invalid.

A.    **"Keeping A Transaction Flow Captive" Is Not Defined in the Specification Or Prosecution History, and Has No Generally Accepted Meaning in the Art**

All of the asserted claims of the '500 patent require that transaction applications associated with a "means for switching" include "a plurality of transactional services" that are "managed by at least one value-added network service provider." (*See, e.g.*, '500 patent, col. 9:44-51)  According to the claims of the '500 patent, in addition to managing transactional services provided by the transactional application, this "value-added network service provider" is also responsible for "keeping a transaction flow captive." (*Id.*, col. 9:51-53)

The '500 patent offers absolutely no context for how a service provider can "keep" an undefined "transaction flow" in a state of "captivity."  The specification provides no graphical depiction of a "captive" transaction flow, no written description of how a service provider could "keep" a "transaction flow captive," and no example of what would constitute a captive transaction flow.  Indeed, the terms "transaction flow" and "captive" do not appear in the written description or in any figures, and the dependent claims do not clarify the meaning of this phrase.

The prosecution history of the '500 patent is similarly devoid of any definition for or insight into what is meant by "keeping a transaction flow captive."  This phrase was added (along with several other limitations) during prosecution of the '500 patent in response to a rejection that was based on a 1995 journal article written by Davison.  (Ex. D at WXC000001060-62; WXC000001067-68)  The patent applicant argued that Davison disclosed methods of executing an interactive transaction on the Web, in part through the use of a "Common Gateway Interface," or "CGI":

> The CGI application [of Davison] does not allow a user to connect to a variety of services on the Web and to perform real-time transactions on those services nor does it allow the value-added network service provider to keep the transaction flow captive at the network entry point. Instead, the CGI application can only allow a user to interact with a single service.

(*Id.* at WXC000001067-68)  As the foregoing quotation makes clear, the applicant argued that a key point of alleged distinction between prior art systems like the Davison CGI application and the claimed invention "allow[ed] a user to connect to a variety of services," while the CGI application could only "allow a user to interact with a single service."  But that point of distinction says nothing about what it means to "keep the transaction flow captive"—the nature of the transaction flow and how it can be "kept captive" is left entirely unexplained.

Moreover, there is no instance of any applicable technical dictionary or e-commerce publication known to Defendants that offers any insight into what would constitute "keeping a transaction flow captive."[4]  In fact, when internet searches were run using Google for the phrases "keeping a transaction flow captive" and "captive transaction flow," the only results were for citations to the patents-in-suit.  (*See* Ex. O)  It appears that the only time this phrase has ever been used is in the claims of the patents-in-suit.

**B.    "Routed Transactional Data Structure" Is Not Defined in the Specification or Prosecution History, and Has No Generally Accepted Meaning in the Art**

The claim phrase "routed transactional data structure," which appears in all of the asserted claims of the '158 patent, suffers from the same deficiencies as the "keeping a transaction flow captive" limitation.  The asserted claims of the '158 patent are directed generally to a "method for performing a real time Web transaction," in which one of the steps requires

---

[4]    Defendants searched numerous technical dictionaries to try to discern the bounds of what is meant by the phrase "keeping a transaction flow captive," including (1) McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003), attached as Ex. I; (2) Dictionary of Computer Words (rev. 1995), attached as Ex. J; (3) Webster's New World Computer Dictionary (10th ed. 2003), attached as Ex. K; (4) Microsoft Computer Dictionary (5th ed. 2002), attached as Ex. L; (5) Institute of Electrical and Electronics Engineers Dictionary (6th ed. 1998), attached as Ex. M; and (6) Newton's Telecom Dictionary (4th ed. 1998), attached as Ex. N.  None of these dictionaries offers any insight into what constitutes a "transaction flow," or what it means to "keep" such a flow "captive."

