# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 12-280-RGA |
| BANK OF AMERICA, N.A. and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, | ) ) ) | |
| | ) | |
| Defendants-Counterclaimants. | ) | |
| | ) | |
| PI-NET INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-282-RGA |
| | ) | |
| JPMORGAN CHASE & CO., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-355-RGA |
| | ) | |
| CITIZENS FINANCIAL GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANTS' REPLY BRIEF IN FURTHER SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT OF INDEFINITENESS**

| | |
|---|---|
| Robert S. Saunders (ID No. 3027)<br>SKADDEN, ARPS, SLATE, MEAGHER<br>   & FLOM LLP<br>One Rodney Square<br>P.O. Box 636<br>Wilmington, Delaware 19899<br>Tel.: (302) 651-3000<br>rob.saunders@skadden.com<br><br>*Attorneys for Defendant JPMorgan*<br>*Chase & Co.* | Richard L. Horwitz (ID No. 2246)<br>David E. Moore (ID No. 3983)<br>POTTER ANDERSON & CORROON LLP<br>Hercules Plaza, 6th Floor<br>1313 N. Market Street<br>Wilmington, Delaware 19801<br>Tel.: (302) 984-6000<br>rhorwitz@potteranderson.com<br>dmoore@potteranderson.com<br><br>*Attorneys for Defendants Bank of America, N.A.;*<br>*Merrill Lynch, Pierce, Fenner & Smith*<br>*Incorporated; and Citizens Financial Group, Inc.* |

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

I.   "MEANS FOR PROCESSING," "COMPUTER SYSTEM . . . FOR PROCESSING," AND "MEANS FOR TRANSMITTING" ARE INDEFINITE. .............1

   A.   The "Means for Processing," "System . . . for Processing," And "Means for Transmitting" Terms Are Governed By 35 U.S.C. § 112(f). .............................1

   B.   The "Corresponding" Structures That Pi-Net's Expert Identifies Are Computer-Implemented And Require Algorithms To Operate. .............................3

   C.   Pi-Net's Attempts To Avoid The Algorithm Disclosure Requirement Fail. .............5

II.  THE CLAIM PHRASES "KEEPING A TRANSACTION FLOW CAPTIVE" AND "ROUTED TRANSACTIONAL DATA STRUCTURE" ARE INDEFINITE. ......................................................................................................................7

   A.   Dr. Bardash's Definition For "Keeping A Transaction Flow Captive" Is Not Based On The Specification, Prosecution History, Or Relevant Art. ...............7

   B.   Dr. Bardash's Definition For "Routed Transactional Data Structure" Is Not Based On The Specification, Prosecution History, Or Relevant Art. ......................9

CONCLUSION ..............................................................................................................10

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Aristocrat Technologies Australia Pty Ltd. v. International Game Technology*,
  521 F.3d 1328 (Fed. Cir. 2008) ......................................................................................... 3, 4

*Blackboard, Inc. v. Desire2Learn Inc.*,
  574 F.3d 1371 (Fed. Cir. 2009) ............................................................................................... 7

*Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*,
  412 F.3d 1291 (Fed. Cir. 2005) ............................................................................................... 1

*Ergo Licensing, LLC v. CareFusion 303, Inc.*,
  673 F.3d 1361 (Fed. Cir. 2012) ............................................................................................... 6

*Flo Healthcare Solutions, LLC v. Kappos*,
  697 F.3d 1367 (Fed. Cir. 2012) ............................................................................................... 2

*Freeman v. Gerber Products Co.*,
  357 F. Supp. 2d 1290 (D. Kan. 2005) ................................................................................... 10

*Function Media, L.L.C. v. Google Inc.*,
  708 F.3d 1310 (Fed. Cir. 2013) ............................................................................................... 5

*Harris Corp. v. Ericsson Inc.*,
  417 F.3d 1241 (Fed. Cir. 2005) ............................................................................................... 4

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*,
  889 F. Supp. 2d 677 (D.N.J. 2012) ......................................................................................... 4

*In re Katz Interactive Call Processing Patent Litigation*,
  639 F.3d 1303 (Fed. Cir. 2011) ............................................................................................... 6

*LG Electronics, Inc. v. Bizcom Electronics, Inc.*,
  453 F.3d 1364 (Fed. Cir. 2006) ............................................................................................... 2

