**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 12-280-RGA |
| BANK OF AMERICA, N.A. and MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, | ) ) ) | |
| | ) | |
| Defendants-Counterclaimants. | ) | |
| | ) | |
| PI-NET INTERNATIONAL INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-282-RGA |
| | ) | |
| JPMORGAN CHASE & CO., | ) | |
| | ) | |
| Defendant. | ) | |
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-355-RGA |
| | ) | |
| CITIZENS FINANCIAL GROUP, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | |
|---|---|
| PI-NET INTERNATIONAL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CAPITAL ONE FINANCIAL | ) |
| CORPORATION; ING BANK, FSB; | ) |
| CAPITAL ONE, NATIONAL | ) |
| ASSOCIATION; and CAPITAL ONE BANK | ) |
| (USA), NATIONAL ASSOCIATION, | ) |
| | ) |
| Defendants. | ) |
| | ) |

C.A. No. 12-356-RGA

## JOINT CLAIM CONSTRUCTION BRIEF

Robert S. Saunders (DE Bar No. 3027)
SKADDEN, ARPS, SLATE, MEAGHER &
FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com

*Attorneys for Defendant JPMorgan Chase &
Co.*


Matt Neiderman (DE Bar No. 4018)
Benjamin A. Smyth (DE Bar No. 5528)
DUANE MORRIS, LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Tel: 302.657.4900
Fax: 302.657.4901

*Attorneys for Defendants Capital One
Financial Corp., ING Bank, fsb,
Capital One, National Association, &
Capital One Bank (USA), National
Association*

Richard L. Horwitz (DE Bar No. 2246)
David E. Moore (DE Bar No. 3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware  19801
Tel.:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants Bank of America,
N.A.; Merrill Lynch, Pierce, Fenner & Smith
Incorporated & Citizens Financial Group, Inc.*


George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 N. Market St.
Suite 1000
Wilmington, De 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff
Pi-Net International, Inc.*

# TABLE OF CONTENTS

I.   Introduction ...................................................................................................... 1

    A.   Pi-Net's Summary of Argument .................................................................. 1

    B.   Defendants' Summary of Argument ............................................................ 2

II.  Pi-Net's Statement on the Nature and Stage of Proceedings ........................... 3

III. Pi-Net's Statement on the Standard for Indefiniteness ................................... 3

IV.  Pi-Net's Statement on Means-Plus-Function Elements .................................. 5

V.   Agreed-upon Constructions ............................................................................. 8

    A.   Transaction ................................................................................................. 8

    B.   Term 7: "Network" .................................................................................... 8

    C.   Term 36: "Atop" and "On Top" .................................................................. 8

VI.  Disputed Constructions .................................................................................... 8

    A.   Term 1: "Real-time" ................................................................................... 8

        1.   Plaintiff's Opening Position ................................................................ 9

        2.   Defendants' Answering Position ....................................................... 11

        3.   Plaintiff's Reply Position ................................................................. 15

        4.   Defendants' Sur-Reply Position ....................................................... 18

    B.   Term 2: "Exchange" ................................................................................. 21

        1.   Plaintiff's Opening Position .............................................................. 21

        2.   Defendants' Answering Position ....................................................... 23

        3.   Plaintiff's Reply Position ................................................................. 24

        4.   Defendants' Sur-Reply Position ....................................................... 26

    C.   Term 3: "Object Routing" ......................................................................... 26

        1.   Plaintiff's Opening Position .............................................................. 27

        2.   Defendants' Answering Position ....................................................... 29

        3.   Plaintiff's Reply Position ................................................................. 32

        4.   Defendants' Sur-Reply Position ....................................................... 33

    D.   Term 4: "Transactional Services" ............................................................. 34

        1.   Plaintiff's Opening Position .............................................................. 35

        2.   Defendants' Answering Position ....................................................... 35

        3.   Plaintiff's Reply Position ................................................................. 36

        4.   Defendants' Sur-Reply Position ....................................................... 36

E.    Term 5: "Web Transaction[s]".................................................... 36

    1.    Plaintiff's Opening Position............................................ 36

    2.    Defendants' Answering Position ..................................... 37

    3.    Plaintiff's Reply Position .............................................. 38

    4.    Defendants' Sur-Reply Position .................................... 38

F.    Term 6: "Transaction Link"................................................... 38

    1.    Plaintiff's Opening Position............................................ 39

    2.    Defendants' Answering Position ..................................... 39

    3.    Plaintiff's Reply Position .............................................. 40

    4.    Defendants' Sur-Reply Position .................................... 41

G.    Term 8: "Web Application[s]"................................................ 41

    1.    Plaintiff's Opening Position............................................ 41

    2.    Defendants' Answering Position ..................................... 42

    3.    Plaintiff's Reply Position .............................................. 43

    4.    Defendants' Sur-Reply Position .................................... 44

H.    Term 9: "Network Application" ............................................. 45

    1.    Plaintiff's Opening Position............................................ 45

    2.    Defendants' Answering Position ..................................... 46

    3.    Plaintiff's Reply Position .............................................. 47

    4.    Defendants' Sur-Reply Position .................................... 48

I.    Terms 10 and 11: "Virtual Information Store" and "Distributed On-line Service Information Bases" ....................................................... 48

    1.    Plaintiff's Opening Position............................................ 49

    2.    Defendants' Answering Position  Updated Proposed Construction: Data storage mediums accessed by the TransWeb Management Protocol and containing data structures identified by unique IP addresses. ................................................................. 50

    3.    Plaintiff's Reply Position .............................................. 52

    4.    Defendants' Sur-Reply Position .................................... 52

J.    Terms 12-15: "Means for Transmitting a Transaction Request from Said Transactional Application," "Means for Processing Said Transaction Request," "Computer System Executing the Back-end Transactional Application for Processing the Transaction Request in Real-time," and "Keeping a Transaction Flow Captive" ............................................. 54

    1.    Plaintiff's Opening Position............................................ 54

       2.      Defendants' Answering Position ...................................................... 54

K.    Term 16: "A Routed Transactional Data Structure That is Both Complete and Non-deferred, in Addition to Being Specific to the Point-of-Service Application"........................................................................................... 54

       1.      Plaintiff's Opening Position........................................................... 55

       2.      Defendants' Answering Position ...................................................... 55

       3.      Plaintiff's Reply Position................................................................ 57

       4.      Defendants' Sur-Reply Position ...................................................... 61

L.    Term 17: "Point of Service Application"............................................. 63

       1.      Plaintiff's Opening Position........................................................... 63

       2.      Defendants' Answering Position ...................................................... 66

       3.      Plaintiff's Reply Position................................................................ 69

       4.      Defendants' Sur-Reply Position ...................................................... 75

M.    Term 18: "Transactional Application" and "Back-End Transactional Applications" ................................................................................... 78

       1.      Plaintiff's Opening Position........................................................... 78

       2.      Defendants' Answering Position ...................................................... 79

       3.      Plaintiff's Reply Position................................................................ 83

       4.      Defendants' Sur-Reply Position ...................................................... 84

N.    Term 19: "The Selected Back-end Transactional Application" ......................... 88

       1.      Plaintiff's Opening Position........................................................... 88

       2.      Defendants' Answering Position ...................................................... 88

       3.      Plaintiff's Reply Position................................................................ 89

       4.      Defendants' Sur-Reply Position ...................................................... 89

O.    Term 20: "Service Network" ............................................................ 90

       1.      Plaintiff's Opening Position........................................................... 90

       2.      Defendants' Answering Position ...................................................... 90

       3.      Plaintiff's Reply Position................................................................ 92

       4.      Defendants' Sur-Reply Position ...................................................... 93

P.    Term 21: "Value-added Network (VAN) Switch" ................................... 94

       1.      Plaintiff's Opening Position........................................................... 94

       2.      Defendants' Answering Position ...................................................... 96

       3.      Plaintiff's Reply Position................................................................ 98

　　　　4.　　　Defendants' Sur-Reply Position ...................................................... 100

Q.　　Term 22: "Switching" ............................................................................. 100

　　　　1.　　　Plaintiff's Opening Position ........................................................... 101

　　　　2.　　　Defendants' Answering Position ................................................... 101

　　　　3.　　　Plaintiff's Reply Position ............................................................. 102

　　　　4.　　　Defendants' Sur-Reply Position ................................................... 104

R.　　Term 23: "Management Agent" .............................................................. 104

　　　　1.　　　Plaintiff's Opening Position ........................................................... 104

　　　　2.　　　Defendants' Answering Position ................................................... 105

　　　　3.　　　Plaintiff's Reply Position ............................................................. 106

　　　　4.　　　Defendants' Sur-Reply Position ................................................... 107

S.　　Term 24: "Value-added Network Service Provider" ............................. 107

　　　　1.　　　Plaintiff's Opening Position ........................................................... 107

　　　　2.　　　Defendants' Answering Position ................................................... 108

　　　　3.　　　Plaintiff's Reply Position ............................................................. 109

　　　　4.　　　Defendants' Sur-Reply Position ................................................... 110

T.　　Term 25: "Value-added Network System" ............................................ 111

　　　　1.　　　Plaintiff's Opening Position ........................................................... 111

　　　　2.　　　Defendants' Answering Position ................................................... 111

　　　　3.　　　Plaintiff's Reply Position ............................................................. 111

U.　　Term 26: "Said User Application" ......................................................... 112

　　　　1.　　　Plaintiff's Opening Position ........................................................... 112

　　　　2.　　　Defendants' Answering Position ................................................... 112

　　　　3.　　　Plaintiff's Reply Position ............................................................. 113

　　　　4.　　　Defendants' Sur-Reply Position ................................................... 114

V.　　Terms 27-35 .......................................................................................... 114

　　　　1.　　　Defendants' Answering Position ................................................... 114

　　　　2.　　　Plaintiff's Reply Position ............................................................. 115

　　　　3.　　　Defendants' Sur-Reply Position ................................................... 116

W.　　Term 27: "Means for Switching to a Transactional Application in
　　　　Response to a User Specification from a Network Application" ..................... 117

　　　　1.　　　Plaintiff's Opening Position ........................................................... 117

　　　　2.　　　Defendants' Answering Position ................................................... 117

3.      Plaintiff's Reply Position .................................................... 118

4.      Defendants' Sur-Reply Position ........................................ 118

X.      Term 28: "Means for Receiving Said User Specification" .............................. 119

1.      Plaintiff's Opening Position................................................ 119

2.      Defendants' Answering Position ........................................ 119

Y.      Term 29: "Means for Enabling a Switch to Said Transactional
        Application" ........................................................................... 120

1.      Plaintiff's Opening Position................................................ 120

2.      Defendants' Answering Position ........................................ 120

3.      Plaintiff's Reply Position.................................................... 121

4.      Defendants' Sur-Reply Position ........................................ 121

Z.      Term 30: "Means for Activating Said Transactional Application" .................. 122

1.      Plaintiff's Opening Position................................................ 122

2.      Defendants' Answering Position ........................................ 122

3.      Plaintiff's Reply Position.................................................... 123

4.      Defendants' Sur-Reply Position ........................................ 123

AA.     Terms 31-32: "Means for Creating a Transaction Link Between Said
        Network Application and Said Transactional Application" and "Means for
        Activating an Agent to Create a Transaction Link Between Said User
        Application and Said Transactional Application" ........................................... 124

1.      Plaintiff's Opening Position................................................ 124

2.      Defendants' Answering Position ........................................ 127

3.      Plaintiff's Reply Position.................................................... 128

4.      Defendants' Sur-Reply Position ........................................ 129

BB.     Term 33: "Means for Presenting Said User With a List of Transactional
        Applications" ........................................................................ 130

1.      Plaintiff's Opening Position................................................ 130

2.      Defendants' Answering Position ........................................ 130

3.      Plaintiff's Reply Position.................................................... 130

4.      Defendants' Sur-Reply Position ........................................ 131

CC.     Term 34: "Means for Submitting Said User Specification According to a
        User's Selection of Said Transactional Application from Said List of
        Transactional Applications".................................................................. 131

1.      Plaintiff's Opening Position................................................ 132

2.      Defendants' Answering Position ........................................ 132

3.      Plaintiff's Reply Position ...................................................................... 133

4.      Defendants' Sur-Reply Position ........................................................... 133

DD.     Term 35: "Means for Coupling Said Means for Transmitting to a Host
        Means" ................................................................................................... 133

1.      Plaintiff's Opening Position................................................................... 134

2.      Defendants' Answering Position ........................................................... 134

3.      Plaintiff's Reply Position ...................................................................... 134

4.      Defendants' Sur-Reply Position ........................................................... 135

## <u>TABLE OF AUTHORITIES</u>

**Page**

<small>**CASES**</small>

*Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*,
　521 F.3d 1328 (Fed. Cir. 2008).................................................................114

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
　672 F.3d .........................................................................................57, 91

*B. Braun Med., Inc. v. Abbott Labs.*,
　124 F.3d 1419 (Fed. Cir. 1997).................................................................115

*Chimie v. PPG Industries, Inc.*,
　402 F.3d 1371 (Fed. Cir. 2005)..................................................................12

*Computer Docking Station Corp. v. Dell, Inc.*,
　519 F.3d 1366 (2008).....................................................................11, 12, 30

*Datamize, LLC v. Plumtree Software, Inc.*,
　417 F.3d 1342 (Fed. Cir. 2005)........................................................... passim

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ....................79

*Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*,
　616 F.3d 1357 (Fed. Cir. 2010)........................................................37, 39, 67, 81

*Halliburton Energy Servs., Inc. v. MI LLC*,
　514 F.3d 1244 (Fed. Cir. 2008)........................................................24, 67, 81, 112

*Harris Corp. v. Ericsson Inc.*,
　417 F.3d 1241 (Fed. Cir. 2005).................................................................114

*i4i Ltd. P'ship v. Microsoft Corp.*,
　598 F.3d 831 (Fed. Cir. 2010)...................................................................23

*In re Hyatt*,
　708 F.2d 712 (Fed. Cir. 1983)...................................................................39

*Intel Corp. v. United States ITC*,
　946 F.2d 821 (Fed. Cir. 1991)...................................................................40

*IPXL Holdings, LLC v. Amazon.com, Inc.*,
　430 F.3d 1377 (Fed. Cir. 2005).................................................................108

*K-2 Corp. v. Salomon SA*,
  191 F.3d 1356 (Fed. Cir. 1999)......................................................................35, 68, 82

*Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*,
  No. 10-CV-487-RGA-CJB, 2012 WL 3201701 (D. Del. Aug. 3, 2012) ................................30

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003)..............................................................................115

*Microsoft Corp. v. Multi-Tech Sys., Inc.*,
  357 F.3d 1340 (Fed. Cir. 2004)................................................................................14

*Net MoneyIN, Inc. v. VeriSign, Inc.*,
  545 F.3d 1359 (Fed. Cir. 2008)..............................................................................114

*Novo Indus., LP v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003)..............................................................................113

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)................................................................................11

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) (en banc)........................................................38, 105, 108

*Renishaw PLC v. Marposs Societa Per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998)......................................................................35, 42, 46

*Respironics, Inc. v. Invacare Corp.*,
  303 F. App'x 865 (Fed. Cir. 2008) ............................................................................30

*Telemac Cellular Corp. v. Topp Telecom, Inc.*,
  247 F.3d 1316 (Fed. Cir. 2001)........................................................................40, 102

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
  503 F.3d 1295 (Fed. Cir. 2007)................................................................................14

*Wi-Lan Inc. v. Acer, Inc.*,
  No. 07-CV-473 TJW, 2010 WL 3766551 (E.D. Tex. Sept. 20, 2010) ...................................50

## STATUTES

35 U.S.C. § 112(d) ................................................................................................90

I.   **INTRODUCTION**

A.   **Pi-Net's Summary of Argument**

The patents in suit reflect a pioneering invention that foreshadowed the current

transactional capabilities over the internet.  Not everything in the patents was new of course,

because, like any other invention in the information technology art, the invention involved

known technologies and techniques coupled with new protocols and other technologies.

Writing on such a novel slate, the inventor had to introduce new terms to explain and define

the invention.   One such newly-introduced term was "Web application" – a term now

commonly used but apparently used for the first time in Plaintiff's original application.  These

terms found their way into the claims, and now form the basis for Defendants' main argument

that almost every term of the patents-in- suit is insolubly ambiguous, and, therefore, that every

claim in suit is invalid for indefiniteness.

Although Defendants ask the Court to hold every claim of all three patents is suit

invalid for indefiniteness, Defendants have not followed any of the expected procedures or

provided the normally-expected support for a Court to summarily hold patent claims

invalid for indefiniteness.   Defendants still must carry their burden of proof by clear

and  convincing evidence, but, yet, Defendants have not served or filed a declaration of any

expert or otherwise supported their request that the Court summarily the dismiss the case by

holding almost every claim term to be insolubly ambiguous.  We have only Defendants'

counsels' argument.

That argument by Defendants is not only unsupported, but, as will be shown

below,  is erroneous on the facts and the law.  As will be detailed below, Defendants have

invoked phrases from prosecution histories completely of context, and have attempted to

extended certain limited Federal Circuit pronouncements far beyond what the Court did or suggested, and in contravention of basic rules of claim construction.

Defendants' unprecedented efforts at a quick summary judgment without following the procedures of Rule 56 fail. The patent claims do hold together and do so well, as shown below.

### B.    Defendants' Summary of Argument

Faced with clear evidence of its patents' fatal flaws, Pi-Net predictably attempts to rewrite the claims in a last-ditch effort to save itself from non-infringement and indefiniteness defenses.  Pi-Net's proposed constructions not only violate bedrock principles of claim construction but also conflict with, and are often precluded by, the intrinsic record.  Indeed, Pi-Net's circular and illogical constructions highlight the fundamental problem with the asserted patents—they do not disclose a discernible invention.  Thus, both courts and potential infringers are left with the impossible task of creating something out of nothing to attempt to determine the bounds of Pi-Net's right to exclude.  This is not simply a case where the claim terms lack definitional support in the specification: the Patents-in-Suit suffer from a dearth of disclosure, internal inconsistencies, and insoluble ambiguity.  Thus, the claims simply *cannot be interpreted* in any logical manner in light of the intrinsic record.

Defendants recognize that there are a significant number of terms at issue.  There are a few key terms, however, that permeate all three patents, and the resolution of those disputed terms may streamline the entire case.  For example:

- If the Court adopts Defendants' argument that the terms "transactional application" (Term 17), "routed transactional data structure" (Term 16), and "VAN switch" (Term 21), are indefinite, all asserted claims are invalid;

2

- If the Court adopts Defendants' proposed construction of "real-time" (Term 1),  Pi-Net concedes that Defendants cannot be found to infringe the Patents-in-Suit; and

- If the Court grants Defendants' Motion for Partial Summary Judgment of Indefiniteness (D.I. 54), 29 of the 32 asserted claims are invalid.

Indeed, Pi-Net recognizes this and struggles now to piece together an ex-post-facto explanation for the patents' deficiencies.  The result is an improper, and largely illogical, redrafting of claims that this Court cannot endorse.

## II.  PI-NET'S STATEMENT ON THE NATURE AND STAGE OF PROCEEDINGS

Pursuant to Paragraph 11 of the Court's July 17, 2012 Scheduling Order, as amended December 11, 2012, Plaintiff Pi-Net International, Inc. ("Pi-Net") hereby submits its Opening Claim Construction for the asserted claims of the three patents-in-suit –U.S. Patent No. 5,987,500 ("the '500 patent"), U.S. Patent No. 8,037,158 ("the '158 patent"), and U.S. Patent No. 8,108,492 ("the '492 patent").

Plaintiff refers to the parties' Joint Claim Construction Chart, which sets forth the proposed constructions and citations to the intrinsic record. (DI 65)[1]

## III.  PI-NET'S STATEMENT ON THE STANDARD FOR INDEFINITENESS

Defendants object to a many claim terms on the grounds that the terms are indefinite. The law is that only "insolubly ambiguous" claim limitations are indefinite, and any claim limitation which can be construed is not indefinite as a matter of law.  *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 458 Fed. Appx. 910, 917 (Fed. Cir. 2012).  Indefiniteness is difficult to establish, and mere difficulty in construction is not enough:

---

[1]  To avoid confusing the record with multiple Docket Index citations, Plaintiff here cites only the Docket Index for the first named-case, *Pi-Net International, Inc. v. Bank Of America, N.A. et al*, C.A. No. 12-280-RGA.  Other than the docket number, the papers in all the cases are identical.

> The definiteness requirement … does not compel absolute clarity.
> Only claims "not amenable to construction" or "insolubly
> ambiguous" are indefinite.  Thus, the definiteness of claim terms
> depends on whether those terms can be given any reasonable
> meaning.  Furthermore, a difficult issue of claim construction does
> not *ipso facto* result in a holding of indefiniteness.  "If the meaning
> of the claim is discernible, even though the task may be formidable
> and the conclusion may be one over which reasonable persons will
> disagree, we have held the claim sufficiently clear to avoid
> invalidity on indefiniteness grounds." … "By finding claims
> indefinite only if reasonable efforts at claim construction prove
> futile, we accord respect to the statutory presumption of validity
> and we protect the inventive contribution of patentees, even when
> the drafting of their patents has been less than ideal." ….

*Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347-1348 (Fed. Cir. 2005) (holding

the term "aesthetically pleasing" to be too subjective to be definite).   In the most recent

"indefiniteness" decision, the Federal Circuit reversed judgment of indefiniteness, holding that:

> [Definiteness] does not require "absolute clarity" or precision in
> claim language; this court has ruled that claims are not invalid for
> indefiniteness unless they are "not amenable to construction' or
> 'insolubly ambiguous.'"  Overcoming the presumption of patent
> validity, therefore, demands clear and convincing evidence that "a
> skilled artisan could not discern the boundaries of the claim."

*Accentra, Inc. v. Staples, Inc.*, 2013 U.S. App. LEXIS 225 (Fed. Cir. 2013) (internal citations

omitted).[2]

---

[2]  See also, *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1359 (Fed. Cir. 2012) ("A
claim is invalid as indefinite only where it is 'not amenable to construction' or is 'insolubly
ambiguous.'"); *IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1119 (Fed. Cir. 2011) ("A claim
is only indefinite if it is 'not amenable to construction or [is] insolubly ambiguous.'");  *Star Sci.,
Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1373 (Fed. Cir. 2011) ("This court only finds
claims 'not amenable to construction' or 'insolubly ambiguous' to be indefinite.  Thus, a
construed claim can be indefinite if the construction remains insolubly ambiguous, meaning it
fails to provide sufficient clarity about the bounds of the claim to one skilled in the art. Absolute
clarity is not required to find a claim term definite.  This court has held that a claim term may be
definite even when discerning the meaning is a "formidable [task] and the conclusion may be
one over which reasonable persons will disagree."); *Haemonetics Corp. v. Baxter Healthcare
Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010) ("A claim is not indefinite merely because parties
disagree concerning its construction.  An accused infringer must thus demonstrate by clear and
convincing evidence that one of ordinary skill in the relevant art could not discern the boundaries

Drawings alone may provide a written description. *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1366-67 (Fed. Cir.2009); *In re Dossel*, 115 F.3d 942, 946 n. 3 (Fed. Cir.1997); *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1565 (Fed.Cir.1991) ("[U]nder proper circumstances, drawings alone may provide a 'written description' of an invention as required by §112.").

## IV.   PI-NET'S STATEMENT ON MEANS-PLUS-FUNCTION ELEMENTS

Claim that are written in the "means-plus-function" format are governed by 35 U.S.C. §112(f).  Such claims can be held indefinite if the specification does not disclose any structure corresponding to the "means" limitation.

Here, the '500 Patent discloses the structure for the means-plus-function elements.  This case is not one where there is no structure.  Therefore, *Aristocrat Techs. Australia Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1335-36 (Fed. Cir. 2008) is irrelevant, because no structure was disclosed in the patent involved in that case, but structures are disclosed here.

The necessary structure or algorithm in a means-plus-function claim can be expressed in many different ways.  Thus, in one leading case, *Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F.3d 1376, 1384-1386 (Fed. Cir. 2011), the Court reversed a district court's ruling of indefiniteness of the computer-implemented "means for cross-referencing," holding that §112

---

(continued…)

of the claim based on the claim language, the specification, the prosecution history, and the knowledge in the relevant art."); *Energizer Holdings, Inc. v. ITC*, 275 Fed. Appx. 969, 975 (Fed. Cir. 2008) ("whether a claim meets the definiteness requirement of section §112 ¶2 turns on a determination as to whether the claim can be construed."); *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1376 (Fed. Cir. 2008) ("a claim that is amenable to construction is not invalid on the ground of indefiniteness if the construction renders the claim definite.").

5

does not require that computer code be included in the specification, and a statement of a four-step process for cross-referencing was sufficient.  The Court explained:

> Precedent and practice permit a patentee to express that procedural algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."  In *Finisar* the court explained that the patent need only disclose sufficient structure for a person of skill in the field to provide an operative software program for the specified function.  "The amount of detail required to be included in claims depends on the particular invention and the prior art."  In turn, the amount of detail that must be included in the specification depends on the subject matter that is described and its role in the invention as a whole, in view of the existing knowledge in the field of the invention.

(659 F.3d at 1385; internal citations omitted).  The Court held that the "four-step process for cross-referencing" disclosed in the patent was sufficient, because the steps could be "implemented by persons of skill in computer programming." (659 F.3d at 1386)

In addition to written disclosure, the Figures of the patent can provide the structure, and tie the "means" limitation and the disclosure.  *Aerotel, Ltd. v. Telco Group, Inc.*, 433 Fed. Appx. 903, 919-920 (Fed. Cir. 2011) ("We find that, based on Figure 3 and the corresponding description in the specification, a person of ordinary skill in this field would know that the "regular telephone system" performs the coupling function.  At a minimum, Telco did not meet its burden of showing by clear and convincing evidence that a person of ordinary skill in the art would be unable to identify the disclosed structure, which is, standing alone, sufficient to warrant reversal of the district court's construction."); *In re Beigel*, 7 Fed. Appx. 959, 963 (Fed. Cir. 2001) ("A proper means-plus-function analysis would compare the structure described in either Figure 6 or Figure 7 to the structure described in Chatelot, to determine if Chatelot discloses identical or equivalent structure.")

Further, a "structure" does not require detailed descriptions or information known to one skilled in the art. *AllVoice Computing PLC v. Nuance Communications, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007) (holding that "[i]n software cases … algorithms in the specification need only disclose adequate defining structure to render the bounds of the claim understandable to one of ordinary skill in the art"); *Linear Technology Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1322 (Fed.Cir. 2004) ("Although the expression 'PWM circuit' does not reference a specific circuit structure, persons of skill in the art would understand that 'PWM circuit' references a discrete class of circuit structures that perform known functions.  That the disputed term is not limited to a single structure does not disqualify it as a corresponding structure, as long as the class of structures is identifiable by a person of ordinary skill in the art."); *S3, Inc. v. nVIDIA Corp.*, 259 F.3d 1364, 1370-71 (Fed.Cir. 2001) (holding "selector" adequately disclosed as corresponding structure for the "means ... for selectively receiving," although the electronic structure of the sensor and the details of its operation were not described); *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1382 (Fed.Cir. 2001) (holding "status sensing means" properly defined by a block diagram that included a box labeled "vacuum sensor" because the specification described vacuum sensor as a "commercially available unit" that would have been understood by a person ordinarily skilled in the art to disclose structure capable of performing the recited function).

