1               UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF DELAWARE

3

4    PI-NET INTERNATIONAL INC.,  :  CA NO. 12-282-RGA

5                         :  November 25, 2013

6            Plaintiff,    :

7                         :  2:00 o'clock p.m.

8    v.                       :

9                         :

10    JPMORGAN CHASE & COMPANY,   :

11                         :

12            Defendant.    :

13    ............................:

14

15

16      TRANSCRIPT OF PARTIAL SUMMARY JUDGMENT OF INDEFINITENESS

17         BEFORE THE HONORABLE RICHARD G. ANDREWS

18           UNITED STATES DISTRICT JUDGE

19

20

21    APPEARANCES:

22

23    For Plaintiff:    O'KELLY, ERNST & BIELLI

24                  BY:  GEORGE PAZUNIAK, ESQ

25

```
 1
 2    For Defendant:          SKADDEN, ARPS, SLATE, MEAGHER & FLOM
 3                            BY:   DOUGLAS R. NEMEC, ESQ
 4                            BY:   JESSICA RAATZ, ESQ
 5                            BY:   EDWARD L. TULIN, ESQ
 6                            BY:   ANDREW GISH, ESQ
 7
 8
 9
10
11    Court Reporter:         LEONARD A. DIBBS
12                            Official Court Reporter
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1

2                     P R O C E E D I N G S

3

4              (The proceedings occurred at 2:00 o'clock p.m. as

5      follows:)

6

7              THE COURT:  Good afternoon.  Please be seated.

8              This is Defendant's Motion for Pretrial Summary

9      Judgment of Indefiniteness in Pi-Net v. JPMorgan, No. 12-282.

10             Mr. Pazuniak, good afternoon.

11             MR. PAZUNIAK:  Good afternoon, your Honor.

12             THE COURT:  I see Mr. Tulin there, who I know.

13             So, I guess, Ms. Raatz, you're a person that I'm

14     supposed to know; is that right?

15             MS. RAATZ:  Good afternoon, your Honor.

16             Jessica Raatz on behalf if JPMorgan Chase, and these

17     are my colleagues from New York, Doug Nemec, Ed Tulin, and

18     Andrew Gish.

19             Mr. Nemec will be arguing today.

20             THE COURT:  Good afternoon to you all.

21             What I thought made sense is -- and I don't know

22     whether there's any general remarks of one kind or another that

23     either one side wants to say -- but I figured there are five

24     terms or phrases that maybe it makes sense to talk about them

25     one at a time with defendant saying what their argument is.

1              And then Mr. Pazuniak can respond.

2              That will help me more than if I just hear you talk

3      about all five, and hear him talk about all five, okay?

4              MR. NEMEC:  I'm happy to proceed that way, your Honor.

5              MR. PAZUNIAK:  Your Honor, actually, what your Honor

6      has said is what I have proposed to Mr. Nemec and we talked

7      about it.

8              The problem is that there's no switch.  And, so, every

9      time we're going to switch, we're going to have to disconnect

10     the cable and attach it.

11             I don't know if your Honor is aware of that, so we're

12     not set up the way we're normally setup.

13             THE COURT:  Okay.

14             MR. PAZUNIAK:  But we can easily switch.

15             THE COURT:  Well, I'm --

16             MR. PAZUNIAK:  So I'm perfectly happy to have Mr. Nemec

17     go first.

18             THE COURT:  We'll do the best we can.

19             MR. PAZUNIAK:  Okay.

20             THE COURT:  Okay.  Mr. Nemec?

21             MR. NEMEC:  Certainly, your Honor.

22             And I think we have a presentation that we have hard

23     copies of, and that may help, so we don't necessarily need to

24     put it on the screen.

25             THE COURT:  Yes.  That maybe just fine.

1          Do you have two copies?

2          MR. NEMEC:  I have three.

3          THE COURT:  Two is enough.  I guess you can give one to

4     Mr. Dibbs.

5          MR. NEMEC:  If I may I approach and then I'll proceed?

6          (Pause)

7          If I don't trip in the process.

8          I apologize, your Honor.  Thank for your patience.

9          THE COURT:  Things happen.

10         MR. NEMEC:  So we appreciate your decision to take this

11    particular motion up early in advance of other the Summary

12    Judgment Motions, and in advance of the Markman Hearing, because

13    as we laid out in our papers, we think there's substantial room

14    for the case to be more focused for some of the myriad defenses

15    to be narrowed down or eliminated by virtue of taking up this

16    particular issue at the outset.

17         There are a lot of claims in the Markman papers, as

18    your Honor has observed.  There would be a lot fewer claims for

19    us to grapple with, if even one of the claims at issue here,

20    terms at issue here, were determined to be indefinite.

21         So we think it makes a lot of sense to address this

22    issue and resolve it, one way or the other, at this stage before

23    we move on.

24         We also think it's particularly appropriate, in this

25    case, to look at the indefiniteness issues as a threshold issue,

1    because of the particularly confounding nature of the

2    disclosures of the patents-in-suit.

3           It's confusing to me.  I don't profess to be an expert

4    in computer science.  I deal with technology cases on a regular

5    basis I find the patents to be incredibly confusing.

6           We're at the beginning of expert discovery in the case.

7    And our expert witness, who has decades of experience in

8    computer science, was astounded by the vagueness of the patents.

9           THE COURT:  When you say he or she was astounded, but I

10   don't have anything from your expert witness, do I?

11          MR. NEMEC:  You don't, your Honor, and as I will get

12   into a few moments, we soon see it was either necessary or

13   appropriate to submit any kind expert testimony in connection

14   with this motion.

15          THE COURT:  Okay.  Since I don't have any expert

16   testimony, telling me your expert is astounded, it seems kind of

17   irrelevant.

18          MR. NEMEC:  Understood.

19          What is particularly, I think noteworthy to us, is the

20   inventor's own testimony in regard to the disclosure in these

21   patents.

22          At her deposition -- and I've skipped past it, again,

23   due to my incompetence with it -- at her deposition this past

24   September, Mr. Tulin conducted the questioning and was

25   conducting questions about the software module and specification

1    of the '500 patent, and Dr. Arunachalam answered to this effect,

2    answering very candidly that she views the disclosure of these

3    patents and to be very badly written.  A poor representation of

4    what it is that she believed that she had invented at the time.

5           I think that's particularly telling.  It corroborates

6    the views that we're expressing here, that it is nearly

7    impossible, if not impossible, to define any --

8           THE COURT:  Did she actually say that?

9           I mean it's one thing to say that they're badly

10   written.  I read a lot of patents, and lots of them are badly

11   written, but most of them are not indefinite.

12          MR. NEMEC:  No, your Honor.

13          She doesn't concede that the claims are indefinite,

14   certainly.

15          THE COURT:  Even when she says "badly written," I mean,

16   does she say what she means by "badly written"?

17          I've read ones that were written in German and

18   translated into English by somebody who's first language was not

19   English.  That was badly written.  But --

20          MR. NEMEC:  Your Honor, it's clear from the context of

21   the deposition -- and we're happy to provide a copy -- it's not

22   particularly -- it doesn't particularly have a bearing on the

23   determination of these issues.

24          But the frames things for two reasons.

25          One, Dr. Arunachalam agrees with our assessment that

1    the patents are not clearly written.  They're a bad

2    representation of what it is that she believes she had invented.

3           And perhaps more importantly, as a tether to the legal

4    standard that governs this process, she acknowledged that we

5    have to live with what the patent says.

6           And that leads us to the standards that we're going to

7    be working within today, which is, we can't rewrite the patents

8    to make sense of what it says.  We have to look at the four

9    corners of the patent, and the patent documents, and define

10   whether to a person skilled in the art, anything concrete can be

11   discerned from what those claims terms are, and whether or not

12   there are instructions disclosed in there that one skilled in

13   the art would -- would define as sufficient to practice

14   functions and aspects like that.

15          The legal standard -- could we move back on the slide?

