# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF Delaware

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **C.A. No. 12-282-RGA** |
| ) | |
| **JPMORGAN CHASE & CO.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## PLAINTIFF'S OPENING BRIEF IN SUPPORT OF MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DEFENDANT'S RETAINED EXPERT, DAWN HALL

George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff*
*Pi-Net International, Inc.*

# TABLE OF CONTENTS

I.   NATURE AND STAGE OF THE PROCEEDING ................................................................... 1

II.   SUMMARY OFRGUMENT ............................................................................................... 1

III.   LEGAL STANDARD ........................................................................................................ 3

IV.   ARGUMENT ..................................................................................................................... 3

   A.  Ms. Hall May Not Testify Regarding Her Proposed Damage Figure .................................. 3

     1.  No Basis for An Acceptable Non-Infringing Alternative ................................................. 3

     2.  No Reliable Basis for the $200,000 Figure ................................................................. 11

   B.  Ms. Hall May Not About Settlement Agreements ........................................................... 14

   C.  Ms. Hall May Not Testify Regarding JPMorgan's Licensing Policies ............................ 16

V.   CONCLUSION ................................................................................................................ 18

# TABLE OF AUTHORITIES

## CASES

*AVM Technologies, LLC v. Intel Corp.*,

    927 F. Supp. 2d 139 (D. Del. 2013) ........................................................................ 15

*Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l, Inc.*,

    350 F. Supp. 2d 582, 592 (D. Del. 2004) ............................................................... 14

*Daubert v. Merrill Dow Pharm., Inc.*,

    509 U.S. 579 (1993) ................................................................................................. 1

*Gaylord v. United States*,

    678 F.3d 1339 (Fed. Cir. 2012) .............................................................................. 18

*In re Paoli R.R. Yard PCB Litig.*,

    35 F.3d 717 (3d Cir.1994) ...................................................................................... 11

*In re TMI Litig.*,

    193 F.3d 613 (3d Cir. 1999) ................................................................................... 17

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,

    694 F.3d 51 (Fed. Cir. 2012) .................................................................................. 15

*Loeffel Steel Prods. v. Delta Brands, Inc.*,

    387 F. Supp. 2d 794 (N.D. Ill. 2005) ..................................................................... 17

*Rude v. Westcott*,

    130 U.S. 152 (1889) ............................................................................................... 14

*Sterling v. Redevelopment Authority of the City of Phil.*,

    836 F.Supp. 2d 251, 273 (E.D. Pa. 2011) .............................................................. 14

*TASER Int'l, Inc. v. Karbon Arms, LLC*,

2013 WL 6773663 (D. Del. 2013) ...................................................................................... 4

*Uniloc USA, Inc. v. Microsoft Corp.*,

632 F.3d 1292 (Fed. Cir. 2011).......................................................................................... 16

*Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*,

609 F.3d 1308 (Fed. Cir. 2010).......................................................................................... 15

*XpertUniverse, Inc. v. Cisco Sys., Inc.*,

2013 WL 1702159 (D. Del. 2013) ................................................................................ 13, 17

*ZF Meritor, LLC v. Eaton Corp.*,

696 F.3d 254 (3d Cir. 2012) cert. denied, 133 S. Ct. 2025 (U.S. 2013) ..................... 11, 12, 13

**RULES**

F.R.Civ.P. Rule 26(a)(2)(B)..................................................................................................... 6

F.R.Civ.P. Rule 26(a)(2)(C)..................................................................................................... 5

Federal Rule of Evidence 702 ........................................................................................... passim

Federal Rule of Evidence 703 ..................................................................................................... 4

## I.      NATURE AND STAGE OF THE PROCEEDING

Plaintiff respectfully moves to exclude testimony of Defendant's expert, Dawn Hall,

relating to invalidity for failure to comply with the requirements of Federal Rule of Evidence 702

and *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579 (1993).

This is a patent infringement action filed by Plaintiff Pi-Net International, Inc. ("Pi-Net")

against Defendant JPMorgan involving –U.S. Patent No. 5,987,500 ("the '500 patent") (App. A),

U.S. Patent No. 8,108,492 ("the '492 patent") (App. C), and U.S. Patent No. 8,037,158 ("the

'158 patent") (App. C).

