**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PI-NET INTERNATIONAL INC.,

                Plaintiff,

     v.                                Civ. No. 1:12-cv-00282-RGA

JPMORGAN CHASE & CO.,

                Defendant.

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
FOR SUMMARY JUDGMENT OF INDEFINITENESS, LACK OF ENABLEMENT,
<u>AND LACK OF WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112</u>**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

I.      NATURE AND STAGE OF PROCEEDINGS .................................................. 1

II.     SUMMARY OF ARGUMENT ........................................................................ 1

III.    FACTUAL BACKGROUND .......................................................................... 2

        A.      The Asserted Claims Of The Patents-in-Suit ........................................ 2

        B.      The Specification Of The Patents-in-Suit ............................................ 4

IV.     APPLICABLE LAW ..................................................................................... 4

        A.      Legal Standard Governing Summary Judgment .................................... 4

        B.      Legal Standards Governing Indefiniteness ........................................... 5

        C.      Legal Standards Governing Lack Of Written Description ...................... 6

        D.      Legal Standards Governing Lack Of Enablement .................................. 7

V.      ALL ASSERTED CLAIMS ARE INVALID AS INDEFINITE. ...................... 7

        A.      The Court Should Grant Summary Judgment For All Terms Not
                Amenable To Construction. .............................................................. 7

        B.      Even If The Court Adopts Pi-Net's Constructions For The "Application
                Terms," They Are Still Indefinite. ..................................................... 8

VI.     ALL ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN
        DESCRIPTION UNDER 35 U.S.C. § 112(**a**). ............................................. 11

        A.      The Specification Provides No Evidence That The Inventor Possessed The
                Claimed "VAN Switch" Or The Claimed Method Of "Object Routing." ............. 11

        B.      The Specification Provides No Evidence That The Inventor Possessed
                Any "Back-End" Elements Required By the Asserted Claims. ............................. 15

VII.    ALL ASSERTED CLAIMS ARE INVALID FOR LACK OF ENABLEMENT. ............ 17

        A.      Undue Experimentation Is Required To Implement The Asserted Claims. .......... 17

        B.      The Specification Provides No Working Examples And No Direction Or
                Guidance To Move Beyond The Prior Art. ........................................................ 19

CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Amgen, Inc. v. Chugai Pharmaceuticals Co.*,
    927 F.2d 1200 (Fed. Cir. 1991)........................................................................7

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................4

*Ariad Pharmaceuticals, Inc. v. Eli Lilly & Co.*,
    598 F.3d 1336 (Fed. Cir. 2010)......................................................................6

*Automotive Technologies International, Inc. v. BMW of North America, Inc.*,
    501 F.3d 1274 (Fed. Cir. 2007)............................................................7, 18, 20

*Biomedino, LLC v. Waters Technologies Corp.*,
    490 F.3d 946 (Fed. Cir. 2007)........................................................................5

*Carnegie Mellon University v. Hoffmann–La Roche Inc.*,
    541 F.3d 1115 (Fed. Cir. 2008)......................................................................6

*Crown Operations International, Ltd. v. Solutia Inc.*,
    289 F.3d 1367 (Fed. Cir. 2002)......................................................................17

*Default Proof Credit Card Systems, Inc. v. Home Depot U.S.A., Inc.*,
    412 F.3d 1291 (Fed. Cir. 2005)......................................................................5

*Garside v. Osco Drug, Inc.*,
    895 F.2d 46 (1st Cir. 1990)............................................................................5

*Genentech, Inc. v. Novo Nordisk, A/S*,
    108 F.3d 1361 (Fed. Cir. 1997)......................................................................7

*Halliburton Energy Services, Inc. v. M-I LLC*,
    514 F.3d 1244 (Fed. Cir. 2008)...................................................................5, 9

*In re Katz Interactive Call Processing Patent Litigation*,
    639 F.3d 1303 (Fed. Cir. 2011)......................................................................6

*Lockwood v. American Airlines, Inc.*,
    107 F.3d 1565 (Fed. Cir. 1997)......................................................................14

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)........................................................................................4

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008)..............................................................6

*PureChoice, Inc. v. Honeywell International, Inc.*,
    333 F. App'x 544 (Fed. Cir. 2009) .........................................................5

*Regents of the University of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997)..............................................................6

*Scott v. Harris*,
    550 U.S. 372 (2007).............................................................................4, 5

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
    537 F.3d 1357 (Fed. Cir. 2008)..............................................................5

*In re Wands*,
    858 F.2d 731 (Fed. Cir. 1988).................................................7, 17, 19

*Warner–Lambert Co. v. Teva Pharmaceuticals USA, Inc.*,
    418 F.3d 1326 (Fed. Cir. 2005)..............................................................7

