## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO. | : | |
| | : | |
| Defendant. | : | |
| | : | |

### DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS
### *DAUBERT* MOTION TO EXCLUDE CERTAIN TESTIMONY OF STEVAN PORTER

### REDACTED VERSION
### FILED PUBLICLY
### FEBRUARY 5, 2014

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  January 29, 2014

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PI-NET INTERNATIONAL, INC.<br><br>                    Plaintiff,<br><br>          v.<br><br>JPMORGAN CHASE & CO.<br><br>                    Defendant. | Civ. No. 1:12-cv-00282-RGA |

**DEFENDANT'S OPENING BRIEF IN SUPPORT OF ITS**
**_DAUBERT_ MOTION TO EXCLUDE CERTAIN TESTIMONY OF STEVAN PORTER**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

_Attorneys for Defendant JPMorgan Chase & Co._

# TABLE OF CONTENTS

Page

I.   NATURE AND STAGE OF PROCEEDINGS ................................................................1

II.  SUMMARY OF ARGUMENT ....................................................................................1

III. STATEMENT OF FACTS .........................................................................................2

     A.   The Accused Products............................................................................................2

     B.   The Porter Report .................................................................................................3

IV.  THE APPLICABLE LAW .........................................................................................6

     A.   Standard For Reasonable Royalty Damages Awards ...............................................6

     B.   Legal Standards For Excluding Expert Testimony Under *Daubert* &
           Rule 702 ..............................................................................................................7

V.   MR. PORTER'S METHODOLOGY IS UNRELIABLE AND INADMISSIBLE
     UNDER *DAUBERT* AND THE FEDERAL RULES OF EVIDENCE..............................9

     A.   Mr. Porter's Opinions Regarding The MercExchange/Aden Agreement
           Are Based On A Flawed, Speculative, And Unreliable Methodology. ..................9

           1.   Mr. Porter Has Incomplete Information and Must Speculate to Fill
                  in Gaps Regarding the MercExchange/Aden Agreement. ..........................9

           2.   Mr. Porter's "Royalty Rate Translation" of the MercExchange/
                  Aden Agreement Is Speculative and Unsupported ...................................10

     B.   Mr. Porter's Opinions Regarding The Portel/i3 Agreement Are Based On
           A Flawed, Speculative, And Unreliable Methodology. ........................................14

           1.   Mr. Porter Has Incomplete Information and Must Speculate to Fill
                  in Gaps Regarding the Portel/i3 Agreement. ...........................................14

            2.   Mr. Porter's "Royalty Rate Translation" of the Portel/i3 Agreement
                  Is Speculative and Unsupported..............................................................15

     C.   Mr. Porter's Cost Savings Calculations Are Unreliable........................................15

           1.   Mr. Porter's Cost Savings Calculations Do Not Reflect JPMC's
                  Benefit From Allegedly Infringing Uses. .................................................15

2.      Mr. Porter Provided No "Reliable and Tangible" Evidence of
         Apportionment of JPMC's Contribution to Cost Savings. .........................16

CONCLUSION ...........................................................................................................................17

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*AVM Technologies, LLC v. Intel Corp.*, 927 F. Supp. 2d 139 (D. Del. 2013) ................................7

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) ............................................7

*Dunn v. Sandoz Pharmaceuticals Corp.*, 275 F. Supp. 2d 672 (M.D.N.C. 2003) .........................8

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ......................................................................7

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116
      (S.D.N.Y. 1970) ....................................................................................................................6, 7

*Kannankeril v. Terminix International, Inc.*, 128 F.3d 802 (3d Cir. 1997) ....................................8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ....................................................................7

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012) ..........12, 13, 14, 15

*Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) ................................6

*Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584 (D.N.J.
      2002), *aff'd*, 68 F. App'x 356 (3d Cir. 2003) ...........................................................................8

*MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556 (E.D. Va. 2007) ................................12

*In re Paoli Railroad Yard PCB Litigation*, 35 F.3d 717 (3d Cir. 1994) ........................................7

*Player v. Motiva Enterprises, LLC*, 240 F. App'x 513 (3d Cir. 2007) ............................................8

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 711 F.3d
      1348 (Fed. Cir. 2013), *cert. denied*, 82 U.S.L.W. 3107 (U.S. 2014) ......................................8

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ........................................6, 8, 13

*Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538 (Fed. Cir. 1995) ........................................................6

*TASER International, Inc. v. Karbon Arms, LLC*, No. 11-426-RGA, 2013 U.S.
      Dist. LEXIS 178327 (D. Del. Dec. 19, 2013) .......................................................................12

*In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999) ........................................................................8

*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011) .........................7, 11, 15, 17

*United States v. Mitchell*, 365 F.3d 215 (3d Cir. 2004) ..................................................................7

