# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO. | : | |
| | : | |
| Defendant. | : | |
| | : | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT OF LACHES FOR U.S. PATENT NO. 5,987,500

### REDACTED VERSION
### FILED PUBLICLY
### FEBRUARY 5, 2014

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  January 29, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PI-NET INTERNATIONAL INC.,

                Plaintiff,

      v.

JPMORGAN CHASE & CO.,

                Defendant.

Civ. No. 1:12-cv-00282-RGA

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION FOR PARTIAL
SUMMARY JUDGMENT OF LACHES FOR U.S. PATENT NO. 5,987,500**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

# TABLE OF CONTENTS

Page

I. NATURE AND STAGE OF PROCEEDINGS ...................................................1

II. SUMMARY OF ARGUMENT ........................................................................1

III. STATEMENT OF FACTS ..............................................................................2

    A. The '500 Patent.............................................................................................2

    B. The Parties ....................................................................................................3

    C. Accused Products...........................................................................................3

IV. THE APPLICABLE LAW ..............................................................................5

    A. Law Governing Summary Judgment .............................................................5

    B. Legal Standard For Determining Whether Laches Bars A Claim .........................6

V. LACHES BARS PRE-SUIT INFRINGEMENT CLAIMS FOR THE '500 PATENT ...................................................................................................8

    A. Pi-Net's Unreasonable And Inexcusable Delay .....................................................8

        1. Presumption of Laches Applies to '500 Patent .........................................8

            (a) JPMC's Open & Pervasive Use of the Accused Products...............8

            (b) JPMC's Advertising & Promotion of the Accused Products .........10

            (c) Pi-Net's Broad View of the Scope of the '500 Patent Establishes Constructive Notice of Infringement As of March 2006 ...................................................................................11

        2. Pi-Net Has No Evidence That Delay Was Reasonable or Excusable........13

            (a) Given the Evidence That Prompted Pi-Net to File Suit, There Can Be No Dispute That Pi-Net's Delay Was Unreasonable....................................................................................13

            (b) Pi-Net Has No Excuse For Its Delay ............................................17

    B. Pi-Net's Delay Has Resulted In Prejudice To JPMC. ............................................18

        1. JPMC Has Suffered Evidentiary Prejudice Due to Pi-Net's Delay............18

i

2.    JPMC Has Suffered Economic Prejudice Due to Pi-Net's Delay. .............19

VI.    CONCLUSION.................................................................................................................20

**TABLE OF AUTHORITIES**

**CASES**

*A.C. Aukerman Co. v. R.L. Chaides Construction Co.*,
    960 F.2d 1020 (Fed. Cir. 1992)....................................................................2, 6, 7, 18, 20

*ABB Robotics, Inc. v. GMFanuc Robotics Corp.*,
    828 F. Supp. 1386 (E.D. Wis. 1993), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995).....................19

*Altech Controls Corp. v. E.I.L. Instruments, Inc.*,
    33 F. Supp. 2d 546 (S.D. Tex. 1998) ...............................................................................18

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)..............................................................................................................5

*Avocet Sports Technology Inc. v. Polar Electro Inc.*,
    No. C-12-02234 EDL, 2013 WL 1729668 (N.D. Cal. Apr. 16, 2013) .............................11

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...............................................................................................................5

*Comcast Cable Communications Corp. v. Finisar Corp.*,
    No. C 06-04206 WHA, 2008 WL 170672 (N.D. Cal. Jan. 17, 2008),
    *aff'd*, 319 F. App'x 916 (Fed. Cir. 2009) ....................................................................10, 12

*Crown Packaging Technology, Inc. v. Rexam Beverage Can Co.*,
    679 F. Supp. 2d 512 (D. Del. 2010).....................................................................7, 15, 16

*Enel Co. v. Schaefer*,
    No. 12-CV-1369-IEG(WMC), 2013 WL 5727421 (S.D. Cal. Oct. 22, 2013) ..................7

*Hall v. Aqua Queen Manufacturing, Inc.*,
    93 F.3d 1548 (Fed. Cir. 1996)...............................................................................7, 17, 18

*I/P Engine, Inc. v. AOL Inc.*,
    915 F. Supp. 2d 736 (E.D. Va. 2012) ........................................................................16, 17

*Lake Caryonah Improvement Ass'n v. Pulte Home Corp.*,
    903 F.2d 505 (7th Cir. 1990) ...............................................................................................6

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986)............................................................................................................5, 6

*Odetics, Inc. v. Storage Technology Corp.*,
    919 F. Supp. 911 (E.D. Va. 1996) .....................................................................................18

*Pearson v. Central Ill. Light Co.*,
210 F.2d 352 (7th Cir. 1954) ........................................................................................16

*Podobnik v. U.S. Postal Service*,
409 F.3d 584 (3d Cir. 2005).............................................................................................6

