## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO. | : | |
| | : | |
| Defendant. | : | |

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

### REDACTED VERSION
### FILED PUBLICLY
### FEBRUARY 5, 2014

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  January 29, 2014

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

PI-NET INTERNATIONAL INC.,

                    Plaintiff,

          v.                                    Civ. No. 1:12-cv-00282-RGA

JPMORGAN CHASE & CO.,

                    Defendant.

## DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
## FOR SUMMARY JUDGMENT OF NON-INFRINGEMENT

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iii

I.      NATURE OF PROCEEDINGS ................................................................................... 1

II.     SUMMARY OF ARGUMENT ................................................................................... 1

III.    STATEMENT OF FACTS ......................................................................................... 2

        A.      The Patents-in-Suit ......................................................................................... 2

        B.      The Accused Instrumentalities ....................................................................... 4

IV.     Applicable Law ......................................................................................................... 6

        A.      Legal Standard Governing Summary Judgment ............................................ 6

        B.      Legal Standards Governing Infringement ...................................................... 7

V.      PI-NET HAS NO EVIDENCE OF INFRINGEMENT UNDER THE DOCTRINE
        OF EQUIVALENTS ................................................................................................... 7

VI.     THERE IS NO EVIDENCE THAT JPMC PRACTICES THE "BACK-END"
        CLAIM ELEMENTS ................................................................................................. 8

        A.      All Asserted Claims Recite At Least One "Back-End" Limitation. ............... 8

        B.      Pi-Net Misconstrues The Claims As Limited To "Front-End" Components ......... 10

        C.      Pi-Net Has No Evidence That JPMC's Accused Instrumentalities Practice
                Any "Back-End" Limitations. ...................................................................... 12

                1.      Pi-Net Has Failed to Identify What It Contends Are the "Back-End
                        Transactional Applications." ........................................................... 12

                2.      Pi-Net Has Failed to Identify What Constitutes the Back-Office
                        Server Required By Claims 10 & 11 of the '492 Patent. ................ 14

                3.      Pi-Net Has No Evidence of "Real-Time" Back-End Performance
                        Required By At Least All Asserted Claims of the '158 and '492
                        Patents. ............................................................................................ 14

        D.      There Is No Genuine Dispute That The Accused Instrumentalities Do Not
                Connect to Back-End Systems "On Top Of" A Facilities Network. ............ 15

VII.   THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT JPMC'S
       ACCUSED INSTRUMENTALITIES DO NOT INFRINGE THE PATENTS-IN-
       SUIT UNDER JPMC'S PROPOSED CLAIM CONSTRUCTIONS. ...............................17

       A.     No Infringement Under JPMC's Construction Of "Real Time"............................17

       B.     No Infringement Under JPMC's Construction Of "Object Routing"....................18

CONCLUSION.........................................................................................................................20

# TABLE OF AUTHORITIES

**CASES**

**Page**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............................................................................................. 6

*Dawn Equipment Co. v. Kentucky Farms Inc.*,
140 F.3d 1009 (Fed. Cir. 1998) .......................................................................... 7

*Fujitsu Ltd. v. Netgear, Inc.*,
No. 07-cv-710-bbc, 2009 WL 3047616 (W.D. Wis. Sept. 18, 2009), *aff'd in part,*
*rev'd in part*, 620 F.3d 1321 (Fed. Cir. 2010) ..................................................... 13

*Garside v. Osco Drug, Inc.*,
895 F.2d 46 (1st Cir. 1990) ................................................................................. 7

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
482 F. Supp. 2d 1045 (N.D. Ind. 2007), *aff'd,*
260 F. App'x 297 (Fed. Cir. 2008) .................................................................... 8

*Invitrogen Corp. v. Clontech Laboratories, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005) .......................................................................... 14

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) ............................................................................................. 7

*Minnesota Mining & Manufacturing Co. v. Chemque, Inc.*,
303 F.3d 1294 (Fed. Cir. 2002) .......................................................................... 7

*Scott v. Harris*,
550 U.S. 372 (2007) ............................................................................................. 7

*Zoltek Corp. v. United States*,
442 F.3d 1345 (Fed. Cir. 2006) .......................................................................... 7

**RULES**

Federal Rule of Civil Procedure 56(a) ................................................................... 6

## I.      NATURE OF PROCEEDINGS

On March 7, 2012, plaintiff Pi-Net International, Inc. ("Plaintiff" or "Pi-Net")
filed a complaint for patent infringement against JPMorgan Chase & Co. ("Defendant" or
"JPMC") based on U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"),
and 8,108,492 ("the '492 patent") (collectively "the patents-in-suit").  Fact and expert discovery
have closed.  The parties completed *Markman* briefing on May 15, 2013 (D.I. 74), and the Court
will hold a *Markman* hearing on March 6, 2014.  (D.I. 95)  Defendant was granted leave to file
an early motion for summary judgment of indefiniteness, and the Court held oral argument on
that motion on November 25, 2013.  Trial is scheduled to begin on June 2, 2014.  (*Id.*)

