**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO. | : | |
| | : | |
| Defendant. | : | |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO
EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL SIEGEL**

**REDACTED VERSION
FILED PUBLICLY
FEBRUARY 21, 2014**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  February 14, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PI-NET INTERNATIONAL, INC. | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | :   Civil No. 1:12-cv-00282-RGA |
|  | : |
| JPMORGAN CHASE & CO. | : |
|  | : |
| Defendant. | : |
|  | : |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION
TO EXCLUDE THE EXPERT TESTIMONY OF DR. MICHAEL SIEGEL**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  February 14, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... iii

I.      NATURE OF PROCEEDINGS ................................................................... 1

II.     SUMMARY OF ARGUMENT .................................................................... 1

III.    STATEMENT OF FACTS ........................................................................... 3

        A.      The Patents-in-Suit ......................................................................... 3

        B.      Dr. Siegel's Reports ........................................................................ 3

IV.     APPLICABLE LAW .................................................................................... 4

        A.      Legal Standard Governing Expert Testimony ................................ 4

        B.      Legal Standard for Anticipation ..................................................... 6

        C.      Legal Standard for Obviousness ..................................................... 6

V.      DR. SIEGEL'S OPINIONS ON ANTICIPATION SHOULD NOT BE
        EXCLUDED SIMPLY BECAUSE PI-NET'S EXPERT DISAGREES WITH
        THEM. ........................................................................................................... 7

VI.     DR. SIEGEL'S OPINIONS ON OBVIOUSNESS SHOULD NOT BE
        EXCLUDED. ................................................................................................. 9

        A.      Dr. Siegel Explicitly Discloses The Obvious Combinations. ......... 9

        B.      Dr. Siegel Explicitly Opines On The Motivation To Combine References. ......... 11

        C.      Pi-Net Conflates *Daubert* With The Summary Judgment Standard. ..................... 12

        D.      Pi-Net's Cited Cases Demonstrate That Dr. Siegel's Testimony Is
                Admissible. ..................................................................................... 13

        E.      Dr. Siegel's Testimony Regarding Obviousness In View Of Scholl Is Fully
                Elucidated And Admissible. ........................................................... 13

VII.    DR. SIEGEL'S OPINIONS HAVE SUFFICIENT FACTUAL FOUNDATION,
        AND THEREFORE SHOULD NOT BE EXCLUDED. ............................... 14

        A.      The Record Establishes That Dr. Arunachalam Copied Portions Of The
                Patent Specification From The Prior Art. ...................................... 15

i

B.      Dr. Siegel's Opinion Of The Breadth Of Pi-Net's Proposed Constructions Is Supported By The Record In This Case............................................................16

C.      The Record Establishes That Embodiments Of Lawlor Were Licensed. ..............16

CONCLUSION.......................................................................................................................17

## <u>TABLE OF AUTHORITIES</u>

**CASES**

Page

*AstraZeneca LP v. Breath Ltd.*,
    Nos. 2013-1312, 2013-1352, 2013 WL 5813759 (Fed. Cir. Oct. 30, 2013)..............6, 7, 10

*Bennett Marine, Inc. v. Lenco Marine, Inc.*,
    2013 WL 5273116 (Fed. Cir. 2013)..................................................................................13

*In re Bond*,
    910 F.2d 831 (Fed. Cir. 1990)........................................................................................6, 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993).............................................................................................................5

*Helifix Ltd. v. Blok-Lok, Ltd.*,
    208 F.3d 1339 (Fed. Cir. 2000)...........................................................................................6

*Heller v. Shaw Industries, Inc.*,
    167 F.3d 146 (3d Cir. 1999)...............................................................................................12

*i4i Ltd. Partnership v. Microsoft Corp.*,
    598 F.3d 831 (Fed. Cir. 2010), *aff'd*, 131 S. Ct. 2238 (2011).........................5, 6, 8, 12, 15

*KSR International Co. v. Teleflex Inc.*,
    550 U.S. 398 (2007)............................................................................................................7

*Meadows v. Anchor Longwall & Rebuild, Inc.*,
    306 F. App'x 781 (3d Cir. 2009).......................................................................2, 5, 8, 12

*Meyer Intellectual Properties Ltd. v. Bodum, Inc.*,
    690 F.3d 1354 (Fed. Cir. 2012)...........................................................................................7

*Motorola Mobility, LLC v. International Trade Commission*,
    737 F.3d 1345 (Fed. Cir. 2013)........................................................................................13

*In re Paoli Railroad Yard PCB Litigation*,
    35 F.3d 717 (3d Cir. 1994)..................................................................................................5

*Pritchard v. Dow Agro Sciences*,
    430 F. App'x 102 (3d Cir. 2011).........................................................................................5

*Pure Earth, Inc. v. Call*,
    531 F. App'x 256 (3d Cir. 2013).........................................................................................5

*Rambus Inc. v. Rea*,
    527 F. App'x 902 (Fed. Cir. 2013) ...................................................................6

