## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC. | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO. | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE
THE EXPERT TESTIMONY OF DAWN HALL**

**REDACTED VERSION
FILED PUBLICLY
FEBRUARY 21, 2014**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  February 14, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

---

|                                    |     |                           |
| ---------------------------------- | --- | ------------------------- |
| PI-NET INTERNATIONAL, INC.         | :   |                           |
|                                    | :   |                           |
| Plaintiff,                         | :   |                           |
|                                    | :   |                           |
| v.                                 | :   | Civil No. 1:12-cv-00282-RGA |
|                                    | :   |                           |
| JPMORGAN CHASE & CO.               | :   |                           |
|                                    | :   |                           |
| Defendant.                         | :   |                           |
|                                    | :   |                           |

---

**DEFENDANT'S BRIEF IN OPPOSITION TO PLAINTIFF'S
MOTION TO EXCLUDE THE EXPERT TESTIMONY OF DAWN HALL**

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  February 14, 2014

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................................ ii

I.      NATURE AND STAGE OF PROCEEDINGS ................................................................2

II.     SUMMARY OF ARGUMENT .......................................................................................2

III.    STATEMENT OF FACTS ..............................................................................................3

        A.      The Patents-in-Suit............................................................................................3

        B.      The Hall Report.................................................................................................5

IV.     THE APPLICABLE LAW ..............................................................................................8

V.      ANY TESTIMONY BASED ON MS. HALL'S REPORT IS RELIABLE AND
        ADMISSIBLE UNDER *DAUBERT* AND THE FEDERAL RULES OF
        EVIDENCE.......................................................................................................................9

        A.      Ms. Hall Should Be Permitted To Testify About Non-Infringing
                Alternatives. ......................................................................................................9

                1.      There Is a Substantial Written Record of Non-Infringing
                        Alternatives. ........................................................................................10

                2.      Ms. Hall Properly Relied on Dr. Siegel for Technical Expertise..............12

                3.      Ms. Hall Properly Relied on Mr. Romanelli for Factual Matters. ............15

                4.      Ms. Hall's Cost Figures Are Reliable and Admissible..............................16

        B.      Ms. Hall Should Be Permitted To Testify Regarding Pi-Net's Licenses. ..............18

        C.      Ms. Hall Should Be Permitted To Testify Regarding JPMC's Historical
                Approaches To Vendor And Non-Vendor Licenses. .............................................20

CONCLUSION..........................................................................................................................20

## TABLE OF AUTHORITIES

**CASES**                                                                        **Page(s)**

*Arlington Industries, Inc. v. Bridgeport Fittings, Inc.*,
    658 F. Supp. 2d 630 (M.D. Pa. 2009) ......................................................................9, 21

*AVM Technologies, LLC v. Intel Corp.*,
    927 F. Supp. 2d 139 (D. Del. 2013)..............................................................................20

*Carnegie Mellon University v. Marvell Technology Group, Ltd.*,
    No. 09-290, 2012 WL 3686736 (W.D. Pa. Aug. 24, 2012)........................................10, 11

*Chemipal Ltd. v. Slim-Fast Nutritional Foods International, Inc.*,
    350 F. Supp. 2d 582 (D. Del. 2004)..............................................................................19

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993)................................................................................................8, 9

*Fresenius Medical Card Holdings, Inc. v. Baxter International, Inc.*,
    No. C 03-1431 SBA, 2006 WL 1390416 (N.D. Cal. May 18, 2006) ...............................11

*IGT v. Alliance Gaming Corp.*,
    No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7084605
    (D. Nev. Oct. 21, 2008).............................................................................................13

*Kimberly-Clark Worldwide, Inc. v. First Quality Baby Products, LLC.*,
    No. 1:09-CV-1685, 2013 WL 6036029 (M.D. Pa. Nov. 13, 2013) ...........................16, 17

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012).......................................................................................20

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)...................................................................................20

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013), *cert. denied*,
    82 U.S.L.W. 3107 (2014)..............................................................................................8

*PSN Illinois, LLC v. Abbott Laboratories*,
    No. 09 C 5879, 2012 WL 5381278 (N.D. Ill. Oct. 31, 2012) ..........................................16

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)...........................................................................2, 19, 20

*Rude v. Westcott*,
    130 U.S. 152 (1889)....................................................................................................19

*Schneider ex rel. Estate of Schneider v. Fried*,

320 F.3d 396 (3d Cir. 2003)..................................................................................8, 12

*Small v. Nobel Biocare USA, LLC*,
808 F. Supp. 2d 584 (S.D.N.Y. 2011)................................................................19

*SSL Services, LLC v. Citrix Systems, Inc.*,
No. 2:08-cv-158-JRG, 2012 WL 1995514 (E.D. Tex. June 4, 2012)................15

*St. Clair Intellectual Property Consultants, Inc. v. Acer, Inc.*,
935 F. Supp. 2d 779 (D. Del. 2013)..........................................................1, 10, 15

*Sterling v. Redevelopment Authority of City of Philadelphia*,
836 F. Supp. 2d 251 (E.D. Pa. 2011), *aff'd*,
511 F. App'x 225 (3d Cir. 2013).........................................................................19

*TASER International, Inc. v. Karbon Arms, LLC*,
No. 11-426-RGA, 2013 WL 6773663 (D. Del. Dec. 19, 2013)........................18

