**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **C.A. No. 12-282-RGA** |
| **v.** ) | |
| ) | **Redacted Version of** |
| **JPMORGAN CHASE & CO.,** ) | **D.I. 129** |
| ) | |
| **Defendant.** ) | |
| ) | |

**PLAINTIFF'S ANSWERING BRIEF IN OPPOSITION TO
DEFENDANT'S MOTION TO EXCLUDE THE EXPERT
TESTIMONY OF STEVAN PORTER (D.I. 109 and 110)**

George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff
Pi-Net International, Inc.*

# TABLE OF CONTENTS

I.      NATURE AND STAGE OF THE PROCEEDING.................................................................. 1

II.     SUMMARY OF ARGUMENT ......................................................................................... 1

III.    STATEMENT OF FACT ................................................................................................ 2

    A.   Description of Methodology Used in the Porter Report ................................................ 2

    B.   Initial Analytical Approach .......................................................................................... 3

    C.   Apportionment ............................................................................................................ 4

    D.   Guideline Agreements.................................................................................................. 6

IV.     LEGAL STANDARD.................................................................................................... 8

V.      ARGUMENT - MR. PORTER'S METHODOLOGY IS RELIABLE AND ADMISSIBLE

UNDER *DAUBERT* AND FRE 702 ....................................................................................... 10

    A.   JPMC's Arguments Go to Weight, Not Admissibility................................................... 10

    B.   Mr. Porter's Opinions Based on the MercExchange Agreement Are  Product of a

Reliable Methodology and Not Speculative .......................................................................... 12

    C.   Mr. Porter's Opinions Based on the i3 Agreement Are  Product of a Reliable

Methodology and Not Speculative........................................................................................ 16

    D.   Mr. Porter's Cost Savings Calculations Are Reliable..................................................... 17

    E.   Mr. Porter Properly Apportioned Cost Savings to Pi-Net and JPMC............................ 19

VI.     CONCLUSION............................................................................................................ 20

# TABLE OF AUTHORITIES

## CASES

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,

    694 F.3d 1312 (Fed.Cir.2012) ................................................................................ 11

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*,

    2013 WL 5332108 (W.D. Pa. 2013) ...................................................................... 19

*Georgia-Pacific Corp. v. United States Plywood Corp.*,

    318 F.Supp. 1116 (S.D.N.Y.1970) .......................................................................... 9

*Huntley v. United States*,

    135 F.Supp. 542 (Ct.Cl. 1955) ............................................................................... 9

*i4i Ltd. P'ship v. Microsoft Corp.*,

    598 F.3d 831 (Fed. Cir. 2010) aff'd, 131 S. Ct. 2238 (U.S. 2011) ...................... 9, 11

*In re Paoli R.R. Yard PCB Litig.*,

    35 F.3d 717 (3d Cir. 1994) ................................................................................... 10

*Ind. Mich. Power Co. v. United States*,

    422 F.3d 1369 (Fed.Cir.2005) ................................................................................ 9

*Inline Connection Corp. v. AOL Time Warner Inc.*,

    470 F.Supp.2d 424 (D.Del. 2007) .......................................................................... 6

*Interwoven, Inc. v. Vertical Computer Sys.*,

    2013 WL 3786633 (N.D. Cal. 2013) .................................................................... 11

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,

    694 F.3d 51 (Fed. Cir. 2012) .......................................................................... 14, 16

*Lucent Technologies, Inc. v. Gateway, Inc.*,

   580 F.3d 1301 (Fed. Cir. 2009).............................................................................. 3, 9

*Minks v. Polaris Indus.*,

   546 F.3d 1364 (Fed. Cir. 2008)................................................................................. 9

*Multimedia Patent Trust v. Apple Inc.*,

   2012 WL 5873711 (S.D. Cal. 2012)....................................................................... 10

*Precision Pine & Timber Inc. v. United States*,

   596 F.3d 817 (Fed.Cir. 2010)................................................................................... 9

*Pure Earth, Inc. v. Call*,

   2013 U.S. App. LEXIS 14724 (3d Cir. 2013) ....................................................... 10

*Putnam v. Henkel Consumer Adhesives, Inc.*,

   2007 WL 4794115 (N.D. Ga. 2007) ........................................................................ 6

*Rembrandt Soc. Media, LP v. Facebook, Inc.*,

   2013 WL 6327852 (E.D. Va. 2013)........................................................................ 12

*ResQNet.com, Inc. v. Lansa, Inc.*,

   594 F.3d 860 (Fed. Cir. 2010)................................................................................ 16

*Riles v. Shell Exploration & Prod. Co.*,

   298 F.3d 1302 (Fed. Cir. 2002)................................................................................ 9

*Sensonics, Inc. v. Aerosonic Corp.*,

   81 F.3d 1566 (Fed. Cir. 1996)................................................................................ 19

*Telcordia Techs., Inc. v. Cisco Sys.*,

   612 F.3d 1365 (Fed. Cir. 2010)................................................................................ 9

*TWM Mfg. Co. v. Dura Corp.*,

   789 F.2d 895 (Fed.Cir.1986)...................................................................................... 3

*Uniloc USA, Inc. v. Microsoft Corp.*,

   632 F.3d 1292 (Fed. Cir. 2011)................................................................................ 10

*Unisplay, S.A. v. American Elec. Sign Co.*,

   69 F.3d 512 (Fed.Cir.1995)...................................................................................... 9

*WhitServe, LLC v. Computer Packages, Inc.*,

   694 F.3d 10 (Fed. Cir. 2012).................................................................................... 14

*Wordtech Sys. v. Integrated Networks Solutions, Inc.*,

   609 F.3d 1308 (Fed.Cir.2010).............................................................................. 9, 10

**STATUTES**

35 U.S.C. § 284......................................................................................................... 8

## I.   NATURE AND STAGE OF THE PROCEEDING

Defendant JPMorgan Chase & Co. ("JPMC") has moved to exclude the opinions of Mr. Stevan Porter, a damages expert retained by counsel for Plaintiff Pi-Net International Inc. ("Pi-Net")  (D.I. 109, 110)  This is Pi-Net's answering brief in opposition of that motion.

