## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PI-NET INTERNATIONAL INC.,<br><br>                 Plaintiff,<br><br>      v.<br><br>JPMORGAN CHASE & CO.,<br><br>                 Defendant. | Civ. No. 1:12-cv-00282-RGA |

**DEFENDANT'S REPLY BRIEF IN FURTHER SUPPORT OF ITS *DAUBERT*
MOTION TO EXCLUDE CERTAIN TESTIMONY OF MR. STEVAN PORTER**

REDACTED VERSION
FILED PUBLICLY
MARCH 5, 2014

| | |
|---|---|
| OF COUNSEL:<br>Daniel A. DeVito<br>Douglas R. Nemec<br>Edward L. Tulin<br>Andrew D. Gish<br>SKADDEN, ARPS, SLATE,<br>   MEAGHER & FLOM LLP<br>Four Times Square<br>New York, New York  10036<br>Tel:  (212) 735-3000 | Robert S. Saunders (ID No. 3027)<br>Jessica Raatz Kunz (ID No. 5698)<br>SKADDEN, ARPS, SLATE,<br>   MEAGHER & FLOM LLP<br>920 N. King Street, 7th Floor<br>Wilmington, Delaware  19801<br>Tel:  (302) 651-3000<br>Fax:  (302) 651-3001<br>rob.saunders@skadden.com<br>jessica.kunz@skadden.com<br><br>*Attorneys for Defendant JPMorgan Chase & Co.* |

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. ii

I.    SUMMARY OF ARGUMENT ...............................................................................1

II.   PI-NET'S "NON-COMPARABILITY" ARGUMENTS MISS THE POINT OF JPMC'S MOTION ..................................................................................................3

    A.    JPMC's Motion Is Directed At Mr. Porter's "Translation" Methodology. ...............3

    B.    There Are "More Suitable" Agreements Upon Which Mr. Porter Could Have Relied. ..................................................................................................5

III.  PI-NET'S "MARKET FOOTPRINT" ARGUMENTS DO NOT PROVIDE A BASIS TO ADMIT MR. PORTER'S TESTIMONY. ...........................................6

IV.  PI-NET CONCEDES THAT MR. PORTER'S COST SAVINGS CALCULATIONS ARE SPECULATIVE. ..................................................................7

CONCLUSION ...................................................................................................................10

# TABLE OF AUTHORITIES

**CASES**

**Page**

*ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012)......................................................................................4

*AVM Technologies, LLC v. Intel Corp.*,
    927 F. Supp. 2d 139 (D. Del. 2013)................................................................................2

*DataQuill Ltd. v. High Tech Computer Corp.*,
    887 F. Supp. 2d 999 (S.D. Cal. 2011).............................................................................3

*Interwoven, Inc. v. Vertical Computer Systems*,
    No. CV 10-04645 RS, 2013 WL 3786633 (N.D. Cal. July 18, 2013).....................4, 5, 6

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
    711 F.3d 1348 (Fed. Cir. 2013), *cert. denied*, 134 S. Ct. 900 (2014)..............................7

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010).................................................................................3, 5, 6

*Robocast, Inc. v. Apple Inc.*,
    No. 11-235-RGA, 2014 WL 334183 (D. Del. Jan. 28, 2014)..........................................9

I.   SUMMARY OF ARGUMENT

JPMC's *Daubert* motion demonstrates that Mr. Porter's method of performing "royalty translation" on two third-party agreements (the MercExchange/Aden Agreement and the i3/Portel Agreement) is unreliable, unsupported, and should be excluded.  (*See* D.I. 110)  Although Pi-Net filed a lengthy opposition to JPMC's motion (D.I. 129), it amounts to little more than a regurgitation of Mr. Porter's report and deposition testimony.   Pi-Net's opposition not only fails to establish the reliability of Mr. Porter's "translation" of the third-party agreements, it actually concedes the key facts underlying JPMC's motion:

- *MercExchange/Aden Agreement*.  The original royalty structure for this agreement was a hybrid between a lump-sum payment and a running royalty based on *gross transaction value*, and not a per-transaction royalty like the one that Mr. Porter ultimately envisions for the hypothetical negotiation.  (D.I. 110 at 3 (citing Ex. AM ¶ 108))  Pi-Net does not dispute that Mr. Porter's method of "translating" this agreement involved four different inputs:  (1) the terms negotiated by MercExchange and Aden, (2) the transaction value and profit information from eBay, (3) the alleged cost-savings information from JPMC, and (4) a 25-50% adjustment, to arrive at a *value-per-transaction* royalty of ▮▮▮▮▮▮▮▮▮▮.  Pi-Net cites no caselaw where such a multi-party, multi-input "translation" approach has ever been endorsed.