"transferring funds from the checking account to the savings account [of a Web user] in real time [by] utilizing *a routed transactional data structure* that is both complete and non-deferred." ('158 patent, col. 9:41-10:15 (emphasis added))

The term "routed transactional data structure" never appears in the written description, is never identified in any figure, and is not discussed in any way.  It is similarly not defined, clarified, or explained in any of the dependent claims of the '158 patent.  A person of skill in the art, having read the patents-in-suit, would have absolutely no guidance as to what the bounds of this "structure" might be, or how such a "structure" might be "utilized" to transfer funds.  As with the "keeping a transaction flow captive" limitation, no relevant extrinsic sources known to Defendants offer any insight into what is meant by the undefined phrase "routed transactional data structure" (*see* Exhibits I through N)—and the only results from a Google search for this term likewise were the patents-in-suit (*see* Exhibit P).

A person of skill in the art attempting to discern the scope of "routed transactional data structure" would find the prosecution history similarly unhelpful.  This phrase was first added to pending claim 72 (which became claim 1 of the '158 patent) on June 7, 2010.  (*See* Exhibit E, Pt. 2 at 525-38)  At no time during the prosecution of the '158 patent (or during the prosecution of any of the patents-in-suit) did the applicant define the phrase "routed transactional data structure," or clarify the scope of this phrase when distinguishing a prior art reference.

C.    **All Asserted Claims of the '500 and '158 Patents Are Invalid Because They Recite "Keeping A Transaction Flow Captive" or "Routed Transactional Data Structure"**

The applicant for the patents-in-suit was entitled to act as her own lexicographer—to define terms that had no generally accepted meaning in the art.  But the applicant here appears to have coined two terms without providing a definition for either of them in the claims, written description, or prosecution history.  Under these circumstances, there is no

19

way for a person of skill in the art to discern the bounds of any claim containing either the "keeping a transaction flow captive" or "routed transactional data structure" limitations. *See, e.g.*, *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1342 (Fed. Cir. 2003) (noting that the definiteness requirement serves a public notice function to ensure that a potential competitor can "determine whether or not he is infringing").

Indeed, when the specification is devoid of any context for a term that is used only in the claims, such that the skilled artisan lacks any guidance as to claim scope, multiple courts have invalidated such claims as indefinite. *See, e.g.*, *Acacia Media Techs. Corp. v. New Destiny Internet Grp.*, 405 F. Supp. 2d 1127, 1132-39 (N.D. Cal. 2005) (finding that "sequence encoder" was a "coined term" that lacked an established definition in the relevant art, and was therefore indefinite because there was no clear statement of the term's meaning in the specification or file history); *Rothschild Trust Holdings, LLC v. Citrix Sys., Inc.*, 491 F. Supp. 2d 1105, 1122-23 (S.D. Fla. 2007) (finding that "full band broadcast signal" was indefinite because that phrase had no accepted meaning to a person of ordinary skill in the relevant art and was not defined in the patent specification). Federal Circuit precedent on this issue is clear—part of the *quid pro quo* for obtaining a patent is that the patentee must clearly define the scope of the invention, by providing sufficient disclosure "in the specification" and prosecution history (and not in response to a summary judgment motion). *See PureChoice, Inc.*, 333 F. App'x at 548. By failing to define the "keeping a transaction flow captive" and "routed transactional data structure" terms, the patent applicant did not keep her end of that bargain.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court declare claims 1-7, 10-12, 14-17, and 35 of the '500 patent, claims 1-6 and 11 of the '158 patent, and claims 1-8 of the '492 patent invalid as indefinite under 35 U.S.C. § 112(b).

Respectfully submitted,

/s/ Robert S. Saunders

Robert S. Saunders (ID No. 3027)

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

One Rodney Square

P.O. Box 636

Wilmington, Delaware  19899

Tel:  (302) 651-3000

Fax:  (302) 651-3001

rob.saunders@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

/s/ David E. Moore

Richard L. Horwitz (ID No. 2246)

David E. Moore (ID No. 3983)

POTTER ANDERSON & CORROON LLP

Hercules Plaza, 6th Floor

1313 N. Market Street

Wilmington, Delaware  19801

Tel.:  (302) 984-6000

rhorwitz@potteranderson.com

dmoore@potteranderson.com

*Attorneys for Defendants Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Citizens Financial Group, Inc.*

Dated:  March 5, 2013

1090788/38945/39024

21