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
  382 F.3d 1354 (Fed. Cir. 2004) ............................................................................................... 2

*Microsoft Corp. v. Motorola Inc.*,
  No. C10-1823JLR, 2013 WL 454268 (W.D. Wash. Feb. 7, 2013) ......................................... 7

*Omega Engineering, Inc. v. Raytek Corp.*,
  334 F.3d 1314 (Fed. Cir. 2003) ............................................................................................... 9

*Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*,
   No. C 09-2651 MHP, 2010 WL 2292316 (N.D. Cal. June 7, 2010) ...................................3

*United Video Properties, Inc. v. Amazon.com, Inc.*,
   No. 11-003-RGA, 2012 WL 2370318 (D. Del. June 22, 2012)...........................................6

*Via Technologies, Inc. v. Intel Corp.*,
   No. A-01-CA-602-SS, 2003 WL 25810099 (W.D. Tex. Mar. 17, 2003) ...........................3

**STATUTES**

35 U.S.C. § 112(b) ...............................................................................................................1, 10

35 U.S.C. § 112(f)......................................................................................................................2, 3

**OTHER AUTHORITIES**

U.S. Patent No. 5,892,509 (filed Apr. 4, 2004) ............................................................................2

Defendants' motion for summary judgment is based on two straightforward sets of facts: (1) the specification of the patents-in-suit does not disclose an algorithm to execute the "processing" and "transmitting" functions recited in the means-plus-function terms; and (2) the specification and prosecution histories of the patents-in suit fail to define "keeping a transaction flow captive" and "routed transactional data structure," even though they are "coined" terms that lack a commonly understood meaning. Despite the volume of plaintiff Pi-Net's responsive submissions, they fail to create a genuine dispute as to either of the above sets of material facts. *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302 (Fed. Cir. 2005) (affirming summary judgment of indefiniteness and holding that "the testimony of one of ordinary skill in the art cannot supplant the total absence of structure from the specification"). Pi-Net and its expert, Dr. Bardash, concede that the "processing" and "transmitting" functions are computer-implemented, but fail to identify any algorithm for either of these claimed, computer-implemented functions. As for the "coined" terms, Pi-Net attempts to use its expert to do what it should have done in the intrinsic record: define terms that had no plain and ordinary meaning in the relevant art. Pi-Net's *ex post facto* litigation-inspired lexicography is too little and too late to satisfy the requirements of 35 U.S.C. § 112(b). Although Pi-Net's expert purports to rely on the prosecution histories of the patents-in-suit, the definitions that he conjures for the "coined" terms are not based on that intrinsic record, but are instead an improper attempt to fill the intrinsic gaps left by the inventor. As such, Defendants' motion should be granted in its entirety.

I.  **"MEANS FOR PROCESSING," "COMPUTER SYSTEM . . . FOR PROCESSING," AND "MEANS FOR TRANSMITTING" ARE INDEFINITE.**

   A.  **The "Means for Processing," "System . . . for Processing," And "Means for Transmitting" Terms Are Governed By 35 U.S.C. § 112(f).**

   There is no dispute that the "means for processing" and "means for transmitting" terms found in claims 1-7 and 35 of the '500 patent are governed by 35 U.S.C. § 112(f). (D.I. 66,

hereafter "Resp. Br.," at 9-14) The parties' only dispute in this regard is whether the "system . . . for processing" term in claims 1-8 of the '492 patent is also subject to § 112(f). Pi-Net cites two cases involving the mechanical arts to support its argument that § 112(f) should not apply: *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354 (Fed. Cir. 2004) and *Flo Healthcare Solutions, LLC v. Kappos*, 697 F.3d 1367 (Fed. Cir. 2012). (Resp. Br. at 14-15) The patents at issue in those cases, unlike the '492 patent, did not claim processing functions, but instead were directed to mechanical components (a "connector assembly" in the case of *Lighting World* and a "height adjustment mechanism" in the case of *Flo*). Both of those patents included a term that was structurally cognizable: a connector for use in a fluorescent lighting fixtures, and a height adjustor for use in a mobile medical workstation, respectively. *See Lighting World*, 382 F.3d at 1359-63; *Flo*, 697 F.3d at 1373-74. In contrast, the "system" of claims 1-8 of the '492 patent is a black box defined entirely by its function, with no associated hardware or software.