Indeed, in some cases, the necessary structure may be so obvious, that a description of the structure can be omitted entirely.  Thus, in *HTC Corp. v. IPCom GmbH & Co.*, 667 F.3d 1270 (Fed. Cir. 2012), the Court held:

> The district court concluded that the structure corresponding to the "arrangement for reactivating" limitation was "a processor connected to a transceiver and programmed to formulate and send messages to reactivate the link, if the handover is unsuccessful."

> Although the specification does not literally disclose a processor
> and transceiver, the district court stated that it had "no doubt that
> one skilled in the art would immediately deduce that a processor
> with a transceiver was the structure indicated by the term." On this
> point, we agree with the district court. … Although the
> specification here does not literally disclose a processor and
> transceiver, a person skilled in the art would understand that the
> mobile device would have to contain a processor and transceiver.

(667 F.3d at 1278-1279).

"Whether a specification adequately sets forth structure corresponding to a claimed

function is viewed from the perspective of one skilled in the art." *HTC Corp. v. IPCom GmbH*

*& Co.*, 667 F.3d 1270, 1279 (Fed. Cir. 2012).

## V. AGREED-UPON CONSTRUCTIONS

### A. Transaction

The parties agree that "transaction" should be construed as "any type of commercial or

other type of interaction that a user may want to perform."

### B. Term 7: "Network"

The parties agree that this term should not be construed by itself and that it should be

construed only as part of the other terms including the word "network."

### C. Term 36: "Atop" and "On Top"

The parties agree that these terms should have their plain and ordinary meaning.

## VI. DISPUTED CONSTRUCTIONS

### A. Term 1: "Real-time"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Plain and ordinary meaning. | "in a non-deferred manner, without assembling, disassembling, formatting, or reformatting the transaction information" |

### 1.    Plaintiff's Opening Position

The term needs no construction, because the Patents use the term in context of its plain and ordinary meaning.  The Patents consistently use the term "real-time" from the perspective of the user – that is, transactions are completed in real-time as perceived by the user.  See, for example, the following statements in the Patents:

> A true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services.  For example, although user 100 can browse car dealer Web page 105 today, the user cannot purchase the car, negotiate a car loan or perform other types of real-time, two-way transactions that he can perform with a live salesperson at the car dealership.  Ideally, user 100 in FIG. 1A would be able to access car dealer Web page 105, select specific transactions that he desires to perform, such as purchase a car, and perform the purchase in real-time, with two-way interaction capabilities. ***

> It is therefore an object of the present invention to provide a method and apparatus for providing real-time, two-way transactional capabilities on the Web.  Specifically, one embodiment of the present invention discloses a configurable value-added network switch for enabling real-time transactions on the World Wide Web. ***

> According to one embodiment of the present invention, as illustrated in FIG. 4B, each merchant that desires to be a Web merchant can provide real-time transactional capabilities to users who desire to access the merchants' services via the Web. ***

> Having accessed Web server 104, user 100 can decide that he desires to perform real-time transactions. When Web server 104 receives user 100's indication that he desires to perform real-time transactions, the request is handed over to an exchange component. ***

> Each Web merchant may choose the types of services that it would like to offer its clients. In this example, if Bank decided to include in their POSvc application access to checking and savings accounts, user 100 will be able to perform real-time transactions against his checking and savings accounts. Thus, if user 100 moves $500 from his checking account into his savings account, the

> transaction will be performed in <u>real-time</u>, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user 100 now has the capability to do more than browse his bank account. The ability to perform these types of robust, <u>real-time</u> transactions from a Web client is a significant aspect of the present invention.

The last quote is particularly instructive, because it points that "real-time" is akin to or "in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine." (App. C, '492 Patent at 7:17-19)   These descriptions are consistent with the ordinary meaning of the term "real-time."

Defendants' proposed definition is untenable, except Plaintiff agrees that "real time" by definition is "non-deferred."   Otherwise, Defendants' proposed construction finds no support in the specification, and distorts the prosecution histories cited in support.   Defendants apparently rely on the prosecution history of an application that (1) did not involve any of the Patents; and (2) occurred after the Patent here in issue had issued.   Even if the prosecutions were relevant, which they are not, they do not support Defendants' construction.   In the prosecutions cited by Defendants, the inventor distinguished CGI prior art by the fact that CGI "strips <u>field-by-field from a Web form</u> <u>and sends it as standard I/O to the application</u> that is local to the Back-End, and that must assemble/disassemble the information again." (Appendix E at 188).   Defendants' proposed construction does not address this CGI issue.   Instead, Defendants propose a construction totally out of context of the prosecution histories and CGI, which could be mis-construed to eliminate any internet traffic.   This could be the result, because the Internet has always packetized data which is formatted into HTTP envelopes and is re-assembled at the other end.   The inventor distinguished CGI scripts, and did not concede that no one could ever practice the invention.

### 2.      Defendants' Answering Position

Pi-Net's construction of "real-time" must fail, not only because "real-time" has no

ordinary meaning that clearly applies to its use in the asserted claims, but also because Pi-Net

narrowed the definition during prosecution to overcome otherwise invalidating the prior art.[3]

*See* App. E, '158 Patent Prosecution History Excerpts at 188; App. H, '894 Patent Prosecution

History Excerpts at 21.  Pi-Net must be held to that definition now.  *See Computer Docking*

*Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1374-75 (2008) ("The doctrine of prosecution

disclaimer protects the public's reliance on definitive statements made during prosecution by

precluding patentees from recapturing through claim interpretation specific meanings [clearly

and unmistakably] disclaimed during prosecution.").  By asserting ordinary meaning, Pi-Net

attempts to preserve ambiguity as to the meaning of "real-time" that leaves a would-be juror to

wonder whether "real-time" indicates the speed at which a transactions takes place, the manner

in which a transactions takes place, or even the timeframe in which a transaction takes place.

### (a)      Real-time Has No Ordinary Meaning and Must Be Construed.

Pi-Net's request to leave the term "real-time" with its "ordinary meaning" is improper

because its own brief demonstrates that the term has more than one "ordinary meaning."  In this

situation, the term must be construed in the context of the Patents-in-Suit.  *See O2 Micro Int'l*

*Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360-61 (Fed. Cir. 2008) ("'[P]lain and

ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning.").

Pi-Net's assertion that "transactions are completed in real-time *as perceived by the user*"

---

[3] The asserted claims in the Patents-in-Suit recite systems and methods for two-way transactions over a network.  Every asserted independent claim includes a limitation requiring that the claimed system or method performs these transactions in "real-time."  *See, e.g.*, '500 patent, claims 1, 10, 35 ("transactional services being performed interactively and in real time"); '158 patent, claim 1 ("a method for performing a real time Web transactions"); '492 patent, claims 1, 10, 12 ("real-time Web transactions").

highlights this fact.  That the scope of a claim could vary based on perceptions of different audiences flies in the face of a basic tenet of claim construction—courts construe claim terms "to assign a fixed, unambiguous, legally operative meaning to the claim." *Chimie v. PPG Industries, Inc.*, 402 F.3d 1371, 1377 (Fed. Cir. 2005).

Moreover, Pi-Net's reliance on the *example* from the common specification of a user transferring $500 from his checking into his savings account "in real-time, in the same manner the transactions would have been performed by a live teller at the bank or an ATM machine" is unpersuasive.  A contextual analysis reveals that this "in the same manner . . ." clause is not meant to define "real-time."  To be consistent with the rest of the common specification, "in the same manner the transactions would have been performed by a live teller at the bank or an ATM machine" must modify and further describe "the transaction," and cannot be definition of "real-time."  '492 patent at 7:15-19.  If this clause were to define "real-time" in the context of the asserted claims, then Pi-Net's own admission that "real-time" is "by definition" non-deferred would be untenable.  The common specification explains that transactions are "deferred" when "the consumer's request is not processed" at the time of the request.  '492 patent at 1:44-47.  Many banking transactions done through a live teller or an ATM are processed later in time from the customer's presence (for example, depositing of a check).  Pi-Net's proposal is thus inconsistent with the claim language and at odds with the written description.

### (b)      Pi-Net Has Disavowed a Broad Construction of "Real-time."

Pi-Net clearly disavowed a broad scope of the term "real-time" during prosecution of the Patents-in-Suit and in the prosecution of other patents sharing the same common specification.  It must now be held to its disavowal.  *Computer Docking Station Corp*, 519 F.3d at 1374-75.  Indeed, the patentee relied on its version of "real-time" functionality to distinguish its claims from the prior art.  *See, e.g.*, '492 patent at 1:25-32; 2:31-33.  Here, both the common

specification and the prosecution history specifically narrow the definition of "real-time" in an attempt to distinguish the present invention from invalidating prior art.  The Patents-in-Suit make clear that Pi-Net did not invent the ability to conduct two-way transactions over the Internet.  Indeed, the common specification discloses that Common Gateway Interface ("CGI") applications allowed dynamic "'two-way' transaction[s]" prior to the priority date of the Patents-in-Suit.  '492 patent at 1:65-2:7.  To distinguish the alleged invention from this well-known prior art, Pi-Net explained that although users had "limited 'deferred' transactional capabilities," these transactions were "not performed in real-time," '492 patent at 1:42-48, meaning that, at minimum, "real-time" must be "non-deferred."

The prosecution history of the '158 patent confirms this distinction.  During prosecution, the pending claims were rejected over CGI-based technology.  In response, Pi-Net argued to the PTO:

> [e]ven if [the prior art] taught of completing a transaction, it was through the use of CGI, which strips field-by-field from a Web form and sends it as standard I/O to the application that is local to the Back-End, and *that must assemble/disassemble* the information again.  *The transaction is not completed in real-time.*[4]

In other words, Pi-Net clearly disavowed claim scope by telling the PTO that CGI processing does not involve "real-time" transactions because CGI requires assembly/disassembly of the transaction information.  "Real-time" transactions therefore exclude those that involve assembly/disassembly.

Pi-Net then reasserted and reemphasized its definition of "real-time" in a later prosecution within the same family as the Patents-in-Suit.  U.S. Patent No. 8,346,894 ("'894 patent") is a divisional of and claims priority to the '158 patent—they share common figures and a common specification.  In response to a non-final rejection by the PTO during prosecution of

---

[4] App. E, '158 Patent Prosecution History Excerpts at 188 (emphasis added).

the '894 patent, Pi-Net amended its pending claims to add the term "real-time," among others.

In support of its amendment and its claims, Pi-Net argued that:

> [the prior art] deals with processing documents using CGI scripts,
> which the Applicant has clearly described in this present
> Application *as well as in the parent patents* that CGI involves
> standard I/O and formatting and reformatting at both ends so as to
> be compatible with HTML files is [a] '*deferred transaction*', (as in
> . . . the Applicant's specification), not with true two-way or N-way,
> *real-time* transactional capabilities.[5]

Again disavowing claim scope, Pi-Net told the PTO that CGI processing does not involve "real-time" transactions because CGI requires formatting and reformatting of transaction information.

Pi-Net's assertion that such evidence "did not involve any of the Patents" and "occurred after the Patent here in issue had issued" is clearly wrong. The '158 patent is one of the Patents-in-Suit, and the aforementioned Applicant Remarks were made before the issuance of both the '158 patent and the '492 patent, which is a divisional of and claims priority to the '158 patent. Further, Pi-Net's disavowal of scope for the term "real-time" in the later prosecution history may be used to limit the scope of the same term in earlier patents in the same family. Indeed, "[a]ny statement of the patentee in the prosecution of a related application as to the scope of the invention would be relevant to claim construction." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004); *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295 (Fed. Cir. 2007). Here, Pi-Net's arguments regarding "real-time" during the prosecution of the '894 patent are particularly relevant because the term at issue was added in an amendment to overcome a rejection.[6] Moreover, Pi-Net sought to bolster its amendments by adding the aforementioned remarks meant to distinguish the alleged invention from well-known

---

[5] App. H, '894 Patent Prosecution History Excerpts at 19 (emphasis added).

[6] *Id.* ("[T]he relevance of the statement made in this instance is enhanced by the fact that it was made in an official proceeding in which the patentee had every incentive to exercise care in characterizing the scope of its invention.").

prior art, including CGI scripting.  Pi-Net cannot now attempt to escape its own definition of "real-time" simply because that definition is not conducive to its infringement contentions here.

The patentee repeatedly limited its definition of "real-time" transactions claimed in the Patents-in-Suit to distinguish the prior art and now must be held to its earlier statements.  As a result, Defendants' proposed interpretation should be adopted.

### 3. Plaintiff's Reply Position

#### (a) Defendants' Construction Renders Patents Meaningless

Defendants' construction of "real-time" distorts the prosecution history and renders the patents meaningless, in defiance of virtually every rule of claim construction.  Plaintiff charged in its first brief that Defendants' construction of "real-time" caused every claim of every patent in suit to exclude any internet or Web applications.  Defendants' answering brief is resoundingly quiet on this point, and thus Defendants apparently concede that their construction will result in a patents that no one will ever be able to infringe.[7]

---

[7] Defendants' construction excludes any internet or Web transactions, because Defendants are attempting to exclude any transmission where packets of information are disassembled and reassembled. Yet, the still current basic document of the internet, the Internet Protocol, states that the foundation of the internet is the disassembly of data into packets at the front end and their reassembly at the receiving end:

> The Internet Protocol is designed for use in interconnected systems of packet-switched computer communication network … The internet protocol provides for transmitting blocks of data called datagrams from sources to destinations, where sources and destinations are hosts identified by fixed length addresses. The internet protocol also provides for fragmentation and reassembly of long datagrams, if necessary, for transmission through "small packet" networks.

(App. K, RFC 791, Section 1.1 (September 1981)). Today, all internet communication is still based on disassembly of information into "packets," which are then transmitted and reassembled at the destination. Thus, when Defendants exclude any device or method where information is subject to "assembling, disassembling, formatting, or reformatting," Defendants are excluding any Web or other internet transmissions.

Defendants' proposal thereby violates every generally-accepted and fundamental rule of claim construction, because the entire specification and all the patent claims are directed to Web transactions, and the specification specifically calls for packetizing of data.

> Network layer 303 enables any pair of systems in the network to communicate with each other. Network layer 303 contains hardware units such as routers, that handle routing, packet fragmentation and reassembly of packets.  Transport layer 304 establishes a reliable communication stream between a pair of systems, dealing with errors such as lost packets, duplicate packets, packet reordering and fragmentation.

(App. C at 5:7-14.)  Yet, by proposing to construe the term "real-time" to exclude packetizing of data, Defendants would exclude the disclosed inventions, including the specific teaching above. That one term would render the remainder of the patent claims irrelevant, because, again, one cannot practice the Web transactions required by the patent claims, because the claims require Web transactions, and all such Web transactions rely on data packets which  Defendants' construction would preclude.

A construction that eliminates the specification and all the claims is not a correct construction.

### (b)        Defendants Misconstrue the Prosecution History

Defendants argue that their construction is mandated by the prosecution history of a related application. There, the inventor argued that her invention was distinguishable from a prior art communication system, the Common Gateway Interface or CGI, because:

> CGI … strips field-by-field from a Web form and sends it as standard I/O to the application that is local to the Back-End, and **that** must assemble/disassemble the information again.  The transaction is not completed in real-time.

(App. E at 188 [emphasis added]).  The inventor never argued that her invention excluded the internet or the packetizing of data that the internet and Web require.   To the

contrary, the inventor argued that only that the "**THAT**" had to be assembled/dissembled – i.e., the data that was stripped field-by-field from a web form and which was then sent as standard I/O to an application.

Thus, the prosecution history shows only a very specific argument targeted at the defined CGI processes.  Nothing in that prosecution suggests that the inventor was excluding basic packetizing required by the internet and specified in her disclosure and claims.

The other prosecution comment by the inventor argued by Defendants also does not support Defendants' arguments.  (App. H at 19).  Again, the inventor only distinguished the prior art, because it "discloses deferred transactional capabilities utilizing CGI, not realtime Web transactions from a World Wide Web application, as in Applicant's specification." (*Id.*)

In short, Defendants are misconstruing the relevant prosecution histories to produce an unprecedented and preposterous result that renders the patents and all claims meaningless.  Such a construction is not in accord with the fundamental construction principles, that:

> The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.[8]

### (c)  Ordinary Meaning

Defendants argue that "real-time" cannot be given its ordinary meaning, because the term may differ in perception of different people.  The mere fact that there can be some variability in the ordinary meaning of a term does not mean that a Court is required to construe it.  For example, Defendants' internal documents refer to the online banking systems as "real-time" without attempting any precise definition, because the term does have a commonly-understood

---

[8] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2013 U.S. App. LEXIS 5949 (Fed. Cir. 2013)

meaning.  (App. N).  All references to "real-time" in the patents are consistent with that common understanding, as reflected in Defendants' internal documents.

Finally, Defendants assert that banking transactions performed by a teller or at an ATM machine, which the inventor described in the patent specification as being "real-time," are actually not "real-time,"[9] because the bank may actually process the transaction at a later time. That is an irrelevancy, because the customers have completed interacting with the bank and have nothing further to do. That is a real-time transaction by any definition, and nothing in the patent specification or the claims suggests that a transaction is not "real-time" simply because banks choose to process their internal accounts in batches at a later time.

### 4.   Defendants' Sur-Reply Position

Where Pi-Net attempts to preserve the ambiguity of "real-time" to aid its infringement theory, Defendants' construction is grounded soundly in the intrinsic record and should be adopted.  Foremost, Pi-Net's proposal conflicts with accepted tenets of claim construction.  For example, Pi-Net relies on Defendants' proprietary documents to attempt to show "ordinary meaning," which is an obviously improper (and unhelpful) use of extrinsic evidence—these documents did not exist at the time of the patent application, and if anything, they reinforce Defendants' point that "real-time" has several "ordinary" connotations depending on its context.

---

[9] [I]f Bank decided to include in their POSvc application access to checking and savings accounts, user 100 will be able to perform real-time transactions against his checking and savings accounts. Thus, if user 100 moves $500 from his checking account into his savings account, the transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user 100 now has the capability to do more than browse his bank account. The ability to perform these types of robust, real-time transactions from a Web client is a significant aspect of the present invention.

(App. C. '492 Patent at 7:11-23)

18

*See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art . . . as of the effective filing date of the patent application.").  Moreover, Pi-Net's argument that "variability" in the ordinary meaning of a term does not necessitate construction is refuted by binding precedent. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1361 ("[T]he 'ordinary' meaning of a term does not resolve the parties' dispute, and claim construction requires the court to determine what claim scope is appropriate in the context of the Patents-in-Suit.").

Pi-Net's proposal also contradicts the prosecution histories and the specification.   First, as explained above, the applicant clearly limited the scope of "real-time" to distinguish prior art. Contrary to Pi-Net's assertions, Defendants' construction does not "misconstrue" the prosecution history.  Indeed, Defendants *agree* with Pi-Net's explanation of the quoted intrinsic evidence. The inventor repeatedly informed the USPTO that, in CGI applications, the data that was "stripped field-by-field from a web form" had to be "assembled/disassembled." *See* App. H at 19. The inventor clarified that the prior art CGI "transaction is not completed in real-time."  Thus, this assembly/disassembly of data is what distinguished the alleged "real-time" transactional capability of the Patents-in-Suit from prior art CGI applications.  Further, if "real-time" encompasses nothing more than "non-deferred," as Pi-Net asserts, Pi-Net never identifies any other distinction between its alleged "real-time" invention and the prior art CGI applications. Indeed it admits that both involve non-deferred, two-way transactions over the Internet.  '492 patent at 1:65-2:7.  Such a result ignores the inventor's clear disavowal and flies in the face of reason.  Rather, the only logical reading of this prosecution history indicates that the inventor relied on its use of "real-time" to connote a transaction that can occur without

assembly/disassembly (thus making it able to be processed faster than the prior art CGI applications).

Second, Pi-Net's proposal conflicts with the specification.  Pi-Net asserts that a transaction may be "real-time" even if "the bank may actually process the transaction at a later time . . . because the customers have completed interacting with the bank and have nothing further to do."  The specification, however, explicitly instructs that a transaction is not "real-time" if it is processed after a user's interaction with the bank is complete.  It provides an example where a transaction is initiated via e-mail such that the customer has finished interacting with the bank after clicking the "send" button.  It then explains that "because the consumer's request is not processed until the e-mail is received, read, and the . . . system reading the e-mail executes the transaction . . . [t]his transaction is thus not performed in real-time."  '492 patent at 1:45-48.  The intrinsic evidence clearly refutes Pi-Net's argument.  Moreover, Pi-Net already has conceded that "real-time by definition is non-deferred."  Thus, "real-time" cannot mean merely "in the same manner the transactions would have been performed by a live teller at the bank or an ATM," as Pi-Net suggests, because many transactions performed by live tellers and ATMs are only executed after a delay (*e.g.*, deposits often are made days later).  '492 patent at 7:15-19.  As such, "in the same manner [as] a live teller" cannot *define* "real-time."  *Id.*

Finally, that Defendants' construction may eliminate Pi-Net's infringement theory is irrelevant.  Pi-Net has not cited any authority to support its argument that a construction solidly grounded in the intrinsic record should not be adopted if it reduces the likelihood of infringement because current methods of practice within the field of the alleged invention do not comport with that construction.  Indeed, Pi-Net's argument that Defendants' construction "eliminates the specification" is an unsupported red-herring, seeking to disguise Pi-Net's attempts to avoid a

construction that hurts its infringement positions.  For example, Pi-Net's citation to the specification's discussion of the OSI model is irrelevant, as the quoted language is a description of well-known prior art and the OSI model clearly is not part of the "disclosed inventions" as Pi-Net asserts.  Thus, Pi-Net has no basis to argue that Defendants' construction would exclude "the disclosed inventions, including the specific teaching [regarding OSI]."   Instead, Defendants' construction should be adopted because it properly excludes prior art applications that the inventor herself recognized as distinct from and outside the scope of the Patents-in-Suit.

### B.      Term 2: "Exchange"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "POSvc Application list of at least one Web application on a Web page and associated software for switching and routing the object with information entries and attributes to a back-end transactional application." | "Web page and at least two applications; displays web page that includes a list of applications" |

### 1.      Plaintiff's Opening Position

"Exchange" is a term coined by the inventor.  The Patents depict the Exchange in Figures 4B and 5C & D:

**Figure 4B**          **Figure 5C**          **Figure 5D**

All three Figures show that the Exchange includes a Web page that displays a list of POSvc Applications 510, and Figures 5C & D show that the Exchange sits on a Web server. Consistent with these Figures, the specification teaches that "Exchange 501 comprises Web page 505 and point-of-service (POSvc) applications 510.  Exchange 501 also conceptually includes a switching component and an object routing component," and "Exchange 501 processes the consumer's request and displays an exchange Web page 505 that includes a list of POSvc Application applications 510 accessible by exchange 501."  (App. C at 18-21, 39-41).

Thus, Plaintiff's proposed construction encompasses all the elements that the inventor identified as being the components or features of the coined term "Exchange."

Defendants' proposed definition is ambiguous in demanding "Web page and at least two applications."  Specifically, nothing in the Patents requires that the list of POSvc Applications include multiple applications.  One can have a list of only one POSvc Application.  Nothing in the Patent specifications or any of the prosecution histories requires multiple POSvc Applications on the list.  More importantly, Defendants' definition seems to suggest that the Exchange is required to be conducting transactions simultaneously with two applications, which is directly contrary to specifications of the Patents.

2.    **Defendants' Answering Position**

Pi-Net's proposed construction for "exchange" improperly attempts to read the

"associated software for switching and routing the object with information entries and attributes

to a back-end transactional application" limitation into the claims and should be rejected

accordingly.  First, the specification clearly states that it is not the exchange alone, but "exchange

501 and a management agent component . . . together" that "perform the switching, object

routing, application and service management functions . . . ."  '492 patent at 6:33-38.  The

specification further explains that the exchange and management agent "together constitute a

value-added network (VAN) switch."  '492 patent at 7:43-45.  As it is the VAN switch, and not

the exchange alone, that is described as performing the switching and routing functions, the

portion of Pi-Net's proposed construction reciting "for switching and routing the object with

information entries and attributes to a back-end transactional application" should not be adopted.

Second, the "exchange" should not be limited to a software embodiment.  The specification does

not describe the "exchange" as encompassing "associated software," and likewise does not

describe a software algorithm for switching and routing.  *See generally* '492 patent at 6:18-7:9.

Instead, the purported invention is described to be software-implemented only in the preferred

embodiment, '492 patent at 4:49-57, and thus the construction of the term "exchange" should not

be so limited.  *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010)

("Generally, a claim is not limited to the embodiments described in the specification unless the

patentee has demonstrated a clear intention to limit the claim's scope with words or expressions

of manifest exclusion or restriction.").  Third, and finally, Pi-Net's construction would render the

term indefinite.  Pi-Net asserts that the "associated software" comprising "exchange" is for

"switching and routing the object" when "object" has no antecedent basis.  "Object" is not used

in either claims 1 or 2 of the '158 patent, nor is the term "object" ever defined by the intrinsic

record.  Thus, Pi-Net's proposed construction would render the term "exchange" indefinite.  *See Halliburton Energy Servs., Inc. v. MI LLC*, 514 F.3d 1244, 1249 (Fed. Cir. 2008) ("[A] claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable.").

In contrast, Defendants' proposed construction is consistent with intrinsic record which repeatedly describes the "exchange" as a Web page displaying a list of at least two applications. '492 patent at 6:18-20 (the exchange "comprises Web page 505 and point-of-service (POSvc) applications 510."); *see also* Figs. 4B, 5C, 8; 6:39-41; 6:52-55; 9:28-30.

### 3.  Plaintiff's Reply Position

The first difference between Plaintiff's and Defendants' construction is that Plaintiff specifies that the Exchange must include a POSvc Application, while Defendants propose any "applications." The difference is significant, because Defendants' construction referencing any "applications" is so broad as to potentially encompass any prior art web page.

Plaintiff Pi-Net's construction is the proper, because it follows exactly the definition in the patent, comports with the actual invention and avoids being so broad as to encompass any prior art web page.

Defendants' proposed construction is unsupported by any intrinsic evidence, and Defendants does not disclose why the term should be defined so broadly as to discount the point of the invention and encompass the prior art. Interestingly, the only intrinsic support cited by Defendants is the very construction proposed by Plaintiff Pi-Net-- "Exchange 501 comprises Web page 505 and point-of-service (POSvc) applications 510." (App. C at 6:18-20)

Plaintiff Pi-Net's construction also incorporates the requirement for "associated software for switching and routing the object with information entries and attributes to a back-end transactional application." Defendants challenge this. Even though the construction may be

complete without that "associated software" proviso, its inclusion is worthwhile. The specification says that "Exchange 501 also _conceptually_ includes a switching component and an object routing component (described in more detail below)." (App. C at 6:20-23) As described in the specification that follows, the switching and object routing components are software, and specifically software protocol. (App. C at 7:51 to 8:2). Thus, Plaintiff's construction follows exactly what is disclosed in the patent.

Defendants criticize Plaintiff's construction because they say the "it is the VAN switch, and not the exchange alone, that is described as performing the switching and routing functions." True, but irrelevant. Plaintiff does not say that the Exchange is solely responsible for switching and routing, but consistent with the express disclosure in the patents, say only that the Exchange includes such functions. That is completely consistent with Defendants' citation to the VAN Switch.

Defendants next argue that Exchange should not be limited to software. Yet, both Plaintiff and Defendants agree that the Exchange comprises a "web page and [certain] applications," _supra_. A web page is software, as are "applications."