16          The goal is to make the claims understandable to one

17   skilled in the art, so that they can understand whether or not

18   they're infringing claims that are being asserted against them.

19          That's our goal.  The patent and the intrinsic evidence

20   are intended to be dispositive on this issue.

21          There's a very limited role for testimony from people

22   skilled in the art, which gets to the reason why we submitted

23   nothing from an expert witness, or person skilled in the art, to

24   respond to what Dr. Arunachalam was saying.

25          The additional reason why the Bardash declaration in

1    this case can be particularly problematic, and it has to be

2    approached with a great deal of cause, the definiteness analysis

3    is conduct based on the knowledge of one skilled in the art at

4    the time of the invention.

5          In this case, we're talking about the 1995, 1996 time

6    frame.

7          And Dr. Bardash acknowledges this in his papers.  I

8    don't think there's any dispute of this issue of law.

9          But even as he acknowledges that, he turns to a

10   description, a general description of what he perceives the

11   invention to be.  And he talks about something called the SOP

12   protocol, and he said this SOP is an embodiment of the invention

13   and he goes on to describe it.

14         So that's very troubling, because SOP is not fairly

15   characterized as an embodiment of the invention.  SOP is

16   something that didn't exist at the time of this invention.  It

17   came later.  And it actually is part of the accused

18   instrumentality in this case.

19         So to say --

20         THE COURT:  How would I know that?

21         MR. NEMEC:  Pardon me, your Honor.

22         THE COURT:  How would I know that SOP came later?

23         MR. NEMEC:  Your Honor could take judicial notice of

24   this.  It's something that a search on the internet would reveal

25   that SOP is a Microsoft product.  It's a protocol that comes as

1    part of the Microsoft package of software that consumers can

2    install on their computers.

3           Circa 1998 the technology was developed.  It was

4    released to the public in 1999.

5           THE COURT:  SOP I can find on the internet?  I can take

6    judicial notice of?

7           MR. NEMEC:  It is a matter of public knowledge and I

8    don't think that it's a disputed fact.

9           In fact, given the fact that it was accused as part of

10   the instrumentality, I think it's clear that it's not prior art,

11   but rather after-developed technology.

12          THE COURT:  Okay.

13          MR. NEMEC:  So, your Honor, we have an expert who's

14   supposed to be testifying about one skilled in the art that

15   would interpret from the patent documents circa 1995, 1996,

16   characterizing the invention based on later developed

17   technology.  Technology that is indisputably developed by others

18   in the late 1990's, as a proxy for what one skilled in the art

19   would understand the invention to be.  And then proceeds into

20   opinions on particular issues raised with these terms.  In every

21   instance, opining in the presentence, one skilled in the art

22   would -- one skilled in the art would be able to, one skilled in

23   the art would understand, without referencing what one skilled

24   in the art understood in the 1990's.

25          THE COURT:  Did Dr. Bardash, in his Affidavit or

1    Declaration actually say what a person of ordinary skill in the

2    art is?

3           MR. NEMEC:  I don't believe that he does, your Honor.

4    I don't remember offhand.

5           THE COURT:  That's my impression from looking at it was

6    that he didn't, so it's kind of hard to take too seriously what

7    someone says -- you know, it seems like a necessary prerequisite

8    to talk about a person of ordinary skill in the art is who is

9    this person?

10          MR. NEMEC:  I would agree with that, your Honor.

11          THE COURT:  I figured you would.  I was trying to see

12   if Mr. Pazuniak had a hint.

13          THE COURT:  Go ahead.

14          MR. NEMEC:  So I can move through this.  I'll address,

15   unless your Honor prefers that I start with a different term,

16   I'll address the means for transmitting terms first.

17          THE COURT:  All right.

18          I kind of think it makes sense to do them in the same

19   order that you did them in your brief, so that makes sense.

20          MR. NEMEC:  So we can quickly move through some of the

21   other predicate slides.

22          We had group the claims into two general categories;

23   what we characterize as the means plus function categories --

24   terms -- two of which are admittedly means plus function, one

25   there's a dispute.

1          And then what we call the coined terms.

2          THE COURT:  Right.

3          MR. NEMEC:  I think it's accepted by everybody that the

4    terms don't have an ordinary meaning, and the dispute boils down

5    to whether any meaning can be discerned from what the

6    disclosures in the patent show.

7          There's also a chart in the slides there that just lays

8    out for your Honor which of the patent claims, the -- the

9    various disputed terms show up in.

10         THE COURT:  I thought you did in your brief a fine job

11   of saying which ones were which.

12         But go ahead.

13         MR. NEMEC:  Okay.  I'll note that there are some

14   general precepts of law with regard to means plus function

15   terms, and some overarching points.

16         As I just indicated, the parties don't dispute that two

17   of the three alleged means plus function terms are, in fact,

18   means plus function terms.

19         I don't believe the parties dispute that the functions

20   associated with these means plus function terms are computer

21   implemented, which is important in terms of the law that would

22   actually be relevant to assessing the efficacy in the

23   disclosure.

24         And I would submit, through the presentation that we're

25   putting forward today in the briefing, your Honor, that there is

1    no genuine dispute that the functions that are claimed in all

2    three of what we characterize as the means plus function terms

3    cannot be carried out in a general purpose computer without

4    special programming.

5              THE COURT:  Well, I think Mr. Pazuniak disputes that on

6    some of it.

7              MR. NEMEC:  He most certainly does and I will endeavor

8    to demonstrate otherwise.

9              THE COURT:  He thought you said there was no dispute.

10             MR. NEMEC:  I will endeavor that there is no genuine

11   dispute.

12             THE COURT:  Okay.  Okay.  Sorry.

13             Got it.  You're right.

14             Were you starting to stand up there?

15             MR. NEMEC:  And finally, I think this, too, may be

16   subject to some dispute from counsel.  I'll submit that the

17   record shows no genuine dispute, that there are no algorithms

18   disclosed in the specification for any of the functions that

19   we're going to be discussing.

20             As the Federal Circuit has made clear, for a

21   computer-implemented means plus function term, a structure needs

22   to be disclosed in the specification, and that structure is an

23   algorithm.  A piece of hardware, while it may be a structure in

24   the general parlance, is not the kind of structure you need to

25   disclose for purposes of 112, Paragraph F, for a computer

1    implemented invention.

2           To move from that into the means for transmitting term,

3    this one appears in the claim of the '500 patent.  The position

4    advanced by plaintiffs, in response to our motion, is that the

5    structure that corresponds to the means for transmitting in the

6    '500 patent claims is the exchange.

7           So we need to examine what the exchange is.  And when

8    we do that, we perceive a number of critical problems with the

9    exchange as the supporting structure.  The first is a linking

10   problem.

11          Case law requires a clear link between the function

12   recited in the claim for a means plus function term and

13   associated structure in the specification.  We don't see that

14   between the means for transmitting and the exchange.

15          Now, there are a number of passages that Dr. Bardash

16   points to in his Declaration, and plaintiff points to in the

17   briefing, that in the specification they discuss the exchange.

18   And there are some functions that are recited that the exchange

19   purportedly performs.  None of those is transmitting.

20          Moreover, there's a lack of clarity in the

21   specification as to which of those functions that are recited in

22   the specification are actually performed by the exchange.