Discovery is complete, and all proposed expert witnesses have provided expert reports

and have been deposed.  This case is set for trial on June 2, 2014. (D.I. 95)

One of the expert reports submitted by JPMorgan is that by Dawn Hall, Exhibit AM (A-

2253-2315).  Ms. Hall intends to testify as to damages.  In accordance with the Scheduling

Orders in this case (D.I. 90, 95), Plaintiff Pi-Net has moved to exclude the testimony of Ms. Hall

with respect to these invalidity issues.

This is Pi-Net's opening brief in support of that motion.

## II.      SUMMARY OF ARGUMENT

Defendant JPMorgan has proffered the expert testimony of Dawn Hall on damages.  Ms.

Hall's opinions do not comply with the requirements of FRE 702 and *Daubert*.

First, Ms. Hall proposes to testify that JPMorgan had available acceptable non-infringing

alternatives to the systems that were actually implemented by JPMorgan.  The admissibility of

such acceptable non-infringing alternatives requires expert evidence.  See, for example, *TASER*

*Int'l, Inc. v. Karbon Arms, LLC*, 2013 WL 6773663 n. 1 (D. Del. 2013) ("Expert testimony

would be needed in order to establish the feasibility and cost of a design around.")  Yet, there is

1

no record of any such acceptable non-infringing alternatives, nor can any be presented at trial. Her only source are the expert opinions to two persons, neither of whom had presented an expert statement on the issue, and had not been identified during discovery as being knowledgeable on the topic.

Second, Ms. Hall proposes to testify that the cost of the acceptable non-infringing alternatives would be no more than $200,000.  Even if such acceptable non-infringing alternatives could somehow be made of record, there is no record supporting such cost of the acceptable non-infringing alternatives, nor can any be presented at trial.  Ms. Hall's only source is the expert opinions of a JPMorgan employee, who has not been presented as an expert, and who had not been identified during discovery as being knowledgeable on the topic.  Ms. Hall admittedly has no basis for the testimony beyond the unverified "off-the-cuff" assertion by a person who had made no investigation of the subject.

Third, Ms. Hall proposes to testify that reasonable royalties should be based on earlier litigation settlement agreements, when the law precludes reliance on such evidence, and Ms. Hall has insufficient foundation under FRE 702 to demonstrate that such agreements are probative.

Finally, Ms. Hall proposes to express JPMorgan's opinions of their licensing policies. Ms. Hall has insufficient foundation under FRE 702 to testify as an expert as to such policies. The sole source of her testimony is a telephone conversation with a JPMorgan employee who had never been identified as knowledgeable with respect to the topic, and had never been deposed.  Further, Ms. Hall had not undertaken an investigation required by FRE 702 to determine whether the JPMorgan's hearsay assertions were correct.

### III.   LEGAL STANDARD

To avoid needless repetition, the section entitled "III.   Legal Standard" in Plaintiff's Opening Brief In Support Of Motion To Exclude The Expert Testimony Of Defendant's Retained Expert, Susan Spielman, On Invalidity is here incorporated.

### IV.   ARGUMENT

#### A.  Ms. Hall May Not Testify Regarding Acceptable Non-Infringing Alternatives

Ms. Hall proposes only one damage figure in this case.  She intends to testify that the measure of damages in this case is the additional cost that JPMorgan would have incurred in switching from its existing system to one of three other possible systems, which she refers to as "CGI," "FastCGI" or a system that she says would have only information entries and no attributes (referred to as the "Non-Object system" in this brief).  Ms. Hall intends to testify that each of the above three systems was an acceptable non-infringing alternative to JPMorgan and could have been implemented by JPMorgan at the cost of no more than $200,000.  Thus, she says that the measure of damages should be no more than $200,000.  This is the sum-total of her affirmative testimony on damages.  (Exh. AM, A-2284-90)

Ms. Hall's proposed testimony must be stricken, because it violates virtually every principle of FRE 702.