## STATUTES

35 U.S.C. § 112........................................................................................1

35 U.S.C. § 112(a) ..................................................................................6

35 U.S.C. § 112(b) ..................................................................................5

Fed. R. Civ. P. 56(a) ...............................................................................4

## I.  NATURE AND STAGE OF PROCEEDINGS

On March 7, 2012, plaintiff Pi-Net International, Inc. ("Plaintiff" or "Pi-Net") filed a complaint for patent infringement against JPMorgan Chase & Co. ("Defendant" or "JPMC") based on U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"), and 8,108,492 ("the '492 patent") (collectively, the "patents-in-suit").  Fact and expert discovery have closed.  *Markman* briefing was completed on May 15, 2013, and the Court will hold a *Markman* hearing on March 6, 2014.  (D.I. 74, 95)  Defendant was granted leave to file an early motion for summary judgment of indefiniteness of three claim terms, and the Court held oral argument on that motion on November 25, 2013.  Trial is scheduled to begin on June 2, 2014.  (*Id.*)

## II.  SUMMARY OF ARGUMENT

This is the rare case where the patents-in-suit are so wholly incomprehensible, threadbare, and contradictory that they should be found invalid for indefiniteness, lack of written description, *and* lack of enablement under 35 U.S.C. § 112.  As Dr. Lakshmi Arunachalam, the sole inventor of the patents-in-suit, admits, "the lawyer wrote this [patent], you know, very badly . . . I think it's written very poorly when I read this like the way you pointed out to me today.  I don't like the way it was written.  I would have written it better."  (Ex. DBB at 203:6-23)  Whether or not Dr. Arunachalam conceived of an invention, patent rights are granted only in exchange for a useful public disclosure, not as a reward for inscrutable, intangible thoughts.  Indeed, as Dr. Arunachalam further admits, the "lawyer [who drafted the patents-in-suit did] a bad job and <u>now we have to live with what she wrote</u>."  (Ex. DBB 203:16-18 (emphasis added))  What that lawyer wrote was (1) a series of claim terms that are either not amenable to construction or offer no guidance as to the bounds of the claim scope; and (2) a patent specification that (a) lacks any evidence that the inventor possessed the claimed technology, and (b) is devoid of any guidance to a person of skill in the art trying to make and use that claimed technology.  Indeed, the only

1

disclosed embodiment of the claimed technology is based on a protocol—the TransWeb[TM]

Management Protocol—*that never existed*.  Accordingly, summary judgment should be granted

in JPMC's favor.

## III.   FACTUAL BACKGROUND

### A.   The Asserted Claims Of The Patents-in-Suit

Pi-Net has accused JPMC of infringing claims 1-6, 10-12, 14-16, and 35 of the '500

Patent; claim 4 of the '158 Patent; and claims 1-8 and 10-11 of the '492 Patent (collectively, the

"asserted claims").  The asserted claims of the '492 and '500 patents generally relate to systems

and methods for performing "real-time" transactions over the World Wide Web (the "Web"),

while the asserted claim of the '158 patent is specifically directed to the performance of one

particular type of "real-time" transaction—the transfer of funds from a checking account to a

savings account.  Claim 1 of the '492 patent is representative of the system claims, and requires a

multi-component system comprising several elements:

> a Web server, including a processor and a memory, for offering one or more Web
> applications as respective point-of-service applications [POSvc applications] in a
> point-of-service application list on a Web page;

> each Web application of the one or more Web applications for requesting a real-
> time Web transaction;

> a value-added network (VAN) switch running on top of a facilities network
> selected from a group consisting of the World Wide Web, the Internet and an e-
> mail network, the VAN switch for enabling the real-time Web transactions from
> the one or more Web applications;

> a service network running on top of the facilities network for connecting through
> the Web server to a back-end transactional application; and

> a computer system executing the Back-end transactional application for
> processing the transaction request in real-time.

(Ex. C at 9:50-67)[1]  According to Pi-Net, these claims are directed to a system in which a user takes an action at the "front-end" that causes data to be routed through a system and used as a basis to execute a transaction at the "back-end," thereby completing a non-deferred (or "real time") transaction.  (D.I. 74 at 71 ("So, for every Web transaction, there is a front-end of the transactional application, and there is a back-end that corresponds to that front-end POSvc Application.").  In other words, under Pi-Net's interpretation of the asserted claims, a Web browser transmits data to a "Web server," which relays that data to a "Value Added Network (VAN) switch," which relays the data to software called a "back-end transactional application," which then processes the requested transaction by accessing various back-end systems.