*WhitServ, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 1291 (2013) ...................................................................................7, 11

**Statutes**

35 U.S.C. § 284.........................................................................................................................6

Fed. R. Evid. 702 advisory committee's notes (2000 Amendments)..........................................7, 8

Fed. R. Evid. 702(c)-(d)............................................................................................................7

## I.   NATURE AND STAGE OF PROCEEDINGS

On March 7, 2012, plaintiff Pi-Net International, Inc. ("Plaintiff" or "Pi-Net")

filed a complaint for patent infringement against JPMorgan Chase & Co. ("Defendant" or

"JPMC") based on U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"),

and 8,108,492 ("the '492 patent") (collectively, the "patents-in-suit").  Fact and expert discovery

have closed, and the Court will hold a *Markman* and case dispositive motion hearing on March 6,

2014.  (D.I. 95.)  Trial is scheduled to begin on June 2, 2014.  (*Id.*)

## II.   SUMMARY OF ARGUMENT

1.   Pi-Net's damages expert, Mr. Stevan Porter, opined that in a hypothetical

negotiation between JPMC and Pi-Net in the early 2000s, the parties would have agreed upon a

royalty rate of $0.04 per infringing transaction, such that Pi-Net is entitled to damages of no less

than ███████████.  In reaching this conclusion, Mr. Porter opined that the parties would have

considered two third-party license agreements outside the field of the patents-in-suit: (1) a

January 2000 patent agreement between MercExchange, LLC ("MercExchange") and Aden

Enterprises, Inc. ("Aden") ("the MercExchange/Aden Agreement"); and (2) an April 2000

exclusive patent license agreement between Portel Services Network, Inc. ("Portel") and i3

Mobile Inc. ("i3") ("the Portel/i3 Agreement").

2.   In order to fit these non-analogous agreements into his analysis, Mr. Porter

performs "royalty base translations," as well as a series of adjustments that depend on unproven

assumptions, unreliable methods, and pure speculation.  By altering the basic character of these

agreements and imposing arbitrary adjustments to both their qualitative and quantitative

elements (so that they no longer resemble any of the original terms of these agreements), Mr.

Porter opines that they support a per-transaction royalty of between roughly $0.035 and $0.058.

3.   In performing this "royalty base translation," Mr. Porter uses a "cost savings" calculation that fails to properly apportion the value of any cost savings exclusively to the patented technology, and uses cost savings figures that are disconnected from the actual costs incurred in connection with the accused products.

4.   The unsupported and unreliable "translation" of these agreements runs afoul of Fed. R. Evid. 702, and thus any testimony from Mr. Porter on either the MercExchange/Aden Agreement or the Portel/i3 Agreement should be excluded.

## III.   STATEMENT OF FACTS

### A.   The Accused Products

Pi-Net accuses six JPMC online banking instrumentalities of infringing the patents-in-suit:  Account Transfers, Payments, Customer Center, Account Activity (Business Card), Wire Transfers, and Chase Mobile Application, QuickPay$^{sm}$ ("Mobile QuickPay") (collectively, "Accused Instrumentalities").  With the exception of Mobile QuickPay, all of the Accused Instrumentalities are accessible to JPMC's customers through the website www.chase.com.  Generally speaking, Account Transfers allows JPMC customers to electronically transfer monies between various bank accounts; Payments allows JPMC customers to electronically pay various bills, such as cable, phone, or electric bills; Wire Transfers allows for electronic scheduling of domestic or international money transfer via wire; and QuickPay allows for individuals who have downloaded a mobile application to their phone to transfer money to other individuals.  (Ex. AM at 11-12; Ex. AF at 18-19)  Customer Center is an online clearinghouse of hyperlinks assembled by each individual JPMC online banking customer, and allows that customer online access to a variety of JPMC online services, while Account Activity (Business Card) allows certain JPMC customers to check and track their account balances, payments, and credits.  (*See id.*)

B.      The Porter Report

In his October 25, 2013 expert report ("Porter Report" or the "Report"), Mr. Porter opined that Pi-Net is entitled to a value-per-transaction royalty of no less than $0.04, which yields damages of no less than ████████ when applied to the ████████ financial transactions Mr. Porter alleges were performed by the Accused Instrumentalities during the period of January 2007 to August 2013.  (Ex. AF at ¶¶ 132-33)  Mr. Porter purported to consider the *Georgia-Pacific* factors, focusing mainly on the twelfth factor:  the portion of the profit or selling price that may be customary in the particular business to allow for the use of the inventions or analogous inventions.  (*Id.* at ¶¶ 99-123)  In the context of this *Georgia-Pacific* factor, Mr. Porter opined that two third-party agreements—the MercExchange/Aden Agreement and the Portel/i3 Agreement—support a royalty rate of $0.04 per accused transaction.