*R2 Medical Systems, Inc. v. Katecho, Inc.*,
931 F. Supp. 1397 (N.D. Ill. 1996) .................................................................................7

*Raber v. Pittway Corp.*,
No. C 92-2581 FMS, 1994 WL 374542 (N.D. Cal. July 11, 1994)..................................20

*St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.*,
No. 09-354-LPS, 2013 WL 3367319 (D. Del. July 2, 2013) ............................................7

*Wanlass v. General Electric Co.*,
148 F.3d 1334 (Fed. Cir. 1998)..........................................................................8, 11, 19

## <u>STATUTES AND REGULATIONS</u>

Fed. R. Civ. P. 56(a) .........................................................................................................5

## I.      NATURE AND STAGE OF PROCEEDINGS

On March 7, 2012, plaintiff Pi-Net International, Inc. ("Plaintiff" or "Pi-Net") filed a

patent infringement complaint against JPMorgan Chase & Co. ("Defendant" or "JPMC") based

on U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"), and 8,108,492

("the '492 patent") (collectively, the "patents-in-suit").  Fact and expert discovery have closed,

and the Court will hold a *Markman* and case dispositive motion hearing on March 6, 2014.  (D.I.

95)  Trial is scheduled to begin on June 2, 2014.  (*Id.*)

## II.     SUMMARY OF ARGUMENT

1.  The equitable doctrine of laches bars any pre-suit damages for infringement of the

'500 patent because Pi-Net unreasonably and inexcusably delayed its suit for at least eight years

after it knew or should have known of JPMC's allegedly infringing online banking

instrumentalities.  Pi-Net did not assert infringement of the '500 patent until March 7, 2012,

which was more than 12 years after the '500 patent was issued, more than 11 years after the date

Pi-Net contends that JPMC began offering the allegedly infringing systems to its customers

(which would be used to perform more than ▮▮▮▮▮▮ transactions in 2006 alone), and more

than 10 years after JPMC began an extensive, ▮▮▮▮▮ dollar marketing campaign to

promote the very online instrumentalities that Pi-Net later accused of infringement.  Moreover,

Dr. Lakshmi Arunachalam, the sole owner of Pi-Net and sole named inventor of the '500 patent,

has been a customer of JPMC's (and/or its predecessors-in-interest) since ▮▮.  Pi-Net cannot

credibly contend that Dr. Arunachalam—as a JPMC customer who has repeatedly stated that her

patents cover essentially all internet commerce—did not know or should not have known of the

alleged infringement for more than six years prior to the date that this suit was filed.  That is

particularly true given that the precise information that Pi-Net cited as a basis for its Complaint in March 2012 had been publicly available since before March 2006 through JPMC's websites.

2.   Under these circumstances, laches is presumed to bar any recovery by Pi-Net for any alleged acts of pre-suit infringement of the '500 patent.  *See A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).  Pi-Net can offer no reasonable excuse for delaying its suit against JPMC.  As a result of this unreasonable and inexcusable delay, JPMC has suffered both evidentiary prejudice (through the loss of witnesses, documents, and other business records) and economic prejudice (through JPMC's significant outlays and investments in expanding its product offerings in the field of the '500 patent).  Accordingly, JPMC respectfully submits that the Court should grant summary judgment of laches for the '500 patent and bar any recovery for pre-suit damages.

## III.   STATEMENT OF FACTS

### A.   The '500 Patent

The '500 patent issued on November 16, 1999, almost thirteen years before Pi-Net first alleged infringement by JPMC.  The '500 patent is entitled "Value-Added Network System for Enabling Real-Time, By-Directional [*sic*] Transactions on a Network," and relates to a method and apparatus for providing a "real-time," two-way electronic transaction over a network.  Pi-Net has characterized the '500 patent as relating "broadly to conducting online transactions via web applications."  (Ex. AF 49; *see also* D.I. 1 at ¶ 2 (noting that the '500 patent "disclose[s] the fundamental technology underlying Web commerce by use of Web applications . . . [in] online banking and other financial services"))  Dr. Lakshmi Arunachalam is the sole named inventor of the '500 patent, and Pi-Net is its sole assignee.  Pi-Net asserts infringement of claims 1-6, 10-12, 14-16, and 35 of the '500 patent.