## II.      SUMMARY OF ARGUMENT

Pi-Net has not put forth any evidence that JPMC infringes under the doctrine of
equivalents, so the only question is whether Pi-Net can satisfy its burden of proving literal
infringement.  The Court should grant summary judgment of literal non-infringement in JPMC's
favor for two separate and independent reasons: (1) regardless of what claim construction the
Court adopts, Pi-Net has no evidence that the "back-end" elements of JPMC's systems infringe
the patents-in-suit, or that connecting to such back-end systems occurs "on top" of a facilities
network; and (2) if the Court adopts certain claim constructions, then there can be no genuine
dispute that Pi-Net cannot prove that JPMC infringes any of the patents-in-suit.

***First***, Pi-Net has failed to provide any evidence—and is unable to provide any
evidence—that JPMC's accused systems practice the claim elements directed to the "back-end"
systems that "correspond" to the front-end systems, and/or those that are responsible for
"processing" transactions (e.g., transferring funds).  Pi-Net, its experts, and its counsel have
consistently and repeatedly asserted that the patents-in-suit are directed only to "front-end"
actions and architecture, and have limited their infringement case accordingly—but the plain

1

language of the claims undisputedly requires that JPMC perform certain steps utilizing "back-end" systems.  Because Pi-Net ignored any limitations that require particular "back-end" systems, or attempted to re-write claim language to shift explicit "back-end" limitations to the "front-end," Pi-Net's evidence of infringement is fatally deficient.  Moreover, even if Pi-Net had evidence that JPMC has the required "back-end" systems, there is no dispute that JPMC's web servers do not connect to such systems "on top" of a facilities network, as claims 1-8 of the '492 patent require.

**_Second_**, if the following claim constructions are adopted, then Pi-Net cannot establish infringement of those elements:

| Term | JPMC Proposed Construction | Claims |
|---|---|---|
| "real time" | "in a non-deferred manner, without assembling, disassembling, formatting, or reformatting the transaction information" | All asserted claims |
| "object routing" | "transmitting data on a network using the TransWeb$^{TM}$ Management Protocol in which a unique IP address is hierarchically assigned to each network object, *e.g.*, including each bank account" | Sole asserted claim of the '158 patent |

Given these critical deficiencies in Pi-Net's infringement case, no reasonable jury could return a verdict in Pi-Net's favor, and summary judgment is therefore warranted.

## III.    STATEMENT OF FACTS

### A.    The Patents-in-Suit

Pi-Net accuses JPMC of infringing claims 1-6, 10-12, 14-16, and 35 of the '500 Patent; claim 4 of the '158 Patent; and claims 1-8 and 10-11 of the '492 Patent (collectively, the "asserted claims").  The asserted claims of the '492 and '500 patents generally relate to systems and methods for performing "real-time" transactions over the World Wide Web (the "Web").  Claim 1 of the '492 patent is representative of the system claims, and requires:

> a Web server, including a processor and a memory, for offering one or more Web applications as respective point-of-service applications [POSvc applications] in a point-of-service application list on a Web page;

each Web application of the one or more Web applications for requesting a real-time Web transaction;

a value-added network (VAN) switch running on top of a facilities network selected from a group consisting of the World Wide Web, the Internet and an e-mail network, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;

a service network running on top of the facilities network for connecting through the Web server to a back-end transactional application; and

a computer system executing the Back-end transactional application for processing the transaction request in real-time.

(Ex. C at 9:50-67)[1]  According to Pi-Net, the patents-in-suit generally claim a system and method for online transactions, wherein a user takes an action at the "front-end" that causes data to be routed through a system and used as a basis to execute a transaction at the "back-end," thereby completing a non-deferred (or "real time") transaction.  (D.I. 74 at 71 ("So, for every Web transaction, there is a front-end of the transactional application, and there is a back-end that corresponds to that front-end POSvc Application."); *id.* at 83 ("The transactional application also has a back-end in the 'Bank Back Office,' *where the user-specified transactions are executed.*" (emphasis added))[2]  In other words, under Pi-Net's interpretation of the asserted claims, a Web browser transmits data to a "Web server," which relays that data to a "Value Added Network (VAN) switch," which relays the data to back-end software called a "transactional application," which then finally processes the requested transaction by accessing various back-end systems.

The sole asserted claim of the '158 patent (claim 4) requires the "real-time"

---

[1]  The patents-in-suit are cited as Exs. A through C, respectively, to D.I. 75.