*Research Foundation of State University of New York v. Mylan Pharmaceuticals Inc.*,
    531 F. App'x 1008 (Fed. Cir. 2013) .................................................................6

*Rolls-Royce, PLC v. United Technologies, Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010).......................................................................10

*Stecyk v. Bell Helicopter Textron, Inc.*,
    295 F.3d 408 (3d Cir. 2002)........................................................................2, 14

*United States v. Lee*,
    339 F. App'x 153 (3d Cir. 2009) ......................................................................5

*United States v. Mitchell*,
    365 F.3d 215 (3d Cir. 2004)..........................................................................5, 6

*United States v. Mornan*,
    413 F.3d 372 (3d Cir. 2005)..............................................................................5

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
    2013 WL 1702159 (D. Del. 2013) ..................................................................15

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013) ....................5

**REGULATIONS**

35 U.S.C. § 102.........................................................................................................6

Fed. R. Evid. 703 ................................................................................................3, 14

## I.      NATURE OF PROCEEDINGS

Defendant JPMorgan Chase & Co. ("JPMC") respectfully submits this brief in opposition to the Motion to Exclude Expert Testimony of Defendant's Retained Expert, Dr. Michael Siegel (D.I. 118), filed by plaintiff Pi-Net International, Inc. ("Pi-Net").  On January 29, 2014, Pi-Net filed that motion and two other *Daubert* challenges to JPMC's experts, while JPMC filed three motions for summary judgment and a *Daubert* motion to exclude certain testimony of Pi-Net's damages expert.  (D.I. 109-122)  A *Markman* and case dispositive motion hearing is scheduled for March 6, 2014, and trial is scheduled to begin June 2, 2014.  (D.I. 95)

## II.      SUMMARY OF ARGUMENT

Pi-Net seeks to prevent one of JPMC's technical experts, Dr. Michael Siegel, from offering testimony regarding:  (1) whether three prior art references that do not explicitly use the term, "World Wide Web" (henceforth, the "Web"), nevertheless anticipate the asserted patent claims; (2) whether combinations of prior art references analyzed and charted in Dr. Siegel's report render the asserted patents obvious; and (3) three miscellaneous topics that Pi-Net alleges lack factual foundation.  As discussed below, Pi-Net's motion is fundamentally at odds with the established law, and should be denied in its entirety.

***First***, Pi-Net asserts that Dr. Siegel's anticipation testimony is inadmissible not because it is methodologically unsound, but rather *because Pi-Net's expert disagrees that certain prior art references at issue disclose transactions that occur on the Web*.  This aspect of Pi-Net's motion cannot be described as anything but frivolous—it is completely inappropriate to seek exclusion of substantive opinions on prior art references through a *Daubert* challenge merely because the opposing expert disagrees with those opinions.  Indeed, Pi-Net's assertion directly contradicts the well-established *Daubert* principle that the admissibility of expert testimony is evaluated "solely on principles and <u>methodology</u>, <u>not on the conclusions</u> that [it] generate[s]."

*Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 789 (3d Cir. 2009) (emphasis added) (internal quotation marks omitted).  However, Pi-Net never once critiques the methods Dr. Siegel employed to analyze and compare the prior art disclosures to the patent claims, and with good reason.  Dr. Siegel did what technical experts in every patent infringement case do:  he read references that predate the patents-in-suit, interpreted them according to the frame of reference of a person of ordinary skill at the time of the alleged invention, and opined on whether they disclosed the claimed elements.  While Pi-Net's substantive critique of Dr. Siegel shows that the parties disagree about how to interpret the prior art, under no circumstances can such a disagreement render Dr. Siegel's opinions inadmissible.

*Second*, Pi-Net asserts that Dr. Siegel's obviousness testimony is inadmissible because his reports do not chart every one of the innumerable combinations and permutations of the prior art references and their claim elements.  However, as Pi-Net's own expert acknowledges repeatedly, such "make-work" is "unnecessary and would merely produce a document several times thicker with no additional information."  (Ex. AA at 161)  Dr. Siegel gave sufficient notice of his opinions by analyzing and charting each individual reference in detail, and by explaining the multiple motivations to combine those references at length.  As with Pi-Net's first argument, Pi-Net's position improperly conflates the ultimate question of obviousness with the question of whether Dr. Siegel's testimony on that issue is admissible.

*Third*, Pi-Net asserts that three miscellaneous facts cited by Dr. Siegel allegedly lack foundation.  Pi-Net ignores the clear authority that "experts may rely on facts from firsthand knowledge or observation, information learned at the hearing or trial, and facts learned out of court" even if such facts are not "independently admissible in evidence."  *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002); Fed. R. Evid. 703.  Pi-Net proffers

no argument that Dr. Siegel's underlying methodology with respect to these facts is flawed. Moreover, even if the case law did not mandate the admission of Dr. Siegel's testimony, the facts that Pi-Net disputes are explicitly established *both* in the record of this case *and* publicly.