*TQP Development, LLC v. Merrill Lynch & Co.*,
No. 2:08-CV-471-WCB, 2012 WL 3283354
(E.D. Tex. Aug. 10, 2012) .................................................................................14

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011)............................................................................8

*United States v. Mitchell*,
365 F.3d 215 (3d Cir. 2004).................................................................................8

*Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*,
No. 1:05CV955, 2011 WL 2470460 (M.D.N.C. June 20, 2011)......................20

*Wonderland Nurseygoods Co. v. Thorley Industries, LLC*,
No. 12-196, 2013 WL 6328772 (W.D. Pa. Dec. 5, 2013) ..................................9

*XpertUniverse, Inc. v. Cisco Systems, Inc.*,
No. 09-157-RGA, 2013 WL 1702159 (D. Del. Feb. 25, 2013) ........................18

*ZF Meritor, LLC v. Eaton Corp.*,
696 F.3d 254 (3d Cir. 2012), *cert. denied*, 133 S. Ct. 2025 (2013) ..................18

## STATUTES AND RULES

Fed. R. Evid. 703 ....................................................................................................8, 9

## I.      NATURE AND STAGE OF PROCEEDINGS

Defendant JPMorgan Chase & Co. ("JPMC") respectfully submits this brief in opposition

to the Motion to Exclude Certain Testimony of Defendant's Retained Expert, Dawn Hall (D.I.

120), filed by plaintiff Pi-Net International, Inc. ("Pi-Net").  On January 29, 2014, Pi-Net filed

that motion and two other *Daubert* challenges to JPMC's technical experts, while JPMC filed

three motions for summary judgment and a *Daubert* motion to exclude certain testimony of

Pi-Net's damages expert.  (D.I. 109-22)  The Court will hold a *Markman* and case dispositive

motion hearing on March 6, 2014, and trial is scheduled to begin June 2, 2014.  (D.I. 95)

## II.      SUMMARY OF ARGUMENT

1.  Pi-Net seeks to limit the testimony of JPMC's damages expert, Ms. Dawn Hall, on

three topics:  (a) the effect that alternative, non-infringing systems would have had on a

hypothetical negotiation; (b) the impact that Pi-Net's executed patent licenses should have on the

structure and value of a hypothetical license; and (c) JPMC's history of structuring patent license

agreements as lump-sums.  Pi-Net's challenge is little more than an attempt to compensate for the

failure of Pi-Net's own damages expert to serve a reply report that rebutted any of Ms. Hall's

opinions, and Pi-Net's failure to adequately examine JPMC's witnesses during discovery.

2.  Pi-Net seeks to exclude Ms. Hall's testimony regarding available, non-infringing

alternatives (based primarily on the Common Gateway Interface, or "CGI").  In so doing, Pi-Net

mischaracterizes not only Ms. Hall's report and deposition testimony, but also the applicable

precedent of this Court, which has recently rejected a nearly identical challenge to expert

damages testimony.  *See St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*, 935 F. Supp.

2d 779, 781 (D. Del. 2013).  The patents-in-suit identify prior art CGI systems as non-infringing

alternatives to the claimed technology—and JPMC's predecessors *actually were using* this

alternative, prior art system in the early 2000s.  Ms. Hall's treatment of these non-infringing

alternatives relies on the opinion of JPMC's technical expert, Dr. Michael Siegel, that CGI and other similar systems were viable alternatives to the claimed technology.  Ms. Hall also considered factual evidence from Mr. Rick Romanelli, JPMC's lead Internet architect, regarding JPMC's actual computing power and manpower as of 2001.  Thus, although styled as a *Daubert* motion, Pi-Net's challenge is actually a thinly veiled summary judgment motion, which seeks a declaration that CGI is not an *acceptable* alternative to the claimed technology.  But the question of CGI's viability presents a factual dispute that has been the subject of extensive, competing expert reports and testimony—and cannot be resolved through a *Daubert* challenge.

3.  Pi-Net's challenge to Ms. Hall's testimony that Pi-Net's own license agreements support a limited, lump-sum royalty is similarly misplaced.  Pi-Net again mischaracterizes and ignores applicable law, which permits a damages expert to consider settlement agreements— particularly when they cover precisely the same intellectual property as the hypothetical license would.  *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010).

4.  Finally, Pi-Net seeks to exclude Ms. Hall from "express[ing] JPMorgan's opinions of their [*sic*] licensing policies."  (D.I. 120 at 2)  Ms. Hall has not set forth any JPMC "opinions" of its licensing policies.  She merely indicated—based on factual evidence from a JPMC employee and consistent with the evidence cited by Pi-Net's own damages expert—that companies like JPMC typically enter into lump-sum patent licenses, rather than agreeing to running royalties on a per-transaction basis.  Nothing about Ms. Hall's cited evidence or opinion on these historical practices is unreliable or otherwise runs afoul of the *Daubert* standard.