## II.   SUMMARY OF ARGUMENT

JPMC contentions ignore Mr. Porter's actual methodology, and are entirely counsel's argument unsupported by any declaration or even citations to JPMC's own expert report.  Mr. Porter has conducted a sophisticated analysis to meet, and exceed, the demands of existing precedent and law.

Both parties agree that damages in this case should be measured in the form of a reasonable royalty based on the cost-savings that JPMC has enjoyed and continues to enjoy from its use of the patented technology.  The cost savings, however, had never been calculated, and, thus, Mr. Porter considered multiple inputs in quantifying the cost-savings, and then conducted a thorough and sophisticated analysis to determine the appropriate portion of those cost savings that are attributable to Pi-Net's patents.  JPMC has not pointed to any evidence that Mr. Porter has not considered.  In compliance with Rule 702, Mr. Porter's report is the product of reliable principles and methods which have been applied reliably to the facts of the case, and it is hard to imagine a sounder expert report on the fact pattern here.

JPMC challenges Mr. Porter's references to (1) a patent agreement between MercExchange, LLC and Aden Enterprises, Inc. effective January 2000 ("the MercExchange Agreement "); and (2) an exclusive patent license agreement between Portel Services Network, Inc. and i3 Mobile Inc. effective April 2000 ("the i3 Agreement").  JPMC asserts that these are non-analogous agreements, and that Mr. Porter's "royalty base translations" and adjustments

1

"depend on unproven assumptions, unreliable methods, and pure speculation."  However, Mr. Porter explained his use of these Agreements in his report and deposition, all of which rests on solid economic principles grounded in the facts of the case.  JPMC has not demonstrated by declaration of a competent expert, much less by any cogent analysis, that Mr. Porter's analysis is so legally unreliable that it must be stricken, and JPMC's citation to cases only reflects how thorough and sophisticated Mr. Porter's analysis is relative to existing precedent.

JPMC also alleges that Mr. Porter used cost savings figures that are disconnected from the actual costs incurred in connection with the accused products and failed to properly apportion the cost savings to the patented technology.  But, Mr. Porter detailed in his report and deposition how he tabulated cost savings using JPMC data and apportioned cost savings in accordance with the Pi-Net "footprint," exactly in accordance with precedent.  JPMC certainly has not identified any better approach on the facts here.

All JPMC's arguments show are nothing more than differences of opinion, which are matters for cross-examination at trial, and not a basis for disqualifying an expert.  JPMC is not asking the Court to decide a *Daubert* or Rule 702, but to decide fact issues reserved to the jury.

### III.      STATEMENT OF FACT

### A.      Description of Methodology Used in the Porter Report

Mr. Porter employed reliable principles and methods in undertaking a complete analysis of the 15 *Georgia-Pacific* factors in the context of a hypothetical negotiation.  Mr. Porter utilized generally accepted methods of royalty determination including the analytical/cost savings approach and the market approach.  Further, Mr. Porter tailored his analyses of observed data, including market comparable royalties, to the facts of the case, adjusting royalty observations to account for differences between guideline agreements and the hypothetical license.

To build his methodology on the firmest footing, Mr. Porter included in his royalty base and cost savings analysis only those infringing transactions that had direct economic consequences for JPMC, and excluded a far greater number of transactions that did not have a directly quantifiable economic impact, even though they were infringing.  In general, Mr. Porter 1) assessed the incremental profit JPMC generated as a result of its use of systems utilizing the patents-in-suit through the "analytical approach"; and then 2) apportioned that incremental profit between the contribution of the patents-in-suit and other factors, using the "market approach" and other financial data produced in this matter. (Porter Rpt. ¶130, Exh. AF, A-1619-20)

> ### B.        Initial Analytical Approach

JPMC does not appear to challenge Mr. Porter's general approach.  Mr. Porter began with a quantitative "analytical" methodology, which compares an infringer's profitability from infringing activity with its normal profit margin.   The incremental profit from infringement then becomes an amount from which a reasonable portion can be derived as royalties.  (Porter Rpt. ¶86, A-1599; Porter Dep. p. 193, Exh. AP, A-2556).  This approach is well-recognized in the law.[1]  In this case, there are not traditional sales and profit data, and so, using JPMC data, Mr. Porter determined JPMC's cost savings from using the patented technology as compared to non-patented technology, which Mr. Porter identified as no less than $0.249 per transaction included in his royalty base. (Porter Rpt. ¶87; A-1599)  This follows the analytical approach because of the accepted accounting identity that profit equals revenue minus cost (i.e., cost savings result in

_____

[1] See *TWM Mfg. Co. v. Dura Corp*., 789 F.2d 895, 899 (Fed.Cir.1986) (describing the analytical method as "subtract[ing] the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices"); *Lucent Technologies, Inc. v. Gateway, Inc*., 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("Litigants routinely adopt several approaches for calculating a reasonable royalty.  The first, the analytical method, focuses on the infringer's projections of profit for the infringing product.").

equal profit gains), and the cost savings approach ties the reasonable royalty analysis directly to the economic consequences of JPMC's infringement: "My analysis ties royalties to the quantum of [Defendant's] financial benefit [of infringement]." (Porter Dep. p. 122, A-2539)

Mr. Porter also considered, and compared JPMC's cost savings data against, industry reports and academic studies quantifying per-transaction cost savings attained by banks using online banking systems.  These reports validated cost savings Mr. Porter tabulated using JPMC data, identifying cost savings in the range of $0.51 to $3.95 per transaction, depending on transaction type. (Porter Rpt. ¶87).