- *i3/Portel Agreement.*  Pi-Net does not dispute that Mr. Porter never reviewed a complete, executed version of the i3/Portel Agreement (*see* Ex. AP at 211:12-212:7, 212:18-22), and instead can only speculate that all of the relevant terms of the i3/Portel Agreement were provided in the excerpts that Mr. Porter reviewed.  (D.I. 129 at 16)  As for the actual steps that Mr. Porter performed, Pi-Net does not dispute that Mr. Porter begins with an agreement between i3 and Portel with a 5% royalty based on *gross revenue* (not a per-transaction royalty), inputs i3's revenue and profit data from 2000, inputs JPMC's alleged cost savings data from January 2007 until August 2013, and ends up with a value-per-transaction royalty of ▮▮▮▮▮▮▮▮ that he contends would have been agreed upon by Pi-Net and BankOne in 2001.

Left with this set of essentially undisputed facts, Pi-Net offers two primary arguments in support of the challenged testimony from Mr. Porter:  (1) that the third-party agreements are not "so non-comparable [to the Pi-Net/BankOne hypothetical negotiation] that they should be excluded" (D.I. 129 at 12); and (2) Mr. Porter's "royalty translation" method was

based in part on the respective "market footprints" of the various parties (*id.* at 2, 8, 15).  Neither argument is sufficient to satisfy Pi-Net's burden of "establish[ing] that its calculation is based on reliable methodology and concrete facts."  *AVM Techs., LLC v. Intel Corp.*, 927 F. Supp. 2d 139, 147 (D. Del. 2013).

Pi-Net's first argument completely misses the thrust of JPMC's motion, which was not that testimony on the third-party agreements should be excluded merely because they are "non-comparable" to the hypothetical negotiation between Pi-Net and BankOne (although there is no dispute that those agreements involve different parties, different patents, and a different royalty structure than those that Mr. Porter contends would have been the subject of a license here).  Instead, it is the particular steps of "royalty rate translation" that Mr. Porter performed on those third-party agreements that runs afoul of the *Daubert* standards for admissibility.  (*See, e.g.*, D.I. 110 at 10 (contending that "Mr. Porter's 'royalty rate translation' of the MercExchange/Aden Agreement is speculative and unsupported"))

Pi-Net's second primary argument is equally misguided.  Pi-Net can point to no data that Mr. Porter relied on to quantify how the "market footprint" of any of the third-parties compares to that of the parties to the hypothetical negotiation.  Moreover, even if Pi-Net had applied any market data as part of the unsupported "royalty translation" method, Pi-Net admits that when Mr. Porter performs the step of his "translation" method that imports JPMC's purported cost savings information for at least Wire Transfers and Customer Center into his analysis, he uses speculative or inapplicable data for both systems.  (D.I. 129 at 18-19)

As such, Mr. Porter's testimony regarding the impact that the MercExchange/ Aden Agreement and the Portel/i3 Agreement would have had on the hypothetical negotiation in 2001 should be excluded.

## II. PI-NET'S "NON-COMPARABILITY" ARGUMENTS MISS THE POINT OF JPMC'S MOTION.

### A. JPMC's Motion Is Directed At Mr. Porter's "Translation" Methodology.

The crux of JPMC's *Daubert* challenge is that Mr. Porter's "translation" methodology (which Pi-Net refers to as a series of "adjustments," D.I. 129 at 11) is unreliable and speculative. Faced with the undisputed facts set forth above, Pi-Net first argues that these are not objections to methodology, but rather go to the "weight" of Mr. Porter's "conclusions." (D.I. 129 at 10-11) However, JPMC's argument is directed to Mr. Porter's method of manipulating the terms of those agreements based upon a variety of extrinsic factors and inputs from multiple other parties. Indeed, the lack of comparability of the MercExchange/Aden Agreement and the i3/Portel Agreement to the hypothetical license is beyond dispute—it is the very reason that Mr. Porter must undertake the "translation" exercise, in an effort to fit those licenses within the hypothetical royalty framework that he believes Pi-Net and BankOne would have agreed upon in 2001. While the demonstrable lack of comparability could alone justify excluding the third-party agreements from consideration,[1,2] JPMC's challenge is directed to

---

[1] *See, e.g., ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871-72 (Fed. Cir. 2010) (vacating damages award that was partly based on expert testimony regarding a non-comparable license, because otherwise "plaintiff would be free to inflate the reasonable royalty analysis with conveniently selected licenses without an economic or other link to the technology in question").