Pi-Net also relies upon *LG Electronics, Inc. v. Bizcom Electronics, Inc.*, 453 F.3d 1364, 1372 (Fed. Cir. 2006), which held that the term "control unit" was not subject to § 112(f). But the limitations at issue in claims 1-8 of the '492 patent are readily distinguishable from those in *LG Electronics*. In that case, the relevant claim recited the structural elements of the "control unit," describing it as "a CPU and a partitioned memory system, wherein the memory system comprises common memory and personal memory." *See* U.S. Patent No. 5,892,509, claim 35. In contrast, the only relevant structure in claims 1-8 of the '492 patent is the generic reference to a "computer system"—the remainder of the claim limitation identifies only what that system *does* (perform "executing" and "processing" steps), not what components make up that system.

Finally, Pi-Net argues that because the structure for performing the "processing" function in the '492 claims is identified as a "computer system," rather than merely as a "means"

2

for performing that step, the '492 patent claims should not be subject to the same disclosure requirements as the analogous claims in the '500 patent. But this argument ignores the fact that, in this context, the term "computer system" discloses no more structure than the term "means." Indeed, Pi-Net's expert never asserts that the term "computer system" connotes any meaningful structural limitations for the '492 patent. *See, e.g.*, *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) (noting that because "general purpose computers can be programmed to perform very different tasks in very different ways, simply disclosing a computer" is inadequate to satisfy § 112(f)). Thus, the Court should follow the approach taken in *Soque Holdings (Bermuda) Ltd. v. Keyscan, Inc.*, No. C 09-2651 MHP, 2010 WL 2292316 (N.D. Cal. June 7, 2010), which recognized that a bare reference to a "'computer' provides no basis to distinguish the structure from any other general purpose computer [and] does not adequately describe a specific structure" that would allow the claim to avoid means-plus-function treatment. *Id.* at *12; *accord Via Techs., Inc. v. Intel Corp.*, No. A-01-CA-602-SS, 2003 WL 25810099, at *2 (W.D. Tex. Mar. 17, 2003) (construing the term "system for generating memory requests" within a processing device as a means-plus-function term).

> **B.** The "Corresponding" Structures That Pi-Net's Expert Identifies Are Computer-Implemented And Require Algorithms To Operate.

The Federal Circuit has established a bright-line default rule that a "'*computer-implemented* means-plus-function term is limited to the [algorithm] disclosed in the specification.'" *Aristocrat*, 521 F.3d at 1333 (emphasis added); *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005) ("[T]he corresponding structure for a § 112 ¶ 6 claim for a *computer-implemented function is [an] algorithm. . . .*" (emphasis added)). Because the above-discussed terms are subject to § 112(f) and are computer-implemented, the specification must disclose algorithms for performing the recited functions to render the claims definite. Yet Pi-Net

does not even attempt to point to algorithms; rather, it improperly conflates the disclosed general-purpose computer with the special-purpose software necessary to perform the claimed functions. That only confirms the need for algorithms.

In a departure from Pi-Net's prior arguments for the "means for processing" and "system . . . for processing" terms, Dr. Bardash contends that several different structures correspond to this function: a "'computer system 200,' connecting to the 'host or data repository 575 in the Bank Back Office," in combination with "Web server 104." (D.I. 66, ex. A, hereafter "Bardash Decl.," at ¶ 22) In so doing, Dr. Bardash concedes that to perform the claimed functions, a general purpose computer requires algorithms that are specific to each bank's particular "back office." (*Id*.) This conclusion is consistent with the specification, which makes clear that although a general-purpose computer (with a processor in it) is necessary to carry out the claimed functions, that alone is not sufficient. Instead, the processor must "retrieve[] processing instructions and data from a data storage medium." ('500 patent, col. 4:24-27; *accord id.*, col. 3:59-65) When it comes to the actual *instructions* needed to carry out that processing function, both the specification and Dr. Bardash are completely silent.[1]

In similar fashion, Pi-Net's expert argues that the corresponding structure for the "transmitting" function in claims 1-7 and 35 of the '500 patent is an "Exchange." (Bardash Decl. at ¶ 8) As discussed in Defendants' Reply Brief in Further Support of Their Motion for Leave, there is no clear link between the "Exchange" and the "transmitting" step in the '500 patent claims. But assuming that there was such a link, the Exchange is indisputably part of a general-