Finally, Defendants argue that Plaintiff's construction would render the term indefinite, because "'object' has no antecedent basis." Preliminarily, there is no law that requires that constructions have an 'antecedent basis." Moreover, both parties agree that the Exchange "also _conceptually_ includes a switching component and an object routing component (described in more detail below)." (App. C at 6:20-23) Thus, it is unclear what Defendants mean by the statement that "object" is undefined when that term is used in the patents (and it is defined in the patents).

### 4.     Defendants' Sur-Reply Position

In its reply, Pi-Net argues that the proper construction of "exchange" requires a "POSvc application" rather than "applications," or else the "exchange" would "potentially encompass any prior art web page." The Federal Circuit, however, has long rejected reading limitations into claim terms, even to avoid invalidity. *See, e.g.*, *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1321 (Fed. Cir. 2013); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1434 (Fed. Cir. 1988).

In addition, Pi-Net's second argument—that the proper construction of "exchange" should include Pi-Net's "'associated software' proviso"—should be rejected as an improper attempt to read extraneous limitations into the claims. Pi-Net itself concedes that the proper construction of "exchange" "may be complete without that 'associated software' proviso," but argues that its inclusion is "worthwhile." Courts, however, do not construe terms based on what may be "worthwhile" to a plaintiff's case. As explained above, this limitation cannot be read into the claims because the purported invention is described to be software-implemented only in a preferred embodiment. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d at 843. Notably, the software protocols identified by Pi-Net in support of its proposed "associated software" limitation are described in the context of the "VAN switch," not the "exchange." '492 patent at 7:51-8:2. Thus, Pi-Net's extraneous "associated software" limitation should be rejected.

### C.     Term 3: "Object Routing"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "Communicating between a POSvc Application and a back-end transactional application individual data structure with information entries and attributes (i.e., objects) over the application layer of the OSI model." | "system for transmitting data on a network using the TransWeb Management Protocol in which a unique IP address is hierarchically assigned to each network object, *e.g.*, including each bank account" |

### 1.    Plaintiff's Opening Position

Preliminarily, it is useful to identify the "object" as used in the Patents.  Figure 5D

demonstrates that the object is the individual data structure with information entries and

attributes for transactional application which is communicated between a POSvc Application and

a back-end:



The prosecution history also teaches that "object" is synonymous with "transactional data

structure."  See, for example, the following definition of "object" by the inventor in the course of

distinguishing certain prior art:

> The Applicant respectfully disagrees in that the Rogers reference
> fails to disclose an object that is a transactional data structure
> specific to a transactional web application.

(Appendix E at 93)

> Independent claim 1 recites the step of 'receiving a transactional
> request for access to multimedia content, the transactional request
> received from a multimedia user, wherein the transactional request
> includes an object that is a transactional data structure specific to a
> transactional web application.' As noted above, Rogers fails to
> disclose an 'object that is a transactional data structure' as that term

> is understood in the '185 Patent application -- a data structure
> specific to a Web application.  ***
>
> [The prior art] do[es] not constitute an encapsulation of data into a
> 'transactional data structure specific to a transactional web
> application' as is the 'object' that is recited in independent claim 1
> of the present application. [The prior art] 'object' is not a
> 'transactional data structure' much less one that is specific to a non-
> existent transactional web application.  [The prior art], therefore,
> cannot meet … an 'object' or transactional data structure specific to
> a transactional web application, including the final step of claim 1,
> which involves the 'routing of the transactional data structure.'

(App. E at pp. 93-94).  Thereafter, the inventor similarly distinguished other prior art.  (App. F at

116-17, 147-148, 185-189).  See, for example:

> An "application," in [the prior art] is readily distinguished from a
> transactional Web application with an "object" or transactional
> data structure that connects to a transactional Point-of-Service
> application across a service network atop the World Wide Web as
> claimed.

(App. E at pp. 117).

Therefore, "object" requires and means a transactional data structure specific to a

transactional application.

"Object routing" is defined in the Patents in App. C at 2:62-67; 4:62-64; 5:23-27; and

8:3-15, and is depicted in Figure 5D as shown in the annotated Figure 5D above.  As described in

the cited specification text and in Figure 5D, "routing" is the communication of the "object"

from the POSvc Application to the back-end transactional application.

Defendants' proposed construction is nothing more than an impermissible attempt to read

certain preferred features into the claim construction, while introducing terms such as "network,"

"TransWeb Management Protocol," and "network object," which themselves will require

significant construction to avoid being misleading.  For example, the term "networked object" is

different from "network object," Defendants' definition potentially confuses that distinction.

## 2.   Defendants' Answering Position

Ignoring clear limitations in the specification and disavowals in the prosecution history, Pi-Net has proposed an impermissibly broad construction of "object routing" that would encompass any transmission of data on the Internet.   Specifically, Pi-Net asserts that "object routing" captures any transmission of structured data using the application layer of the OSI model.[10]   Protocols ensnared by this construction include HTTP (i.e., the Web), FTP (i.e., file transfer), and SMTP (i.e., e-mail).   However, Pi-Net fails to address, let alone rebut, the plain intrinsic evidence demonstrating that object routing necessarily requires (1) use of the "TransWeb Management Protocol" (hereinafter "TMP") and (2) hierarchical assignment of unique IP addresses to each object.

First, the specification defines "object routing" as utilizing TMP in all embodiments.   Pi-Net argues that including a reference to TMP in the construction for "object routing" is an "impermissible attempt to read certain preferred features into" the claim language.   However, the written description and figures reveal that TMP is a required element that must be found in *all* embodiments of "object routing."   In the section of the specification titled "Van [sic] Switching and Object Routing," the patentee notes that "object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP)."   '492 patent at 7:63-65.   Moreover, all of the disclosed embodiments of "object routing" reiterate this clear disavowal and require TMP in combination with other protocols.   In each of the six different alternative embodiments for "object routing" disclosed in the specification, TMP is combined with additional protocols as part of the "object routing" process.   '492 patent at 8:3-5.   Moreover, in the only Figure of the Patents-in-Suit that explicitly refers to "object routing" (Fig. 8), TMP is a required element.   '492

---

[10]   The OSI model refers to "an international standard that provides a common basis" for communications systems by characterizing and organizing the system into abstraction layers. '492 patent at 4:58-66.

patent at Fig. 8, step 816; *see also* 9:32-37.   Under these circumstances, TMP is "not merely a

preferred embodiment; it is the patents' only embodiment." *Respironics, Inc. v. Invacare Corp.*,

303 F. App'x 865, 871 (Fed. Cir. 2008); *accord Computer Docking Station Corp.*, 519 F.3d at

1373-74 (holding that "repeated and definitive remarks in the written description could restrict a

claim limitation"); *Lambda Optical Solutions, LLC v. Alcatel-Lucent USA Inc.*, No. 10-CV-487-

RGA-CJB, 2012 WL 3201701, at *9 (D. Del. Aug. 3, 2012) (determining that claimed "optical

signals" must be construed as "compliant" where the specification "inexorably" led to the

conclusion that the patentee intended to so limit the claimed invention).

Second, the specification and prosecution history demonstrate that "object routing"

requires the assignment of a unique IP address to each object in a hierarchical fashion.   The

Abstracts of each of the Patents-in-Suit directly link the assignment of a unique network address

to the process of object routing.   *See* '500 patent at Abstract ("Additionally, a method for

enabling object routing is disclosed, comprising the step[] of . . . assigning a unique network

address to each of the object identities."); *see also* '158 patent at Abstract ("Specifically, one

embodiment of the present invention discloses a method for enabling object routing, the method

comprising the step[] of . . . . assigning a unique network address to each of the object

identities.").   Similar language, emphasizing and underscoring the step of assigning a unique

network address to each and every "object" as a necessary precursor to object routing, is also

found in the Summary of Invention section.   '492 patent at 2:60-67.

Figure 6B "illustrates an example of this hierarchical addressing tree structure" that is

necessary to accomplish the claimed object routing.   In that figure, the web server has IP address

123.123.123.123, and each object on the server is assigned a unique IP address based on the web

server's IP address (e.g., 123.123.123.123.1 to 123.123.123.123.3).   '492 patent at 8:25-26.



The prosecution history likewise demonstrates and confirms that this step of assigning a unique IP address to "objects" is a required step of object routing. Specifically, in argument to overcome a rejection in view of Davison during prosecution of the '500 patent, the patent applicant disavowed prior art systems in which "objects" such as bank accounts were not assigned unique IP addresses:

> [T]he object identity represents a networked object where the address for each networked object essentially establishes the individual object as an 'IP-reachable' or accessible node on the Internet. <u>This Internet address is used to uniquely identify and access the object</u> . . . the object identities according to the claimed invention refer to the individual checking and savings accounts . . . <u>Each account is an individual addressed network object that is accessible on the network.</u> Thus, each account is an object identity associated with information entries and attributes, and the object identity represents a networked object. The object identity (the account) is associated with a unique network address, and <u>the unique network address is utilized to identify and route the object</u> identity on the network. <u>This **type** of an **object routing** system is not taught or suggested by Davison. As such Applicant respectfully submits that the claimed invention is patentable over Davison</u>.

App. D, '500 Patent Prosecution History Excerpts at 23-24 (emphasis added). Thus, the applicant has unequivocally elected to narrow the scope of "object routing" to include only processes where each object is assigned a unique IP address.

Pi-Net's opening brief fails to even address the use of IP addresses in "object routing." Instead of focusing on the steps that are required to accomplish "object routing," as set forth above, Pi-Net's opening arguments for this term focus on defining "object" to mean "a transactional data structure."  Pi-Net's construction thus ignores the specification and prosecution history and should be rejected accordingly.[11]

### 3.      Plaintiff's Reply Position

Defendants assert that Plaintiff Pi-Net's construction is so broad as to ensnare the prior art. Defendants, however, have not demonstrated that that to be the case. However, even if that were true, Defendants should be gladdened that they have a base for arguing invalidity.

The fact remains that "object routing" is well-explained in the patents and it is the routing of "objects" which the patents show to be structured data.

Defendants attempt to include various extraneous elements, including "TransWeb Management Protocol" and "hierarchical assignment of unique IP addresses to each object." This is wholly improper, and is nothing more than an impermissible attempt to incorporate preferred embodiments into the claims language. Defendants cite the statement in the patents that "object routing is provided via a proprietary protocol, TransWeb™ Management Protocol (TMP)." However, this is typical language for any preferred embodiment, and no Court has ever held that such language mandates the incorporation of such element into the construction of the claims. Defendants next argue "clear disavowal," but do not cite any support, because there is none.

---

[11]  Defendants' construction of "object routing" includes the limitation of "using the TransWeb Management Protocol."  That term is nowhere defined in the patent or intrinsic record of the Patents-in-Suit, nor does it appear to have a plain and ordinary meaning. *See above.* Defendants believe that further discovery will reveal that any element including that term is therefore both indefinite and not enabled, and therefore invalid.  Although the preference is to construe terms to preserve the validity of a patent, here, as with so many other of the asserted claims, that is not possible.  Plaintiff defined her alleged invention using that term and should be held to the consequences.

Equally, it is incorrect to say that in "each of the six different alternative embodiments for "object routing" disclosed in the specification, TMP is combined with additional protocols as part of the "object routing" process." To the contrary, the patent merely states that TMP can be combined with other protocols. There are very few references to TMP in the patent, and TMP is never presented as the invention. TMP refers to specific embodiments or examples, but does not describe and define the invention overall.

### 4.    Defendants' Sur-Reply Position

Pi-Net's argument that Defendants' construction improperly incorporates limitations from the specification into the claims is incorrect for at least two reasons.  First, the specification clearly establishes that, in the context of the alleged invention, both utilization of TMP and assignment of unique, hierarchical IP addresses are necessary aspects of *every* disclosed embodiment of "object routing," and not merely preferred embodiments.  Although Pi-Net asserts that "there are very few references to TMP in the patent," not only is TMP introduced in the portion of the written description entitled "Van Switching and Object Routing," but it is also referenced four separate times as an essential element of "object routing." '492 patent at 7:62-8:26; 9:24-37.  Moreover, Pi-Net does not (and cannot) dispute that each and every disclosed embodiment of "object routing" must use TMP:

> "One embodiment of the present invention **[1]** utilizes TMP and distributed on-line service information bases (DOLSIBS) to perform *object routing*.  Alternatively, **[2]** TMP can incorporate **[a]** s-HTTP, **[b]** Java™, **[c]** the WinSock API or **[d]** ORB with DOLSIBs to perform *object routing*."

'492 patent at 8:3-7 (numbering added).  That is, TMP is required in *all* disclosed embodiments that perform the claimed method: (1) TMP with DOLSIBs; (2)(a) TMP with s-HTTP; (2)(b) TMP with Java; (2)(c) TMP with the WinSock API; and (2)(d) TMP with ORB.  '492 patent at 8:3-7.

Pi-Net also offers no argument in response to multiple citations from the specification, each of which makes clear that the only way to perform the claimed "object routing" is to assign a unique, hierarchical IP address to each "object." '492 patent at 2:60-67; 8:25-26; Fig. 6B. Pi-Net's proposed construction is thus entirely divorced from the context of the specification, which describes only a very limited and specific form of data transmission that requires the assignment of a unique, hierarchical IP address.

Second, during prosecution the applicant clearly distinguished and disavowed prior art data transmission systems (like Davison) that did not assign a unique network address to the constituent "objects." In particular, the applicant argued that an "object routing" system that "utilize[s] . . . [a] unique network address is utilized to identify and route the object . . . is not taught or suggested by Davison." App. D, '500 Patent Prosecution History Excerpts at 23-24. Pi-Net now argues that the precise point of distinction between the claimed "object routing" and prior art data transmission systems should have no bearing on the scope of what is meant by "object routing" in the Patents-in-Suit. But Pi-Net must be limited to the nature of the invention that it described during prosecution, given the unmistakable disavowal of routing systems that do not assign unique, hierarchical IP addresses. *Saffran v. Johnson & Johnson*, No. 2012-1043, slip op. at 16-18 (Fed. Cir. Apr. 4, 2013) (limiting a claimed "device" to a "continuous sheet" where the applicant "distinguish[ed] prior art by representing . . . that '[t]he device used is a sheet'" and the specification "consistently describe[d] the disclosed 'device' as a sheet").

D.      **Term 4: "Transactional Services"**

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "Online services from a web application." | Plain and ordinary meaning. |

### 1. Plaintiff's Opening Position

In the '500 Patent, the term is found in the context of the limitation "said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provide."  In the '492 Patent, the term is found in context of the claim limitation "wherein the connection to the Web merchant services or back-end transactional services is managed," where the latter is defined a providing "an interactive real-time Web transaction from the Web application."  Therefore, the claims themselves establish that the term has a more precise meaning than what could be termed "ordinary meaning."

Plaintiff's proposed construction captures the meaning mandated by the claims as a whole.

### 2. Defendants' Answering Position

Defendants propose that the term "transactional services" be given its plain and ordinary meaning.  *See Renishaw PLC v. Marposs Societa Per Azioni*, 158 F.3d 1243, 1249, (Fed. Cir. 1998) ("Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning.").  Unlike other terms, such as "real-time," Pi-Net never expressly (or impliedly) defined the term "transactional services" to be "online services from a web application."  Pi-Net is unable to cite any evidence from the specification or file history where "transactional services" is so defined, indicating that the patentee did not intend to "coin" a definition different from its ordinary meaning.  Instead, Pi-Net seeks to improperly import limitations into the term with no evidentiary support.

Pi-Net cannot retroactively attempt to coin a definition for "transactional services" when the patentee chose not to do so in either the specification or the prosecution histories.  *See K-2 Corp. v. Salomon SA*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").  Because Pi-Net has not overcome

the presumption of ordinary meaning, Pi-Net's construction should be rejected and the term

"transactional services" should not be construed.

### 3.    Plaintiff's Reply Position

Defendants misconstrue Plaintiff's proposal. Plaintiff is not arguing that the term is

expressly defined in the specification, but argues only that the other provisions of the claims

mandate that "transactional services" mean "online services from a web application."

### 4.    Defendants' Sur-Reply Position

Pi-Net fails to respond to Defendants' argument that these terms should be given their

plain and ordinary meaning.  As described above, Pi-Net's proposed construction should be

rejected and "transactional services" and "transaction link" need not be construed.

### E.    Term 5: "Web Transaction[s]"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "Web transaction from a POSvc application displayed on a Web page." | Plain and ordinary meaning. |

### 1.    Plaintiff's Opening Position

The "plain and ordinary meaning" of Web transaction is not clear.  The claim language

itself requires that "Web transactions" arise from a POSvc Application.  Thus, in the '492 Patent,

the claim limitations are "enabling the real-time Web transactions from the one or more Web

applications" (Claim 1); and "or a real-time Web transaction from a Web application." (Claim

10).

Plaintiff's proposed definition avoids confusing the issues by clarifying that the web

transactions must arise from POSvc Application to avoid confusion or ambiguity.

## 2.    Defendants' Answering Position

Defendants propose that the term "Web transaction[s]" be construed consistent with its plain and ordinary meaning as "any type of commercial or other type of interaction performed by a user over the World Wide Web."  The parties agree that the term "transaction" should be construed as "any type of commercial or other type of interaction that a user may want to perform," which is consistent with that term's plain and ordinary meaning.  Joint Claim Construction Chart at 3.  Moreover, the specification and the language of the claims establishes that the meaning of the term "Web" in the context of the Patents-in-Suit refers to the World Wide Web, which is consistent with that term's plain and ordinary meaning.  Claim 1 of the '492 patent, for example, requires a "VAN switch for enabling the real-time Web transactions from the one or more Web applications."

Pi-Net's proposed construction is improper and would lead to illogical results.  First, Pi-Net's proposed construction defines "Web transaction" using the term "Web transaction."  Such a circular construction can be of no aid to the jury in understanding the claimed term.  *See Funai Elec. Co., Ltd. v. Daewoo Elecs. Corp.*, 616 F.3d 1357, 1366-67 (Fed. Cir. 2010) ("The criterion [for claim construction] is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").  Second, Pi-Net's proposal inserts an additional limitation—"Web transaction from a POSvc application displayed on a Web page"—that is inconsistent with the language of the claims.  Contrary to Pi-Net's assertion, the Patents-in-Suit claim "Web transaction[s] from a Web application."  *See, e.g.*, '158 patent, claim 1.  Nothing in the claims specifies that the claimed "Web transaction" is performed by a particular type of Web application.  Because Defendants' proposed construction "stays true to the claim language and most naturally aligns with the patent's description of the invention . . . [it is] the correct

construction" and, therefore, it should be adopted by the court.  *See Phillips v. AWH Corp.*, 415

F.3d 1303, 1313 (Fed. Cir. 2005) (en banc) (internal quotes omitted).

### 3.       Plaintiff's Reply Position

Plaintiff i-Net's proposed construction of "Web transactions" arises from the other

limitations in the claims.

Defendants' position is unclear.  Defendants orginally stated in the claim chart that "Web

transaction[s]" should be construed as "plain and ordinary meaning," without any further

explanation.  Defendants repeat this proposal in their first brief.  However, Defendants' brief

then adds a definition that had never been previously proposed – adding that the "plain and

ordinary meaning" of the term is "any type of commercial or other type of interaction that a user

may want to perform."  This sounds like a construction, rather than plain and ordinary meaning.

In any event, Defendants' proposal is problematic, because it consists solely of the agreed-upon

definition for the word "transaction."  (Joint Claim Construction Chart at 3).  The claim term is

"<u>Web</u> transaction."  Defendants' proposal, therefore, impermissibly ignores the word "Web" in

the term "Web transaction."  This is plainly impermissible.

### 4.       Defendants' Sur-Reply Position

Defendants' proposed construction of this term does not ignore the word "Web," as Pi-

Net contends.  As stated above, the plain and ordinary meaning of the term "Web transaction" is

a "transaction" (as jointly defined by the parties) performed over the World Wide Web.

### F.       Term 6: "Transaction Link"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "Connecting between the POSvc Application on the web page and the application performing the requested transaction using object routing (see separate definition)" | Plain and ordinary meaning. |

### 1. Plaintiff's Opening Position

"Connecting between the POSvc Application on the web page and the application performing the requested transaction using object routing (see separate definition)"

The limitation is found only in the '500 Patent, and, in each instance, the entire limitation which reads "creating a transaction link between said network application and said transactional application." Therefore, the "transaction link" must connect between the POSvc Application and the application performing the requested transaction." The link necessarily involves "object routing" (see Term 3, "object routing," above), because that is the "linking" taught in the Patent.

### 2. Defendants' Answering Position

Like "transactional services," Defendants propose that "transaction link" be given its plain and ordinary meaning. The parties have already stipulated to a construction of the term "transaction." The term "transaction link" does not require any additional construction, as the word "link" is a commonly used word in the art whose meaning is readily understood. *See Funai Elec.*, 616 F.3d at 1366-67.

Pi-Net's construction makes no sense grammatically and attempts impermissibly to read in limitations from the specification. It is well-established that "[a] claim must be read in accordance with the precepts of English grammar." *In re Hyatt*, 708 F.2d 712, 714 (Fed. Cir. 1983). The language of claims 3, 12 and 35 of the '500 patent, which are all of the claims that include the term "transaction link," simply require the creation of a "transaction link" between "said network application and said transactional application." *See, e.g.*, '500 patent, claim 3. Substituting Pi-Net's proposed construction for "transaction link" into the claim language, the limitation nonsensically reads "means for creating a <u>connecting between the POSvc Application on the web page and the application performing the requested transaction using object routing</u> between said network application and said transactional application." Pi-Net's proposed

construction would improperly render the second half of the limitation—"between said network application and said transaction application"—to be mere surplusage. *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting a construction that would render a phrase in the remainder of the claim to be "mere surplusage"). Applying Pi-Net's construction to claims 12 and 35 would yield similarly undesirable results.

Pi-Net's attempt to alter the scope of the claim by reading in the "object routing" limitation is improper and unsupported by the intrinsic evidence. Indeed, the term "transaction link" is not actually used anywhere in the common specifications of the Patents-in-Suit, other than in the claims themselves. *See Intel Corp. v. United States ITC*, 946 F.2d 821, 836 (Fed. Cir. 1991) ("Where a specification does not require a limitation, that limitation should not be read from the specification into the claims."). This is clearly not a situation where construction of a claim term may account for a patentee's repeated and consistent use of a claim term throughout the specification under a single meaning. Pi-Net's assertion that "object routing" is the only "linking" taught in the specification is erroneous. For example, the specification describes a variety of links between systems in the context of describing the OSI reference model. *See generally*, '492 patent at 4:48-5:17. Thus, Pi-Net's proposed construction should be rejected and the term "transaction link" should not be construed.

### 3.     Plaintiff's Reply Position

The term is found only in context of Term 31 ("Means for Creating a Transaction Link Between Said Network Application and Said Transactional Application"), and is considered in that context.

### 4.       Defendants' Sur-Reply Position

Pi-Net fails to respond to Defendants' argument that these terms should be given their plain and ordinary meaning.  As described above, Pi-Net's proposed construction should be rejected and "transactional services" and "transaction link" need not be construed.

### G.       Term 8: "Web Application[s]"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "Point of service application on a web page." | Plain and ordinary meaning. |

### 1.       Plaintiff's Opening Position

There is no "plain and ordinary meaning" of "Web applications" as proposed by Defendants, and there certainly were none when the inventor first filed her applications.  The term "web applications" does not appear to have existed before the present inventions.  The specification and prosecution histories demonstrate that terms "Web Application" and "POSvc Application 510" were used synonymously.  The inventor repeatedly stated in prosecution "Web application or a Point-of-Service application on a Web page."  (App. F at 48, 49, 52, 67, 69-77)  Most relevant, the inventor cited the same passages in the specification to define "Web application" and "POSvc Application" (App. F at 66).  The inventor used the terms synonymously in the same sentence.  (App. E at 117:  "[The prior art] is readily distinguished from a transactional Web application with an 'object' or transactional data structure that connects to a transactional Point-of-Service application across a service network atop the World Wide Web as claimed.").  See also App. E at 116 ("Web transactions from point-of-service Web applications").

2.      **Defendants' Answering Position**

Defendants propose that the terms "Web application[s]" and "network application" should each be given their plain and ordinary meaning.  *See Renishaw PLC*, 158 F.3d at 1249 ("Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning.").

Pi-Net asserts that the claim terms "Web application," "point of service-application," "point of service Web application," and "network application" all have the same meaning because the "specifications and prosecution histories demonstrate that [the terms] were used synonymously."  However, Pi-Net cannot cite any intrinsic evidence suggesting that "Web application" or "network application" are defined as "POSvc Application[s] on a web page," demonstrating that the patentee did not intend to "coin" a definition different from these terms' respective ordinary meaning.  Indeed, the default rules of construction teach that unless the intrinsic evidence reveals otherwise, different terms are presumed to have different meanings. *CAE Screenplates, Inc.*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings."). Pi-Net has provided no evidence to overcome this presumption.

Moreover, in this case, the intrinsic evidence cited by Plaintiff only proves Defendants' point.  First, for "Web application," Pi-Net points to statements in the prosecution history where it used the phrase "Web application or a Point-of-Service application on a Web page."  Yet these statements appear to describe "Web application" as something different from a "Point-of-Service application on a Web page"—not something that is synonymous.  For example, claim 1 of the '492 patent uses both terms—"offering one or more Web applications as respective point-of-service applications"—which indicates that, while there may be overlap between the terms, they are to remain distinct.

Second, for "network application," Pi-Net's argument that because the common specification never used the term "network application," that term clearly meant "POSvc application," is a wholly-unsupported non-sequitur and operates contrary to the basic tenets of claim construction.  Furthermore, despite Pi-Net's assertions to the contrary, during the prosecution history of the '500 patent, the patentee distinguished *transactional applications*," not "network applications," from CGI applications.  Pi-Net's argument that "network applications" and "transactional applications" are the same would render the '500 patent claims meaningless—each asserted independent claim requires a method or means "for switching to a transactional application…from a network application."  *See* '500 patent claims 1, 10, 35.  Thus, Pi-Net's proposed construction would lead to illogical results and could not be adopted even if "network application" did not have an ordinary meaning.

Here, the jury will not need assistance in understanding either "network application," or "Web application," and the Court should adopt Defendants' proposed "ordinary meaning" over Pi-Net's invented constructions for these terms.

### 3.    Plaintiff's Reply Position

Plaintiff Pi-Net contends that the terms "Web Application[s]" and "Network Application" are synonymous with "Point of Service Application," with the term "network application" being used in the '500 Patent, and "Web application" and "POSvc Application" being used in the '158 and '492 Patents. Defendants assert that POSvc Application is indefinite, and the terms "Web Application[s]" and "Network Application" have ordinary meaning.

Contrary to Defendants' statement in their brief, Plaintiff has not argued that "transactional application" is synonymous with any of the prior three terms.

Plaintiff pointed out in its opening brief that the term "web application" could not have had a "plain and ordinary meaning" at the time the inventor had filed her priority application,

because she had apparently invented the term in writing her application.  Defendants do not

identify any prior use of the term, and, thus, the inventor's own application is the first known use

of the term.  As such, it cannot be "plain and ordinary meaning."

In the specification, the term is used synonymously with POSvc Application, and is

referred to as the "Web client."  (App. C at 2:58; 7:22)  The prosecution histories demonstrate

that terms "Web Application" and "POSvc Application 510" were used synonymously, as

previously stated.  Defendants assert that the phrase "Web application or a Point-of-Service

application on a Web page" repeatedly found in the prosecution history demonstrates that the

two were distinct individualized terms.  But, Defendants cannot cite any factual or legal support

for their proposition.  The phrase "Web application or a Point-of-Service application on a Web

page" in the context of the specification can only mean that the two are synonymous.  Any

question of the proper meaning is quashed by the plain language of the '492 Patent, where the

claims state:

> offering one or more Web applications as respective point-of-
> service applications in a point-of-service application list on a Web
> page ….