23          There's a reference to, for example, the exchange

24   working together with a management agent to perform a litany of

25   functions.  Again, none of which includes transmitting.

1          But it's now a question of whether the exchange does

2    transmitting at all.

3          If it does transmitting, does it do so alone, or does

4    it do so in combination with some other element?

5          Federal Circuit case law clearly requires or requires a

6    clear link between function, and structure, and it is absent

7    here.

8          Even if we were to accept that a link existed, the

9    question now becomes, Is the exchange an algorithm?

10         And I would submit to your Honor that the exchange is

11   most definitely not an algorithm.  The exchange is, essentially,

12   a black box component.  It's a software component described as a

13   box in the figures.  Its functions are recited in the

14   specification.

15         But the way that it carries out any of those functions,

16   particularly the transmitting function, is never described.

17   There is no set of instructions.  There is nothing that the

18   Federal Circuit would characterize as an algorithm to describe

19   how one skilled in the art would pick up this disclosure, look

20   at the exchange, understand that the exchange performs the means

21   for transmitting, and then be able to implement that.

22         THE COURT:  The function of a means for transmitting is

23   to transmit a transaction request to the network, right?

24         MR. NEMEC:  To the -- essentially to the back office of

25   the bank.

1          THE COURT:  Well, to the back office of the bank,

2     that's, essentially, part a of network?

3          MR. NEMEC:  The claim language literally means for

4     transmitting a transaction request from said transactional

5     application and means for processing said transactional request.

6          So in the context of the overall claim, the processing

7     is going on -- and this is subject to some dispute in one of the

8     later terms that we're going to be discussing -- the position is

9     that the computer system, it either resides in or overlaps with

10    the back office computers at the bank where the bank is

11    processing and carrying out the real-time transaction.

12         THE COURT:  Right.  So if you think of that as a real

13    simplified thing, you have somebody, a consumer, or somebody

14    like a consumer, who's out sitting in their room where they have

15    a computer, and there's some kind of application on it relating

16    to banking, and they fill out some stuff, and they hit the send,

17    and that send thing shoots off to the bank, who then presumably,

18    although, I don't think it's in -- who then does something to

19    the transaction request and presumably then replies, right?

20    That's what we're talking about here?

21         MR. NEMEC:  I believe, in general terms, that's what's

22    supposed to be going on.

23         THE COURT:  And, so -- so isn't it the transmitting

24    here, basically, something that any computer that has an

25    internet hookup does all the time?

1          MR. NEMEC:  Not based on what the specification is

2     telling us by way of criticism of the prior art and the

3     characterization of the key aspects of the invention.

4          In the background of the invention, there's a criticism

5     of the communication means that are available in the prior art

6     for getting information to a bank for conducting a transaction,

7     and how two-way communications not really feasible based on the

8     prior art.

9          So it's evident from both the characterization of the

10     prior art, and the overall structure of the claim, what is

11     called for here is something more than the prior art means of

12     transmission that may have existed.  One skilled in the art is

13     going to be looking for something that's different from what was

14     known before, which they're told is not effective and is not

15     within the scope of the invention.

16          THE COURT:  Well, isn't the -- from what I could see of

17     the exchange in the specification -- and I certainly didn't

18     spend enough time on it to say I saw everything there was to see

19     -- isn't the exchange sort of described as being the vehicle

20     that, in fact, does allow this information to be transmitted and

21     interpreted by the bank?

22          MR. NEMEC:  That's not clear from the disclosure, your

23     Honor.

24          There's a -- there's a passage that Dr. Bardash points

25     to in the brief where they talk about the exchange managing the

1    connection between the user and the bank.

2         And that in connection with the passage that is

3    describing earlier where there's an indication that the exchange

4    may, in certain circumstances, work with other elements, raises

5    a question of whether the exchange is managing the connection or

6    whether it's actually carrying out the connections.

7         And, in either instance, it doesn't rise to the level

8    of an algorithm, because it doesn't actually describe what it's

9    doing to manage, or control, or carry out.  And there's still no

10   mention of transmission, so we're making a leap that this

11   control over the connection is, in fact, the transmission

12   function, it's called out in the came claims.

13        There's a number of inferences and, essentially,

14   guesses that need to be made to even get us to these passages in

15   the specification.  And then once they're there, they clearly

16   don't lay out a set of instructions that would be then to form

17   the template for a person skilled in the art to write the

18   software and implement the invention.

19        The software doesn't need to be there.  There needs to

20   be source code.  We don't contend that there needs to be --

21   there has to be something more than a mere recitation of the

22   functions that are to be carried out.

23        THE COURT:  And, so, if I thought a general-purpose

24   computer could do this, that would be the end of your argument,

25   right?

1      MR. NEMEC:  If you were to conclude that a

2  general-purpose computer could carry out this transmission, it

3  could cure the lack of an algorithm and corresponding structure

4  in the specification.  It raises some serious problems about the

5  validity of the claim over the prior art, given the arguments

6  that were made.

7      THE COURT:  Well, that's an issue for a different day?

8      MR. NEMEC:  That would be true, yes.

9      I will turn things over to Mr. Pazuniak to make his

10  remarks on this term, so that we don't allow it to monopolize

11  the proceedings.

12      But I would like to draw your Honor's attention to a

13  Federal Circuit case that is very much on point, in our view, to

14  this means transmitting term.

15      The Function Media v. Google case.  It's cited in our

16  reply, but because of space constraints, we didn't have the

17  opportunity to go into a lengthy analysis.

18      As you can see from the slide, the term at issue is the

19  same, means for transmitting.

20      The alleged supporting structure in the specification

21  is very similar and that in our case it's an exchange.  In the

22  Function Media it was a presentation generation program.

23      The Federal Circuit in that said, essentially, this is

24  a block box in the specification that describes the functions.

25      THE COURT:  You've got the -- your chart has the wrong

1    columns.

2            MR. NEMEC:  It does he, indeed, your Honor.

3            THE COURT:  All right.

4            MR. NEMEC:  I apologize.

5            THE COURT:  Well, no, no, no.  I know you were just

6    doing that to make sure that I was actually paying attention,

7    but, okay.

8            MR. NEMEC:  I'm sorry.  I should have caught that.

9            THE COURT:  Well, no, that's all right.  That's all

10   right.

11           I was actually looking at it with you and thinking,

12   Well, this case is with an exchange.  This is pretty on point.

13           MR. NEMEC:  Yes, it's amazing.  Dispositive even.

14           And just to wrap up the point, the argument in the

15   Function Media case, with respect to the sufficiency of the PGP

16   in that case, were very much like the characterization of the

17   exchange in this case.  In other words, the specification there

18   talked about the functions that were performed by the PGP, but

19   did not lay out a set of instructions or something that would

20   rise to the level of an algorithm to empower one skilled in the

21   art to associate that software with something concrete, as

22   opposed to just an abstract claiming of the function of

23   transmitting.

24           THE COURT:  All right.

25           Why don't I hear from Mr. Pazuniak?

1      MR. NEMEC:  All right.  Thank you, your Honor.