#### B.  No Record Of Acceptable Non-Infringing Alternatives

Ms. Hall testified that her sole basis for testifying that there are acceptable non-infringing alternatives to the systems and methods of the patents in suit are telephone conversations with JPMorgan's technical expert, Dr. Michael Siegel, and JPMorgan's internal employee, Rick Romanelli.  Romanelli holds a position today that basically makes him the chief architect of JPMorgan's online system.  Ms. Hall admits that she has no other information, and is not

3

qualified to comment on the issues of, what may be an acceptable noninfringing alternatives. Thus, her testimony rests solely on the statements made to her by Dr. Siegel and Mr. Romanelli during the relatively short telephone conversations. (Exh. AS, Dep. pp. 42-44, 73-78, A-2678, 2686-87)

For Ms. Hall to rely on the statements by Dr. Siegel or Mr. Romanelli, however, they would have to be qualified as experts entitled to give opinion on the availability to JPMorgan of acceptable non-infringing alternatives. *TASER Int'l, Inc. v. Karbon Arms, LLC*, 2013 WL 6773663 n. 1 (D. Del. 2013) ("Expert testimony would be needed in order to establish the feasibility and cost of a design around.") This is basic law. FRE 702 allows experts to express opinions only if the expert's testimony "is based on sufficient facts or data"; and "the testimony is the product of reliable principles and methods." FRE 702(b-c). Ms. Hall cannot rely on the "expert" opinions of either Dr. Siegel or Mr. Romanelli, because neither is qualified to provide such opinions. Ms. Hall cannot provide expert testimony based solely on statement made to her by someone who is not qualified to provide expert testimony, and neither Dr. Siegel nor Mr. Romanelli are qualified to provide such expert testimony. [1]

---

[1] Federal Rule of Evidence 703 does not authorize Ms. Hall to testify on ultimate opinions such as the availability of acceptable non-infringing alternatives based solely on hearsay opinions of unqualified third-parties. Ms. Hall did not obtain "facts" or "data," but was given expert opinions. Even if Mr. Romanelli and Dr. Siegel provided facts or data, Rule 702 still controls. Thus, the official comments to FRE 702 state:

> There has been some confusion over the relationship between Rules 702 and 703. The amendment makes clear that the sufficiency of the basis of an expert's testimony is to be decided under Rule 702. Rule 702 sets forth the overarching requirement of reliability, and an analysis of the sufficiency of the expert's basis cannot be divorced from the ultimate reliability of the expert's opinion. In contrast, the "reasonable reliance" requirement of Rule 703 is a relatively narrow inquiry. When an expert relies on inadmissible information, Rule 703 requires the trial court to determine whether that information is of a type

4

### 1.  Mr. Romanelli Is Precluded From Providing Any Expert Testimony

JPMorgan has never identified Mr. Romanelli as a person knowledgeable about CGI or FastCGI systems, much less as an expert in this case.  Pi-Net did depose Mr. Romanelli with respect to JPMorgan's systems, where the word CGI and FastCGI were never uttered, and there was no testimony regarding any Non-Object system. [2]

F.R.Civ.P. Rule 26(a) require that all expert testimony be disclosed, so that the proposed experts can be deposed and the basis of their testimony investigated. A party must submit an expert report of each retained expert.  The parties must also submit expert statements for any expert who does not have to file an expert report.  Thus, F.R.Civ.P. Rule 26(a)(2)(C) provides that:

> (C) Witnesses Who Do Not Provide a Written Report. Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure [of Expert Testimony] must state:
>
> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

Here, JPMorgan has not provided any Rule 26(a)(2)(C) disclosure for Mr. Romanelli, and, thus, he cannot provide any opinions at trial, even if he was qualified to do so.  (JPMorgan has never identified Mr. Romanelli as knowledgeable, much less an expert, on the subject of acceptable

---

> reasonably relied on by other experts in the field.  If so, the expert can rely on the information in reaching an opinion.  However, the question whether the expert is relying on a sufficient basis of information—whether admissible information or not—is governed by the requirements of Rule 702.

[2]  When questioned about certain other prior art systems used for online banking, Mr. Romanelli basically disclaimed any knowledge about the systems beyond what he could decipher from reading the published exhibits presented to him.  (Exh. BC, Dep. pp. 38-39)

non-infringing alternatives, and, thus, his expertise and qualifications were never investigated

during discovery).