Claim 4 of the '158 patent requires the "real-time" transfer of funds from a checking account to a savings account using object routing, as set forth below:

[a] method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising:

providing a Web page for display on a computer system coupled to an input device;

providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;

accepting a first signal from the Web user input device to select the point-of-service application;

accepting subsequent signals from the Web user input device; and

*transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred*, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals . . .

---

[1] The patents-in-suit are cited as Exs. A through C, respectively, to D.I. 75.

wherein *object routing* is used to complete the transfer of funds in a Web application.

(Ex. B at 9:41-10:15, 10:21-22 (emphasis added)) The required, "real-time" transfer of funds must occur on the "back-end" of the banking system. (Ex. AN at 157:17-22)

### B. The Specification Of The Patents-in-Suit

Other than minor differences in their titles, abstracts, and recitations of related applications, the patents-in-suit share an identical written description, and all claim priority to a provisional application that was filed on November 13, 1995. The common written description consists of roughly nine columns of text and fifteen figures. Five of those figures (Figs. 1A through 4A) illustrate prior art, while the remaining ten figures (Figs. 4B through 8) are described as various embodiments of the alleged invention. Although the claimed technology is directed to an allegedly novel implementation of a software switch (*i.e.*, the VAN Switch), the specification contains no algorithm, formula, or protocol to carry out those claimed functions.

## IV. APPLICABLE LAW

### A. Legal Standard Governing Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery and disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is genuinely disputed only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial). The court resolves all ambiguities and draws all factual inferences in favor of the non-moving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*,

550 U.S. 372, 380 (2007) (quoting Rule 56(c)).  A promise to produce admissible evidence at trial is not sufficient to defeat a motion for summary judgment.  *See, e.g.*, *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990).

**B.    Legal Standards Governing Indefiniteness**

To be valid, a patent claim must "particularly point[] out and distinctly claim[] the subject matter which the inventor . . . regards as the invention." 35 U.S.C. § 112(b).  The Federal Circuit has repeatedly recognized that "[t]he primary purpose of the definiteness requirement is to ensure that the claims are written in such a way that they give notice to the public of the extent of the legal protection afforded by the patent, so that interested members of the public, *e.g.*, competitors of the patent owner, can determine whether or not they infringe." *Default Proof Credit Card Sys., Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1302-03 (Fed. Cir. 2005) (internal quotations marks and citation omitted).  Thus, a claim satisfies the definiteness requirement "[i]f one skilled in the art would understand the bounds of the claim when read *in light of the specification*." *PureChoice, Inc. v. Honeywell Int'l, Inc.*, 333 F. App'x 544, 548 (Fed. Cir. 2009) (emphasis added) (internal quotation marks and citation omitted).  Indefiniteness is a question of law "that is drawn from the court's performance of its duty as the construer of patent claims." *Biomedino, LLC v. Waters Techs. Corp.*, 490 F.3d 946, 949 (Fed. Cir. 2007).

"[I]f reasonable efforts at claim construction result in a definition that does not provide sufficient particularity and clarity to inform skilled artisans of the bounds of the claim, the claim is insolubly ambiguous and invalid for indefiniteness." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1371 (Fed. Cir. 2008).  Thus, "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope." *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

5

### C.     Legal Standards Governing Lack Of Written Description

To satisfy the written description requirement of 35 U.S.C. § 112(a), "the applicant must 'convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention,' and demonstrate that by disclosure in the specification of the patent." *Carnegie Mellon Univ. v. Hoffmann–La Roche Inc.*, 541 F.3d 1115, 1122 (Fed. Cir. 2008) (citation omitted).  "The purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification." *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1319 (Fed. Cir. 2011) (internal quotation marks and citation omitted).  Ultimately, "the specification must describe an invention understandable to [a] skilled artisan and show that the inventor actually invented the invention claimed." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). "Compliance with the written description requirement is a question of fact but is amenable to summary judgment in cases where no reasonable fact finder could return a verdict for the non-moving party." *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1307 (Fed. Cir. 2008).

Assessing "possession as shown in the disclosure" requires "an objective inquiry into the four corners of the specification." *Ariad*, 598 F.3d at 1351.  A "mere wish or plan" for obtaining the claimed invention does not satisfy the written description requirement.  *Regents of Univ. of Cal. v. Eli Lilly & Co.*, 119 F.3d 1559, 1566 (Fed. Cir. 1997); *see also PowerOasis*, 522 F.3d at 1306 (the "'descriptive matter must necessarily be present in the'" specification) (citation omitted).  "[I]f the claimed invention does not appear in the specification . . . the claim . . . fails regardless whether one of skill in the art could make or use the claimed invention." *Ariad*, 598 F.3d at 1348.