The MercExchange/Aden Agreement covered one U.S. patent and 8 U.S. patent applications that relate to methods and systems for facilitating Internet commerce through online auctions.  (Ex. AM at ¶ 106)  Royalty payments under the MercExchange/Aden Agreement were structured as the greater of "the first $50,000 earned on relevant transactions or a 1.5% royalty on gross transaction value."  (*Id.* at ¶ 108)  Through a series of calculations and adjustments, Mr. Porter "translated" this 1.5% rate into a "value-per transaction royalty" that was based not on gross transaction value, but on alleged "cost savings values achieved through the accused instrumentalities."  His calculation proceeded as follows:

1) Because Aden's online auction system, LeftBid.com, "did not have significant operations," Mr. Porter contends that the parties would have engrafted revenue information from another third-party, eBay, onto the MercExchange/Aden Agreement.  Mr. Porter consulted SEC filings indicating that in 2000 eBay realized $5.4 billion of gross transaction value and earned $336 million in gross profits.

2) Mr. Porter then multiplied the 1.5% royalty rate from the MercExchange/Aden Agreement by the $5.4 billion eBay realized in gross transaction value to yield $81.3 million in royalties that he asserts would have resulted if eBay had been a party to the

3

MercExchange/Aden Agreement (which it was not).

3) Mr. Porter next divided that $81.3 million in eBay royalties by the $336 million in gross profit that eBay earned in 2000, to yield a royalty rate of 24% of eBay's gross profit.

4) Mr. Porter then opines that Pi-Net and JPMC, having altered the basic structure of the MercExchange/Aden Agreement and imported eBay's revenue data, would then have adjusted this royalty rate downward by 25-50% to account for unspecified "qualitative differences."  This adjustment yields a royalty range of 12% to 18%.

5) Then, Mr. Porter applies this adjusted 12-18% rate to the gross cost savings that he alleges were realized through JPMC's use of the Accused Instrumentalities, which he calculates at approximately ███████ from January 2007 until August 2013.

6) Mr. Porter then divides this figure by his total number of accused JPMC transactions (███████), which results in a value-per-transaction royalty of $0.039 to $0.058.

(*Id*. at ¶ 112)

Mr. Porter never reviewed the complete Portel/i3 Agreement, which was the second third-party license agreement that he relied upon as part of his analysis of *Georgia-Pacific* Factor 12.  (Ex. AF at ¶ 115; Ex. AP at 212:21-25)  Instead, Mr. Porter relies on publicly available summaries and excerpts from the Portel/i3 Agreement, which report that it was an exclusive patent license with running royalties of 5% of i3's gross revenue.  (Ex. AF at ¶¶ 113-14)  This Agreement covers a single U.S. patent, which relates to "hand-held terminal hardware for inputting orders for goods and service . . . and transmitting such orders in a single burst via a telephone line to a processing center."  (Ex. AM at 45-46)  As with the MercExchange/Aden Agreement, Mr. Porter argues that Pi-Net and JPMC would have undertaken a "royalty base translation" to alter the terms of the Portel/i3 Agreement:

1) Mr. Porter applies the 5% royalty rate in the Portel/i3 Agreement to i3's revenue in 2000 of $4.5 million, to yield $224,000 that would have been due under the Portel/i3 Agreement (assuming there were no other terms in this Agreement that impact the amounts due).

2) From here, Mr. Porter divided the $224,000 in speculated i3 royalty by the $1.9 million in gross profits that i3 reported in 2000, to yield a royalty rate of about 12%

of i3's gross profits for that year.

3) Mr. Porter then opines (without any citation) that JPMC and Pi-Net would have considered a narrow range of royalty values around this 12% figure (namely, 11% to 13%).

4) Mr. Porter then applies this 11-13% range to the gross cost savings that he alleges were realized through JPMC's use of the Accused Instrumentalities, which Mr. Porter calculates at approximately ███████ from January 2007 until August 2013.

5) Mr. Porter then divides this figure by his total number of accused transactions (███ █████), which results in a value-per-transaction royalty of $0.035 to $0.042.