### B.      The Parties

Pi-Net is a California corporation with its principal place of business ███████████ ██████████████, in Menlo Park, California.  (D.I. 1 ¶ 1; Ex. DBC at 7:23-7:25)  Dr. Arunachalam is the owner and Chief Executive Officer of Pi-Net.  (Ex. DBB. at 68:22-69:7)  Dr. Arunachalam has been a JPMC customer since ████, and has maintained multiple accounts at JPMC for years.  (Ex. DAB; Ex. DBD at 69:11-72:13)  Dr. Arunachalam first became an online banking customer at JPMC in ████.  (Ex. DAB)

In its Complaint, Pi-Net correctly notes that JPMC is a leading global financial services firm and one of the largest banking institutions in the U.S.   JPMC provides financial services for consumers and small businesses, commercial banking, financial transaction processing, asset management and private equity.  (D.I. 1, ¶ 3)  JPMC is "built on the foundation of more than 1,000 predecessor institutions that have come together over the years to form today's company." (Ex. DAC at JPM0201562)  Of particular relevance to the present motion are two mergers from the early 2000s: (1) the merger of the Chase Manhattan Corporation—then the largest bank-holding company in the U.S.—with JP Morgan & Co., Inc., to form JPMorgan Chase & Co. in 2000; and (2) the merger of JPMorgan Chase & Co. with BankOne Corp. in 2004 to form JPMC, which at the time was the second-largest bank in the U.S.  (*Id.* at JPM0201580; Ex. AF at 8)  At the time of merger of JPMorgan Chase & Co. with BankOne, both financial institutions were offering online, web-based services to their customers through www.chase.com and www.bankone.com, respectively.  (*See, e.g.*, Ex. DAE; Ex. DAF)

### C.      Accused Products

Pi-Net accuses six online banking instrumentalities of infringing the '500 patent: Account Transfers, Payments, Customer Center, Account Activity (Business Card), Wire Transfers, and Chase Mobile Application, QuickPay[sm] ("Mobile QuickPay") (collectively, "Accused

Instrumentalities").[1]  With the exception of Mobile QuickPay, all of the Accused

Instrumentalities are accessible to JPMC's customers through the website www.chase.com.

When Pi-Net first filed suit against these products, Pi-Net cited several screenshots from JPMC's

website and argued that they embodied the "inventions of the patents-in-suit."  (D.I. 1 at 4-6)

      Account Transfers allows JPMC customers to electronically transfer monies between

various bank accounts; Payments allows JPMC customers to electronically pay various bills,

such as cable, phone, or electric bills; Wire Transfers allows for electronic scheduling of

domestic or international money transfer via wire; and Mobile QuickPay allows for individuals

who have downloaded a mobile application to their phone to transfer money to other individuals.

(Ex. AM at 11-12; Ex. AF at 18-19)  Customer Center is an online clearinghouse of hyperlinks

assembled for each individual JPMC online banking customer that allows access to a variety of

JPMC online services, while Account Activity (Business Card) allows certain JPMC customers

to check and track their account balances, payments, and credits.  (*See id.*)  Pi-Net contends that

JPMC (through its predecessor-in-interest, BankOne) first infringed the '500 patent by offering at

least one of the Accused Instrumentalities on its website in the latter half of 2001.  (Ex. AF at ¶

50)  With the exception of Mobile QuickPay, which was launched in August 2009, all of the

Accused Instrumentalities were available to the public through JPMC's website prior to March

2006.  (*See* Ex. AM, Schedules 3.0-8.0)  Pi-Net contends that the "basic structure used in

[JPMC's] accused instrumentalities [including Mobile QuickPay] has been maintained since at

least 2002."  (Ex. AF at 6 n.5)

---

[1] *See* Ex. DAY at 1–2.  Pi-Net has attempted to expand the number of accused products beyond
those permitted in the Court's Order.  Even if Pi-Net is allowed to expand its infringement
allegations beyond those allowed in the Court's Order, the analysis for purposes of this motion is
the same, as discussed below.

At least as early as 2002, demonstrations of JPMC's online banking system (including screenshots of the user interfaces) were available to the public on the Internet.  (*See* Ex. DAG; Ex. DAH; Ex. DAI)  For more than a decade prior to this suit, JPMC and its predecessors undertook a prolific marketing campaign to promote and inform the public about their online banking systems generally—and about the Accused Instrumentalities specifically—across several different mediums, including print, online, and direct mailing.  (Ex. DAJ at JPM0201656–657; Ex. DAK at JPM0201885–922)  Indeed, in 2004 alone JPMC and BankOne spent an estimated ▮▮▮▮▮▮ advertising their online banking systems.  (Ex. DAL at JPM0201707–721)  By the end of 2006, JPMC had 5.7 million online banking customers, up from 3.4 million such customers at the end of 2004.  (Ex. DAM at 40) ▮▮▮▮▮ of transactions were performed each year by these online customers.  In 2006, at least ▮▮▮▮▮▮ accused transactions were performed, and from 2007 until August 2013, at least ▮▮▮▮▮▮ transactions were performed using the Accused Instrumentalities.  (Ex. AM, Schedules 1.0 and 1.1)

## IV.  THE APPLICABLE LAW

### A.  Law Governing Summary Judgment

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986).  However, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment"; only genuine factual disputes based on evidence in the record will preclude summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) (holding that the movant's burden can be "discharged by 'showing' . . . that there

5

is an absence of evidence to support the nonmoving party's case").  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita*, 475 U.S. at 586–87; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (holding that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