[2]  As set forth in the parties' Joint *Markman* Brief, "Plaintiff Pi-Net contends that the terms 'Web Application[s]' and 'Network Application' are synonymous with 'Point of Service Application,' with the term 'network application' being used in the '500 Patent, and 'Web application' and 'POSvc Application' being used in the '158 and '492 Patents."  (D.I. 74 at 43)  Defendant has separately argued that certain of these terms are indefinite (*Id.* at 63-88), but assumes for purposes of this motion that the Court adopts Pi-Net's constructions.

transfer of funds from a checking account to a savings account using "object routing":

> [a] method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising:
>
> providing a Web page for display on a computer system coupled to an input device;
>
> providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;
>
> accepting a first signal from the Web user input device to select the point-of-service application;
>
> accepting subsequent signals from the Web user input device; and
>
> *transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred*, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals. . . .
>
> wherein object routing is used to complete the transfer of funds in a Web application.

(Ex. B at 9:41-10:15, 10:21-22 (emphasis added))  The required, "real-time" transfer of funds must occur on the "back-end" of the banking system.  (Ex. AN at 157:17-22)

**B.     The Accused Instrumentalities**

Pi-Net accuses six online banking instrumentalities of infringing the '500 patent and the '492 patent: Account Transfers, Payments, Customer Center, Account Activity (Business Card), Wire Transfers, and Chase Mobile Application, QuickPay[sm] ("Mobile QuickPay") (collectively, the "Accused Instrumentalities").[3]  Only the Account Transfers Instrumentality is accused of infringing the '158 patent.  (*See, e.g.*, Ex. AA, Appx. K)  With the exception of

---

[3]     *See* Ex. DAY at 1–2.  Pi-Net has attempted to expand the number of accused products beyond those permitted in the Court's Order.  Regardless of what instrumentalities Pi-Net ultimately is permitted to pursue infringement against, the analysis for purposes of this motion is the same, as discussed below.

Mobile QuickPay, all of the Accused Instrumentalities are accessible to JPMC's customers through the website www.chase.com.  Generally speaking, Account Transfers allows JPMC customers to electronically transfer monies between various bank accounts; Payments allows JPMC customers to electronically pay various bills, such as cable, phone, or electric bills; Wire Transfers allows for electronic scheduling of domestic or international money transfer via wire; and Mobile QuickPay allows for individuals who have downloaded a mobile application to their phone to transfer money to other individuals.  (Ex. AM at 11-12; Ex. AF at 18-19)  Customer Center is a page of hyperlinks assembled for each JPMC online banking customer that allows access to a variety of JPMC online services, while Account Activity (Business Card) allows certain JPMC customers to check and track their account balances, payments, and credits.  (*Id.*)

While there are substantial differences among certain Accused Instrumentalities, the parties do not dispute that, generally speaking, JPMC customers using www.chase.com (labeled "Customers" and "Mobile") employ a Web browser (such as Internet Explorer or Mozilla Firefox) to connect to Web servers in a "presentation tier" (labeled ███████████ ███), which communicate with a "middleware tier" (labeled █████████████████), which directs various "back office" systems (depending on the Accused Instrumentality utilized) within JPMC (███████████████) and outside JPMC (labeled ███████████) to perform various transactions.  (Ex. AA at 96-98)  Both parties have analyzed the JPMC systems as a series of three tiers.  (*See, e.g.*, *id.* at 96 ("It is useful to view the JPMorgan online system as a series of tiers or layers.")  "The presentation tier is what the user is visually seeing and where the user is applying input."  (*Id.* at 96)  Similarly, the middleware tier generates what "the user will see in the presentation tier."  (*Id.* at 97)  The back-end tier is generally responsible for processing transactions (e.g., funds transfers).  (D.I. 74 at 84 ("The back-end . . . performs the transaction

selected by the user . . . ."))  The basic architecture of JPMC's systems is depicted below:



(Ex. DAA at JPMC0000062 (color annotations added))

## IV.     APPLICABLE LAW

### A.     Legal Standard Governing Summary Judgment

Summary judgment is appropriate when the pleadings, the discovery and

disclosure materials on file, and any affidavits "show [ ] that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A

fact is genuinely disputed only when "the evidence is such that a reasonable jury could return a

verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986);

*see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial).  The court resolves all ambiguities and draws all factual inferences in favor of the non-moving party, but "only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting Rule 56(c)).  A promise to produce admissible evidence at trial is not sufficient to defeat a motion for summary judgment.  *See, e.g.*, *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49 (1st Cir. 1990).

## B.  Legal Standards Governing Infringement

To establish literal infringement, the patentee must establish by a preponderance of the evidence that each claim element is present in the accused products or methods.  *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).  In order for a product or method to literally infringe a patent claim, the product or method must include each and every element of the claim.  *See Zoltek Corp. v. United States*, 442 F.3d 1345, 1359 (Fed. Cir. 2006). If even a single element is missing from an accused product or method, a finding of literal infringement is precluded.  *Id.*  If an independent claim is not infringed, then claims that depend from it will also not be infringed.  *See Minn. Mining & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1299 (Fed. Cir. 2002).