## III.    STATEMENT OF FACTS

### A.    The Patents-in-Suit

Pi-Net asserts infringement against JPMC based on U.S. Patent Nos. 5,987,500 ("the '500 patent"), 8,037,158 ("the '158 patent"), and 8,108,492 ("the '492 patent") (collectively the "patents-in-suit").  Pi-Net accuses JPMC of infringing claims 1-6, 10-12, 14-16, and 35 of the '500 Patent; claim 4 of the '158 Patent; and claims 1-8 and 10-11 of the '492 Patent (collectively, the "asserted claims").  The asserted claims generally relate to "a method and apparatus for providing real-time, two-way transactional capabilities" through an online network, such as the Web.  (Ex. C, Abstract)  The patents-in-suit acknowledge that they were not the first disclosure of an online system for two-way interactive transactions, and that the vast majority of the components that make up modern e-commerce systems were well known as of November 1995. (*E.g.*, Ex. C at Figs. 1A, 1B, 4A)

### B.    Dr. Siegel's Reports

Dr. Siegel is a Principal Research Scientist in the Information Technology Group at the Sloan School of Management at the Massachusetts Institute of Technology, and holds a Ph.D. in Computer Science from Boston University.  (Ex. AH at ¶ 7)  On October 25, 2013, Dr. Siegel issued an Opening Expert Report (the "Siegel Opening Report"), which provides a detailed analysis of (1) the patents-in-suit; (2) the nine primary prior art references that anticipate

the asserted claims;[1] (3) obviousness in light of combinations of the primary prior art references; and (4) obviousness in light of one of the primary references (Scholl) in combination with references disclosing well-known aspects of Web commerce (such as providing access to both a checking account and a savings account).  (Ex. AH at ¶¶ 20, 43-56, 63-113)  The 49-page Siegel Opening Report also includes approximately 300 pages of claim charts thoroughly mapping the disclosure of each of the primary references to the patents-in-suit.  (Ex. AH at Exs. A-H)  In addition to this rigorous technical analysis, the Siegel Opening Report explicitly details the legal support for Dr. Siegel's methodology (Ex. AH at ¶¶ 24-27), the claim constructions he applied (*id.* at ¶¶ 28-34), and motivation to combine references (*id.* at ¶¶ 118-125).

        On December 10, 2013, Dr. Siegel issued a Reply Expert Report in response to the First Expert Report of William C. Easttom II (the "Siegel Reply Report").  The Siegel Reply Report explicitly indicated that, despite thoroughly and carefully considering Mr. Easttom's report, Dr. Siegel "remain[ed] of the opinion that all of the elements of the asserted claims of the patents-in-suit were disclosed in either a single prior art reference, or in a combination of references."  (Ex. AI at ¶ 8)  The Siegel Reply Report further explained that although he did not "catalogue[] each and every error from Mr. Easttom's report," his "report should not be construed to agree with or concede any point or contention from Mr. Easttom's report."  (Ex. AI at ¶¶ 27-28)

## IV.    APPLICABLE LAW

### A.    Legal Standard Governing Expert Testimony

        "An expert witness may be permitted to testify regarding scientific, technical, or other specialized knowledge if it will assist the trier of fact to understand the evidence or to

---

[1]    U.S. Patent Nos. 5,793,964 ("Rogers"); 5,799,157 ("Escallon"); 5,774,668 ("Choquier"); 5,870,724 ("Lawlor"); 5,710,887 ("Chelliah"); NetBill: 1994 Prototype, by Goradia ("Goradia"); 5,724,424 ("Gifford"); 5,715,314 ("Payne"); and 5,742,762 ("Scholl").

determine a fact in issue." *United States v. Lee*, 339 F. App'x 153, 158 (3d Cir. 2009) (quoting

*United States v. Mornan*, 413 F.3d 372, 380 (3d Cir. 2005) (internal quotation marks omitted).

"Rule 702 and *Daubert* require a district court to ensure that 'expert testimony is not only

relevant, but reliable.'" *Pure Earth, Inc. v. Call*, 531 F. App'x 256, 259 (3d Cir. 2013) (quoting

*ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 291 (3d Cir. 2012)).  However, "[t]he standard

for determining reliability 'is not that high.'" *Pure Earth, Inc.*, at 259 (quoting *In re Paoli R.R.*

*Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).  Indeed, "[t]he Rules of Evidence embody a

strong preference for admitting any evidence that may assist the trier of fact . . . so testimony

should not be excluded simply because a judge thinks its probative value is outweighed by other

evidence." *Pritchard v. Dow Agro Scis.*, 430 F. App'x 102, 104 (3d Cir. 2011).

   In evaluating the admissibility of expert testimony, the District Court's focus

"'must be solely on principles and methodology, not on the conclusions that they generate.'"