## III.   STATEMENT OF FACTS

### A.   The Patents-in-Suit

The asserted claims of the patents-in-suit generally relate to "a method and apparatus for providing real-time, two-way transactional capabilities on the [World Wide] Web."  (Ex. C,

3

Abstract)  The patents-in-suit acknowledge that they were not the first disclosure of a web-based system for two-way interactive transactions, and that prior to the claimed technology, "a user [had] access to two-way services on the Web via Common Gateway Interface (CGI) applications," (Ex. C at 1:65-67), as shown in Figure 1B (color annotations added):



**FIG. 1B** (PRIOR ART)

Figure 1B illustrates two examples of web-based, CGI applications:  "transactions on a checking account **152** and [making] a payment on [a] loan account." (Ex. C at 2:11-15)  Although the specification of the patents-in-suit criticized CGI-based systems, it acknowledged that as of 1995, "CGI [was] a standard interface for running external programs on a Web server . . . [that] allow[ed] Web servers to create documents dynamically when the server receives a request from a Web browser." (Ex. C at 1:67-2:3)  For instance, when a Web server receives a request from the front-end in a CGI-based system, "the Web server dynamically executes the appropriate CGI script and transmits the output of the execution back to the requesting Web browser" on the front-end. (Ex. C at 2:3-6)  This is a "two-way" interaction, with information flowing both from the user (front-end) to the merchant (back-end), and vice versa. (Ex. C at 2:7)

4

**B.    The Hall Report**

Ms. Dawn Hall, a Managing Director at FTI Consulting, was retained by JPMC's counsel to analyze the economic damages that Pi-Net may be able to recover if JPMC is found liable for infringement of the patents-in-suit.  (Ex. AM at 2)  For more than fifteen years, Ms. Hall has consulted on complex financial, accounting, and damages matters for a variety of clients, including those in the banking, securities, and financial markets.  (Ex. AM at Ex. 1 at 1)  On November 25, 2013, Ms. Hall served a 61-page report responding to Pi-Net's damages expert, Mr. Stevan Porter.  Mr. Porter concluded that a hypothetical negotiation in the latter of 2001 between Pi-Net and JPMC's predecessor-in-interest (BankOne) would have resulted in an agreed running royalty of $0.04 per transaction, such that Pi-Net is entitled to "reasonable royalty damages [of] no less than ▮▮▮▮▮▮▮▮."  (Ex. AF at 6-7, 57)[1]

In response, Ms. Hall performed an analysis of the fifteen *Georgia-Pacific* factors.  (Ex. AM at 20-22)  As part of this analysis, Ms. Hall opined that rather than structuring the hypothetical license as a running royalty, the parties would have entered into a lump-sum, fully paid-up license.  (*Id.* at 23-24)  For support, Ms. Hall relied primarily on three sources.  First, Ms. Hall noted that Pi-Net entered into *at least fifteen* license agreements covering at least one of the patents-in-suit.  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex. AM at 18, 23-24)  Second, Ms. Hall noted that based on her experience, "[f]inancial institutions typically enter into agreements for fixed fees or lump-sum payments" when licensing intellectual property, unless the license was conveyed by "vendors providing an ongoing service."  (Ex. AM at 24; *see also* Ex. AF at ¶¶ 118-

---

[1]    Mr. Porter chose not to serve a Reply Report in response to Ms. Hall's opinions.  Pi-Net did, however, submit reply reports from its technical experts that purport to respond to Ms. Hall.

23 (identifying three JPMC vendor agreements that have a "value-per transaction payment

structure")) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Ms. Hall also considered whether a non-infringing alternative would have been available

to JPMC at the time of the hypothetical negotiation in late 2001:

> The cost of "designing around" the patented technology by implementing a
> comparable alternative can serve as a proxy as to what a true licensee would be
> willing to pay for access to the patented technology. That is, a licensee would
> likely not be willing to pay more for access to the technology than it would cost to
> implement one (or a combination of) non-infringing alternatives, to the extent no
> other factors would compel the licensee to accept a higher royalty.

(Ex. AM at 29) Ms. Hall noted that, according to JPMC's technical expert, Dr. Siegel, there were

at least three different alternatives available to implement JPMC's online banking systems as of

2001: CGI, FastCGI, and reducing the information that is transmitted as part of a transaction.[2]

(Ex. AM at 29-32) In identifying these alternatives, Ms. Hall cited (i) the patents-in-suit

themselves (which disclose and discuss CGI as an alternative way of performing two-way,

interactive, web-based banking transactions); (ii) Dr. Siegel's First Expert Report, served

October 25, 2013; (iii) publicly available documents showing the widespread use of CGI-based

systems; and (iv) discussions with Dr. Siegel. (Ex. AM at 29-32) In particular, Ms. Hall relied

on Dr. Siegel's written opinion that the patents-in-suit exaggerate any alleged deficiencies of

---

[2] Because Pi-Net's expert agrees that FastCGI "simply is used to make CGI function more
quickly," (Ex. AE at 7), these two systems are collectively called the "CGI-based systems."