### C.   <u>Apportionment</u>

Mr. Porter could have applied the entire cost savings as a reasonable royalty without further adjustment.  The accepted analytical approach applied to the facts of this case recognizes that in the absence of access to the patents-in-suit, JPMC could not have offered a commercially viable online banking solution and thus would not have realized any cost savings. (Porter Dep. pp. 91-93, A-2531)  However, as means of refining the analysis, and fully crediting JPMC's contributions to commercializing the accused systems, Mr. Porter apportioned cost savings (i.e., incremental profits) attained through JPMC's Accused Instrumentalities between the patents-in-suit and other factors. (Porter Dep. pp. 218-225)

Mr. Porter intrinsically embedded a key element for apportioning the cost savings value between the Pi-Net contribution and other factors when he conservatively included in his royalty base and cost savings analysis only those transactions with direct economic consequences for JPMC, despite evidence that even infringing transactions without directly quantified financial consequences benefit JPMC economically.  (Porter Rpt. ¶89; Porter Dep. p. 227, A-2565).  Mr. Porter then considered two separate and parallel areas of quantitative inquiry in apportioning value. (Porter Dep. pp. 218-225, A-2563-64).

First, Mr. Porter evaluated the payments made by JPMC to third-party providers of electronic banking transactions processing, which third-parties contribute to the value chain involving JPMC's accused systems.  The per-transaction payments made by JPMC to these third-parties are instructive as to: 1) the appropriateness of structuring payments on a per-transaction basis; and 2) the relative level of contribution made by JPMC to the accused system value chain from which it obtains cost savings. (Porter Rpt. ¶¶ 118-123)  JPMC's actual per-transaction payments reflect JPMC's history of dividing per-transaction cost savings obtained through the accused systems between itself and third-parties, and the quantum of JPMC's retained per-transaction cost savings reflects the economic value of its contributions in commercializing and maintaining the accused systems separate from third-party contributions.  The Porter Report identifies the per-transaction payments made by JPMC to third-parties as ranging from $0.02 to $0.28.  (Porter Rpt. ¶¶ 120-122; A-1614-16).

Second, Mr. Porter evaluated "guideline" patent license agreements that he concluded were analogous to the hypothetical agreement.  These guideline agreements reflect royalties for the licensees' uses of patents as part of the value chains associated with covered product/service commercialization.  They provide quantitative basis for apportioning JPMC's cost savings in the hypothetical license since the guideline agreements reflect royalties for use of licensed patents isolated from non-patent contributions to value.  The Porter Report evaluated the licensed patents' contributions to value by quantitatively analyzing royalties relative to licensee gross profits. (Porter Rpt. ¶¶ 111-112 and 116-117, A-1610-14).  Mr. Porter used gross profit as a bridge (since JPMC cost savings flow to gross profit) between guideline agreement royalties and the hypothetical license so as to analyze guideline and hypothetical license royalties on equal economic footing. (Porter Dep., pp. 195-196)  The Porter Report's evaluation of the guideline

5

agreements provides quantitative basis for a royalty in the range of $0.035 to $0.058 per

"covered" transaction, and his ultimate opinion that the royalty should be $0.04 per "covered"

transaction. (Porter Rpt. ¶¶ 102-117, A-1609-14)

### D.      Guideline Agreements

JPMC challenges Mr. Porter's use of the Guideline Agreements in apportioning cost

savings.  JPMC alleges that these agreements are not "comparable," but does not identify any, let

alone more applicable, guideline agreements.

Mr. Porter researched and used these guideline agreements in his application of the well-

accepted economic appraisal technique known as the "market approach" in determining the value

of the Pi-Net patents' contribution.[2]  The market approach is widely used in patent valuation and

licensing negotiations, and Mr. Porter has utilized the market approach in the normal course of

his consulting work in the software and Internet technology space assisting firms with arm's-

length patent licensing. (Porter Dep. 10-11, 68, A-2511, 2525)  Mr. Porter undertook an

exhaustive search of public records for agreements analogous to the hypothetical license. (Porter

Rpt. ¶¶ 102-104, A-1606-07).  JPMC's damage expert, Dawn Hall, testified that she reviewed

what Mr. Porter had done, and did not think that she could do any better.  (Hall Dep. at 215-17,

A-2721-22)

Mr. Porter's search identified the MercExchange and i3 Agreements, and Mr. Porter

chose to use them because they were similar to, and could inform, the hypothetical license in this

_____

[2] See *Inline Connection Corp. v. AOL Time Warner Inc.*, 470 F.Supp.2d 424, 432 & n. 38
(D.Del. 2007); *Putnam v. Henkel Consumer Adhesives, Inc*., 2007 WL 4794115 (N.D. Ga. 2007)
("Mr. Tanger used a market approach, which is a method of valuing intangible assets by
comparing similar transactions by unrelated parties, to assess the reasonable royalty rate in the
event Henkel is found to have infringed.").

case.  Mr. Porter identified numerous economically material similarities in his report and in his

deposition.[3]

---

[3]   First, the guideline agreements, like the hypothetical license, are single-patent license agreements.  The hypothetical license entails grant of a single patent and two technologically related patent applications.  The MercExchange Agreement entailed grant of a single patent and eight technologically related patent applications. (Porter Rpt. ¶106; A-1608)  The i3 license granted a single patent and no patent applications. (Porter Rpt. ¶113; A-1612).