[2] The excerpts of the i3/Portel Agreement reveal another fundamental difference from the hypothetical agreement contemplated between Pi-Net and BankOne. Although Pi-Net's opposition brief contends that the i3/Portel Agreement "involve[d] U.S. parties and cover[ed] U.S. patents only," (D.I. 129 at 7 n.3), that contention is flatly contradicted by Mr. Porter himself, who noted that this agreement "provides exclusive rights and includes *Canadian territory in its grant*, whereas the hypothetically negotiated agreement would be non-exclusive and limited to the U.S." (Ex. AF ¶ 115 (emphasis added)) This is the sort of distinction that weighs in favor of excluding any testimony based on such an agreement, notwithstanding any methodological flaws. *See, e.g., DataQuill Ltd. v. High Tech Computer Corp.*, 887 F. Supp. 2d 999, 1024-25 (S.D. Cal. 2011) (granting motion to exclude expert

*(cont'd)*

whether Mr. Porter's method of "adjusting" those agreements to fit his desired licensing structure passes muster under *Daubert*. Pi-Net, as the proponent of Mr. Porter's testimony, must demonstrate that this particular "adjustment" or "translation" method, which fundamentally alters the structure of the third-party agreements, is reliable. Pi-Net has not met this burden, and instead provides only conclusory and unexplained statements that his adjustments were "proper." (*See, e.g.*, D.I. 129 at 11)

Pi-Net cites numerous cases allowing expert testimony regarding agreements that were arguably not comparable to the facts of the relevant hypothetical negotiation. (D.I. 129 at 11-12) However, these cases are inapposite, because none of them allowed for the kind of "royalty translation" that is the subject of JPMC's motion. For instance, in *ActiveVideo Networks, Inc. v. Verizon Communications, Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) (cited in D.I. 129 at 12), the Federal Circuit affirmed a decision to allow damages expert testimony based on third-party agreements, where the only challenge to the use of those agreements was that they did not cover the patents-in-suit and also included "software services." *Id.* at 1333. Here, the third-party agreements do not cover the patents-in-suit, but that is only incidental to JPMC's objection; the unreliable manipulation of those agreements is what violates the *Daubert* standard. Thus, while Pi-Net is correct that the "degree of comparability between an existing and hypothetical license may be addressed through cross-examination," that fact is irrelevant to JPMC's motion. *Interwoven, Inc. v. Vertical Computer Sys.*, No. CV 10-04645 RS, 2013 WL 3786633, at *11 (N.D. Cal. July 18, 2013) (cited in D.I. 129 at 11-12). In fact, the *Interwoven* decision upon which Pi-Net relies is specifically distinguishable from the facts here. In that case, the plaintiff's

---

*(cont'd from previous page)*
testimony in part based on the fact that agreement-at-issue extended to territory beyond the U.S., in contrast to U.S.-based hypothetical license).

4

damages expert relied on certain third-party agreements to "obtain a foundational royalty rate, that he then adjusted using *the Georgia-Pacific factors*." *Id.* at *3 (emphasis added). Mr. Porter did not make adjustments to the MercExchange/Aden and i3/Portel Agreements based on the *Georgia-Pacific* factors, but rather used a five- or six-step method to "translate" the existing third-party royalty structure into one that does not resemble the original royalty construct. Pi-Net's cited caselaw is therefore both inapposite and distinguishable.

### B. There Are "More Suitable" Agreements Upon Which Mr. Porter Could Have Relied.

Pi-Net incorrectly implies that Mr. Porter was left with no choice but to consider the MercExchange/Aden Agreement and the i3/Portel Agreement because there are no "more suitable comparable agreement(s) that Mr. Porter should have considered." (D.I. 129 at 10) Pi-Net is wrong for a variety of reasons. First, there is no legal support for the notion that a patentee's damages expert may base his reasonable royalty opinion on admittedly non-comparable licenses "adjusted" using an unreliable method and admittedly faulty data where the accused infringer has not identified a "more suitable" foundation for the royalty analysis. The burden of proving damages and satisfying the *Daubert* standard rests squarely on Pi-Net, and neither burden would be eliminated even if JPMC offered *no* competing analysis of the applicable damages. *See, e.g.*, *ResQNet.com*, 594 F.3d at 872 (noting that it is the "[patentee's] burden . . . to persuade the court with legally sufficient evidence regarding an appropriate reasonable royalty," and thus a defendant can prevail on damages even when "offer[ing] no expert testimony to counter" an opposing expert). Nevertheless, JPMC's damages expert did put forward voluminous evidence of "more suitable" bases for the reasonable royalty analysis, and JPMC referenced such evidence in its opening *Daubert* brief. (*See* D.I. 128 at 5, 18-20)