---

[1] Even if Dr. Bardash had argued that one of ordinary skill in the art could come up with an algorithm, that would fail to satisfy § 112(f). *Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 889 F. Supp. 2d 677, 684 (D.N.J. 2012) ("[W]hen a court determines that no algorithm has been disclosed at all, the Court need not consider the parties' expert testimony.").

purpose computer system, and thus requires an algorithm to operate. (*See* '500 patent at col. 6:14-16 (noting that an exchange can reside either on a computer system with a web server, or "reside on a separate computer system that resides on the Internet"); col. 6:47-53 (same)) The Exchange must be programmed to carry out the claimed "transmitting" step, which is achieved through the implementation of "a software module, which may be executed on the [illustrated] computer system **200** in a conventional manner." ('500 patent, col. 4:35-39) Dr. Bardash never disputes this fundamental point—instead, he concedes that the Exchange must be programmed to manage retrieval and sending of information by coordinating between a "webpage and POSvc Application." (Bardash Decl. at ¶¶ 11-15)

Given this concession from Dr. Bardash, this case falls squarely within the most recent Federal Circuit precedent. Indeed, just after Defendants filed their motion for leave, the Federal Circuit considered closely analogous claim language to that found in the '492 and '500 patent claims, and affirmed the district court's summary judgment determination that a claim for a "means for transmitting" was indefinite. *Function Media, L.L.C. v. Google Inc.*, 708 F.3d 1310, 1317-19 (Fed. Cir. 2013). In that case, the patentee argued that a software module called a PGP was the corresponding structure that carried out the claimed "transmitting" function. *Id.* at 1317. But as is case with the patents-in-suit, the patentee in *Google* failed to "disclose[] [an] algorithm by which the [structure] performs the transmission function." *Id.* at 1318-19.

### C. Pi-Net's Attempts To Avoid The Algorithm Disclosure Requirement Fail.

Faced with a specification that lacks an executing algorithm, Pi-Net's only recourse is to try to fit this case into a narrow exception to the default rule, by arguing that no algorithm need be disclosed for these claimed, computer-implemented functions. Pi-Net relies primarily on *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1313-14 (Fed. Cir. 2011). (Resp. Br. at 12-14) But *Katz* has been narrowly circumscribed:

5

> [*Katz*] identified a *narrow exception* to the requirement that an algorithm must be disclosed for a general-purpose computer to satisfy the disclosure requirement: when the function "can be achieved by any general purpose computer without special programming." . . . If special programming is required for a general-purpose computer to perform the corresponding claimed function, then the default rule requiring disclosure of an algorithm applies. It is only *in the rare circumstances* where any general-purpose computer without any special programming can perform the function that an algorithm need not be disclosed.

*Ergo Licensing, LLC v. CareFusion 303, Inc.*, 673 F.3d 1361, 1364-65 (Fed. Cir. 2012) (emphasis added) (citation omitted). So long as the claimed computer-implemented function "*requires more than merely plugging in a general-purpose computer*," then a corresponding algorithm must be disclosed. *Id.* at 1365 (emphasis added).

Dr. Bardash makes clear that merely plugging in a general purpose computer is insufficient to carry out the claimed processing and transmitting steps, because those steps involve a multi-component, computer-implemented Exchange connected between Web servers and "back office" data repositories. (Bardash Decl. at ¶ 15) Unlike displaying an icon (a function that all off-the-shelf computers can perform), Dr. Bardash's own take on the corresponding structure requires special-purpose algorithms to implement. *Cf. United Video Props., Inc. v. Amazon.com, Inc.*, No. 11-003-RGA, 2012 WL 2370318, at *11 (D. Del. June 22, 2012). This case is therefore distinguishable from the narrow and generic functions in *Katz*.