(App. C at claim 1).  This claim language unequivocally explains that a Web application is a

POSvc Application.

### 4.    Defendants' Sur-Reply Position

In its reply, Pi-Net reasserts that these terms are synonymous with "POSvc Application"

without further analysis.  Although Pi-Net asserts that the inventor "apparently invented the term

["Web Application"] in writing her application," that assertion is easily discredited.[12]

---

[12]    A quick Internet search performed by Defendants revealed several uses of the term "Web application" in the early 1990s, prior to Pi-Net's filing of its provisional application.  *See, e.g.*, App. L, Tim Berners-Lee, et al., *The World-Wide Web*, 37 COMMUNICATIONS OF THE ACM 76, 79 (1994).

Moreover, the specification explicitly instructs that the "Web" was not invented by Pi-Net and that prior art applications (*e.g.* CGI applications) were executed on the Web.  *See, e.g.*, '492 patent at Figs. 1A, 1B; 1:33-2:45 ("[A] user may have access to two-way services on the Web via Common Gateway Interface (CGI) applications."); 5:59-61.  Thus, Pi-Net's construction should be rejected and these terms need not be construed.

### H.      Term 9: "Network Application"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "POSvc Application on a web page" | Plain and ordinary meaning. |

### 1.      Plaintiff's Opening Position

As was the case with "Web applications" (Term 8 above), there is no apparent "plain and ordinary meaning" of "network application."

In any event, the Patents' specifications and prosecution histories demonstrate that terms "network application" and "POSvc Application 510" were used synonymously.

First, the Patent itself never uses the term "network application," but only the terms POSvc Application or Web application (which were used synonymously).  This demonstrates that "network application" meant POSvc Application.

Most importantly, however, during prosecution of the '500 Patent, the inventor distinguished her "network applications" from the prior art "CGI applications."  (App. D at 20-24).   Yet, applying "plain and ordinary meaning," those distinguished CGI applications could potentially be encompassed by Defendants' proposed definition, so that the very term that the inventor used to distinguish the prior art, now covers the prior art.

## 2. Defendants' Answering Position

Defendants propose that the terms "Web application[s]" and "network application" should each be given their plain and ordinary meaning. *See Renishaw PLC*, 158 F.3d at 1249 ("Absent a special and particular definition created by the patent applicant, terms in a claim are to be given their ordinary and accustomed meaning.").

Pi-Net asserts that the claim terms "Web application," "point of service-application," "point of service Web application," and "network application" all have the same meaning because the "specifications and prosecution histories demonstrate that [the terms] were used synonymously." However, Pi-Net cannot cite any intrinsic evidence suggesting that "Web application" or "network application" are defined as "POSvc Application[s] on a web page," demonstrating that the patentee did not intend to "coin" a definition different from these terms' respective ordinary meaning. Indeed, the default rules of construction teach that unless the intrinsic evidence reveals otherwise, different terms are presumed to have different meanings. *CAE Screenplates, Inc.*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of . . . different terms in the claims connotes different meanings."). Pi-Net has provided no evidence to overcome this presumption.

Moreover, in this case, the intrinsic evidence cited by Plaintiff only proves Defendants' point. First, for "Web application," Pi-Net points to statements in the prosecution history where it used the phrase "Web application or a Point-of-Service application on a Web page." Yet these statements appear to describe "Web application" as something different from a "Point-of-Service application on a Web page"—not something that is synonymous. For example, claim 1 of the '492 patent uses both terms—"offering one or more Web applications as respective point-of-service applications"—which indicates that, while there may be overlap between the terms, they are to remain distinct.

46

Second, for "network application," Pi-Net's argument that because the common specification never used the term "network application," that term clearly meant "POSvc application," is a wholly-unsupported non-sequitur and operates contrary to the basic tenets of claim construction.  Furthermore, despite Pi-Net's assertions to the contrary, during the prosecution history of the '500 patent, the patentee distinguished "*transactional applications*," not "network applications," from CGI applications.  Pi-Net's argument that "network applications" and "transactional applications" are the same would render the '500 patent claims meaningless—each asserted independent claim requires a method or means "for switching to a transactional application…from a network application."  *See* '500 patent claims 1, 10, 35.  Thus, Pi-Net's proposed construction would lead to illogical results and could not be adopted even if "network application" did not have an ordinary meaning.

Here, the jury will not need assistance in understanding either "network application," or "Web application," and the Court should adopt Defendants' proposed "ordinary meaning" over Pi-Net's invented constructions for these terms.

### 3.     Plaintiff's Reply Position

Plaintiff Pi-Net contends that the terms "Web Application[s]" and "Network Application" are synonymous with "Point of Service Application," with the term "network application" being used in the '500 Patent, and "Web application" and "POSvc Application" being used in the '158 and '492 Patents. Defendants assert that POSvc Application is indefinite, and the terms "Web Application[s]" and "Network Application" have ordinary meaning.

Contrary to Defendants' statement in their brief, Plaintiff has not argued that "transactional application" is synonymous with any of the prior three terms.

Defendants simply assert – without any support -- that "network application" (found only in the '500 Patent) should be construed as "plain and ordinary meaning."  Defendants ignore that

the term is not found in the specification, and, thus, necessarily must represent something

disclosed in the specification, and that is the POSvc Application.

### 4. Defendants' Sur-Reply Position

In its reply, Pi-Net reasserts that these terms are synonymous with "POSvc Application"

without further analysis. Although Pi-Net asserts that the inventor "apparently invented the term

["Web Application"] in writing her application," that assertion is easily discredited.[13]

Moreover, the specification explicitly instructs that the "Web" was not invented by Pi-Net and

that prior art applications (*e.g.* CGI applications) were executed on the Web. *See, e.g.*, '492

patent at Figs. 1A, 1B; 1:33-2:45 ("[A] user may have access to two-way services on the Web

via Common Gateway Interface (CGI) applications."); 5:59-61. Thus, Pi-Net's construction

should be rejected and these terms need not be construed.

### I. Terms 10 and 11: "Virtual Information Store" and "Distributed On-line Service Information Bases"

| Term | Pi-Net's Construction | Defendants' Construction |
|---|---|---|
| virtual information store | "An information store that is temporarily created, and which contains information entries and attributes of an object. (These can be HTTP or SOAP messages comprising header fields and a message body that includes attributes and information entries in a Web transaction.)" | **Updated Proposed Construction:**<br><br>"Data storage mediums accessed by the TransWeb Management Protocol and containing data structures identified by unique IP addresses." |

---

[13] A quick Internet search performed by Defendants revealed several uses of the term "Web application" in the early 1990s, prior to Pi-Net's filing of its provisional application. *See, e.g.*, App. L, Tim Berners-Lee, et al., *The World-Wide Web*, 37 COMMUNICATIONS OF THE ACM 76, 79 (1994).

| Term | Pi-Net's Construction | Defendants' Construction |
|------|----------------------|--------------------------|
| distributed on-line service information bases | "Information stores that are temporarily created, and which contains information entries and attributes of an object. (These can be HTTP or SOAP messages comprising header fields and a message body that includes attributes and information entries in a Web transaction.)" | **Updated Proposed Construction:**<br><br>"Data storage mediums accessed by the TransWeb Management Protocol and containing data structures identified by unique IP addresses." |

### 1.     Plaintiff's Opening Position

The Patents state that the terms "virtual information store" and "distributed on-line service information bases" are the same, and both refer to temporarily created virtual structures containing information entries and attributes that are used for object routing.  The Patent says:

> The method for enabling object routing comprises the steps of creating a <u>virtual information store containing information entries and attributes</u>, associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities.  ***

> One embodiment of the present invention utilizes … distributed on-line service information bases (DOLSIBs) to perform object routing.  …  <u>DOLSIBs are virtual information stores</u> optimized for networking.  <u>All information entries and attributes in a DOLSIB virtual information store are associated with a networked object identity</u>.  The networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects, and each networked object is assigned an Internet address.  The Internet address is assigned based on the IP address of the node at which the networked object resides

(App. C at 2:62-67; 8:3-8).

These are coined terms, and have the definition provided in the Patent itself.

### 2. Defendants' Answering Position

**Updated Proposed Construction: Data storage mediums accessed by the TransWeb Management Protocol and containing data structures identified by unique IP addresses.**

As Pi-Net concedes, "'virtual information store' and 'distributed on-line service information bases' are the same," and should be construed the same. Pi-Net asserts that a digital on-line service information base ("DOLSIB") is equivalent to a virtual information store, and that both terms "have the definition provided in the Patent itself." But Pi-Net has proposed an impermissibly broad construction of "DOLSIB" that captures any database of HTTP messages (i.e., all Web traffic). ("These can be HTTP or SOAP messages . . ."). Joint Claim Construction Chart at 9. Because this construction fails to incorporate at least two explicit attributes of "DOLSIB" required by the specification, it should be rejected.

First, the specification states that a DOLSIB must hierarchically assign unique IP addresses to each of its constituent objects:

> The networked object identity identifies the information entries and attributes in the DOLSIB as individual networked objects, and each networked object is assigned an Internet address. The Internet address is assigned based on the IP address of the node at which the networked object resides . . . TMP utilizes this Internet address to uniquely identify and access the object.

'492 patent at 8:10-25 (emphasis added). Indeed, Pi-Net cites this very passage from the specification in its opening brief, characterizing it as "the definition [for DOLSIB] provided in the Patent itself." Pi-Net cannot argue that this is the definition for the term DOLSIB, but argue that certain aspects (i.e., the step of assigning "[t]he Internet address . . . based on the IP address of the node at which the networked object resides") of that definition should be discarded. *See, e.g.*, *Wi-Lan Inc. v. Acer, Inc.*, No. 07-CV-473 TJW, 2010 WL 3766551, at *24 (E.D. Tex. Sept.

20, 2010) (rejecting a proposed construction of "circuitry" because it did not "give the full definition expounded in the specification").

Because the purported invention "utilizes . . . (DOLSIBs) to perform object routing," the prosecution history confirms this understanding. '492 patent at 8:3-5. Specifically, as discussed in the context of Term 3, *supra*, the patent applicant explicitly disavowed "object routing" processes wherein unique IP addresses are not assigned in this manner:

> The object identity (the account) is associated with a unique network address, and the unique network address is utilized to identify and route the object identity on the network.

App. D, '500 Patent Prosecution History Excerpts at 23-24 (emphasis added). Thus, a DOLSIB must hierarchically assign unique IP addresses to each of its constituent objects.

Second, the specification makes clear that a DOLSIB works in conjunction with the "TransWeb Management protocol" ("TMP"). Indeed, the only references to a DOLSIB in the specification confirm that it is a component of "object routing":

> The method for enabling object routing comprises the steps of creating a [DOLSIB] containing information entries and attributes, associating each of the information entries and attributes with an object identity, and assigning a unique network address to each of the object identities.

'492 patent at 2:62-67. Because TMP is an essential element of object routing (as discussed in the context of Term 3), and because DOLSIBs are utilized in the process of object routing, DOLSIBs must also be accessed through TMP.

Aside from failing to reflect the clear teachings of the specification and prosecution history, Pi-Net's construction introduces concepts that are not found anywhere in the intrinsic record. For instance, Pi-Net argues that a DOLSIB is "temporarily created." However, Pi-Net fails to provide, and the specification fails to include, any support for the proposition that a DOLSIB is a temporary creation. To the extent that the patentee wanted to define a DOLSIB as

a temporary creation, it could have done so, but Pi-Net cites to no such lexicography in its opening brief.  It would thus be improper to include such a limitation in the Court's construction.

### 3.    Plaintiff's Reply Position

Defendants originally posited that both terms are indefinite, but now argue a new common construction for both terms in their first brief.

Defendants' construction, however, fails, because it is nothing more than a classically impermissible attempt to incorporate elements of the preferred embodiments that are unnecessary for construction of the actual terms. Thus, Defendants ask the Court to add the requirement that the "virtual information store" and "distributed on-line service information bases (DOLSIB)" be "accessed by the TransWeb Management Protocol." This is an extraneous limitation, because nothing in the claims speaks to "accessing" the virtual information store or DOLSIB.

Next, Defendants ask the Court to add the requirement that the "virtual information store" and "DOLSIB" "contain data structures identified by unique IP addresses." Again, this is an extraneous limitation, because nothing in the claims speaks to how the" the virtual information stores or DOLSIBs are identified. Thus, a mobile home may have an address for identification once it is located on a lot, but that mobile home exists even before it has an address. The claim terms are directed to the "mobile home" itself.

### 4.    Defendants' Sur-Reply Position

Pi-Net argues without support that "accessed by the TransWeb Management Protocol" is an "extraneous limitation because nothing in the claims speaks to 'accessing' the . . . DOLSIB." This is incorrect.  In fact, the claims explicitly link the DOLSIB to object routing, which (as discussed in the context of Term 3) is accomplished using TMP.  *See* '158 patent at claim 5 ("The method of claim 4, wherein the **object routing includes the use of a distributed on-line**

**service information bases** [sic].") (emphasis added).  The specification further confirms that DOLSIBs are relevant to the present invention only insofar as they are accessed during the process of "object routing."  *See, e.g.*, '492 patent at 8:3-5 ("One embodiment of the present invention utilizes TMP and [DOLSIBs] to perform object routing.").  Indeed, TMP and the DOLSIB are described as working together to effect this "object routing."  *See, e.g.*, '492 patent at 8:24-25 ("TMP utilizes this Internet address to uniquely identify and access the object from DOLSIB.")  The construction for DOLSIB and VIS <u>must</u> account for these teachings because Pi-Net admits these are coined terms that have no meaning separate from the Patents-in-Suit.

Pi-Net next argues that the limitation "containing *data structures identified* by unique IP addresses" is inappropriate because "nothing in the claims speaks to how the . . . *DOLSIBs are identified*" (emphasis added).  This argument misstates Defendants' proposed construction. Defendants do not argue that the DOLSIB *itself* must be identified by a unique IP address, but rather that it must "contain[] *data structures* identified by unique IP addresses" (emphasis added).  Defendants' construction is necessary to properly reflect the Patents-in-Suit.  *E.g.*, '492 patent at 8:10-13, 24-25.  Thus, Pi-Net's analogy is inapt.  The DOLSIB is not akin to a mobile home that may or may not *have an address*, but rather is like a phonebook that must by definition *store addresses*.  Further, the IP addresses stored in a DOLSIB must be both unique <u>and</u> hierarchically assigned, as discussed in the context of Term 3.  Defendants' proposal for these terms therefore should be adopted.

**J.** **Terms 12-15: "Means for Transmitting a Transaction Request from Said Transactional Application," "Means for Processing Said Transaction Request," "Computer System Executing the Back-end Transactional Application for Processing the Transaction Request in Real-time," and "Keeping a Transaction Flow Captive"**

**1.** **Plaintiff's Opening Position**

Defendants assert that this term is indefinite.  This same term is the subject of Defendants' Motion for Summary Judgment of Indefiniteness, which is currently pending before the Court.  To avoid needless duplication and burden on the Court, Plaintiff incorporates by reference its analysis of this term Plaintiff's brief in opposition to Defendants' Motion (D.I. 68-0), and the discussion of the term by Dr. Michael Bardash in his Declaration accompanying Plaintiff's response to Defendants' Motion. (D.I. 68-1).

**2.** **Defendants' Answering Position**

Terms 12 through 15 are the subject of Defendants' Motion for Partial Summary Judgment of Indefiniteness.  These terms are indefinite for at least the reasons described in Defendants' briefing in support of their Motion for Leave to File a Motion for Partial Summary Judgment of Indefiniteness and their Brief in Support of Their Motion for Partial Summary Judgment of Indefiniteness.  D.I. 48, D.I. 55, D.I. 61, D.I. 69 in C.A. No. 1:12-cv-00280-RGA.

**K.** **Term 16: "A Routed Transactional Data Structure That is Both Complete and Non-deferred, in Addition to Being Specific to the Point-of-Service Application"**

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "A data structure with information entries and attributes displayed in a POSvc Application on a Web page for the specified real-time Web transaction from the specific Web application, which is routed from the front-end POSvc Application on a Web page over an online service network on the Web to a Back Office transactional application or application of a value-added network service provider or Web merchant" | This claim term is indefinite. |

### 1. Plaintiff's Opening Position

Defendants assert that this term is indefinite. This same term is the subject of Defendants' Motion for Summary Judgment of Indefiniteness, which is currently pending before the Court. To avoid needless duplication and burden on the Court, Plaintiff incorporates by reference its analysis of this term Plaintiff's brief in opposition to Defendants' Motion (D.I. 68-0), and the discussion of the term by Dr. Michael Bardash in his Declaration accompanying Plaintiff's response to Defendants' Motion. (D.I. 68-1).

### 2. Defendants' Answering Position

Defendants' Motion for Partial Summary Judgment of Indefiniteness covers a truncated version of this term, namely, "routed transactional data structure." In addition to the reasons presented in the briefing of that motion, the remainder of this claim limitation (i.e., "that is both complete and non-deferred, in addition to being specific to the [POSvc]"), renders this term indefinite for three additional and independent reasons.

First, the claimed routed transactional data structure ("RTDS") must be "complete." However, the intrinsic record provides no definition for what constitutes a "complete" data structure. Thus, a jury is left to wonder whether this term means a data structure containing sufficient data for some unspecified purpose, containing a volume of data above some arbitrary threshold, or containing data that is not split into separate packets. "Complete" could even refer to the status of the structure itself, rather than the data housed within the structure. Whatever the case, the public is left to guess as to the bounds of this claim term, and it is therefore indefinite. *See, e.g.*, *Datamize*, 417 F.3d at 1350 ("[A] claim term, to be definite, requires an objective anchor" to adequately notify the public of the patentee's right to exclude.).

The statements to the contrary by Pi-Net's expert, Dr. Michael Bardash, only highlight this inherent ambiguity, which cannot be resolved except by rewriting the claim language. Dr. Bardash concludes that "'[c]omplete' means to complete the transaction." Bardash Decl., ¶ 49. In other words, Dr. Bardash maintains that "complete" is a synonym for the verb "execute" (i.e., the ability to "execute" transactions), rather than for the adjective "total." However, "execute" is a facially nonsensical descriptor for a data structure (i.e., one might "execute" a transaction, but it is nonsensical to "execute" a data structure). Rather than define the bounds of what would constitute a "complete" RTDS, Dr. Bardash rewrites the claim language. Indeed, Pi-Net's proposed definition does not even include a reference to the concept of "completion," whether in the context of the RTDS itself, or in the context of the overall transaction.

Second, the RTDS must be "non-deferred." This term describes a dynamic action with a temporal component (e.g., a non-deferred delivery), and thus is nonsensical and meaningless in the context of static data (e.g., a non-deferred social security number). Dr. Bardash's only assertion on this point is the unremarkable statement that "non-deferred means the opposite of . . . 'deferred'," (i.e., without delay). Bardash Decl., ¶ 50. This definition, however, does nothing to cure the meaningless application of a temporal adjective to a static term.[14]

Third, the RTDS must be "specific to the point-of-service application." However, the specification provides no guidance or "objective anchor" by which the "specificity" of the RTDS can be measured. Again, it might signify that the data structure is compatible with the POSvc, is compatible *exclusively* with the POSvc, originates with the POSvc, contains data regarding the POSvc, or connotes any one of a multitude of possible, contradictory meanings. Dr. Bardash's sole argument to the contrary is that "'being specific to the point-of-service application' is self-

---

[14] Defendants dispute that "non-deferred" is synonymous with "real-time" in the context of the Patents-in-Suit. *See* Term 1.

explanatory" and, for unspecified reasons, is elucidated by Figure 5D.  Bardash Decl., ¶ 51.  But

Figure 5D merely "illustrates a user selecting a bank POSvc application from the POSvc

application list," and provides no objective basis to determine what level of "specificity" is

required in order to fall within the bounds of the claimed RTDS.  '492 patent at 3:31-32.  That

Dr. Bardash is unable to even offer a definition for what is meant by this phrase (and, as with the

other aspects of this term discussed above, fails to incorporate any aspect into his proposed

definition), only confirms that a person of skill in the art would be unable to determine the

bounds of this claim.

Even if the RTDS is not indefinite, Pi-Net's construction is impermissibly broad and

unsupported.  According to Dr. Bardash, "'a routed transactional data structure' refers to what is

described in the specification as 'object routing.'"  Bardash Decl., ¶ 46.  But such a construction

would render dependent claim 4 of the '158 patent—"the method of claim 1 wherein object

routing is used"—meaningless.  This cannot be a proper construction.  *See Aspex Eyewear, Inc.*

*v. Marchon Eyewear, Inc.*, 672 F.3d at 1348.  Aside from Dr. Bardash's conclusory statements,

Pi-Net has not presented any evidence to show that replacing "RTDS" with the equally

undefined term "object" cures these indefiniteness defects.  Indeed, the would-be juror is still left

unable to determine how an "object" would be complete and non-deferred.

### 3.      Plaintiff's Reply Position

#### (a)      The Prosecution History of the '158 Patent

Defendants assert that this term is indefinite because each of the words "complete," "non-

deferred" and "being specific to the point-of-service application" are indefinite. Defendants'

arguments, however, again rest on the erroneous presumption that a claim is invalid for

indefiniteness if the record does not permit precise numerical or other "objective anchors" for the

term.  As noted previously, the "objective anchor" has been referenced by the Federal Circuit

<u>only</u> in one case, and that involved the term "aesthetically pleasing." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350-1351 (Fed. Cir. 2005) ("A purely subjective construction of 'aesthetically pleasing' would not notify the public of the patentee's right to exclude since the meaning of the claim language would depend on the unpredictable vagaries of any one person's opinion of the aesthetics of interface screens.  While beauty is in the eye of the beholder, a claim term, to be definite, requires an <u>objective anchor</u>.  Thus, even if we adopted a completely subjective construction of 'aesthetically pleasing,' this would still render the '137 patent invalid.")  Again, the issue in *Datamize* was that "aesthetically pleasing" is purely subjective and changeable based individual perceptions.  As set forth in, for example, *Biosig Instruments v. Nautilus, Inc.*, *supra* and *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, *supra*, a claim term is not indefinite if it can be determined by those skilled in the art.

The meaning of the terms is apparent from the claim itself and the prosecution record. (App. E).  What is now claim 1 of the 158 patent was application claim 72.  (App. E at 70). Claim 72 originally did not include the challenged language, but, in pertinent part, only referred to transferring funds "in real time."  (*Id.*)  After the PTO rejected the claims in view of the Rogers prior art reference, the inventor amended claim 72 to add "utilizing a routed transactional data structure that is both complete and non-deferred in addition to being specific to the point of service application, the routing occurring."  (*Id.* at 91)  The inventor argued that the prior art did not disclose "an object that is a transactional data structure specific to a transactional web application" or "'providing …content ... in a service network atop the World Wide Web, and as part of a complete, non-deferred, and real-time transaction," and argued that "Rogers wholly fails to disclose a complete, non-deferred, real-time transaction."  (*Id.* at 93, 94)  Then, with specific reference to claim 72, the inventor added: "Rogers does not disclose or teach a transactional Web

application, much less a banking Web application that is transactional, complete, non-deferred, and operating in real-time in a service network atop the World Wide Web." (*Id*. at 95)  Finally, the inventor concluded her remarks with the summary statement:  "Rogers … fails to disclose an object that is a transactional data structure specific to a transactional web application.  … Rogers finally fails to disclose complete, non-deferred, real-time transactions.  In light of the foregoing, Rogers fails to disclose any of the independent claims of the present application." (*Id*. at 96)

The Examiner then withdrew the Rogers reference as prior art, but asserted a new reference, DeBettencourt.  (*Id*. at 98-99).  The inventor responded that the new reference also deficient, because

> An 'application,' in DeBettencourt, is readily distinguished from a transactional Web application with an 'object' or transactional data structure that connects to a transactional Point-of-Service application…

And because the prior art fails to disclose

> the routing of the transactional data structure … occur in a service network atop the World Wide Web, and as part of a complete, non-deferred, and real-time Web transaction from a Web application.

(*Id*. at 117, 128).  The inventor had to then file an RCE, but repeated the same arguments in another filing after the RCE filing, where the inventor argued:

> Taking into account the Examiner's objection related to DeBettencourt, … Applicant has modified this portion of Claim 1 to … the routing of the transactional data structure and subsequent providing of requested multimedia on- line services atop the Web from the point-of-service application occur in a service network atop the World Wide Web, and as part of a <u>complete, non-deferred, and real-time Web transaction</u> from a Web application", to distinguish from DeBettencourt.

* * *

> <u>Claims 72-79</u> and 83-85 are not taught by De Bettencourt, because DeBettencourt does not teach "object routing" nor "networked

59

> object" in managing the flow of a Web transaction from a Web
> application. This has been <u>discussed</u> <u>above</u>. The claims have been
> appropriately modified, taking into account the objections raised
> by the Examiner, to clarify this distinction between DeBettencourt
> and the claims in Applicant's patent application. DeBettencourt
> …does not teach performing a financial or banking transaction (see
> 5,778,178:6:45-66; Fig. 5D), utilizing object routing or networked
> object (see 5,778,178:8:6; Fig. 5D) from a Web transaction from a
> Web application, as in Applicant's patent application.

(*Id*. at 147, 149). At that point, the Examiner allowed what are now the claims of the '158

Patent. (*Id*. at 173

### (b)     Response to Defendants' Invalidity Arguments

Defendants first assert that the claims are indefinite, and thus invalid, because it is

unclear "what constitutes a 'complete' data structure." The Defendants, however, have it all

wrong, because their argument does not comport with the claim language. Most relevant is the

prosecution history, because that is where the claim terms were introduced. That prosecution

history demonstrates that both the Examiner and the inventor always viewed the claims as

referring to a "complete, non-deferred, and real-time Web transaction." This comports with the

reasonable reading of the claims, which are directed to a "method for performing a real time

Web transaction." Claim 1, the only independent claim, then continues that the method includes

> accepting subsequent signals from the Web user input device; and
> transferring funds from the checking account to the savings
> account in real-time utilizing a routed transactional data structure
> that is both complete and non-deferred, in addition to being
> specific to the point-of-service application, the routing occurring in
> response to the subsequent signals.

A skilled artisan will recognize that an "object" is a data structure specific to an application. In

this case of the instant patents, the application is a Point-of-Service Application displayed on a

Web page. Therefore, the data structure (or "object") is specific to the point-of-service

application. The claim term is "a routed transactional data structure that is both complete and

non-deferred, in addition to being specific to the point-of-service application."  The object or data structure has "information entries and attributes", as shown in Fig. 5D, and this data structure with the information entries and attributes make it interactive and transactional and the information entries are input by the user or returned in real-time as the results of a Web transaction by the system. So, the data structure is transactional. The object is routed over the online service network over the application layer 7 of the OSI model over the Web. The object data structure with its information entries and attributes is an encapsulated whole, by definition, and the data structure is "complete" and is "whole," an "encapsulated whole," by its very definition. The object data structure is routed as a whole and in real-time and is routed in a non-deferred manner. Therefore, the object data structure is a "a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application"

### 4.    Defendants' Sur-Reply Position

Defendants argue that the RTDS is insolubly ambiguous and thus indefinite, and in response, Pi-Net offers only circular arguments that amount to classic bootstrapping.