2           (Pause)

3      MR. PAZUNIAK:  Your Honor, if I may hand up copy of

4 presentation?

5      THE COURT:  Sure.

6      MR. PAZUNIAK:  The way it was done, it was done on 14-

7 inch paper, but there's also sort of a half of letter sized

8 paper where it's shrunk.

9      THE COURT:  Okay.

10      MR. PAZUNIAK:  So you'll have it both ways.

11      Your Honor, just a couple initial remarks in response

12 to Doug's comments.

13      That statement that the witness made, that he pointed

14 out at the very front, was specific, I think, to a given issue

15 that was being discussed at the time.  That's my recollection.

16 But your Honor already addressed that, so I'll pass on to it.

17      Your Honor, asked about the level of skill.

18      That is correct.  Mr. Bardash did detail the level of

19 skill.

20      THE COURT:  Not that it makes a difference, is it Dr.

21 Bardash or Mr Bardash?

22      MR. PAZUNIAK:  Doctor.

23      But there's -- it's interesting that your Honor asked

24 the question, because our expert reports are being exchanged as

25 we speak.

1              And the defendant, JPMorgan, has stated a position that

2     one skilled in the art has a very high level of skill.  People

3     with Master's and some years of experiences.

4              Plaintiff, on the other hand, Dr. Bardash in

5     particular, has taken the position that the level of skill is

6     actually lower, because we're dealing with the area of www web

7     technology, which was which still relatively new, and so there

8     was relatively little experience.

9              In fact, at the time, there were many people working in

10    the field who had no college degrees.  Bill Gates, perhaps,

11    comes to mind.

12             Anyhow, so there -- so there is --

13             THE COURT:  I think he might have been slightly above

14    the person of ordinary skill in the art by that time.

15             MR. PAZUNIAK:  Dr. Bardash certainly was, but all of

16    his comments were directed to one of ordinary skill in the art,

17    which as it points out, is being exchanged right now.

18             He did not put a very high level or certainly at a much

19    lower level than the defendants --

20             THE COURT:  Well, in my Declaration he doesn't say what

21    the level is at all, does he?

22             MR. PAZUNIAK:  I'm sorry?

23             THE COURT:  He didn't say in the Declaration I have

24    what the level was at all; is that right?

25             MR. PAZUNIAK:  That's correct.  He did not.

1          Then Mr. Nemec pointed out that he -- that Dr. Bardash

2     referred to the SOP protocol.  This is in Paragraph 6 of his

3     Declaration.

4          THE COURT:  Right.  I did see that.

5          MR. PAZUNIAK:  He was talking about what the invention

6     was very briefly, and then simply used the SOP analogy, because

7     it's day-to-day practical utilization that could illustrate.  He

8     rely on it in any way, shape, or form, in any of the opinions

9     that he provided, and I think that's very, very clear.

10          So, with that, I think your Honor asked some questions

11     about what this invention is, and I think it would be useful to

12     start with that.

13          THE COURT:  Okay.

14          MR. PAZUNIAK:  I think we have to go back to 1995,

15     1996, and recall what the web technology was at the time.

16          On the screen I have a couple samples of -- of screen

17     shots of websites downloaded from the internet archives from the

18     1996 time frame, that sort depict what I think was probably at

19     the top of the heap.

20          And I think the experts would agree that it would be at

21     the top of the heap, as far as website technology is concerned,

22     and that's for Amazon and Yahoo.

23          And how did these prior art systems work?

24          At Page 3 of the handout, we have the most simple form,

25     which is hyperlinking.  Basically, that was described in Figure

1    1-A of the patents.

2            And, essentially, you had a web browser that a user

3    logs on to a site, and then the web server and -- and I

4    highlighted on -- I'm sorry -- I highlighted that this 104 is

5    the web server, and 105 is a web page as defined in the patents,

6    but, essentially, one could hyperlink from one page to another,

7    from one website to another.

8            The more sophisticated and the most powerful technology

9    at the time in 1996, and the technology that was addressed in

10   the background section of the patents-in-suit was called CGI.

11   And, essentially, this one now permitted people to use forms.

12           You could have, for example, have a user, through his

13   browser, ask the web server to display a form.  The server would

14   serve up something that looks like -- I keep hitting the wrong

15   button on these things -- you know, it would pull up something

16   like this.  Like a form as shown on this Page 4.

17           That form, if your Honor looks, I think you would thus

18   see it on the handout, but there is a little reference to CGI in

19   red.

20           THE COURT:  Yes.

21           MR. PAZUNIAK:  That's what -- that's what would be

22   delivered by the server to the browser.  That CGI was critical.

23           That meant that you were asking me for a form.  I'm

24   giving you this form.  It's all on an HTML form.  I'm giving you

25   this form.  And there's the CGI.

1          When you click, fill out this form and hit submit, that

2     form is going to be returned to the web server, and then the web

3     server will give it to a CGI process.  That's what this meant.

4          Now, so, if the user filled in the form, hit the CG --

5     hit the submit, it went to CGI.

6          What was the key point of CGI?

7          CGI acted totally outside of the web server.

8          The web server would get this form, get this signal

9     from the user, from the browsing saying, I want to perform this

10    -- I want you to take this form and do something with it.

11         The web server didn't care what that form was or

12    anything.  It just saw that CGI, and immediately the server

13    handed it off to a CGI process that was outside of the web

14    server.

15         So, at that point, the server stopped working.  The

16    thing was handed over back to the CGI.  CGI, whatever process it

17    was, it could have been something like I want to search for

18    books on Amazon, or I want to search for something else, it

19    would be that CGI process outside of the server that was

20    running.

21         Every time the server asked the CGI program to do

22    something, it would start a whole new program, because once CGI

23    did its job, it would send a response back to the server and

24    then it would shut down.

25         At that point, the server didn't look at the response,

1   didn't do anything with it.

2          It just said, Okay, I got a response and then it would

3   send it back to the browser.

4          That's it.

5          And again, the process would now shut down.

6          So what was the problem with that?

7          The problem is that it had a lot of limitations.

8          One was that the performance was very sketchy, because

9   the web server had to call this completely different program now

10  to do something.  There was a huge overhead on both -- on the

11  server side -- on the entire system, because a new CGI program

12  had to be invoked every time a user hit a submit or did

13  anything, because every time something that got sent back, the

14  process, all the processes terminated, and then you had to

15  restart again.

16         These are not, I don't think, opinions.  These are well

17  known established facts that I think every scientist would agree

18  to.

19         You also had limits on how much work you could do,

20  because the web server could only contact CGI, and then some

21  other program would have to go to other sites, for example, if

22  they were going to do something together.

23         And then there was this whole issue of safety.

24         The problem with CGI is that users were actually now

25  conducting programs on a web server, and asking the web server

1    to send something to somebody, you know, to the back end to

2    perform.

3            Today, no one does it.  Today, we have enough problems

4    with hacking with far more sophisticated technology than this,

5    and that was a problem.

6            So what was the solution that Dr. Arunachalam came up

7    with?

8            She said, Let's get rid of CGI.  No more CGI.  She

9    invented web applications.

10           The first patent -- the first literature that I'm aware

11   of where the term "web application" is used is in her patents.

12           I had made that point in, I think, some briefs a long