In short, Mr. Romanelli has not been shown to be qualified to express any opinions

regarding acceptable non-infringing alternatives, and, thus, Ms. Hall cannot rely on his expert

advice on what may or may not be an acceptable non-infringing alternatives.

### 2. Dr. Siegel Did Not Serve an Expert Report and Is Thus Precluded From Expert Testimony As To Acceptable Non-Infringing Alternatives

Dr. Siegel also did not provide any expert report on the issue of acceptable non-infringing

alternatives.  Dr. Siegel's reports did discuss CGI, but it was in the context of comparing the

prior art CGI against the patented inventions.  He never mentions in his report either FastCGI or

the Non-Object systems, much less as potential acceptable non-infringing alternatives.

F.R.Civ.P. Rule 26(a)(2)(B)(i) requires that an expert report "must contain (i) a complete

statement of all opinions the witness will express and the basis and reasons for them."  Dr. Siegel

did not present any expert report on acceptable non-infringing alternatives, and may not testify at

trial as to such acceptable non-infringing alternatives.

### 3. Dr. Siegel Is Not Qualified to Give Opinions As To Acceptable Non-Infringing Alternatives

Even though Dr. Siegel is excluded from testifying about acceptable non-infringing

alternatives for failure to submit an expert report, he is also disqualified from testifying on the

subject, because he lacks the expertise required by FRE 702.  He was asked about his purported

statements to Ms. Hall about the acceptable non-infringing alternatives.  Dr. Siegel responded

that he had never talked to anyone at JPMorgan.

> Q.· · ·Is it correct that you have not met with anyone associated with JPMorgan?
>
> A.· · ·I do not recall meeting with anyone from JPMorgan.

(Exh. AQ, Dep at 10, A-2570)

> Q.· · ·In any event do you have any recollection of talking to another defendant JPMorgan expert about CGI?
>
> A.· · ·I don't believe I had any direct discussions with JPMorgan….

(Exh. AQ, Dep at 115, A-2596).   He also barely remembered his telephone conversation with

Ms. Hall:

> Q.· · ·In any event do you have any recollection of talking to another defendant JPMorgan expert about CGI?
>
> A.· · ·I don't believe I had any direct discussions with JPMorgan, but….
>
> Q.· · ·There's a Ms. Dawn Hall.  Does that ring any bells?
>
> A.· · ·Well, actually, I may have had a telephone call with -- I may have had one telephone call with people from -- and I don't recall who was on the call -- people from FTI.  ***
>
> Q.· · ·And how long of a call was it?
>
> A.· · ·I'm going to say between 20 minutes and 40 minutes, but it -- I don't really – you know, less than -- I'm sure it was less than an hour and I'm sure it was more than ten minutes.  And that's probably the safer range.· ·I really...
>
> Q.· · ·And do you recall who was on that call?
>
> A.· · ·I don't recall exactly who was on that call.  ***
>
> Q.· · ·Do you recall if you prepared for that call or if it was just a call that came in and you chatted?
>
> A.· · ·Prepared for?  I'm not sure if there were specific reports already created which I looked at in advance, in which case then Andrew may have mailed me something, e-mailed me something, but I don't recall what that was.

(Exh. AQ, Dep at 115-16, A-2596)

Thus, Ms. Hall based her ultimate opinion about acceptable non-infringing alternatives

available to JPMorgan on an off-the-cuff conversation with Dr. Siegel conducted without any

apparent preparation by Dr. Siegel.  Not only does the record reflect lack of reliability and fit for

Dr. Siegel's comments, but any comments about acceptable non-infringing alternatives must be

purely speculation, because Dr. Siegel had never talked with JPMorgan and, thus, could not know what would be acceptable to JPMorgan and its clients.

Further, in a fatal circularity, Dr. Siegel's knowledge about CGI or FastCGI being used in banking applications is based entirely on publications cited in Ms. Hall's report.  Dr. Siegel testified:

> Q.· · ·Can you identify any banking or other financial institution that provides for content to users by use of CGI technology.
>
> A.· · ·As of today?
>
> Q.· · ·Yes.
>
> A.· · ·I did not do that search.··I did not look.
>
> Q.· · ·Can you identify any bank or Web site that has been reported to use CGI technology in the past, whether or not you have any other knowledge of it?
>
> A.· · ·There are some documents in my report or in Dawn Hall's report which refer to discussions with me and some references.··One of them – and this is done from memory so we could look at the document, but I'll do it as best I can -- one of them describes Schwab and CGI. Another one describes Wells Fargo and CGI.··And there may be others.··This is what I -- another one might involve S1 and CGI.··I don't know if it was referenced or not.  And I'm not trying for exhaustive, if that's all right.