### D.     Legal Standards Governing Lack Of Enablement

Under 35 U.S.C. § 112(a), "[t]o be enabling, the specification of a patent must teach those skilled in the art how to make and use the full scope of the claimed invention without 'undue experimentation.'" *Genentech, Inc. v. Novo Nordisk, A/S*, 108 F.3d 1361, 1365 (Fed. Cir. 1997) (internal quotation marks and citation omitted).   "Although the ultimate determination of whether one skilled in the art could make and use the claimed invention without undue experimentation is a legal one, it is based on underlying findings of fact." *Warner–Lambert Co. v. Teva Pharm. USA, Inc.*, 418 F.3d 1326, 1337 (Fed. Cir. 2005).   Courts may consider, as of the filing date of the patent: (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims (the "*Wands* Factors").   *In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988).   However, "it is not necessary that a court review all the *Wands* Factors to find a disclosure enabling.   They are illustrative, not mandatory." *Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1213 (Fed. Cir. 1991).   Where a "specification provides only a starting point, a direction for further research," it is not enabling.   *Auto. Tech. Int'l, Inc. v. BMW of N. Am., Inc.*, 501 F.3d 1274, 1284 (Fed. Cir. 2007).

## V.     ALL ASSERTED CLAIMS ARE INVALID AS INDEFINITE.

### A.     The Court Should Grant Summary Judgment For All Terms Not Amenable To Construction.

For the reasons expressed by JPMC in the *Markman* Brief (D.I. 74), there is no genuine dispute that the following terms are indefinite and cannot be construed:

- "a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application"[2]
- "point-of-service application[s]" and "point-of-service Web applications"
- "transactional application[s]" and "back-end transactional application[s]"
- "the selected back-end transactional application"
- "service network"
- "value-added network (VAN) switch"
- "switching"
- "management agent"
- "value-added network service provider"
- "value-added network system"
- "said user application"
- "means for receiving said user specification"
- "means for enabling a switch to said transactional application"
- "means for activating said transactional application"
- "means for presenting said user with a list of transactional applications"
- "means for submitting said user specification according to a user's selection of said transactional application from said list of transactional applications"
- "means for coupling said means for transmitting to a host means"
- "means for switching to a transactional application in response to a user specification from a network application"
- "means for activating an agent to create a transaction link between said user application and said transactional application"
- "means for creating a transaction link between said network application and said transactional application"

**B.    Even If The Court Adopts Pi-Net's Constructions For The "Application Terms," They Are Still Indefinite.**

All asserted claims require a point-of-service ("POSvc") application, a "Web application," or "a network application."  Pi-Net contends that these three claim terms are synonymous, "with the term 'network application' being used in the '500 Patent, and 'Web application' and 'POSvc Application' being used in the '158 and '492 Patents."  (D.I. 74 at 83)  In addition, all asserted claims of the '500 patent and the '492 patent require either a "transactional

---

[2] A truncated version of this term—"routed transactional data structure"—is addressed in JPMC's pending Motion for Summary Judgment of Indefiniteness and related briefing (D.I. 59-61, 66, and 67).  The Joint *Markman* Brief (D.I. 74) addresses additional indefiniteness arguments for this term—that it is also rendered indefinite by the descriptors "complete," "non-deferred," and "specific to the point-of-service application."

application" or a "back-end transactional application."  Pi-Net contends that these two claim terms are likewise synonymous.[3]  (D.I. 64 at 14)

Even if the Court determines that the Application Terms are amenable to construction and adopts Pi-Net's constructions for them, the Application Terms are nonetheless indefinite because Pi-Net's constructions fail to define the scope of these terms.  *See Halliburton*, 514 F.3d at 1251 ("Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope.").  Pi-Net's proposed constructions for "POSvc application," "Web application," and "network application" provide no meaningful guidance to a person skilled in the art because they are purely and inescapably circular.

As an initial matter, Pi-Net contends that the term "POSvc application" is a term that was coined for the first time in the patents-in-suit.  (Ex. AD at 35 (opining that "the term POSvc Application was coined by the inventor and to a person[] skilled in the art has no meaning but the complete definition given in the Patent") (emphasis removed); Ex. AB at 27 ("'POS[vc] Application' is a term that was coined by the inventor"))  Pi-Net defines "Web application" strictly in terms of the coined term, "POSvc application," but then defines a "POSvc application" in terms of a "Web application":

| POSvc Application | Web Application | Network Application |
|---|---|---|
| "A Web application displayed on a web page, and displaying an 'object' data structure in the Web application with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the Web application based on inputs for the values of the attributes at the front-end POSvc Application" | "[POSvc] application on a web page" | "POSvc Application on a web page" |

---

[3] Collectively, the terms POSvc application, web application, network application, transactional application, and back-end transactional application are referred to as the "Application Terms."