(Ex. AF at ¶¶ 116-117)

As noted above, Mr. Porter's calculations are based in part on the alleged cost savings that Mr. Porter contends are attributable to the "use of the accused instrumentalities," which he aggregates across the Accused Instrumentalities for an approximate alleged total of ███████. (*See, e.g.*, Ex. AF at ¶ 94, Ex 5.1, Ex. 6.1)  For the Customer Center, which alone accounts for more than one-third of his total alleged costs savings of ███████, Mr. Porter calculates cost savings not based on the "use" of the instrumentality, but rather based on the monthly "occurrence" of a "suppressed mailing."  (Ex. AF at Ex. 8.5; Ex. AP at 117:23-118:19) In so doing, Mr. Porter did not consider the actual usage data that JPMC provided for the Customer Center (Ex. AP at 118:20-119:18); instead, Mr. Porter attributes cost savings to that instrumentality every time that JPMC does not mail a monthly bank statement.  For Wire Transfers, Mr. Porter actually calculates the difference in fees *charged* by JPMC for wires initiated in a branch, as opposed to those that are initiated online.  (Ex. AF at Ex. 7.4)  Mr. Porter does not consider JPMC's actual costs for wire transfers.

Additionally, Mr. Porter acknowledges that JPMC has "contributed information technology and programming investments to commercialize and optimize their systems, marketed the accused instrumentalities to consumers, maintained the online banking systems,

5

and undertaken branding and design efforts on the systems' behalf.  These independent contributions would be anticipated to have economic consequences and *to have accounted for a share of the financial benefits associated with the accused instrumentalities*."  (Ex. AF at ¶ 125 (emphasis added))  Mr. Porter does not attempt to quantitatively apportion any cost savings to account for JPMC's share of those savings that he identified.

## IV.   THE APPLICABLE LAW

### A.   Standard For Reasonable Royalty Damages Awards

Recovery of damages for patent infringement is governed by Section 284 of the Patent Act, which provides:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284.  One common approach for calculating a reasonable royalty, the "hypothetical negotiation, . . . attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before the infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009); *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc).  This hypothetical negotiation can either result in a lump-sum payment or a license agreement based on a running royalty.  *See Lucent*, 580 F.3d at 1326 (discussing "[s]ignificant differences" between each structure).

In *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), the court provided "[a] comprehensive (but unprioritized and often overlapping) list of relevant factors for a reasonable royalty calculation." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citing *Georgia-Pac.*, 318 F. Supp. at 1120). The Federal Circuit has since "sanctioned the use of the *Georgia-Pacific* factors to frame the

reasonable royalty inquiry." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).  Courts "do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *WhitServ, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012).  However, "[i]f they choose to use them, . . . reciting each factor and making a conclusory remark about its impact on the damages calculation before moving on does no more than tell the jury what factors a damages analysis could take into consideration." *Id.*  Instead, "some explanation of both why and generally to what extent the particular factor impacts the royalty calculation is needed." *Id.*

### B.      Legal Standards For Excluding Expert Testimony Under *Daubert* & Rule 702

It is well established that trial courts function as "gatekeep[ers]" with respect to the admission of expert evidence.  *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997).[1]  This "gatekeeping role" requires courts to assess "whether the reasoning or methodology underlying the [expert] testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93; *see also In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

Rule 702 was amended to reflect *Daubert*, and now requires that "the testimony is the product of reliable principles and methods" which have been applied "reliably . . . to the facts of the case." Fed. R. Evid. 702(c)-(d); *see also* Fed. R. Evid. 702 advisory committee's notes (2000 Amendments) ("The trial judge in all cases of proffered expert testimony must find that it

---

[1]      "*Daubert* was 'limited to the scientific context because that [wa]s the nature of the expertise offered [t]here,' but *Kumho Tire* extended *Daubert's* 'general principles' to all of 'the expert matters described in Rule 702.'" *United States v. Mitchell*, 365 F.3d 215, 234 (3d Cir. 2004) (citations omitted).

is properly grounded, well-reasoned, and not speculative before it can be admitted."); *AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 147 (D. Del. 2013) (Andrews, J.) ("Before presenting a damages number to the jury, the patentee must establish that its calculation is based on reliable methodology and concrete facts.").  The proponent of expert testimony has the burden of establishing the reliability of his or her testimony.  *See* Fed. R. Evid. 702 advisory committee's notes (2000 Amendments) (a proponent of expert testimony "has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence"); *see also In re TMI Litigation*, 193 F.3d 613, 705 (3d Cir. 1999) ("[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance of the evidence.").