**B.      Legal Standard For Determining Whether Laches Bars A Claim**

"Laches is . . . an equitable defense to a claim for patent infringement."  *A.C. Aukerman Co.*, 960 F.2d at 1028.  The defense "focuses on the dilatory conduct of the patentee and the prejudice which the patentee's delay has caused."  *Id.* at 1031–32; *see also Lake Caryonah Improvement Ass'n v. Pulte Home Corp.*, 903 F.2d 505, 509 (7th Cir. 1990) ("[C]ourts are reluctant to come to the aid of a party who has knowingly slept on his rights under circumstances where he might have earlier asserted such rights in the exercise of due diligence.").  In order for laches to apply, the alleged infringer must prove two elements by a preponderance of the evidence: (i) the patentee's delay in asserting the infringement claim was unreasonable and inexcusable, and (ii) the alleged infringer suffered material prejudice attributable to the delay.  *See A.C. Aukerman Co.*, 960 F.2d at 1028, 1045.  A successful laches defense bars any recovery for damages prior to the filing of a complaint asserting infringement of the product-at-issue.  *See id.* at 1039–41.

A presumption of laches arises where the patentee delays in asserting an infringement claim for more than six years after the date that it knew or should have known of the allegedly infringing activity.  *See id.* at 1028.  If new products accused of infringement are introduced, or if changes to the accused products are made, the period of delay continues for those new

6

products if they are "the same or similar" to the prior products.  *See St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*, No. 09-354-LPS, 2013 WL 3367319, at *2 (D. Del. July 2, 2013) (citations omitted).  Similarly, activities of a predecessor-in-interest are "tacked" onto those of a newly formed corporate entity when calculating delay for laches purposes.  *See R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1412–13 (N.D. Ill. 1996) ("[A] defendant that is the transferee of an entire business or its assets may rely upon the patentee's delay in suing the transferor."); *Enel Co. v. Schaefer*, No. 12-CV-1369-IEG(WMC), 2013 WL 5727421, at *7 (S.D. Cal. Oct. 22, 2013) (granting summary of laches and permitting tacking of predecessor's activity where there was a "substantial change of ownership").

If the presumption applies, then the patentee bears the burden of presenting evidence to create a "genuine dispute" as to either the reasonableness of delay or the alleged prejudice.  *See A.C. Aukerman Co.*, 960 F.2d at 1037–38; *Crown Packaging Tech., Inc. v. Rexam Beverage Can Co.*, 679 F. Supp. 2d 512, 521 (D. Del. 2010).  Unless the patentee satisfies this burden of production, a defendant can "remain 'utterly mute' on the issue of prejudice and nonetheless prevail."  *Id.* at 526, n.75 (citing *Hall v. Aqua Queen Mfg.*, 93 F.3d 1548, 1553 (Fed. Cir. 1996)). Material prejudice to an alleged infringer may be evidentiary or economic.  Evidentiary prejudice "may arise by reason of a defendant's inability to present a full and fair defense on the merits due to loss of records, the death of a witness, or the unreliability of memories of long past events, thereby undermining the court's ability to judge the facts."  *A.C. Aukerman Co.*, 960 F.2d at 1033.  In contrast, economic prejudice may arise when a defendant "will suffer the loss of monetary investments or incur damages which likely would have been prevented by earlier suit," based upon a "*change* in the economic position of the alleged infringer during the period of delay."  *Id.*

## V.   LACHES BARS PRE-SUIT INFRINGEMENT CLAIMS FOR THE '500 PATENT

### A.   Pi-Net's Unreasonable And Inexcusable Delay

#### 1.   Presumption of Laches Applies to '500 Patent.

In this case, the record is replete with evidence that Pi-Net knew or should have known of the alleged infringement of the '500 patent for more than six years prior to the time that it brought suit (i.e., prior to March 7, 2006), including: (1) the open and pervasive public use of the accused products by ███ of customers before 2006; (2) JPMC's extensive advertising of the accused products; (3) the long-standing relationship of Pi-Net's CEO as a JPMC customer; and (4) the extensively broad view that Pi-Net has taken of the scope of the patents-in-suit.

##### (a)   JPMC's Open & Pervasive Use of the Accused Products.

As noted above, Dr. Arunachalam has been a customer of JPMC and its predecessors-in-interest for ████████████, and has specifically been a JPMC online banking customer since ███. This motion thus presents the rare circumstance in which the patentee was a direct consumer of the allegedly infringing products and services. As a long-time customer of JPMC's, no one was in a better position to evaluate whether JPMC's activities fell within the scope of the '500 patent's claims. *See, e.g.*, *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1339 (Fed. Cir. 1998) (noting that "[a]llocating the burden to patentees to seek out infringers is proper . . . because compared to potential infringers, they are in the best position to know the scope of their patent protection and, therefore, also to know likely places to find infringement"). As demonstrated by the screenshots included in the Complaint (*see* D.I. 1), to find evidence of the alleged acts of infringement, Dr. Arunachalam need only have logged onto her own bank's website at some point after ███. Under the established law, the duty to undertake this investigation started the laches clock, and conferred constructive knowledge of alleged infringement. *See id.* at 1337-38.