## V.  PI-NET HAS NO EVIDENCE OF INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS.

The burden is on Pi-Net to prove, by a preponderance of evidence, that JPMC practices each and every element of the asserted claims either literally or under the doctrine of equivalents.  Pi-Net has provided no evidence in any of its discovery responses or expert reports that outlines even a theory of infringement under the doctrine of equivalents.  In fact, the only mention of the "'doctrine of equivalents'" by Pi-Net is in its technical expert's report, where Dr.

7

Bardash outlines his general "understand[ing]" of how to prove infringement under the doctrine of equivalents.  (Ex. AA at 53)  Such a conclusory statement is insufficient to avoid summary judgment in Defendant's favor on this issue.  *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 482 F. Supp. 2d 1045, 1061 (N.D. Ind. 2007) (citations omitted) (granting summary judgment of no infringement under the doctrine of equivalents where expert reports failed to offer any claim-by-claim equivalents analysis), *aff'd*, 260 F. App'x 297 (Fed Cir. 2008).  Thus, the only question is whether, based on the evidence that Pi-Net has put forth, a reasonable jury could conclude that each and every element of the asserted claims is literally present in JPMC's Accused Instrumentalities.  For the reasons set forth below, no reasonable jury could so conclude.

## VI.   THERE IS NO EVIDENCE THAT JPMC PRACTICES THE "BACK-END" CLAIM ELEMENTS.

Regardless of how the asserted claims are construed, Pi-Net bears the burden of *proving* by a preponderance of the evidence that JPMC's Accused Instrumentalities literally practice each and every claim limitation.  Because each asserted claim includes at least one limitation directed to "back-end" systems responsible for executing the transactions requested by a Web user, Pi-Net's burden includes proving not merely how JPMC's "front end" systems receive transaction requests, but also how particular "back-end" applications act upon such requests.  However, Pi-Net has failed to marshal any such proof.

### A.   All Asserted Claims Recite At Least One "Back-End" Limitation.

Each of the asserted claims of the '492 patent specifically and explicitly recites limitations directed to "back-end" systems for executing transactions.  Claims 1-8 require "a computer system executing the *Back-end* transactional application for processing the transaction request in real-time."  (Ex. C at 9:50-10:38 (emphasis added))  Claim 8 further specifies that this "computer system executing a *back-end* transactional application for processing the transaction

8

request in real-time" also "includes a data repository" from which bank data must be retrieved "to complete a real-time Web banking transaction." (*Id.* at 10:28-38 (emphasis added))  Similarly, the method of claim 10 requires that numerous systems execute back-end steps, including a "*back-end* transactional application" that "correspond[s] to a [front-end] Web application," and which "is an application running at the back-office server of one or more Web merchants or at the *back-end*." (*Id* at 10:49-56 (emphasis added))  Claim 10 further specifies that the user request "is a request to *connect to the selected back-end transactional application to perform an interactive real-time Web transaction*," and requires the step of "accessing data from a host or data repository coupled to the back office server of one or more Web merchants or to the back-end transactional application." (*Id.* at 10:59-62; 11:8-14 (emphasis added))

      The '158 and '500 patents similarly require that steps be performed on the back-end.  All asserted claims of the '500 patent recite a means for switching "to a transactional application," which Pi-Net has proposed be construed (synonymously with the "back-end transactional application" term) as an application that "corresponds to the front end."[4]  In like fashion, the sole asserted claim of the '158 patent requires "transferring funds from the checking account to the savings account" of a Web user, which cannot occur without accessing the back-end systems, as Pi-Net's expert, Dr. Bardash, testified:

> Q. And it is not possible to accomplish a transfer of funds from the checking account to the savings account without accessing the back office or back end tier . . . correct?
>
> A. That's correct . . . .

(Ex. AN at 157:17-22)

---

[4]    JPMC has argued separately that this term is indefinite, but assumes for purposes of this motion that the Court adopts Pi-Net's proposed construction.

**B.      Pi-Net Misconstrues The Claims As Limited To "Front-End" Components.**

Pi-Net's infringement case depends on ignoring the above-cited limitations, and on rewriting the asserted claims to sever any "back-end" limitations.  Despite the numerous references in the asserted claims to back-end systems, and methods that require performance by back-end systems, Pi-Net's technical expert, Dr. Bardash, has asserted that "[t]he [patents-in-suit] recognize[] that merchants will have a variety of *'back office' systems, but these systems are not in any way part of the invention*."  (Ex. AA at 23 (emphasis added); *id.* at 23 ("What is normally viewed as the *'back-office' processes plays no role in the transaction request*, and users do not interact with back-office systems, particularly of a bank.") (emphasis added); *id.* at 96 ("The patent issues here focus on the presentation tier or layer and its interaction with the middleware tier or layer.")  Pi-Net's counsel echoed these characterizations at oral argument:

> And what did the patent say about this back office?  Well, Dr. Arunachalam said the back office comprises Legacy databases and other repositories that are utilized by the bank to store its data. The connection between user and the bank services is managed by exchange 501. So she was saying flat out, Look, I'm not dealing with the back office. I don't care about the back office. Obviously, no one is going to know what banks do in the bank office. . . .  And, so, Dr. Bardash, in his Declaration, explained all this. This is in Paragraph 22. And he said, Look, the invention is the front end. *It's not anything that happens in the back end.*

(Ex. DAX at 40:3-16 (emphasis added))  As discussed above, there can be no question that, contrary to the assertions made by Pi-Net's technical expert and counsel, the asserted claims are specifically directed to the back-end systems, and what "happens in the back end." (*Id.*)

In particular, both Pi-Net's counsel and Dr. Bardash contend that the asserted claims just require getting to the entry point to the back-end.  (*See* Ex. AA at 23 ("The invention requires only an Exchange which can make calls to or otherwise obtain information from the back office."); Ex. DAX at 40:4-16 ("Look, I'm not dealing with the back office. . . .  My job as [*sic*] to get you from the browser to the entry point to the back office."))  But proof of

10

infringement requires much more than just evidence that a transaction request or other transaction information makes it to the "entry point to the back office"—all asserted claims of the '492 and '500 patents require a "back-end transactional application"—i.e., software that "corresponds" to the front-end Web application or POSvc application.  And all asserted claims require specific actions by the back-end transactional application (or some other system), including: the processing of a transaction request (in the '500 patent); the transfer of monetary funds from a checking account to a savings account (in the '158 patent); and the processing of a transaction request in "real-time" by a "Back-end transactional application" (in the '492 patent).

When confronted with the actual claim language, Pi-Net's technical expert, Dr. Bardash, acknowledged that it requires certain back-end processing and back-end systems:

> "Q. So in the case of at least claim one of the 492 patent the term 'real-time' describes processing that occurs on the back end tier as opposed to the front end? . . .
> A. Well in the claim that's what [it] says, yeah."  (Ex. AN at 160:16-22 (emphasis added))

> "Q.  And it is not possible to accomplish a transfer of funds from the checking account to the savings account without accessing the back office or back end tier ███████████████ ; is that correct?
> A.  That's correct."  (Ex. AN at 157:17-22 (emphasis added))

> "there is a back end component to this transaction, but the front end is completed after the – front end response happens after the back end transaction completes."  (Ex. AN at 158:20-25 (emphasis added))

> "Q.  And in order for the method outlined in claim one of the 158 patent to be completed, there must be an actual transfer of funds from the checking account to a savings account in real-time, correct? . . .
> A.  I mean that's what the claim says, right."  (Ex. AN at 159:2-9 (emphasis added))

Thus, while Pi-Net may wish it were free to ignore claim elements directed to back-end transaction processing, there is no genuine dispute that they are required by the asserted claims.

C.    **Pi-Net Has No Evidence That JPMC's Accused Instrumentalities Practice Any "Back-End" Limitations.**

1.    **Pi-Net Has Failed to Identify What It Contends Are the "Back-End Transactional Applications."**

All asserted claims of the patents-in-suit require, explicitly or through the claim constructions proposed by Pi-Net, a back-end transactional application "that corresponds to the front-end" POSvc application (which is synonymous, under Pi-Net's characterization of the patents-in-suit, with a "web application" or "network application").  (D.I. 64 at 14; *see also* Ex. AD at 40 ("The requirement of having a counterpart in the backend follows directly from the inventor's coined definition of the POSvc Application term."))  Dr. Bardash's position is that each of the Accused Instrumentalities is itself a unique web application.  (Ex. AA, Appx. J at 33)  Thus, to satisfy Pi-Net's burden, it must provide evidence that there is an back-end application provided by JPMC that corresponds to each of these front-end applications.  Neither Dr. Bardash nor anyone else has even attempted to do so on behalf of Pi-Net.

At his deposition, Dr. Bardash conceded that, at most, he identified a Universal Resource Locator (or URL) that is associated with *one* of the Accused Instrumentalities (the "Payments" Instrumentality).  (Ex. AN at 244-48)  Dr. Bardash noted his belief that there is some underlying, unidentified computer code associated with that URL (which he did not identify for any other Accused Instrumentality) that "is the transactional application in this case."  (*Id*. at 249)  However, Dr. Bardash never examined or analyzed any underlying computer code in this case (associated with the front-end or back-end), and thus is unable to identify anything in JPMC's back-end systems that "corresponds" to each individual front-end application for each Accused Instrumentality.[5]  (*Id.* at 248-49)  For instance, Dr. Bardash contends that a middle-tier computer

---

[5]    Dr. Bardash has opined that the distinction between "front-end" and "back-end" systems can

*(cont'd)*

system "executes the transactional applications that that [*sic*] correspond to the Accused

Instrumentalities' POSvc Application on the front end"—*but he never identifies what those*

*allegedly corresponding transactional applications are*.  (*See* Ex. AA, Appx. J at 29)  There is

no evidence of a corresponding, back-end application for each (or any) Accused Instrumentality.