*Meadows*, 306 F. App'x at 789 (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579,

580, 595 (1993)).  That is, "*Daubert* and Rule 702 are safeguards against unreliable or irrelevant

opinions, not guarantees of correctness." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854

(Fed. Cir. 2010); *accord United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) ("As long as

an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be

tested by the adversary process—competing expert testimony and active cross-examination—

rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or

satisfactorily weigh its inadequacies.").  Thus, "[w]hen the methodology is sound, and the

evidence relied upon sufficiently related to the case at hand, disputes about the degree of

relevance or accuracy . . . may go to the testimony's weight, but not its admissibility." *i4i Ltd.*

*P'ship*, 598 F.3d at 852; *Mitchell*, 365 F.3d at 244 (holding that *Daubert* "neither requires nor

empowers trial courts to determine which of several competing scientific theories has the best provenance").

## B.    Legal Standard for Anticipation

"Anticipation is a question of fact." *Rambus Inc. v. Rea*, 527 F. App'x 902, 906 (Fed. Cir. 2013). "A determination that a patent claim is invalid as anticipated under 35 U.S.C. § 102 'requires that a prior art reference disclose every limitation of the claimed invention, either explicitly or inherently.'" *Research Found. of State Univ. of N.Y. v. Mylan Pharm., Inc.*, 531 F. App'x 1008, 1010 (Fed. Cir. 2013) (citation omitted). In part because a patentee can act as her own lexicographer, anticipation is "not an *ipsissimis verbis* test" (i.e., the prior art reference need not use the same terminology as the patent claims). *In re Bond*, 910 F.2d 831, 832 (Fed. Cir. 1990) (per curiam) (emphasis added) (internal quotation marks and citation omitted). Rather, a prior art reference that "does not expressly disclose in words" one or more elements of a patent claim still anticipates a patent "if a person of ordinary skill in the art would understand the [reference] as disclosing [the claim elements] and if such a person could have combined [its] description . . . with his own knowledge to make the claimed invention." *Helifix Ltd. v. Blok-Lok, Ltd.*, 208 F.3d 1339, 1347 (Fed. Cir. 2000).

## C.    Legal Standard for Obviousness

"The obviousness analysis involves four factual inquiries: (1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the pertinent art, and (4) secondary considerations of nonobviousness." *AstraZeneca LP v. Breath Ltd.*, No. 2013-1312, 2013 WL 5813759, at *6 (Fed. Cir. Oct. 30, 2013) (internal quotation marks and citation omitted). "When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her

6

technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." *KSR v. Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 402-03, 421 (2007).  Indeed, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and can "fit the teachings of multiple patents together like pieces of a puzzle." *AstraZeneca LP*, 2013 WL 5813759, at *6 (internal quotation marks and citation omitted).  Thus, an expert's "analysis of obviousness . . . may include recourse to logic, judgment, and common sense available to the person of ordinary skill [which] do[es] not necessarily require explication in any reference or expert opinion." *Meyer Intellectual Props. Ltd. v. Bodum, Inc.*, 690 F.3d 1354, 1375-76 (Fed. Cir. 2012) (internal quotation marks and citation omitted).

## V.   DR. SIEGEL'S OPINIONS ON ANTICIPATION SHOULD NOT BE EXCLUDED SIMPLY BECAUSE PI-NET'S EXPERT DISAGREES WITH THEM.

Pi-Net argues that Dr. Siegel should be precluded from offering testimony that three references—Escallon, Choquier, and Lawlor—are anticipatory.  Pi-Net's proposed constructions for the asserted claims all require operating on the Web.  Dr. Siegel has explicitly opined that the Escallon, Choquier, and Lawlor references disclose all the elements of the asserted claims, including the Web-based components required under Pi-Net's proposed constructions.  Pi-Net's sole basis for excluding this testimony is that its technical expert, Mr. Charles Easttom, reads Escallon, Choquier, and Lawlor differently.

Pi-Net's argument not only fails to apply the appropriate legal standard for determining the admissibility of expert testimony, but it also turns the *Daubert* analysis on its head.  Rather than assessing the "principles and methodology" that Dr. Siegel employed—which are identical to those that Mr. Easttom used—Pi-Net asks the Court to rule, as a matter of law, that Dr. Siegel reached the wrong conclusion, and that therefore his testimony is unreliable.  Pi-Net's approach is precisely what courts are *not* supposed to do when considering *Daubert*

7

challenges.  *See Meadows*, 306 F. App'x at 789; *i4i Ltd. P'ship*, 598 F.3d at 856 ("[I]t is not the district court's role under *Daubert* to evaluate the correctness of facts underlying an expert's testimony.").  Pi-Net never suggests that Dr. Siegel's credentials are flawed, and it never attacks his methodology—instead, Pi-Net cites, at most, a duel of experts.  (*E.g.*, D.I. 118 at 5 ("Pi-Net's expert . . . pointed out that Escallon does not disclose any Web system or method."); *id.* at 6 ("Pi-Net's expert . . . pointed out that Choquier does not disclose any Web system or method."); *id.* at 7 ("Pi-Net's expert . . . pointed out that Lawlor does not disclose any Web system or method."))  This is a quintessential factual dispute that must be decided by a jury.