CGI-based systems, and that CGI is "not distinct" from the claimed technology because it incorporates the same sort of features and functionalities recited in the asserted claims.  (Ex. AM at 25-26, 29-30 (citing Ex. AH at ¶¶ 59-61))

Ms. Hall also discussed the CGI-based systems that Dr. Siegel identified with Mr. Romanelli, a JPMC employee with nearly 12 years of experience with the online banking platforms for JPMC and BankOne (JPMC's predecessor).  (Ex. AM at 30-31)  Mr. Romanelli stated that in 2000-2001, BankOne's online system used a CGI-based interface, and thus BankOne's systems had the "capacity and performance headroom" to accommodate a return to a CGI-based online banking system.  (Ex. AM at 30-31)  BankOne was acquired by JPMC in 2004.  (Ex. AM at 7)  Because of its prior use of the CGI interface, BankOne already had employees "with the requisite skills and expertise" to construct a CGI-based system utilizing banking applications like those depicted in Figure 1B.  (Ex. AM at 31)  However, Mr. Romanelli conservatively estimated that to revert to a CGI-based platform in late 2001, he would need "1-2 full time developers at an average annual salary of $100,000 a year for one year."  (Ex. AM at 31)  Thus, Ms. Hall concluded that "it would cost [JPMC] approximately $200,000 to implement such a change" in 2001.  (Ex. AM at 31-32)

In arriving at her view that this $200,000 figure is the reasonable royalty that would have resulted from a hypothetical negotiation between Pi-Net and BankOne in 2001, Ms. Hall considered many other factors, including (a) ██████████████████████████████ ████████████████████████████████████████████ ██████████████ ; (b) Pi-Net's history of licensing ████████████████████████ in settlement of litigation for sums ranging from ████████████████ ; (c) ████████████████████████████ ████████████████████████████████████ ; (d) the lack of evidence

that the patents-in-suit produce benefits over the prior art; (e) ████████████████

████████████████████████████████████████████████████████████████

████████████████████; and (f) ████████████████████████████

████████████████. (Ex. AM at 34-35)

## IV.   THE APPLICABLE LAW

"The patentee bears the burden of proving damages" in patent infringement cases. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011).  "In determining damages, a jury may rely on expert testimony." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1373 (Fed. Cir. 2013).  Federal Rule of Evidence 702 requires courts to "ensure that all expert testimony is rooted in firm scientific or technical ground." *Id.* (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-90 (1993)).  In the Third Circuit, "Rule 702 embodies a trilogy of restrictions on expert testimony:  qualification, reliability and fit." *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003).  "[T]he district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury." *Id.*

However, "'*Daubert* does not require that a party who proffers expert testimony carry the burden of proving to the judge that the expert's assessment of the situation is correct.'" *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (citation omitted).  "'As long as an expert's scientific testimony rests upon "good grounds, based on what is known," it should be tested by the adversary process—competing expert testimony and active cross-examination—rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies.'" *Id.* (citation omitted).  "'*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.'" *Id.* (citation omitted).  Furthermore, "[d]ata relied on by the expert 'need not be admissible for the

opinion to be admitted' if experts in the field would reasonably rely on such data." *Power Integrations*, 711 F.3d at 1373 (quoting Fed. R. Evid. 703).  "Rule 703 provides that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'" *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703).

## V.    ANY TESTIMONY BASED ON MS. HALL'S REPORT IS RELIABLE AND ADMISSIBLE UNDER *DAUBERT* AND THE FEDERAL RULES OF EVIDENCE.

### A.    Ms. Hall Should Be Permitted To Testify About Non-Infringing Alternatives.

Ms. Hall opined that the availability of certain non-infringing alternatives would have exerted substantial downward pressure on the value of a license to the patented technology, such that under the particular facts and circumstances of this case, JPMC's predecessor would have paid no more than $200,000 for a lump-sum license in late 2001.  (Ex. AM at 34-35)  As is typical for damages experts, Ms. Hall relied on Dr. Siegel's opinion that, consistent with the teachings of the patents-in-suit, certain CGI-based systems and systems with limited transmission of transaction information were available as of late 2001 to perform banking functions analogous to those in the accused systems.  Ms. Hall is not a computer scientist or software engineer; her expertise is in accounting and intellectual property damages.  As such, her testimony is directed only to the effect that these alternatives would have had on the 2001 negotiations.  Pi-Net provides no evidence that Dr. Siegel's opinions are not the sort of data reasonably relied upon by damages experts.  *See, e.g.*, *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 658 F. Supp. 2d 630, 642 (M.D. Pa. 2009) (concluding that damages experts frequently offer opinions relating to the "presence of acceptable non-infringing substitute products"); *Wonderland Nurserygoods Co. v. Thorley Indus., LLC*, No. 12-196, 2013 WL 6328772, at *5 (W.D. Pa. Dec. 5, 2013) (denying a motion to strike a damages expert report in

part because he could "rely on inadmissible hearsay as long as it is of a type reasonably relied on by experts in his field").

Ms. Hall also relied on Mr. Rick Romanelli, a long-time JPMC employee with firsthand knowledge of BankOne and JPMC's online banking systems, for factual information about JPMC's computing infrastructure and manpower as of 2001.  Multiple courts have allowed damages testimony similar to that of Ms. Hall.  *See, e.g.*, *Acer*, 935 F. Supp. 2d at 781 (rejecting a motion to limit testimony of a damages expert regarding "non-infringing alternatives and their associated cost," because any challenge to that testimony would "go toward the weight of the evidence," not its admissibility); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, No. 09-290, 2012 WL 3686736, at *2-5 (W.D. Pa. Aug. 24, 2012) ("*CMU*") (rejecting motion to exclude a damages expert who opined, based on technical expert's opinion, that non-infringing alternatives would have limited hypothetical license to $250,000).