 Second, all agreements were struck by licensors not independently commercializing the licensed patent property.  (Porter Rpt. fn. 101; A-1610)  Mr. Porter also recognized that the exclusive nature of the i3 agreement is indicative of a non-commercializing licensor. (Porter Rpt. ¶113 and fn. 108; A-1612-13)

 Third, all agreements cover patented technologies for electronic financial transaction methods in Internet commerce, for which there are "analog" or non-digital counterparts.  The MercExchange Agreement covers technology relating to online auction transactions. (Porter Rpt. ¶109, A-1608-09)  The i3 Agreement relates to technology covering three-party electronic commerce transactions. (Porter Rpt. ¶113; A-1610).

 Fourth, all agreements cover patented technology "platforms" relating to electronic transactions able to span multiple industry applications. (Porter Rpt. ¶¶110 and 113 and fn. 99)

 Fifth, all agreements set forth royalties as running royalties: the MercExchange Agreement on the basis of gross transaction value (Porter Rpt. ¶108; A-1608-09); and the i3 Agreement on the basis of gross revenue (Porter Rpt. ¶114; A-1612).

 Sixth, as with the hypothetical license, both the guideline agreements' royalty bases reflect values that are tallied in the normal course of business operations and have direct bearing on the economic results of the business. (Porter Rpt. ¶¶ 111-112, 116-117; A-1611-20)

 Seventh, all agreements were entered as of the early 2000s, and both guideline agreements were struck prior to the hypothetical negotiation date.  (Porter Rpt. ¶¶ 106; 113, A-1608, 1612)

 Eighth, both the guideline agreements, like the hypothetical license, cover patents for "systems" or "methods."  The MercExchange Agreement's single granted patent at the time of the license grant relates to "A method and apparatus for creating a computerized market...." (Porter Rpt. ¶107; A-1608) The Portel patent covers "data terminal and system for placing electronic orders." (Porter Report, Exhibit 9.3)

 Ninth, all agreements entail patent grants necessary but not sufficient to commercialize covered systems.  Mr. Porter specifically evaluated the contribution of the granted patents to the total value chain comprised by the covered systems in his analysis. (Porter Rpt. ¶¶ 112 and 115 and fn. 100)  Mr. Porter contemplated the independent commercialization costs and risks incurred by the licensees like JPMC, and he considered the other commercial inputs necessary for licensees and JPMC to commercialize covered systems.  He thus considered the market and economic footprints of the licensed technologies relative to the covered systems. (Porter Dep. pp. 197-199; A-2557-58)

 Tenth, all agreements involve U.S parties and cover U.S. patents only. (Porter Rpt. ¶104)

 Eleventh, both the guideline agreements, like the hypothetical license, were executed outside the scope of litigation settlement. (Porter Rpt. ¶103).

Notwithstanding numerous similarities between the guideline agreements and the hypothetical license, Mr. Porter also identified – and logically accounted for – any differences. Notably, Mr. Porter's analysis could have ended without making royalty adjustments to account for differences and would still have supported his conclusion as to reasonable royalties. The Porter Report nonetheless adjusts downward the MercExchange Agreement's royalties in a logical and conservative manner to specifically tailor the analysis of that Agreement to the facts of the case. (Porter Dep. pp. 205-207, 214-216; A-2559-62) This accounting for differences reflects the analytical depth of the Porter Report and the application of Mr. Porter's expertise in patent licensing economics. Such accounting for differences between market observations and the hypothetical license is a proper and logical part of the market approach methodology when properly performed. (Porter Rpt. ¶¶ 100, 110, 115, and 124-126; A-1605 etc.) Mr. Porter accounts for, among other things, the economic and market footprint of the guideline agreements' licensed patents relative to covered goods. The relative quantum of contribution made by the patents to the goods forms a component of Mr. Porter's evaluation of the guideline agreements' royalty terms and how those terms would have informed hypothetical negotiations. (Porter Rpt. ¶¶ 110 and 115; A-1605 etc.; Porter Dep., pp. 218-219; A-2563)

## IV.    LEGAL STANDARD

To avoid needless repetition as to the legal standards for admitting expert testimony, the section entitled "III.   Legal Standard" in D.I. 116 at 3-4 is here incorporated.

The legal standard for damages in this case is that a patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The statute guarantees patentees a reasonable royalty even when they are unable to prove entitlement to lost profits or

an established royalty rate.  *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).  "[A]ny reasonable royalty analysis necessarily involves an element of approximation, and uncertainty."  *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-58 (Fed. Cir. 2010) aff'd, 131 S. Ct. 2238 (U.S. 2011); *Lucent.,* 580 F.3d at 1325 ("any reasonable royalty analysis "necessarily involves an element of approximation and uncertainty").

A "reasonable royalty" derives from a hypothetical negotiation between the patentee and the infringer when the infringement began.  See, e.g., *Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.3d 512, 517 (Fed.Cir.1995).  "Creating a licensing agreement for patented technology is, at best, an inexact science." *Lucent,* 580 F.3d at 1336.  The hypothetical negotiation is not presumed to result in a perfect solution, and it "necessarily involves an element of approximation and uncertainty." *Wordtech Sys. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed.Cir.2010); *Unisplay*, 69 F.3d at 517; *Telcordia Techs., Inc. v. Cisco Sys.*, 612 F.3d 1365 (Fed. Cir. 2010); *Lucent*, 580 F.3d at 1324-25; *Minks v. Polaris Indus.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008).

A list of relevant factors for a reasonable royalty calculation appears in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970).