5

Even putting aside the extensive analysis by JPMC's own damages expert, the Court need look no further than the ▮ license agreements covering the patents-in-suit to find agreements "more suitable" than those relied upon by Mr. Porter. (*See id.*); *see also ResQNet.com*, 594 F.3d at 872-73 (concluding that the "most reliable license in this record arose out of litigation"). As such, Pi-Net's extensive reliance on *Interwoven* is even more misplaced. (D.I. 129 at 10-11) In *Interwoven*, the Court particularly noted that "there [wa]s no evidence that any license for the exact patents-in-suit was negotiated but not considered." 2013 WL 3786633, at *11. In Pi-Net's case, at least fifteen licenses "for the exact patents-in-suit" were negotiated and executed by Pi-Net, and thus it is absurd to suggest that the third-party "guideline agreements" were the only data points from which to offer a royalty analysis.

### III. PI-NET'S "MARKET FOOTPRINT" ARGUMENTS DO NOT PROVIDE A BASIS TO ADMIT MR. PORTER'S TESTIMONY.

A key aspect of JPMC's *Daubert* challenge is that Mr. Porter applied an arbitrary 25-50% downward adjustment as part of his "royalty translation" of the MercExchange/Aden Agreement to account for unspecified "qualitative differences," while no such adjustments were performed for the i3/Portel Agreement. (D.I. 110 at 3-4, 12-13) Pi-Net argues that this "royalty adjustment reflects a thorough consideration of economic information and a specific account for differences *in the market footprints* between the MercExchange patents . . . and Pi-Net's patents." (D.I. 129 at 15 (emphasis added); *see also id.* at 16 n. 7 (contending that Mr. Porter's downward shifts are based on "the *market footprints* of the licensed technologies relative to their commercial embodiments" (emphasis added)))

As an initial matter, Mr. Porter provides no evidence of market share data, or any methodology for measuring the market footprints of the MercExchange patents, the Pi-Net patents, or the i3 patents as of 2001—and provides no analysis of how the various footprints in

6

those respective markets compared as of that date. Moreover, Pi-Net's explanation in its opposition brief directly contradicts Mr. Porter, who indicated in his report that the downward adjustment was not to account for quantitative differences in "market footprint," but rather "to account for *qualitative differences* between the MercExchange/Aden and hypothetical agreements." (Ex. AF ¶ 112 (emphasis added)) Pi-Net provides no explanation as to what those qualitative differences are, how they are absent in the i3/Portel Agreement, or how those qualitative differences relate (if at all) to Pi-Net's unspecified market data. This shifting and internally inconsistent explanation for Mr. Porter's methodology only confirms that these methods are based on precisely the sort of unreliable and unsupported speculation that the Federal Circuit has urged district courts to exclude as part of their gatekeeping role. *See, e.g.*, *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1372-74 (Fed. Cir. 2013) (finding abuse of discretion in district court's decision to admit expert report because damages expert's calculation of reasonable royalty was based on "speculative leaps" and noting that "unreliable testimony frustrates a primary goal of expert testimony in any case, which is meant to place experience from professional specialization at the jury's disposal, not muddle the jury's fact-finding with unreliability"), *cert. denied*, 134 S. Ct. 900 (2014).

IV. **PI-NET CONCEDES THAT MR. PORTER'S COST SAVINGS CALCULATIONS ARE SPECULATIVE.**

Pi-Net makes the unsupported statement "that damages in this case should be measured in the form of a reasonable royalty based on the cost-savings that JPMC has enjoyed and continues to enjoy from its use of the patented technology." (D.I. 129 at 1) That may be Mr. Porter's view, but it is by no means an established fact. For her part, JPMC's damages expert disputes that the reasonable royalty should be based on alleged "cost-savings," and instead contends that it would have been limited under the particular circumstances of this case to the

cost that JPMC would have incurred in moving to a non-infringing alternative. (Ex. AM at 34-35) But even if Mr. Porter were correct in his view that JPMC's cost-savings should determine the reasonable royalty in this case, his method of quantifying those cost-savings is defective.