Similarly unavailing is Pi-Net's attempt to overcome the generic nature of the processing and transmitting structure disclosed in the specification by identifying it not as a "computer" alone, but as an "Exchange" or the "'host or data repository 575 in the Bank Back Office," in combination with "Web server 104." (Bardash Decl. at ¶ 22) Analogous attempts by other patentees have been rejected by both district courts and the Federal Circuit. For instance, in *Blackboard, Inc. v. Desire2Learn Inc.*, 574 F.3d 1371 (Fed. Cir. 2009), the Court affirmed a partial summary judgment of indefiniteness for the claim term "means for assigning," where the

6

patentee argued that the corresponding structure was not merely a computer, but rather was "a server computer with an access control manager." *Id.* at 1382. Despite the combination of elements, the claim was still held to be indefinite because "how" the "access control manager" performed the claimed function—*i.e.*, what set of instructions or algorithm would have to be programmed into that server computer—was "left undisclosed." *Id.* at 1383; *accord Microsoft Corp. v. Motorola Inc.*, No. C10-1823JLR, 2013 WL 454268, at *7 (W.D. Wash. Feb. 7, 2013) (granting partial summary judgment of indefiniteness for a "means for decoding" where the patentee's expert failed to identify a "device . . . [that] may perform the patented invention without further programming"). Whether described as a software module, a general purpose processor, a "back-office" system, or an Exchange, there can be no dispute that what Dr. Bardash identifies as corresponding "structures" are incapable of performing the claimed functions absent an algorithm, and therefore the means-plus-function terms discussed above are indefinite.

II. **THE CLAIM PHRASES "KEEPING A TRANSACTION FLOW CAPTIVE" AND "ROUTED TRANSACTIONAL DATA STRUCTURE" ARE INDEFINITE.**

Neither Pi-Net nor Dr. Bardash disputes that the only time that the terms "keeping a transaction flow captive" and "routed transactional data structure" have ever appeared in print is in the claims of the patents-in-suit. And neither Pi-Net nor Dr. Bardash points to any definition for these terms in the patents-in-suit or any extrinsic resource. Instead, Pi-Net argues that these terms should not be found indefinite because: (1) they were added during prosecution after certain claims were rejected over the prior art; and (2) Dr. Bardash purports to have his own definitions for them. Neither of these arguments is sufficient to avoid indefiniteness.

A. **Dr. Bardash's Definition For "Keeping A Transaction Flow Captive" Is Not Based On The Specification, Prosecution History, Or Relevant Art.**

Pi-Net contends, based on Dr. Bardash's report, that during prosecution of the '500 patent the "inventor argued and explained the exact meaning of the [term 'keeping a transaction

7

flow captive']"—namely, that the term should be defined to mean "maintain continuous control (over a real-time Web transaction)." (Resp. Br. at 17; *see also* Bardash Decl. at ¶¶ 35-37) That description bears no resemblance to what occurred during prosecution.

As Defendants noted in their opening brief, the phrase "keeping a transaction flow captive" was first introduced into the claims after a rejection by the PTO based on "Davison," a CGI-based system. (D.I. 59 at 17-18) Dr. Bardash asserts that the patentee introduced the term "as a readily understandable shorthand for maintaining continuous control of a transaction at the network entry point," and cites a lengthy excerpt from the prosecution history. (Bardash Decl. at ¶ 37) But the cited text merely states that, in contrast to Davison, the claimed invention allows a user to interact with multiple services (as opposed to a single customized operation or service, as was purportedly the case in Davison). (D.I. 66, Appendix D at 21-22) It also identifies *where* transaction flow is kept "captive" (at the "network entry point"), but says nothing about what it means to keep that flow captive at that location. Moreover, the passage that Dr. Bardash relies upon says nothing about "continuous control"—it merely draws a contrast between the single-service based functionality of Davison and the multi-service functionality of the claimed invention. That contrast offers no insight into what the term "keeping a transaction flow captive" means, and provides no basis for the definition that Dr. Bardash has suggested. Dr. Bardash also cites to the '500 patent, but none of those citations refers to a "transaction flow," or to maintaining "continuous control" over such a flow. (*See* Bardash Decl. at ¶¶ 36-37)

As is evident from the foregoing discussion, Dr. Bardash did not define the phrase "keeping a transaction flow captive" based upon any intrinsic disclosure, dictionary, or industry publication; instead, he fabricated his own independent definition of the term, which is entirely untethered to the specification or the prosecution history. Dr. Bardash is not interpreting the

8

specification and prosecution history—he is impermissibly rewriting it. *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1332 (Fed. Cir. 2003) (rejecting an expert declaration because it "cannot be used to vary the plain language of the patent document[s]").