First, Pi-Net argues that the limitations "complete," "non-deferred," and "specific to the point-of-service application" are definite simply because they were added during prosecution to overcome Rogers and DeBettencourt.  While this verbiage was added during prosecution, that fact is irrelevant because the applicant's remarks and amendments fail to define these limitations. Rather, all of Pi-Net's quotations from the prosecution history uniformly demonstrate that the applicant never affirmatively defined any of these limitations:

> "Applicant has modified this portion of Claim 1 to . . . the routing of the transactional data structure . . . as part of a complete, non-deferred, and real-time Web transaction."

> "Rogers does not disclose or teach a transactional Web application,
> much less a banking Web application that is transactional,
> complete, non-deferred, and operating in real-time in service
> network atop the World Wide Web."

App. E at 147, 95.  These remarks simply establish the applicant's view that whatever the terms

"complete," "non-deferred," and "specific to the point-of-service application" may mean, those

elements are not found in the prior art.  The lack of any affirmative, substantive definition for

these terms only underscores their insoluble ambiguity.  That ambiguity is not resolved by Pi-

Net's assertion that the "inventor always viewed the claims as referring to a 'complete, non-

deferred, and real time Web transaction.'"  Pi-Net only begs the same question—the applicant

may have always viewed these elements as part of the claims, but that does not answer the

question of *what* those terms mean in the context of a RTDS.

Second, Pi-Net appears to argue that the term "complete" is synonymous with "whole."

Even if there was support for this definition in the specification or prosecution history (which

there is not), it does nothing to cure the insoluble ambiguity that Defendants identified above.  A

jury would have no guidance as to whether a "whole" RTDS contains sufficient data for some

unspecified purpose, a volume of data above some arbitrary threshold, or data that is not split

into packets.  Moreover, this construction flatly contradicts Pi-Net's own expert, Dr. Michael

Bardash, who concluded that "complete" was a synonym for "execute" (i.e., the ability to

"execute" transactions), rather than for "whole."  Bardash Decl., ¶ 49 ("Complete means to

complete the transaction.").  Because Pi-Net's construction is at odds with that of its own expert,

finds no support in the specification, and even if adopted would leave this phrase insolubly

ambiguous, the reference to a "complete" RTDS is necessarily indefinite.

Third, as for the meaning of "non-deferred," Pi-Net asserts without support that "[t]he

object data structure is routed as a whole and in real-time and is routed in a non-deferred

manner." Not only does Pi-Net fail to define what is meant by non-deferred, but Pi-Net also fails to address Defendants' argument that "non-deferred" is a temporal term that is nonsensical when applied to static data like an RTDS.

Finally, Pi-Net asserts that "[a] skilled artisan will recognize that an 'object' is a data structure specific to an application . . . Therefore, the data structure . . . is specific to the point-of-service application." This statement—which essentially posits that "the RTDS is specific to a POS application because it is specific to a POS application"—only highlights that not even Pi-Net can define this term. If a skilled artisan would recognize what it means to be "specific to an application," then Pi-Net should be able to put forward a definition. Further, Pi-Net fails even to address Defendants' arguments that "specific to the point-of-service application" is susceptible to a multitude of equally plausible, contradictory constructions, as shown above.

## L.    Term 17: "Point of Service Application"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "A Web application displayed on a web page, and displaying an "object" data structure in the Web application with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the Web application based on inputs for the values of the attributes at the front-end POSvc Application" | This claim term is indefinite. |

### 1.    Plaintiff's Opening Position

The term POSvc Application was coined by the inventor. She defined and explained the term in the Patents, and Plaintiff's definition of the term follows precisely the definition in the Patents. Thus, the Patent defines the term as follows:

> A POSvc application is an application that can execute the type of transaction that the user may be interested in performing. The

POSvc list is displayed via the graphical user interface component.
….

An example of a POSvc application list is illustrated in FIG. 5C.
User 100 can thus select from POSvc applications Bank 510(1),
Car Dealer 510(2) or Pizzeria 510(3). … If user 100 desires to
perform a number of banking transactions, and selects the Bank
application, a Bank POSvc application will be activated and
presented to user 100, as illustrated in FIG. 5D. …

Once Bank POSvc application 510 has been activated, user 100
will be able to connect to Bank services and utilize the application
to perform banking transactions, thus accessing data from a host or
data repository 575 in the Bank "Back Office." …

… In this example, if Bank decided to include in their POSvc
application access to checking and savings accounts, user 100 will
be able to perform real-time transactions against his checking and
savings accounts. Thus, if user 100 moves $500 from his checking
account into his savings account, the transaction will be performed
in real-time, in the same manner the transaction would have been
performed by a live teller at the bank or an ATM machine.
Therefore, unlike his prior access to his account, user 100 now has
the capability to do more than browse his bank account. …

(App. C at 6:39 to 7:38)

A key defining aspect of the POSvc Application is that it has a transactional data

structure, which the Patents call the "object."  This is depicted in Figure 5D, which, together with

the accompanying text, demonstrates that the POSvc Application incorporates the transactional

data structure or object:



The fact that the POSvc Application included the transactional data structure was repeatedly argued by the inventor in the Patent office, to distinguish the prior art.  See, for example the arguments upon which the PTO issued the claims of the '158 patent:

> Montulli lacks a point-of-service application on a Web page or a transactional Web application, offered as an online service atop the Web, with an "object" or transactional data structure, that connects to a transactional application across a service network atop the World Wide Web, as these terms would be understood by one skilled in the art after reading the subject application and as claimed in the subject Application. ***

> As described above, the subject application is directed to a point-of-service application on a Web page, a transactional Web application, offered as an online service atop the Web, with an "object" and/or a transactional data structure, that connects to a transactional application across a service network atop the World Wide Web.

(App. E at 186, 188).

Thus, the Figures and other specifications of the Patents, supported also by the prosecution histories, demonstrate that a POSvc Application is a Web application displayed on a

web page, corresponding to a back-end transactional application, and displaying an "object" data structure with attributes and information entries corresponding to the selected Web transactional request.

### 2.    Defendants' Answering Position

Although Pi-Net concedes that "transactional application" and "point of service ("PoS or POScv") application" are coined terms with no ordinary meaning, the intrinsic record fails to provide any explanation that would allow a person of ordinary skill in the art to determine the bounds of these terms. *See. e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350 (Fed. Cir. 2005) ("[A] claim term, to be definite, requires an objective anchor" to adequately notify the public of the patentee's right to exclude.). Pi-Net fails to cite to any language in the claims to support its constructions. Similarly, the intrinsic record fails to suggest a satisfactory definition, merely asserting that both are "applications that are designed to incorporate and take advantage of the capabilities provided by the present invention." '492 patent at 6:21-25. Nowhere does the patentee explain any workable standard for what qualifies as a "transactional application" or "PoS application" or which capabilities of the present invention they must encompass. *See, e.g.*, *Datamize*, 417 F.3d at 1350.

Symptomatic of this lack of support, neither the intrinsic record nor Pi-Net's arguments define the relationship between a "PoS application" and a "transactional application." The specification explains that "PoS applications 510 are transactional applications." '492 patent at 6:22-23. However, elsewhere the Patents-in-Suit indicate that "PoS applications" are entirely distinct from "transactional applications." For instance, independent claim 12 of the '492 patent separately claims "point-of-service applications as on-line services on the Web page" and "transactional applications running at one or more back-end host computers," implying that the applications both serve different functions and run on different systems. Thus, it is not clear if

66

these applications have a genus/species relationship (i.e., a "PoS application" is a particular type of "transactional application"), or an equivalence relationship (i.e., the terms "PoS application" and "transactional application" have identical meanings).

Pi-Net's attempts to exploit this ambiguity to argue two sides of the same coin highlight the indefiniteness of these terms. Specifically, Pi-Net proposes opposing constructions for these terms (i.e., a "transactional application" is not equivalent to a "PoS application" but rather "corresponds to the front-end POS application.") However, Pi-Net's opening brief routinely cites "PoS applications" as equivalent to not only, "transactional applications," but also to "Web applications" and "network applications." (e.g. Term 30 (arguing that the "the list of transactional applications are presented as 'POSvc Application 510,'" and that this "PoS application" is corresponding structure to the "means for presenting said user with a list of transactional applications")). Pi-Net cannot argue that each of these terms is synonymous when it is convenient for Pi-Net, but, at other times, argue that they are separate and distinct. *See Halliburton Energy Servs.*, 514 F.3d at 1254-55.

Even if it were possible to construe these terms, Pi-Net's proposed constructions are internally inconsistent, and therefore incorrect. Pi-Net's construction of "PoS application" is circular and uses the term "front-end POSvc Application" to define PoS application, with no explanation of whether a "front-end" PoS application is a unique term in and of itself. *Funai Elec.*, 616 F.3d at 1366-67 ("The criterion [for claim construction] is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention."). Equally troubling, Pi-Net equates "transactional application" with "back-end transactional application" without any intrinsic (or extrinsic) support. While it is commonly understood that the same claim term used in related patents must be construed consistently, the inverse is also

persuasive: if the patentee meant to use the term "transactional application" in the later patents in the family, she easily could have done so instead of adding the additional limitation, "back-end." *See, e.g.*, *CAE Screenplates Inc.*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of ... different terms in the claims connotes different meanings."). Thus, Pi-Net's proposed constructions are unsupported by the intrinsic evidence and emphasize the indefinite nature of the claim terms.

Pi-Net attempts to cure the defects of indefiniteness by reading limitations into the definitions of "PoS application" that are simply unsupported by the intrinsic evidence. *See K-2 Corp.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). Pi-Net argues that a "key defining aspect" of the "PoS application" is that it has a "transactional data structure, which the Patents call the 'object.'" The only evidence cited in support of this "key defining" feature, however, is the prosecution history of the '158 patent. Tellingly, the claim at issue in that prosecution history plainly states that the claimed invention "utilize[es] a routed transactional data structure that is . . . specific to the point-of-service application." '158 patent at 10:10-15. Furthermore, the '158 patent's prosecution history explains that "[the prior art] is also lacking an 'object' that is a Web 'transactional data structure specific to a transactional Web application.'" It is clear that this evidence relates to a separate limitation found only in the sole independent claim of the '158 patent, and does not provide the definition of "PoS application." Pi-Net cannot retroactively insert limitations into its claims in order to overcome the insolubly ambiguous nature of disputed terms or to attempt to bolster its infringement theory.

If the Court is inclined to construe "PoS application" and "transactional application," Defendants respectfully request that a proposed alternative construction be adopted. If the terms

mean anything, the prosecution history teaches that "transactional applications" must "connect[] the user to a complete set of services rendered by at least one associated merchant."[15]   As discussed above, the specification requires the definition of "PoS application" to encompass, at minimum, the limitations defined in "transactional application." '492 patent at 6:20-21.  Any construction which did not limit the scope of these terms would allow Pi-Net to evade limitations that the patentee repeatedly imposed specifically to overcome rejections over prior art before the PTO.

### 3.    Plaintiff's Reply Position

Plaintiff Pi-Net contends that the terms "Web Application[s]" and "Network Application" are synonymous with "Point of Service Application," with the term "network application" being used in the '500 Patent, and "Web application" and "POSvc Application" being used in the '158 and '492 Patents. Defendants assert that POSvc Application is indefinite, and the terms "Web Application[s]" and "Network Application" have ordinary meaning.

Contrary to Defendants' statement in their brief, Plaintiff has not argued that "transactional application" is synonymous with any of the prior three terms.

Even though the Patents depict the POSvc Application in the figures and discuss the term in the patent text, Defendants still assert that the term is "indefinite" – i.e., that the term is so insolubly ambiguous that the '158 and '492 patents must be held invalid for violating 35 USC §112.  Defendants base their argument citing completely out- of- context a phrase from *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350-1351 (Fed. Cir. 2005).  In fact, in *Datamize* the Court held only that the phrase "aesthetically pleasing" was fatally indefinite, because it was

---

[15] App. D, '500 Patent Prosecution History Excerpts at 21-22 (emphasis added)  ("Unlike the CGI forms-based application in Davison, which connects the user only to a certain service, the transactional application in the present invention connects the user to a complete set of services rendered by at least one merchant associated with this transactional application").

entirely personally subjective, and the law is that the "scope of claim language cannot depend solely on the unrestrained, subjective opinion of a particular individual purportedly practicing the invention." The "objective anchor" comment was in that context. This was the only instance where the Court had cited the concept of an "objective anchor." Neither that term nor any similar term is found in any other pronouncement by the Court as a requirement for definiteness. Thus, the "objective anchor" comment appears merely to state that claims that are entirely dependent on the subjective personal views of individuals will be held invalid, because no skilled artisan could ever determine the claim's scope. Nothing in the case changes the previously analyzed law that a claim term is indefinite only if it is "insolubly ambiguous" even after difficult and complex construction.

Here, Defendants do not suggest that a skilled artisan could not understand the claim terms, and they cannot so argue, because they have not presented any evidence by an expert or other probative evidence. Instead, Defendants argue only that there allegedly is no specific definition of the term in the intrinsic record. Such an argument does not demonstrate by clear and convincing evidence that "POSvc Application" is so "insolubly ambiguous" as to invalidate the claims of two patents. Indeed, the Defendants' many citations to the intrinsic record actually establish that there is an intrinsic record for construing the term. Thus, Defendants' own arguments are self-defeating.

In fact, there is no difficulty in construing "POSvc Application." Defendants' assertions of alleged internal inconsistencies are contradicted by the plain disclosures of the patents and reality. Thus, Defendants allege inconsistency in that "POSvc Application" is sometimes referred to as a "transactional application" and sometimes as an application entirely distinct from the transactional application. But, any transaction requires two or more entities -- the

customer/user and the bank or other web merchant who is providing transactional services.  The

POSvc Application is a transactional application accessed via the webpage by which the user

enters into a transaction.  Figures 5C and 5D show that the POSvc Application links to the bank

or other web merchant's back-end which contains the other end of the transactional application,

as well as the databases and other facilities necessary for performing the transaction.  So, for

every Web transaction, there is a front-end of the transactional application, and there is a back-

end that corresponds to that front-end POSvc Application.  Thus, the patents describe the

transaction involving bank transfers.  (App. C at 6:51 to 7:38).  The example refers to Figure 5C

which shows a list of POSvc Applications.  (*Id.* at 6:51-55)  The example then shows the user

selecting a bank application from that POSvc Application list, which is then activated, as shown

in Figure 5D.  (*Id.* at 6:55-58)  The example continues:

> Once Bank POSvc application 510 has been activated, user 100
> will be able to connect to Bank services and utilize the application
> to perform banking transactions, thus accessing data from a host or
> data repository 575 in the Bank "Back Office."

(*Id.* at 6:65 to 7:2).  The patent then describes a specific transaction:

> In this example, if Bank decided to include in their POSvc
> application access to checking and savings accounts, user 100 will
> be able to perform real-time transactions against his checking and
> savings accounts.  Thus, if user 100 moves $500 from his checking
> account into his savings account, the transaction will be performed
> in real-time, in the same manner the transaction would have been
> performed by a live teller at the bank or an ATM machine.
> Therefore, unlike his prior access to his account, user 100 now has
> the capability to do more than browse his bank account.  The
> ability to perform these types of robust, real-time transactions from
> a Web client is a significant aspect of the present invention.

(*Id.* at 7:11-23).  Thus, the example discloses a "POSvc Application" which is activated by a

user selection.  That POSvc Application is also referred to as a "Web client."  (*Id.* at 7:22)  That

"POSvc Application" or "Web client" is selectable by the user, and so it is the front-end of a transactional application which can "connect to Bank services and utilize the application to perform banking transactions." (*Id*. at 6:66 to 7:2)  The back end of the transactional application is referred to as the "Bank Back Office." (*Id*. at Figure 5D; 7:1-2).

Thus, there is no inconsistency in identifying the POSvc Application at the front-end of the transaction (or what the patent refers to as "Web client") as a "transactional application," and also referring to a "back-end transactional application."  This is the reality that a transaction requires two parties or ends and an applications that links them – a sender and a receiver, or buyer and purchaser, or depositor and deposit account, and the like.

Defendants then argue that the patent <u>text</u> does not support Plaintiff's construction that the a POSvc Application is a "A Web application displayed on a web page, and displaying an "object" data structure in the Web application with attributes and … information entries…." But all text must be read in conjunction with the patent drawings. As shown above in Plaintiff's opening brief, Figures 5C shows that the POSvc Application is displayed on a web page, and then Figure 5D supports the remainder of the proposed construction:



In addition, the language "return of information entries from the Web merchant's or value-added network service provider's system" is also supported by Figure 8 which shows "Data retrieved from data repository," followed by the user ending the transaction or continuing with another transaction. The "return of information entries from the Web merchant's or value-added network service provider's system" construction is also supported by the text of the patents that:

> Once Bank POSvc application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank "Back Office."

(App. C at 6:65 to 7:2).

These terms are not only apparent from the patent specification, but the prosecution history shows that the inventor distinguished her claims from the prior art by arguing that "the transactional request includes an object that is a transactional data structure specific to a transactional web application" and that the prior art "objects do not constitute an encapsulation

of data into a 'transactional data structure specific to a transactional web application'" (App. E at 93, 94). See also App. E at 116 and 127 (prior art "is also lacking an 'object' that is a Web 'transactional data structure specific to a transactional Web application.'"); App. F at 77 ("A DIS object, as in Rogers, is not an 'object' or 'data structure' specific to a Web application, as in the subject patent Application."); App. H at 21-22 ("Scholl lacks an object that is a data structure specific to a POSvc Web application with both information entries and attributes routed as an encapsulated whole on a service network on the Web").

Thus, all the elements of the construction come directly from the patents and the prosecution histories.

Defendants' last argument is that if the court were to hold that POSvc Application is construable, then it must "connect[] the user to a complete set of services rendered by at least one associated merchant." Defendants raise this argument for the first time in their brief, and it was included in the claim chart. Moreover, Defendants again take one phrase out of the context of the lengthy argument distinguishing CGI. Most interestingly, Defendants do not explain how a consistent line of arguments by the inventor over all applications that defines POSvc Application as comprising the object with a transactional data structure (as reflected in Figure 5D) does not define the term, but a single statement -- out-of-context -- suddenly becomes the only defining construction of the term.

If the Court were to include Defendants' proposal, the court should include the entire relevant statement from the prosecution history, and not an isolated phrase out-of-context of the entire statement:

> Each transactional application is capable of providing the user with a complete set of transactional services offered by a certain network merchant (i.e. a certain network service provider). For example, if the user selects a Bank transactional application, the

Bank application is activated and the user is connected to a variety
of Bank services. The user can perform any Bank transaction in
real time and interactively.

(App. D at 21).

### 4.      Defendants' Sur-Reply Position

"Transactional application" and "POSvc application" are insolubly ambiguous and

therefore indefinite.  Contrary to Pi-Net's assertions, Defendants already have shown that, in

light of the intrinsic record, a skilled artisan could not understand these terms, thus obviating the

need for any extrinsic expert testimony.   Indeed, the intrinsic record is awash with irreconcilable

inconsistencies that preclude the formation of any meaningful standard for "measuring the scope

of [these disputed] phrase[s]."   *Datamize, LLC*, 417 F.3d at 1350; *see also Ernie Ball, Inc. v.*

*Earvana, LLC*, 2013 WL 261916, at *7 (Fed. Cir. Jan. 24, 2013) (finding claim language

indefinite where the intrinsic record offered no "objective way to discern" where a claimed

"sinusoidal" line ends and a "non-sinusoidal" line begins); *Intermec Techs Corp. v. Palm Inc.*,

738 F. Supp. 2d 522, 548 (D. Del. 2010) (finding claim language indefinite where there was

"[no] guidance which would allow a person of ordinary skill in the art to discern the meaning of

"first style" or "second style," nor to discern the degree of difference between the two");

*Girafa.com, Inc. v. IAC Search & Media, Inc.*, 2009 WL 3074712, at *3 (D. Del. Sept. 25, 2009)

(finding claim language indefinite where " there is no "objective anchor" that exists for "the

home page" as used in the claims").  This is precisely the failure of the claim language here:  in

some instances POSvc applications and transactional applications are the same; in some

instances they are different but related; and in others they are completely separate concepts.

Nothing in the intrinsic record explains how to determine the actual bounds of these two terms or

how they function together.  A person skilled in the art is left with no way to determine the scope

of the claimed invention.

Pi-Net's arguments in reply attempt to retroactively redraft the claim language and only confirm that these terms are not amenable to construction. *See K-2 Corp.*, 191 F.3d at 1364. Foremost, Pi-Net argues that a "front-end transactional application" is the same as a POSvc application (or "Web application" or "network application"), which in turn somehow "corresponds to" a "back-end transactional application." Pi-Net cannot support its argument with citations to the intrinsic record because it is *contradicted* by the claim language and the specification. For example, the claims of the '500 patent do not recite a "POSvc application" or "back-end transactional application," rather they refer only to a "transactional application" that is "switch[ed] to in response to a user specification from a network application." '500 patent at claim 1. Claim 1 clearly requires that the "network application" (which Pi-Net equates to "POSvc application") be separate and distinct from the "transactional application," or else the claimed "switch" would be read out of the claims. Pi-Net's proposed construction, however, collapses these two distinct elements and rechristens them as a combined single "transactional application" which also includes a "back-end transactional application." Pi-Net's interpretation not only bears no resemblance to the actual claim language, but also creates more ambiguity than it cures. The "transactional application" that is "switch[ed] to," in claim 1 cannot be equivalent to the "back-end transactional application," as the "switch[ed] to" "transactional application" must also provide the *front-end user* with a plurality of transaction services, and Pi-Net itself argues that "the user never sees the back-end transactional application." Thus, the "switch[ed] to" "transactional application" in claim 1 of the '500 patent, which is neither "front-end" nor "back-end," remains a mystery under Pi-Net's proposal.

Likewise, claim 1 of the '158 patent does not recite either a "transactional application" or "back-end transactional application." If "POSvc application" is "only the front-end" of the

claimed application, as Pi-Net contends, then claim 1 of the '158 patent (the only independent claim) *cannot* be a "method for performing" real-time transactions because only the front "half" of the system would be provided.  Indeed, the specification itself states that "a POSvc application is an application that can execute the type of transaction that the user may be interested in performing." '492 patent at 6:41-44.  Figure 8 and its accompanying explanation only emphasize this inherent ambiguity, as the specification states that "[i]n step 812, the switching component in the exchange switches the user to the selected POSvc application," indicating that, in at least one embodiment, "POSvc application" is more than the mere "front-end" of the claimed application, it is also the application which conducts the alleged "real-time transaction[s]."  Thus, Pi-Net's position, while seemingly simple, is wholly untenable in light of the actual intrinsic record, and would improperly read the alleged invention out of the claims.[16] Moreover, Pi-Net's analogy to a river is completely misplaced.  Defendants do not dispute that "one can refer to the head of the river or the mouth of the river as distinct elements, but they are still a river"—the problem with these claim terms is that the patentee sometimes calls the "head" the "mouth," sometimes calls the "mouth" the "head," and sometimes calls the "river" itself either the "mouth" or the "head."

In addition, Pi-Net's reply only highlights the complete lack of support for its conclusory and circular constructions.  Rather than provide evidence to show that any definition of POSvc or transactional application must include the limitation of "displaying an object data structure," Pi-Net merely superimposes its own language into the patents' figures.  Again, however, neither Pi-

---

[16]     Also, Pi-Net's argument is inconsistent with its position to-date in this lawsuit.  While Pi-Net now argues that the "Bank Back Office" equates to the "back-end of the transactional application" (allegedly depicted in Figure 5D), Pi-Net has previously argued *to this Court* that the "Bank Back Office" in Figure 5D was *irrelevant* to this case.  *See* App. M, Jan. 10, 2013 Hearing Tr. ("you . . . can have your data repositories . . . stuff that you do in the very back end in processing this information, which we agree is not relevant, and I don't need to know.").

Net nor the Court can rewrite the claim language or the specification, and Pi-Net's conclusory statements are not evidence of a coined definition. *See K-2 Corp.*, 191 F.3d at 1364. Furthermore, the "evidence" that Pi-Net cites from the prosecution histories is wholly unrelated to the definition or scope of POSvc or transactional application. Indeed, statements made to distinguish prior art containing certain types of "objects" in no way prove (or even suggest) that "POSvc application" and "transactional application" must display an "object data structure."

Lastly, Defendants agree with Pi-Net's argument that, the Court should, at minimum, limit Pi-Net to statements made during prosecution, namely that each "transactional application" must connect the user with a complete set of transactional services. If the Court is inclined to construe these terms, Defendants do not object to the inclusion of the entire section of the prosecution history cited by Pi-Net in reply.

## M.   Term 18: "Transactional Application" and "Back-End Transactional Applications"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc Application on a Web page" | This claim term is indefinite. |

### 1.   Plaintiff's Opening Position

The meaning of the terms "transactional applications" or "back-end transactional applications" is apparent from the claims themselves and the entirety of the Patent disclosure. The function of the POSvc Application is to permit the user to perform such transactions as are allowed by the web merchant. This is the entire discussion at App. C at 6:51 to 7:50. The transactions by definition require applications to effectuate the transactions, and these are the

back-end transactional applications, which begin with the POSvc Application, which is the entry

point for the user communications with the back-end transactional application.

Thus, if, as provided in the patent, a user wants to transfer funds from one bank account

to another on-line, a transactional application must be invoked to mediate that request.

The proper construction of the terms, however, is most clearly informed by the claim

language itself. *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 2013 U.S. App.

LEXIS 5949, 18-19 (Fed. Cir. 2013) ("[T]he claims are of primary importance, in the effort to

ascertain precisely what it is that is patented."  We presume that the terms in the claim mean

what they say.") Here, in the '500 Patent, the claims state "said *transactional application*

providing a user with a plurality of transactional services managed by at least one value-added

network service provider" (Claims 1, 10 and 35).  In the '492 Patent, the claims state

"connecting through the Web server to a back-end transactional application; and a computer

system executing the Back-end transactional application for processing the transaction request in

real-time" (claim 1), and "the Web application corresponding to a respective *back-end*

*transactional application*, wherein the *back-end transactional application* is an application

running at the back-office server of one or more Web merchants or at the back-end; receiving a

request for Web merchant services upon receipt by a Web server a selection of the Web

application" (claim 10).  Thus, the claim language itself clearly defines the "transactional

applications."

## 2.    Defendants' Answering Position

Although Pi-Net concedes that "transactional application" and "point of service ("PoS or

POScv") application" are coined terms with no ordinary meaning, the intrinsic record fails to

provide any explanation that would allow a person of ordinary skill in the art to determine the

bounds of these terms.  *See. e.g.*, *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1350

(Fed. Cir. 2005) ("[A] claim term, to be definite, requires an objective anchor" to adequately notify the public of the patentee's right to exclude.).  Pi-Net fails to cite to any language in the claims to support its constructions.  Similarly, the intrinsic record fails to suggest a satisfactory definition, merely asserting that both are "applications that are designed to incorporate and take advantage of the capabilities provided by the present invention."  '492 patent at 6:21-25. Nowhere does the patentee explain any workable standard for what qualifies as a "transactional application" or "PoS application" or which capabilities of the present invention they must encompass.  *See, e.g.*, *Datamize*, 417 F.3d at 1350.