13   time ago, and challenged the defendants and said, Okay, find me

14   where anyone had had a web application before Dr. Arunachalam.

15   No one has found one yet.

16           At least until someone comes up with something, she

17   invented web applications.

18           And what is a web application?

19           The web application doesn't work outside the web

20   server.  It's works inside the web server space.  A huge

21   difference.

22           But she not only came up with idea of, Let's not use

23   CGI in these external programs, but work within space, but she

24   came up with a method of doing it.

25           And what was her method?

1          Well, the first point is, you would have a list of a

2    point -- in other words, you would go to somebody's -- or their

3    merchants or providers.  I think she used the term "merchant

4    website".

5          I keep hitting this wrong button.

6          And you would have this shown here at the top of Page

7    7.  You would have a -- a web server and on top of that you

8    would have a web page.

9          So far, when we're looking here, it's just like normal,

10   except now here you have a list of what she called point of

11   service applications.

12         And we'll get into that in a second.

13         But once that user chose a point of service application

14   on that -- on that web page, this is where the exchange comes

15   in.

16         At that point, the server would invoke a web process.

17         And what -- what was the specifics of that web process?

18         This is shown on the next page.

19         You would go -- so you have the -- at the top left-hand

20   corner, you'll see there that you had this list of point of

21   service applications, and you chose the particular transaction

22   or process that you want to use.

23         So you would click, let's say in this case, on a bank.

24         It says, I want to conduct a particular bank process,

25   and the user would click that.

1           And I'd like -- this is a little minor thing, but you

2    will notice that if you look at the web page, it's now as --

3    it's now not sitting on a web server, as it was in the prior

4    art, or as shown in her earlier drawings, but is now sitting on

5    an exchange, and the web page is no longer 105, but 505,

6    designating that this is now a being presented, you know, as a

7    point of service application displayed on a web page.

8           And how does this application now work?

9           Well, don't forget that what you see on a browser, all

10   it is is information that is being generated by the web server,

11   and is being sent back to the browser for the user to look at.

12   The browser actually doesn't do very much.

13          Today you can use some JAVA Script, and some things

14   like that, but, basically, you're running these -- today even

15   when you're running web applications, the server is where all

16   the -- where the activity take place, and then this is

17   presented, via a browser, to the user.

18          So what does the -- what does the web server do?

19          Well, you have the exchange, and what the exchange does

20   is now present this applications, point of service application

21   on a web page to the user.

22          It may look a little bit like the old forms, but these

23   are not HTML forms that are just simply sent back.  These are

24   now tied to a transactional application that is the web server

25   space.

1          And how did she say you would communicate between that

2     point of service application and the back end?

3          Well, she called it objects.  The term "objects" is

4     found all over the place in many different contexts.  It was

5     used as term.

6          THE COURT:  But it doesn't appear in the patent, does

7     it?

8          MR. PAZUNIAK:  Yes, yes.  There's a whole description

9     of objects in the patent, and there's terms that she uses,

10    object browsing.  Then she talks about network objects, network

11    objects identity.  She talks about the syntax and how these

12    objects are formed.

13         The key to this is that the objects have a defined data

14    structure of attributes and information entries.

15         This is -- this is, your Honor, very straightforward.

16         If they can -- if JPMorgan can find a web server that

17    is generating an application displayed to a user on a web page

18    where the web page is showing a data structure of attributes and

19    information entries, and find it in the prior art, we're dead.

20    If they can show that theory not doing anything like that, they

21    escape infringement.

22         THE COURT:  So what exactly does the exchange do?

23         MR. PAZUNIAK:  Well, the exchange has -- has multiple

24    functions.

25         THE COURT:  Well, let's talk about the transmission

1    function.

2           MR. PAZUNIAK:  Excuse me.  And I will get to it, but --

3    and I keep hitting the wrong button -- okay.

4           So you can see that everything is really here running

5    on the exchange.  So the exchange is the -- is the program that

6    generates the web application, so it's the one that has --

7    creates this structure or data structure that's presented to a

8    user on a web page.

9           This is pure software.  It's in a way that a user might

10   see a form that looks much like the old forms, but the

11   differences that these are forms that are now being generated by

12   the transactional application inside the web server.

13          THE COURT:  So the exchange sends a web page somewhere?

14          MR. PAZUNIAK:  Yes, the exchange actually has -- the

15   patent says expressly that the exchange includes both the point

16   of service application and the mechanism for generating a web

17   page.

18          THE COURT:  What is the -- so what is the exchange?

19          MR. PAZUNIAK:  The exchange is -- the exchange is the

20   point of service application.  It is the typical web server

21   mechanism for displaying a web page and then displaying the

22   point of service application on the web page.

23          It also includes what is called the advance switch,

24   which is also variously defined in the patents as -- if your

25   Honor looks at Figure 7, you know, the four layers of the

1   advance switch are defined, and then inside the patent

2   specification around page -- you know, pages -- Columns 6, 7,

3   and 8, there's a whole description of what that advance switch

4   does.

5           THE COURT:  So you saying the exchange is the advance

6   switch?

7           MR. PAZUNIAK:  The exchange includes the advance

8   switch, yes.  The exchange has multiple functions, so there's a

9   lot going on with that.

10          THE COURT:  And, I'm sorry, just to go back, the

11  exchange -- one of its functions is transmitting.

12          What does it transmit --

13          MR. PAZUNIAK:  Okay.

14          THE COURT:  And where does it transmit it?

15          MR. PAZUNIAK:  Okay.  Can I -- let me address that.

16          The best way to do it on -- your Honor, let me take a

17  step back.

18          On Page 11 of the handout I have, that's the first

19  slide on the means transmitting.

20          Your Honor had earlier taken notice of certain actions

21  that were taking place in the PPO and the SAP review.  I'm not

22  relying on anything that the Patent Office is doing, but your

23  Honor took notice of it, so I thought maybe I should at least

24  mention it in my presentation, to make sure that we're not -- we

25  have everything together.

1              But the Patent Office looked at this term in the SAP

2    review.  It came up with what it considered to be the definition

3    of that term, means for transmitting a transaction request, and

4    said it is an interface that connects a request from a

5    transactional application to a process or that performs the

6    requested transaction.

7              We defined that as the exchange, but the two are not

8    actually different, and I'll explain why.

9              Dr. Bardash, in his Declaration, said that a person

10   skilled in the art would recognize that the structure for the

11   means for transmitting the transaction is the exchange.  And he

12   particularly noted a couple sections in the patent where that

13   was -- where that was plainly said.

14             Then he continued, after explaining all that, he

15   continued, and in Paragraph 15, he basically addressed the --

16   the comment by the PTO as to what is the interface.

17             And he said the critical point is, That as shown in

18   Figure 5 D, it's point of service application displays the

19   object data structure with its attributes and provides a

20   mechanism to retrieve or send the information entries, et

21   cetera.

22             So what is he pointing out here?