(Exh. AQ, Dep at 117-18, A-2597)

Whatever publications Dr. Siegel may have reviewed on the topic of acceptable non-infringing alternatives – if any, because none were cited in the list of documents that he reviewed that were attached to his report – he admittedly did not know anything about what other banks did, except for information that was publically available.  Thus, Dr. Siegel referenced a document that might indicate that Well Fargo had used a system that included CGI in 1997, and he then testified:

> Q.· · ·Do you know if Wells Fargo today uses CGI?
>
> A.· · ·I don't know one way or the other whether they use CGI.

(Exh. AQ, Dep at 120-21, A-2597-98)

> Q.· · ·So sitting here you cannot say that the capability that Wells Fargo provides to its customers and to itself would have been possible using a CGI interface technology?
>
> A.· · ·Today?
>
> Q.· · ·Yes.
>
> A.· · ·I've never considered whether it would be possible to provide that today.

(Exh. AQ, Dep at 124, A-2598).

Dr. Siegel then confirmed that he had no information about any other financial system that might have used a system based on CGI either in the past or today:

> Q.· · ·Let's talk about Schwab.  Do you have any information as to whether Schwab today uses a system that relies on CGI interfacing?
>
> A.· · ·Again, I don't have knowledge of what Schwab has chosen for all of its interactions with users.··I don't know all of that.  You have an article I believe in Dawn Hall's report, which does discuss some of the development at Schwab.

(Exh. AQ, Dep at 124, A-2598).

Dr. Siegel repeatedly confirmed that he had no particular knowledge or experience, and had made no investigation, as to whether any financial institution was successfully using any proposed acceptable non-infringing alternatives:

> Q. ………·Let me ask you a slightly different question.  If I asked you to identify any currently operational bank or financial institution Web site that relies on FastCGI interface technology, could you identify any?
>
> A.· · ·I've not been asked to look and haven't.

(Exh. AQ, Dep at 138, A-2602).

> Q.· · ·And in the middle of that paragraph [in Ms. Hall's report] it says, "For instance, at least Royal Bank of Canada, Citibank, and Wachovia operated online banking platforms using FastCGI." … Do you have any information about that sentence?

A.· · ·I would imagine I had seen that on a Web site and that's what I determined, that they used FastCGI. … Or some report.··Excuse me, it may not be a Web site, it may be a report.

Q.· · ·Well, I don't see anything cited here to support that.  And so my question is where is the support for the information that Royal Bank, Citibank, and Wachovia, or any one of them operated online banking platforms using FastCGI?

A.· · ·This is not my report.··I don't know where the support is.  I can read what it says here and – you know, if it says Dr. Siegel says this, then I said it. ***

Q.· · ·What is your support for saying it?

A.· · ·I was not asked to provide any support or it's not documented here.

(Exh. AQ, Dep at 139-40, A-2602)

Thus, Ms. Hall is relying on the purported statement made to her by Dr. Siegel, even though Dr. Siegel:

- Has never met with JPMorgan, and, thus, has no basis to know what would be acceptable to JPMorgan,

- Has no first-hand knowledge of any financial institution utilizing any acceptable non-infringing alternatives, much less any knowledge or information as to how successful the acceptable non-infringing alternatives might have been, had they been actually used,

- Did not investigate or review any issues regarding acceptable non-infringing alternatives, and

- Bases his statements solely on his review of some public information that was cited in Ms. Hall's report.

### C. **Ms. Hall Cannot Testify About the $200,000 Figure**

Even if Ms. Hall had a basis for testifying that there were acceptable non-infringing alternatives available to JPMorgan, FRE 702 prohibits Ms. Hall from testifying that the cost of replacing the undefined acceptable non-infringing alternative system would cost only $200,000. The sole basis for her testimony is a conversation with Mr. Romanelli. The basis for his conclusion is not presented in Ms. Hall's report, and Mr. Romanelli did not provide any report.