(D.I. 64 at 8, 13-14 (color emphasis added))  Inserting Pi-Net's proposed construction for "Web application" into its construction for "POSvc application" highlights the meaningless nature of these constructions.  Pi-Net's proposed definition for "POSvc Application" becomes:

> [a] POSvc application on a web page displayed on a web page, and displaying an 'object' data structure in the POSvc on a web page with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the POSvc application on a web page based on inputs for the values of the attributes at the front-end POSvc Application.

(insertions underlined)  In other words, under Pi-Net's proposed construction, a POSvc application is defined *in terms of itself four separate times.*  It would thus be impossible for any person skilled in the art to determine whether or not a given structure constitutes a "POSvc application" that falls within the scope of the asserted claims, particularly because Pi-Net unequivocally maintains that the patents-in-suit represent the first ever use of the term "POSvc application."

Pi-Net's proposed construction for "transactional application" and "back-end transactional application" only compounds this ambiguity.  Specifically, Pi-Net defines these terms as "an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc Application on a Web page."  (D.I. 64 at 14)  Again, inserting Pi-Net's construction for "POSvc application" into its construction for "transactional application" only highlights the insoluble circularity of these constructions:

> an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc application on a web page displayed on a web page, and displaying an 'object' data structure in the POSvc application on a web page with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the POSvc application on a web page based on inputs for the values of the attributes at the front-end POSvc Application on a Web page.

(insertions underlined)  No amount of technical expertise can unravel this definition because it is drafted in terms of another wholly indefinite term.

## VI.    ALL ASSERTED CLAIMS ARE INVALID FOR LACK OF WRITTEN DESCRIPTION UNDER 35 U.S.C. § 112(a).

No reasonable jury reviewing the specification of the patents-in-suit could conclude that the inventor had possession of the technology recited in the asserted claims as of November 1995 for at least two reasons.  First, although all asserted claims of the '500 patent and the '492 patent require a "VAN Switch," the specification shows that the inventor had nothing more than a vague idea of the functions that a VAN Switch could perform.  It lacks any description of how those functions could be achieved and any evidence indicating that the inventor was in possession of a protocol for executing such functions.  Second, although each and every claim requires certain "back-end" elements, there is no evidence from the specification that the inventor was ever in possession of any such "back-end" elements.

### A.    The Specification Provides No Evidence That The Inventor Possessed The Claimed "VAN Switch" Or The Claimed Method Of "Object Routing."

In her opening expert report, one of JPMC's experts, Sue Spielman, opined that "a person of skill in the art as of the date of the alleged invention *would not have understood from the specification of the patents-in-suit that the patentee had possession of a VAN Switch* configurable to perform 'real-time' transactions."  (Ex. AJ at ¶ 46 (emphasis added))  Pi-Net's expert, Dr. Bardash, never offered a responsive opinion—at no time in any of his expert reports did Dr. Bardash opine that he (or a person or ordinary skill in the art at the time of the invention) would have understood the specification as evidencing *possession* of a VAN Switch, which is a coined term.  (Ex. AB at 7)  Thus, Pi-Net cannot point to any of its expert reports to create a genuine issue of material fact.  In fact, Dr. Bardash's failure to offer a responsive opinion is unsurprising, given that the specification (1) discloses nothing more than a non-existent protocol for using a

VAN Switch to perform "object routing," and (2) fails to meaningfully describe what physical components, algorithmic structures, or other elements make up this coined term.

### 1. The Only Embodiment of a VAN Switch or "Object Routing" Is Based on the Non-Existent TransWeb™ Management Protocol.

A "VAN Switch" is a required element for all claims of the '492 and '500 patents.  The claimed VAN Switch is inextricably linked to the concept of "object routing," which, according to Pi-Net, is the "heart" of the claimed technology.  (*See* Ex. AD at 27; *see also* Ex. C at 1:29-31 ("Specifically, the present invention relates to a method and apparatus for configurable [VAN] switching and object routing."); Ex. C at 7:51-8:39 (devoting an entire section of the "Detailed Description" to "Van Switching and Object Routing"))  The only embodiment of a "VAN switch 520 [that] provides multi-protocol object routing" disclosed in the specification is "via a proprietary protocol, TransWeb™ Management Protocol (TMP)."  (Ex. C at 7:62-65)  It is undisputed that, despite its alleged trademark and "proprietary" nature, the TransWeb™ Management Protocol *never actually existed and, thus, has never been made commercially available*.  (*See, e.g.*, Ex. AN at 258:6-10; *see also* Ex. AB at 14 (noting that "the inventor [Dr. Arunachalam] has testified there never had been any proprietary protocol"))