   The reliability prong of Rule 702 and *Daubert* is aimed at determining whether the proposed expert has "good grounds" for his or her opinion, as opposed to "subjective belief or unsupported speculation."  *Magistrini v. One Hour Martinizing Dry Cleaning*, 180 F. Supp. 2d 584, 594 (D.N.J. 2002) (internal quotation marks and citations omitted), *aff'd*, 68 F. App'x 356 (3d Cir. 2003).  It is a fundamental rule of evidence that "speculation is unreliable . . . and is inadmissible."  *Dunn v. Sandoz Pharm. Corp.*, 275 F. Supp. 2d 672, 684 (M.D.N.C. 2003); *see also Player v. Motiva Enters., LLC*, 240 F. App'x 513, 520 (3d Cir. 2007) (not precedential) ("[G]uess work is not a reliable method."); *Kannankeril v. Terminix Int'l, Inc.*, 128 F.3d 802, 806 (3d Cir. 1997) ("In order for the expert testimony to be 'reliable,' we have required that the testimony be based on the 'methods and procedures of science,' rather than on 'subjective belief or unsupported speculation.'" (citation omitted)).  Indeed, the Federal Circuit has emphasized that "[a] reasonable royalty [rate] based on . . . speculative evidence violates the statutory requirement that damages under § 284 be 'adequate to compensate for the infringement.'" *ResQNet.com*, 594 F.3d at 873 (citation omitted); *Power Integrations, Inc. v. Fairchild*

*Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1372-74 (Fed. Cir. 2013) (finding abuse of discretion in district court's decision to admit expert report because damages expert's calculation of reasonable royalty was unreliable where expert made "speculative leaps").

## V.     MR. PORTER'S METHODOLOGY IS UNRELIABLE AND INADMISSIBLE UNDER *DAUBERT* AND THE FEDERAL RULES OF EVIDENCE.

### A.     Mr. Porter's Opinions Regarding The MercExchange/Aden Agreement Are Based On A Flawed, Speculative, And Unreliable Methodology.

In order to make the MercExchange/Aden Agreement fit within his desired royalty construct, Mr. Porter must (1) disregard the overall MercExchange-Aden transaction structure (which included two other non-patent agreements); (2) substitute revenue and profit information for eBay, a non-party to the MercExchange/Aden Agreement, to speculate what sort of per-gross-profit royalty the MercExchange/Aden Agreement represents; (3) apply an arbitrary reduction to this resultant per-gross-profit royalty to account for unspecified "qualitative differences"; and then (4) multiply an unreliable cost-savings estimate by this royalty to come up with a rate that conveniently fits within the range of Mr. Porter's ultimate per-transaction rate of $0.04.  Under the established law, these speculative and unsupported steps render any testimony from Mr. Porter about the MercExchange/Aden Agreement inadmissible and unreliable.

#### 1.     Mr. Porter Has Incomplete Information and Must Speculate to Fill in Gaps Regarding the MercExchange/Aden Agreement.

As an initial matter, Mr. Porter was unable to find any third-party license agreements that were comparable to the agreement that would have been contemplated by JPMC and Pi-Net in a hypothetical negotiation—namely, a non-exclusive patent license covering the field of online banking transactions.  (Ex. AM at 39 nn.150 and 151 (citing Porter emails); Ex. AP at 216:2-12)  He therefore expanded his search, and uncovered the MercExchange/Aden Agreement, which was one piece of a broader, three-agreement transaction between

MercExchange and Aden.[2]  Mr. Porter does not have any specific knowledge of (1) the annual amount of royalties that Aden paid under the terms of this agreement; or (2) how much revenue Aden earned from the covered technology.  (Ex. AP at 188:4-12, 192:10-14)  To fill in this gap, he applies the terms of the MercExchange/Aden royalty structure (i.e., a 1.5% rate on gross transaction value) to revenue earned not by Aden, *but by non-party eBay*, which had no license agreement with MercExchange and which was in vastly different financial condition at the relevant time.  (*Id*. at 191-92, 207:3-14)  Mr. Porter further conceded that he had no knowledge of how eBay's profits compare to Aden's.  (*Id*. at 191:6-192:3)  Thus, having insufficient information to perform even the first step of his analysis, Mr. Porter employs data from a third party that had no agreement with MercExchange (let alone a comparable one), whose financial condition is admittedly different from Aden, and whose profitability Mr. Porter is not able to compare to that of Aden.

> **2.      Mr. Porter's "Royalty Rate Translation" of the MercExchange/
> Aden Agreement Is Speculative and Unsupported.**

Mr. Porter then makes another change to the framework of the MercExchange/Aden Agreement by performing a "royalty rate translation," which uses the terms negotiated in one agreement by MercExchange and Aden, the revenue/profit data from eBay, and purported cost savings information from JPMC to conclude that a royalty of $0.039 to $0.058 would result from JPMC's hypothetical negotiations with Pi-Net.  Mr. Porter has no information about the number of transactions that were performed by Aden or eBay, and cites no evidence for his view that JPMC and Pi-Net would have used cost savings as a basis for calculating a

---

2      The other two agreements were an Exchange & Transfer Agreement where Aden acquired all outstanding shares of MercTravel, and a Capital Contribution and Sale Agreement in which Aden purchased a 10% ownership interest in MercExchange.  (Ex. AM at 41-42 (citing 10-Ks))

royalty rate.  This "translation" approach to the MercExchange/Aden Agreement cannot satisfy the *Daubert* standards for admissibility, for at least the reasons discussed below.