8

Dr. Arunachalam was far from alone—more than 5.7 million others had become online banking customers at Chase by the end of 2006, and performed more than ▮▮▮▮▮ transactions using the Accused Instrumentalities in the year 2006 alone.  (Ex. DAM at 40; Ex. AM, Schedule 1.1)  Over the course of the more than 6 years of delay, more than ▮▮▮▮▮ accused transactions were performed.  (Ex. AM, Schedule 1.0)  Since before March 2006, the Accused Instrumentalities have been available to millions of JPMC customers (like Dr. Arunachalam) 24 hours a day, 7 days a week, through publicly available websites, as exemplified by the screenshot below from November 27, 2005 (highlighting the Account Activity and Account Transfers Accused Instrumentalities by name):



(Ex. DAN)  During the laches period, BankOne and Chase also provided "demos" of their online banking systems that displayed "the actual screens" from the user interface of online services,

(Ex. DAG), including at least Account Transfers (Ex. DAH), Payments (Ex. DAI), and Account

Activity (*id.*).  The extensively pervasive use of the allegedly infringing products weighs

strongly in favor of finding that the patentee had constructive notice of the allegedly infringing

activity.  *See, e.g.*, *Comcast Cable Commc'ns Corp. v. Finisar Corp.*, No. C 06-04206 WHA,

2008 WL 170672 at *4-5 (N.D. Cal. Jan. 17, 2008) (finding that 515,000 customers for accused

digital television systems meant that those systems were "well known").

(b)      <b>JPMC's Advertising & Promotion of the Accused Products.</b>

JPMC and its predecessors heavily advertised their online banking systems through print,

online, and direct mailing. (Ex. DAK at JPM0201885–922.)  Beginning in January 2002,

BankOne launched an aggressive direct mail campaign, promoting several features of BankOne's

online banking systems, which would allow customers to: "View activity and current balances[;]

Download transaction history[; and] Transfer funds between accounts," as shown below:



(Ex. DAO at JPM0201996; *see also* Ex. DAD at JPM0201981)  From July to September 2002,

BankOne spent nearly ▮▮▮▮▮ advertising the Payments Accused Instrumentality alone.  (Ex.

DAP)  This advertising spending skyrocketed in 2004, with BankOne "dominat[ing]" other

banks in the online advertising space for its website.  In fact, BankOne spent at least ████

advertising its online banking instrumentalities in 2004 alone, while Chase spent ████ on

such expenditures that same year. (Ex. DAL at JPM0201707–721)

     Defendant's pervasive and multifaceted advertising activity triggered a duty on Pi-Net to

investigate Defendant's Accused Instrumentalities.  *See, e.g.*, *Wanlass*, 148 F.3d at 1338

("[S]ales, marketing, publication, or public use of a product similar to or embodying technology

similar to or embodying technology similar to the patented invention, or published descriptions

of the defendant's potentially infringing activities, give rise to a duty to investigate whether there

is infringement.").  Even if Pi-Net failed to investigate, and thus argues that it lacked actual

knowledge of the Accused Instrumentalities prior to 2006, JPMC's extensive advertising

campaign (including advertising on its website) undisputedly imparts constructive knowledge to

Pi-Net and starts the laches clock.  *See Avocet Sports Tech. Inc. v. Polar Electro Inc.*, No. C-12-

02234 EDL, 2013 WL 1729668, at *4 (N.D. Cal. Apr. 16, 2013) (granting summary judgment of

laches where the defendant had been openly marketing and selling the accused products by

advertising them on its "website as early as August 2004," and concluding that this constituted

"at a minimum, . . . constructive notice of allegedly infringing activity as of August 2004").

    (c)    **Pi-Net's Broad View of the Scope of the '500 Patent Establishes Constructive Notice of Infringement As of March 2006.**

     Pi-Net's CEO, Dr. Arunachalam, has consistently and repeatedly expressed the view that

the '500 patent confers substantially broad rights that essentially preempt any commercially

viable embodiments of internet commerce:

- As of November 2005, Pi-Net's view was that its patents, including the '500 patent "████████████████████"  (Ex. DAQ)

- As of January 2006, Pi-Net's view was that its ██████████████████ ████████████████████████ █████████████████████████████████ " (Ex. DAR at WXC000171893)

- In January 2006, Pi-Net's contemplated a "████████████████████████ ████████████████████████████████████████████████████████ " (Ex. DAR at WXC000171894-895 (emphasis added))

- As of February 2006, Pi-Net's view was that ████████████████████ ███████████████████████████████████████ " (Ex. DAS at WXC000062538)