Indeed, Dr. Bardash explicitly admits that he did not individually analyze each of

the Accused Instrumentalities, noting that he "ha[s] not attempted to address individually each

Accused Instrumentality against every claim, because that would have been useless make-work

project of copying and pasting the same information and merely substituting the name of one

Accused Instrumentality for another."  (Ex. AA at 161)  Even assuming that Dr. Bardash is

correct for the *front-end* of the JPMC system, Dr. Bardash has not provided any evidence that

this is correct for the *back-end* of the JPMC system, which he did not analyze because he did not

consider the back-end systems to be "in any way part of the invention."  (*Id.* at 23)

Having failed to analyze the back-end of JPMC's systems, and failed to opine on

how those back-end systems are allegedly the same across the various Accused Instrumentalities,

Dr. Bardash's opinion is fatally deficient.  *See Fujitsu Ltd. v. Netgear, Inc.*, No. 07-cv-710-bbc,

2009 WL 3047616, at *3 (W.D. Wis. Sept. 18, 2009) (dismissing patentee's infringement claims

and noting that "[i]n those instances in which plaintiffs' failure to prove that grouping of accused

products is appropriate, the consequence is an absence of evidence regarding many of the

accused products").  At issue in *Fujitsu* were a number of allegedly infringing wireless

communications systems.  Rather than analyzing all of the accused systems, "plaintiffs relied on

_____

*(cont'd from previous page)*
   be relative, and therefore JPMC's ████████████████████████████████ could
   be considered a back-end component relative to the presentation tier.  However, this does not
   create a genuine dispute, because Dr. Bardash does not contend that these systems are
   responsible for processing transactions, or that they "correspond" to any front-end systems.

grouping of products by applying their expert's opinions on test results for one version of an accused product to other allegedly similar versions of the product." *Id.* This sort of reliance is inappropriate in "a suit for patent infringement in which it is plaintiffs' burden to prove by a preponderance of the evidence that *each* accused product practices all the elements of at least one claim of an asserted patent." *Id.* Pi-Net's evidence is similarly deficient here, and thus is insufficient to satisfy its burden of proof.

### 2. Pi-Net Has Failed to Identify What Constitutes the Back-Office Server Required By Claims 10 & 11 of the '492 Patent.

In addition to the failure to identify any corresponding "back-end transactional applications," Pi-Net has also provided no evidence of what it even contends is the "back-office server" required by claims 10 and 11 of the '492 patent. At his deposition, Dr. Bardash admitted that he never identified a "back-office server" required by this claim for any of the Accused Instrumentalities in any of his reports. (Ex. AN at 253:19-25) Dr. Bardash has only been able to "speculate" as to what might perform the recited claim functions. (Ex. AN at 252) That is insufficient, as a matter of law, for Pi-Net to survive summary judgment. *See Invitrogen Corp. v. Clontech Labs., Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) (holding expert speculation insufficient to defeat summary judgment).

### 3. Pi-Net Has No Evidence of "Real-Time" Back-End Performance Required By At Least All Asserted Claims of the '158 and '492 Patents.

At least all asserted claims of the '158 and '492 patents specifically require "real-time" performance by the back-end components of the claimed system or method. (*See, e.g.*, Ex. B, claim 1 (requiring "real-time" transfer of funds on the back-end); Ex. C, claim 1 (requiring a "back-end transactional application for processing the transaction request in real time"). Dr. Bardash explicitly conceded this point in his deposition:

14

> "Q. So in the case of at least claim one of the 492 patent the term
> 'real-time' describes processing that occurs on the back end tier as
> opposed to the front end? . . .
> A. <u>Well in the claim that's what [it] says, yeah.</u>"

(Ex. AN, 160:16-22 (emphasis added))  Dr. Bardash performed no analysis of whether any back-end processing or transferring occurs in a "real-time" fashion (under any proposed claim construction); instead, his only analysis was from the perspective of a user on the "front-end" of the system.  (Ex. AN at 13)  There can be no dispute that the user has no contact with the back-end components of JPMC's system, and thus an analysis that fails to consider back-end processing steps *at all* cannot satisfy Pi-Net's burden of proving "real-time" back-end processing.

### D.   There Is No Genuine Dispute That The Accused Instrumentalities Do Not Connect to Back-End Systems "On Top Of" A Facilities Network.