Dr. Siegel's methodology is sound and fully elucidated within the body of his reports.  Beginning from the principle that "a patent claim may be rendered invalid as anticipated if every element in the patent claim is explicitly or inherently disclosed or described in a single prior art reference," Dr. Siegel conducted "an element-by-element comparison of the claims to the prior art."  (Ex. AH at ¶ 25)  Appropriately, Dr. Siegel recognized that "a prior art reference need only disclose the elements of a claim term, even if it refers to the elements by a different name."  (Ex. AI at ¶ 40)  Where Dr. Siegel observed such terms, he carefully explained the basis for his opinions that a reference was anticipatory.  For instance, Dr. Siegel provided a clear, technical rationale for his opinion that the "pages" of the "electronic book" described in Escallon were technically equivalent to the "Web page" in the asserted claims:

> Escallon describes displaying "an electronic book [i.e., an electronic catalog] including information presentation pages, databases associated with the presentation pages, and coded forms for receiving and formulating transaction requests based upon such information." Col. 2, ll. 14-17. Further, Escallon explains that these "pages" allow for "any combinations of static or dynamic presentations of text, graphics, audio and video information, control functions and hyper-link entry points." Col. 3, ll. 5-7. <u>That is, Escallon describes the electronic book as embodying the functionality of a Web page, without using the word Web.</u>

(Ex. AH at Ex. D, Part B at 1 (emphasis added))  This approach is consistent with a proper

invalidity analysis.  *See Bond*, 910 F.2d at 832-33.

        Moreover, Mr. Easttom is incorrect that the references that Dr. Siegel cites do not

disclose the Web.  For instance, Escallon explicitly describes itself as building upon prior art

systems that "automatically pass data to . . . back-office computers <u>via the Internet</u>."  (Ex. DBH

at 1:29-31 (emphasis added) (internal brackets removed))  Similarly, Choquier explicitly

discloses its system "would preferably be interconnected by leased lines and/or by a data

network (such as the <u>Internet</u>)."  (Ex. DBI at 5:44-46 (emphasis added); *id.* at 5:7-8 (explaining

that the system uses "the Transport Control Protocol/<u>Internet Protocol</u>") (emphasis added))  And,

Lawlor discloses operating on a "digital packet network," which Dr. Siegel has opined signified

the Internet/Web during the relevant time period.  (Ex. DBJ at 6:65-66; Ex. AH at ¶ 89)  It is

Dr. Siegel's opinion that the Internet is not technologically distinct from certain other computer

networks.  Specifically, Dr. Siegel has opined that the Internet is simply the name for one

particular network, but it is not technologically or patentably distinct from certain predecessor

networks.  (*See, e.g.*, Ex. AH at ¶ 57 (emphasis added))  Pi-Net has not argued that this

conclusion is factually incorrect, let alone that it is the product of faulty methodology.  Thus, the

jury should be permitted to evaluate its merit.

## VI.    DR. SIEGEL'S OPINIONS ON OBVIOUSNESS SHOULD NOT BE EXCLUDED.

### A.    Dr. Siegel Explicitly Discloses The Obvious Combinations.

        Pi-Net falsely asserts that certain of Dr. Siegel's opinions amount to "generalized

obviousness" based on "undisclosed combinations" of prior art.[2]  Rather, in the course of

---

[2]    Pi-Net suggests that Dr. Siegel's opinion that "the asserted claims are rendered obvious by a combination of any one of the foregoing references in combination with the knowledge [of] a person of ordinary skill in the art" is somehow improper, but never articulates how that could

*(cont'd)*

providing detailed, element-by-element opinions, Dr. Siegel explained that each of the prior art references could additionally be "combine[d] . . . <u>with the other references [he] discuss[es] in [his] Report</u>, so as to render the asserted claims obvious." (Ex. AH at ¶¶ 67, 73, 79, 85, 92, 97, 102, 107)  That is, Dr. Siegel opined that any combination of the Rogers, Escallon, Choquier, Lawlor, Chelliah, Goradia, Gifford, Payne, and Scholl references (all of which are fully analyzed in Dr. Siegel's claim charts) would render the asserted patents invalid for obviousness.  (*See* Ex. AH at ¶ 20)  Because there are innumerable possible combinations and permutations of these references and their claim elements, it would have been virtually impossible to chart them all. Instead, Dr. Siegel gave less voluminous—but equally complete—notice of his obviousness opinions by providing approximately 300 pages of claim charts thoroughly mapping the elements of each individual reference, (Ex. AH at Exs. A-H), and effectively explaining that that a person skilled in the art could "fit the teachings of [these references] together like pieces of a puzzle" if necessary, as Federal Circuit precedent explicitly allows.  *AstraZeneca*, 2013 WL 5813759 at *6.