As discussed below, Pi-Net's challenge to Ms. Hall's testimony on non-infringing alternatives is based on several fundamental errors:  (1) Pi-Net ignores the teachings of the patents-in-suit themselves, which identify CGI-based systems as non-infringing alternatives; (2) Pi-Net ignores Dr. Siegel's extensive discussion of CGI-based systems in his written reports; (3) Pi-Net mischaracterizes Mr. Romanelli's evidence as "expert opinion," when it is merely factual.

### 1.    There Is a Substantial Written Record of Non-Infringing Alternatives.

Pi-Net contends that there is "no record of acceptable non-infringing alternatives," other than the conversations that Ms. Hall had with Dr. Siegel and Mr. Romanelli.  (D.I. 120 at 3) Pi-Net's characterization bears no resemblance to the actual record—most notably, CGI-based systems are not only identified in the specification of the patents-in-suit, but there is also a figure that depicts the use of CGI to perform two types of web-based banking transactions:  checking account transactions and online loan payments.  (*E.g.*, Ex. C at 2:1-5, Fig. 1B)  The patentee

intended for CGI-based systems to fall outside the scope of the asserted claims, and thus those systems would have been available as non-infringing alternatives in 2001.

Pi-Net is also incorrect when it contends that "Dr. Siegel did not provide any expert report on the issue of acceptable non-infringing alternatives." (D.I. 120 at 6)  As expressed in Dr. Siegel's expert reports and deposition testimony, it is his expert view that CGI-based systems would have been acceptable alternatives as of 2001.  (Ex. AH at ¶¶ 59-62; Ex. AI at ¶¶ 34-38; Ex. AQ at 109 ("I think CGI can do exactly—and I've stated it in my report, can do exactly what is in this invention."))  Pi-Net's technical experts disagree with Dr. Siegel's conclusion—but that is not a reason to preclude Ms. Hall from testifying about the economic effect that CGI-based systems would have on the hypothetical negotiations.  *See, e.g.*, *Fresenius Med. Card Holdings, Inc. v. Baxter Int'l, Inc.*, No. C 03-1431 SBA, 2006 WL 1390416, at *7 (N.D. Cal. May 18, 2006) (denying a motion to bar a damages expert from testifying about the economic impact of a non-infringing alternative because whether "in fact, [a product is] a viable alternative . . . is not an issue for the Court to determine under the *Daubert* review[;] [w]hether there is a 'noninfringing substitute is a question of fact'") (citation omitted); *CMU*, 2012 WL 3686736, at *5 (finding that a damages expert had "good grounds" for concluding that alternative "technologies existed and that they could achieve similar results as those derived from [the] patented technologies," and that the court could not resolve whether a non-infringing alternative did in fact exist "by way of a *Daubert* review").

Finally, although Dr. Siegel did not expressly address what Pi-Net terms the "Non-Object" systems in his report, Pi-Net was clearly on notice of Dr. Siegel's views regarding this third non-infringing alternative from Ms. Hall's report.  Pi-Net was thus aware of Dr. Siegel's views regarding this "Non-Object" system for more than a month before his deposition occurred,

and could have probed his opinions on this point at his deposition.  Having had sufficient written

notice of both Dr. Siegel's technical views, and the economic impact that those views would have

on the hypothetical negotiation from Ms. Hall—and having had the opportunity to question them

both about this alternative system—Pi-Net has offered no basis to exclude this evidence.

### 2.    Ms. Hall Properly Relied on Dr. Siegel for Technical Expertise.

Pi-Net argues that Dr. Siegel is "not qualified to give opinions as to acceptable non-

infringing alternatives."  (D.I. 120 at 6)  As an initial matter, Pi-Net's criticism of Dr. Siegel is

misplaced—Pi-Net has separately challenged certain aspects of Dr. Siegel's reports as unreliable

under the *Daubert* standard, but never raised any challenge to his qualifications.  (*See* D.I. 118)

Dr. Siegel has four technical degrees:  a B.S. and an M.S. in engineering, and an M.A. and Ph.D.

in computer science.  He has spent more than two decades on the research faculty of the

Information Technologies Group of the Massachusetts Institute of Technology ("MIT").  During

that time, he has developed algorithms, systems, and applications, and authored more than 70

journal articles and reports in the fields of computer science and information systems.  (Ex. AH

at ¶¶ 6-16)  Dr. Siegel also has first-hand knowledge of CGI-based alternatives—he developed

and implemented system architecture utilizing CGI during his time at MIT.  (Ex. AQ at 47:4-22)

Dr. Siegel thus unquestionably meets the Third Circuit qualification standards that would allow

him to offer technical view regarding the functionality and viability of systems that were

available as alternatives to the claimed technology.  *See, e.g.*, *Schneider*, 320 F.3d at 404 (the

"qualification" prong of Rule 702 should be evaluated "liberally" because "'a broad range of

knowledge, skills, and training qualify an expert'") (citation omitted).

Pi-Net asserts that despite Dr. Siegel's credentials, he is nonetheless not qualified to opine

on non-infringing alternatives for two reasons:  (1) he did not recall having any discussions with

JPMC regarding CGI at his deposition; and (2) he was unable during his deposition to identify

from memory any institutions that *today* utilize CGI-based online banking systems.  (D.I. 120 at 6-10)  Pi-Net cites no caselaw in this section of its supporting brief, and with good reason—there is no requirement that a technical expert must discuss non-infringing alternatives with defendant's in-house personnel,[3] or must offer an opinion as to the viability of the alternative *today*, as opposed to the date of the hypothetical negotiation (*i.e.*, as of 2001).