Ultimately, damages must be shown "with reasonable certainty," but "the amount of damages need not be 'ascertainable with absolute exactness or mathematical precision.'" *Ind. Mich. Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed.Cir.2005).  Evidence must be sufficient to enable finder of fact to make a "fair and reasonable approximation" of damages; that is, a party seeking damages must prove them with "reasonable certainty," which "requires more than a guess, but less than absolute exactness."  *Precision Pine & Timber Inc. v. United States*, 596 F.3d 817, 833 (Fed.Cir.2010); *Huntley v. United States*, 135 F.Supp. 542, 546 (Ct.Cl. 1955)

9

("All that is required is such reasonable certainty that damages may not be based wholly upon speculation," and "may be estimated with a fair degree of accuracy.").

## V. ARGUMENT - MR. PORTER'S METHODOLOGY IS RELIABLE AND ADMISSIBLE UNDER *DAUBERT* AND FRE 702

### A. JPMC's Arguments Go to Weight, Not Admissibility

JPMC challenges Mr. Porter's opinion, but does not cite any expert evidence, and does not identify any more suitable comparable agreement(s) that Mr. Porter should have considered. Mr. Porter explained in detail in his report and deposition why the guideline Agreements are comparable and appropriate, which is a matter of expert opinion.  See, pages 5-6 and fn. 3, *supra*, which demonstrates the fundamental similarity of the guideline Agreements and the hypothetical license.  An expert may rely on agreements, even if they are not a perfect fit, so long as they are not "radically different from the hypothetical agreement under consideration" and the expert lays "a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1316, 1317 (Fed. Cir. 2011).  "A damages expert may rely on comparable licenses that are different from the hypothetical agreement as long as he "account[s] for 'the technological and economic differences' between them." *Multimedia Patent Trust v. Apple Inc*., 2012 WL 5873711 (S.D. Cal. 2012) (quoting *Wordtech*, 609 F.3d at 1320.)

Unable to present expert evidence to challenge Mr. Porter, JPMC misstates Mr. Porter's methodology and report to say something it does not.  It is impossible to adequately demonstrate within the 20-page limit of this brief each and every JPMC error that permeates JPMC's brief, but the most pertinent are considered below.  Because all errors cannot be addressed, however, it is worthwhile to note that "The standard for determining reliability is not that high." *Pure Earth, Inc. v. Call*, 2013 U.S. App. LEXIS 14724 (3d Cir. 2013) (quoting *In re Paoli R.R. Yard PCB*

10

*Litig.*, 35 F.3d 717, 745 (3d Cir. 1994)).  "Thus, plaintiffs offering expert testimony do not 'have to prove their case twice—they do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable.'" *Id*.

Mr. Porter applied the appropriate methodology of identifying agreements that were fundamentally comparable (fn. 3, *supra*), and then made proper adjustments in view of the specific facts of the hypothetical negotiation.  JPMC's objections are directed to what can be viewed as superficial differences that ignore the underlying fundamentals that reliably inform the hypothetical negotiations in this case.  In any event, JPMC's disputes with whether Mr. Porter correctly concluded that the guideline agreements were comparable and whether he made all the necessary adjustments, do not go to the underlying methodology, but to whether Mr. Porter's expert conclusions are persuasive.  These are matters for cross examination and are not bases for judgment as a matter of law.  The Federal Circuit's analysis in *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc*., 694 F.3d 1312 (Fed.Cir.2012) fully applies here:

> Verizon points out various weaknesses in the damages assessment by ActiveVideo's expert.  At their core, however, Verizon's disagreements are with the conclusions reached by ActiveVideo's expert and the factual assumptions and considerations underlying those conclusions, not his methodology. These disagreements go to the weight to be afforded the testimony and not its admissibility. See *i4i*, 598 F.3d at 854 (holding that a party's quarrel with the facts the damages expert used go to the weight, not admissibility, of the expert's opinion). The degree of comparability of the Gemstar and Grande license agreements as well as any failure on the part of ActiveVideo's expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion. See *id*. at 852 ("[W]hen the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.")  The district court did not err by failing to exclude the testimony of ActiveVideo's damages expert.

694 F.3d at 1333 (emphases supplied).  See also *Interwoven, Inc. v. Vertical Computer Sys*., 2013 WL 3786633 (N.D. Cal. 2013), where the Court noted that arguments such as JPMC's do

not disqualify an expert:

> Gemini based his conclusions on what he thought to be the best evidence available to him.  … Moreover, while relatively cursory, Gemini does acknowledge the reasons why a hypothetical license for the patents-in-suit would differ from that negotiated in the Basix1 Agreements. … These comparisons indicate Gemini underwent a thorough analysis of the factors involved in connection with each license agreement.  Any concern as to the degree of comparability between an existing and hypothetical license may be addressed through cross-examination.

See also *Rembrandt Soc. Media, LP v. Facebook, Inc*., 2013 WL 6327852 (E.D. Va. 2013)

("Facebook claims that the expert's calculation of the royalty rate is unreliable because the lower bound (2.3%) of the royalty rate was calculated using two incomparable licenses.  Such a flaw concerns the factual underpinnings of Mr. Malackowski's methodology, not the methodology itself.")