In its opening brief, JPMC raised three methodological flaws with Mr. Porter's cost-savings calculation: (1) Mr. Porter used "mail suppression" data rather than the actual usage data to calculate cost savings for the Customer Center instrumentality; (2) Mr. Porter used fees charged, rather than cost data, for the Wire Transfers instrumentality; and (3) Mr. Porter failed to apportion his cost savings analysis to account for JPMC's own non-infringing contribution to the Accused Instrumentalities. (D.I. 110 at 15-17)

As to JPMC's first point, Pi-Net does not dispute that Mr. Porter ignored the actual usage data for the Customer Center that JPMC produced and substituted "mail suppression" data, which Pi-Net argues was "a matter of expert judgment." (D.I. 129 at 18) Pi-Net contends that this substitution—which was not performed for any other Accused Instrumentality—is justified because "each banking customer who logs onto the Accused Instrumentalities is presented bank balance and other personal banking information . . . [which] is the mechanism that enables JPMC to suppress mailings since, in its absence, such information would be mailed rather than viewed online." (D.I. 129 at 18) Pi-Net's contention is directly at odds with that of its own technical expert, Dr. Bardash, who testified that merely logging onto the Customer Center is not sufficient to "suppress" any mailings; such mailings are only suppressed based on the "paperless preferences" that are separately managed by a given user. (Ex. AN at 264-65 (noting, in particular, that even if an online banking user elects not to receive paper bank statements, the online user can "always get them back later")) Mr. Porter is not offering "technical opinions" regarding how the Accused Instrumentalities operate and has

8

instead relied on Dr. Bardash.  (*See, e.g.*, Ex. AP at 77-78)  As such, Mr. Porter has no basis to reject Dr. Bardash's view regarding how "suppressed mailings" are managed.

As to JPMC's second point, Pi-Net explicitly concedes that "*Mr. Porter is only speculating regarding JPMC's costs*" for online-initiated wire transfers as opposed to branch-initiated wire transfers.  (D.I. 129 at 19 (emphasis added))  Pi-Net attempts to shift the blame for this evidentiary failure to JPMC.  (*Id.*)  However, it is not that JPMC did not produce the necessary documentation to Pi-Net in the litigation, but rather that the documentation *does not exist*, because JPMC does not track cost savings for online-initiated vs. branch-initiated wire transfers in the ordinary course of business.  (*Id.*)  The fact that JPMC does not even track this cost-savings data certainly does not justify unabashed speculation and guesswork on Mr. Porter's part—if anything, it establishes that his approach to calculating a reasonable royalty based on alleged cost savings is not what the parties would have agreed to in a hypothetical negotiation.  *See, e.g.*, *Robocast, Inc. v. Apple Inc.*, No. 11-235-RGA, 2014 WL 334183, at *2 (D. Del. Jan. 28, 2014) (granting motion to exclude damages expert testimony for which "[the] underlying data was unreliable, and was unreliably applied").

Finally, as to JPMC's third point, Pi-Net contends that "a key component of Mr. Porter's analysis was to apportion cost savings between the contribution of the patents-in-suit and other factors," which include JPMC's contributions to invest in, design, develop, program, market, brand, design, and maintain the Accused Instrumentalities.  (D.I. 129 at 20)  Although Pi-Net characterizes this apportionment as a "key component" of Mr. Porter's analysis, Pi-Net can find only 6 paragraphs to cite from Mr. Porter's report in support of this contention. (D.I. 129 at 20)  In reality, those paragraphs have nothing to do with apportioning alleged cost savings from the Accused Instrumentalities to JPMC's independent, indisputably non-infringing efforts.

9

The paragraphs that Pi-Net cites relate only to JPMC's agreements with third-party vendors, and the per-transaction costs associated with those vendor services.  (Ex. AF ¶¶ 118-23)  Mr. Porter offers no explanation as to how these per-transaction *cost expenditures* allow for calculation (and apportionment) of JPMC's independent *cost savings*.

## CONCLUSION

For the foregoing reasons, JPMC respectfully requests that the Court grant this motion and exclude any testimony from Mr. Porter regarding the MercExchange/Aden Agreement and the i3/Portel Agreement.

DATED: February 26, 2014

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000

Respectfully submitted,

/s/ *Robert S. Saunders*

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
    MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*