> B. **Dr. Bardash's Definition For "Routed Transactional Data Structure" Is Not Based On The Specification, Prosecution History, Or Relevant Art.**

Pi-Net's definition for "routed transactional data structure" suffers from many of the same flaws as its definition of "keeping a transaction flow captive." Significantly, Pi-Net's proposed definition only reshuffles this four-word phrase, parroting back the very words that make up the phrase itself along with a variety of other terms that either do not appear in the patents-in-suit or are themselves undefined:

> "**data structure** with information entries and attributes displayed in a POSvc Application on a Web page from the specific Web application, which is **routed** from the front-end POSvc Application on a Web page over an online service network on the Web to a Back Office **transactional** application or application of a value-added network service provider or Web merchant."

(Resp. Br. at 18 (emphasis added)) Pi-Net cannot retroactively define an undefined term merely by scrambling the words that make up that term. The circular nature of this definition, which finds no support in the intrinsic record, only bolsters Defendants' view that this term is indefinite.

Dr. Bardash argues that the use of the phrase "transactional data structure" in the prosecution history of the '158 Patent renders this term definite. (Bardash Decl. at ¶¶ 41-46) In particular, he contends that "transactional data structure" is synonymous with the term "object." Those references from the prosecution history are insufficient to render the term definite, *because "object" also is undefined*. Dr. Bardash is unable to point to any definition of "object" in the intrinsic record, and Pi-Net's only suggestion as to the meaning of "object" is that it must mean something different from a generic "physical or virtual structure." (Resp. Br. at 18, n.8)

9

Instead, Dr. Bardash attempts to obscure the lack of any definition for "object" or "routed transactional data structure" by adding his own annotations to Fig. 5D and hypothesizing that it depicts the "routing" of a data structure. (Bardash Decl. at ¶¶ 46-47)  As an initial matter, Dr. Bardash does not explain how an understanding of "routing" provides a definition for what constitutes the "data structure."  Moreover, that Dr. Bardash needed to add his own labels and annotations to Fig. 5D only underscores the lack of an actual intrinsic disclosure. *See, e.g.*, *Freeman v. Gerber Prods. Co.*, 357 F. Supp. 2d 1290, 1304 (D. Kan. 2005) (rejecting an attempt "to use the[] expert declarations to vary the intrinsic evidence by importing additional terms that do not accurately depict Figure 2").  In addition, Pi-Net does not point to anything to suggest that a skilled artisan would look to Fig. 5D for a meaning of a "routed transactional data structure" in the first place.  On the contrary, Fig. 5D depicts "a user selecting a bank," and an "operator agent" that "may be activated to ensure the availability of distributed functions and capabilities." ('158 patent, col. 3:20-21; col. 6:63-67)  Neither Fig. 5D nor any other figure of the patents-in-suit is described as depicting a "routed transactional data structure."

Pi-Net apparently hopes that the sheer length of its proposed definition, combined with the imprimatur of a lengthy expert report, will be enough to distract the Court from the undeniable lack of a definition for the term "routed transactional data structure" (or "object") in either the specification or prosecution history.  Pi-Net cannot point to an actual definition for this term anywhere other than in Dr. Bardash's report.  That is inadequate to satisfy § 112(b).

## CONCLUSION

Based on the undisputed facts and law discussed above, Defendants respectfully request that the Court declare claims 1-7, 10-12, 14-17, and 35 of the '500 patent, claims 1-6 and 11 of the '158 patent, and claims 1-8 of the '492 patent invalid as indefinite.

DATED: April 11, 2013                                Respectfully submitted,

| | |
|---|---|
| */s/ Robert S. Saunders* | */s/ David E. Moore* |
| Robert S. Saunders (ID No. 3027) | Richard L. Horwitz (ID No. 2246) |
| SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP | David E. Moore (ID No. 3983) |
| | POTTER ANDERSON & CORROON LLP |
| One Rodney Square | Hercules Plaza, 6th Floor |
| P.O. Box 636 | 1313 N. Market Street |
| Wilmington, Delaware  19899 | Wilmington, Delaware  19801 |
| Tel.:  (302) 651-3000 | Tel.:  (302) 984-6000 |
| rob.saunders@skadden.com | rhorwitz@potteranderson.com |
| | dmoore@potteranderson.com |
| *Attorneys for Defendant JPMorgan Chase & Co.* | |
| | *Attorneys for Defendants Bank of America, N.A.; Merrill Lynch, Pierce, Fenner & Smith Incorporated; and Citizens Financial Group, Inc.* |