Symptomatic of this lack of support, neither the intrinsic record nor Pi-Net's arguments define the relationship between a "PoS application" and a "transactional application."  The specification explains that "PoS applications 510 are transactional applications."  '492 patent at 6:22-23.  However, elsewhere the Patents-in-Suit indicate that "PoS applications" are entirely distinct from "transactional applications."  For instance, independent claim 12 of the '492 patent separately claims "point-of-service applications as on-line services on the Web page" and "transactional applications running at one or more back-end host computers," implying that the applications both serve different functions and run on different systems.  Thus, it is not clear if these applications have a genus/species relationship (i.e., a "PoS application" is a particular type of "transactional application"), or an equivalence relationship (i.e., the terms "PoS application" and "transactional application" have identical meanings).

Pi-Net's attempts to exploit this ambiguity to argue two sides of the same coin highlight the indefiniteness of these terms.  Specifically, Pi-Net proposes opposing constructions for these terms (i.e., a "transactional application" is not equivalent to a "PoS application" but rather "corresponds to the front-end POS application.")  However, Pi-Net's opening brief routinely

cites "PoS applications" as equivalent to not only, "transactional applications," but also to "Web applications" and "network applications."  (e.g. Term 30 (arguing that the "the list of transactional applications are presented as 'POSvc Application 510,'" and that this "PoS application" is corresponding structure to the "means for presenting said user with a list of transactional applications")).  Pi-Net cannot argue that each of these terms is synonymous when it is convenient for Pi-Net, but, at other times, argue that they are separate and distinct.  *See Halliburton Energy Servs.*, 514 F.3d at 1254-55.

Even if it were possible to construe these terms, Pi-Net's proposed constructions are internally inconsistent, and therefore incorrect.  Pi-Net's construction of "PoS application" is circular and uses the term "front-end POSvc Application" to define PoS application, with no explanation of whether a "front-end" PoS application is a unique term in and of itself.  *Funai Elec.*, 616 F.3d at 1366-67 ("The criterion [for claim construction] is whether the explanation aids the court and the jury in understanding the term as it is used in the claimed invention.").  Equally troubling, Pi-Net equates "transactional application" with "back-end transactional application" without any intrinsic (or extrinsic) support.  While it is commonly understood that the same claim term used in related patents must be construed consistently, the inverse is also persuasive: if the patentee meant to use the term "transactional application" in the later patents in the family, she easily could have done so instead of adding the additional limitation, "back-end." *See, e.g.*, *CAE Screenplates Inc.*, 224 F.3d at 1317 ("In the absence of any evidence to the contrary, we must presume that the use of ... different terms in the claims connotes different meanings.").  Thus, Pi-Net's proposed constructions are unsupported by the intrinsic evidence and emphasize the indefinite nature of the claim terms.

Pi-Net attempts to cure the defects of indefiniteness by reading limitations into the definitions of "PoS application" that are simply unsupported by the intrinsic evidence. *See K-2 Corp.*, 191 F.3d at 1364 ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee."). Pi-Net argues that a "key defining aspect" of the "PoS application" is that it has a "transactional data structure, which the Patents call the 'object.'" The only evidence cited in support of this "key defining" feature, however, is the prosecution history of the '158 patent. Tellingly, the claim at issue in that prosecution history plainly states that the claimed invention "utilize[es] a routed transactional data structure that is . . . specific to the point-of-service application." '158 patent at 10:10-15. Furthermore, the '158 patent's prosecution history explains that "[the prior art] is also lacking an 'object' that is a Web 'transactional data structure specific to a transactional Web application.'" It is clear that this evidence relates to a separate limitation found only in the sole independent claim of the '158 patent, and does not provide the definition of "PoS application." Pi-Net cannot retroactively insert limitations into its claims in order to overcome the insolubly ambiguous nature of disputed terms or to attempt to bolster its infringement theory.

If the Court is inclined to construe "PoS application" and "transactional application," Defendants respectfully request that a proposed alternative construction be adopted. If the terms mean anything, the prosecution history teaches that "transactional applications" must "connect[] the user to a complete set of services rendered by at least one associated merchant."[17] As discussed above, the specification requires the definition of "PoS application" to encompass, at minimum, the limitations defined in "transactional application." '492 patent at 6:20-21. Any

---

[17] App. D, '500 Patent Prosecution History Excerpts at 21-22 (emphasis added) ("Unlike the CGI forms-based application in Davison, which connects the user only to a certain service, the transactional application in the present invention connects the user to a complete set of services rendered by at least one merchant associated with this transactional application").

construction which did not limit the scope of these terms would allow Pi-Net to evade limitations that the patentee repeatedly imposed specifically to overcome rejections over prior art before the PTO.

### 3.      Plaintiff's Reply Position

Plaintiff Pi-Net contends that the terms "Web Application[s]" and "Network Application" are synonymous with "Point of Service Application," with the term "network application" being used in the '500 Patent, and "Web application" and "POSvc Application" being used in the '158 and '492 Patents. Defendants assert that POSvc Application is indefinite, and the terms "Web Application[s]" and "Network Application" have ordinary meaning.

Contrary to Defendants' statement in their brief, Plaintiff has not argued that "transactional application" is synonymous with any of the prior three terms.

Defendants' argument that these terms are indefinite is untenable.  As pointed out earlier, the meaning of the terms "transactional applications" and "back-end transactional applications" is apparent from the claims themselves and the entirety of the Patent disclosure.  The POSvc Application is a transactional application, but it is also only the front-end of that application. The transactional application also has a back-end in the "Bank Back Office," where the user-specified transactions are executed.  The back-end of the transactional application performs the transaction selected by the user, but the user never sees the back-end of the transactional application.  A river has a head and a mouth, and one can refer to a head of the river or the mouth of the river as distinct elements, but they are still a river.  There is simply no inconsistency or indefiniteness in having the claims recognize the reality that every transaction has at least a front-end and a back-end.

Defendants argue that "Nowhere does the patentee explain any workable standard for what qualifies as a 'transactional application' or 'PoS application' or which capabilities of the

present invention they must encompass."  But, Defendants cite no authority for the requirement

of a "workable standard."  No such requirement appears in any Federal Circuit authority.  To the

contrary, the Federal Circuit requires only that that a skilled artisan can appreciate the term.

*Biosig Instruments v. Nautilus, Inc.*, 2013 U.S. App. LEXIS 8486 (Fed. Cir. Apr. 26, 2013) ("the

record shows that the variables here, including the spacing, size, shape, and material affecting the

'spaced relationship' between the electrodes, can be determined by those skilled in the art. Thus,

'spaced relationship' cannot be said to be insolubly ambiguous."); *Star Scientific, Inc. v. R.J.*

*Reynolds Tobacco Co.*, 655 F.3d 1364, 1373-74 (Fed. Cir. 2011) ("controlled environment" is

not indefinite, because "a person of ordinary skill would know how to establish a controlled

environment to perform the claimed method," even if the patents-at-issue did not give exact

numbers measuring humidity, temperature, and airflow).

    Defendants present no evidence whatsoever (at least the properly-supported declaration

of an expert) that the claims are invalid, because a skilled artisan could not determine what is a

"transactional application" or a "back-end transactional application," in light of the specification

and the context of the claims themselves.

### 4.    Defendants' Sur-Reply Position

    "Transactional application" and "POSvc application" are insolubly ambiguous and

therefore indefinite.  Contrary to Pi-Net's assertions, Defendants already have shown that, in

light of the intrinsic record, a skilled artisan could not understand these terms, thus obviating the

need for any extrinsic expert testimony.  Indeed, the intrinsic record is awash with irreconcilable

inconsistencies that preclude the formation of any meaningful standard for "measuring the scope

of [these disputed] phrase[s]."  *Datamize, LLC*, 417 F.3d at 1350; *see also Ernie Ball, Inc. v.*

*Earvana, LLC*, 2013 WL 261916, at *7 (Fed. Cir. Jan. 24, 2013) (finding claim language

indefinite where the intrinsic record offered no "objective way to discern" where a claimed

"sinusoidal" line ends and a "non-sinusoidal" line begins); *Intermec Techs Corp. v. Palm Inc.*, 738 F. Supp. 2d 522, 548 (D. Del. 2010) (finding claim language indefinite where there was "[no] guidance which would allow a person of ordinary skill in the art to discern the meaning of "first style" or "second style," nor to discern the degree of difference between the two"); *Girafa.com, Inc. v. IAC Search & Media, Inc.*, 2009 WL 3074712, at *3 (D. Del. Sept. 25, 2009) (finding claim language indefinite where " there is no "objective anchor" that exists for "the home page" as used in the claims"). This is precisely the failure of the claim language here: in some instances POSvc applications and transactional applications are the same; in some instances they are different but related; and in others they are completely separate concepts. Nothing in the intrinsic record explains how to determine the actual bounds of these two terms or how they function together. A person skilled in the art is left with no way to determine the scope of the claimed invention.

Pi-Net's arguments in reply attempt to retroactively redraft the claim language and only confirm that these terms are not amenable to construction. *See K-2 Corp.*, 191 F.3d at 1364. Foremost, Pi-Net argues that a "front-end transactional application" is the same as a POSvc application (or "Web application" or "network application"), which in turn somehow "corresponds to" a "back-end transactional application." Pi-Net cannot support its argument with citations to the intrinsic record because it is *contradicted* by the claim language and the specification. For example, the claims of the '500 patent do not recite a "POSvc application" or "back-end transactional application," rather they refer only to a "transactional application" that is "switch[ed] to in response to a user specification from a network application." '500 patent at claim 1. Claim 1 clearly requires that the "network application" (which Pi-Net equates to "POSvc application") be separate and distinct from the "transactional application," or else the

claimed "switch" would be read out of the claims.  Pi-Net's proposed construction, however, collapses these two distinct elements and rechristens them as a combined single "transactional application" which also includes a "back-end transactional application."  Pi-Net's interpretation not only bears no resemblance to the actual claim language, but also creates more ambiguity than it cures.  The "transactional application" that is "switch[ed] to," in claim 1 cannot be equivalent to the "back-end transactional application," as the "switch[ed] to" "transactional application" must also provide the *front-end user* with a plurality of transaction services, and Pi-Net itself argues that "the user never sees the back-end transactional application."  Thus, the "switch[ed] to" "transactional application" in claim 1 of the '500 patent, which is neither "front-end" nor "back-end," remains a mystery under Pi-Net's proposal.

Likewise, claim 1 of the '158 patent does not recite either a "transactional application" or "back-end transactional application."  If "POSvc application" is "only the front-end" of the claimed application, as Pi-Net contends, then claim 1 of the '158 patent (the only independent claim) *cannot* be a "method for performing" real-time transactions because only the front "half" of the system would be provided.  Indeed, the specification itself states that "a POSvc application is an application that can execute the type of transaction that the user may be interested in performing."  '492 patent at 6:41-44.  Figure 8 and its accompanying explanation only emphasize this inherent ambiguity, as the specification states that "[i]n step 812, the switching component in the exchange switches the user to the selected POSvc application," indicating that, in at least one embodiment, "POSvc application" is more than the mere "front-end" of the claimed application, it is also the application which conducts the alleged "real-time transaction[s]."  Thus, Pi-Net's position, while seemingly simple, is wholly untenable in light of

the actual intrinsic record, and would improperly read the alleged invention out of the claims.[18]

Moreover, Pi-Net's analogy to a river is completely misplaced.  Defendants do not dispute that

"one can refer to the head of the river or the mouth of the river as distinct elements, but they are

still a river"—the problem with these claim terms is that the patentee sometimes calls the "head"

the "mouth," sometimes calls the "mouth" the "head," and sometimes calls the "river" itself

either the "mouth" or the "head."

In addition, Pi-Net's reply only highlights the complete lack of support for its conclusory

and circular constructions.  Rather than provide evidence to show that any definition of POSvc or

transactional application must include the limitation of "displaying an object data structure," Pi-

Net merely superimposes its own language into the patents' figures.  Again, however, neither Pi-

Net nor the Court can rewrite the claim language or the specification, and Pi-Net's conclusory

statements are not evidence of a coined definition.  *See K-2 Corp.*, 191 F.3d at 1364.

Furthermore, the "evidence" that Pi-Net cites from the prosecution histories is wholly unrelated

to the definition or scope of POSvc or transactional application.  Indeed, statements made to

distinguish prior art containing certain types of "objects" in no way prove (or even suggest) that

"POSvc application" and "transactional application" must display an "object data structure."

Lastly, Defendants agree with Pi-Net's argument that, the Court should, at minimum,

limit Pi-Net to statements made during prosecution, namely that each "transactional application"

must connect the user with a complete set of transactional services.  If the Court is inclined to

---

[18]     Also, Pi-Net's argument is inconsistent with its position to-date in this lawsuit.  While Pi-Net now argues that the "Bank Back Office" equates to the "back-end of the transactional application" (allegedly depicted in Figure 5D), Pi-Net has previously argued *to this Court* that the "Bank Back Office" in Figure 5D was *irrelevant* to this case.  *See* App. M, Jan. 10, 2013 Hearing Tr. ("you . . . can have your data repositories . . . stuff that you do in the very back end in processing this information, which we agree is not relevant, and I don't need to know.").

construe these terms, Defendants do not object to the inclusion of the entire section of the

prosecution history cited by Pi-Net in reply.

### N.      Term 19: "The Selected Back-end Transactional Application"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "The selected application offered by the value-added network service provider or Web merchant that corresponds to the front-end POSvc Application on a Web page" | This claim term is indefinite. |

#### 1.      Plaintiff's Opening Position

The term is self-explanatory from the claim language.  See also Figure 5C, which shows

a selection of POSvc Applications.  The selection process is described at App. C at 6:39-43,

6:51-64.  The same selection of an application provided by the Web merchant is shown in Figure

8 and its accompanying text:

> In step 810, the user makes a selection from the POSvc application
> list.  In step 812, the switching component in the exchange
> switches the user to the selected POSvc application, and in step
> 814, the object routing component executes the user's request.

(App. C at 9:30-35).

#### 2.      Defendants' Answering Position

For the reasons stated above with respect "back-end transactional application," the term

"the selected back-end transactional application" also is indefinite.  Pi-Net's argument in support

of its proposed construction for this term—"the selected application offered by the value-added

network service provider or Web merchant that corresponds to the front-end POSvc Application

on a Web page"—in fact supports Defendants' argument that the claim limitation is indefinite.

The passages of the common specification relied on by Pi-Net refer only to the selection by a

user of a point of service application, which according to Pi-Net, is not the same thing as a

"back-end transactional application."  Accordingly, the term "the selected back-end transactional

application" is insolubly ambiguous and therefore is indefinite.

### 3.      Plaintiff's Reply Position

Defendants assertion that independent claim 10 of the '492 patent is invalid for

indefiniteness is untenable for the reasons detailed above. Defendants argue that the patent shows

only that a user selects a POSvc Application, but not a back-end transactional application. But, as

explained above in connection with the construction of the POSvc Application, and as shown in

Figure 5D, the POSvc Application is the front-end of the transactional application. By selecting

the front-end of the transactional application, the other or back-end of that transactional

application is also selected. Thus, Figure 5D shows a line from the user selection directly to the

back-end.

### 4.      Defendants' Sur-Reply Position

Pi-Net argues that "the selected back-end transactional application" is not indefinite

because "Figure 5D shows a line from the user selection directly to the back-end" and that "[b]y

selecting the front-end of the transactional application, the other or back-end of that transactional

application is also selected."  In reality, Figure 5D shows only a line going from "User 100" to

"Data Repository 575," which the specification describes as merely a repository "utilized by [a]

bank to store its data."  '492 patent at 6:65-7:4.  There is simply no indication that this

repository, or any other structure depicted in Figure 5D, is a "back-end transactional

application," which Pi-Net contends is "an application provided by the web merchant or value-

added network service provider that corresponds to the front-end POSvc Application on a Web

page."  For this reason and the additional reasons stated above, this term is indefinite.

O.      Term 20: "Service Network"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "An online network." | This claim term is indefinite. |

### 1.      Plaintiff's Opening Position

The Patent explicitly defines a "service network" as "running on top of a facilities network, namely the Internet, the Web or e-mail networks."  (App. C at5: 55-59)  Thus a "service network" is an online network or facility.

### 2.      Defendants' Answering Position

The term "service network" is insolubly ambiguous, and thus indefinite, because the intrinsic record fails to provide any explanation that would allow a person of ordinary skill in the art to determine the bounds of the coined term.  Not only does "service network" lack a generally accepted meaning in the art (as Pi-Net concedes), but nothing in the intrinsic record explains the difference between the allegedly novel "service network" and the well-known, prior art "facilities networks."

According to the patentee, the allegedly novel "service network" is distinct from a "facilities network."  Claim 1 of the '492 patent recites "a service network running on top of the facilities network."[19]  Similarly, the specification describes the invention as including a "service network . . . running on top of a facilities network, namely the Internet, the Web or e-mail networks."  '492 patent at 5:59-61.  The specification further describes these exemplary facilities networks as prior art to the purported invention.  *See* '492 patent at Figs. 1A ("Prior Art"), 1B

_____

[19] The term "service network" is recited in each independent claim of the '492 patent (claims 1, 10, and 12) and the only independent claim of the '158 patent (claim 1).  Because dependent claims necessarily incorporate all of the limitations of the independent claims from which they depend, a finding that an independent claim is invalid as indefinite means that any claim that depends from it is also indefinite, unless the dependent claim corrects the indefiniteness flaw in the independent claim.  *See* 35 U.S.C. § 112(d).

("Prior Art"); 1:33-2:45 (description of the Internet, the Web, and e-mail in the context of Figs. 1A and 1B).  In overcoming a prior art rejection, the patentee argued that "[t]here is a significant difference between a physical network or 'a facilities network' on the one hand, and the 'service network' 'atop a facilities network' (such as the physical Internet, Web, 'email networks' or 'other IP-based facilities networks'), disclosed in the Application."  App. F, '492 Patent Prosecution History Excerpts at 48-49.  The patentee, however, failed to identify this "significant difference."  That is, the specification and prosecution history provide no objective criteria for one of ordinary skill in the art to determine whether a network falls within the scope of the allegedly novel "services network" or is merely a prior art facilities network.  Because the public is left to guess as to the bounds of this claim term, it is therefore indefinite.  *See, e.g.*, *Datamize, LLC*, 417 F.3d at 1350 ("[A] claim term, to be definite, requires an objective anchor" to adequately notify the public of the patentee's right to exclude.).

Pi-Net's proposed construction of "service network"—"online network"—is impermissibly broad, unsupported by the specification, and reads upon exemplary prior art "facilities networks," in contravention of the specification, claims, and prosecution history.  Pi-Net's opening brief provides no support for its conclusory argument that a "'service network' is an online network or facility"—because there is none—and it should be rejected accordingly.  Neither the claims nor the specification describe the "service network" as "online," or even use the term "online."  Indeed, "online" only appears in the phrase "online service atop the Web" recited in dependent claim 5 of the '492 patent.[20]  Moreover, the plain and ordinary meaning of "online network" would clearly capture the Internet, the Web, e-mail, or other IP-based

---

[20] The limitations in a dependent claim should not normally be read into the independent claim from which it depends.  *See Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc)).

networks, the very same types of networks specifically criticized by the patentee. *See, e.g.*, '492

patent at 1:38-48; 1:62-64; 2:7-11. Thus, under Pi-Net's proposed construction, there would be

no difference, let alone a significant difference, between the allegedly novel "service network"

and the prior art "facilities networks" distinguished by the patentee.  Under these circumstances,

there is no way for a person of ordinary skill in the art to discern the bounds of any claim

containing the "service network" limitation. *See, e.g.*, *Datamize*, 417 F.3d at 1350.

### 3.     Plaintiff's Reply Position

Defendants argue that all the claims of the '158 and '492 Patents are invalid for

indefiniteness because the term "service network" is indefinite and indistinguishable from a

"facilities network."   As previously analyzed, Defendants have not presented any evidence to

support their position, and ignore the governing law that requires "insoluble ambiguity" to

invalidate a claim for indefiniteness.   Moreover, Defendants err, because skilled artisan will

immediately recognize that "facilities network" is the physical network of wired and wireless

physical components that carry signals, while a service network is a virtual or logical network

that runs on top of the physical facilities network.

First, the patent specification explicitly defines a "service network" as "running on top of

a facilities network, namely the Internet, the Web or e-mail networks."  (App. C at5:55-59), and

refers to the fact that the "Exchange 501 creates and allows for the management (or distributed

control) of a <u>service network</u>, operating within the boundaries of an IP-based facilities

network." (App. C at 6:30-33).   The parties agree that the Exchange comprises at least a

webpage and a POSvc Application, which establishes the service network is by definition an

online network.

Second, the claims themselves do not just say "service network," but say:   "a service

network atop the World Wide Web" (App. B, '158 patent claim 1); and:

> a service network running on top of the facilities network for
> connecting through the Web server to a back-end transactional
> application….

(App. C claim 1).  Thus, the claim language itself establishes establish that the service network is an online network, because it is running on top of the World Wide Web and connects to a back- end transactional application via a Web server.

Third, during prosecution, the inventor explained and applied the term "service network" to distinguish the prior art.  See, for example App. E at 186; App. F at 68; and App. F at 77.

In light of the teachings of the patent, the context of the claims and the prosecution history, Defendants can argue the proper construction of the claims, but they cannot reasonably suggest that the all the claims of two patents are invalid for indefiniteness because a term found in the specifications and the prosecution history is so insolubly ambiguous that it cannot be construed.

### 4.    Defendants' Sur-Reply Position

As explained above, in overcoming a prior art rejection, the patentee argued that there was a "significant difference" between a "service network" and prior art "facilities networks," but failed to identify this "significant difference."  Pi-Net now argues that a skilled artisan would immediately recognize that a "facilities network" is a "physical network of wired and wireless physical components that carry signals, while a service network is a virtual or logical network that runs on top of the physical facilities network."  Pi-Net's proffered distinction, however, is contradicted by the fact that the Web and e-mail—both of which are described in the intrinsic record as "facilities networks"—are in fact virtual networks that transmit data over the physical infrastructure of the Internet.  See '492 patent at Figs. 1A, 1B; 1:33-2:45; 5:59-61; App. F, '492 Patent Prosecution History Excerpts at 48-49.  Thus, the distinction between a "service network" and a "facilities network" cannot be based upon whether the network is virtual, and one of

ordinary skill in the art is left to guess as to the "significant difference."  Moreover, Pi-Net

erroneously argues that merely because the term "service network" is "found in the

specifications and the prosecution history," Defendants cannot reasonably argue that this term is

indefinite.  Pi-Net cites no case law for this proposition because there is none—"service

network" is insolubly ambiguous and indefinite.[21]

### P.        Term 21: "Value-added Network (VAN) Switch"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| Value-Added Network: means an online service network comprising a Web application (i.e., POSvc application).<br><br>Switch: Structure connecting the object sender and the object receiver between the POSvc Application on a web page and the transactional application at the OSI Application layer.<br><br>Value Added Network (VAN) Switch is thus a structure connecting the object sender and the object receiver between the POSvc Application on a web page and the transactional application at the OSI Application layer on an online service network comprising a Web application (i.e., POSvc application). | This claim term is indefinite. |

### 1.        Plaintiff's Opening Position

In the '500 Patent, the "value-added network switch" is not a limitation, because it is

found only in the preamble, which merely serves to introduce the intended function of the

invention that follows.   The term was never argued by the examiner or inventor during

---

[21]      Pi-Net simply fails to respond to Defendants' argument that its proposed construction clearly reads the allegedly novel "services network" upon the exemplary prior art "facilities networks," underscoring the flaws with Pi-Net's proposed construction of "service network."

prosecution, and is not necessary to complete the structural limitations that follow.[22]

The term is a limitation in the '492 Patent. The "VAN switch," labeled "520" in the Patent specifications, is depicted in Figure 7. "VAN switch 520" has four components – "Switching Service 702," "Management Service 703," "Boundary Service 701," and "Application Service 704," which are described at App. C at 8:41 to 9:37. They are virtual structures connecting the object sender and the object receiver between the POSvc Application on a web page and the transactional application at the OSI Application layer on an online service network comprising a Web application (i.e., POSvc application). Thus, "boundary service 701" provides the interfaces between the user and the internet and the provider services. (8:41-51) "Switching service 702 is an OSI application layer switch" (8:52), which performs routing of user connections and connectivity between the POSvc Application and the provider services. (8:52-63). Management service 703 provides the tools managing connections between the user

---

[22]  *Dawson v. Dawson*, 2013 U.S. App. LEXIS 6083 (Fed. Cir. 2013) ("a preamble is not limiting 'when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention' … [n]or is a preamble limiting if it 'merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.'"); *Textron Innovations Inc. v. Am. Eurocopter Corp.*, 2012 U.S. App. LEXIS 18825, 8-9 (Fed. Cir. 2012) (preamble not a limitation "when a patentee 'defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention'," or "if 'the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention…'"); *Am. Med. Sys. v. Biolitec, Inc.*, 618 F.3d 1354, 1358 (Fed. Cir. 2010) ("photoselective vaporization" in the preamble not a limitation, because not argued to distinguish the prior art during prosecution, not antecedent basis, and "does not embody an essential component of the invention. Instead, the term "photoselective vaporization" is simply a descriptive name for the invention that is fully set forth in the bodies of the claims"); *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("The phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention. Its use does not limit the claims . . . to a control apparatus that is separate from the machine tool. The claim is infringed by any apparatus encompassing all of the limitations in the body of the claim.").

and service provider or end user. (8:64 to 9:8)  Application service 704 contains application

programs, including the "POSvc Applications such as Bank POSvc Application."  (9:9-23).

### 2.    Defendants' Answering Position

The term "value-added network (VAN) switch" is insolubly ambiguous and indefinite

because the intrinsic record fails to provide any explanation that would allow a person of

ordinary skill in the art to determine the bounds of the coined term.[23]  First, the specification

contains multiple, contradictory explanations of "VAN switch" that cannot be resolved and thus

create insoluble ambiguity.  The specification initially depicts the "VAN switch" as a component

of the exchange, as illustrated in Fig. 5B.  However, the specification subsequently depicts the

"exchange" as a component of the VAN switch in Figure 6A (as illustrated below):



Figure 6A                             Figure 5B

Because both depictions cannot be true, and the specification provides no means to determine

which is correct, "VAN switch" is necessarily indefinite.  Equally troubling, the specification

also discloses that a "VAN switch" is comprised of an "exchange and a management agent,"

---

[23] Pi-Net's assertion that "VAN Switch" is not a limitation in the '500 patent is simply untenable.  Each of the dependent claims in the '500 patent which relate to Claims 1 and 10 (the independent claims containing "VAN Switch" in their preamble) recite "[t]he configurable value-added network switch as claimed in claim []."

'492 patent at 7:51-54, while at the same time stating that "switching service 702," an undefined

term, "represents the core of the VAN switch." '492 patent at 8:52-54.  This undefined

"switching service" is then shown in conjunction with three other elements—a "boundary

service," a "management service," and an "application service"—as comprising the "VAN

switch."  *See* '492 patent at Fig. 7.  Again, the would-be juror is left to wonder what elements of

specification and figures actually comprise a "VAN switch."

Even if these irreconcilable contradictions could be cured, "VAN switch" is still

indefinite because it contains another insolubly ambiguous structure—the "management agent."

The specification expressly states that "exchange 501 and *management agent* 601, illustrated in

FIG. 6A, together constitute a value-added network (VAN) switch." '492 patent at 7:52-54.

That is, a "VAN switch" contains a management agent.  However, as discussed in the context of

Term 23, "management agent" is itself indefinite.

Pi-Net's proposed construction cannot cure these defects because it is unsupported by the

intrinsic evidence and would lead to illogical results.  According to one part of the specification,

one of the components of the "VAN switch" is the application service 704, which contains

"application programs that deliver customer services … [and] includes POSvc applications."