23             If your Honor considers Slide 13, the interface.  The

24   interface is actually the networked object.  The networked

25   object that is displayed on a web page and then communicated by

1    the web server to the back office.

2          It is an interface.  It connects a request from a

3    transactional application, which is in this picture, bank 510.

4    And you can see that second arrow there going to the Legacy back

5    office, and that's -- that shows that that object structure --

6    and notice that it has that same number, bank 510, as part of

7    that structure, and it's being communicated to the back office.

8          So -- so the object routing is clearly identified as

9    part of the exchange function, and that's right out of the

10   patent.  And the interface is the network object that is

11   communicated between the front end and the back end.

12         It's very -- this is not something that's being, you

13   know, we're not taking words and creating words.  I mean this is

14   all stuff in the patent.

15         THE COURT:  All right.

16         Why don't I give Mr. Nemec a chance to say -- talk

17   about something else.  We are rapidly running out of time here.

18         MR. NEMEC:  Thank you, your Honor.

19         I was under the impression that we had an hour

20   allotted?

21         THE COURT:  Yep.

22         MR. NEMEC:  In the end of most of our hour, I will not

23   -- well, I will engage in a rebuttal to what --

24         THE COURT:  Yes, that would make sense.

25         MR. NEMEC:  -- what Mr. Pazuniak just said, other than

1   to point out that throughout, in that presentation, we still

2   never saw any evidence of an algorithm disclosed in the

3   specification for how this admittedly brand-new concept of an

4   exchange carries out transmitting in a way that's different from

5   the prior art that Mr. Pazuniak, in the patent, went to lengths

6   to -- to distinguish and disparage.

7       Let me move to a means for processing, which I think is

8   a more clear-cut issue.

9       This is one in which, Pi-Net has taken the position

10   that the corresponding structure is, in fact, a general

11   processing, and is relying upon -- and Mr. Pazuniak will

12   certainly correct me this time, if I'm mischaracterize his

13   arguments -- but his position is that this case falls within the

14   narrow exception articulated in the Federal Circuit Katz

15   decision, which identifies certain types of inventions whereby a

16   general purpose computer is adequate structure in the absence of

17   a disclosed algorithm.

18       And the Federal Circuit, subsequent to _Katz_, turned

19   back to that issue in the _Ergo_ licensing case, and expanded a

20   bit on the very rare circumstances in the narrow nature of this

21   exception.

22       And they speak in terms of functions which,

23   essentially, can be carried out when you take the computer out

24   of the box and plug it in.  If it is a function like that, then

25   you may fall within the _Katz_ exception, where reciting a general

1    computer, a general-purpose computer as your company and

2    structure, is enough and you don't need that algorithm.

3         If you need to do anything to that computer, to allow

4    it to carry out that function, you need to put software on that.

5    You need to program that computer and turn it into a special-

6    purpose computer, so it can carry out that function, you no

7    longer fall within the Katz exception.

8         In this case, the means for processing, is not a

9    straightforward type of processing.  The function is to be

10   carried out.  It's not the kind of thing that you can just pull

11   your computer out from a box at Best Buys, plug it in, and have

12   it process.

13        We're talking about actually processing this real-time

14   transaction that was supposedly not possible in the prior art.

15        What actually gets to the heart of this invention, real

16   time, two-way communication and online to conclude transactions.

17   Means for processing that transaction in real time.

18        Moreover, the structure that is identified by

19   plaintiff, as corresponding here, is a general purpose computer,

20   which may overlap with or, in fact, entirely constitute back

21   office computers at the banks and at the merchants that are

22   performing these transactions.

23        And I think that helps to clarify that certainly you're

24   not going to take a general purpose computer out of the box, and

25   plug in, and expect that it perform bank transfers, and loan

1    approves, and all the sort of transactions that this patent

2    purports to cover in real time without any kind of special

3    programming.

4         THE COURT:  So let's just assume for a second that the

5    invention here is something about getting information from a

6    consumer to a bank for a bank to act on, is there any reason why

7    the patent has to describe the bank's internal processes for

8    acting on this application?

9         MR. NEMEC:  In this case, I would submit patentee does,

10   because it's not just suggesting that those functions should be

11   carried out in the way that they were in the prior art.  Real

12   time is a key aspect of the invention and is intended to

13   distinguish over prior art, online transactions, which,

14   according to the inventor, did not take place in real time.

15        Whatever constructions the Court may decide is

16   appropriate for the term "real time," it's not the kind of thing

17   that the inventor is suggesting was known in the prior art, and

18   would have been accessible to people skilled in the art.

19        (Pause)

20        Your Honor, I think it's as simple as that.

21        The functions here, in my view, are admittedly beyond

22   what an out of the box computer could carry out.

23        THE COURT:  Well, don't you think I would be helped

24   here if I had something from your expert saying that?  How am I

25   supposed to know what a back-off computers in the bank do?

1          MR. NEMEC:  Your Honor, I think it's evident from the

2    juxtaposition of the characterization of the prior art in the

3    patent, and the invention, as it's claimed in Claim 1 and

4    dependent claims of the '500 patent, it's not necessary for an

5    expert to come in and observe that point.

6          Our expert is of that view, but for purposes of Summary

7    Judgment, and for purposes of determining this indefiniteness

8    question, the question can be answered from within the four

9    corners of the patent.

10          I would say you could boil down two concepts that are

11   key to what distinguishes this invention over the prior art.

12   Whatever the claim terms may mean, one is the communication that

13   takes place, which is described in depth in the background as

14   compared to CGI, which the patents do not cover, apparently, and

15   the other is the real-time processing, which is distinguished

16   from the prior art.

17          So here we're talking about two means terms, both of

18   which are key components of the invention.

19          THE COURT:  All right.

20          Thank you.

21          Mr. Pazuniak, I take it you agree that the means for

22   the processing, you're relying a general-purpose computer,

23   right?

24          MR. PAZUNIAK:  No.

25          THE COURT:  No.  Okay.

1             Tell me what you're relying on.

2             MR. PAZUNIAK:  It is a little more than that, your

3       Honor.

4             THE COURT:  Just be quick about it.

5             MR. PAZUNIAK:  I should say in part yes, part no, but

6       let me explain, if I may?

7             Again, the means for processing said transaction

8       request was also considered in the PTO.  And there's a

9       definition of that and I have it quoted on Page 14 of this slide

10      presentation.

11            The Patent Office determined that the structure for the

12      means for processing means the back office processing resources.

13            I think, in trying to understand that this whole thing,

14      we need to start again with what was stated to be in the prior

15      art and what was stated to be the invention.

16            If your Honor -- I didn't put Figure 4-A on Slide 15

17      and I should have, but if your Honor has a copy of the patent?

18            THE COURT:  I do.

19            MR. PAZUNIAK:  And if your Honor look looks at Figure

20      4, you will see the section -- well, Figure 4-A is the prior

21      art, and your Honor will see that the back office section, the

22      two left columns are identical for 4-A and 4-B.

23            4-B is the invention.  4-A is the prior art.

24            What is the difference between 4-A and 4-B?

25            It is that little block that has the exchange, the web

1    pages point of service applications.  That's where the invention