FRE 702 and *Daubert* preclude any attempts by Ms. Hall to present this figure to a jury. Ms. Hall has not identified any complete system or method. Ms. Hall's simply refers to CGI and FastCGI, or some unknown Non-Object system that no one has ever heard of. These are labels, and not alternatives. It is impossible within the process set forth in FRE 702 to have an expert testify about the cost of implementing acceptable non-infringing alternatives when one cannot even identify the replacement system.

The second fatal problem is that there is no supporting calculations for the $200,000 number. According to Ms. Hall, Mr. Romanelli allegedly said that JPMorgan's actual system could have been converted to an acceptable non-infringing alternative system by one or two technical people, and, thereafter, that there would be no further additional cost associated with that alternative. The governing law on this point is that

> In some circumstances, an expert might be able to rely on the estimates of others in constructing a hypothetical reality, but to do so, the expert must explain why he relied on such estimates and must demonstrate why he believed the estimates were reliable.

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 292 (3d Cir. 2012) cert. denied, 133 S. Ct. 2025 (U.S. 2013), citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 748 n. 18 (3d Cir.1994) ("Arguably, [third-party estimates] that an expert relies on are not his underlying data, but rather the data that went into the [third-party estimates] in the first place are his underlying data.").

11

In *ZF Meritor,* the 3d Circuit affirmed the district court's striking of an expert opinion on damages that relied on a document that was entitled "Five Year Product Line Profit and Loss" that had been presented by company management to its Board of Directors. *ZF Meritor*, 696 F.3d at 290-91. The Court noted that such documents often serve as legitimate bases for expert damages opinions. The Court, nevertheless, struck the opinion in issue, because the damages expert was not sufficiently familiar with the background of the document:

> [A]lthough [the expert] was generally aware of the circumstances under which the [financial document] was created and the purposes for which it was used, he lacked critical information that would be necessary for [the other party] to effectively cross-examine him. An expert's "lack of familiarity with the methods and the reasons underlying [someone else's] projections virtually preclude[s] any assessment of the validity of the projections through cross-examination." Here, [the expert] knew that the [financial document] was presented to the Board by experienced management professionals, but he did not know who initially calculated the [document] figures. He did not know whether the [document] projections were calculated by ZF Meritor management, lower level employees at ZF Meritor, or came from some outside source. Nor did [the expert] know the methodology used to create the [document] or the assumptions on which the [document]'s price and volume estimates were based.

*ZF Meritor*, 696 F.3d at 293.

Here, Ms. Hall testified that she did not know and did not care how or why Mr. Romanelli determined that only one or two additional technicians working for an indeterminate period of time would be able to convert the existing JPMorgan system, and provide an acceptable non-infringing alternative without any further additional cost or negative issues. (Exh. AM, Dep. 90, A-2690). Ms. Hall testified she had only one contact with Mr. Romanelli and that was by way of an approximately 60-minute telephone call (Exh. AM, Dep. pp. 64-65, A-2683-84). When asked what it is that JPMorgan hypothetically could have done to create an acceptable non-infringing alternative, Ms. Hall testified that she did not know:

> Q.· · ·And what was that one piece that Mr. Romanelli talked about?

12

A.· · ·The development of a Chase specific standard integration layer that would be necessary to implement a standardized CGI platform.

Q.· · ·And can you explain what that means.

A.· · ·<u>I'm not a technical person.</u>· ·I'm sorry, I don't know what that means from a technical perspective.· ·But it's my understanding from him that it's just an interface that they need to basically develop.

****

Q.· · ·Whatever he said his opinion is of what JPMorgan could have done, what was the basis for his conclusion that this alleged change that you have described, this one component, would have avoided the infringement of the patents in ·suit?

A.· · ·<u>I'm not exactly sure of what analysis Mr. Romanelli performed,</u> but when you look at the patent -- as I was directed and what I understand from my discussions with Mr. Siegel -- his CGI is considered prior art and not claimed in the patent.

Q.· · ·But you're not saying they would use CGI or FastCGI, you said that they would – al Mr. Romanelli talked about was changing one component.

A.· · ·As CGI.