A non-existent protocol cannot evidence possession of any claimed embodiment.  At most, the inventor envisioned creating a new protocol for implementing the claimed VAN Switch and "object routing" steps, which would "incorporate[] the same security features as the traditional Simple Network Management Protocol, SNMP."  (Ex. C at 7:65-67)  But the patents-in-suit do not provide any meaningful description of what TMP actually was.  Nor do they indicate that a pre-existing protocol, like SNMP or HTTP (a protocol for Web-based communications), could be used alone to implement the claimed invention.  Indeed, the only

embodiments of VAN Switching or object routing discussed in the specification explicitly require TMP alone or in combination with other protocols or payloads.  (*See* Ex. C at 8:3-8)

Faced with a patent disclosure that describes "VAN Switching and Object Routing" solely with regard to a propriety protocol (TMP) that was never actually designed, implemented, or depicted in the patents-in-suit, Pi-Net tries to rewrite the specification.  Pi-Net's expert argues that the TransWeb[TM] Management *Protocol* is not a "protocol" at all, and instead "is merely a shorthand for the general protocol that is described in the patent."  (Ex. AC at 9)  Even if true, it simply begs the question of what protocols are available to implement the VAN Switching and Object Routing that are required by the asserted claims.  Pi-Net can point to no evidence that the inventor possessed or identified any protocol that was (or could be) used to implement a VAN Switch or perform "object routing."[4]  Thus, no reasonable jury could find that the inventor possessed a system with a VAN Switch or a method of performing "object routing."

### 2. Only Non-Structural, Abstract Descriptions of the VAN Switch Functions Are Disclosed.

Regardless of what protocol a VAN Switch uses to carry out the claimed function, it is undisputed that the VAN Switch is physical, tangible structure that includes software "configured" to "enabl[e] real-time transactions."  (*See, e.g.*, Ex. A, claims 1, 10, and 35; Ex. C, claims 1 and 10; *see also* D.I. 64 at 16 (proposing to construe "VAN switch" as "a *structure* connecting the object sender and the object receiver . . .") (emphasis added))  Yet the specification offers no structural diagrams, figures, or narrative descriptions that provide any insight into the actual architecture that would evidence possession of such an allegedly novel

---

[4] Indeed, the one existing protocol that Pi-Net has identified as an "embodiment of the object routing described in the Patents [is] SOAP," or the Simple Object Access Protocol.  (Ex. AA at 9)  SOAP was independently developed by Microsoft and disclosed in a 36-page document in 2000, *see* Ex. DBF.

physical structure.  *See, e.g., Lockwood v. Am. Airlines, Inc.*, 107 F.3d 1565, 1572 (Fed. Cir. 1997) (noting that a patent specification shows possession of the claimed invention by describing all of its limitations using "such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention").

In discussing the VAN Switch, Pi-Net's experts have pointed only to a number of *abstract, conceptual* drawings.  (*See* Ex. AB at 9-12 (citing Figures 6A and 7))  Figure 6A of the patents-in-suit depicts the VAN switch as the combination of an exchange, a management manager, and a management agent.  However, the specification provides no structural detail for these elements.  For instance, the "management manager" is described only as "interact[ing] with the operator agent 503 residing on exchange 501." (Ex. C at 7:60-61)  Indeed, the specification likewise describes the "operator agent" exclusively in functional terms, noting that it "may be activated to ensure the availability of distributed functions and capabilities." (Ex. C at 7:7-9)  Neither Figure 6A nor the accompanying text provides any indication of the relationship between these components, aside from their abstract positions floating within a conceptual "cloud" of the Internet, as shown below.

Similarly, Figure 7 alternately depicts the VAN switch as the combination of four "services" occupying an equal portion of a pie-shaped concept map:



FIG. 6A

The only description of these "services" consists of aspirational, functional language.  For instance, the "boundary" service is described solely as "provid[ing] the interfaces between VAN switch 520, the Internet and the Web," and other devices.  (Ex. C at 8:44-45)  However, the specification provides no technical explanation of how the inventor constructed such interfaces.  Even if the technical underpinnings of these services were explained, the specification does not explain how a person skilled in the art could aggregate this hodgepodge of services into the software-based VAN switch required by the asserted claims.  Figure 7 provides no indication of how these disparate services interconnect or interact, aside from the fact that they occupy the four abstract corners of a conceptual "circle."  (Ex. C at 3:38-39)  This theoretical construct cannot constitute evidence of possession of a VAN Switch that is capable of "enabling the real-time Web transactions from [a] Web application[]."  (Ex. C, claim 1)

## B. The Specification Provides No Evidence That The Inventor Possessed Any "Back-End" Elements Required By the Asserted Claims.