As an initial matter, Mr. Porter provides no basis for his statement that "the prevailing relationship between online auction gross transaction value and auctioneer gross profit would have been understood" by JPMC or Pi-Net, nor did he provide any testimony as to his "understanding" of the relationship.  (Ex. AF at ¶ 112)  Mr. Porter further assumes that cost savings and gross profits are an equivalent parameter, urging the application of gross profits royalty to the accused instrumentalities' cost savings, but cites no explanation for this conversion. (*Id*.)  For this reason alone, Mr. Porter's calculation runs afoul of the *Daubert* standard.  *See WhitServe*, 694 F.3d at 32-33 & n.16 (holding expert's testimony could not support verdict where expert started with running royalty of the *profit* to yield a running royalty of the *revenue* and record contained no explanation of conversion).

Mr. Porter also did not apportion eBay's gross profits when calculating the "translated" gross profit royalty rate that he then uses to further "translate" that rate into a per-transaction value.  Instead, Mr. Porter divided the speculated royalties that eBay would have paid if it had been a party to the MercExchange/Aden Agreement by eBay's gross profits.  (Ex. AF at ¶ 112)  This artificially inflates the resulting per-gross-profits royalty rate because Mr. Porter did not apportion eBay's gross profits to account only for the profits realized from the MercExchange licensed technology.  *Uniloc USA*, 632 F.3d at 1318 (noting that a patentee "'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative'" (citation omitted)). In order to use the entire value of eBay's profits, Mr. Porter must prove that the licensed tech-

nology was the basis for the demand of the eBay product.  Here, Mr. Porter "never conducted any market studies or consumer surveys to ascertain whether the demand . . . is driven by the patented technology."  *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012).

      Moreover, Mr. Porter ignores reality by basing the calculation on eBay's gross profits.  In fact, MercExchange was later awarded only $25 million in royalties from eBay for infringing the very patents Aden had licensed in 2000.  *See MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 563 (E.D. Va. 2007).  Thus, after conducting its own *Georgia-Pacific* analysis, the District Court for the Eastern District of Virginia awarded MercExchange only a fraction of the $81 million in royalties that Mr. Porter asserts that eBay would have paid in 2000 *alone*.  (Ex. AM at 43)  Accordingly, the 24% royalty of gross profits that Mr. Porter calculates using non-apportioned revenue from non-party eBay is not only contrary to reality, but vastly overstated.

      Finally, Mr. Porter opines that the parties would have arbitrarily reduced his calculated rate by "one-fourth to one-half . . . to account for qualitative differences between the MercExchange/Aden [Agreement] and [the] hypothetical [Pi-Net-JPMC agreement]."  (Ex. AF at ¶ 112)  When questioned about the methodology that he used to make this adjustment, Mr. Porter testified only that this 25-50% reduction was "a numeric distillation of [his] qualitative analysis of factors distinguishing the [MercExchange/Aden Agreement] from the agreement that would have resulted from hypothetical negotiations."  (Ex. AP at 201:10-14)  This unsupported statement rests solely on Mr. Porter's subjective judgment—which is nothing more than *ipse dixit*.  *See* TASER *Int'l, Inc. v. Karbon Arms, LLC*, No. 11-426-RGA, 2013 U.S. Dist. LEXIS

178327, at *29 (D. Del. Dec. 19, 2013) (excluding reasonable royalty analysis for unreliable methodology where expert offered "quintessential *ipse dixit* justification").

Mr. Porter's arbitrary adjustment to the non-comparable MercExchange/Aden Agreement mirrors the type of analysis that was flatly rejected as inadmissible in *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012).  In that case, the Federal Circuit sharply criticized a damages expert who imposed a 66% reduction on his royalty rate, because his "complete lack of economic analysis to quantitatively support [the reduction] echoes the kind of arbitrariness of the '25% Rule' that [the Federal Circuit] recently and emphatically rejected from damages experts, and would alone justify excluding [the expert's] opinions." *Id.* at 69.  Indeed, as with Mr. Porter's adjustment, which was based on unspecified "qualitative differences," so too was the *LaserDynamics* expert's adjustment based on "vague qualitative notions." *Id.*  And as with Mr. Porter's adjustment, the *LaserDynamics* adjustment "appears to have been plucked out of thin air." *Id.*  Just as the Federal Circuit held that the *LaserDynamics* damages theory was too "arbitrary and speculative" to be presented to a jury, so too should the Court exclude Mr. Porter's testimony here. *Id.* at 81-82.