- By virtue of the '500 patent, Pi-Net's view was that it ████████████████ █████████████████████████████████████████████████████ " (Ex. DAT at WXC000459049–052; Ex. DBB at 321–24)

- Dr. Arunachalam's view is that she is "████████████████████████████ ████████████████████████████████████████████ " (Ex. DAU at WXC000452831)

Pi-Net's "expansive view" of the '500 patent further establishes that, notwithstanding Dr. Arunachalam's direct relationship with JPMC (the second largest bank in America) and direct knowledge of its banking services, Pi-Net should have known of the potential infringement of the Accused Instrumentalities.  *Comcast*, 2008 WL 170672, at \*5–6 (granting summary judgment of laches and holding that defendant's "open and notorious [activity] combined with [plaintiff's] *own expansive view of the scope of its patent rights* indicates that [plaintiff] was well on notice of its rights . . . at least six years [prior]" (emphasis added)).  In *Comcast*, the patentee's CEO testified that "there was no practical non-infringing way to avoid the patent [asserted in that case]."  *Id.* at \*4.  That is precisely the position that Pi-Net has taken here—that no bank of JPMC's size is capable of providing commercially viable online banking services without infringing the patents-in-suit.  (*See* Ex. AF at ¶ 92; Ex. AE at 2, 5)  Given Pi-Net's long-standing views that web-based transactions involving the "Internet Cloud" or the "ramp to the Internet Cloud" cannot be performed without infringing the '500 patent, Pi-Net cannot now argue that it

should not have been aware of the ███ of web-based transactions being performed by millions of JPMC customers prior to March 2006.

>  **2.     Pi-Net Has No Evidence That Delay Was Reasonable or Excusable.**
>
>  **(a)     Given the Evidence That Prompted Pi-Net to File Suit, There Can Be No Dispute That Pi-Net's Delay Was Unreasonable.**

Pi-Net will likely contend that, while it may be charged with actual or constructive notice of the existence of Defendant's Accused Instrumentalities, it was not aware (and could not have discovered) that those Accused Instrumentalities may infringe the '500 patent because it was not able to inspect JPMC's middleware or back-end systems that underlie the Accused Instrumentalities.  This argument must fail for two reasons.

First, the record demonstrates that precisely the same information relied upon by Pi-Net as part of its initial infringement case—and that relied on by its technical expert *after fact discovery*—was publicly available prior to March 2006.  In its Complaint, Pi-Net noted that "JPM's online-banking and other Web financial transactional features are exemplified, in part, by the following screenshot of the JPM opening screen which displays the point-of-service applications of the inventions of the ['500 patent]" (shown below).  Pi-Net's infringement expert, Dr. Michael Bardash, based his infringement analysis primarily on publicly available screenshots of the user interface, reproducing no less than *thirty-seven* different screenshots from the www.chase.com website in what he described as "Illustrations of the Accused Instrumentalities In Actual Application."  (*See* Ex. AA at 65–93, 101–103, 109)  Many of these screenshots are then reproduced in the claim charts that Dr. Bardash includes with his report.  (*See* Ex. AA, Appx. J and K)  Among those screenshots is the same basic image that was included in Pi-Net's complaint (*cf.* Ex. AA at 66-67):

13



(D.I. 1 at ¶ 10)   However, JPMC had a *nearly identical* website interface in April of 2004:



(Ex. DAE)

Having relied primarily on these screenshots—which represent information that has been publicly accessible and available to all (including Pi-Net) since before March 2006—as the basis for this lawsuit, Pi-Net should now not be permitted to argue that the very same publicly available information was nonetheless inadequate to constitute sufficient notice of the allegedly infringing activity.  This is particularly true because in this case, Pi-Net's experts have taken the view that "[a] review of [JPMC] source code [relating to the Accused Instrumentalities] would not have been particularly helpful, and *was not necessary*."  (Ex. AC at 4 (emphasis added); Ex. AN at 185)  Indeed, this is the first time that Pi-Net's technical expert, who has previously served as an expert in multiple patent cases, has not relied on a review of source code as part of his infringement analysis. (Ex. AN at 186)

Under similar circumstances, this Court has previously granted a motion for summary judgment of laches.  *See Crown Packaging*, 679 F. Supp. 2d at 520-21.  In *Crown Packaging*, defendant asserted a counterclaim for infringement of a patent covering a method for processing a beverage can prior to its assembly.  *Id.* at 517.  Opposing plaintiff's laches motion, defendant argued that it did not learn of plaintiff's infringement until discovery and could not have learned earlier without access to plaintiff's documents, information, and equipment.  *Id.* at 524.  In rejecting this argument and holding that the presumption applied, this Court recognized that experts had testified that visual inspection of the can was sufficient, and that defendant's "allegations of infringement . . . are themselves based on visual inspection and examination of [plaintiff's] cans."  *Id.* at 523–25 (footnote omitted).  As in *Crown Packaging*, Pi-Net's expert relied on a "visual inspection" of the user interface and Pi-Net's allegations of infringement were based on screenshots.  (D.I. 1 at ¶¶ 10-11, 13; Ex. DAV at 14–17, 20–30, 31–34; Ex. AA at 65–

93, 101–103, 109)  Accordingly, any argument that Pi-Net's delay in asserting infringement was reasonable based upon the nature of the Accused Instrumentalities should be rejected.