Claims 1-8 of the '492 Patent require "a service network running <u>on top of</u> a facilities network [selected from a group consisting of <u>the World Wide Web, the Internet, and an email network]</u> for <u>connecting through the Web server to a back-end transactional application</u>."  (Ex. C at 9:62-64 (emphasis added))[6]  The parties have jointly proposed to construe "on top" according to its "plain and ordinary meaning."  (D.I. 64 at 4)  Under this construction, there is no genuine dispute of material fact that the Accused Instrumentalities do not infringe, because they each fail to operate "on top of" the Web, the Internet, or an email network.

The parties agree that running "on top of" another network refers simply to transmitting data over that network.  (Ex. AA, Appx. I at 36 (equating "over a digital network atop the Web" with data being "carried over the Web"))  Thus, "a service network running on top of a facilities network [selected from a group consisting of the World Wide Web, the Internet,

---

[6]   Defendant has separately argued that the term "service network" is indefinite (D.I. 74 at 90-94), but for purposes of this motion, has assumed that the Court construes this term consistently with Pi-Net's proposed construction.

and an email network] for <u>connecting through the Web server to a back-end transactional application</u>" is a network that transmits data from a Web server to a back-end transactional application over the Web, the Internet, or an email network.

There is no genuine dispute that the Accused Instrumentalities do not practice these limitations, because the accused Web servers connect to the back-end systems over *a private network*, and *not* over the Web, the Internet, or an email network.  ███████████

████████████████████████████████████████████████████████

████████████████████████████████████  (Ex. AA at 155-56 (explaining that ███████████

██████████████████████████████████████████████████████

██████████████  )) The specification of the patents-in-suit distinguishes these sorts of private networks from those claimed in the '492 patent.  (*See, e.g.*, Ex. C at 8:57-60 (distinguishing between "the Internet (a public switched network) and private networks *including back office networks, such as banking networks*" (emphasis added))  Dr. Bardash has never disputed that JPMC's middleware and back-end systems operate on a private network.  Instead, he asserts that "[i]t is plain that the limitations refer to the front end and not the back end.  JPMC's front end operates on the Web in whole or part."  (Ex. AC at at 6-7)  This assertion is contrary to the unambiguous text of the claim, which recites "a service network running on top of the facilities network for connecting through the Web server <u>to a back-end transactional application.</u>"  (Ex. AC at 6-7 (emphasis added))  Regardless of whether the *front-end* operates on the Web, there is no dispute that communication *between* the front-end Web servers and the back-end systems (which is what must occur over the Web, Internet, or email network according to claims 1-8 of the '492 patent) occurs entirely over a private network.  Thus, while the front-end of the Accused Instrumentalities operates in part over the Internet or Web, the back-end connection recited by

claims 1-8 of the '492 patent undisputedly does *not* occur over such a network.

## VII. THERE IS NO GENUINE DISPUTE OF MATERIAL FACT THAT JPMC'S ACCUSED INSTRUMENTALITIES DO NOT INFRINGE THE PATENTS-IN-SUIT UNDER JPMC'S PROPOSED CLAIM CONSTRUCTIONS.

### A. No Infringement Under JPMC's Construction Of "Real Time."

If the Court adopts JPMC's construction of "real time," which is present in every asserted claim, then none of the Accused Instrumentalities could be found to infringe.  As part of performing a JPMC transaction, the transaction information must be assembled, disassembled, formatted, and/or reformatted—which is prohibited by JPMC's construction.  (D.I. 64 at 3)

Dr. Bardash, Pi-Net's technical expert, did not dispute that under this construction, JPMC does not perform any "real-time" transactions.  (Ex. AA at 12; Ex. AN at 225:2-226:3 (failing to consider whether messages are reformatted within the Accused Instrumentalities)) Indeed, all transactions requested by www.chase.com and Chase Mobile users initiate a chain (or multiple chains) of communications between an array of nodes (i.e., computer systems or software), including the user's Web browser or native application, systems in the presentation tier, systems in the middleware tier, and systems in the back-end tier.  (Ex. AA at 106-109; Ex. DAA at JPMC0000062)  For instance,



JPMC's nodes never simply forward a message without assembling, disassembling, formatting, and/or reformatting.  Thus, if JPMC's construction is adopted, then the Accused Instrumentalities undisputedly do not infringe the "real-time" limitations.

### B.     No Infringement Under JPMC's Construction Of "Object Routing."

If the Court adopts JPMC's construction of "object routing," which is present in the only asserted claim of the '158 patent, there is no genuine dispute that Pi-Net cannot prove infringement of this claim.  Specifically, JPMC's proposed construction of "object routing" requires "transmitting data on a network using the TransWeb[TM] Management Protocol in which a unique IP address is hierarchically assigned to each network object, e.g., including each bank account."  (D.I. 64 at 5)  However, the Accused Instrumentalities do not (1) employ the TransWeb[TM] Management Protocol; (2) assign unique IP addresses to network objects, such as bank accounts; and (3) assign IP addresses hierarchically.