Pi-Net further complains that, where Mr. Easttom asserted that a given reference did not contain a particular element, Dr. Siegel failed to supplement his report with a specific combination that did contain the disputed element.  (D.I. 118 at 9)  As an initial matter, disagreement between Dr. Siegel and Mr. Easttom is expected and does not inherently require Dr. Siegel to modify or supplement his opinions to avoid their exclusion.  Moreover, as explained in the previous paragraph, Dr. Siegel's opening report thoroughly documented that any combination of Rogers, Escallon, Choquier, Lawlor, Chelliah, Goradia, Gifford, Payne, and Scholl would

---

*(cont'd from previous page)*

be the case.  (D.I. 118 at 8, 9 n.2)  It is well settled that "[i]f a person of ordinary skill, before the time of the invention . . . would have found the invention merely an easily predictable and achievable variation . . . of the prior art, then the invention likely would have been obvious." *Rolls-Royce, PLC v. United Techs., Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010).

render the asserted patents invalid for obviousness.  Thus, to the extent that Mr. Easttom opined

that a particular element was lacking in Rogers, for instance, Dr. Siegel had already opined that

any of Escallon, Choquier, Lawlor, Chelliah, Goradia, Gifford, Payne, and Scholl could fill in

the alleged gap for the reasons detailed in Dr. Siegel's claim charts.

Notably, Pi-Net's own expert, Dr. Michael Bardash, took a similar approach in his

reports for the sake of efficiency.  Specifically, Dr. Bardash declined to chart his complete

infringement opinions for each of the six Accused Instrumentalities, instead offering a single

chart of some unspecified amalgam of the Accused Instrumentalities.  (Ex. AA at App. I-K)  Dr.

Bardash explained:

> I have not attempted to address individually each Accused
> Instrumentality against every claim, because that would have been
> useless make-work project of copying and pasting the same
> information . . . such useless work project was unnecessary and
> would merely produce a document several times thicker with no
> additional information.

(Ex. AA at 161)  To the extent this practice gives sufficient notice of Dr. Bardash's opinions, it

must also give sufficient notice of Dr. Siegel's opinions.

### B.    Dr. Siegel Explicitly Opines On The Motivation To Combine References.

Pi-Net also incorrectly asserts that Dr. Siegel "provided no reason or motivation

to combine" references.  (D.I. 118 at 2)  To the contrary, Dr. Siegel's Opening Report includes a

three-and-a-half page section entitled "Suggestions, Reasons, and Motivations to Combine

References," where Dr. Siegel did precisely that.  For instance, Dr. Siegel cited a September

1995 publication, entitled *Lessons Learned Using the Web as an Application Interface*, and

explained that, in order to gain "the advantages of moving to a web-based interface for

applications, such as cross-platform portability[,] . . . one of ordinary skill in the art *would have

been motivated* to modify or augment applications without a web-based interface into 'web

11

applications,' by combining them with existing knowledge and prior art references discussed herein." (Ex. AH at ¶ 121 (emphasis added))  Similarly, Dr. Siegel opined that "the emergence of online, Internet-based banking at, for instance, Stanford Federal Credit Union (and at other financial institutions discussed herein), w*ould have provided a significant reason to combine* or modify then-existing systems and references to achieve non-deferred transactions, including account transfers, given the consumer demand and increased efficiencies relating to these developments." (Ex. AH at ¶ 125 (emphasis added))  While Mr. Easttom may disagree with these thoroughly articulated opinions, that does not render them inadmissible.  *i4i Ltd. P'ship*, 598 F.3d at 856.

### C.  Pi-Net Conflates *Daubert* With The Summary Judgment Standard.

As with Pi-Net's arguments regarding Dr. Siegel's anticipation opinions, Pi-Net again conflates the ultimate question of obviousness in light of the prior art with whether testimony regarding that prior art should be admissible.  The *Daubert* standard empowers courts to exclude testimony that based on faulty or unreliable *methodology*, but does not allow courts to exclude testimony based on who is ultimately likely to prevail on dueling testimony.  *Meadows*, 306 F. App'x at 789.  Pi-Net never describes any faults in Dr. Siegel's methodology, aside from conclusory assertions.  (*E.g.*, D.I. 118 at 12 ("His assertions lack the required methodology or reliability . . . ."))  Instead, Pi-Net repeatedly argues that Dr. Siegel's opinions are insufficient to *prove* obviousness.  (D.I. 118 at 9-11 (devoting several pages to a recitation of the legal requirements for *proving* obviousness))  However, Dr. Siegel's testimony is unquestionably admissible—even if it does not ultimately carry the day on the issue of obviousness—so long as it is the product of proper methodology.  *See, e.g.*, *Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 152 (3d Cir. 1999) (holding that "expert opinion must be based on reliable methodology . . . but it need not be so persuasive as to meet a party's burden of proof").