Ms. Hall relied on Dr. Siegel for several examples of financial institutions other than JPMC/BankOne that used CGI to implement their web-based banking systems in the early 2000s (including Wells Fargo, Charles Schwab, Royal Bank of Canada, Citibank, and Wachovia).  (Ex. AM at 30-31)  Dr. Siegel also referenced several publicly available documents that confirmed the widespread use of CGI in online systems as of the 2001 timeframe.  (Ex. AM at 30 n. 112) Pi-Net's technical experts may disagree on the content of these documents, but that dispute does not provide a basis to restrict Ms. Hall's (or Dr. Siegel's) testimony on this subject.  *See, e.g.*, *IGT v. Alliance Gaming Corp.*, No. 2:04-CV-1676-RCJ-RJJ, 2008 WL 7084605, at *8 (D. Nev. Oct. 21, 2008) (denying a motion to exclude testimony of a damages expert where there was a factual dispute as to "what machines could serve as a noninfringing substitute for IGT's patented products," and noting that "*Daubert* does not allow a court to resolve a factual dispute underlying the expert's analysis").  Discussions with JPMC to confirm this publicly available information are unnecessary, because JPMC—through its predecessor, BankOne—*was actually using CGI-based systems* during the early 2000s, and Dr. Siegel has clearly expressed the view that CGI is "not distinct" from the claimed technology.  (Hall Report at 29-30)  Ms. Hall thus properly relied on Dr. Siegel's views and the public documents he identified.  *See, e.g.*, *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 3283354, at *2 (E.D. Tex. Aug. 10,

---

[3]   Ironically, Pi-Net criticizes Ms. Hall for relying on JPMC's in-house personnel, while criticizing Dr. Siegel for *not* relying on the same in-house personnel.  (D.I. 120 at 5, 8)

2012) (denying motion to exclude damages expert opinion on non-infringing alternatives who cited defendant's technical expert and "various public documents," because "his methodology was reliable and reproducible"); *SSL Servs., LLC v. Citrix Sys., Inc.*, No. 2:08-cv-158-JRG, 2012 WL 1995514, at *3 (E.D. Tex. June 4, 2012) (denying *Daubert* motion to limit testimony of damages expert where non-infringing alternatives were "actually sold on the market" and technical expert's report "address[ed] the existence of non-infringing alternatives").

That Dr. Siegel was unable at his deposition to identify the use of CGI in any banking systems *today* is of no moment—the critical inquiry is what was available as of the date of the first alleged infringement, which was in the latter half of 2001.  Nearly all of the deposition quotes from Pi-Net's brief relate to what is happening *today*, as opposed to what was happening as of 2001.  (*See* D.I. 120 at 8 (seeking information "[a]s of today"); *id.* at 8-9 (asking about Wells Fargo's use of CGI "today"); *id.* at 9 (asking "whether Schwab today uses a system that relies on CGI"); *id.* at 9-10 (asking about banks that "currently" use FastCGI))  When Dr. Siegel was actually asked about the relevant time frame, he was able to recall from "memory" that at least "Schwab," "Wells Fargo" and "S1" were all using CGI "in the past."  (D.I. 120 at 8)

Pi-Net further asserts that Ms. Hall's reliance on Dr. Siegel's views are improper because he engaged in only "pure[] speculation" regarding the non-infringing alternatives.  (D.I. 120 at 8)  However, this precise argument has been rejected by this Court.  For instance, in *Acer*, the patentee argued that "the proffered testimony of the alleged acceptable non-infringing alternatives should be excluded because the alternatives are speculative and the assertion of acceptability is conclusory and contrary to the evidence."  (Case No. 1:09-cv-00354-LPS, D.I. 729, at 17)  In particular, the patentee challenged the *Acer* expert's reliance on "technical expert Darrell Long [to] evaluate the acceptability of [a] stripped down . . . alternative."  (*Id.* at 18)

14

Judge Stark denied the motion to exclude this testimony and noted that any issues regarding the underlying bases for the expert's conclusions were fodder for cross-examination, and not a basis for inadmissibility.  *Acer*, 935 F. Supp. 2d at 781.

### 3.        Ms. Hall Properly Relied on Mr. Romanelli for Factual Matters.

Pi-Net argues that Mr. Romanelli "is precluded from providing any expert testimony" on the non-infringing alternatives identified in the Hall Report.  (D.I. 120 at 5)  Pi-Net distorts Mr. Romanelli's statements, which are purely factual in nature.  Mr. Romanelli's primary statements were:  (1) as of 2000-2001, JPMC's predecessor offered online banking utilizing CGI-based systems; (2) at that time, JPMC's predecessor had staff with knowledge about CGI and had computing systems that were operating below capacity; and (3) the salary for an engineer working with CGI at that time was approximately $100,000 per year.  (Ex. AM at 30-31)  These are the sorts of underlying facts that damages experts frequently rely upon in reaching their conclusions regarding a hypothetical royalty rate.  *See, e.g.*, *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC.*, No. 1:09-CV-1685, 2013 WL 6036029, at *3 (M.D. Pa. Nov. 13, 2013) (denying a motion to exclude testimony from a damages expert and noting that it is appropriate for a damages expert to rely on "availability of personnel on the defendant's staff who could engineer a noninfringing alternative at low cost"); *accord PSN Illinois, LLC v. Abbott Labs.*, No. 09 C 5879, 2012 WL 5381278, at *3-4 (N.D. Ill. Oct. 31, 2012) (rejecting motion to exclude damages expert testimony regarding non-infringing alternatives where expert relied on "interviews with Abbott doctors" and noting that objection to such reliance went to the "weight, if any, [that] should be given to" expert's opinions).