### B.  Mr. Porter's Opinions Based on the MercExchange Agreement Are the Product of a Reliable Methodology and Not Speculative

JPMC errs in arguing that the licenses cited by Mr. Porter are so non-comparable that they should be excluded.  (D.I. 112 at 9).  Mr. Porter established in great detail why they were comparable.  (fn. 3, *supra*).  JPMC cites no authority for its proposed requirement that the comparable patents must involve banking, and such a rule would be inconsistent with existing law.  (pp. 10-11, *supra*).  In any event, the MercExchange patents relate to electronic financial transactions spanning multiple "vertical sectors" or industry applications.  The Pi-Net patents are not restricted to banking applications, and, hence even under the strictest definitions, "comparable technologies" extend beyond banking.  Further, MercExchange patents relate to financial transactions effectuated via online auction, which, without the patented technology, would be undertaken offline or via analog means, which is exactly the issue here.  The Portel patent similarly relates to a platform for multiple vertical sectors. Any differences between guideline agreements and the hypothetical negotiation are accounted for in the Porter Report

analysis (Porter Rpt. ¶¶ 102-117; A-1606 etc.)

Further, (1) Mr. Porter did NOT "disregard the overall MercExchange-Aden transaction structure (which included two other non-patent agreements)" (D.I. 110 at 9).  In fact, Mr. Porter summarized and considered the other agreements between MercExchange and Aden in his report, and determined they did not impact the results of the MercExchange/Aden patent license agreement (Rpt. Exh. 9.3, A-1607, 1682-83).[4]  Similarly, contrary to JPMC's argument (D.I. 110 at 11), Mr. Porter described the prevailing relationship between online auction gross transaction value and auctioneer gross profit, and analyzed publicly reported financial data from eBay expressly to understand this relationship, which data and analysis would have been available to parties at the hypothetical negotiation. (Porter Rpt. ¶111-112 and fn. 102)  This is logical analysis, not bad methodology.  (Porter Dep. pp. 190-191; A-2556)  Also contrary to JPMC's erroneous argument (D.I. 110 at 11), in adjusting the guideline agreements to comport with Pi-Net-JPMC hypothetical negotiations, Mr. Porter did NOT "assume that cost savings and gross profits are an equivalent parameter," but applied the basic truism that lower costs result in higher profits.  (Porter Dep. pp. 195-196; A-2557).  Basic economics is that, at a given level of revenue, a reduction in cost results in an equal gain in profit.

(2)  Mr. Porter did NOT "substitute revenue and profit information for eBay, a non-party to the … Agreement, to speculate what sort of per-gross-profit royalty the … Agreement represents."  (D.I. 110 at 9)  JPMC's discussion of eBay is built upon a fundamental error that

_____

[4]  Mr. Porter testified at his deposition: "I certainly considered them [the other MercExchange Agreements], yes, and I summarized them in my report.  In the end, in the final analysis, I determined that the two parties at the time of their agreements were operating at arm's length and that the particulars of the transaction reflect the patent licensing between two independent entities…I certainly considered the other dealings…" (Porter Dep. p. 186).

permeates all its arguments.  Mr. Porter neither analyzed nor hypothesized any eBay agreement.

Mr. Porter researched eBay's financial data to help "understand the prevailing economics of the

relationship between gross transaction value and gross profit generated by enabling those

transactions to occur" in the licensee's business. (Porter Dep. pp. 190-191; A-2556).  He referred

to eBay because the Aden licensee had not commenced covered operations when the license was

entered, eBay data was reliably filed in SEC reports, and eBay "operate[d] in the same economic

space as [the licensed] business." (*Id.*)  Such public and pertinent financial information reflects

industry economics. (*Id.*) Mr. Porter's described approach is not speculation, but rather well-

considered economic logic of looking at industry data to inform an Agreement's economics. Mr.

Porter's approach bears no relationship to *WhitServe*, as JPMC argues.  (D.I. 110 at 11).[5]

JPMC then erroneously argues that "Mr. Porter must prove that the licensed technology

was the basis for the demand of the eBay product" (D.I. 110 at 11-12), which has nothing to do

with Mr. Porter's limited use of eBay financial information.  JPMC's citation to *LaserDynamics,*

*Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012) (D.I. at 12) is simply irrelevant

because none of Mr. Porter's analyses depends on whether eBay infringed or whether its demand

was driven by a patented invention.  JPMC compounds its error by arguing that a Court

"awarded MercExchange only a fraction of the $81 million [$25 million] in royalties that Mr.

Porter asserts that eBay would have paid in 2000 alone." (D.I. 110 at 12).  JPMC's argument is

---

[5] In *WhitServe, LLC v. Computer Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012), the Court was addressing WhitServe's reliance upon the "25% Rule," which Mr. Porter did not use and which has no relevance here.  Moreover, Mr. Porter explained specifically the economic relationship between cost savings and gross profit for JPMC, and specifically analyzed gross profits in the guideline agreement contexts. (Porter Rpt. ¶¶ 85-87 and fn. 80; Porter Dep. pp. 193, 195-196). He also explained any "conversion" of royalty observations. (Porter Rpt. ¶¶ 111-112 and 116-117).

irrelevant, because it has nothing to do with the financial information used by Mr. Porter, Mr.

Porter does not assert eBay would have paid any such royalties, and there is no authority

suggesting that eBay damages in another litigation has any bearing on the economics of the

hypothetical negotiations in this or any other case.

(3)  Mr. Porter did NOT "apply an arbitrary reduction to this resultant per-gross-royalty

to account for unspecified 'qualitative differences.'" (D.I. 110 at 9)  Mr. Porter explained the

royalty reduction in his report (Porter Rpt. ¶110 and 115) and deposition testimony:

> With respect to the adjustment made in connection with the MercExchange
> Agreement, that downward adjustment is in large part explained by the difference in
> contribution given by JPMorgan and Bank One in the hypothetical negotiation
> context from what I view as a quite modest contribution on the part of Aden and the
> Leftbid platform in that connection, in connection with that consummated license.
> That explains why there's a significant reduction in the royalty value from that
> guideline agreement to inform the hypothetical negotiation and why there was not a
> significant reduction in the Portel, i3 agreement where it is clear, from my analysis,
> that i3 Mobile was contributing a significant value to the overall value chain in
> which the patented property was playing a part.