'492 patent at 9:9-11.  That is, the POSvc application is a component of the VAN switch.

Therefore, it is impossible for the VAN switch to be a structure that connects "the object sender

and the object receiver between the POSvc Application on a web page and the transactional

application at the OSI Application Layer" as Pi-Net suggests.  Moreover, the terms "object

sender" and "object receiver" are seemingly created by Pi-Net solely for the purpose of

construction, as Pi-Net has not pointed to any intrinsic evidence which includes these terms,

either expressly or impliedly.  Lastly, Pi-Net's construction would render dependent claim 2 of

the '492 patent—"[t]he system of claim 1, wherein VAN switch is an application lawyer switch in the application lawyer of the OSI model"—meaningless.

Pi-Net's attempt to define "VAN switch" fails because the various descriptions for this term that are provided by the specification are irreconcilable.  Because this term is insolubly ambiguous, it is therefore indefinite.

### 3.    Plaintiff's Reply Position

Preliminarily, Defendants apparently concede Plaintiff's position that in the '500 Patent, the "value-added network switch" is not a limitation, because it is found only in the preamble. With respect to the '492 Patent, Defendants again argue invalidity without any support.

Plaintiff identified the meaning of the term in its first brief, which Defendants generally ignore.  Instead, Defendants incorrectly argue that the Patent defines the term inconsistently. Preliminarily, even if Defendants were correct in their factual analysis, overlapping claim terms and constructions do not render claims indefinite.  *C.R. Bard v. M3 Sys.*, 157 F.3d 1340, 1360 (Fed. Cir. 1998) ("It is incorrect to construe the claims as barring all overlap"); *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007) ("Even though the "composite composition" claims, as construed by the district court, cover substantially the same subject matter that is covered by the "pellet" and "linear extrudate" claims, overlapping patent claims are not unusual, and the overlap does not require us to construe the "composite composition" claims to cover subject matter that differs from the subject matter covered by the other two sets of claims.").

In any event, there is really no inconsistency. Figure 5B does not purport to say that all the components shown in that Figure are components of the Exchange, but the accompanying text states that: "FIG. 5B illustrates exchange 501. Exchange 501 comprises Web page 505 and point-of-service (POSvc) applications 510. Exchange 501 also <u>conceptually</u> includes <u>a</u> switching

98

component and an object routing component (described in more detail below)." (App. C at 6:18-23; emphases supplied).

Similarly, Figure 6Adoes not say that everything shown in Figure 6A is part of the Van Switch. The text accompanying Figure 6A says clearly that "As described above, exchange 501 and management agent 601, illustrated in FIG. 6A, together constitute a value-added network (VAN) switch." (App. C at 7:52-54)

Thus, the Figures and the text are consistent: the Exchange comprises the web page and the POSvc Application. This Exchange with a Management Agent is then termed a VAN Switch. , and both define both the VAN switch and the Exchange components. The switching functionality can be found in the Exchange, which is not inconsistent with the definition of VAN Switch, because that Exchange is part of the VAN Switch and can provide the switching function or service. Therefore, Defendants' arguments do not create any dilemma or inconsistency. An individual State is an entity that can be described as an individual entity, part of the West, South, Mid-West or East, or as part of the United States.  All the terms are equally applicable.

Similarly, there is no inconsistency in construing the VAN Switch as including a POSvc Application and saying that the VAN Switch links the POSvc Application and the back-end of the transactional application.  A computer can be defined to include a modem, and also be defined as the component that connects the computer and/or modem to another entity, and it would be impossible to try to define the terms in an exclusive form, because the modem in the computer will still rely on the operating system of the computer for its own operations.

Finally, again, Defendants' arguments demonstrate that the patent specification, including text and drawings, do discuss and illustrate the VAN Switch.  Therefore, it is the obligation of the Parties and the Court to construe the claim term unless the term is so insolubly ambiguous

that there is no rational basis by which the claims be construed.  Defendants have not come close

to that standard.

### 4.      Defendants' Sur-Reply Position

Pi-Net ignores the explicit inconsistencies in the specification regarding the "VAN

switch." [24]   In arguing that the "exchange" is part of the VAN switch, Pi-Net disregards Figure

5B, which explicitly shows that the VAN switch is a component of the exchange.  Instead, Pi-

Net arbitrarily contends that the "switching component" of the exchange (which the figure labels

as "VAN switch") is not the VAN switch.  *See* '492 patent at Fig. 5B, 6:20-21.  The

specification, however, provides no additional detail describing the "switching component" of

the exchange, and Pi-Net does not explain why a skilled artisan would conclude that the

"switching component" of the exchange is not the "VAN switch" as explicitly depicted in Figure

5B.  Pi-Net therefore cannot now cure the ambiguity in the specification with circular attorney

arguments that merely collapse two distinct terms to avoid having to define either.  For these

reasons and the reasons stated above, "value-added network (VAN) switch" is indefinite. [25]

### Q.      Term 22: "Switching"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "Application layer switching at the application layer 7 of the OSI model connecting the object sender and the object receiver between the POSvc Application on a webpage and the transactional application" | This claim term is indefinite. |

---

[24]     As explained above, Defendants do not concede that "VAN Switch" is not a limitation in the '500 patent.  *Pac-Tec Inc. v. Amerace Corp.*, 903 F.2d 796, 801, 1876 (Fed. Cir. 1990) (noting preamble language constituting a structural limitation is part of the claimed invention).

[25]     Pi-Net states in reply that a "VAN switch" is "an exchange and management agent." Nonetheless, combining Pi-Net's proposed construction of "exchange" with "management agent," which Pi-Net asserts to have a yet-to-be-discovered ordinary meaning, does not result in Pi-Net's proposed construction of "VAN switch."

### 1.    Plaintiff's Opening Position

The claim language itself defines "switching" as the connecting between the POSvc

Application that a user sees on the webpage (which includes the object structure as shown in

Figure 5D), and the transactional application which is the object receiver (as also shown in

Figure 5D).  Thus, the claims say: "means for switching to a transactional application in response

to a user specification from a network application" ('500 Patent claim 1); "switching to Web

merchant services in response to a Web server's receipt of a selection of one of the point-of-

service Web applications" ('492 Patent claim 3); and "switching utilizing the VAN switch to the

back-end transactional application in response to receiving the request from the Web server."

('492 Patent claim 10).  The construction finds support also in the specification:

> The present invention allows the user to switch between
> transactional applications which are associated with various value-
> added network service providers and content owners.

(App D at 21).  Construing the term to include "at the application layer 7 of the OSI model" is

appropriate, because the Patents state that "The present invention is implemented to function as a

routing switch within the 'application layer' of the OSI model."  (4:62-64).

### 2.    Defendants' Answering Position

Like "VAN switch," the term "switching" is insolubly ambiguous and therefore

indefinite, because a person of ordinary skill in the art is unable to determine the bounds of the

coined term.  Foremost, the only "switching" claimed by the present invention is that done by the

so-called "VAN switch."  *See, e.g.*, '500 patent at claims 1, 10; '492 patent at 7:51-8:2; 8:41-63;

claims 3, 10.  Notably, Pi-Net's proposed constructions for "VAN switch" and "switching" are,

in essence, identical.  As with "VAN switch" above, "switching" must also be found indefinite.

Pi-Net states that "switching" is defined in the language of claim 1 of the '500 patent and

claims 3 and 10 of the '492 patent as "the connecting between the POSvc Application … and the

transactional application."  However, Pi-Net's construction of "switching" is inconsistent with the claim language.  For example, claim 10 of the '492 patent includes both "switching" and "connecting" elements.  Pi-Net provides no basis to overcome the strong presumption that two different terms used in a patent should be construed to have different meanings.  *See Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1325 (Fed. Cir. 2001) (rejecting a construction that would render a phrase in the remainder of the claim to be "mere surplusage").  Moreover, Pi-Net improperly inserts limitations into claims to overcome indefiniteness.  For the reasons explained for "VAN switch," neither "object sender," "object receiver," nor "application layer 7" are proper limitations on "switching."  Thus, the term "switching" is insolubly ambiguous and therefore indefinite.

### 3.        Plaintiff's Reply Position

Defendants incorporate their prior comments as VAN Switch, and, thus, Plaintiff incorporates its analysis of that term.  Interestingly, Defendants do not attempt to support their argument that "switching" is so insolubly ambiguous as to render the claims invalid for indefiniteness.  Instead, Defendants argue the merits of Plaintiff's proposed construction, when they had not provided any construction on their own part.

Defendants argue that Plaintiff's construction of switching is allegedly inconsistent, because it refers to "connecting the object sender and the object receiver," but claim 10 of the '492 patent includes both "switching" and "connecting" elements.  That argument fails, because there is no inconsistency.  Claim 10 reads:

> switching utilizing the VAN switch to the back-end transactional application in response to receiving the request from the Web server; … [and]
>
> connecting to specified ones of the Web merchant services or to back-end services, wherein the connection to the Web merchant services or back-end transactional services is managed….

Plaintiff construes "switching" to include the element of "connecting the object sender and the object receiver." This is the first step to, but not the same as, "connecting to specified ones of the Web merchant services or to back-end services." That is the "switching" connects to the back end, but the claim further requires a connection to the "Web merchant services." Thus, the terms are additive, not inconsistent with each other.

Similarly, Defendants err in arguing that "neither "object sender," "object receiver," nor "application layer 7" are proper limitations on "switching." Plaintiff believes that these are proper terms for the construction of "switching," and every part of the definition is in the specification. Thus, the reference to OSI Application Layer 7 is proper based on the fact that the patent says that is "the invention":

> The present invention is implemented to function as a routing switch within the "application layer" of the OSI model.

(App. C at 4:62-64). See also App. C at 5:23-25.

Similarly, any switching involves requires an object sender and an object receiver. The patents state:

> As described above, the present invention is implemented to function as a routing switch in application layer 307. Application layer routing creates an open channel for the … selective flow of data from remote databases on a network.

(App. C at 5:23-27), and:

> VAN switch 520 provides multi-protocol object routing, depending upon the specific VAN services chosen.

(App. C at 7:62-63). Thus, both the OSI Application layer 7 and the object sender/receiver are appropriate constructions.

However, contrary to Defendants' argument, even should the Court reject these construction terms, there is still no basis for arguing that the claims are invalid for indefiniteness.

### 4.     Defendants' Sur-Reply Position

Faced with Defendants' evidence that "switching" and "connecting" must be separate limitations of claim 10 of the '492 patent, Pi-Net attempts to distinguish the terms by asserting that "'switching' connects to the back end," whereas "connecting" connects to the "Web merchant services."  Pi-Net simply disregards the section of claim 10 that requires "*connecting to ... Web merchant services or to back-end services*."  Moreover, claim 10 further explains that the "request for Web merchant services is a request to *connect* to the selected *back-end* transactional application."  '492 patent at 10:59-64.  Thus, under Pi-Net's proposed construction, the "switching" and "connecting" limitations both accomplish the step of connecting to the back-end transactional application.  For the foregoing reasons, the term "switching" is indefinite.[26]

### R.     Term 23: "Management Agent"

| Pi-Net's Construction | Defendants' Construction |
| --- | --- |
| "Management agent" is ordinary meaning. | This claim term is indefinite. |

### 1.     Plaintiff's Opening Position

Patents regularly refer to "management agents" without need for further definition.  See, for example, Pat. 6,134,552 to SAP AG (App. I) ("a management agent for managing said logical objects and physical objects using said content model means"); and Patent 6,363,421 to Lucent ("a management agent application for interfacing the element management server with the network element") (App. J).  These are recognized protocols or programs through which online services can be managed, data can be retrieved, and data can be manipulated and delivered.  Consistent with the ordinary understanding of one skilled in the art, the Patents here

---

[26]     Pi-Net once again fails to provide any evidence to support its arguments that "object sender," "object receiver," or "application layer 7," are limitations on "switching."  Indeed, the "evidence" cited is unrelated to any definition or scope of "switching" or "VAN switch."

state that "exchange 501 and a management agent component … perform the switching, object routing, application and service management functions…." (App. C at 6:34-36).

### 2.      Defendants' Answering Position

Like several terms discussed above, the term "management agent" is also insolubly ambiguous and therefore indefinite because a person of ordinary skill in the art is unable to determine the bounds of the coined term.  First, there is no definition of "management agent" in the claims of the Patents-in-Suit.  Second, the common specification states, under the heading "VAN Switching and Object Routing," that "exchange 501 and management agent 601, illustrated in FIG. 6A, together constitute a value-added network (VAN) switch."  *See* '492 patent at 7:52-54.  The common specification, however, does not define or explain the term "management agent."

Pi-Net argues that the term should be given its ordinary meaning, but the only intrinsic evidence that Pi-Net relies on is Figure 6A of the common specification, which includes an empty box labeled "management agent 601."  Pi-Net attempts to supplement this deficient description with extrinsic evidence—two unrelated patents issued to third parties that use the words "management agent"—to establish that the term has a plain and ordinary meaning and is "regularly refer[ed] to … without need for further definition."  Opening Br. at 23.  These patents are inapposite for at least two reasons.

First, the earliest priority date of both cited patents is after the filing date of both the '500 patent and the provisional application to which it claims priority.  Thus, neither patent is allowable as extrinsic evidence here.  *See Phillips*, 415 F.3d at 1313 ("[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application.").  Second, those patents not only defined the function performed by

their respective "management agents," but also provided different definitions for this term, indicating that there is no commonly understood definition of management agent. For instance, the '552 patent states that "Management Agent 110 . . . reads and writes content to and from content storage 112 upon user requests in conformity with the settings within administration data 114." U.S. Patent No. 6,134,552 at 5:3-8. By contrast, the '421 patent describes the functionality of the "management agent application" disclosed in that patent as part of a "management server" utilized on "a special communication link." U.S. Patent No. 6,363,421 at 1:24-65. Both of the cited patents use the words "management agent" in a different context than the Patents-in-Suit, and neither relates to performing Web transactions. Thus, this extrinsic evidence cannot render the term "management agent" definite.

### 3.   Plaintiff's Reply Position

Defendants present no declaration or other support for their argument that the claims must be held invalid for indefiniteness on the grounds that "management agent" is insolubly ambiguous. Plaintiff pointed out two patents filed shortly after the effective filing date of the patents in suit, and this is sufficient to show that the term "management agent" was used in patents and was understandable to a skilled artisan at the time of the invention.

Defendants nevertheless argue that this is insufficient, because the cited patents were filed after the priority date of the present inventions. In response, Plaintiff respectfully points to: App. O – RFC 1157, at pp. 5, 7, 8 and 10 (1990); App. P – RFC 1155 at p. 16 (1990); and App. Q – RFC 1696 at 6 (1994). Presumably, having shown that the term "management agent" was readily recognizable by the art, including by use of the term in internet and other network standards, that this sufficiently negates Defendants' position and demonstrates that the term has a plain and ordinary meaning to one skilled in the art.

### 4.      Defendants' Sur-Reply Position

Having no response to Defendants' arguments with respect to Pi-Net's previously cited extrinsic evidence, Pi-Net simply attempts to marshal additional extrinsic evidence to establish the understood meaning of the term at the time of filing of the Patents-in-Suit.  It is improper for Pi-Net to introduce new affirmative, extrinsic evidence in reply.  But even if the Court considers this new evidence, it does not support Pi-Net's proposed construction for the same reasons as the previously-cited patents: the cited Internet standards belie that a plain and ordinary meaning of "management agent" exists because they use the term to refer to *different* functionalities and components than the two U.S. patents previously relied on by Pi-Net.  *Compare* Pi-Net's App. O at 5, *with* U.S. Patent No. 6,134,552 at 5:3-8, *and* U.S. Patent No. 6,363,421 at 1:24-65.  Pi-Net neither explains nor reconciles the inconsistencies in its extrinsic evidence and thus fails to establish that the term "management agent" had a single, well-recognized meaning in the art at the time of the alleged invention.  For this reason and the reasons stated above, the term "management agent" is indefinite.

### S.      Term 24: "Value-added Network Service Provider"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "Web merchant, or the provider of the POSvc Application on a web page that provides transactional capabilities to users who desire to access the Web merchant's or value-added network service provider's services via the Web." | This claim term is indefinite. |

### 1.      Plaintiff's Opening Position

The term is self-explanatory.  It is the web-merchant who provides the "POSvc Application 501" utilized by the user.  In the examples given at App. C at 7:10-50, it is the bank who made the "POSvc Application 501" available to the user.  In the examples at 6:52-54, it is

the "Bank 510(1), Car Dealer 510(2) or Pizzeria 510(3)."  The term is also similarly defined in

the prosecution history:

> Each transactional application is capable of providing the user with
> a complete set of transactional services offered by a certain
> network merchant (i.e. a certain network service provider).

(Appendix D at 21)

## 2.    Defendants' Answering Position

The term "value-added network service provider" is insolubly ambiguous and therefore

indefinite, because a person of ordinary skill in the art is unable to determine the bounds of the

coined term.  Tellingly, Pi-Net concedes that this is a "coined" term; however, the claims

themselves do not define the term, and the specification does not use the term at all.  *See*

*Phillips*, 415 F.3d at 1315 ("[T]he specification is always highly relevant to the claim

construction analysis.  Usually, it is dispositive; it is the single best guide to the meaning of a

disputed term.")

Pi-Net's proposed construction contradicts other language in the claims in which the

limitation appears.  For example, claim 1 of the '500 patent claims a "value-added network

switch … comprising … said value-added network service provider keeping a transaction flow

captive."  Accordingly, the "value-added network service provider" must be a component of the

"value-added network switch" and if the term is construed to be a "Web merchant" or "provider

of the POSvc Application," then under Pi-Net's construction those entities must be components

of the value-added network switch, which does not make sense.  Indeed, such a hybrid claim that

includes system and method elements is invalid as indefinite.  *See IPXL Holdings, LLC v.*

*Amazon.com, Inc.*, 430 F.3d 1377, 1384 (Fed. Cir. 2005) (holding that "reciting both an

apparatus and a method of using that apparatus renders a claim indefinite").

### 3.     Plaintiff's Reply Position

Defendants summarily argue that the claims of the '500 Patent are invalid on the grounds that this term is insolubly ambiguous. Again, Defendants present no declaration of an expert or other evidence to demonstrate that the term is insolubly ambiguous to one skilled in the art.

Further, contrary to Defendants' argument, Plaintiff did not "concede that this is a 'coined' term," but argued that it is self-explanatory. In any event, the specifications and claims themselves do define the term for reasons stated in Plaintiff's first brief.

The remainder of Defendants' arguments is plainly wrong. Thus Defendants cite claim 1 of the '500 patent, which states in relevant part:

> A configurable <u>value-added network switch</u> for enabling real-time transactions on a network, said configurable value-added network switch compromising:
>
> means for switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value- added network service provider, <u>said value-added network service provider</u> <u>keeping a transaction flow captive</u>, said plurality of transactional services being performed interactively and in real time; …..

Defendants argue that the underlined language makes the "value-added network service provider" a component of the "value-added network switch,' and, further, that "Web merchant" and "provider of the POSvc Application" "must be components of the value-added network switch."  Defendants concede that this argument "does not make sense," and Plaintiff agrees.

Defendants' argument is the same as that recently rejected by the Federal Circuit in *Biosig Instruments, Inc. v. Nautilus, Inc.*, 2013 U.S. App. LEXIS 8486 (Fed. Cir. Apr. 26, 2013) ("claim 1 of the '753 patent is clearly limited to a heart rate monitor possessing the recited

structure that is capable of substantially removing EMG signals.  It is not indefinite.

Accordingly, this case fails to invoke our decision in *IPXL Holdings*….")  Here, just as the Court

held in *Biosig*, the claim is limited to a value-added network switch, which possesses the recited

structure, including means for switching to a transactional application where the transactional

application is provides certain functions, including allowing the service provider keeping the

flow captive.  The present case is indistinguishable from *Biosig*, and, thus Defendants'

arguments of invalidity under *IPLX* must be rejected as a matter of law.

### 4.    Defendants' Sur-Reply Position

Pi-Net's argument that this term is not indefinite in view of the recent decision in *Biosig*

*Instruments, Inc. v. Nautilus, Inc.*, No. 2012-1289, 2013 U.S. App. LEXIS 8486 (Fed. Cir. Apr.

26, 2013) is misplaced.  The claim at issue in *Biosig* involved a heart rate monitor "with

functional limitations that describe the capability of substantially removing EMG signals."  *Id.* at

31-32.  Unlike *Biosig*, the relevant language of claim 1 of the '500 patent—"said value-added

network service provider keeping a transaction flow captive"—is not a "functional limitation that

describe[s] the capability" of the VAN switch, but rather is a method step performed by a third-

party, the value-added network service provider.  It is not clear whether infringement occurs

when one creates the VAN switch or when the "value-added network service provider keep[s]

the transaction flow captive."  *IPXL Holdings, LLC*, 430 F.3d at 1384 ("it is unclear whether

infringement . . . occurs when one creates a system . . . or whether infringement occurs when the

user actually uses the input means").  For that reason and the reasons stated above, the term

"value-added network service provider" is indefinite.

### T.     Term 25: "Value-added Network System"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "A value-added network is an online service network comprising a Web application (i.e., POSvc application). A value-added network system is one that enables real-time Web transactions from a POSvc application on a Web page." | This claim term is indefinite. |

### 1.     Plaintiff's Opening Position

The term is found only in the preamble, and is not a limitation for the same reasons as stated previously.  If the term is a limitation, it is self-explanatory.  It is the network system provided by "value-added network service provider."  The latter means the provider of the POSvc Applications that provides transactional capabilities to users who desire to access the Web merchant's or value-added network service provider's services via the Web, as shown *supra*.

### 2.     Defendants' Answering Position

The term "value-added network system" is indefinite because each of the individual means-plus-function elements that comprise the "value-added network system" are indefinite, as argued in Defendants' Motion for Partial Summary Judgment of Indefiniteness and elsewhere in Defendants' Answering Brief.  *See supra* Term 12; *infra* Term 27 (formerly Term 33); Term 32 (formerly Term 35).

### 3.     Plaintiff's Reply Position

[Further discussion of Term 25 is omitted, because both Plaintiff and Defendants refer only to the summary judgment briefing]

U.    **Term 26: "Said User Application"**

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| The "said user application" is the "network application." The terms "user application," "network application," and "POSvc application" are synonymous. | This claim term is indefinite and lacks antecedent basis. |

1.    **Plaintiff's Opening Position**

The relevant claim language is:

> means for switching to a transactional application in response to a user specification from a network application… [and]

> means for activating an agent to create a transaction link between said user application and said transactional application….

Defendants' position is not understood.  The claim language clearly states that a user specified an action on a "network" application" to connect with a "transactional application," and then refers to a "link between said user application and said transactional application.  The "said user application" obviously refers to the network application used by the user.  It is also plain that the "network application" is the POSvc Application (a/k/a "Web application).  See App. C at 2:54-57.

2.    **Defendants' Answering Position**

The term "said user application" lacks antecedent basis and thus renders claim 35 of the '500 patent indefinite, because its meaning is not reasonably ascertainable to a person of ordinary skill in the art.  *See Halliburton Energy Servs.,* 514 F.3d at 1249 ("We have also stated that a claim could be indefinite if a term does not have proper antecedent basis where such basis is not otherwise present by implication or the meaning is not reasonably ascertainable.").  The definition of "user application" cannot be inferred from the patent itself, as the term "user

application" does not appear in any other part of claim 35, any other claim of the Patents-in-Suit, or anywhere in the common specification.

Although Pi-Net argues that "user application," "network application," and "POSvc application" are synonymous, the specification indicates the contrary.  For example, as explained above, the specification discloses that "POSvc applications 510 are *transactional applications*, namely applications that are designed to incorporate and take advantage of the capabilities provided by the present invention."  '492 patent at 6:22-25 (emphasis added).  Should the term "said user application" be interchanged with  "POSvc application," as Pi-Net suggests, claim 35 could then be read to require a transaction link between said transactional application and said transactional application, which renders the limitation nonsensical.  Because the ambiguity of the term "said user application" precludes the Court from correcting claim 35 in a manner that can be readily understood, claim 35 is indefinite.  *See Novo Indus., LP v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003) ("Since we cannot know what correction is necessarily appropriate or how the claim should be interpreted, we must hold [the claim] invalid for indefiniteness in its present form.").

### 3.    Plaintiff's Reply Position

Defendants' arguments repeat the error addressed previously in discussions surrounding the terms "POSvc Application," network application" and "Web application," (Terms 8, 9 and 17 *supra*.)  Plaintiff incorporates its prior analysis.

Specifically, there is no inconsistency in the POSvc Application being a "transactional application" that is used to connect with the back-end transactional application.  The front and back-ends correspond to each other and are plainly linked, because otherwise a user would not be able to go online, invoke a Web application and complete a transaction such as transferring funds

from one account to another.  The front-end and back-ends need to be working with the same "object" (i.e., transactional data structure) for the invention to function.

### 4.    Defendants' Sur-Reply Position

Pi-Net fails to address Defendants' argument that the term "said user application" lacks antecedent basis.  Instead, Pi-Net merely reasserts its position that "said user application" is synonymous with "POSvc application," "Web application," and "network application."   Again, however, Pi-Net ignores both the inconsistencies that stem from this proposal, as explained with Terms 8, 9, 17, and 18 above, and also the well-established rule that different claim terms are presumed to have different meanings.  *See CAE Screenplates, Inc.*, 224 F.3d at 1317.  "Said user application" is not defined and does not appear in any other part of claim 35 of the '500 patent, nor is "user application" defined in the intrinsic record.  The meaning of "said user application" is not ascertainable to skilled artisan and is therefore indefinite.

### V.    Terms 27-35

### 1.    Defendants' Answering Position

Terms 27 through 35 are means-plus-function ("MPF") limitations, which are indefinite for at least two reasons.  First, as discussed in Defendants' Motion for Partial Summary Judgment, where a means-plus-function limitation is implemented by a computer, the specification must "disclose an algorithm for performing the claimed function."  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1367 (Fed. Cir. 2008); *see also Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1249 (Fed. Cir. 2005) ("[T]he corresponding structure for a § 112 ¶ 6 claim for a computer-implemented function is [an] algorithm. . . .").  A generic computing device, such as "a general purpose computer or microprocessor," is insufficient corresponding structure. *Aristocrat Techs. Australia PTY Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008).  Here, not one of the corresponding structures cited by Pi-Net provides the required algorithm—

and with good reason, because neither Pi-Net nor its expert have been able to identify a single algorithm that is disclosed in the specification. Instead, Pi-Net cites various computing systems or software, such as a "Point of Service application" and a "Switching Service," as corresponding structures. However, because the specification fails to provide algorithms to implement these computer systems, they cannot provide sufficient structure to render the MPF limitations definite. All Pi-Net can point to are the names for computing structures, which are little more than structural black boxes defined entirely in terms of their respective functions (for which no computing instructions are provided).

Second, even if Pi-Net's asserted structures were sufficient, they still would not correspond to the claimed functions. For a structure to correspond to the function of a means-plus-function element, it must be "clearly link[ed] or associate[d] . . . to the function recited in the claim" by the specification or prosecution history. *B. Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). By contrast, Pi-Net simply asserts in a conclusory fashion— and, in the case of Terms 33 to 35, literally without discussion—that the cited structures correspond to the functions recited. Because the specification "is not clear as to the structure that the patentee intends to correspond to the claimed function," Pi-Net is impermissibly "attempting to claim in functional terms unbounded by any reference to structure in the specification," and these means-plus-function terms are indefinite. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

Below, we apply these general arguments to show that each of Terms 27-35 is indefinite.