2    is.

3            And what did the patent say about this back office?

4            Well, Dr. Arunachalam said the back office comprises

5    Legacy databases and other repositories that are utilized by the

6    bank to store its data.  The connection between user and the

7    bank services is managed by exchange 501.

8            So she was saying flat out, Look, I'm not dealing with

9    the back office.  I don't care about the back office.

10   Obviously, no one is going to know what banks do in the bank

11   office.  My job as to get you from the browser to the entry

12   point to the back office.

13           And, so, Dr. Bardash, in his Declaration, explained all

14   this.  This is in Paragraph 22.

15           And he said, Look, the invention is the front end.

16   It's not anything that happens in the back end.

17           Now, how does this come into play here?

18           Well, there's two cases that I think are worth looking

19   at.

20           The first is the Typhoon case, which is cited in the

21   briefs, and I have it on Slide 17.

22           The key point there is that the Court said with respect

23   to a means plus function element, and what needs to be

24   disclosed, the Court pointed out that the amount of detail that

25   must be included in the specification depends on the subject

1    matter that is described, and its role in the invention as a

2    whole, and in view of existing knowledge.

3           So now we have to look at not just the fact that

4    there's a limitation, or a structure, but what is the function

5    in those in the role of the invention as a whole?

6           The second case, of course, that Mr. Nemec already

7    addressed briefly is the In re:  Katz, where the Court said,

8    Look, there some functions that can be done by a general

9    computer, and in this case, the function was means for

10   processing at least certain of said answer data signals.

11          So, I mean, it wasn't just, oh, process.  It was a very

12   specific process of processing data signals.

13          But the Court said, Yeah, but that could be done by a

14   general processor and we don't need much more.

15          So what do we have here for means of processing?

16          First of all, as your Honor has pointed out, there is

17   no Affidavit or other record support for defendant's argument.

18          The whole point of the Pi-Net invention was not to

19   change the back office processes.  It was just to connect to

20   them.

21          And she showed how to connect to them via the web

22   server and these point of service applications, which delivered

23   a structured data option.  Once you get that, she didn't care

24   what was happening in the back.

25          So under the In re:  Katz interactive case, yes, a

1    general purpose computer, in this kind of a situation, is

2    perfectly fine, because we are not trying to change the back

3    office processes.  We're letting them stay the way they are.

4            Our point is only to connect to them, and that is what

5    -- this is what Dr. Bardash said, again, in his Declaration.

6            That a person skilled in the art, reading this and

7    looking at the same kind of information that I just showed to

8    you, would understand.  The back office processes are what they

9    are.

10           So given the fact that the whole point of this means

11   for processing is, basically, just, Okay, once we get the

12   information to you, go ahead and finish the job, do whatever you

13   used to do in your Legacy systems.  All you really need is the

14   Legacy system that doesn't change.

15           And, therefore, the means for processing is, in this

16   context, not so much a general computer, but it is whatever

17   computer existed in the system to begin with.

18           THE COURT:  Well... well, hold on a second.

19           (Pause)

20           Oh, okay.  I thought I lost one of the patents here.

21           So I guess one of the issues, for example, on Claim 1

22   of the '500 patent where it's the third limitation, the third

23   meaning, the means for processing said transaction request, what

24   does that mean?

25           I understand what the transaction request is.

1           Does that mean a means for processing it, getting it to

2    the entry to the back end computer, or does that mean doing

3    something with the back end computer?

4           MR. PAZUNIAK:  If I may refer your Honor to what the

5    Patent Office determined that --

6           THE COURT:  Well, don't tell me what Patent Office

7    said.

8           MR. PAZUNIAK:  Okay.  All right.

9           THE COURT:  Give me answer.

10          MR. PAZUNIAK:  The means for processing said

11   transaction request means that the bank, or the other merchant,

12   or whoever performs the requested function.

13          So, in the patent, there was this example of a user --

14          THE COURT:  So the bank performs the requested

15   function.

16          Let's assume that the borrower, a person wants to

17   borrow money from the bank.  That means that the bank figures

18   out whether or not to offer the person money.

19          Is that processing the transaction request?

20          MR. PAZUNIAK:  Yes.  And, your Honor -- and I'm sorry,

21   your Honor -- but your Honor's question has a lot of different

22   -- can we take a simpler analogy?

23          The reason I say that is because the way -- when you

24   start talking about borrowing, there are so many levels of

25   interaction and so many activities, but let's take the example

1    that's in the patent.

2           A user wants to shift money from one account to

3    another.

4           THE COURT:  Okay.  Let's do that.

5           MR. PAZUNIAK:  The transaction is the user says -- goes

6    on the website, opens up the point of service application that

7    says transfer money and says, I want you to transfer the money.

8           The bank then has all kinds of internal activities, but

9    at the front end of those activities, the bank receives the

10   instruction just like it would receive an instruction from an

11   ATM machine or from a bank teller.

12          THE COURT:  Right.  But that's receiving instruction,

13   the means for transmitting, right?

14          MR. PAZUNIAK:  That's the transmission.

15          THE COURT:  It's the means for processing?

16          MR. PAZUNIAK:  Right.  And as soon as the bank puts

17   something in one of its ledgers, and responds to the user and

18   says, I've done it, that's the end of the transaction.

19          THE COURT:  Maybe that's the end of the transaction,

20   but the claim says processing the transaction request.

21          MR. PAZUNIAK:  Right.

22          THE COURT:  Doesn't that mean that the bank actually

23   takes it's things and moves the money from one place to another?

24          MR. PAZUNIAK:  No, because the actual amount of money

25   is something that is outside of the user's transaction.

1          THE COURT:  Well, no, no, no.

2          But the -- if the transaction request is, I want you to

3     move money, but the moving of money itself, that's not part of

4     the claim?

5          MR. PAZUNIAK:  Right.

6          THE COURT:  But the bank recognizes that a person wants

7     to move some money and doing something to make that happen is a

8     part of the claim, isn't it?

9          MR. PAZUNIAK:  Your Honor, if I can just explain.

10         There are several levels that take place.

11         For example, the ultimate transfer and balancing of the

12    books is something that happens in batch processing.

13         THE COURT:  Right, right, right.  But what I'm trying

14    to figure out is what the limit of the claim is.

15         MR. PAZUNIAK:  So if -- if the bank -- if the user

16    says, I had to move money from A to B --

17         THE COURT:  Right.

18         MR. PAZUNIAK:  -- and that transaction is open, he hits

19    submit.  Yes, at that point, the -- the web server process makes

20    a note, yes.

21         Whatever system the bank has, there's some kind of a

22    database or something where they say, Okay, move money from A to

23    B.

24         It is a statement.  It's a very simple database.

25         THE COURT:  So here's the question I'm asking, Mr.

1     Pazuniak is:

2         The claim isn't just, I sent the request to move the

3     money to the bank, that that's the means for transmission,

4     right?

5         MR. PAZUNIAK:  Right.

6         THE COURT:  If something happened after I transmitted

7     to the bank this claim --

8         MR. PAZUNIAK:  Right.

9         THE COURT:  -- which means the bank processes the

10     transaction request, and I take it that at a minimum that means

11     that the bank not only gets the request, but -- I don't know --

12     can it read the request and then act on it?