Q.· · ·Well, either it's CGI or one component.  What is your testimony?

A.· · ·It says, "It would have used CGI as part of its on-line banking system development in the 2001 time frame.· ·The Chase computer systems" -- let's see... "The only additional cost that Chase would incur with a CGI based on-line banking system would be related to the development of a Chase specific standard integration layer that would be necessary to implement a standardized CGI platform." ·<u>So I'm not aware of what, if any, infringement analysis Mr. Romanelli </u>did on CGI, but it's my understanding that CGI is considered -- what the patent attorneys call is prior art and not claimed under the patents.

(Exh. AS, Dep. at 92-94, A-2690-91)

*ZF Meritor* is governing law, and the decision states that an expert must, *inter alia*, "know the methodology used to create" the underlying financial basis and the "assumptions on which" the company information was based.  Ms. Hall admitted she had no information or underlying bases, and never investigated them.  See also *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 1702159 (D. Del. 2013) (striking testimony where expert "has not provided any

13

reliable basis for drawing this inference based on his expertise" and, thus, "falls short of a reliable opinion based on Chatterjee's scientific, technical, or specialized knowledge, as required by Rule 702."); *Chemipal Ltd. v. Slim–Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004) (excluding expert damages opinion that was "entirely dependent on an uncritical acceptance of" an earlier market study); *Sterling v. Redevelopment Authority of the City of Phil.*, 836 F.Supp. 2d 251, 273 (E.D. Pa. 2011) ("Ryden's unqualified acceptance of Sterling's projections without verification or investigation renders his opinion too speculative to offer any assistance to the jury").

Ms. Hall's testimony must be excluded.

### D. <u>Ms. Hall May Not Testify About Pi-Net's Settlement Agreements</u>

Ms. Hall proposes to testify about settlement Agreements that Pi-Net had entered into with other Defendants. The proposed testimony should be allowed, because it is contrary to governing law, and cannot pass FRE and *Daubert* muster.

The general rule is that Settlement Agreements should not be used for determining a reasonable royalty. The rule was stated at least in *Rude v. Westcott*, 130 U.S. 152, 164-65 (1889) ("[A] payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement."), and the general rule has been consistently followed since that time. The most recent pronouncement by the Federal Circuit is as follows:

> The propriety of using prior settlement agreements to prove the amount of a reasonable royalty is questionable. … The notion that license fees that are tainted by the coercive environment of patent litigation are unsuitable to prove a reasonable royalty is a logical extension of Georgia–Pacific, the premise of which assumes a voluntary agreement will be reached between a willing

14

licensor and a willing licensee, with validity and infringement of the patent not
being disputed.

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012).  The Federal

Circuit, thus, generally abjured the relevance of settlement agreements, except in "limited

circumstances," such as where the settlement agreement was "in a running royalty form" was

"the most reliable license in [the] record."  *Id.*

This Court had in another case precluded expert testimony based on a single settlement

Agreement, but stated in passing that "multiple settlement agreements might show a pattern."

*AVM Technologies, LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 144 (D. Del. 2013).  That would be

true if the Agreements were "in a running royalty form," because then one could determine if the

running royalties were the same and/or explore why the running royalties differed, which would

overcome the plain problems of using litigation settlement agreements.

In this case, however, all the settlement Agreements are in the form of a lump-sum, and

were entered into before there had been any significant discovery.  Thus, there is no record of the

whether any of the settling Defendants infringed or to what extent, and, thus provide no basis for

comparison with JPMorgan's infringement.  These settlement Agreements are therefore

worthless.  Thus, in one recent case, the Court held that an expert's testimony was

> flawed because the two lump-sum licenses provide no basis for comparison
> with … infringing sales.  Neither license describes how the parties calculated
> each lump sum, the licensees' intended products, or how many products each
> licensee expected to produce. … Thus, without additional data, the licenses
> offered the jury "little more than a recitation of royalty numbers."

*Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010),

citing *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("a

lump-sum damages award cannot stand solely on evidence which amounts to little more than a

recitation of royalty numbers.")  To perhaps oversimplify the matter, if a single lump-sum

settlement Agreement has zero value in determining a hypothetical royalty, then multiplying zero value by any number still results in a zero.