Each of the asserted claims of the '492 patent specifically and explicitly recites limitations directed to "back-end" systems for executing transactions.  For instance, claims 1-8 require "a computer system executing the Back-end transactional application for processing the transaction request in real-time."  (Ex. C at 9:50-10:38)  All asserted claims of the '500 patent recite a means for switching "to a transactional application," which Pi-Net has proposed be construed synonymously with "back-end transactional application" as an application that "corresponds to the front-end."  (*See, e.g.*, Ex. A, claims 1, 10, 35)  In like fashion, the sole asserted claim of the '158 patent requires "transferring funds from the checking account to the savings account" of a Web user, which cannot occur without accessing the back-end systems.  (Ex. AN at 157:17-22)  As even the inventor has conceded, the asserted claims require a system that is complete from the front-end to the back-end.  (*See* Ex. DBB at 112:13-25 (the claims

encompass "<u>end-to-end</u> real-time web transaction[s] from a web application, from <u>end-to-end</u> . . . that covers my invention, so whatever it takes to go from <u>here to all the way to the end and bring it all back</u> . . .")  Thus, the asserted claims cover (and must therefore show possession of) not only the "front-end" systems that allow user interaction, but also the corresponding "back-end" systems for processing transactions.

There is no evidence in the specification that the inventor possessed the "back-end" or back office systems explicitly required by the asserted claims.  For instance, Pi-Net's experts contend that Figure 5D shows object routing to the "back-end," which consists in that figure of "Data Repository 575."  (Ex. AA at 8-9)  However, the only way of accessing this back-end system, as explained in the patents-in-suit, is through the use of the non-existent protocol, TMP. (Ex. C at 9:35-36)  Moreover, the specification never provides any description of the "back-end transactional application"—this phrase appears only in the claims.  Nor is there any description or diagram showing the back-end software, hardware, algorithms, or other physical structures that were (or could be) part of the "back-end transactional application" required by all claims of the '500 and '492 patents.

Finally, although the specification makes reference to a "real-time" transaction involving the movement of $500 from a checking account to a savings account (Ex. C at 7:10-23), the only accompanying description is a *functional* one from the perspective of a user, with no description of the specific back-end architecture and elements (*see id.*).  As Pi-Net's counsel represented to the Court, the inventor did not "know what banks do in the back office," such as how to actually perform a transfer of funds from one account to another.  (Ex. DAX at 40:4-16)  But "what banks do in the back office" falls directly within the scope of the asserted claims.  The specification does not evidence any possession of these back office systems.

16

## VII.   ALL ASSERTED CLAIMS ARE INVALID FOR LACK OF ENABLEMENT.

As discussed above, the patents-in-suit disclose, at most, a theoretical and abstract concept using an undeveloped and undefined protocol to access certain back-end systems (about which the specification provides no information).  Given this dearth of disclosure, and the *Wands* Factors discussed below, no reasonable jury could conclude that the specification of the patents-in-suit satisfies the enablement requirement of 35 U.S.C. § 112(a).

### A.   Undue Experimentation Is Required To Implement The Asserted Claims.

The Federal Circuit has acknowledged that the field of the patents-in-suit presents particular challenges for the first *Wands* Factor, which is directed to the question of whether undue experimentation is required.  *See e.g.*, *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1381 (Fed. Cir. 2002) ("A specification that claims an invention requiring implementation through computer software but fails to set forth the details of computer programming may present issues of whether the experimentation required to write the programming is reasonable or unreasonable.") (internal quotation marks and citation omitted); *see also Wands*, 858 F.2d at 737.

In this case, no reasonable jury could conclude that anything less than undue experimentation would be needed to implement the claimed invention—in particular because both Ms. Spielman (one of JPMC's technical experts) and Mr. Easttom (one of Pi-Net's technical experts) *agree that considerable experimentation and effort* would be necessary to implement the technology in the asserted claims.  (*See* Ex. AJ at ¶ 52 (opining that a person could not design a system as required by the asserted claims, "without engaging in substantial and significant efforts at trial and error"); Ex. AO at 306-08 (opining based on "countless real world examples" that it was "just too hard" prior to about 2003 to design and implement web applications))  As discussed above, these difficulties are exacerbated because there is no protocol disclosed in the

17

specification for the VAN Switch required by all asserted claims of the '500 patent and '492

patent, or to perform the "object routing" required by all asserted claims of the '158 patent.  In

other words, a person of skill in the art would know only that she would need to *invent her own*

*new protocol* to implement the claimed technology, because the "proprietary protocol" (TMP)

disclosed in the patents-in-suit *never actually existed*.  (Ex. AB at 14)

The asserted claims are closely analogous to those that were held invalid in *Automotive*

*Technologies International, Inc. v. BMW of North America, Inc.*, 501 F.3d 1274, 1282 (Fed. Cir.