Additionally, before Mr. Porter's "adjustment" to the MercExchange/Aden per-gross-profit rate, it was ***twice*** the comparable rate of that "translated" from the Portel/i3 Agreement.  If anything, the adjustment appears to have been used to artificially create a construct in which these two license agreements appeared to both corroborate Mr. Porter's ultimate per-transaction rate of $0.04.  As the Federal Circuit has recognized, this "downward shift . . . is an admission that his calculations are speculative." *ResQNet.com*, 594 F.3d at 871. Indeed, allowing Mr. Porter to present these detailed calculations to the jury, which have the imprimatur of expert testimony and exactitude (although they are completely untethered to the

13

MercExchange/Aden Agreement) would pose a great "risk of unfair prejudice, confusion of the issues, and misleading the jury." *LaserDynamics*, 694 F.3d at 78.

**B.      Mr. Porter's Opinions Regarding The Portel/i3 Agreement Are Based On A Flawed, Speculative, And Unreliable Methodology.**

        **1.      Mr. Porter Has Incomplete Information and Must Speculate to Fill in Gaps Regarding the Portel/i3 Agreement.**

As with the MercExchange/Aden Agreement, Mr. Porter has incomplete information regarding the actual terms of the Portel/i3 Agreement.  Mr. Porter admits that he "ha[s] not reviewed the [Portel/i3] agreement itself," and instead has relied only on excerpts in reaching his conclusions.  (Ex. AP at 211:12-212:7; 212:18-22)  Thus, Mr. Porter can only speculate that the terms that do not appear in the summary or excerpts he reviewed do not impact his conclusions regarding how JPMC and Pi-Net would have evaluated this license.[3]  Indeed, despite failing to review the entirety of the agreement, Mr. Porter identifies several material differences between the snippets of the Portel/i3 Agreement that he had, and the sort of agreement that JPMC and Pi-Net would have been negotiating.  (Ex. AF at ¶¶ 62, 115)  In particular, the Portel/i3 Agreement covers broader territory than the U.S., is exclusive (when the Pi-Net-JPMC agreement would be non-exclusive), and relates to different technology.  (*Id.*)  Thus, even the limited portion of the Portel/i3 Agreement that Mr. Porter had suggests that this agreement is an unreliable starting point for the Pi-Net-JPMC negotiations.

---

[3]  Mr. Porter does not offer any opinion as to whether, if JPMC and Pi-Net had only snippets of the Portel/i3 Agreement available, the parties would have relied on it in the context of the hypothetical negotiation.

**2.    Mr. Porter's "Royalty Rate Translation" of the Portel/i3 Agreement Is Speculative and Unsupported.**

Mr. Porter used the same basic "royalty rate translation" approach on the Portel/i3 Agreement as he did for the MercExchange/Aden Agreement, and thus his testimony regarding the Portel/i3 agreement should be excluded for the same reasons. (Ex. AF at ¶ 117; Ex. AP at 214:6-8) There are, however, two distinctions from his approach with the MercExchange/Aden Agreement: (1) Mr. Porter uses actual revenue information from a party to the Portel/i3 Agreement in performing his "translation"; and (2) Mr. Porter does not make any 25-50% adjustment to the "translated" royalty for the Portel/i3 Agreement. As for this first distinction, Mr. Porter still fails to apportion the i3 revenue that he cites to that which actually is attributable to the patented technology, and thus this calculation is still impermissibly speculative. *See Uniloc USA*, 632 F.3d at 1318. And as for the second distinction, Mr. Porter provided no basis in his report or during his deposition testimony for how the Portel/i3 Agreement is "quali-tatively" more similar to the hypothetical negotiation. He likewise provides no explanation as to why it would not be appropriate to include a reduction in the "translated" royalty for this agreement, when it was necessary (in Mr. Porter's view) to do so for the MercExchange/Aden Agreement. *See LaserDynamics*, 694 F.3d at 69. This is particularly noteworthy given Mr. Porter's acknowledgment that an exclusive license agreement, such as the Portel/i3 Agreement, would typically command a *higher* royalty. (Ex. AF at ¶115)

**C.    Mr. Porter's Cost Savings Calculations Are Unreliable.**

**1.    Mr. Porter's Cost Savings Calculations Do Not Reflect JPMC's Benefit From Allegedly Infringing Uses.**

As part of his "translation" approach, Mr. Porter utilizes an aggregated "cost savings" figure to convert revenue-based royalty rates into those that reflect what he alleges are per-transaction cost savings. (Ex. AF at ¶¶ 94, 112, 117) The data that Mr. Porter used to

perform these cost savings "translations" have serious flaws that render his values speculative and unreliable.