Second, as courts have long recognized, it is not necessary for Pi-Net to have known, to an absolute certainty, how the Accused Instrumentalities worked before it is charged with constructive knowledge of the allegedly infringing acts.  *See, e.g.*, *Pearson v. Central Ill. Light Co.*, 210 F.2d 352, 356–57 (7th Cir. 1954) (even if a patentee is unsure of potential infringement, the patentee has a duty to promptly investigate and determine if infringement existed); *I/P Engine, Inc. v. AOL Inc.*, 915 F. Supp. 2d 736, 745 (E.D. Va. 2012) ("[T]he Federal Circuit does not require that perfect or exacting information being made public of a possibly infringing technology to place a patentee on notice.").  Indeed, as this Court more recently recognized, it "is enough that the plaintiff has or should have 'more than a mere suspicion but less than absolute assurance of [the] alleged infringement in order to activate the laches clock.'"  *Crown Packaging*, 679 F. Supp. 2d at 520 (citation omitted).  To that end, "[i]f a patentee knows of the existence of a product or device that (i) embodies technology similar to that for which [she] holds a patent a patent and (ii) uses that similar technology to accomplish a similar objective, [she] has a duty to examine the product or device more closely to ascertain whether it infringes [her] patent." *Id.* at 520 n.42.

There can be no dispute that it was evident from the publicly available marketing materials, and from the www.chase.com website itself, that JPMC was employing technology "similar to that" of the '500 patent.  Thus, although Pi-Net is likely to highlight that its expert also relied upon deposition testimony or other documents that were not publicly available prior to March of 2006, it need not have had these documents prior to bringing suit; indeed, when Pi-Net did file suit in March of 2012, the only information available for its infringement analysis

16

was publicly available materials like the screenshots that have been available for more than a decade.  *See, e.g.*, *I/P Engine*, 915 F. Supp. 2d at 745 (finding that descriptions of allegedly infringing products in a "blog" post from the defendant confers constructive knowledge of alleged infringement on patentee "even if . . . [that post] is technically inaccurate, [because] it still serves as the kind of marketing document the [Federal Circuit] cited as putting a patentee on notice of possible infringement").

**(b)      Pi-Net Has No Excuse For Its Delay.**

JPMC suspects that Pi-Net will argue that it faced "cash constraints" that excuse its delay in filing suit.  This argument should be rejected for several reasons.  First, "poverty, by itself, is never an excuse for laches purposes."  *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1554 (Fed. Cir. 1996).  Second, although JPMC has repeatedly requested the only documents that Dr. Arunachalam indicated would provide any indication of the financial health of Pi-Net (*i.e.*, its tax returns), Pi-Net refused to produce them.  (Ex. DBG)  Third, Pi-Net's principal filed multiple suits for patent infringement in this Court *four years* prior to the filing of the Complaint against JPMC.  (*See WebXchange Inc. v. Allstate Corporation*, No. 1:08-cv-00131 (D. Del. filed Mar. 5, 2008); *WebXchange Inc. v. Dell Inc.*, No. 1:08-cv-00132 (D. Del. filed Mar. 5, 2008); *WebXchange Inc. v. FedEx Corporation*, No. No. 1:08-cv-00133 (D. Del. filed Mar. 5, 2008))  Fourth, Dr. Arunachalam has testified under oath that she has extensive assets, including ██

███████████████████████████████████████████████████████

████████████████"  (Ex. DBD at 65-66)  Given its failure to produce any evidence of Pi-Net's financial condition, multiple prior patent suits filed during the laches period, and personal wealth of Pi-Net's CEO, any alleged poverty cannot excuse Pi-Net's failure to file suit against JPMC prior to March 2006.

17

**B.    Pi-Net's Delay Has Resulted In Prejudice To JPMC.**

Because the presumption of laches applies to Pi-Net's claim of infringement for the '500

patent, the burden is on Pi-Net to produce evidence that Defendant *has not* suffered evidentiary

or economic prejudice.  See *Aukerman*, 960 F.2d at 1037–39.  Indeed, JPMC can remain "*utterly*

*mute* on the issue of prejudice" and still succeed on its laches defense.  *Hall*, 93 F.3d at 1554.  Pi-

Net is unable to meet that burden as a matter of law, because Defendant has indisputably

suffered both evidentiary and economic prejudice due to Pi-Net's delay.