First, there is no dispute that none of the Accused Instrumentalities use the TransWeb[TM] Management Protocol in any capacity, for any reason.  The patents-in-suit explain that "multi-protocol object routing is provided via a <u>proprietary</u> protocol, TransWeb[TM]

Management Protocol (TMP)."  (Ex. C at 7:63-67 (emphasis added))  However, there is no

evidence that this trademarked, proprietary protocol ever existed, and there is similarly no

evidence that it was ever made publicly available.  (Ex. AN at 258:6-10 ("Q. Do you know if

[TMP] exists? . . . A. I don't . . . I really wasn't asked to discover that."))  Dr. Bardash contends

that TMP "is merely a shorthand for the general protocol that is described in the patent."  (Ex.

AC at 9)  However, this unsupported contention does not give rise to a genuine dispute, because

it is directly at odds with the text of the patent, which describes TMP as a "proprietary,"

trademarked protocol that exclusively provides the object routing component of the alleged

invention.  (Ex. C at 7:63-67)  Nowhere does the specification ever describe TMP as a shorthand

for the entire invention—indeed, in the "flow diagram" in Figure 8, TMP is identified in only one

place in the transaction flow (data retrieval from the data repository).  (*See* Ex. C, Fig. 8)

Moreover, even if TMP did exist, Pi-Net has failed to set forth any evidence demonstrating that

JPMC's Accused Instrumentalities practice this protocol.  (*See, e.g.*, Ex. AA; Ex. AC)

   Second, there is no dispute that none of the Accused Instrumentalities assigns a

unique IP address, or any IP address, to an "object" such as a bank account.  "An IP address is a

series of four numbers of up to three digits separated by periods (e.g., 159.53.42.11) that

designates the location on a network of a piece of hardware, such as a server or a personal

computer," to facilitate the transmission and reception of digital messages.  (Ex. AK at ¶ 82)

None of the Accused Instrumentalities assigns an IP address to a bank account; rather, the

Accused Instrumentalities access bank account information by querying hardware databases that

store such information for thousands of bank accounts.  (Ex. DBA at 110:20-111:9)

   Third, the Accused Instrumentalities do not assign IP addresses to objects

"hierarchically."  This hierarchical assignment is depicted in Figure 6B, in which a web server

has IP address (i.e., 123.123.123.123) and each object on the server is assigned a unique address based on the web server's IP address (i.e., 123.123.123.123.1 to 123.123.123.123.3):



There is no dispute that the Accused Instrumentalities do not assign IP addresses in this fashion. (Ex. AK at ¶ 85)   Indeed, none of Pi-Net's experts have even addressed this topic in a report, declaration, or deposition.   Thus, Pi-Net has failed to set forth—and cannot set forth—any evidence demonstrating such hierarchical assignment.

## CONCLUSION

Pi-Net has not even attempted to adduce evidence of infringement under the doctrine of equivalents, and thus summary judgment in JPMC's favor on this issue should be granted.   As for literal infringement, because of its misplaced and exclusive focus on providing evidence for only "front-end" limitations of the patents-in-suit, Pi-Net cannot satisfy its burden for the particular limitations from the asserted claims that are directed to the "back-end."   Even if Pi-Net could satisfy this burden, there is no dispute that JPMC's Web servers do not connect to such "back-end" systems "on top" of a facilities network, as claims 1-8 of the '492 patent require. Additionally, if the Court adopts JPMC's construction for "real time," then there is no dispute that *none of the asserted claims* are infringed.   Similarly, if the Court adopts JPMC's construction for "object routing," then there is no dispute that *none of the asserted claims of the '158 patent* are infringed.   For the foregoing reasons, JPMC respectfully requests that the Court grant this motion and dismiss Pi-Net's claims for infringement.

DATED: January 29, 2014                    Respectfully submitted,

                                           /s/ *Robert S. Saunders*

                                           Robert S. Saunders (ID No. 3027)
OF COUNSEL:                                Jessica Raatz Kunz (ID No. 5698)
Daniel A. DeVito                           SKADDEN, ARPS, SLATE,
Douglas R. Nemec                               MEAGHER & FLOM LLP
Edward L. Tulin                            920 N. King Street, 7th Floor
Andrew D. Gish                             Wilmington, Delaware  19801
SKADDEN, ARPS, SLATE,                      Tel:  (302) 651-3000
    MEAGHER & FLOM LLP                     Fax:  (302) 651-3001
Four Times Square                          rob.saunders@skadden.com
New York, New York  10036                  jessica.kunz@skadden.com
Tel:  (212) 735-3000

                                           *Attorneys for Defendant JPMorgan Chase & Co.*

21