12

**D.     Pi-Net's Cited Cases Demonstrate That Dr. Siegel's Testimony Is Admissible.**

Pi-Net's cited cases only confirm that there is no basis to exclude Dr. Siegel's testimony.  First, Pi-Net cites *Bennett Marine, Inc. v. Lenco Marine, Inc.*, Nos. 2012-1336 *et al.*, 2013 WL 5273116 (Fed. Cir. Sept. 19, 2013).  (D.I. 118 at 10)  In that case, while the court concluded that the expert's testimony alone was insufficient to prove obviousness, it never questioned the admissibility of the expert's testimony.  *Id* at *9.  Second, Pi-Net cites *Motorola Mobility, LLC v. Int'l Trade Comm'n*, 737 F.3d 1345, 1349 (Fed. Cir. 2013), for the proposition that "conclusory statements by an expert cannot meet a challenger's burden of proof on invalidity."  (D.I. 118 at 13)  In fact, the relevant portion of that case addressed whether a particular *alleged admission* by an *opposing expert* was sufficient to prove obviousness.  *Motorola*, at 1350-51.  Regardless, the Federal Circuit did not exclude even this allegedly conclusory testimony.  *Id*.  Pi-Net's inability to marshal a single case in support of excluding Dr. Siegel's testimony further demonstrates that Pi-Net's motion is contrary to the established law, and should be rejected.

**E.     Dr. Siegel's Testimony Regarding Obviousness In View Of Scholl Is Fully Elucidated And Admissible.**

Additionally, Pi-Net makes the conclusory assertion that Dr. Siegel's opinions regarding obviousness in view of Scholl should be excluded.  (D.I. 118 at 14)  In support of its position, Pi-Net selectively quotes from Dr. Siegel's report and characterizes Dr. Siegel as opining that "the claims are obvious because I say so."  (D.I. 118 at 14)  In fact, the quoted statement is from a short, introductory section of Dr. Siegel's report titled, "Summary of Opinions to Be Expressed."  (Ex. AH at ¶ 20; Ex. AI at ¶ 9)  This section further explains that Dr. Siegel's full opinions are "set forth in more detail below."  (Ex. AH at ¶ 19)  In the body and claim charts of Dr. Siegel's Report, he specifically opines that various secondary prior art

references disclose certain well-known aspects of Web commerce (such as "providing access to a

checking account and a savings account"), and that the combination of Scholl with these

references renders the asserted claims obvious.  (*E.g.*, Ex. AH at Ex. D at ¶¶ 4, 5, 18, 27)  And,

Dr. Siegel provided an extensive explanation of his opinion that a person skilled in the art would

be motivated to combine Scholl with the other references identified.  (*E.g.*, Ex. AH at ¶¶ 118-125)

Thus, there is no basis to exclude Dr. Siegel's opinions regarding Scholl.

## VII.   DR. SIEGEL'S OPINIONS HAVE SUFFICIENT FACTUAL FOUNDATION, AND THEREFORE SHOULD NOT BE EXCLUDED.

Pi-Net complains that Dr. Siegel's opinions rely on three facts "for which he has

no foundation or basis to testify."  (D.I. 118 at 15)[3]  Namely, Pi-Net seeks to exclude Dr. Siegel's

testimony that (1) Dr. Arunachalam copied portions of the patent specification; (2) Pi-Net's

proposed constructions are extremely broad; and (3) an embodiment of the Lawlor reference was

licensed and sold.  (D.I. 118 at 15)  Pi-Net offers no basis for excluding testimony on these facts.

Pi-Net has again failed to apply the correct legal standard.  It is well-established

that "experts may rely on facts from firsthand knowledge or observation, information learned at

the hearing or trial, and facts learned out of court . . ., [and] [i]f the facts are of the type

'reasonably relied upon' by experts in the particular field in forming opinions or inferences upon

a subject, [then] the facts or data need not be independently admissible in evidence."  *Stecyk v.*

*Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) (citation omitted); Fed. R. Evid.

703.  The Federal Rules of Evidence "place[] the burden of exploring the facts and assumptions

underlying the testimony of an expert witness on opposing counsel during cross-examination."

---

[3]   In addition to these three facts that allegedly lack foundation, Pi-Net argues that Dr. Siegel's "report contains many such assertions."  (D.I. 118 at 15)  JPMC has no way to respond to Pi-Net's vague allegations, and Pi-Net should be precluded from challenging the admissibility of Dr. Siegel's testimony regarding any additional facts not identified in Pi-Net's opening brief.

*Id.*; *i4i*, 598 F.3d at 854 ("[Defendant's] quarrel with the facts [the expert] used go to the weight, not admissibility, of his opinion."). Thus, even if the evidence that Dr. Siegel relied upon were not readily available in the record—which it is—excluding his testimony would be inappropriate.

Moreover, Pi-Net has provided no evidence or argument to support its bare assertion that Dr. Siegel's reports are "on all fours with the situation in *XpertUniverse*." (D.I. 118 at 15) In that case, this Court precluded an expert from opining that certain source code was included in specific demonstration versions of a product, based solely on the fact that the entity at issue "had only one product, so the code . . . must have been included in that product." *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157-RGA, 2013 WL 1702159, at *1 (D. Del. Feb. 25, 2013). By contrast, as discussed below, Dr. Siegel's opinions do not rely on such guesswork, but are directly grounded in documents that are both publicly available and of record in this case.