Pi-Net's complaints that it did not have the opportunity to depose Mr. Romanelli on the topics that he discussed with Ms. Hall likewise ring hollow.  JPMC made Mr. Romanelli available for a two-day, 14-hour deposition, which Pi-Net took in October 2013.  While Pi-Net

chose not to question Mr. Romanelli about CGI (and to use less than the 14 hours allotted for the deposition), that was a strategic choice by Pi-Net.  Thus, Pi-Net's failure to probe Mr. Romanelli on these topics when it had the chance is no basis to exclude Ms. Hall's testimony.

### 4.     Ms. Hall's Cost Figures Are Reliable and Admissible.

Ms. Hall opines that, at most, JPMC's predecessor would have paid $200,000 for a hypothetical license to the patents-in-suit.  Pi-Net argues that Ms. Hall "cannot testify about the $200,000 figure" for two reasons:  (1) Ms. Hall failed to identify a complete alternative system; and (2) Ms. Hall did not verify the underlying methodology that Mr. Romanelli used to estimate the manpower that would be needed to implement an alternative system.  Pi-Net mischaracterizes both the facts and the law, and thus offers no basis to exclude Ms. Hall's testimony on this point.

First, Ms. Hall identified a complete system—as in the prior CGI-based banking systems that had been employed by BankOne, it would utilize existing BankOne infrastructure, along with a Chase-specific "standard integration layer." (Ex. AM at 31)  The architecture utilized in this system would be generally analogous to the CGI-based system depicted as "prior art" in the patents-in-suit, and would include a web browser, web server with CGI interfaces and banking application software, and back-end systems such as databases.  (Ex. C at Fig. 1B)

As to Pi-Net's second argument, Ms. Hall identified the precise basis for Mr. Romanelli's cost estimates.  Because BankOne had recently utilized CGI interfaces and applications for its online banking operations, it had "employees on staff with the requisite skills and expertise to" revert to CGI-based architecture.  (Ex. AM at 31)  Mr. Romanelli estimated that, at most, two additional employees would be necessary to fully implement a CGI-based online banking interface like that identified in Figure 1B of the patents-in-suit.  (*Id.*)  Ms. Hall relied on Mr. Romanelli because there is no one at JPMC with greater knowledge about JPMC's online systems—he is the Executive Director and Lead Architect of JPMC's Corporate Internet Group.

16

(Ex. AM at 30-31)  Moreover, Mr. Romanelli's costs estimates are far more reliable than the

typical case, because JPMC *actually implemented a CGI-based system in the early 2000s*.  (Ex.

AM at 30)  Pi-Net's lengthy quotation from Ms. Hall's deposition thus only confirms that she

appropriately relied on Mr. Romanelli for certain factual details.  (*See* D.I. 120 at 12-13)  Thus,

Ms. Hall's testimony regarding the $200,000 reasonable royalty is well-supported and consistent

with the established law.  *See, e.g.*, *Kimberly Clark Worldwide*, 2013 WL 6036029, at *3

(admitting expert testimony that a reasonable royalty would not exceed "the cost of using a

noninfringing alternative" where "no other factors would compel [the defendant] to accept a

higher royalty rate during the hypothetical negotiations").

     Indeed, Pi-Net's cited caselaw does not establish a *per se* rule that cost data for non-

infringing alternatives from internal personnel are unreliable and inadmissible.  (D.I. 120 at 4,

12-14)  None of Pi-Net's cases address the particular circumstance of a non-infringing

alternative.[4]  For instance, Pi-Net relies on *TASER Int'l, Inc. v. Karbon Arms, LLC*, No. 11-426-

RGA, 2013 WL 6773663 (D. Del. Dec. 19, 2013).  However, *TASER* is distinguishable in two

respects:  (1) in that case, the damages figure that defendant's expert was "based entirely on

Karbon Arms' CEO's statement that a $.05 per unit royalty rate would be appropriate," *id.* at *1,

while Ms. Hall's opinion is based on a full consideration of all the *Georgia-Pacific* factors (Ex.

AM at 21-22, 34-35); and (2) in *TASER*, the $.05 royalty was "pulled . . . out of the sky" (Case

No. 1:11-cv-426, D.I. 146 at 5), while Ms. Hall's costs figure was based on JPMC's actual know-

how and capacity as of 2001.  Similarly distinguishable is *ZF Meritor, LLC v. Eaton Corp.*, 696

F.3d 254 (3d Cir. 2012).  In that case, the damages expert was "unaware of the qualifications of

---

[4]    *XpertUniverse, Inc. v. Cisco Sys., Inc.*, No. 09-157-RGA, 2013 WL 1702159 (D. Del. Feb. 25, 2013), which Pi-Net cites multiple times in its brief, is completely inapposite, and deals with inferences that can be drawn relating to source code.  *Id.* at *1.

the individuals [relied upon], or the assumption on which [his] estimates were based." *Id.* at 292.