(Porter Dep. pp. 218-219; A-2563)  The royalty adjustment reflects a thorough consideration of

economic information and a specific accounting for differences in the market footprints between

the MercExchange patents licensed for Aden's commercialization and Pi-Net's patents licensed

for JPMC's commercialization.

(4)  Mr. Porter did NOT "multiply an unreliable cost-savings estimate by this royalty to

come up with a rate that conveniently fits within the range of Mr. Porter's ultimate per-

transaction rate of $0.04." (D.I. 110 at 9)  The cost savings data relied upon by Mr. Porter are

from JPMC's files and are reliable.  The other data relied upon by Mr. Porter comes from

industry and academic reports, and JPMC has not suggested those data are unreliable.  JPMC

mistakenly alleges that: "Mr. Porter testified only that this 25-50% reduction was a 'numeric

distillation of [his] qualitative analysis of factors …" (D.I. 110 at 12).  JPMC cited Mr. Porter's

testimony out of context.[6]  Mr. Porter properly applied his expertise to specifically account for

differences in market footprint relative to the guideline agreement and the hypothetical license

point-by-each-point. (Porter Rpt. ¶¶ 110 and 115)  Both the Report and Mr. Porter's testimony

reflect sound and transparent economic reasoning based upon facts pertinent to the case. (Porter

Dep. pp. 214-214 and 218-219)  JPMC misapplies both *LaserDynamics* and *ResQNet.com*,

whose fact patterns bear no relationship to Mr. Porter's methodology.  (D.I. 110 at 13). [7]

### C.    Mr. Porter's Opinions Based on the i3 Agreement Are Product of a Reliable Methodology and Not Speculative

Contrary to JPMC's unsupported argument (D.I. 110 at 4, 14), Mr. Porter did review the

i3 agreement as its terms were disclosed pursuant to SEC requirements, and did not alter the

terms of the i3 Agreement.  All material terms of the licenses have been considered in the Porter

Report, and all differences were accounted for. (Porter Dep. p. 212).

---

[6] Mr. Porter's explained in his deposition, "This is not a calculation that is a generic packaged product that you pull off the shelf; this is a tailored calculation.  This is one that takes into account the very particular dynamics of the guideline agreements and the hypothetical negotiation, understands those qualitatively, and then couches any changes on those qualitative observations, and that's exactly what I've done in my report." (Porter Dep. pp. 199-200; A-2558).

[7] In *LaserDynamics, Inc. v. Quanta Computer, Inc*., 694 F.3d (Fed. Cir. 2012), the expert simply shifted without any explanation or support from a 6% royalty for a disk drive to a 2% royalty on an entire laptop computer.  Mr. Porter focused his reasonable royalty analysis on cost savings attributable to the accused systems, and apportions those cost savings using quantitative data and clear economic reasoning – and not unsupported assumptions or speculation about relative value. Mr. Porter made only one royalty rate adjustment and that was the 25%-50% reduction to specifically reflect the differences in licensee contribution to the finished commercialized good in the MercExchange/Aden context relative to the hypothetical license context.  Such adjustments are normal and appropriate in the course of market approach valuations.

*ResQNet.com, Inc. v. Lansa, Inc*., 594 F.3d 860 (Fed. Cir. 2010) is irrelevant, because Mr. Porter did not arbitrarily downward shift any calculations, but properly, as required by precedent, tailored considerations as to the market footprints of the licensed technologies relative to their commercial embodiments.

Contrary to JPMC's erroneous argument (D.I. 110 at 15), Mr. Porter did not need to apportion i3 revenue, because the agreement's specified royalty already reflects division of value between parties for patented and non-patented contributions.  Likewise, the portion of i3 gross revenue attributable to the licensed technology is reflected in the agreement's royalty rate.

The i3 Agreement is comparable to the facts here.  JPMC challenges are answered in Mr. Porter's report, which specifically describes the factors implicating a downward adjustment to the MercExchange Agreement, and no adjustment to the i3 Agreement. (Porter Report, Pars. 110 and 115), and in Mr. Porter's deposition, where he fully and completely answered every question of counsel.  (Porter Dep. 214-216, 218-219; A-2562-63).

### D.   Mr. Porter's Cost Savings Calculations Are Reliable

In determining cost savings, Mr. Porter relied on JPMC and industry data to compare costs of infringing transactions relative to costs of analogous transactions performed without use of the accused systems.  (Porter Rpt. ¶80, 82, and 83; A-1596-98)  He looked at: 1) JPMC business records tabulating per-transaction cost savings; 2) industry data and academic studies analyzing per-transaction cost savings associated with use of systems analogous to the accused systems; and 3) JPMC business records reflecting revenue, active users, and other quantitative data from which information can be derived as to cost savings attributable to the accused systems.  JPMC has not suggested that the sources relied-upon by Mr. Porter are unreliable.

JPMC erroneously argues that "Mr. Porter utilizes an aggregated 'cost savings' figure to convert revenue-based royalty rates into those that reflect what he alleges are per-transaction cost savings," and that the "data that Mr. Porter used to perform these cost savings 'translations' have serious flaws that render his values speculative and unreliable." (D.I. 110 at 15-16).  In fact, as shown below, Mr. Porter used available JPMC data, which JPMC agrees is reliable.