### 2. Plaintiff's Reply Position

Plaintiff Pi-Net incorporates its prior legal analysis, which Defendants ignore, or, at least, have not specifically addressed. It is particularly noted that Defendants brandish the term "algorithm" as support for each of their contentions, but without defining the term. In fact, there

is no precise definition of the term, but it is generally recognized that there are many ways that the algorithm can be conveyed. Thus, the "specification can express the algorithm in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Noah Sys. Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012)

### 3.    Defendants' Sur-Reply Position

The fate of these terms turns on the answer to a single question:  can the claimed functions be performed on a general use computer without any special programming?  If the answer is no, then the claims must be declared invalid absent some disclosure of an algorithm in the specification.  There can be no dispute that all of the claimed functions require specialized programming to be performed, and thus the burden is on Pi-Net to identify a corresponding algorithm for each such function. *Noah Sys., Inc.*, 675 F.3d at 1319 ("Computer-implemented means-plus-function claims are indefinite unless the specification discloses an algorithm to perform the function associated with the limitation.").  Although Pi-Net has correctly enumerated what can qualify as an algorithm—"mathematical formula, . . . prose, . . .or . . . flow chart"—it has failed to point to any such algorithm.  As such, the claims containing these terms must be declared invalid.

W.    **Term 27: "Means for Switching to a Transactional Application in Response to a User Specification from a Network Application"**

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is to switch to a transactional application in response to a user specification from a network application.<br><br>Structure is the "Switching Service 702," which is "a routing switch within the 'application layer' of the OSI model" "in application layer 307." | This claim term is indefinite. |

### 1.    Plaintiff's Opening Position

The term "switching" was previously defined at p. __, *supra*.  The structure for the "means for switching" is "Switching Service 702," which is "a routing switch within the 'application layer' of the OSI model."  See the specification:

> Switching service 702 is an OSI application layer switch.  …  It performs a number of tasks including the routing of user connections to remote VAN switches, described in the paragraph above, multiplexing and prioritization of requests, and flow control. Switching service 702 also facilitates open systems' connectivity with both the Internet (a public switched network) and private networks including back office networks, such as banking networks.

(App. C at 8:52-63).  The switching site is normally found on the web server:  "For the purposes of this application, users are described as utilizing PC's to access the Web via Web server "switching" sites."  (App. C at 5:61-63)

### 2.    Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because the specification does not disclose a corresponding algorithm.  Pi-Net contends that the corresponding structure is "Switching service 702," which is special purpose software allegedly unknown in the art.  '492

patent at 8:52-63 ("Switching service 702 is an OSI *application layer* switch . . . These switches are one *significant aspect of the present invention*.")).  Nevertheless, the specification does not identify an algorithm to implement the switching service.  Rather, the specification describes this specialized software in fully functional terms, stating that "[i]t performs a number of tasks," but failing to explain the steps that are executed to perform those "tasks."  '492 patent at 8:52-63. As such, the term "switching service" is little more than the proverbial "black box," and is insufficient to render the "means for switching" definite.

### 3.   Plaintiff's Reply Position

Defendants again invoke their newly-minted term: "special-purpose software." Defendants, however, still cite no support for this concept and none exists.

### 4.   Defendants' Sur-Reply Position

Pi-Net's sole responsive argument for these terms is that Defendants' use of the term "special-purpose software" in their invalidity arguments was inappropriate.  This term reflects the relevant case law, which requires that "[w]hen dealing with a '*special purpose* computer-implemented means-plus-function limitation,' . . . the specification [must] disclose the algorithm for performing the function."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).  Whether described as software, or hardware, or a computer employing software or hardware, the principle is the same—claims to functions that cannot be performed on a computer without special programming (like those disclosed in Terms 27-35) must be declared invalid absent the disclosure of a corresponding algorithm in the specification.  Pi-Net's semantic argument does not alter the underlying law, which requires disclosure of an executing algorithm. No such algorithm was disclosed for any of these terms.

## X.        Term 28: "Means for Receiving Said User Specification"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is receiving said user specification.<br><br>Structure is a Web server. | This claim term is indefinite. |

### 1.        Plaintiff's Opening Position

The Patent twice states that the web server receives the user specification:

> As illustrated in FIG. 5A, user 100 accesses Web server 104. Having accessed Web server 104, user 100 can decide that he desires to perform real-time transactions.  <u>When Web server 104 receives user 100's indication that he desires to perform real-time transactions</u>, the request is handed over to an exchange component. ***
>
> In step 804, the user issues a request for a transactional application, and the web server hands off the request to an exchange in step 806.

(App. C at 6:6-8; and 9:26-28)

### 2.        Defendants' Answering Position

The "means for receiving said user specification" is a component of the "means for switching to a transactional application" (Term 27).  As discussed above, the "means for switching" and its components—including this term—are indefinite.

## Y.   Term 29: "Means for Enabling a Switch to Said Transactional Application"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is enabling a switch to the transactional application.<br><br>Structure is Boundary Service 701 in the VAN Switch. "Specifically, boundary service 701 provides the interfaces between VAN switch 520, the Internet and the Web, and Multi-media end user devices such as PCs…. Boundary service 701 also provides the interface to the on-line service provider." | This claim term is indefinite. |

### 1.   Plaintiff's Opening Position

The Patent defines the structure at App. C at 8:43-48:

> Structure is Boundary Service 701 in the VAN Switch. "Specifically, boundary service 701 provides the interfaces between VAN switch 520, the Internet and the Web, and Multi-media end user devices such as PCs…. Boundary service 701 also provides the interface to the on-line service provider."

### 2.   Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because the specification does not disclose a corresponding algorithm.  Pi-Net contends that the corresponding structure is "Boundary Service 701," which is special-purpose software.  '492 patent at 8:43-48.  However, Pi-Net's citations do not identify an algorithm to implement the boundary service.  Rather, the specification describes this specialized software in fully functional terms, stating generically that it "provides the interfaces between VAN switch 520, the Internet and the Web, and multi-media end user devices," but failing to explain how it "provides" such "interfaces."  '492 patent at 8:52-63.  This bare "boundary service" requires an algorithm to function, and is thus insufficient to render the "means for enabling a switch" definite.

120

### 3.      Plaintiff's Reply Position

Defendants have invented a new term: "special-purpose software." Defendants cite no support for this concept and none exists. It is recognized "simply disclosing software … without providing some detail about the means to accomplish the function is not enough." *Noah Sys., Inc. v. Intuit, Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012).   However, once a disclosure is identified, the question of its sufficiency is a matter of the understanding of a person skilled in the art. *Noah Sys., supra*, 675 F.3d at 1313 ("When the specification discloses some algorithm, on the other hand, the question is whether the disclosed algorithm, from the viewpoint of a person of ordinary skill, is sufficient to define the structure and make the bounds of the claim understandable.")

### 4.      Defendants' Sur-Reply Position

Pi-Net's sole responsive argument for these terms is that Defendants' use of the term "special-purpose software" in their invalidity arguments was inappropriate.  This term reflects the relevant case law, which requires that "[w]hen dealing with a '*special purpose* computer-implemented means-plus-function limitation,' . . . the specification [must] disclose the algorithm for performing the function."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013).  Whether described as software, or hardware, or a computer employing software or hardware, the principle is the same—claims to functions that cannot be performed on a computer without special programming (like those disclosed in Terms 27-35) must be declared invalid absent the disclosure of a corresponding algorithm in the specification.  Pi-Net's semantic argument does not alter the underlying law, which requires disclosure of an executing algorithm. No such algorithm was disclosed for any of these terms.

Z.    Term 30: "Means for Activating Said Transactional Application"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is to activate the transactional application.<br><br>Structure is the selected Point-of-Service application from the list of Point-of-Service applications displayed on the graphical user interface on a web page. | This claim term is indefinite. |

1.    Plaintiff's Opening Position

The Patent repeatedly states that the transactional application is activated from the POSvc

Application.  (Figures 5C, 5D and 8; and 6:22-25, 6:39 to 7:38, and 9:24-37).  See especially

Figure 5D showing the POSvc Application as the activated intermediary, and the statement that:

> A POSvc application is an application that can execute the type of transaction that the user may be interested in performing.

(App. C at 6:41-43).

2.    Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because the specification does

not disclose a corresponding algorithm.  Instead of pointing to an algorithm, Pi-Net asserts that

the corresponding structure is the "Point-of-Service Application," which is Term 17, above.

However, as discussed in the context of Term 17, the specification fails to disclose any definition

of "Point-of-Service Application," let alone an algorithm, and therefore it is insufficient structure

to render the "means for activating said transactional application" definite.

Even if the "Point-of-Service Application" were sufficient structure, it is not clearly

linked to the "means for activating."  Pi-Net cites portions of the specification that describe the

activation of the *point-of-service application*, not the activation of a *transactional application*.

Indeed, although Pi-Net cites Figures 5C, 5D, and 8, those figures merely depict "a user selecting a bank POSvc application from the POSvc application list" causing a "*POSvc application* [to] be activated." '492 patent at Figs. 5C, 5D, and 8; 6:22-25, 6:39-7:38, 9:24-37 (emphasis added). Pi-Net's conflation of the POSvc and the transactional application contradicts its own arguments for Terms 17 and 18, where Pi-Net asserts that a transactional application is distinct from a POSvc application.  Indeed, if a transactional application were equivalent to a POSvc application, then Pi-Net's construction would translate to "a transactional application for activating said transactional application"—an absurd, circular result.  As such, the link between the "means for activating" and this supposedly corresponding structure is insufficient.

### 3.   Plaintiff's Reply Position

Defendants' arguments again fail to recognize that the front-end POSvc Application is a transactional application that corresponds to a back-end transactional application.  Therefore, there is no inconsistency in the front-end transactional application being the structure that activates the corresponding back-end transactional application.

### 4.   Defendants' Sur-Reply Position

In response to Defendants' arguments that descriptions of a POSvc application cannot provide corresponding structure for "transactional applications," Pi-Net now asserts tortured explanations of "POSvc application" and "transactional application" in which the terms are both identical and distinct according to the whims of Pi-Net's contradictory positions.  For the reasons discussed in the context of Terms 17 and 18, Pi-Net's explanations are improper.[27]

---

[27]    Pi-Net's arguments also generate further inconsistencies.  If a POSvc application were a component of a transactional application, as Pi-Net contends, then it could not be the "means for activating" the transactional application.  Rather, the means for activating must be distinct from the transactional application, or the term amounts to a circular "transactional application for activating a transactional application."  Similarly, regarding the "means for presenting said user with a list of transactional applications," even if a POSvc application were a component of a

**AA.   Terms 31-32: "Means for Creating a Transaction Link Between Said Network Application and Said Transactional Application" and "Means for Activating an Agent to Create a Transaction Link Between Said User Application and Said Transactional Application"**

| Term | Pi-Net's Construction | Defendants' Construction |
|---|---|---|
| means for creating a transaction link between said network application and said transactional application | Means-plus-function element:<br><br>Function is to create a transaction link between the network application and the transactional application.<br><br>Structure is the object data structure (with information entries and attributes) displayed (e.g. checking account object in POSvc application 510 in Fig. 5D) in the selected Point-of-Service application as displayed by Web server on web page. "As illustrated in FIG. 5D, once the connection is made between POSvc application 510(1), for example, and services, an operator agent on Web server 104 may be activated to ensure the availability of distributed functions and capabilities." | This claim term is indefinite. |
| means for activating an agent to create a transaction link between said user application and said transactional application | Function is to activate an agent to create a transaction link between the user application and the transactional application.<br><br>Structure is information entries in an object in a Point-of-Service (POSvc) application on a Web page. | This claim term is indefinite. |

**1.   Plaintiff's Opening Position**

With respect to the term "means for creating a transaction link between said network

application and said transactional application" found in claim 3 of the '500 Patent, the function is

_____

(continued…)

transactional application, a list of POSvc applications would not equate to a list of transactional applications any more than a list of tires would equate to a list of cars.

as stated in the claim, and the Patent identifies the structure in Figure 5D and the associated text.

Specifically, the transaction link between the network application (POSvc Application 510) and

the back-end transactional application is created by the structured data object shown below:



The Patent text accompanying Figure 5D explains that the link between the POSvc

Application and the transactional application is the data structure of the object depicted above:

> Once Bank POSvc application 510 has been activated, user 100
> will be able to connect to Bank services and utilize the application
> to perform banking transactions, thus accessing data from a host or
> data repository 575 in the Bank "Back Office." *** This
> connection between user 100 and Bank services is managed by
> exchange 501.  As illustrated in FIG. 5D, once the connection is
> made between Bank POSvc application 510(1), for example, and
> Bank services, an operator agent on Web server 104 may be
> activated to ensure the availability of distributed functions and
> capabilities.

(App. C at 6:65 to 7:9).

The "exchange 501" which was cited in the above excerpt has been construed as Term

__, *supra,* and is defined in the Patent itself:   "Exchange 501 comprises Web page 505 and

point-of-service (POSvc) applications 510.  Exchange 501 also conceptually includes a switching

component and an object routing component." (App. C at 18-21).

Thus, the Patent shows that the "means for creating a transaction link between said

network application and said transactional application" is the object or transactional data

structure.  Figure 5D and the accompanying descriptions specify that the network application

(POSvc Application) and the transactional application are linked via the object and its

transactional data structure.  That object is routed between the two to create the link.

The term "means for activating an agent to create a transaction link between said user

application and said transactional application" found in claim 35 of the '500 Patent, flows from

the above analysis of claim 3, and is incorporated by reference.  The two are compared as

follows:

| **'500 Patent Claim 3** | **'500 Patent Claim 3** |
|---|---|
| "means for creating a transaction link between said network application and said transactional application" | "means for activating an agent to create a transaction link between said user application and said transactional application" |

It was previously shown that "said user application" refers to the "network application,"

which is "POSvc Application 510."  (Term __, *supra*)  Thus, as shown in the comparison, the

difference between the terms is that claim 35 specifies means for activating an agent to create a

transaction link.  The Patent again directs the skilled artisan to Figure 5D for the relevant

structure:

> As illustrated in FIG. 5D, once the connection is made between
> Bank POSvc application 510(1), for example, and Bank services,
> an operator agent on Web server 104 may be activated to ensure
> the availability of distributed functions and capabilities.

(App. C at 7:5-9).  Considering the disclosure as a whole, the transaction link agent is activated with the information entries in the transactional data structure, which starts the transaction link or object routing with the transactional application.

### 2.    Defendants' Answering Position

#### (a)    "Means for Creating a Transaction Link Between Said Network Application and Said Transactional Application"

This computer-implemented MPF limitation is indefinite because the specification does not disclose a corresponding algorithm.  Instead of pointing to an algorithm, Pi-Net asserts that the "object data structure (with information entries and attributes) displayed . . . in the selected Point-of-Service application" is the corresponding structure.  However, the specification fails to provide an algorithm for "creating a transaction link between [the] network application and [the] transactional application."  Indeed, the passages that Pi-Net cites do not reference an "object data structure" or a "transaction link," but instead merely describe "a user selecting a bank POSvc application from the POSvc application list." '492 patent at Figs. 4B, 5D; 6:51-64; 7:5-9.

Even if an "object data structure" were sufficient structure, it is not clearly linked to the function of "creating a transaction link."  Pi-Net's citations merely disclose a user connecting to unspecified "Bank services" but fail to disclose either of the supposedly linked transactional and network applications.  Indeed, while Pi-Net's citations generally discuss a POSvc application, they omit any discussion of linking multiple applications, let alone creating the claimed "transaction link." '492 patent at Figs. 4B, 5D; 6:51-7:9.  Further, because an "object" is, at most, an inanimate collection of data, it cannot be the structure that itself performs an action like "creating a transaction link."[28]

---

[28] The specification likewise provides no definition for what is meant by a "transaction link."

      **(b)**      **"Means for Activating an Agent to Create a Transaction Link Between Said User Application and Said Transactional Application"**

Defendants incorporate their arguments for Term 31.  Further, this term is indefinite for the inclusion of the indefinite term "agent," which is discussed in the context of Term 23.

      **3.**      **Plaintiff's Reply Position**

Defendants' arguments miss the actually technology of the issues as would be recognized by one skilled in the art.  The transaction link is the object.  The transactional application creates the objects, which includes attributes such as "Name" and "Password" shown in figure 5D.  The users input their information, and the objects are routed to the back-end transactional applications for processing.  Therefore, the structured data of the objects creates the link, because that structured data is passed between the front-end and the back-end.

Defendants further argue that there is an absence of adequate linking of the structure to the means, because Plaintiff's citations "merely disclose a user connecting to unspecified 'Bank services' but fail to disclose either of the supposedly linked transactional and network applications."  Again, Defendants miss the technology and what is shown by the patents.  Figure 5D and the accompanying text disclose not only a user connecting to Bank services, but show that the connection is mediated by the structured data of the object (shown as part of the Bank POSvc Application 510.

### 4.   Defendants' Sur-Reply Position

Pi-Net continues to assert without support that the transmission of "structured data" (i.e., the Name and Password) from a POSvc application to a "Data Repository" in Figure 5D somehow "creates a transaction link between [a] network application and [a] transactional application."  Pi-Net's argument is flawed in several respects.[29]  First, the transmission of "structured data" is never described in the Patents-in-Suit as creating a "transaction link."  Moreover, Pi-Net's proposal requires both that (1) a POSvc application is synonymous with a user application; and (2) a "Data Repository" is synonymous with a transactional application.  But Pi-Net can point to no actual support in the specification for these arguments.  Finally, none of the structures in Figure 5D are ever associated with the functions of "activating an agent," or "creating a transaction link."  Pi-Net cannot rewrite the Patents-in-Suit or alter their Figures so that the depiction of a POSvc application transmitting a Name and Password to a Data Repository in a figure captioned "a user selecting a bank POSvc application from the POSvc application list" morphs into the "creat[ion] of a transaction link between [a] user application and [a] transactional application."[30]  Because Pi-Net's proposed construction is at odds with both the claim language and specification, it must be rejected.

---

[29]     Pi-Net's proposed construction also ignores the context of the claims, which require that the "means for creating a transaction link" must be "includ[ed]" as part of the "means for activating said transactional application." '500 patent, claim 3.  Pi-Net argues that a POSvc application is the "means for activating," while also asserting that inanimate structured data— unquestionably *not itself* part of the POSvc application—is what "creates a transaction link."

[30]     Pi-Net also fails to even offer a definition for the claimed "agent," thus reinforcing Defendants' position that Term 32 is indefinite.

BB.    Term 33: "Means for Presenting Said User With a List of Transactional Applications"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is to present user with a list of transactional applications.<br><br>Structure is the webpage that includes POSvc Applications, as depicted in Figures 5C and 5D. | This claim term is indefinite. |

1.     Plaintiff's Opening Position

Figures 5A, 5B and 5C show that the list of transactional applications are presented as "POSvc Application 510" on the "Web Page 104."

2.     Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because it is not clearly linked to an algorithm in the specification.  Pi-Net asserts that the corresponding "[s]tructure is the webpage that includes POSvc Applications."  In other words, Pi-Net asserts that a list of transactional applications is equivalent to a list of POSvc applications.  However, this assertion once again conflates the terms "POS application" and "transactional application," contradicting Pi-Net's own arguments for Terms 17 and 18, which state that a "transactional application" is distinct from a "POSvc application."

3.     Plaintiff's Reply Position

Defendants' arguments again fail to recognize that the front-end POSvc Application is a transactional application that corresponds to a back-end transactional application.  Therefore, there is no inconsistency in the front-end transactional application being the structure that activates the corresponding back-end transactional application.

### 4.      Defendants' Sur-Reply Position

In response to Defendants' arguments that descriptions of a POSvc application cannot

provide corresponding structure for "transactional applications," Pi-Net now asserts tortured

explanations of "POSvc application" and "transactional application" in which the terms are both

identical and distinct according to the whims of Pi-Net's contradictory positions.  For the reasons

discussed in the context of Terms 17 and 18, Pi-Net's explanations are improper.[31]

**CC.    Term 34: "Means for Submitting Said User Specification According to a User's Selection of Said Transactional Application from Said List of Transactional Applications"**

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Means-plus-function element:<br><br>Function is submitting said user specification according to a user's selection of said transactional application from said list of transactional applications.<br><br>Structure is the interactive data structure displayed on a Web page that includes information entries and attributes in a Web application displayed via the graphical user interface component. ('492 Patent Col 6 lines 41-50: "The POSvc list is displayed via the graphical user interface component. One embodiment of the present invention supports HyperText Markup Language as the graphical user interface component. Virtual Reality Markup Language and Java™ are also supported by this embodiment. A variety of other graphical user interface standards can also be utilized to implement the graphical user interface." And, Col 9 lines 28-33: "The exchange activates a graphical user interface to present user with a list of POSvc application options in step 808. In step 810, the user makes a selection from the POSvc Application list.") | This claim term is indefinite. |

---

[31]      Pi-Net's arguments also generate further inconsistencies.  If a POSvc application were a component of a transactional application, as Pi-Net contends, then it could not be the "means for activating" the transactional application.  Rather, the means for activating must be distinct from the transactional application, or the term amounts to a circular "transactional application for activating a transactional application."  Similarly, regarding the "means for presenting said user with a list of transactional applications," even if a POSvc application were a component of a transactional application, a list of POSvc applications would not equate to a list of transactional applications any more than a list of tires would equate to a list of cars.

### 1.      Plaintiff's Opening Position

The structure for this dependent limitation is shown at 6:41-50 and 9:28-33.

### 2.      Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because the specification does not disclose a corresponding algorithm.  Instead of pointing to an algorithm, Pi-Net asserts that the corresponding structure is "the interactive data structure displayed on a Web page that includes information entries and attributes in a Web application displayed via the graphical user interface component."  In naming special-purpose software as corresponding structure, Pi-Net effectively concedes that an algorithm is necessary.  However, the specification fails to provide an algorithm to generate an "interactive data structure" including "information entries and attributes."  Rather, Pi-Net's citations merely describe "present[ing] user with a list of POSvc application options," and do not even use the terms "interactive," "structure," "information entries," or "attributes."  '492 patent at 6:41-50; 9:28-33.

Even if the "the interactive data structure" were sufficient structure, it is not clearly linked to the "means for submitting . . . a user's selection of said transactional applications from a list of transactional applications."  Indeed, the term "transactional application" is not mentioned in the portions of the specification cited by Pi-Net.  Rather, these passages merely disclose selecting a POSvc application from a list of POSvc applications, but Pi-Net has distinguished a POSvc application from a transactional application in the context of Terms 17 and 18.  Moreover, because an "interactive data structure" is, at most, an inanimate collection of data, it cannot be the structure that performs the act of "submitting."

### 3.    Plaintiff's Reply Position

Defendants again invoke their newly-minted term: "special-purpose software."

Defendants, however, still cite no support for this concept and none exists.

### 4.    Defendants' Sur-Reply Position

Pi-Net's sole responsive argument for these terms is that Defendants' use of the term

"special-purpose software" in their invalidity arguments was inappropriate.  This term reflects

the relevant case law, which requires that "[w]hen dealing with a '*special purpose* computer-

implemented means-plus-function limitation,' . . . the specification [must] disclose the algorithm

for performing the function."  *Function Media, L.L.C. v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed.

Cir. 2013).  Whether described as software, or hardware, or a computer employing software or

hardware, the principle is the same—claims to functions that cannot be performed on a computer

without special programming (like those disclosed in Terms 27-35) must be declared invalid

absent the disclosure of a corresponding algorithm in the specification.  Pi-Net's semantic

argument does not alter the underlying law, which requires disclosure of an executing algorithm.

No such algorithm was disclosed for any of these terms.

### DD.    Term 35: "Means for Coupling Said Means for Transmitting to a Host Means"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| Preliminary note: "Host means" is not a means-plus-function element, and "host" has its ordinary meaning. *See Enova Tech. Corp. v. Initio Corp.*, 2012 U.S. Dist. LEXIS 182589 (D. Del. 2012) ("Court's Construction [of "host"]: Ordinary meaning.")<br><br>Means-plus-function element:<br><br>Function is to couple the transmitting means to the host means.<br><br>Structure is the Point-of-Service application 510 on a Web page. | This claim term is indefinite. |

### 1.      Plaintiff's Opening Position

The structure for this dependent limitation is shown at Figures 4B, 5C and 8; and at 6:22-25, 6:39 to 7:38, and 9:24-37.

### 2.      Defendants' Answering Position

This computer-implemented MPF limitation is indefinite because the specification does not disclose a corresponding algorithm.  Instead of pointing to an algorithm, Pi-Net asserts that the corresponding structure is the "Point-of-Service Application," which is Term 17,  discussed above.  However, as discussed in the context of Term 17, the specification fails to disclose any definition of "Point-of-Service Application," let alone an algorithm, and therefore it is insufficient structure to render the "means for activating said transactional application" definite.

Even if a "POSvc application" were sufficient structure, it is not clearly linked to the "means for coupling."  Pi-Net's conclusory citations to the contrary never mention "coupling," "transmitting," or even a "host."  '492 patent at 6:41-50; 9:28-33.  Further, linking "POSvc application" with the "means for coupling" would be inconsistent with Pi-Net's construction of the "means for transmitting" (Term 12) as an "exchange," (Term 2) which is itself construed as a list of POSvc applications.  These constructions would render the meaning of this term, "a POSvc application for coupling a list of POSvc applications to a host means," which is circular and nonsensical.

### 3.      Plaintiff's Reply Position

Contrary to Defendants' unsupported argument, and skilled artisan would readily recognize that the POSvc Application couples the transmitting means to the host means (i.e., the bank back office).

### 4.      Defendants' Sur-Reply Position

Pi-Net fails to address, let alone rebut, Defendants' arguments.  Instead, Pi-Net makes the conclusory statement that a "skilled artisan would readily" support its position.  But without any testimony from a person of skill in the art, this attorney argument is insufficient.  Indeed, even if a skilled artisan would readily "recognize that the POSvc application" corresponds to this function, that does not absolve Pi-Net of the requirement that the specification disclose an algorithm that the POSvc application executes in order to carry out the "coupling" function.  Because Pi-Net cannot satisfy that requirement, this term should be declared indefinite.

DATED: May 15, 2013

Respectfully submitted,

*/s/ Robert S. Saunders*
Robert S. Saunders (ID No. 3027)
SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com

*Attorneys for Defendant JPMorgan Chase*
*& Co.*

*/s/ David E. Moore*
Richard L. Horwitz (ID No. 2246)
David E. Moore (ID No. 3983)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, Delaware  19801
Tel.:  (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com

*Attorneys for Defendants Bank of America,*
*N.A.; Merrill Lynch, Pierce, Fenner & Smith*
*Incorporated; and Citizens Financial*
*Group, Inc.*

*/s/ Benjamin A. Smyth*
Matt Neiderman (Del. Bar No. 4018)
Benjamin A. Smyth (Del. Bar No. 5528)
DUANE MORRIS, LLP
222 Delaware Avenue, Suite 1600
Wilmington, DE 19801-1659
Telephone: 302.657.4900
Facsimile: 302.657.4901

*Attorneys for Defendants Capital One*
*Financial Corporation, ING Bank, fsb,*
*Capital One, National Association, and*
*Capital One Bank (USA), National*
*Association*

*/s/ George Pazuniak*
George Pazuniak (DE Bar No. 478)
O'Kelly Ernst & Bielli, LLC
901 N. Market St.
Suite 1000
Wilmington, De 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff*
*Pi-Net International, Inc.*

DLI-6442138v1

136