13         MR. PAZUNIAK:  There has to be -- I agree with your

14     Honor that somewhere there the bank when you -- somewhere in

15     that bank back office, there is a system that recognizes the

16     request and acknowledges it.

17         THE COURT:  And isn't that the means for processing?

18         MR. PAZUNIAK:  Yes, it could be, but, again --

19         THE COURT:  Well, it could be.  And I'm sorry to --

20     we're talking claim construction here I think -- but whether or

21     not something is indefinite or not sort of depends on how you

22     construe the thing.

23         MR. PAZUNIAK:  Yes, and I agree with your Honor,

24     everything your Honor said.

25         So, yes, there is -- something happens and that's the

1    processing, but that processing that takes place, I go back to

2    what the patent talks -- says what the inventor said here when

3    you do this transfer -- in the patent she says this will be like

4    you went to an ATM machine or went to a bank teller.  So it is

5    the Legacy systems that receive the instruction.

6          What those Legacy systems are, are really beyond the

7    scope of invention, because the invention is the front end,

8    which is to tell the bank to do it.  And, yes, to complete -- to

9    complete the whole series of events.

10         Yes, there is a means for processing, which means that

11   you do not just send it, but the bank has to do it.  And what

12   we're saying is that means for processing is the Legacy systems.

13         THE COURT:  But that seems like -- that seems like

14   there's something wrong with that, that you can say, Well, we

15   don't what it is.  It is whatever the bank has.

16         MR. PAZUNIAK:  When you're thinking -- when you go to

17   the ATM machine, or a teller, or -- or a disk, ultimately, the

18   same depositors or repositories in the bank respond.

19         THE COURT:  Well, no, but -- but we're drawing a

20   distinction between what actually happens and what a patent

21   claims.

22         And here it the seems as though the patent is claiming

23   the back office system, without saying what the bank office

24   system is.

25         MR. PAZUNIAK:  It's -- it is, essentially, saying

1    whatever system the merchant uses in the normal course, they can

2    have.

3            This is where we talk about the role of that -- the

4    role of that element in the scheme of the invention as a whole.

5    This is what the Typhoon case was talking about.

6            The point of the means for processing is merely there

7    to say there's a transaction that's completed.  It has really

8    nothing to do with the invention as a whole, and what the point

9    of the invention is, which is the front end.

10           It is merely acknowledging that the transmission of the

11   request has worked.  And, in other words, that the transmission,

12   you know, was not for nothing.  It did not fail.

13           And if you take a look at the Typhoon case and the In

14   re:  Katz case, it falls squarely within the ambit of both of

15   those.

16           THE COURT:  Here's what I'm going to do:

17           We've used up as much time as I have for this, so I'll

18   take the other terms under advisement.  It's hard for me to

19   remember one case from the next.

20           Mr. Pazuniak, you mentioned a couple of times the PTO.

21   And I guess -- and I'm asking, because I don't know the

22   answer -- were there some other defendants whose cases I stayed?

23           MR. PAZUNIAK:  Your Honor stayed the case against

24   Citizens Bank.

25           THE COURT:  Mr. Klaiber?

1           MR. KLAIBER:  Your Honor, I represent Citizens

2   Financial.

3           THE COURT:  Oh, okay.  I thought you were sitting on

4   Mr. Pazuniak's side.  I thought you were with him.

5           MR. KLAIBER:  I was sitting on that side to see the

6   screen.

7           If you don't mind, I would like to have a minute or

8   two?

9           We -- your Honor did grant our Stay Motion in our

10  papers and we are bound by the outcome of this hearing.

11          THE COURT:  Okay.

12          MR. KLAIBER:  So that's why I'm here.

13          THE COURT:  All right.

14          MR. PAZUNIAK:  So the way the process works, is that

15  that case was stayed.  I'm not involved in the proceedings in

16  the Patent Office, but what has happened so far is SAP filed

17  their papers with respect to the two main patents.

18          The Patent Office --

19          THE COURT:  Who is SAP?

20          MR. PAZUNIAK:  Pardon me.

21          THE COURT:  Who is SAP?

22          MR. PAZUNIAK:  SAP is the indemnifying party for

23  Citizens.

24          THE COURT:  All right.

25          MR. PAZUNIAK:  So they are the ones who actually filed

1    the papers.

2         Of course, Mr. Klaiber and Mr. Nemec may posit this a

3    different way, basically, but the Patent Office, through all of

4    SAP arguments, except for one patent, and it rendered a

5    preliminary decision.  And it's preliminary, because the way the

6    patent processes --

7         THE COURT:  When you say "preliminary," you mean it's

8    not an Office Action?

9         MR. PAZUNIAK:  It's not a final Office Action.  It was

10   for very much of the issues that were raised.  The patentee

11   simply did not address the issues, because they were addressing

12   whether the Patent Office should even take up the case rather

13   than the merits.

14        THE COURT:  Okay.

15        MR. PAZUNIAK:  And after looking at the -- that sort of

16   like procedural issue, and then looking at SAP's decision,

17   essentially, the Patent Office said, None of your prior art is

18   at all important.  However, this one patent, we want to look at

19   further.

20        So now the patentee is going to be filing, as I

21   understand it, a formal response to that one.

22        THE COURT:  So which of the three patents that you know

23   is getting more traction in the PTO?

24        MR. PAZUNIAK:  Well, there was a single -- the '492 and

25   the '500 patents were rejected solely on one patent.  It's the

1   same patent in both.  And that is the Chelliah patent.

2           THE COURT:  So two of the patents are getting some

3   traction?

4           MR. PAZUNIAK:  Yes.  And then the third one has -- in

5   the '158 patent, there are some other issues, and I don't recall

6   what -- all of what the issues are with that one.

7           THE COURT:  Okay.

8           MR. PAZUNIAK:  But the -- the reason I say that the

9   '158 is -- the '158 is a very limited patent.

10          The '492 and '500 patents are far broader, so they are

11  the far more important ones.

12          In those two cases, as I said, the Patent Office found

13  everything is fine except for one prior art reference that.

14          THE COURT:  That's the optimists way of looking at it.

15  Everything is fine for one piece of prior art, because, after

16  all, you lose if there's one piece of prior art, right?

17          MR. PAZUNIAK:  Well, the reason -- the reason I can say

18  that, your Honor, is because the expert reports that are filed,

19  it just so happens to be, of course, one of references that

20  JPMorgan is citing.

21          THE COURT:  Sure.

22          MR. PAZUNIAK:  And we have filed an expert -- we're

23  filing expert reports that, I think, pretty clearly

24  distinguished that one item.

25          THE COURT:  Everybody has an opinion.

1              All right.

2              I'll take these under advisement.

3              Mr. Nemec, is there something that that you wanted to

4    add?

5              MR. NEMEC:  I want to clarify that we do, indeed, have

6    a very different view of what's going on in the Patent Office.

7    A decision was to made to institute these proceedings on the

8    basis that the Patent Office, in all likelihood, that each of

9    the claims that has been challenged will be found invalid.

10             The fact that it's only one piece of prior art is a

11   like a gap in the Titanic saying, Everything is fine, except the

12   iceberg.

13             And, indeed, one of the arguments that was raised by

14   it, in regards to the patents-in-suit was an argument of

15   indefiniteness.  One of the very claims that is before your

16   Honor.  And the Patent Office accepted that there is a

17   likelihood that that claim term is indefinite.

18             So it's definitely an optimist's view that Mr. Pazuniak

19   was presenting.

20             THE COURT:  You see Mr. Pazuniak is a bit of an

21   optimist.

22             All right.

23             In any event, I've got my own decisions to make.

24             Thank you very much for your time.

25             We'll be in recess.  Hope to let you know something

1    before too long.

2              (The proceedings adjourned at 3:27 o'clock p.m.)

3                              *  *  *