FRE 702 and *Daubert* also stand as bars to testimony based on such settlement agreements. The deficiencies discussed above also preclude the ability of an expert to rely on such data.  As noted in *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011), "there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."  Here, there is no "royalty rate," and it is not possible to calculate one, because there is a total absence of any record information, based on the fact that the settlements occurred before any substantive discovery.  Therefore, it is impossible for an expert to adequately evaluate the probative value of those agreements.

### E.   Ms. Hall May Not Testify Regarding JPMorgan's Licensing Policies

Ms. Hall proposes to testify about JPMorgan's licensing policies and agreements.  The proposed testimony, however, is not based on any facts or data, but comprises at least largely, if not entirely on opinions about how JPMorgan allegedly likes to structure its agreements that were given to Ms. Hall by a JPMorgan employee, Massimo Iori.  (Exh. AS, Dep. 34-41, A-2676-78).  For example, Ms. Hall's basis for testifying that JPMorgan never had any agreements comparable to the facts here is based on the opinion of Mr. Iori:

> Q.· · ·And so how do you know whether or not any of these JPMorgan IP agreements are, in fact,·relevant or comparable to the issues or facts of this case?
>
> A.· · ·Because I asked him if there are any comparable -- they are patent licenses or just patent agreements that were for comparable technologies between comparable parties.··The answer was, no.
>
> Q.· · ·But you did not yourself make any evaluation as to whether that was correct or not, correct?
>
> A.· · ·I didn't have any agreements that I was necessarily looking at for JPMorgan.

16

(Dep. 37, A-2677).

The obvious problem with Ms. Hall's "expert opinions" is that they are not her opinions, but the opinions of Mr. Iori.  Not only are they opinions for which Ms. Hall is a mere mouthpiece and not the originator, but JPMorgan never identified Mr. Iori as a knowledgeable person, and Pi-Net never had any opportunity to depose him.  Thus, JPMorgan intends to present evidence from an allegedly knowledgeable witness not by having him identified and made available for deposition, but by the back-door of having him provide information to an "expert" who will convey his hearsay opinion through her testimony – all without having made any independent effort to determine the reliability of Mr. Iori's opinions.  Ms. Hall's proposed testimony must be stricken.  *In re TMI Litig.*, 193 F.3d 613, 697-98 (3d Cir. 1999); *XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 1702159 (D. Del. 2013) (striking testimony where expert "has not provided any reliable basis for drawing this inference based on his expertise" and, thus, "falls short of a reliable opinion based on Chatterjee's scientific, technical, or specialized knowledge, as required by Rule 702."); *Loeffel Steel Prods. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 808 (N.D. Ill. 2005) (Rule 703 "was not intended to abolish the hearsay rule and to allow a witness, under the guise of giving expert testimony, to in effect become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion.")

Although Ms. Hall's testimony must be stricken for reasons stated above, Ms. Hall's proposed testimony about JPMorgan's alleged licensing policies also suffers from legal irrelevance.  (Exh. AS, Dep. 207-08, A-2719)  Specifically, Ms. Hall asserts that, based on her conversations with Mr. Iori, she will testify that JPMorgan would have demanded a lump sum, rather a running royalty, license at the hypothetical negotiations.

17

The testimony is legally irrelevant, because, as recently stated by the Federal Circuit:

> Defendants cannot insulate themselves from paying for the damages they caused by resting on their past agreements and by creating internal "policies" that shield them from paying fair market value for what they took. See *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1555 (Fed.Cir.1995) ("[W]hat an infringer would prefer to pay is not the test for damages."). Instead, the trial court must look at the evidence presented by both sides to determine the fair market value of a license to which the parties would have agreed.

*Gaylord v. United States*, 678 F.3d 1339, 1343-44 (Fed. Cir. 2012). Ms. Hall should be precluded from testifying what she was told was JPMorgan's licensing policy, because it does not pass the FRE 702 and *Daubert* standards, and is legally irrelevant.

## V.    CONCLUSION

On the basis of the foregoing analysis of fact and law, Plaintiff Pi-Net respectfully requests that its motion to strike testimony be granted.

*/s/ George Pazuniak*
George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff Pi-Net Int'l, Inc.*

18