2007).  In that case, the asserted claims encompassed electronic side impact sensors for use with

automotive airbags.  *Id*. at 1277.  The patent specification in that case disclosed "only one short

paragraph and one figure . . . provid[ing] an overview of an electronic sensor without providing

any details of how the electronic sensor operate[d]."  *Id.* at 1282.  Expert knowledge could not

cure this deficiency, because "'[i]t is the specification, not the knowledge of one skilled in the art,

that must supply the novel aspects of an invention in order to constitute adequate enablement.'"

*Id*. at 1283 (citation omitted).  Similarly, the patents-in-suit provide only a conceptual overview

of what functions a VAN Switch should perform, with no details of how to actually make and

use an operational VAN Switch.

As discussed above, the asserted claims also require a number of "back-end" systems,

including a "back-end transactional application."  The specification provides no guidance on how

to configure those back-end applications to "correspond" to front-end applications (as Pi-Net's

proposed construction for this term necessitates), or to execute a diversity of transactions in real-

time.  In this way, both the nature of the invention (*Wands* Factor (4)) and the breadth of the

claims (*Wands* Factor (8)) only confirm the inadequacy of the specification.  Pi-Net asserts that

the patents-in-suit are a pioneering invention that anticipated modern e-commerce across a host

of different fields.  (Ex. DBB at 102:24-103:13)  Yet Pi-Net cannot identify a single disclosure in the specification that describes how to make and use even one type of "back-end" transactional application.

**B.     The Specification Provides No Working Examples And No Direction Or Guidance To Move Beyond The Prior Art.**

*Wands* Factors (2), (3), and (5) relate to the amount of direction or guidance presented by the specification, the presence or absence of working examples in the written description, and the state of the prior art, respectively.  *Wands*, 858 F.2d at 737.  These factors further establish that no reasonable jury could conclude that the asserted claims are enabled.

At the time the patents-in-suit were filed, web transactions were often performed using a technology called Common Gateway Interface ("CGI").  The specification of the patents-in-suit disparages CGI's capabilities and purports to offer a distinct, superior solution. (*e.g.*, Ex. C at 5:49-50 ("CGI scripts provide only limited two-way capabilities"))  However, the specification offers no corresponding disclosure to achieve the desired advances over CGI.

Although Dr. Bardash contends that "[t]he system can be implemented with [little] effort by a skilled artisan who knew web servers, CGI and similar basic skill sets," the specification fails to explain any *technical* distinction between the alleged invention and CGI that could guide its implementation.  (Ex. AB at 19)  Rather, the specification vaguely disparages CGI's *functional* capabilities, and notes that the invention aspires to superior *functionality*, without ever explaining how the invention actually achieves superior performance.  Indeed, there is not a single working example of any web-based transaction using a VAN Switch.  At most, there are abstract concept maps which outline only the barest contours of the overall functions, while leaving the design of the underlying architecture undisclosed.  (*See, e.g.*, Ex. C, Figs. 6A & 7)  Under Pi-Net's view, a person of skill in the art, with knowledge of CGI and other prior art

systems, would have to invent her own protocol, invent her own algorithm for carrying out that protocol, write her own software for the front-end and back-end of systems, and experiment to determine whether those systems could operate in a "real-time" manner that is distinct from CGI. Such disclosure is not enabling as a matter of law.  *Auto. Tech. Int'l*, 501 F.3d at 1284 (holding that, where a "specification provides 'only a starting point, a direction for further research,'" it is not enabling) (citation omitted).

For instance, the specification asserts that CGI provides "a severely limited transaction . . . because each CGI application is customized for a particular type of application or service," but never explains how the purported invention provides an application that is not customized.  (Ex. C at 2:8-11)  Similarly, the specification contends that "due to the lack of interaction and management between the car dealer and the bank, [a user] will not be able to obtain a loan and complete the purchase of [a] car via a CGI application," but fails to explain how the alleged invention provides such "interaction" and "management."  (*Id.* at 2:40-43)  And, the specification asserts that CGI scripts lack "a robust mechanism by which real-time Web transactions can be performed," but never outlines how the alleged invention can provide such a "robust mechanism."  (*Id.* at 5:49-54)  At most, these aspirational statements complain that CGI is deficient and invite readers to improve upon it.

## CONCLUSION

Pi-Net contends that the patents-in-suit represent a "revolutionary concept [for which] there are no existing words."  (Ex. AD at 26)  If that were true, it was incumbent upon the inventor to provide a disclosure commensurate with this scope.  There can be no genuine dispute that the limited specification failed to comply with the *quid pro quo* disclosure requirements of Section 112 of the Patent Act.  Thus, JPMC respectfully requests that the Court grant this motion for summary judgment.

DATED: January 29, 2014

Respectfully submitted,

/s/ *Robert S. Saunders*

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000

SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

21