For instance, Mr. Porter's purported cost savings for the Customer Center are completely untethered to the actual usage data that JPMC produced for this Accused Instrumentality.  Although JPMC produced specific data regarding how many Customer Center sessions had occurred during each year of the damages period, Mr. Porter ignored that data entirely.  (Ex. AP at 118-19 (acknowledging that he "didn't look specifically at customer center data" when calculating the alleged cost savings attributable to the use of the Customer Center)  Mr. Porter provided no basis for disregarding the actual usage data for the Customer Center in his report or in his deposition, and thus the overall cost savings figure applied in his "translation" of the MercExchange/Aden Agreement and the Portel/i3 Agreement is overstated and unreliable.

Moreover, for Wire Transfers, Mr. Porter defines "cost savings" as the difference in the *fee charged* by JPMC for wires initiated in the branch, as opposed to wires initiated online.  (Ex. AF at Ex. 7.4; Ex. AP at 135-37)  Mr. Porter admitted that he has no basis to equate the fee charged by JPMC to JPMC's "cost savings" from using online wire transfers—indeed Mr. Porter is only speculating regarding JPMC's costs, because he did not review "any documents from [JPMC] that analyze cost savings of online wire transfers as compared to transfers conducted at a branch."  (Ex. AP at 137:17-21)  This admitted speculation establishes that the figures Mr. Porter used in his analysis are unreliable, and thus should be excluded from the jury under Fed. R. Evid. 702.

### 2.      Mr. Porter Provided No "Reliable and Tangible" Evidence of Apportionment of JPMC's Contribution to Cost Savings.

Even if the calculations from the MercExchange and Portel agreements were based on sound methodology, and even if cost savings was a reliable measure of the benefit to

JPMC from the alleged acts of infringement, Mr. Porter also failed to apportion JPMC's contribution to those cost savings, which alone should compel exclusion of Mr. Porter's testimony.  Mr. Porter explicitly acknowledged the substantial contribution of JPMC to its allegedly infringing systems, "having contributed information technology and programming investments to commercialize and optimize their systems, marketed the accused instrumentalities to consumers, maintained the online banking systems, and undertaken branding and design efforts on the systems' behalf."  (Ex. AF at ¶ 125)  There can thus be no genuine dispute that some share of the value realized by the accused products is attributed solely to JPMC's non-infringing efforts, but Mr. Porter does not provide "reliable and tangible" evidence of any such apportionment.  *Uniloc USA*, 632 F.3d at 1318.  Indeed, Mr. Porter could not point to any quantification of this contribution in his report, but rather stated that the apportionment "notion colors [his] entire analysis." (Ex. AP at 224:14-225:5)  Thus, by his own admission the cost savings figures used to "translate" the MercExchange/Aden and Portel/i3 licenses are overstated, which in turn yields overstated royalty ranges resulting from the "translation" process.

## CONCLUSION

In reaching his opinion that a hypothetical negotiation between Pi-Net and JPMC in the early 2000s would have resulted in a $0.04 per-transaction royalty rate, the only patent license agreements that Mr. Porter relies upon are the MercExchange/Aden Agreement and the Portel/i3 Agreement.  These third-party agreements do not calculate royalties on a per-transaction basis, and there is no evidence that either of the licensees for these third-party agreements ever paid the equivalent of $0.04 per transaction.  Instead, Mr. Porter takes those license agreements only as a starting point, and then "translates" those agreements into a structure that barely resembles their original form, using a series of speculative and unsupported assumptions (including by using the revenue of yet another non-party, eBay).  In performing

these "translations," Mr. Porter uses unreliable cost savings information, which does not reflect

the actual cost savings for at least the Customer Center and Wire Transfers instrumentalities, and

fails to account for substantial contribution to cost savings that Mr. Porter admits JPMC made.

Due to the particularly misleading and unreliable nature of this testimony—which purports to

mathematically support a royalty rate of $0.04—it should be excluded under Fed. R. Evid. 702.


DATED: January 29, 2014                      Respectfully submitted,

                                             */s/ Robert S. Saunders*
OF COUNSEL:                                  Robert S. Saunders (ID No. 3027)
Daniel A. DeVito                             Jessica Raatz Kunz (ID No. 5698)
Douglas R. Nemec                             SKADDEN, ARPS, SLATE,
Edward L. Tulin                                 MEAGHER & FLOM LLP
Andrew D. Gish                               920 N. King Street, 7th Floor
SKADDEN, ARPS, SLATE,                        Wilmington, Delaware  19801
    MEAGHER & FLOM LLP                       Tel:  (302) 651-3000
Four Times Square                            Fax:  (302) 651-3001
New York, New York  10036                    rob.saunders@skadden.com
Tel:  (212) 735-3000                         jessica.kunz@skadden.com

                                             *Attorneys for Defendant JPMorgan Chase & Co.*