**1.    JPMC Has Suffered Evidentiary Prejudice Due to Pi-Net's Delay.**

As a result of Pi-Net's decade-long delay in asserting infringement against JPMC,

Defendant's ability to present its defenses has been impaired.  For instance, although JPMC was

able to find substantial evidence of invalidity in the form of patents and other publicly available

materials, it has been able to locate only a limited number of documents with respect to the

electronic banking systems that JPMC was utilizing prior to at least 2002, including Chase PC

Banking, Chase Home Banking Pilot, Spectrum, First Window 2000, Bank One's Channel 2000,

and Chemical Bank's PRONTO.  (Ex. DAW at ¶¶ 2-3)  While JPMC has been able to locate

certain information relating to each of these systems, it no longer has the source code,

architecture documents, or other technical documents that JPMC believes would further

corroborate JPMC's invalidity defenses.  (*Id.* at ¶ 4)  In addition, many of those involved in the

design of these early systems have died or are no longer are employed by JPMC—and the

memories of those who remain with JPMC have faded.  (*Id.* at ¶¶ 5-7)  These lost documents and

witnesses prejudice JPMC in its defense of this case.  *See, e.g.*, *Altech Controls Corp. v. E.I.L.*

*Instruments, Inc.*, 33 F. Supp. 2d 546, 553 (S.D. Tex. 1998) (noting that because memories

regarding key events had faded, and "numerous documents have been lost or destroyed" during

the period of delay, that alleged infringer suffered evidentiary prejudice); *Odetics, Inc. v. Storage*

18

*Tech. Corp.*, 919 F. Supp. 911, 922 (E.D. Va. 1996) (noting that documents related to potential defenses "have been lost or destroyed as a consequence of the [patentee's] delay" and determining that alleged infringer suffered evidentiary prejudice as a result); *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) (affirming that evidentiary prejudice may arise "as a result of unavailable or deceased witnesses"). Pi-Net thus cannot offer proof that JPMC suffered no evidentiary prejudice.

### 2.    JPMC Has Suffered Economic Prejudice Due to Pi-Net's Delay.

Although suffering the evidentiary deficiencies described above would alone be sufficient to establish prejudice, JPMC has also suffered economic prejudice.  Economic prejudice is shown either by evidence of loss of investment expenditures or increasing sales of a later-accused product which might have been prevented by an earlier suit.  *See ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 828 F. Supp. 1386, 1394 (E.D. Wis. 1993), *aff'd*, 52 F.3d 1062 (Fed. Cir. 1995).  The key to economic prejudice is "whether there is a nexus between the delay and the infringer's decision to expand the infringing activity, not the form or number of forms the expansion takes." *Id*. at 1395.  There is a direct nexus between Pi-Net's failure to asset infringement of the '500 patent  and JPMC's expansion of the Accused Instrumentalities.

JPMC hired personnel, invested years of time, and spent ▓▓▓ of dollars implementing the Accused Instrumentalities since the 2004 merger of BankOne with JPMC.  Just since 2006, JPMC's Corporate Internet Group has invested over ▓▓▓ in developing, implementing, and upgrading www.chase.com and Mobile QuickPay.  (Ex. DBE)  In addition, JPMC greatly expanded usage of the Accused Instrumentalities during the period of delay.  (Ex. AM, Schedules 3.0-8.0)  Under similar circumstances, courts have dismissed infringement claims at the summary judgment stage.  *See, e.g.*, *Raber v. Pittway Corp.*, No. C 92-2581 FMS, 1994 WL 374542, at *4 (N.D. Cal. July 11, 1994) (finding economic prejudice sufficient to warrant

summary judgment on laches where delay allowed accused infringer to make significant outlays for equipment and "steadily increas[e] sales for the allegedly infringing product"); *A.C. Aukerman*, 960 F.2d at 1033 ("Patentee may [not] intentionally lie silently in wait watching damages escalate. . . ."). Pi-Net thus cannot meet its burden of producing evidence of no economic prejudice.

## VI.     CONCLUSION

Despite the open, notorious, and widespread use of the Accused Instrumentalities to perform ▮▮▮ of transactions, the extensive advertising and marketing campaigns undertaken by JPMC (one of the largest financial institutions in the world), Pi-Net's own knowledge of JPMC's Accused Instrumentalities through its direct customer relationship with JPMC, and Pi-Net's own views regarding the breadth of the '500 patent, Pi-Net nonetheless delayed more than a decade after its alleged first date of infringement to file suit.  When Pi-Net did file suit, it did so based upon the publicly available versions of the www.chase.com website screenshots that had been available prior to March 2006—and Pi-Net can point to no additional information that it had in March 2012 that it lacked in March 2006.  Laches thus bars any recovery for alleged infringement of the '500 patent that pre-dates the filing of the Complaint, and JPMC respectfully requests that the Court dismiss all pre-suit claims for that patent.

20

DATED: January 29, 2014

Respectfully submitted,

/s/ *Robert S. Saunders*

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

21