### A. The Record Establishes That Dr. Arunachalam Copied Portions Of The Patent Specification From The Prior Art.

Contrary to Pi-Net's bare assertion, the record is replete with evidence demonstrating that Dr. Arunachalam copied the concept of a "virtual information store" from prior art references, RFC 1156 and RFC 1213. (D.I. 118 at 15) Most notably, Pi-Net submitted a Duty of Candor Disclosure to the United States Patent and Trademark Office ("USPTO") on March 4, 2009. (Ex. DBL) In that document, Dr. Arunachalam's counsel explicitly outlines the allegations of copying, admits to certain copying (including copying relating to the claim element "virtual information store"), and includes a table comparing the language of RFC 1156 to the language of U.S. Patent No. 5,778,178 (the parent of the '500 patent). (*Id.*) Moreover, the documents that establish Dr. Arunachalam's copying—including the RFCs, the patent prosecution histories, and the patents themselves—are publicly available at the USPTO's Website (accessible at portal.uspto.gov/PublicPair), and were identified in Exhibit C to Dr.

15

Siegel's Opening Report as materials that he considered in forming his opinions.

**B.**   **Dr. Siegel's Opinion Of The Breadth Of Pi-Net's Proposed Constructions Is Supported By The Record In This Case.**

The extreme breadth of Pi-Net's proposed constructions is also well-established in the record.  Pi-Net offered constructions of all disputed terms of the patents-in-suit in the Joint Claim Construction Chart (D.I. 64), and broadly interpreted those constructions in the Joint Claim Construction Brief (D.I. 74) and the expert reports of Mr. Easttom (Ex. AD at 26-42) and Dr. Bardash (Ex. AA at 11-52).  Dr. Arunachalam, the sole inventor of the patents-in-suit, has confirmed the substantial breadth of the claims:

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

(Ex. DBB at 322:6-324:20)  Moreover, Pi-Net's counsel has confirmed in open Court that Pi-Net contends that its patents cover essentially any interactive Web page.  (D.I. 104 at 30:16-21 ("[I]f JPMorgan can find a web server that is generating an application displayed to a user on a web page . . . we're dead."))  While the ultimate breadth of the claims is a matter of dispute, Pi-Net proffers no basis to exclude Dr. Siegel's characterizations of the breadth of the asserted claims.

**C.**   **The Record Establishes That Embodiments Of Lawlor Were Licensed.**

Bizarrely, Pi-Net asserts that there is no foundation in the record for Dr. Siegel's statement that "Lawlor was implemented in . . . 'real-time EFT network-based payments,'" but includes a quote from Dr. Siegel's Opening Report citing directly to three documents that JPMC produced that support Dr. Siegel's statement.  (D.I. 118 at 15 (citing Ex. DBK))  The cited documents are publicly available Web press releases announcing the USPTO's grant of Lawlor and related patents, and describing their implementation.  (Ex. DBK)  For instance, one of the press releases that JPMC produced explains that Lawlor's parent application—which shares the

16

bulk of Lawlor's specification—covers "real-time EFT network-based payments" and was

"cross-licensed . . . to Citibank for its internal use." (Ex. DBK at JPM0204214) Dr. Siegel relied

on this publicly available information to rebut Mr. Easttom, who stated without support that

"[Lawlor], as far as I can tell, was never implemented in any form." (Ex. AD at 162) In contrast

to the conclusory statements from Pi-Net's expert, there is thus a clear factual foundation for Dr.

Siegel's testimony regarding the real-world implementation of Lawlor.

## CONCLUSION

Pi-Net's motion rests on the fatally flawed premise that, because Mr. Easttom

disagrees with Dr. Siegel, Dr. Siegel's testimony should be excluded. However, under no

circumstances can such a disagreement warrant the exclusion of testimony that is the product of

sound methodology. Because Pi-Net fails to even argue that Dr. Siegel's methodology is faulty,

his testimony is admissible, and Pi-Net's motion should be denied.

Respectfully submitted,


/s/ *Robert S. Saunders*

OF COUNSEL:                          Robert S. Saunders (ID No. 3027)
Daniel A. DeVito                     Jessica Raatz Kunz (ID No. 5698)
Douglas R. Nemec                     SKADDEN, ARPS, SLATE,
Edward L. Tulin                         MEAGHER & FLOM LLP
Andrew D. Gish                       920 N. King Street, 7th Floor
SKADDEN, ARPS, SLATE,                Wilmington, Delaware  19801
   MEAGHER & FLOM LLP                Tel.:  (302) 651-3000
Four Times Square                    Fax:  (302) 651-3001
New York, New York  10036            rob.saunders@skadden.com
Tel.:  (212) 735-3000                jessica.kunz@skadden.com
douglas.nemec@skadden.com

                                     *Attorneys for Defendant JPMorgan Chase & Co.*


DATED:  February 14, 2014

17