In contrast, Ms. Hall specifically cited Mr. Romanelli's qualifications (as JPMC's lead online

banking architect) and his knowledge (that JPMC's infrastructure could accommodate any

additional computing power necessary, and that, at most, 1-2 additional individuals with CGI

experience may have needed to be hired).  Pi-Net also cites two non-patent cases where reliance

on "market projections" as part of damages calculations was held to be unreliable.[5]  Ms. Hall did

not rely on general market projections, but rather relied on the historical fact that BankOne

implemented CGI in a contemporaneous timeframe to estimate the cost of reverting to it.

### B.   Ms. Hall Should Be Permitted To Testify Regarding Pi-Net's Licenses.

As noted above, Pi-Net has entered into at least *fifteen* non-exclusive license agreements

covering the patents-in-suit, ranging in value from ███████████████ .  All of these license

agreements were executed to settle patent infringement lawsuits filed by Pi-Net or its related

company, WebXchange.  Ms. Hall relies on these licenses for two purposes:  (1) ████████

████████████████████████████████████████████████████████

██████████████████████████ ; and (2) to show that the value of the patented

technology is "strictly limited."  (Ex. AM at 24)  Pi-Net argues that that there is a *per se* bar that

prohibits testimony based on such license agreements.[6]

Pi-Net is incorrect, and has overlooked the key Federal Circuit decision that addresses

this point—*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) (per curiam).  In

---

[5]   *See Chemipal Ltd. v. Slim-Fast Nutritional Foods Int'l, Inc.*, 350 F. Supp. 2d 582, 592 (D. Del. 2004); *Sterling v. Redevelopment Auth. of City of Philadelphia*, 836 F. Supp. 2d 251, 273 (E.D. Pa. 2011), *aff'd*, 511 F. App'x 225 (3d Cir. 2013) (cited in D.I. 120 at 14).

[6]   Pi-Net's reliance on *Rude v. Westcott*, 130 U.S. 152 (1889), is misplaced.  (D.I. 120 at 14)  *Rude* does not bar testimony based on settlement agreements; rather, it relates to "the probative value of a settlement agreement, not its admissibility."  *Small v. Nobel Biocare USA, LLC*, 808 F. Supp. 2d 584, 591 n.3 (S.D.N.Y. 2011) (citing cases limiting *Rude*).

*ResQNet*, the patentee's damages expert based his royalty rate calculation on seven license agreements—two of which resulted from litigation settlements and covered the *ResQNet* patents-in-suit, and the remaining five of which were not settlement agreements, but which did not relate to those patents. *Id.* at 870. One of the settlement licenses was for a "lump-sum," and the other was for a running royalty. *Id.* The Federal Circuit reversed the damages award, determining that the "most reliable license in this record arose out of litigation" and that the non-settlement agreements improperly inflated the damages calculation. *Id.* at 872-73. *ResQNet* "forecloses" any contention that "'[a]greements reached to resolve patent litigation are not relevant to the calculation of a reasonable royalty.'" *Volumetrics Med. Imaging, LLC v. Toshiba Am. Med. Sys., Inc.*, No. 1:05CV955, 2011 WL 2470460, at *14 (M.D.N.C. June 20, 2011).

Here, the fifteen settlement agreements are the only licenses in the record covering the patents-in-suit—and unlike the third-party licenses relied on by Mr. Porter (*see* D.I. 110), these fifteen licenses are "'the most reliable license[s] in [the] record.'" *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (citation omitted). Pi-Net argues that this cannot be the case because these agreements were entered into (a) early in litigation "before there had been any significant discovery"; and (b) ████████████████████. As to the first argument, Pi-Net is wrong—significant discovery had occurred in many cases, and at least two settlements were executed *after the deadline for document production*. (Ex. AM at 49) As to Pi-Net's second argument, ███████████████████████████

████████████████████—████████████████

██████████████████████████████████

██████████████████████████████

████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████

### C.   Ms. Hall Should Be Permitted To Testify Regarding JPMC's Historical Approaches To Vendor And Non-Vendor Licenses.

Ms. Hall relied on her own relevant experience and the statements of Massimo Iori, a

JPMC employee, to support her view that ████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████    As with Mr. Romanelli, Pi-Net incorrectly characterizes Mr. Iori's statements

as an expert "opinion."  (D.I. 120 at 16-17)  Mr. Iori did nothing more than provide evidence

regarding JPMC's actual, prior licensing practices.  Indeed, Mr. Iori's statements are consistent

with those Pi-Net's own damages expert.  ████████████████████████████████████████████

█████████████████████████████████████████    Thus, the reliability of

Mr. Iori's statements is corroborated by Pi-Net's own damages expert.  *See, e.g.*, *Arlington*

*Indus.*, 658 F. Supp. 2d at 642 n.17 ("The reliance of both damages experts on essentially similar

material at the very least suggest that such evidence is . . . reliable.").  Moreover, Pi-Net had the

opportunity to inquire into JPMC's licensing practices during the depositions of five different

JPMC employees, but neglected to do so.

### CONCLUSION

Pi-Net's *Daubert* motion rests on an improper factual and legal foundation, and provides

no basis to exclude any testimony of Ms. Hall.  Pi-Net's motion should thus be denied.

Respectfully submitted,

/s/ *Robert S. Saunders*

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
douglas.nemec@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  February 14, 2014