Contrary to JPMC's assertions regarding the Customer Center Accused Instrumentality

(D.I. 110 at 16), Mr. Porter determined that a reasonable royalty would reflect the economic value to JPMC by having users choose to receive their account information online, rather than having paper mailings – what is called "Suppressed Mailing." Each suppressed mailing reflects a financial benefit to JPMC from infringement, and is enabled by exposing customer accounts online. Indeed, each banking customer who logs onto the Accused Instrumentalities is presented bank balance and other personal banking information upon login via an infringing transaction. The presentation of such information is the mechanism that enables JPMC to suppress mailings since, in its absence, such information would be mailed rather than viewed online.[8] JPMC argues that Mr. Porter was required to base his royalties solely on actual number of hits on the customer center, but it is a matter of expert judgment as to which count more appropriately reflects the benefit obtained by JPMC from infringement and which is a sounder base for a royalty determined at hypothetical negotiations. Mr. Porter has a reasonable and reliable basis for opining that his approach better reflects the economic linkage between JPMC's utilization of the customer center Accused Instrumentality and JPMC's resulting cost savings.[9]

Similarly, JPMC errs in arguing that Mr. Porter "has no basis to equate the fee charged by

---

[8] To validate the economic link between suppressed mailing cost savings and infringing transactions, Mr. Porter evaluated the count of "Active 30-Day Users" on Chase.com (i.e., those unique customers presented balance information upon login during a 30-day window), finding that the count of unique users in each month tracks and exceeds the count of monthly suppressed mailings. The Porter Report accordingly properly ties cost savings, and thus royalties, to infringing use. (Porter Dep. 118-121; A-2538).

[9] Mr. Porter stated: "… I compared the number of unique visitors during each month to the number of suppressed mailings in each month, and those two values track across time, and in fact the number of unique users in every 30-day period exceeds the number of suppressed mailings in each 30-day period, which is why I believe this [suppressed mailings] is an appropriate measure of infringing use in which there's directly-quantified economic consequence for JPMC." (Porter Dep. 118-119).

JPMC to JPMC's 'cost savings' from using online wire transfers—indeed Mr. Porter is only speculating regarding JPMC's costs, because he did not review 'any documents from [JPMC] that analyze cost savings of online wire transfers as compared to transfers conducted at a branch.'" (D.I. 110 at 16).  Notably, JPMC provides no evidence from JPMC that demonstrates any error by Mr. Porter, and Mr. Porter explained his sound economic reasoning for use of these data at his deposition. (Porter Dep., pp. 136-137)[10]

In any event, JPMC has not pointed to any information for determining cost-savings better than that used by Mr. Porter.  Therefore, JPMC, who will have been already adjudged an infringer, bears the burden of uncertainty and any lack of information more reliable information. *Sensonics, Inc. v. Aerosonic Corp*., 81 F.3d 1566, 1572 (Fed. Cir. 1996); *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd*., 2013 WL 5332108 (W.D. Pa. 2013) ("The Federal Circuit counsels that 'where it is impossible to make a mathematical or approximate apportionment between infringing and noninfringing items, the infringer must bear the burden and the entire risk.'")

### E.     Mr. Porter Properly Apportioned Cost Savings to Pi-Net and JPMC

Mr. Porter's calculations led to his determination that JPMC should keep the vast majority of cost savings derived from the Accused Instrumentalities, and Pi-Net proportionately

---

[10] Regarding wire transfer cost savings: "First, I've seen no other evidence in this matter, or heard, reviewed testimony in this matter about why such a price difference exists [between online and analog wire transfers], and from a marketing perspective, from a business perspective, it seems clear that the difference in price would be intended to drive consumers toward the online systems to utilize those systems rather than to undertake the transaction through the branch. Now, from a business perspective, it makes sense to drive customers to do such a thing if there is some benefit to the bank of having that migration take place, and the quantum of price difference can, in that sense, be a very good proxy for what the quantum of financial benefit to JPMC Chase is of having that migration occur.  So the price difference I think is a reasonable proxy for financial benefit – or cost savings difference." (Porter Dep., pp. 136-137) Moreover, the relationship between price and cost is well established in business economics as illustrated, for example, in the well-known concept of "cost-plus pricing," in which a product's price reflects its cost plus a markup.

obtain only a small sliver of the economic benefit attained from the infringement.   JPMC

nevertheless argues that "Mr. Porter Provided No 'Reliable and Tangible' Evidence of

Apportionment of JPMC's Contribution to Cost Savings." (D.I 110 at 16)

In fact, a key component of Mr. Porter's analysis was to apportion cost savings between

the contribution of the patents-in-suit and other factors. Mr. Porter cited the guideline

Agreements to apportion cost savings.  Mr. Porter also cited JPMC's payments made to third-

parties (e.g., Princeton eCom) participating in the value chain implicated by the accused systems,

because these payments reflect the amount of savings that JPMC has historically retained from –

and thus reflects its contributions to – the accused systems. (Porter Rpt. ¶¶ 118-123)

## VI.   <u>CONCLUSION</u>

JPMC concludes that Mr. Porter's guideline Agreements "do not calculate royalties on a

per-transaction basis, and there is no evidence that either of the licensees for these third-party

agreements ever paid the equivalent of $0.04 per transaction."  Yet, these agreements, like the

hypothetical license here, specify running royalties, which can be presented in various sub-forms

– whether a percentage basis or per-transaction basis – and evaluated against profit. (Porter Dep.

pp. 188 and 195-196).  On this common footing, the guideline agreements do reflect payments

equivalent to or greater than $0.04 per infringing "completed financial transaction" of JPMC.

On the basis of the foregoing analysis of fact and law, Plaintiff Pi-Net respectfully

requests that JPMC's motion to strike testimony be denied.

Respectfully Submitted,

February 14, 2014

20

*/s/ George Pazuniak*
George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff Pi-Net Int'l, Inc.*