## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C.A. No. 12-282-RGA** |
| ) | |
| **JPMORGAN CHASE & CO.,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### PLAINTIFF PI-NET'S SEPARATE APPENDIX TO

### PLAINTIFF'S MOTIONS TO EXCLUDE TESTIMONY AND
### IN RESPONSE TO DEFENDANT JPMC'S MOTIONS

George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff*
*Pi-Net International, Inc.*

February 26, 2014

**TABLE OF CONTENTS**

| Document | Exhibit |
|---|---|
| Patent 5,799,157 to Escallon | BA |
| Rulings of Patent Trial And Appeal Board of the United States Patent And Trademark Office, in the case SAP America, Inc., Petitioner v. Pi-Net International, Inc., Patent Owner, comprising:<br><br>Exh. A:  Case CBM2013-00013 Patent 8,037,158 (BB-2 to B-39)<br><br>Exh. B:  Case IPR2013-00194 Patent 8,108,492 (BB-40 to B-67)<br><br>Exh. C:  Case IPR2013-00195 Patent 5,987,500 (BB-68 to B-103) | BB |
| Deposition of RICHARD JOHN ROMANELLI, excerpts | BC |
| Deposition of CATHY MARINELLI, excerpts | BD |
| Declaration Of Michael Bardash In Response To Defendant's Motions For Summary Judgment | BE |
| Declaration Of George Pazuniak In Response To Defendant's Motion For Summary Judgment Based On Laches | BF |
| Defendant's Response to Interrogatory No. 4 | BG |
| Defendant's Response to Document Requests | BH |
| Second Declaration Of George Pazuniak | BI |
| Defendant's Initial Disclosures | BJ |
| St. Clair case - Opening Brief | BK |
| St. Clair case - Answering Brief | BL |

# EXHIBIT  BA

US005799157A

# United States Patent [19]

## Escallon

| [11] | Patent Number: | 5,799,157 |
|---|---|---|
| [45] | Date of Patent: | Aug. 25, 1998 |

[54] **SYSTEM AND METHOD FOR CREATING INTERACTIVE ELECTRONIC SYSTEMS TO PRESENT INFORMATION AND EXECUTE TRANSACTIONS**

[75] Inventor: **Andres Escallon**, Wellesley, Mass.

[73] Assignee: **Elcom Systems, Inc.**, Norwood, Mass.

[21] Appl. No.: **353,787**

[22] Filed: **Dec. 13, 1994**

[51] Int. Cl.[6] ............................ **G06F 17/00; G06F 17/30**

[52] U.S. Cl. .................... **395/227;** 395/200.05; 395/615; 395/777; 364/401 R

[58] **Field of Search** ................. 395/200.09, 600, 395/650, 7, 200.05, 156, 161, 226, 227, 601, 609, 777, 778, 200.03, 671, 615; 348/7; 364/401 R

[56]                **References Cited**

### U.S. PATENT DOCUMENTS

| 4,011,545 | 3/1977 | Nadir | 395/200.01 |
|---|---|---|---|
| 4,370,707 | 1/1983 | Phillips et al. | 395/615 |
| 4,464,719 | 8/1984 | Spellman | 364/400 |
| 4,591,983 | 5/1986 | Bennett et al. | 395/65 |
| 4,623,963 | 11/1986 | Phillips | 395/712 |
| 4,796,179 | 1/1989 | Lehman et al. | 364/191 |
| 4,799,156 | 1/1989 | Shavit et al. | 395/226 |
| 4,811,325 | 3/1989 | Sharples, Jr. et al. | 369/85 |
| 4,839,835 | 6/1989 | Hagenbuch | 364/567 |
| 4,855,907 | 8/1989 | Ferro, Jr. et al. | 395/620 |
| 4,945,475 | 7/1990 | Bruffey et al. | 72/249 |
| 4,970,657 | 11/1990 | Wolf | 364/513 |
| 4,984,155 | 1/1991 | Geier et al. | 364/401 |
| 5,001,630 | 3/1991 | Wiltfong | 395/203 |
| 5,095,421 | 3/1992 | Freund | 395/650 |
| 5,109,482 | 4/1992 | Bohrman | 395/328 |
| 5,117,354 | 5/1992 | Long et al. | 395/227 |
| 5,133,045 | 7/1992 | Gaither et al. | 395/51 |
| 5,191,410 | 3/1993 | McCalley et al. | 348/13 |
| 5,216,593 | 6/1993 | Dietrich et al. | 364/402 |
| 5,233,520 | 8/1993 | Kretsch et al. | 128/630 |
| 5,249,270 | 9/1993 | Stewart et al. | 395/200 |
| 5,257,363 | 10/1993 | Shapiro et al. | 395/500 |
| 5,261,042 | 11/1993 | Brandt | 395/156 |
| 5,263,744 | 11/1993 | Linder | 283/115 |
| 5,310,997 | 5/1994 | Roach et al. | 235/375 |
| 5,315,508 | 5/1994 | Bain et al. | 364/401 |
| 5,319,542 | 6/1994 | King, Jr. et al. | 364/401 R |
| 5,319,745 | 6/1994 | Vinsonneau et al. | 395/777 |
| 5,324,922 | 6/1994 | Roberts | 235/375 |
| 5,325,534 | 6/1994 | Galy et al. | 395/700 |
| 5,339,392 | 8/1994 | Risberg et al. | 395/161 |
| 5,341,469 | 8/1994 | Rossberg et al. | 395/145 |
| 5,347,632 | 9/1994 | Filepp et al. | 395/200.05 |
| 5,351,276 | 9/1994 | Doll Jr. et al. | 379/67 |
| 5,361,199 | 11/1994 | Shoquist et al. | 395/226 |
| 5,371,532 | 12/1994 | Gelman et al. | 348/7 |
| 5,404,523 | 4/1995 | DellaFera et al. | 395/650 |
| 5,408,619 | 4/1995 | Oran | 395/280 |
| 5,418,945 | 5/1995 | Carter et al. | 395/600 |
| 5,442,749 | 8/1995 | Northcutt et al. | 395/200.09 |
| 5,528,490 | 6/1996 | Hill | 395/226 |

### OTHER PUBLICATIONS

"Electronic Purchasing Service—The Untapped Opportunity in Corporate Purchasing" IBM Technical Literature, 1995.

"The Internet—How it will change the way you do business" *Business Week*, Nov. 14, 1994, pp. 80–88.

"No lines on–line" *Boston Globe*, Dec. 6, 1994, pp. 43 and 52.

*Primary Examiner*—Dinh C. Dung
*Attorney, Agent, or Firm*—Calfee, Halter & Griswold, LLP

[57]                **ABSTRACT**

A fully integrated system and method for production and presentation of dynamically linked electronic presentation of information to front end client computers, for providing dynamic access to information from front end client computers, and for formulating, transmitting and processing transactions based upon information presented and accessed is disclosed. The system and method provides for production of a system for presentation of information to front end client computers in the form of customized electronic books linked to databases of the information presented. The electronic books further include forms for entry of transaction requests based upon such information. The forms are coded for execution of the particular transaction requested thereon by a transaction management system connected to one or more transactional databases.

**18 Claims, 2 Drawing Sheets**



Fig. 1

PRODUCTION SYSTEM



150

- MULTIMEDIA AUTHORING TOOL ⟋152
- ELECTRONIC BOOK PRODUCTION PROGRAMS ⟋154
- ELECTRONIC BOOK CODE COMPILER ⟋156
- DATABASE MANAGER ⟋158
- FORMS EDITOR ⟋160
- FORMS TRANSACTION LANGUAGE COMPILER ⟋162

*Fig. 2*



150 FORMULATED TRANSACTION REQUEST

160 STATE MACHINE

170 TRANSACTION REQUEST PROCEDURE

TRANSACTION STATE MACHINE

200 TMS

*Fig. 3*

5,799,157

**1**

# SYSTEM AND METHOD FOR CREATING INTERACTIVE ELECTRONIC SYSTEMS TO PRESENT INFORMATION AND EXECUTE TRANSACTIONS

## FIELD OF THE INVENTION

The present invention relates generally to computer systems and methods of use and, in particular, to creation of interactive computer systems which present information and execute transactions.

## BACKGROUND OF THE INVENTION

It is known to integrate computer systems and databases to accomplish wide dissemination of information and execution of related transactions. An example of a system for presenting information to remote users or clients who may examine the information and initiate some transaction based thereon is found in catalog procurement systems. In the field of automated catalog procurement systems, Geier, et al., U.S. Pat. No. 4,984,155 disclose a method and system in which a data terminal displays product information to a customer which augments or supplements information from a supplier catalog, and through which a customer may place orders for products. King and Nilsen, U.S. Pat. No. 5,319, 542, disclose a system by which users can order items from suppliers through an electronic catalog and electronic requisition facility which relies on maintenance of a public catalog or catalog database on a public computer system. An article in *Business Week* magazine ("The Internet", Nov. 14, 1994, p. 80) describes an "electronic catalog that can automatically pass data to its back-office computers [via the Internet]. When a browser decides on an item . . . she just clicks on a 'buy' button and it is added to an electronic order form." An article in The Boston Globe ("No Lines On-Line", Dec. 6, 1994, p. 43) describes on-line shopping services with graphics and photographs. Blutinger and Kiernan, U.S. Pat. No. 5,231,566, disclose a method and apparatus for producing by computer a catalog of items to be offered for sale in which each item contains a unique catalog item number.

While these represent improvements over more traditional methods such as the use of printed media, they still do not insure the proprietor of the transaction management system maximum flexibility in designing the ways in which information is disseminated, the formats through which clients may manipulate and interact with such information and the manner in which transactions initiated by client responses to the information are structured, sequenced and executed. Some electronic catalogs convey information about products and prices through multimedia presentations (with, e.g., pictures, video, sound and text), but such presentations are not fully integrated with the facility to execute transactions automatically. Those designed as on-line systems can be costlier to maintain and operate than client-server systems. Some systems do not provide users with the combination of fast access and update capability to product, price and availability information (which changes regularly) and multimedia presentation capabilities. Additionally, systems that rely on pre-existing communications links (such as the Internet or Compuserve) may not be appropriate for some client-server transactions. Finally, systems designed expressly for use as electronic catalogs may not be readily adaptable to other applications.

The foregoing limitations stem from the absence of an adaptable development system for creating interactive electronic systems combining multimedia presentations with automated transactions in a highly flexible environment definable by the proprietor of the transaction management system.

**2**

## SUMMARY OF THE INVENTION

The present invention provides a system and method for creating a fully integrated interactive computer system for presentation of information to client computers and execution of transactions related to such presented information. The invention provides means for any entity to fully implement and control wide dissemination of information and processing of related transactions.

In accordance with one aspect of the invention, a system and method for creating a system for the presentation of information and processing of transactions based upon such information includes a production system for compiling and coding an electronic book including information presentation pages, databases associated with the presentation pages, and coded forms for receiving and formulating transaction requests based upon such information.

In accordance with another aspect of the invention, a system and method for presenting information, formulating transaction requests based upon such information, and processing requested transactions in connection with related databases includes client computers for presenting information in the form of electronic books, related databases and coded forms for formulating transaction requests based upon such presented information, a transaction management system for processing transaction requests transmitted as coded forms from client computers, and transactional databases for executing the requested transactions.

These and other aspects of the invention are described below in detail with reference to the accompanying Figures.

## BRIEF DESCRIPTION OF THE FIGURES

In the accompanying Figures:

FIG. 1 is a schematic block diagram of the data presentation and transaction management system in accordance with the present invention;

FIG. 2 is a schematic block diagram of the production system of the data presentation and transaction management system in accordance with the present invention, and

FIG. 3 is a schematic block diagram of a state machine data transmission routine in accordance with the present invention.

## DETAILED DESCRIPTION OF PREFERRED EMBODIMENTS AND METHODS

The multi-media data presentation and transactional computer system 10 of the invention, represented schematically in FIG. 1, utilizes in its broadest implementation at least three main interactive components including client computers 100, which function as front end user interfaces by and through which front end users access and interact with the other main components; a transaction management system 200, connectable by a communications link 110 to the client computer 100 and by and through which data presentations and transactions are executable, and transactional databases 300 accessible by the transaction management system 200 through a communications link 210. This fundamental novel arrangement of the system 10 and related methods of creating and using provide for wide range multi-media presentation of any kind of information and interactive execution of transactions in connection with large numbers of client computers 100 and transactional databases 300.

As further detailed by additional reference to FIG. 2, the initial data contents of the client computers 100 is created or compiled in accordance with desired data presentations

5,799,157

3

and/or transactions to be presented and/or requested at the client computers 100 in the form of an electronic book 120 generated by an electronic book production system 150. The data contents of the electronic book 120, includes for example any combinations of static or dynamic presentations of text, graphics, audio and video information, control functions and hyper-link entry points which collectively define the appearance and computing function of pages 122 of the book presentable by display upon monitors of client computers 100 and through related multi-media hardware. The production system 150 may include, for example, a multi-media authoring tool 152 for producing the electronic book 120, other electronic book production programs 154 such as graphics generators and editors, and a corresponding electronic book code compiler 156. The electronic book may be adapted and programmed to run as a Windows application. The data contents of the client computers 100 may further include other compatible databases and/or programs resident on the client computers and accessible through the system software.

The data content of individual pages 122 can be selectively created and arranged according to any particular intended use of the system. The type of data content suitable for presentation by the system may include any information desired to be communicated, disseminated or presented and for execution of transactions based upon or related to such information. For example, in the application of the invention to the electronic presentation of any printed text the data may include a cover page, table of contents pages, and individual pages of course presenting information related to entries on the table of contents page(s). In the application of the invention to the collective presentation of data on products offered for sale (i.e., an electronic catalog) there may similarly be compiled for sequential or selective display a cover page 124, table of contents page(s) 126, and individual pages 128 dedicated to individual products or similar types of products. The various pages of the electronic book may be commonly or dissimilarly formatted with, for example, standard or unique graphics fields and background or color attributes, framing, size, legend, numbering, frame sequencing, background/foreground shading for 3-D imaging, etc., and include program selection and control features such as buttons and icons.

The data content of the client computer 100 further includes databases 130 having data entries which correspond to fields of displayed pages bound to the electronic book program at load or run time such that data contained in databases 130 relevant or related in any way to data displayed by the electronic book pages is accessible by the client computer from the electronic book program, i.e., from any of the displayed pages. The databases 130 are in a preferred embodiment of the invention compatible with the dBase program to facilitate direct access. However, other proprietary database programs such as Sybase, Oracle, Informix, SQL Server, Lotus Notes, may be utilized in the client computer 100 as dynamically linked libraries (DLL) accessible through open database connectivity (ODBC). The application of the invention is not limited to the presentation and/or management of transactions relative to any particular type or kind of data or subject matter.

In addition to the dynamic linking of data presented by the pages with data contained in the databases 130, by selective programming of hyperlink entry points on selected pages, the display of individual pages can be dynamically controlled to provide the front end client computer user with control over the sequence and content of the presentation. For example, in a multi-media page presentation which

4

includes a sequence of graphic images such as a slide show, control buttons may be provided on the page to enable the user to pause, forward, reverse and/or skip as desired. Similarly, in the instance where additional data related to the data of the displayed page is retrieved in, for example, the form of a spreadsheet or tables, dynamic page controlling can be used to scroll through a long list only partially displayed or sub-displayed in a window on any particular page.

The databases 130 are produced by a database manager 158 of production system 150 which constructs and/or codes a database of information related to information of pages 122 by establishing key fields linked to pieces of information of pages 122 with data in the databases 130.

The data content of the client computer 100 still further includes electronic forms 140 generated by a forms editor 160 and forms transaction language compiler 162 to provide formats for entry of coded transaction requests relevant to and based upon displayed data and/or additional data in the databases 130. The electronic forms 140 include display formats in the manner of a spreadsheet which physically define fields for entry of data to formulate transaction requests. For example, in the implementation of a product catalog, a purchase list form can be accessed and filled out from a displayed page, and data entered on such list converted to another form such as a purchase order. The electronic forms utilize placeholders 142 correlated to data entry fields on the forms and to corresponding data addresses 132 of appropriate data to be entered in any particular field. Each forms placeholder 142 has an associated variable name. The variable name tells the placeholder what type of data is to be input in a particular field. This aspect of the system may be programmed to be dynamically editable whereby all variable names of the placeholders are identified by the program by associated data in the databases 130 so that as data is added or otherwise edited in the databases 130 all necessary corresponding edits to the forms variable names are automatically made. Similarly, as edits to the forms are made, the associated transactional language may be edited. The forms transaction language compiler 162 provides transaction assembly language that runs on a virtual machine to execute a particular transaction or transactions associated with a particular form.

By the aforedescribed hardware arrangements and methods of use, the invention novelly provides a system for creating a system for the presentation of information in a relational environment to front end client computers, for selectively viewing, accessing and manipulating such data, and selectively formulating transaction requests based upon such data for transmission to the transaction management system 200 for execution as described below. As used herein, the term "formulate" means the selection and entry of information into a format which can be transmitted and processed, the term "transaction" means the carrying out of any instructions or requests represented by selected and formatted information, and the term "creating" means the necessary arrangement of hardware programming to accomplish integration of information to be presented and used by the system to effect transactions.

Dynamic real time or live data interaction between the client computers 100 and the transaction management system 200 is accomplished by the use of state machines between the two components. With reference to FIG. 3, formulated transaction requests 150, for example in the form of purchase orders for goods or services (such as for example travel arrangements and tickets), mortgage or credit applications, admissions application, computer search

5,799,157

5

queries, requests for any type of information (such as for example government publications or annual reports of corporations), etc. are transmitted as completed forms from the client computer 100 to the transaction management system 200 by the interaction of at least two state machines. A state machine program 160 of the client computer 100 creates and initiates a formulated transaction request procedure 170 to initiate the transmission of a formulated transaction request, followed by a subsequent consequent state of, for example, "request sent", "transmission OK", or "transmission failure". A subsequent consequent state may be "response received" and/or "time out" to wait for an appropriate response from the corresponding state machine program 230 of the transaction management system 200. Specified (standard) transactions are controlled, executed or edited according to unique procedure numbers within transaction sets in the corresponding state machine programs. Thus the client computer user can initiate and control transactions with the transaction management system by getting to and through specified states in predetermined transaction sets, in a manner similar to customer control of automated teller machines.

The transaction management system 200 includes multiple transactional management servers 220 connected by communications link or links 110 to client computers 100, and by communications link 210 to transactional databases 300 which include, for example, company or establishment management information services (MIS) 320 which, by suitable database access programs, actually perform the necessary computing functions to fulfill transaction requests. In any mass market implementation of the invention the transactional management servers 220 are therefore database (MIS) program servers whereby large numbers of client computers can access and retrieve requested information and/or responses from large numbers of databases.

In preferred implementations of the system, the transactional management servers are accessing remote transactional databases 300 to fulfill most transaction requests. However, in the implementation of the system to the marketing and sale of products offered by single retail establishment, a separate MIS system 301 of the retailer, for example in the form of a programmable controllable database such as Oracle, is accessed by client computers 100 through the transactional management servers 220. To fulfill and confirm the successful completion of all aspects of any particular transaction with the retailer, the retailer MIS 301 may further access another company's of entity's MIS 320 such as, for example, a credit card administrator's MIS 322 or a shipping company's MIS 324 package tracking system. The transmission and/or access of transaction instruction data contained in additional MIS systems may also be accomplished in accordance with the invention by the use of virtual machine coding compiled with the forms 140 for execution by the transaction management system 200. By editing the accompanying transaction coding with any edits to the forms, user programmable transaction requests are provided.

The communication links 110 and 210 of the system preferably interface with open network environments through dedicated network communication servers 230 which provide network access to the client computers by proxy to effect socket extensions.

I claim:

1. A method executed in a computer system for presenting data and executing transactions, the computer system including at least one client computer, a transaction management system having at least one transaction management

6

server, and at least one transactional database, the method comprising the steps of:

  providing an electronic book on a client computer, the electronic book including data for presentation to a user of the client computer;

  providing a client database on the client computer, the client database including data corresponding to the data in the electronic book;

  providing an electronic form on the client computer, the electronic form including data for execution of a transaction relating to the data in the electronic book and to the data in the client database;

  presenting the electronic book to the user by displaying the electronic book to the user;

  enabling the user to selectively view the data in the electronic book;

  when the user desires to execute a transaction relating to the data in the electronic book, presenting the electronic form to the user by displaying the electronic form to the user;

  enabling the user to selectively enter information into the electronic form, the information specifying the transaction desired to be executed by the user;

  sending the information specifying the transaction desired to be executed by the user to a transaction management server in a transaction management system;

  accessing a transactional database for executing the specified transaction; and

  executing the specified transaction.

2. The method of claim 1, wherein the step of providing an electronic book on a client computer includes the step of providing an electronic catalog on the client computer, the electronic catalog including a cover page, a table of contents page, and individual pages relating to products offered for sale in the electronic catalog.

3. The method of claim 1, further including the steps of:

  providing a placeholder corresponding to specific data in the client database and to specific data in the electronic form; and

  using the placeholder to automatically edit the specified data in the electronic form when the specified data in the client database is edited.

4. The method of claim 1, wherein the step of providing an electronic form on the client computer includes the step of providing a plurality of electronic forms on the client computer, the plurality of electronic forms including a purchase list electronic form and a purchase order electronic form.

5. The method of claim 4, further including the step of:

  automatically converting the purchase list electronic form into the purchase order electronic form when the user selectively enters information into the purchase list electronic form.

6. A computer system for presenting data and executing transactions, the computer system comprising:

  a client computer, the client computer including:

    an electronic book, the electronic book including data for presentation to a user of the client computer,

    a client database, the client database including data corresponding to the data in the electronic book,

    an electronic form, the electronic form including data for execution of a transaction relating to the data in the electronic book and to the data in the client database,

    a display device that presents the electronic book to the user by displaying the electronic book to the user

5,799,157

7

enabling the user to selectively view the data in the electronic book, and that presents the electronic form to the user by displaying the electronic form to the user when the user desires to execute a transaction relating to the data in the electronic book, and

an input device that enables the user to selectively enter information into the electronic form, the information specifying the transaction desired to be executed by the user;

a transaction management system having a transaction management server, the transaction management server receiving the information specifying the transaction desired to be executed by the user; and

a transactional database, the transactional database being accessed by the transaction management server for executing the specified transaction.

7. The computer system of claim 6, wherein the electronic book includes an electronic catalog, the electronic catalog including a cover page, a table of contents page, and individual pages relating to products offered for sale in the electronic catalog.

8. The computer system of claim 6, further including:

a placeholder corresponding to specific data in the client database and to specific data in the electronic form, the placeholder being used to automatically edit the specified data in the electronic form when the specified data in the client database is edited.

9. The computer system of claim 6, wherein the electronic form includes a plurality of electronic forms, the plurality of electronic forms including a purchase list electronic form and a purchase order electronic form, the purchase list electronic form being automatically converted into the purchase order electronic form when the user selectively enters information into the purchase list electronic form.

10. A method executed in a computer system for presenting data and executing transactions, the computer system including at least one client computer, a transaction management system having at least one transaction management server, and at least one transactional database, the method comprising the steps of:

providing an electronic book on a client computer, the electronic book including data for presentation to a user of the client computer, the electronic book being stored entirely on the client computer;

providing a client database on the client computer, the client database including data corresponding to the data in the electronic book, the data in the client database being dynamically linked to the data in the electronic book and being accessible from the electronic book, the client database being stored entirely on the client computer;

providing an electronic form on the client computer, the electronic form including data for execution of a transaction relating to the data in the electronic book and to the data in the client database, the electronic form being stored entirely on the client computer;

presenting the electronic book to the user by displaying the electronic book to the user;

enabling the user to selectively view the data in the electronic book;

when the user desires to execute a transaction relating to the data in the electronic book, presenting the electronic form to the user by displaying the electronic form to the user;

enabling the user to selectively enter information into the electronic form, the information specifying the transaction desired to be executed by the user;

8

sending the information specifying the transaction desired to be executed by the user to a transaction management server in a transaction management system;

accessing a transactional database for executing the specified transaction; and

executing the specified transaction.

11. The method of claim 10, wherein the step of providing an electronic book on a client computer includes the step of providing an electronic catalog on the client computer, the electronic catalog including a cover page, a table of contents page, and individual pages relating to products offered for sale in the electronic catalog.

12. The method of claim 10, further including the steps of:

providing a placeholder corresponding to specific data in the client database and to specific data in the electronic form; and

using the placeholder to automatically edit the specified data in the electronic form when the specified data in the client database is edited.

13. The method of claim 10, wherein the step of providing an electronic form on the client computer includes the step of providing a plurality of electronic forms on the client computer, the plurality of electronic forms including a purchase list electronic form and a purchase order electronic form.

14. The method of claim 13, further including the step of:

automatically converting the purchase list electronic form into the purchase order electronic form when the user selectively enters information into the purchase list electronic form.

15. A computer system for presenting data and executing transactions, the computer system comprising:

a client computer, the client computer including:

an electronic book, the electronic book including data for presentation to a user of the client computer, the electronic book being stored entirely on the client computer,

a client database, the client database including data corresponding to the data in the electronic book, the data in the client database being dynamically linked to the data in the electronic book and being accessible from the electronic book, the client database being stored entirely on the client computer,

an electronic form, the electronic form including data for execution of a transaction relating to the data in the electronic book and to the data in the client database, the electronic form being stored entirely on the client computer,

a display device that presents the electronic book to the user by displaying the electronic book to the user enabling the user to selectively view the data in the electronic book, and that presents the electronic form to the user by displaying the electronic form to the user when the user desires to execute a transaction relating to the data in the electronic book, and

an input device that enables the user to selectively enter information into the electronic form, the information specifying the transaction desired to be executed by the user;

a transaction management system having a transaction management server, the transaction management server receiving the information specifying the transaction desired to be executed by the user; and

5,799,157

**9**

a transactional database, the transactional database being accessed by the transaction management server for executing the specified transaction.

16. The computer system of claim 15, wherein the electronic book includes an electronic catalog, the electronic catalog including a cover page, a table of contents page, and individual pages relating to products offered for sale in the electronic catalog.

17. The computer system of claim 15, further including:

a placeholder corresponding to specific data in the client database and to specific data in the electronic form, the placeholder being used to automatically edit the speci-

**10**

fied data in the electronic form when the specified data in the client database is edited.

18. The computer system of claim 15, wherein the electronic form includes a plurality of electronic forms, the plurality of electronic forms including a purchase list electronic form and a purchase order electronic form, the purchase list electronic form being automatically converted into the purchase order electronic form when the user selectively enters information into the purchase list electronic form.

\* \* \* \* \*

# EXHIBIT  BB

# EXHIBIT A

Trials@uspto.gov                                        Paper No. 15
571-272-7822                          Date Entered:  September 19, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SAP AMERICA, INC.
Petitioner

v.

PI-NET INTERNATIONAL, INC.
Patent Owner
_____

Case CBM2013-00013
Patent 8,037,158
_____

Before, KARL D. EASTHOM, JONI Y. CHANG, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

McNAMARA, *Administrative Patent Judge*.

DECISION
Institution of Covered Business Method Patent Review
*37 C.F.R. § 42.208*

Case CBM2013-00013
Patent 8,037,158

# BACKGROUND

Pursuant to 35 U.S.C. § 321 and § 18 of the America Invents Act (AIA), SAP America, Inc. ("Petitioner") requests that the Patent Trial and Appeal Board initiate a Covered Business Method Patent Review to review claims 1-6, and 11 ("the challenged claims") of U.S. Patent 8,037,158 ("the ´158 Patent"). We have jurisdiction under 35 U.S.C. § 324. The standard for instituting a Covered Business Method Review is the same as that for a Post-Grant Review. § 18(a)(1) of the AIA. The standard for instituting Post-Grant Review is set forth in 35 U.S.C. § 324(a), which provides the following:

> THRESHOLD – The Director may not authorize a post-grant review to be instituted unless the Director determines that the information presented in the petition filed under [35 U.S.C. §] 321, if such information is not rebutted, would demonstrate that it is more likely than not that at least 1 of the claims challenged in the petition is unpatentable.

Petitioner contends that pursuant to 37 C.F.R. §§ 42.301 and 42.304(a), the ´158 Patent meets the definition of a covered business method patent and does not qualify as a technological invention. (Pet. 5-8). Petitioner further contends that claims 1-6, and 11 fail to comply with the patentable subject matter requirements of 35 U.S.C. § 101 (Pet. 13-20), that the challenged claims are invalid under 35 U.S.C. § 103 (Pet. 24-61) and under 35 U.S.C. § 112(b). (Pet. 75-80).

We institute a covered business method patent review based on Petitioner's challenges to claims 1-3 and 11 as unpatentable under 35 U.S.C. § 101 and 35 U.S.C. § 103 and based on Petitioner's challenges to claims 1-6 and 11 under 35 U.S.C. § 112(b).

BB-4

Case CBM2013-00013
Patent 8,037,158

PENDING LITIGATION

A person may not file a petition for a Covered Business Method Patent
Review "unless the person or the person's real party in interest or
privy has been sued for infringement of a patent or has been charged with
infringement under that patent."  (§18 (a)(1)(B) of the AIA).  The ′158 Patent is
the subject of a number of cases pending in U.S. District Courts in Delaware, the
Central District of California, and the Northern District of California.

STANDING

Petitioner argues that it has standing to petition for covered business method
patent review because Patent Owner sued Petitioner's customer, Citizens Financial
Group ("Citizens"), accusing Citizens of infringing claims 1-6 and 11 of the ′158
Patent in the U.S. District Court for the District of Delaware.  Pet. 9.  In addition,
Petitioner has sought declaratory judgment of non-infringement of the ′′158 patent
in a separate action filed by Petitioner in the U.S. District Court for the Northern
District of California (the declaratory judgment action).

Patent Owner argues that Petitioner does not have standing under 37 C.F.R.
§ 42.302, stating that SAP is not a privy of Citizens and that the Petitioner's
standing to bring the declaratory action is in dispute.  Prelim. Resp. 2-4.

"The core functions of the 'real party-in interest' and 'privies' requirement is
to assist members of the Board in identifying potential conflicts, and to assure
proper application of the statutory estoppel provisions.  *Office Patent Trial
Practice Guide*, 77 Fed. Reg. 48756 (Aug. 14, 2012). "The latter, in turn, seeks to
protect patent owners from harassment via successive petitions by the same or
related parties, to prevent parties from having a ''second bite at the apple,'' and to
protect the integrity of both the USPTO and Federal Courts by assuring that all
issues are promptly raised and vetted."  *Id.*  "Whether a party who is not a named

3

Case CBM2013-00013
Patent 8,037,158

participant in a given proceeding nonetheless constitutes a 'real party-in interest' or 'privy' to that proceeding is a highly fact-dependent question." *Id.* "Such questions will be handled by the Office on a case-by-case basis taking into consideration how courts have viewed the terms 'real party-in-interest' and 'privy." *Id.*

The legislative history, which directly addresses the issue raised by the Patent Owner in this case, supports Petitioner's standing to petition for covered business method patent review.[1]  At 157 Cong. Rec. S5432 (daily ed. Sept. 8, 2011), Senator Schumer explained that "privy" "effectively means customers of the petitioner."  Senator Schumer stated as follows:

> Section 18 of the America Invents Act, of which Senator Kyl and I were the authors, relates to business method patents.  As the architect of this provision, I would like to make crystal clear the intent of its language. . . As originally adopted in the Senate, subsection (a)(1)(B) only allowed a party to file a section 18 petition if either that party or its real parties in interest had been sued or accused of infringement.  In the House, this was expanded to also cover cases where a "privy" of the petitioner had been sued or accused of infringement.  A "privy" is a party that has a direct relationship to the petitioner with respect to the allegedly infringing product or service. In this case, it effectively means customers of the petitioner.  With the addition of the word "privy," a company could seek a section 18 proceeding on the basis that customers of the petitioner had been sued for infringement.

Patent Owner does not dispute Petitioner's assertion that the defendant in the Delaware litigation, Citizens, is a customer of Petitioner. Petitioner also represents

---

[1] Our decision is limited to this proceeding, which is brought under Section 18 of the AIA, and the facts of this case.

BB-6

that Citizens has requested Petitioner indemnify Citizens for legal fees and losses. Pet. 9. In view of the foregoing statements of legislative intent, as well as Citizen's request for indemnification by Petitioner, we are persuaded that Petitioner has standing to bring the subject petition.

## BACKGROUND AND RELATED PATENTS

The present Petition concerning the ´158 Patent is one of three filed by Petitioner concerning related patents. U.S. Patent 8,108,492 (the ´492 Patent) is the subject of a petition for an *inter partes* review in proceeding IPR2013-00194 and U.S. Patent 5,987,500 (the ´500 Patent) is the subject of a petition for *inter partes* review in proceeding IPR2013-00195. The ´492 Patent, entitled "Web Application Network Portal,", the ´500 Patent, entitled "Value-Added Network System for Enabling Real-Time, By-Directional Transactions on a Network," (bold font omitted) and the ´158 Patent, entitled "Multimedia Transactional Services," (collectively, "the Subject Patents") share substantially the same specification, but claim different subject matter.

The Subject Patents disclose "a method and apparatus for providing real-time, two-way transactional capabilities on the Web." ´492 Patent, Abstract. *See also,* ´500 Patent, Abstract; ´158 Patent Abstract. The ´158 Patent discloses a method for "enabling service management of the value-added network service, to perform [Operations, Administration, Maintenance & Provisioning] (OAM&P) functions on the services network." ´158 Patent, Abstract, col. 8, ll. 56-67. The claims recite a banking application based on a user's selection of a point-of-service application from a Web page. *See id.*, claims 1-6.

The ´500 Patent discloses a value-added network switch, which includes a system for switching to a transactional application that provides transactional services managed by a value-added network service provider which keeps the

BB-7

Case CBM2013-00013
Patent 8,037,158

transaction flow captive, and performs the transactional services interactively and in real-time, in response to a user specification from a network application, a system for transmitting a transaction request from the transactional application and a system for processing the transaction request. ´500 Patent, Abstract, claim 1.

The ´492 Patent also describes a method for enabling object routing that involves creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity and assigning a unique network address to each of the objects identified. The claims of the ´492 Patent generally recite a system and method in which a Web server lists on a Web page one or more Web applications (each of which can request a real-time Web transaction) as point-of-service applications; a value-added network switch that enables the real-time Web transactions; a service network that connects the Web server to a back-end transactional application; and a computer that executes the back-end transactional application for processing the transaction in real-time. *See* ´492 Patent, Abstract, claim 1.

THE ´492 PATENT

The ´492 Patent is illustrative of the disclosure in the Subject Patents.[2] The invention purports to facilitate real-time two-way transactions, as opposed to deferred transactions, e.g., e-mail. ´492 Patent, col. 1, ll. 39-48. The invention also purports to be an improvement over browse-only transactions, *id.,* col. 1, ll. 49-64, and limited two-way services on the Web through Common Gateway Interface (CGI) applications customized for particular types of applications or services. *Id.*, col. 1, l. 65-col. 2, l. 45.

_____

[2] The specification of the ´158 Patent is the same as that of the ´492 Patent. In this section of the decision only, column and lines references are those of the ´492 Patent. Remaining column and lines references in this decision refer to the ´158 Patent.

6

Case CBM2013-00013
Patent 8,037,158

The ´492 Patent describes a service network running on top of the Internet, having five interacting components:  an exchange agent, an operator agent, a management agent, a management manager, and a graphical user interface (GUI). *Id.,* col. 6, ll. 1-5.

As shown in Figure 8, a user connects to a Web server.  *Id.,* col. 9, ll. 25-26. The Web server runs the exchange component.  *Id.*  Exchange 501 creates and allows for the management or distributed control of the service network, operating within the boundaries on an internet protocol (IP) facilities network.  *Id.,* col. 6, ll. 28-30.

A user connected to the Web server running the exchange component issues a request for a transactional application.  *Id.* col. 9, ll. 25-26.  The Web server receiving the user's request to perform a real-time transaction hands the request over to the exchange agent the Web server is running.  *Id.*, col. 6, ll. 8-11, col. 9. ll. 27-29.  The exchange 501 includes a Web page 505 that uses a GUI to display a list of point-of-service (POSvc) applications 510 accessible to the user by the exchange.  *Id.,* col. 6, ll. 18-20, ll. 39-41, col. 9, ll. 28-30.  The POSvc applications are transactional applications that can execute the type of transaction the user is interested in performing.  *Id.,* col. 6, ll. 22-23, ll. 41-44.  Exchange 501 also includes a switching component and an object routing component.  *Id.,* col. 6, ll. 20-22.  When the user selects a POSvc application, the switching component in the exchange switches the user to the selected POSvc application.  *Id.,* col. 9, ll. 32-33.  The object routing component executes the user's request.  *Id.*, col. 9, ll. 34-35.  The exchange and a management agent thus perform the switching, object routing, application and service management functions.  *Id.*, col. 6, ll. 30-38, col. 9, ll. 32-34.

7

Case CBM2013-00013
Patent 8,037,158

The Exchange 501 and management agent together constitute a value-added network (VAN) switch, which provides multi-protocol object routing via a proprietary TransWeb[TM] Management Protocol (TMP), depending upon the services chosen. *Id.,* col. 7, ll. 52-54, ll. 62-65; col. 8, ll. 41-42. In one embodiment, TMP and distributed on-line service information data bases (DOLSIBs) perform object routing. *Id.,* col. 8, ll. 3-5, col. 9, ll. 34-37. In DOLSIBs, which are virtual information stores optimized for networking, information entries and attributes are associated with a networked object identity that identifies the information entries and attributes in the DOLSIB as networked objects. *Id.*, col. 8, ll. 7-13. Each networked object is assigned an internet address based on the IP address of the node at which the networked object resides. *Id.,* col. 8, ll. 13-15. As a result, networked objects branch from a node in a hierarchical tree structure that establishes the individual object as an "IP-reachable" node on the internet, so that TMP can use this address to access the object from the DOLSIB. *Id.,* col. 8, ll. 16-26. "Each object in the DOLSIB has a name," which is "an administratively assigned object ID specifying an object type." *Id.*, col. 8, ll. 27-29. The object type, together with the object instance, uniquely identifies a specific instantiation of the object, e.g., an instance of an object about car models, and provides the user with specific information about a particular model. *Id.,* col. 8, ll. 31-35. Each object in the DOLSIB also has a syntax, which defines the abstract data structure corresponding to that object type, and an encoding that defines "how the object is represented by the object type syntax while being transmitted over the network." *Id.,* col. 8, ll. 36-39.

The VAN switch 520 has a layered architecture as shown in Fig. 7. Boundary service 701 provides the interface between the VAN switch, the Internet and the Web, and multi-media end user devices and the interface to an on-line

8

BB-10

Case CBM2013-00013
Patent 8,037,158

service provider. *Id.,* col. 8, ll. 42-48. Switching service 702, which is an OSI application layer switch, represents the core of the VAN switch. *Id.,* col. 8, ll. 52-54. "Interconnected application layer switches form the application network backbone" and are described as a significant aspect of the Subject Patents. *Id.*, col. 8, ll. 60-63. Switching service 702 routes user connections to remote VAN switches and facilitates connectivity with the Internet (a public switched network) and private networks, including back office networks, such as banking networks. *Id.,* col. 8, ll. 57-60. Management service 703 contains tools used by the end users to manage network resources, including VAN switches, and provides applications that perform OAM&P functions, such as "security management," "fault management," "performance management," and "billing management." *Id.,* col. 8, l. 64-col. 9, l. 8. "[A]pplication service 704 contains application programs that deliver customer services," including POSvc applications for banking, multi-media messaging, conferencing, financial services. *Id.*, col. 9, ll. 9-14. Depending upon the type of VAN service, the characteristics of the network elements will differ. *Id.,* col. 9, ll. 19-20.

## ILLUSTRATIVE CLAIM

Independent claim 1 is illustrative:

1. A method for performing a real time Web transaction from a Web application over a digital network atop the Web, the method comprising:
   providing a Web page for display on a computer system coupled to an input device;
   providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;
   accepting a first signal from the Web user input device to select the point-of-service application;

9

Case CBM2013-00013
Patent 8,037,158

accepting subsequent signals from the Web user input device; and

transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals.

## BASIS OF PETITION

Petitioner asserts the following challenges to the patentability of claims 1-6 and 11:

Claims 1-6 and 11 are unpatentable for failing to recite statutory subject matter under 35 U.S.C. § 101.

The combination of Lawlor[3] and Computerworld[4] renders claims 1-6 and 11 unpatentable under 35 U.S.C. §103(a).

The combination of Electronic Banking[5] and Applicant's Admitted Prior Art (AAPA) renders claims 1-6 and 11 unpatentable under 35 U.S.C. §103(a).

The combination of SFCU[6] and Electronic Banking renders claims 1-6 and 11 unpatentable under 35 U.S.C. §103(a).

Claims 1-6 and 11 are unpatentable under 35 U.S.C. § 112(b).

## CLAIM CONSTRUCTION

The claim constructions proposed by Petitioner and Patent Owner are summarized in the following Table.

---

[3] Lawlor et al. ("Lawlor"), U.S. Patent 5,220,501 issued Jun. 15, 1993.

[4] The Cyberbanks, *Computerworld*, ProQuest Telecommunications, pg. 80 (1995).

[5] Lipis, A.H. et al., Electronic Banking, The Stock Market, 4th Edition, John Wiley & Sons, New York (1985).

[6] www.thefreelibrary.com/_/print/PrintArticle.aspx?id=17104850, Stanford Federal Credit Union Pioneers Online Financial Services, 03/15/13.

BB-12

Case CBM2013-00013
Patent 8,037,158

| CLAIM TERM/CLAIM | PETITIONER'S PROPOSAL | PATENT OWNER'S PROPOSAL[7] |
|---|---|---|
| Web application/1-4, 11 | A Web application is defined broadly as encompassing at least, for example, a Web browser, Web server software, or CGI scripts. Sirbu Decl. ¶ 18. Pet. 13-14 | A POSvc Application is a Web application displayed on a Web page, corresponding to a back-end transactional application, and displaying an "object" data structure with attributes and information entries corresponding to the selected Web transaction request. Prelim. Resp. 25 |
| Service network atop the World Wide Web/1 | Service network atop the World Wide Web means a network (e.g., hardware and/or software) that provides a service between two or more computers over or involving the Web, for example involving Web client or Web server software. Sirbu Decl. ¶ 22; Pet. 15 | A service network atop the world Wide Web means an online service network running on top of a physical network such as the Web, Internet or email networks or an "online service network running on top of a facilities network such as the Web." Prelim Resp. 59 |
| Web user input device/1 | "[T]he previously recited 'computer system' coupled to an input device." OR | |

---

[7]Ex. 2010, the Declaration of Michael Bardash (Bardash Declaration), filed in the U.S. District Court for the District of Delaware, asserts claim constructions for certain terms. Patent Owner cites to the Bardash Declaration only once, i.e., at page 54 of the Preliminary Response, when arguing the claims are not indefinite. It is not clear whether Patent Owner is asserting the same constructions for all the terms in this proceeding as those proposed in the Bardash Declaration. We have reviewed and considered the statements in the Bardash Declaration.

11

Case CBM2013-00013
Patent 8,037,158

| | | |
|---|---|---|
| | indefinite under 35 U.S.C. § 112(b) as lacking antecedent basis. Pet. 15-16 | |
| Routed transactional data structure that is both complete and non-deferred/1 | "Complete" should be construed to be a data structure used to complete a transaction. (Sirbu Decl. ¶ 24.), Pet. 16; "non-deferred" should be construed to describe any transaction or data structure that is processed immediately without any delay. Sirbu Decl. ¶ 25; Pet. 17 | "[R]outed transactional data structure refers to object routing." Prelim Resp. 57<br><br>"[O]bject is an encapsulated whole with its information entries and attributes specific to a [POS] application . . . that gets routed as a 'complete,' encapsulated whole in 'object routing' in a 'non-deferred,' 'real-time' Web transaction." Prelim. Resp. 58.<br><br>Non-deferred is the opposite of deferred – what the ′158 patent calls "real-time." Prelim Resp. 58 |
| Routing occurring in response to the subsequent signals/1 | Routing occurring in response to the subsequent signals means the transferring of funds occurring in response to the subsequent signals. OR indefinite under 35 U.S.C. § 112(b) as lacking antecedent basis. Pet. 17 | |
| Object routing/4 | encompassing actions or data that execute a user's request, which may | Object routing means communicating between a POSvc Application and a |

12

Case CBM2013-00013
Patent 8,037,158

| | | |
|---|---|---|
| | include sending an object from one point to another. An object in the context of object routing could include a message. Sirbu Decl. ¶26; Pet. 18 | back-end transactional application individual data structure with information entries and attributes (i.e., objects) over the application layer of the OSI model.  Prelim. Resp. 24 |
| Distributed on-line service information bases/5 | Distributed on-line service information bases are any data store on or available over a network. Sirbu Decl., ¶ 27; Pet. 18 | Should be construed with the meaning ascribed in the record.  Prelim. Resp. 24 |
| Virtual information store/6 | A virtual information store is  any data store that contains, for example, information entries and attributes. Sirbu Decl. ¶ 28; Pet. 19 | Should be construed with the meaning ascribed in the record. Prelim Resp. 24 |

Web application.  Patent Owner's proposed construction is not supported in the specification.  Patent Owner cites Fig. 5D as demonstrating that the POSvc application incorporates the transactional data structure or "object."  Prelim. Resp. 6, 25.  The ´158 Patent states that "FIG. 5D illustrates a user selecting a bank POSvc application from the POSvc application list."  Ex. 1001, col. 3, ll. 20-21. The description of Fig. 5D at column 6, ll. 46-67 makes no mention of an "object." Patent Owner cites the locations where the "point-of service" or POScv appears in the specification.  Prelim. Resp. 25, 57.  These references to a point-of-service application in the ´158 Patent do not describe an "object," but instead describe an exchange 501 that performs "object routing" and an embodiment which performs

13

Case CBM2013-00013
Patent 8,037,158

such object routing. *See, id.,* col. 6, ll. 9-16, 30-35; col. 6, l. 42 - col. 7, l. 31; col. 7, l. 61- col. 8, l.31; col. 9, ll. 1-27; Figs. 5B, 5C, 5D, 6A. The '158 Patent does not describe a POSvc displaying an "object" data structure with attributes and information entries corresponding to the selected Web transaction request. The '158 Patent discloses an object routing embodiment in which a networked object identity identifies the information entries and attributes in distributed on-line service information bases as individualized network objects. *Id.,* col. 7, l. 61- col. 8, l. 7. However, this is not a description of a Web application.

Petitioner's proposed construction is overly broad because it encompasses more than an application and includes a browser.

The '158 patent discloses a system for switching to a transactional application in response to a user specification from a World Wide Web application, Ex. 1001, Abstract. The description of Figure 8 refers to a user connecting to a Web server running an exchange and then issuing a request for a transactional application. *Id.*, col. 9, ll. 16-31. However, there is no definition of a "Web application" in the '158 Patent. Claim 1 of the '492 Patent recites offering one or more Web applications as point-of-service applications. Not only does this recitation not define a Web application, it suggests that Web application encompass more than point-or-service applications. We also note that we construed the term "network application" in IPR2013-00195. *See* IPR2013-00195, Paper No. 10, Decision to Institute, Claim Construction. The use of different terms in the claims indicates the drafter intended a different meaning.

Therefore, we construe "Web application" to mean *a software program, that can be accessed by an internet user*.

Service network atop the World Wide Web.  Patent Owner proposes alternative constructions, each of which attempts to distinguish a services network

14

BB-16

Case CBM2013-00013
Patent 8,037,158

from a facilities network.  The '158 Patent discloses that five components interact to provide service network functionality, i.e., real-time transactional capabilities to access a merchant's services via the Web.  Ex. 1001, col. 5, l. 45-col. 6, l. 7.  The service network operates within the boundaries of an IP-based facilities network, namely the Internet, the Web, or e-mail networks.  *Id.*, col. 5, ll. 49-50; col. 6, ll. 23-24.  Petitioner's proposed construction, which appears to include the Web itself, does not address the transactional nature of the claimed service network.  In IPR2013-00194, we construed "service network" to mean a network on which services other than underlying network communication services are provided.  *See,* IPR2013-00194, Paper No.12, Decision To Institute, Claim Construction. Therefore, we construe "service network running atop the World Wide Web" to mean *a network on which services other than underlying network communications services are provide over the internet.*

Web user input device.  We construe "the Web user input device" to mean the same input device as that coupled to the computer system that provides the Web page for display, recited earlier in claim 1.

(Utilizing) a routed transactional data structure that is both complete and non-deferred.  Patent owner does not propose a construction for the entire term, but cites to the prosecution history to describe arguments made concerning parts of the term.  Prelim. Resp. 53-59.  Petitioner proposes constructions for "complete" and "non-deferred."  Petitioner does not propose a construction of "a routed transactional data structure."[8]  The use of the term "non-deferred" in claim 1 of the '158 Patent to describe a data structure is understood only in the context of the remainder of the limitation, which recites "transferring funds" among accounts "in

---

[8] Petitioner also challenges the claims as indefinite under 35 U.S.C. § 112(b) based on their use of the terms "routed transactional data structure," "complete," and "non-deferred." *Infra.*

15

BB-17

Case CBM2013-00013
Patent 8,037,158

real time utilizing a routed transactional data structure." In IPR2013-00194, we construed "real time" as non-deferred. IPR2013-00194, Decision To Institute, Paper No. 12, Claim Construction. In this context, non-deferred means processed immediately. *See* Ex. 1001, col. 7, ll. 2-14, 30-41.

As previously noted, there is no support in the specification for Patent Owner's contention that the ´158 Patent identifies the transactional data structure as the "object," although Patent Owner cites to arguments related to this position in the prosecution history. Prelim. Resp. 25, 57. *See* supra claim construction – Web application. Instead, the ´158 Patent discloses multi-protocol object routing and in one embodiment uses networked object identities. Ex. 1001, col. 7, l. 53- col. 8, l. 6.

The specification does not support Patent Owner's contention that "complete" refers to an encapsulated whole with its information entries and attributes specific to a point-of-service application displayed on a Web page in a real-time Web transaction that gets routed as a complete encapsulated whole in "object routing" in a "non-deferred," real-time Web transaction. Prelim. Resp. 58. A "complete" routed transactional data structure provides the information to accomplish the routing to perform switching.

Therefore, we construe "utilizing a routed data structure that is both complete and non-deferred" to mean *using a data structure that facilitates switching a user who selects a transactional application to a service provider program that provides immediate processing.*

The routing occurring in response to the subsequent signals. We understand "the routing" to be routing resulting from "utilizing a routed transactional data structure" previously recited in claim 1. We understand "the subsequent signals" to be the subsequent signals from the Web user input device recited in claim 1,

16

BB-18

accepted after a first signal from the Web user input device to select the point-of-service application.

Object Routing.  As Patent Owner points out, Petitioner's proposed construction, which includes a message as an object in the context of object routing, encompasses e-mail and does not recognize the specific meaning of object routing as used in the ´158 Patent.  Patent Owner's proposed construction refers to communicating between a POSvc application and "a back-end transactional application individual data structure" with individual entries and attributes.  Prelim. Resp. 24.  However, the ´158 Patent identifies point-of-service applications as transactional applications.  The ´158 Patent describes object routing as an embodiment to accomplish switching between transactional point-of-service applications and service provider processing using networked object identities.  Ex. 1001, col. 6, ll. 11-16, 56-59, col. 8, ll. 1-15.  The networked objects identify information entries and attributes in a distributed on-line service information base as individual networked objects.. *Id.* Therefore, we construe "object routing" to mean *the use of individual network objects to route a user from a selected transactional application to the processing provided by the service provider.*

Distributed on-line service information bases.  Petitioner's proposed construction as any data store available over a network does not take into consideration the description of that term in the ´158 Patent at column 7, line 65-66 through column 8, line 1.  Therefore, we construe "distributed on-line service information bases" to mean *virtual information stores optimized for networking.*

Virtual information store.  In view of the disclosure in the ´158 Patent at column 7, line 66 – column 8, l. 1, we construe "virtual information store" to mean *an information store in which information entries and attributes are associated with a networked object identity.*

17

BB-19

Case CBM2013-00013
Patent 8,037,158

## THE ´158 PATENT IS NOT A PATENT FOR A TECHNOLOGICAL INVENTION

A covered business method patent is "a patent that *claims* a method or corresponding apparatus for performing data processing" or other operations used in the practice, administration, or management of a financial product or service. 37 C.F.R. § 42.301(a). A covered business method patent "does not include patents for technological inventions." *Id.* A technological invention is determined by considering whether the claimed subject matter as a whole recites a technical feature that is novel and unobvious over the prior art, and solves a technical problem using a technical solution. 37 C.F.R. § 42.301(b).

Petitioner asserts that, because the claims recite providing a point-of-service application that provides access to both a checking account and a savings account, the ´158 Patent claims an activity that is entirely financial in nature. Pet. 5-6. Petitioner further asserts that the claims qualify for a covered business method proceeding because they are not directed to a technological invention, i.e., they are not concerned with a technical problem, which is solved by a technical solution, even if they recite some *de minimus* technical feature. Pet. 7-8. Noting that transferring funds among accounts is not a technical problem, Petitioner also asserts that providing a Web page for display, providing a point-of-service application for selection within the Web page and accepting a signal from the Web input device to select the Web application are not novel or non-obvious technical features of a technical solution. Pet. 8.

Patent Owner argues that the ´158 Patent claims are pure technology claims implemented for financial transactions and that the technology disclosed in the ´158 Patent operates the same in financial and non-financial transactions. Pet. 12-

18

BB-20

Case CBM2013-00013
Patent 8,037,158

13.   We are not persuaded by Patent Owner's argument that Fig. 5D of the ´158

Patent exemplifies an "object" as a transactional data structure.  Claim 1, from

which claims 2-6 and 11 depend, recites transferring funds in real time utilizing a

"routed transactional data structure."  We have construed this to mean using a data

structure that facilitates switching a user who selects a transactional application to

a service provider program that provides immediate processing.  Claim 1 does not

recite a particular technology.  Because claim 1 recites only using a data structure

that facilitates switching so that a financial transaction can occur, we are not

persuaded that claim 1 recites a technical solution to a technical problem.

Therefore, the ´158 Patent is eligible for covered business method patent review.

37 C.F.R. § 42.301.

<div align="center">ASSERTED GROUNDS UNDER 35 U.S.C. § 101</div>

Petitioner contends that, like the subject matter found unpatentable in *Bilski

v. Kappos*, 130 S. Ct. 3218, 3231 (2010), the claims of the ´158 Patent are drawn to

abstract functionality, i.e., transferring funds between accounts, and that the mere

pairing of such abstract ideas with a computer system and input means is

insufficient to render patentable subject matter.  Pet. 19-20.  Noting that the issue is

whether the claims include meaningful limitations restricting them to an

application, rather than merely an abstract idea, Patent Owner argues that the

claims do not cover every possible way of transferring funds via a computer, but

are limited to a method that incorporates a POSvc application.  Prelim. Resp. 21-

22.  Patent Owner predicates its argument on its construction of a point-of-service

application as requiring an "object" data structure.  *Id.*  Patent Owner's

construction of point-of-service application is not supported by the specification.

*See* supra, Claim Construction, Web application.  *See also* IPR2013-00194, Paper

No. 12, Decision To Institute, Claim Construction, point-of-service application.

<div align="center">19</div>

Case CBM2013-00013
Patent 8,037,158

Citing *Bilski,*130 S. Ct. at 3227, Patent Owner argues that a claim is limited, meaningfully, if it requires a particular or specific machine implementing a process or a particular transformation of matter.  Prelim. Resp. 21.  The claims are drawn to a "method for performing a real time Web transaction" and recite transferring funds in real time using a "routed transactional data structure," i.e., one  that facilitates switching a user who selects a transactional application to a service provider program, and, in this case, provides immediate processing.  *See supra*, Claim Construction, utilizing a routed transactional data structure.  This claim limitation uses structural language (a routed transactional data structure) to perform a function, i.e., routing a user from a point-of-service application selected through a Web interface to a service provider program, so that that the user can transfer funds among accounts.

> In order for the addition of a machine to impose a meaningful limit on the scope of a [method] claim, it must play a significant part in permitting the claimed method to be performed, rather than function solely as an obvious mechanism for permitting a solution to be achieved more quickly.

*SiRF Technology, Inc. v. International Trade Commission,* 601 F.3d 1319, 1333 (Fed. Cir. 2010).  Claim 1 recites an abstract concept without limiting the transactional data structure.  Therefore, we are persuaded that Petitioner has demonstrated that it is more likely than not that claim 1 recites unpatentable subject matter under 35 U.S.C. § 101.  We are persuaded similarly as to claims 2, 3, and 11.

Claim 4 in the ´158 Patent recites that "object routing is used to complete the transfer of funds."  Our construction of object routing requires the use of individual network objects to route a user from a selected transactional application to the processing provided by the service provider.  *See supra*, claim construction –

BB-22

Case CBM2013-00013
Patent 8,037,158

"object routing." "[O]bject routing," as we have construed the term, is a specific technique that plays a significant part in carrying out the invention recited in claim 4. The relevant inquiry is whether the object routing in claim 4 as a whole is a meaningful limitation restricting claim 4 to an application, rather than merely an abstract idea. *See, Ultramercial, Inc. v. Hulu, LLC,* 722 F.3d 1335, 1344 (Fed. Cir. 2013).

Petitioner argues that object routing is an abstract idea that lacks any ties to a particular machine. Pet. 23. In addition to object routing, claim 4 incorporates the limitations of claim 1, i.e., providing a Web page for display on a computer system, providing point-of-service application as selections within the Web page, and transferring funds utilizing a routed transactional data structure. If a claim covers all practical applications of an abstract idea, it is not meaningfully limited. *Id.* at 1345. Pre-emption is only a subject matter eligibility problem when a claim preempts all practical use of an idea. *Id.* at 1346. Claim 4 does not cover all practical applications of object routing. Claim 4 does not cover all practical methods of performing real time Web transactions. Claim 4 further limits performing a real time Web transaction to completing the funds transfer by object routing. Claim 4 would not cover methods that do not use object routing to complete the transfer of funds in a software program that can be accessed by an internet user, i.e., a Web application, as we have construed that term. Thus, the recitation of object routing in claim 4 meaningfully limits the claimed method for performing a real time Web transaction. Petitioner has not persuaded us it is more likely than not that claim 4 is unpatentable under 35 U.S.C. § 101. We similarly are not persuaded that claims 5 and 6, which depend from claim 4, are more likely than not unpatentable under 35 U.S.C. § 101.

21

Case CBM2013-00013
Patent 8,037,158

In view of the foregoing, we institute a covered business method patent review based on Petitioner's challenges to claims 1-3 and 11 under 35 U.S.C. § 101. We decline to institute covered business method patent review based on Petitioner's challenges to claims 4-6 under 35 U.S.C. § 101.

ART CITED IN PETITION

Electronic Banking – Ex. 1004

Electronic Banking ("EB") generally discloses retail and wholesale banking services and discusses future directions of the financial services industry and electronic funds transfer at the time of its publication in 1985. Ex. 1004, pp. 10-11 (Preface, Table of Contents);[9] Pet. 42. Pages 123-146 of Electronic Banking disclose home banking developments from a telephone bill payment system to a video home banking system. Electronic Banking identifies four categories of service (information retrieval, transactions, electronic messaging and computation), EB, p. 124-5, four major processing functions, (customer information preparation, network control, session management and after-session transaction processing), EB 128, and five major system elements (terminals, communications link, operating center, database and standards). EB, p. 124-5.

Electronic Banking discloses that when a customer accesses the system, this customer is the network controller's customer and can access many different services the network controller offers, including a bank's services, by selecting from categories listed on an index menu. EB, p. 129. When the customer selects banking, the network controller sets up a direct connection between the customer

---

[9] Page number references in the Petition refer to the page number of the Electronic Banking publication, rather than the pages numbers of Ex. 1004. For consistency, further references in this decision are to the page numbers of Electronic Banking, rather than the page numbers of Ex. 1004.

BB-24

Case CBM2013-00013
Patent 8,037,158

and the financial switch (FS) bank, at which point the FS bank takes over the session management function and prompts the customer through the transaction, thereby capturing the customer oriented transaction and providing the bank complete control over the customer's transaction. *Id.* When the customer signs off, the customer is returned to the network controller's main menu from which the customer may select another service, such as news or games. *Id.*

Stanford Federal Credit Union ("SFCU") – Ex. 1005

SFCU discloses that, following a 100 member trial in 1994, in 1995 Stanford Federal Credit Union became the first bank to offer customers services beyond access to information over the Internet, by providing its customers the ability to withdraw or transfer funds from one account to another, and conduct day-to-day business online, using its home page and World Wide Web server. Ex. 1005, p. 1-2.

Lawlor – Ex. 1006

Lawlor discloses a system for remote delivery of banking services. Ex. 1006, Abstract. In Lawlor, contact is established between portable terminals and a central computer operated by a service provider over a telephone or packet data network. *Id.* Users are connected to their banks by linking the digital packet network, accessible through a dial-up gateway, to an ATM network. Ex. 1006, Abstract; col. 7, ll. 30-36, 40-48. The central computer acts as a Point of Sale (POS) or Automated Teller Machine (ATM). *Id.*, Abstract. The bank's data processing system communicates with other banks through specialized ATM networks and digital switches, so that a user of one bank's ATM can access an account in another bank. *Id.*, col. 4, 12-23. Funds transfers can be accomplished in real time. *Id.*, col. 7, ll. 19-22.

Computerworld – Ex. 1007

23

Case CBM2013-00013
Patent 8,037,158

Computerworld discloses that in June 1995 Security First Network Bank was approved to provide services including the ability to make money transfers over the Internet. Ex. 1007.


ANALYSIS OF PETITIONER'S PRIOR ART CHALLENGES

Grounds based on the combination of Lawlor and Computerworld

Patent Owner argues that Lawlor precedes the Web, but acknowledges that Lawlor discloses an invention that "piggybacks" on evolving ATM and telephone company communications networks. Prelim. Resp. 27. Petitioner cites Computerworld as disclosing the implementation of such networks on the Internet and argues that Lawlor and Computerworld address the same problem as that addressed in the '158 Patent, i.e., providing real-time transactional capabilities. Pet. 25, 40. Lawlor discloses the existence of point-of-sale (POS) terminals that dial a central computer, which reformats a request into a standardized debit request message and transmits it over an ATM network causing an immediate debit of the purchaser's bank account. Ex. 1006, col. 5, ll. 25-46. Such ATM networks are digital packet-switched network banks used to communicate with one another. *Id.,* col. 4, ll. 14-23. Therefore, we agree with Petitioner's contention that a person of ordinary skill in the art would have a reason to combine Lawlor, which deals with the remote delivery of retail banking services over interconnected networks, e.g., the telephone network and an interbank ATM network, with the disclosure in Computerworld that certain institutions were pursuing delivery of such services using the Internet, including using the Netscape Navigator browser. Pet. 40-42.

Claim 1

As discussed above, Lawlor discloses the subject matter of independent claim 1, i.e., a method for performing a real-time transaction over a digital

24

Case CBM2013-00013
Patent 8,037,158

network.  The preferred embodiment of Lawlor's invention processes information through the public data network (PDN) and "piggybacks" on an evolving ATM network, Prelim. Resp. 27.  *See* Ex. 1006, col. 7, l. 64 – col. 8, l. 5; col. 11, ll. 22-42.  Lawlor discloses linking two networks, i.e., the digital packet network accessible through dial-up telephone gateway and an ATM network for the purpose of home banking.  *Id.*, col. 7, ll. 45-48.  Thus, when combined, the disclosure in Computerworld and Lawlor describe and suggest a service network atop the Web.

Based on its narrow construction of "Web application," "real-time transaction from a Web application," "point-of-service application," and "service network atop the world wide Web," Patent Owner contends that Lawlor and Computerworld are missing these elements.  Prelim. Resp. 27-30.

In IPR2013-00194, we construed a point of service application to mean a software program that facilitates execution of transactions requested by a user.  *See* IPR2013-00194, Decision To Institute, Paper No. 12, Claim Construction. Computerworld's discussion of accessing banking services over the Internet and using Netscape Navigator in such transactions, Ex. 1007, discloses a Web page displayed on a computer screen and a Web application, i.e., a software program that can be accessed by an Internet user.  Lawlor discloses that with an alpha keyboard, a terminal user can access not only banking services, but also e-mail and other "alpha-dominated" services via the PDN.  Ex. 1006, col. 10, ll. 34-43; col. 7, l. 64-col. 8, l.5.  Lawlor discloses displaying advertising to a consumer based on the consumer's past history, Ex. 1006, col. 32, ll. 15-65, and a menu from which a user selects a type of banking service, e.g., bill paying, account transfer, account information, or other services.  *Id.,* col. 32, l. 65- col. 33, l.2 , col. 41, ll. 35-40. The claimed access to both a savings and checking account is encompassed by

25

Case CBM2013-00013
Patent 8,037,158

Lawlor's disclosure of account transfer and account information options. *See, id.,* col. 10, ll. 34-43.

Lawlor further discloses that, following the user's selection of the particular type of transaction, sub-options are displayed and discloses that the software is responsive to further inputs from the user. *Id.,* col. 41, ll. 57-60. Funds transfers, such as payments, can be accomplished immediately, in real time, and the transactions can be routed through the originating ATM network or another ATM network. *Id.* at col. 7, ll. 49-53, col. 22, ll. 28-52, col. 50, ll. 44-59 . Lawlor also discloses that a central processor transmits through an interchange a debit to the source account and a credit to the receiving account. Pet. 33. Lawlor further discloses a banking module 80H that conducts funds transfers between accounts. Ex. 1006, col. 20, ll. 59-63. We agree with Petitioner that funds transfers can be made between checking and savings accounts. Pet. 32. Lawlor further discloses a routing module  that permits efficient routing of transactions to the appropriate module for servicing. *Id.*, col. 20, ll. 27-29. Thus, we are persuaded that Lawlor discloses utilizing a routed transactional data structure that is both complete and non-deferred, i.e., using a structure that facilitates switching a user who selects a transactional application to a service provider program that provides immediate processing.

In view of the foregoing, we are persuaded that it is more likely than not that Petitioner will prevail in demonstrating that claim 1 of the ´158 Patent is unpatentable under 35 U.S.C. § 103 over the combination of Lawlor and Computerworld. Therefore, we institute a covered business method patent review of claim 1based on Petitioner's challenge to claim 1 as unpatentable over the combination of Lawlor and Computerworld.

<u>Claims 2, 3, and 11</u>

26

Claim 2 recites "an exchange over the Web" completes the transfer of funds, and claim 3 recites that "a management agent is used to complete" the exchange. While Lawlor does not disclose the exchange over the Web, as previously discussed, Lawlor discloses a customer using a PDN, such as a packet-switched telephone communication network, to interface with an ATM network, to transfer funds. We agree with Petitioner that the use of the Internet and a Web browser to perform financial transactions is disclosed by Computerworld. Pet. 35-36.

Lawlor further discloses that the manager 80A in CPU 80 schedules and coordinates the flow of transactions through various system modules by sending the transactions to the appropriate module, e.g., settlement module and the banking module, "for processing and control of interactions with the external environment." *Id.*, col. 20, ll.11-16, col. 20, l. 26 – col. 21, l.10. Thus, the central computer serves as a management agent used to complete the transfer of funds as recited in claim 3.

Claim 11 depends from claim 1 and recites that "the Web transaction is accessing an account across the Web from a Web application." As discussed above, Computerworld discloses the added limitation of accessing accounts through the Internet using a Web browser.

In view of the foregoing, we are persuaded that Petitioner has demonstrated it is more likely than not that claims 2, 3, and 11 of the ´158 Patent are unpatentable under 35 U.S.C. § 103 over the combination of Lawlor and Computerworld. Therefore, we institute a covered business method patent review of claims 2, 3, and 11 based on Petitioner's challenge to claims 2, 3, and 11 as unpatentable over the combination of Lawlor and Computerworld.

<u>Claims 4 -6</u>

We have construed the "object routing" recited in claim 4 to mean the use of individual network objects to route a user from a selected transactional application

to the processing provided by the service provider.  Petitioner has not identified any such object routing in either Lawlor or Computerworld.  Therefore, we do not find it more likely than not that claim 4 is unpatentable over the combination of Lawlor and Computerworld, and we do not institute a covered business method patent review of claim 4 on that basis. Because claim 5 depends from claim 4 and incorporates its limitations, we do not institute a covered business method review of claim 5 based on the same prior art challenge as that asserted against claim 4.

Claim 6 depends from claim 1 and recites a virtual information store, which we have construed to mean an information store in which information entries and attributes are associated with a networked object entity.  Petitioner's reference to databases in Lawlor identifies no databases with the characteristics of a virtual information store. Therefore, we do not find that Petitioner has demonstrated it is more likely than not that claim 6 is unpatentable over the combination of Lawlor and Computerworld, and we do not institute a covered business method patent review of claim 6 on that basis.

Grounds Based on Electronic Banking and SFCU

Patent Owner argues that neither EB nor SFCU discloses at least the claimed "Web application," "a method for performing a real time web transaction from a web application,"  "point-of-service application as a selection within the Web page," "the point-of-service application operating in a service network atop the World Wide Web," and "service network atop the Web."  Prelim Resp. 40-44. Patent Owner further argues that, like Lawlor and Computerworld, EB recounts the use of physical networks and dial-up lines in the decade preceding the Web and discloses only a physical facilities network. *Id.*, 35-36.  In addition, Patent Owner contends that neither SFCU nor EB discloses an object or transactional data structure.  Prelim. Resp. 45.

28

Case CBM2013-00013
Patent 8,037,158

Petitioner argues that EB and SFCU teach techniques for performing real time, two-way transactions, with SFCU explicitly teaching these capabilities on the web. Pet. 73. SFCU discloses that home banking can be accessed through a Web site on the Internet and that users can transfer money from one account to another. Ex. 1005. We understand the ability to transfer funds between accounts includes the ability to transfer funds between savings and checking accounts. Thus, we agree that EB and SFCU address the same problems.

Claim 1

EB discloses performing real-time transactions through a network that a user, who initially is a customer of the network controller, enters to access various services, such as banking, news or games. EB, p. 129. The network controller may be the user's cable company. *Id.* Although Patent Owner contends that the capabilities of the Web are limited, e.g., as a result of the limitations of CGI script execution, SFCU discloses that one such known network is the Web and that a software program can be accessed by an Internet user. Ex. 1005.

EB discloses four categories of banking services (transactions the bank can perform), EB, p. 124-5, which are provided by a point-of service application, i.e., a software program that facilitates execution of transactions requested by a user. When a user selects electronic banking, the network controller sets up a direct connection between the financial switch (FS) bank and the customer, at which point the bank takes over the session management. *Id.,* p. 129. The session manager task may also be performed by the network provider rather than the bank. *See id.* at 131, discussing several examples of banks delegating certain session management functions to cable companies or other communications service providers. Therefore, we agree that EB discloses a service network, i.e., a network on which services, other than underlying network communications services, are

29

provided and that, when combined with SFCU, it would be obvious to one of ordinary skill to provide the point-of-service application in a service network atop the World Wide Web.

EB discloses accepting a signal from the user to select the desired service from the categories listed on an index (or point-of service application) and accepting subsequent signals from the user input device, e.g., response to the bank's computer generated prompts for customer input. *Id.,* p. 129. SFCU provides the disclosure that the user input is provided from a Web user input device.

As previously discussed, EB discloses processing transactions, which we understand to include transferring funds, e.g., for bill payment. EB, p. 125. As Petitioner notes, EB also discloses using terminals to perform ATM functions, and that these functions include transferring funds between checking and savings accounts. Pet. 46-47.

We also are persuaded that EB discloses utilizing a routed transactional data structure that is complete and non-deferred. We have construed this term to mean a data structure that facilitates switching a user who selects a transactional application to a service provider program that provides immediate processing. As discussed above, EB discloses that when a user selects electronic banking, the network controller sets up a direct connection between the financial switch (FS) bank and the customer, at which point the bank takes over the session management. *Id.,* p. 129. EB also discloses the need for a bank to possess software to extract home banking customer account information to set a cutoff time to for updating accounts <u>during</u> or after the session. *Id.* 134 (emphasis added). EB further discloses the Fed Wire network which transfers credits and debits that immediately affect an institution's available funds. *Id.*, p. 165. Thus, EB discloses

30

Case CBM2013-00013
Patent 8,037,158

routed transactions that are both complete and non-deferred, and specific to the point-of-service application.

In view of the foregoing, we are persuaded that Petitioner has demonstrated it is more likely than not that claim 1 of the ´158 Patent is unpatentable under 35 U.S.C. § 103 over the combination of Electronic Banking and SFCU. Therefore, we institute a covered business method patent review of claim 1 based on Petitioner's challenge to claim 1 as unpatentable over the combination of Electronic Banking and SFCU.

Claims 2, 3, and 11

Claim 2 recites "an exchange over the Web" completes the transfer of funds, and claim 3 recites that "a management agent is used to complete" the exchange. EB in combination with SFCU discloses both of these features. EB discloses that transaction instructions and processing to complete banking transactions, such as the exchange of funds, EB, p. 125, and accessing the transactional capabilities through a network, *id.,* p. 129. SFCU discloses that the network used to access such transactions may be the Web. EB also teaches that a computer performing session management functions manages the transactions. *Id.,* p. 120-131.

Claim 11 depends from claim 1 and recites that the "Web transaction is accessing an account across the Web from a Web application." As discussed above, SFCU discloses the added limitation of accessing accounts through the Internet using a Web browser.

In view of the foregoing, we are persuaded that Petitioner has demonstrated it is more likely than not that claims 2, 3, and 11 of the ´158 Patent are unpatentable under 35 U.S.C. § 103 over the combination of Electronic Banking and SFCU. Therefore, we institute a covered business method patent review of

31

BB-33

Case CBM2013-00013
Patent 8,037,158

claims 2, 3, and 11 based on Petitioner's challenge that these claims are as unpatentable over the combination of Electronic Banking and SFCU.

Claims 4-6

We have construed the object routing recited in claim 4 to mean the use of individual network objects, to route a user from a selected transactional application to the processing provided by the service provider. Petitioner has not identified any such object routing in either Electronic Banking or SFCU. Therefore, we do not find that Petitioner has demonstrated that it is more likely than not that claim 4 is unpatentable over the combination of EB and SFCU, and we do not institute a covered business method patent review of claim 4 on that basis. Because claim 5 depends from claim 4 and incorporates its limitations we do not institute a covered business method review of claim 5 based on the same prior art challenge as that asserted against claim 4.

Claim 6 depends from claim 1 and recites a virtual information store, which we have construed to mean an information store in which all information entries and attributes are associated with a networked object entity. Petitioner's reference to databases in Electronic Banking identifies no databases with the characteristics of a virtual information store. Therefore, we do not find that Petitioner has demonstrated it is more likely than not that claim 6 is unpatentable over the combination of EB and SFCU and we do not institute a covered business method patent review of claim 6 on that basis.

Grounds Based on Applicant's Admitted Prior Art and Electronic Banking

Our application of the disclosure in EB to the claims of the '158 Patent is discussed above. *Supra,* Grounds Based on Electronic Banking and SFCU.

Petitioner argues that EB discloses video home banking systems could be implemented over various networks and that the AAPA in the '158 Patent

32

discloses that banking transactions could be performed over the Web, so that one of ordinary skill would understand that the teachings of EB could be adapted to the Web. Pet. 60. As this ground is redundant to the grounds based on EB and SFCU, we do not institute an *inter partes* review on any of the claims based on the combination of Electronic Banking and AAPA.

## CHALLENGES UNDER 35 U.S.C. § 112

Petitioner asserts that claims 1-6 and 11 are unpatentable under 35 U.S.C. § 112(b) because the terms "routed transactional data structure," "non-deferred," "complete," and "service network atop the World Wide Web" are indefinite. Pet. 75-80. Patent Owner counters that the terms "routed data structure," "non-deferred," and "complete" are not indefinite in light of the intrinsic evidence. Prelim Resp., 53-59. Patent Owner asserts that the term "service network atop the World Wide Web" is defined explicitly in the specification at column 5, lines 49-51 and column 6, lines 22-24. Prelim Resp. 59.

We considered the terms "routed transactional data structure," "non-deferred," and "complete" in context in our construction of the claim limitation "(Utilizing) a routed transactional data structure that is both complete and non-deferred." Petitioner contends that "routed transactional data structure" has no known meaning in the art, Pet. 76-77, is not defined in the specification, Pet. 75, and that its scope is not defined in the prosecution history, Pet. 76. We have already determined that the portions of the specification cited by Patent Owner, Prelim. Resp. 57, do not provide describe a routed transactional data structure as object routing, as proposed by Patent Owner. *Supra,* Claim Construction.

Patent Owner extensively argues the prosecution history provides a suitable definition. Prelim. Resp. 53-59. We discern no definition of the term "routed

Case CBM2013-00013
Patent 8,037,158

transactional data structure" in the portions of the prosecution history cited by
Patent Owner.   Page 116 of Exhibit 2009, cited by Patent Owner at page 57 of the
Preliminary Response, attempts to distinguish a reference, DeBettencourt, by
arguing that an "application," in DeBettencourt is different from a transactional
Web application with an "object" or transactional data structure that connects to a
transactional Point-of-Service application across a service network atop the World
Wide Web.  There is no definition of a "routed transactional data structure" in the
cited argument.

A claim is indefinite if, when read in light of the specification, it does not
reasonably apprise those of ordinary skill in the art of the scope of the invention.
*Amgen, Inc. v. Hoechst Marion Roussel, Inc.,* 314 F.3d 1313, 1342 (Fed. Cir.
2003).  Even if a claim's terms can be reduced to words, the claim is still indefinite
if a person of ordinary skill cannot translate the definition into a meaningfully
precise claim scope.  *Halliburton Energy Services, Inc. v. M-I LLC*, 514 F.3d 1244,
12511255 (Fed. Cir. 2008).  Although we have construed the claim to give it the
broadest reasonable interpretation, as a result of the presence of the term "routed
transactional data structure," we are not persuaded that a potential competitor
could determine whether or not he is infringing.  *Morton Int'l. v. Cardinal
Chemical Co.,* 5 F. 3d 1464, 1470 (Fed. Cir. 1993).  Thus, we are persuaded it is
more likely than not that claim 1 is unpatentable under 35 U.S.C. § 112(b).

We are not persuaded that the terms "non-deferred" and "complete" are
similarly indefinite.  While we have not adopted the constructions proposed by
either Petitioner or Patent Owner, the ordinary meaning of these terms can be
applied in construing the subject limitation.  Thus, in IPR2013-00194, we
construed "real-time" to mean "non-deferred "and in this case, we have construed
"non-deferred" to mean "processed immediately."  We have further construed a

34

Case CBM2013-00013
Patent 8,037,158

"complete" routed transactional data structure to provide all the information necessary to perform switching. *Id.*

    We do not agree with Patent Owner that the term "service network atop the Web" is defined expressly in the specification. Prelim. Resp. 59. However, the ´158 Patent discloses five components that provide service network functionality and states that the service network operates within the boundaries of an IP-based facilities network. At least with respect to this term, we are persuaded that one of ordinary skill would understand the bounds of the claim when read in light of the specification. *Exxon Research & Eng'g. Co. v. United States,* 265 F.3d 1371, 1375 (Fed, Cir. 2001). Therefore, we are not persuaded that the term "service network atop the Web" is indefinite.

    The indefinite term "routed transactional data structure" is used in claim 1. All the remaining claims depend from claim 1. In view of the foregoing, we are persuaded that it is more likely than not Petitioner will prevail in demonstrating that claims 1-6 and 11 are unpatentable under 35 U.S.C. § 112(b). Therefore, we institute a covered business method patent review based on Petitioner's challenge to claims 1-6 and 11 as unpatentable under 35 U.S.C. § 112(b).

## SUMMARY

I. The Petition is GRANTED as to the grounds asserting that claims 1-3 and 11 are unpatentable under 35 U.S.C. § 101.

II. The Petition is GRANTED as to the following grounds asserted under 35 U.S.C. § 103:

        Claims 1-3 and 11 as obvious over the combination of Lawlor and Computerworld; and

35

Case CBM2013-00013
Patent 8,037,158

> Claims 1-3 and 11 as obvious over the combination of Electronic
> Banking and SFCU.
> .

III. The Petition is GRANTED as to the grounds asserting claims 1-6 and 11
are unpatentable under 35 U.S.C. § 112(b).

IV. We do not authorize a covered business patent review on the following
grounds asserted under 35 U.S.C. § 103:

> Claims 4-6 as obvious over the combination of Lawlor and
> Computerworld;

> Claims 4-6 as obvious over the combination of Electronic Banking
> and SFCU; and

> Claims 1-6 and 11 as obvious over the combination of Electronic
> Banking and Applicant's Admitted Prior Art.

V.  We do not authorize covered business method patent review on grounds
asserting that claims 4-6 are unpatentable under 35 U.S.C. § 101.


ORDER

In consideration of the foregoing, it is hereby:

**ORDERED** that the Petition is granted.

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 324(a) a covered
business method patent review of the ´158 Patent is hereby instituted, commencing
on the entry date of this Order, and pursuant to 35 U.S.C. § 324(d) and 37 C.F.R.
§ 42.4, notice is hereby given of the institution of a trial.

**FURTHER ORDERED** that the trial is limited to the grounds identified in
Section I, II, and III of the above Summary, and no other grounds are authorized.

**FURTHER ORDERED** than an initial conference call with the Board is
scheduled for 2 PM Eastern Time on October 21, 2013.  The parties are directed to

36

BB-38

Case CBM2013-00013
Patent 8,037,158

the Office Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for
guidance in preparing for the initial conference call, and should come prepared to
discuss any proposed changes to the scheduling order entered herewith and any
motions the parties anticipate filing during the trial.


PETITIONER: (via electronic transmission)

Michael Q. Lee
Mlee-PTAB@skgf.com

Lori A. Gordon
Lgordon-PTAB@skgf.vom


PATENT OWNER: (via electronic transmission)

Bryan Boyle
bboyle@carrferrell.com

Gerald Dodson
jdodson@carrferrell.com

37

# EXHIBIT B

Trials@uspto.gov                                              Paper No. 14
571-272-7822                                    Date Entered: September 19, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

SAP AMERICA, INC.
PETITIONER

v.

PI-NET INTERNATIONAL, INC.
PATENT OWNER

_____

Case IPR2013-00194
Patent 8,108,492

_____

Before, KARL D. EASTHOM, JONI Y. CHANG, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

McNAMARA, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

## BACKGROUND

Petitioner SAP America, Inc. requests *inter partes* review of claims 1-8 and 10-12 of U.S. Patent 8,108,492 (the ´492 Patent) pursuant to 35 U.S.C. §§ 311 et seq. Pet. (Paper 3). The Patent owner, Pi-Net International, Inc., filed a Patent Owner's Preliminary Response under 37 C.F.R. § 42.107(b). Prelim. Resp. (Paper 20). We have jurisdiction under 35 U.S.C. § 314.

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a), which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Petitioner challenges claims 1-7, 10, and 11 as unpatentable under 35 U.S.C. § 102 and claims 8 and 12 as unpatentable under 35 U.S.C. § 103. As discussed further herein, we grant the Petition and institute *inter partes* review of claims 1-7, 10, and 11 as anticipated under 35 U.S.C. § 102 by Chelliah et al. ("Chelliah", U.S. Patent 5,710,887, issued Jan. 20, 1998, Exhibit 1004). We also grant the Petition and institute *inter partes* review of claims 8 and 12 as obvious under 35 U.S.C. § 103, claim 8 over the combination of Chelliah and Electronic Banking (Exhibit 1006),[1] and claim 12 over the combination of Chelliah and Valentino (U.S. Patent 4,648,037, issued Mar. 3, 1987, Exhibit 1007). We do not authorize *inter partes* review on any other grounds.

---

[1] Lipis, A.H. et al., Electronic Banking, The Stock Market, 4th Edition, John Wiley & Sons, New York (1985). In different related proceedings, this reference is designated by the parties as both "Lipis" and "Electronic Banking." We refer to it as Electronic Banking.

2

BB-42

BACKGROUND AND RELATED PATENTS

The present Petition concerning the ´492 Patent is one of three filed by Petitioner concerning related patents. U.S. Patent 5,987,500 (the ´500 Patent) is the subject of a petition for *inter partes* review in proceeding IPR2013-00195 and U.S. Patent 8,037,158 (the ´158 Patent) is the subject of a petition for covered business method patent review in proceeding CBM2013-00013. The ´492 Patent, entitled "Web Application Network Portal," the ´500 Patent, entitled "Value-Added Network System For Enabling Real-Time, By-Directional Transactions On A Network" and the ´158 Patent, entitled Multimedia Transactional Services (collectively, the Subject Patents)) share substantially the same specification, but claim different subject matter.

The Subject Patents disclose a "method and apparatus for providing real-time, two-way transactional capabilities on the Web." ´492 Patent, Abstract. *See also,* ´500 Patent, Abstract; ´158 Patent Abstract. The ´492 Patent also describes a "method for enabling object routing" that involves "creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities." (Abstract.)

The claims generally recite a system and method in which a Web server lists on a Web page one or more Web applications (each of which can request a real time Web transaction) as point-of-service applications; a value-added network switch that enables the real-time Web transactions; a service network that connects the Web server to a back-end transactional application; and a computer that

3

Case IPR2013-00194
Patent 8,108,492

executes the back-end transactional application for processing the transaction in real-time. *See*, ´492 Patent, claim 1.

The ´500 Patent discloses a value-added network switch that includes a system for switching to a transactional application providing transactional services managed by a value-added network service provider that keeps the transaction flow captive and performs the transactional services interactively and in real time, in response to a user specification from a network application, a system for transmitting a transaction request from the transactional application, and a system for processing the transaction request. ´500 Patent, Abstract, claim 1.

The ´158 Patent discloses a method for enabling service management of the value-added network service to perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions on the services network. ´158 Patent, Abstract, col. 8, ll. 56-67. The claims recite a banking application based on a user's selection of a point-of-service application from a Web page. *See*, *id.*, claims 1-6.

### THE ´492 PATENT (EXHIBIT 1001)

The ´492 Patent is illustrative of the disclosure in the Subject Patents. The invention purports to facilitate real-time two-way transactions, as opposed to deferred transactions, e.g., e-mail. ´492 Patent, col. 1, ll. 39-48. The invention also purports to be an improvement over browse-only transactions, *id.,* col. 1, ll. 49-64*,* and  limited two-way services on the Web through Common Gateway Interface (CGI) applications customized for particular types of applications or services. *Id.*, col. 1, l. 65-col. 2, l. 45.

The ´492 Patent describes a service network running on top of the Internet having five interacting components:  an exchange agent, an operator agent, a management agent, a management manager, and a graphical user interface (GUI). *Id.* col. 6, ll. 1-5.

4

BB-44

As shown in Figure 8, a user connects to a Web server. *Id.,* col. 9, ll. 25-26. The Web server runs the exchange component. *Id.* Exchange 501 creates and allows for the management or distributed control of the service network, operating within the boundaries on an internet protocol (IP) facilities network. *Id.,* col. 6, ll. 28-30.

A user connected to the Web server running the exchange component issues a request for a transactional application. *Id.* col. 9, ll. 25-26. The Web server receiving the user's request to perform a real-time transaction hands the request over to the exchange agent the Web server is running. *Id.*, col. 6, ll. 8-11, col. 9, ll. 27-29. The exchange 501 includes a Web page 505 that uses a GUI to display a list of point-of-service (POSvc) applications 510 accessible to the user by the exchange. *Id.,* col. 6, ll. 18-20, ll. 39-41, col. 9, ll. 28-30. The POSvc applications are transactional applications that can execute the type of transaction the user is interested in performing. *Id.,* col. 6, ll. 22-23, ll. 41-44. Exchange 501 also includes a switching component and an object routing component. *Id.,* col. 6, ll. 20-22. When the user selects a POSvc application, the switching component in the exchange switches the user to the selected POSvc application. *Id.,* col. 9, 32-33. The object routing component executes the user's request. *Id.*, col. 9, ll. 34-35. The exchange and a management agent thus perform the switching, object routing, application, and service management functions. *Id.*, col. 6, ll. 30-38, col. 9, ll. 32-34.

The exchange 501 and management agent together constitute a value-added network (VAN) switch, which provides multi-protocol object routing via a proprietary TransWeb[TM] Management Protocol (TMP), depending upon the services chosen. *Id.,* col. 7, ll. 52-54, ll. 62-65; col. 8, ll. 41-42. In one embodiment, TMP and distributed on-line service information data bases (DOLSIBs) perform object routing. *Id.,* col. 8, ll. 3-5, col. 9, ll. 34-37. In

5

DOLSIBs, which are virtual information stores optimized for networking, information entries and attributes are associated with a networked object identity that identifies the information entries and attributes in the DOLSIB as networked objects. *Id.*, col. 8, ll. 7-13. Each networked object is assigned an internet address based on the IP address of the node at which the networked object resides. *Id.,* col. 8, ll. 13-15. As a result, networked objects branch from a node in a hierarchical tree structure that establishes the individual object as an "IP-reachable" node on the internet, so that TMP can use this address to access the object from the DOLSIB. *Id.,* col. 8, ll. 16-26. Each object in the DOLSIB has a name, which is an administratively assigned object ID specifying an object type. *Id.*, col. 8, ll. 27-29. The object type together with the object instance uniquely identifies a specific instantiation of the object, e.g., an instance of an object about car models, provides the user with specific information about a particular model. *Id.,* col. 8, ll. 31-35. Each object in the DOLSIB also has a syntax, which defines the abstract data structure corresponding to that object type, and an encoding that defines how the object is represented by the object type syntax while being transmitted over the network. *Id.,* col. 8, ll. 36-39.

The VAN switch 520 has a layered architecture as shown in Fig. 7. Boundary service 701 provides the interface between the VAN switch, the Internet and the Web, multi-media end user devices and the interface to an on-line service provider. *Id.,* col. 8, ll. 42-48. Switching service 702, which is an OSI application layer switch, represents the core of the VAN switch. *Id.,* col. 8, ll. 52-54. Interconnected application layer switches form the application network backbone and are described as a significant aspect of the Subject Patents. *Id.*, col. 8, ll. 60-63. Switching service 702 routes user connections to remote VAN switches and facilitates connectivity with the Internet (a public switched network) and private networks, including back office networks, such as banking networks.

6

*Id.,* col. 8, ll. 57-60.  Management service 703 contains tools used by the end users to manage network resources, including VAN switches, and provides applications that perform OAM&P functions, such as security management, fault management, performance management, and billing management.  *Id.,* col. 8, l. 64-col. 9, l. 8. Application service 704 contains application programs that deliver customer services, including POSvc applications for banking, multi-media messaging, conferencing, financial services. *Id.*, col. 9, ll. 9-14.  Depending upon the type of VAN service, the characteristics of the network elements will differ.  *Id.,* col. 9, ll. 19-20.

## BASIS OF PETITION

Petitioner challenges claims 1-7, 10, and 11 as anticipated under 35 U.S.C. § 102(a) by NetBill: 1994 Prototype; TR 1994-11 (Goradia), Exhibit 1003.[2] Petitioner also challenges claims 1-7, 10, and 11 as anticipated under 35 U.S.C. § 102(e) by Chelliah and by Gifford (U.S. Patent 5,724,424, issued Mar. 3, 1998 Exhibit 1005).

Petitioner challenges claim 8 as obvious over each of the following three combinations:  the combination of Goradia and Electronic Banking (Lipis), the combination of Chelliah and Lipis, and the combination of Gifford and Lipis.

Petitioner challenges claim 12 as obvious over each of the following three combinations:  the combination of Goradia, Valentino, the combination of Chelliah and Valentino, and the combination of Gifford and Valentino.

## ILLUSTRATIVE CLAIM

Independent claim 1 is illustrative of the claims of the ´492 Patent.

---

[2] Goradia, V. et al., NetBill:  1994 Prototype; TR 1994-11, Carnegie Mellon University, Information Networking Institute (1994).

BB-47

Case IPR2013-00194
Patent 8,108,492

1. A system, comprising:
    a Web server, including a processor and a memory, for
        offering one or more Web applications as respective
        point-of-service applications in a point-of-service application list on a
        Web page;
    each Web application of the one or more Web applications
        for requesting a real-time Web transaction;
    a value-added network (VAN) switch running on top of a
        facilities network selected from a group consisting of the
        World Wide Web, the Internet and an e-mail network, the
        VAN switch for enabling the real-time Web transactions
        from the one or more Web applications;
    a service network running on top of the facilities network
        for connecting  through the Web server to a back-end
        transactional application; and
    a computer system executing the Back-end transactional
        application for processing the transaction request in real time.

Claim 10 is drawn to a method and claim 12 is drawn to a computer implemented system.

## CLAIM CONSTRUCTION

In an *inter partes* review, the Board construes claims using the broadest reasonable interpretation.  *See*, Office Patent Trial Practice Guide, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012).  Patent Owner contends that to avoid a taking without due process under the Fifth Amendment of the Constitution, existing patent claims must be construed during *inter partes* review in the same manner that any issued claims are construed, in accordance with well-established Markman principles.  Prelim. Resp. 6-9.  In an *inter partes* review, the Board considers the patentability of challenged claims, as opposed to the validity of issued claims.  The Board extensively addressed the basis for applying the broadest reasonable construction standard in *inter partes* reviews in *SAP America v. Versata Development Group, Inc.,* IPR2012-00001, Final Written Decision, Paper No. 70,

8

Case IPR2013-00194
Patent 8,108,492

pp. 7-19. In accordance with the principles expressed therein, we apply the broadest reasonable construction to the claims of the ´492 Patent.

Petitioner proposes constructions for the following terms:

Point-of-service application – Citing column 6, lines 41-43 and the Declaration of Dr. Marvin Sirbu (Sirbu Decl.), Exhibit 1002 ¶19, Petitioner construes a "point-of-service application" as "a Web application that executes a type of transaction that an employee (e.g., of a business entity) may be interested in performing." Pet. 5. Patent Owner argues that the terms "Point-of-Service-Application," "Point-of-Service Web Application" and "Point-of-Service Employee Web Application" all "refer to a Web application displayed on a Web page, and displaying an 'object' data structure in the Web application with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the Web application based on inputs for the values of the attributes at the front-end point-of-service application." Prelim. Resp. 11 (quoting terms from the ´492 specification).

We are not persuaded that Patent Owner's proposed definition is supported by the specification. Patent Owner correctly notes that the ´492 specification states that POSvc applications are transactional applications. Ex. 1001, col. 6, ll. 23-24. A "transaction" for purposes of the ´492 Patent includes any type of commercial or other type of interaction that a user may want to perform. Ex. 1001, col. 5, ll. 32-34. Nothing in this description requires an object data structure in a Web application with attributes and a provision for returning information entries corresponding to the requested Web transaction. We note that the exchange 501 comprises a Web page 505 and point-of-service applications, as well as a switching component and an "object routing component." Ex. 1001, col. 6, ll. 18-22. We further note that POSvc applications are applications that are designed to take

9

advantage of the capabilities provided by the invention.  Ex. 1001, col. 6, ll. 23-25.

However, nothing in this description requires the definition of "point-of-service"

application to include the many features argued by Patent Owner.

As disclosed on the ´492 Patent, a point-of-service application may access

back-end processing to execute a transaction requested by a user.  *See,* Ex. 1001,

col. 6, l. 51 – col. 7, l. 9. Therefore, we construe the term "point-of-service"

application" to mean *a software program that facilitates execution of transactions*

*requested by a user.*

<u>Value-added network switch</u> – Citing paragraph 22 of the Sirbu Declaration,

Petitioner proposes that "value-added network switch" be construed as "a hardware

and/or software module that facilitates the movement of data between two or more

computers."  Pet. 6.   Although Petitioner mentions that the ´492 Patent describes

the value-added network switch as one that provides multi-protocol object routing,

depending upon the specific VAN service, Petitioner's proposed construction does

not address this feature.  *Id*., Ex. 1002, ¶ 22.

Citing column 4, lines 62-64 and column 5, lines 23-25 of the ´492 Patent,

Patent Owner argues that the "value-added network switch" (VAN switch) of the

invention is implemented to function as a routing switch within the application

layer of the Open Systems Interconnection (OSI) Model.  Prelim. Resp. 8-9.

Patent Owner argues that Petitioner's construction is unreasonably broad and at

odds with the specification because it would encompass the network layer and

even the physical layer.  *Id.* While Patent Owner criticizes Petitioner's

construction, Patent Owner does not propose a specific construction, other than to

10

BB-50

say that the value-added switch functions as a routing switch and is an application switch in the application layer of the OSI model. Prelim Resp. 8-11. [3]

In addition to the Web page 505 and point-of-service applications, the exchange 501 includes a switching component and an "object routing component." Ex. 1001, col. 6, ll. 18-22. Figure 5B shows VAN Switch 520 as an element in the exchange 501, although the specification does not identify specifically the elements that constitute VAN Switch 520. Instead, the ´492 Patent twice states that the exchange 501 and the management agent 601 <u>together</u> constitute a value-added network (VAN) switch. (Emphasis added). Ex. 1001, col. 7, ll. 51-53; col. 8, ll. 41-42. In the layered architecture of the VAN switch, switching service 702 "represents the core of the VAN switch" and "is an OSI application layer switch." Ex. 1001, col. 8, ll. 42-43, 52-54. Unlike Fig. 5, which includes object router 525, Fig. 7 does not show a separate routing component. Instead, the specification discloses that switching service 702, i.e., the core of the VAN switch, routes user connections to remote VAN switches, prioritizes requests, and performs multiplexing and flow control. Ex. 1001, col. 8, ll. 54-57. Management service 703 contains tools used by end users to manage network resources including VAN switches. Ex. 1001, col. 8, l. 66- col. 9, l. 1. In view of this disclosure, we construe the term "value-added network (VAN) switch" to mean *an OSI application layer switch having a switching component, object routing component and management component*.

<u>real-time</u> – We agree with Petitioner's proposal that "real-time" be construed as a non-deferred processing of the transaction. Pet. 6-7. Patent Owner does not offer an alternative construction. Petitioner's proposed construction is consistent

---

[3] Patent Owner asserts a similar position in IPR2013-00195, Paper No. 7, pp. 7-11, which relates to the ´500 Patent.

BB-51

Case IPR2013-00194
Patent 8,108,492

with the specification. *See,* Exhibit 1001, col. 1, l. 39-col. 2, l. 45. Therefore, we construe "real time" to mean *non-deferred*.

service network – Citing paragraph 26 of the Sirbu Declaration, Petitioner proposes to construe "service network" as a network (e.g., hardware and/or software) that provides a service between two or more computers. Pet. 7. Patent owner does not propose an alternative construction. Taken in context, the numerous uses of "services" in the ´492 Patent refer to services provided by banks, merchants, and other service providers, who typically do not provide underlying network connectivity or communications. The ´492 Patent describes merchants providing services via the Web through a service network running on top of a facilities network, namely the Internet or E-mail. Ex. 1001, col. 5, ll. 55-61. Therefore, we construe "service network" to mean *a network on which services, other than underlying network communications services, are provided*. *See* Ex. 1001, col. 4, l. 55 – col. 5, l. 4.

back-end – We agree with Petitioner's proposal that "back-end" be construed as *a computer system or database accessed by a user via an application*. Pet. 7. Patent Owner does not propose an alternative construction.

a computer system executing a back-end transactional application for processing the transaction request in real-time – This expression appears both in claim 1 and in claim 8, which depends from claim 1. Petitioner, therefore, proposes that the  "computer system" of claim 8 be construed to mean the computer system of claim 1 or another computer. Patent Owner does not propose an alternative construction. We adopt Petitioner's proposed construction.

 Web server – Petitioner proposes that, because of inconsistent use of "the" and "a" with the capitalized term Web server, each instance of Web server in claim 10 be construed as the same Web server. Patent Owner does not propose an alternative construction. We adopt Petitioner's proposed construction.

12

BB-52

back-office server – Citing the discussion of Bank Back Office at column 6, line 65 – column 7, line 2, of the ´492 Patent, Petitioner proposes that "back-office server" be construed as a server associated with a legacy database or other data repository.  Pet. 8-9.  Patent Owner does not propose an alternative.  However, we note that the column 8, lines 57-60 refers to private networks including back office networks, such as banking networks, as an example.  Therefore, we construe the term "back-office server" to mean *a server computer controlling execution of transaction related tasks*.

<div align="center">ART CITED IN PETITION</div>

Goradia (Ex. 1003)

The article by Goradia discloses that, by executing Mosaic and the Money Tool applications, a user can purchase electronic goods via the Mosaic Web browser.  Ex. 1003, p. 6.  A merchant home page provides an html document with links to items which are for sale.  *Id.*  When the consumer clicks on an item, the NetBill protocol is initiated.  *Id.*, p. 7.  The NetBill protocol provides the ability to transfer goods from a merchant to a consumer as well as the ability to transfer funds between these two parties within a single, logically atomic NetBill transaction.  Ex. 1003, Abstract.

Goradia discloses implementing the NetBill API with a Money Tool, which provides the user an interface to authenticate to NetBill, view and select accounts, approve/deny transactions, and retrieve statements, and a Product Server, which is used to sell products.  Ex. 1003, p. 17.  The NetBill protocol is as follows:  1) a consumer application, i.e., the Money Tool, initiates a price request; 2) a merchant application processes the price request and returns a quote with the encrypted goods; 3) a consumer application approves the transaction by generating a check (encrypted with a NetBill session key) and forwards the check to a merchant

<div align="center">13</div>

Case IPR2013-00194
Patent 8,108,492

application; 4) the merchant application generates an invoice (encrypted with a NetBill session key) and sends it and the consumer's check to NetBill for processing; 5) NetBill examines the contents of the check and invoice pair - if both transaction descriptions agree, a funds transfer is performed and the results of the transaction are returned to the merchant application; 6) the merchant application forwards the consumer results and goods key to the consumer application. Ex. 1003, p. 46.

Chelliah Ex. 1004

To facilitate commercial transactions over a computer driven network, the Chelliah patent discloses a computer architecture for on-line commerce that defines an electronic infrastructure to enable a full range of transactions analogous to those occurring in a physical structure, i.e., an electronic mall comprised of a collection of electronic stores where each commercial transaction for goods and services from an electronic store is to a participant in the electronic commerce architecture, e.g., a customer. *See*, Ex. 1004, col. 2, ll. 37-42; col. 3, ll. 7-11; col. 5, ll. 59-61; col. 6, ll. 5-12.

Gifford (Exhibit 1005)

The Gifford patent discloses a system for purchasing goods or information over a computer network in which merchant computers contain databases of digital advertisements that buyer computers access to purchase the advertised product after specifying a payment account. Ex. 1005, Abstract, col. 3, ll. 14-23. Payment orders are backed by accounts in an external financial system network and the payment system obtains authorizations in real-time. *Id.*, Abstract. The software architecture is based on the hypertext conventions of the World Wide Web, using

14

BB-54

Case IPR2013-00194
Patent 8,108,492

HTML and Mosaic 2.0 and the hypertext transfer protocol (HTTP) with Uniform

Resource Locators (URLs). *Id.*, col. 4, l. 61-col. 5, l. 3.

Electronic Banking by Lipis, et. al (Exhibit 1006)

The text, Electronic Banking by Lipis, et. al. (EB), generally discloses retail

and wholesale banking services and discusses future directions of the financial

services industry and electronic funds transfer at the time of its publication in

1985. Ex. 1006, pp. 10-11(Preface, Table of Contents);[4] Pet. 42. Pages 123-146 of

Electronic Banking disclose home banking developments from a telephone bill

payment system to a video home banking system. Electronic Banking identifies

four categories of service (information retrieval, transactions, electronic messaging

and computation), EB p. 124-5, four major processing functions, (customer

information preparation, network control, session management and after-session

transaction processing), EB 128, and five major system elements (terminals,

communications link, operating center, database and standards). EB 124-5.

Electronic Banking discloses that when a customer accesses the system, this

customer is the network controller's customer and can access many different

services the network controller offers, including a bank's services, by selecting

from categories listed on an index menu. EB 129. The network controller then

sets up a direct connection between the customer and the financial switch (FS)

bank, at which point the FS bank takes over the session management function and

prompts the customer through the transaction, thereby capturing the customer-

oriented transaction and providing the bank complete control over the customer's

---

[4] Page number references in the Petition refer to the page number of the Electronic
Banking publication, rather than the pages numbers of Ex. 1006. For consistency,
further references in this decision are to the page numbers of Electronic Banking,
rather than the page numbers of Ex. 1006.

BB-55

transaction. *Id.* When the customer signs off, the customer is returned to the network controller's main menu from which the customer may select another service, such as news or games. *Id.*

<u>Valentino (Exhibit 1007)</u>

Valentino discloses a communication system, which can operate in a virtual machine (VM) environment, enabling employee access to benefits and savings information and the performance of transactional services from a dumb or intelligent terminal, such as a personal computer. Abstract; col. 4, ll. 41-60.


ANALYSIS

<u>Anticipation of Claims 1-7, 10, and 11 by Goradia</u>

Citing Goradia at page 6, Petitioner contends that the hot links to various items which are for sale, illustrated in Figure 1-2 of Goradia, provide the recited one or more point-of-service applications in a point-of-service application list on a Web page. Pet. 9. Patent Owner contends that, instead of a point-of-service application list on a Web page, Goradia discloses hotlinks appearing as hyperlinks on an HTML page. Prelim. Resp. 12.

Claim 1 recites a Web server for offering one or more Web applications as respective point-of-service applications in a point-of-service application list on a Web page. In view of this language, only one Web application need be in the list. We have construed "point-of-service application" to mean a software program that facilitates execution of transactions requested by the user. Goradia discloses that when a user clicks on a chargeable item, the NetBill protocol will be initiated and will conduct processing to allow the user to purchase the goods. Ex. 1003, p. 7-8. Thus, we agree with Petitioner that Goradia discloses the claimed point-of-service applications in a point-of service application list on a Web page.

16

Case IPR2013-00194
Patent 8,108,492

Patent Owner contends that Goradia fails to disclose each Web application requesting a real time transaction because the consumer who clicks on a hotlink is disconnected and transferred from the original website or URL to another URL. Prelim. Resp. 14-15.  We understand Patent Owner's position to be that the claimed Web application may not transfer the user to another website during the transaction.  This feature, however, is not recited in claim 1, which only recites that the Web application is for requesting a real time transaction.

Petitioner next contends that the "Money Tool" disclosed by Goradia provides the recited VAN switch because it facilitates the movement of data, such as purchase data and product data, between the consumer's computer and the merchant's product server, thereby acting as a network switch over the Internet. Pet. 11.  Patent Owner contends that Goradia relies on a facilities network that refers to the physical Internet rather than a service network, and that Goradia fails to disclose a switch that functions as a routing switch in the application layer of the OSI model.  Prelim. Resp. 16-17.  We have construed the term VAN switch to mean an OSI application layer switch having a switching component, object routing component, and management component.  In related proceeding CBM2013-00013, we construed "object routing" to mean the use of individual network objects to route a user from a selected transactional application to the processing provided by the service provider.  CBM2013-00013, Paper No. 15, Decision to Institute, Claim Construction.

The Sirbu declaration states that the Money Tool is an application layer network switch.  Ex. 1002, ¶¶ 35, 44.  Goradia discloses that NetBill components are written in C++ and that, in an attempt to simplify the development of  remote procedure call (RPC) clients and servers, a code generator is provided that provides a layer of abstraction between NetBill objects and the non-object NetBill interface. Ex. 1003, p. 29.  However, because neither Petitioner nor the Sirbu declaration

17

identifies any disclosure in Goradia of an OSI application layer switch having an object routing component and a management component, Petitioner has not demonstrated that Goradia discloses the VAN switch recited in claim 1. Dependent claims 2-7 and independent claim 10 and dependent claim 11 all recite the VAN switch, which Petitioner has not demonstrated is disclosed by Goradia. Therefore, we decline to institute *inter partes* review on the grounds that claims 1-7, 10, and 11 are anticipated by Goradia.

Anticipation of Claims 1-7, 10, and 11 by Chelliah

Petitioner asserts that electronic storefronts disclosed by Chelliah provide the recited point-of-service applications. Pet. 24, Ex. 1002, ¶73. With respect to claims 1-7, 10, and 11, Patent Owner contends that external commerce subsystems invoked to complete a transaction, as disclosed in Chelliah, are not point-of-service Web applications, but instead, are back-end applications in which products can be wrapped into a general system architecture. Prelim. Resp. 24, 27-28. Patent Owner also contends that the Internal Commerce subsystems in Chelliah are not Web applications. *Id*.

We have construed the term "point-of-service application" to mean a software program that facilitates execution of transactions requested by a user. Chelliah discloses that a user interface can be provided as part of a Customer Contact System, such as Compuserve or America Online or a World-Wide Web site on the Internet accessed by a browser. Ex. 1004, col. 12, ll. 1-8. Patent Owner contends that Chelliah discloses a graphical interface, which serves as a gateway to merchant websites and not a point-of-service Web application. Prelim. Resp. 24-25. However, in Chelliah, the customer enters the chosen electronic storefront via the Web through an interface and then conducts a transaction. In CBM2013-00013, we construed "Web application" to mean a software program that can be

18

accessed by an internet user.  CBM2013-00013, Paper No. 15, Decision to
Institute, Claim Construction.

The electronic storefront of Chelliah is a Web application, i.e., a software
program that can be accessed by an internet user, that facilitates execution of
transactions requested by the user.  When a customer clicks on an icon to enter an
Electronic Storefront to make a purchase, Internal Commerce Subsystems are
invoked to represent the store's interactions with the customer and External
Commerce Subsystems, such as a credit card processing network, which may be
invoked to complete the transactions.  Ex. 1004, col. 6, ll. 37-49.  This is similar to
the disclosure in the ´492 Patent that, because of the connection between a
customer and a bank's POSvc, the user can utilize the application, including the
Bank's "back office" capabilities to execute tasks related to the transactions
permitted by the bank.  Ex. 1001, col. 6, l. 65-col. 7, l. 9.  Therefore, we agree that
Chelliah discloses the claimed point-of-service application.

Patent Owner identifies no further distinctions over Chelliah with respect to
claims 1-3, 6, 7, 10, and 11.  Patent Owner does not dispute that Chelliah discloses
a value-added network (VAN) switch in the application layer.  Our construction of
the term VAN switch includes object routing and management.  Our construction
is not limited to the specific embodiment disclosed in the ´492 patent in which
TMP and distributed on-line service information data bases (DOLSIB) perform
object routing.  Ex. 1001, col. 8, ll. 3-5, col. 9, ll. 34-37.

Chelliah notes that a program object is an integrated collection of data and
functions that describe an entity or business function and the operations that can be
performed by the entity or business function.  Ex. 1004, col. 9, ll. 30-35. Program
objects can access databases and can serve as interfaces to non-object oriented
systems. *Id.* Chelliah discloses that a Participant Program Object, which contains
customer sensitive information, is created when a participant registers with the

19

electronic service from which he or she will interact with the electronic commerce system and that this object will communicate with a Sales Representative Program Object created when the customer selects a store. *Id.*, col. 10, ll. 19-35. The Participant Program Object communicates with a Customer Monitoring Object or a Sales Representative Program Object. *Id.* col. 10, ll. 31-33. The customer monitoring object is created by referencing customer related information stored in a customer information database when the customer selects a supplier. *Id.*, col. 3, ll. 30-35. The customer monitoring object is configured to respond to customer inquiries communicated through an input means, regarding items presented on a display by accessing information from a database and taking further action. *Id.*, col. 3, ll. 33-56. The Sales Representative Program Object, which controls the flow of the transaction processing session and is part of the Internal Commerce Subsystem, communicates with a Product Database through a Pricing Engine, which is part of the External Commerce Subsystems. *Id.,* col. 10, ll. 35-60. Chelliah states that the Commerce Subsystems can be thought of as "distributed objects" accessible to various stores and multiple stores at the same time. *Id*., col. 7, ll. 7-9. Chelliah also discloses an implementation, capable of being distributed across multiple computer platforms, in which an object request broker, in response to an object handle or pointer, directs a request to use the services of a particular object to that object. *Id.*, col. 14, ll. 31-38. Thus, Chelliah discloses the object routing and management features of the claimed VAN switch, as construed. *See*, IPR2013-00195, Paper No. 9, Decision to Institute, Anticipation of Claims 1-6, 10-12, 14-17, and 35 by Chelliah.

Patent Owner argues that claims 4 and 5 are distinguished over Chelliah because they recite a value added network (VAN) service atop the Web. Patent Owner cites column 9, lines 9-23, as describing a VAN service and asserts that because a VAN service is a point-of-service application, it cannot be simply a

20

Case IPR2013-00194
Patent 8,108,492

hyperlink.  Prelim. Resp. 18-20.  Patent Owner asserts that clicking a hyperlink causes a disconnection from the computer and is not in real-time contact.  Prelim. Resp. 29.  Claim 1, from which claim 4 depends, merely recites that the Web application, i.e., a point-of service application, is for requesting a real-time transaction.   We have construed real time as non-deferred processing of the transaction.  Chelliah discloses a Payment Handler Interface as a program object. The Payment Handler Interface is program object is responsive to a Sales Representative Object.  The Sales Representative Object serves as a front end to convert an object-oriented function call to call an External Payment Handler using a commercially-implemented payment handling system. Ex. 1004, col. 11, ll. 40-49. Patent Owner provides no basis for asserting that this disclosure in Chelliah is a deferred transaction, such that it is not a real-time transaction.

In consideration of the above, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing in demonstrating that claims 1-7, 10, and 11 are anticipated by Chelliah and we institute *inter partes* review based on Petitioner's challenge that claims 1-7, 10 and 11 are anticipated by Chelliah.


Anticipation of Claim 1-7, 10, and 11 by Gifford

Petitioner does not address specifically the point-of-service application recited in claim 1 of the ´492 Patent, but contends that each of the links in the advertisement Web page disclosed by Gifford provides the recited Web application for providing a real-time Web transaction.  Pet. 36.  Petitioner further asserts that, because the combination of the merchant computer and payment computer disclosed by Gifford facilitates the movement of data between the merchant computer and a real-time financial authorization network, Gifford discloses the VAN switch recited in claim 1.  *Id.*  Patent Owner argues that Gifford discloses only hyperlinks to another Web page and does not disclose a point-of-service

21

BB-61

application list or provide any basis for concluding that a set of hyperlinks are applications. Prelim. Resp. 28. Patent Owner also contends that hyperlinking between URLs disconnects the user from one Web site in order to connect to another and causes Gifford's transactions to lack real-time capability and real-time contact. *Id.*, p. 28-29. Patent Owner does not explain why disconnecting from one Web site to connect to another is not a real-time transaction. Patent Owner further argues that Gifford does not disclose a VAN switch. *Id.,* p. 29.

We have construed a point-of-service application as a Web application that can execute transactions requested by a user. We also have construed the VAN switch to mean an OSI application layer switch having a switching component, object routing component and management component. Petitioner has not demonstrated these components of the VAN switch are present in Gifford. Therefore, we do not institute *inter partes* review of claims 1-7, 10 and 11 as anticipated by Gifford.

Obviousness of Claim 8

Claim 8 depends from claim 1. Petitioner challenges claim 8 as obvious over the combination of Goradia and Lipis, the combination of Chelliah and Lipis and the combination of Gifford and Lipis. As discussed above, we refer to Lipis by the designation Electronic Banking (EB). As described above, Petitioner has not demonstrated that the VAN switch recited in claim 1 is disclosed in Goradia. *See, supra,* anticipation of claims 1-7, 10 and 11 by Goradia. Also, as described above, Petitioner has not demonstrated that the VAN switch recited in claim 1 is disclosed in Gifford. *See, supra,* anticipation of claims 1-7, 10 and 11 by Gifford. Petitioner does not contend that EB discloses the VAN switch. Pet. 44. Therefore, we do not institute *inter partes* review of claim 8 based on Petitioner's challenge

22

that claim 8 is obvious over the combination of Goradia and Lipis or Petitioner's challenge that claim 8 is obvious over the combination of Gifford and Lipis.

Having found that Petitioner is reasonably likely to prevail in demonstrating that Chelliah anticipates claim 1, we turn to Petitioner's challenge to claim 8 based on the combination of Chelliah and Electronic Banking. Petitioner contends that the home banking videotex system in Electronic Banking discloses the claimed computer system that includes a data repository to store banking data (Pet. 44) and that the remaining limitations of claim 8, *i.e.* a computer system executing a back-end transactional application and retrieving data to complete a real time Web banking transaction as a Web application, are disclosed by Chelliah. Pet. 46-47. Patent Owner argues that claim 8 is not obvious because the limitations of claim 1 from which it depends are not disclosed by Chelliah. Prelim. Resp. 34.

As discussed above, we agree with Petitioner that Chelliah discloses a computer system executing a back-end transactional application for processing the transaction request in real time. *See*, *supra*, anticipation of claims 1-7, 10 and 11 by Chelliah. Among the five major elements of the video home banking system described in EB are communications and databases. EB 124-5. Electronic Banking discloses that such databases may be located at the operating center or resident with an information provider and that a Gateway mechanism may be employed to link similar databases, such as those at banks, with the operation center. EB 125. The use of such databases in financial transactions is well known, as evidenced by the references to legacy databases in the ´492 Patent. Ex. 1001, col. 7, ll. 1-5. The description of the services provided by the network in Electronic Banking of allowing the user to select a service, such as news or banking, followed by the bank's capturing the transaction and processing it, is motivation for the combination with Chelliah. *See* EB 129.

BB-63

Case IPR2013-00194
Patent 8,108,492

In consideration of the above, we are persuaded that Petitioner has shown a
reasonable likelihood of prevailing in demonstrating that claim 8 is obvious over
the combination of  Chelliah and EB, and we institute *inter partes* based on
Petitioner's challenge to claim 8 as obvious over the combination of Chelliah and
Electronic Banking.

Obviousness of Claim 12

Petitioner challenges claim 12 as obvious over the combination of Goradia
and Valentino, the combination of Gifford and Valentino, and the combination of
Chelliah and Valentino.  Independent claim 12 recites that the service network
includes a VAN switch.  We have not found the VAN switch to be disclosed in
either Goradia or Gifford because, as discussed above, these references lack any
disclosure of object routing.  Petitioner does not contend that Valentino discloses
the VAN switch not found in Goradia or Gifford.  Pet. 48-51, 54-57.  Therefore,
we do not institute *inter partes* review of claim 12 based on Petitioner's challenges
to the patentability of claim 12 as obvious over the combination of Goradia and
Valentino or Gifford and Valentino.

Petitioner asserts that Valentino discloses the limitation in claim 12 that the
point-of-service Web applications are offered by service providers or multiple sub-
entities of a business entity to provide value added on-line services atop the Web
for access by employees of the business entity.  Pet. 52.  Petitioner contends that
the combination of Chelliah and Valentino is a simple substitution of Chelliah's
electronic storefronts with employee applications and that Chelliah's service
network and computer systems can be used by such employee applications. Pet. 54.
Patent Owner contends that claim 12 is not obvious over the combination because
Chelliah does not disclose the limitations of claim 1, upon which claim 12 is

24

Case IPR2013-00194
Patent 8,108,492

dependent, that Valentino makes no mention of the Web, and that Petitioner has not articulated a basis for the combination.  Prelim. Resp. 34-36.

We note that claim 12 is an independent claim, not dependent from claim 1, as stated by the Patent Owner.  Prelim. Resp. 34, 35, 36.  In addition, we note the similarities between claim 12 and claim 1 and, applying the same analysis in each case, we agree with Petitioner that Chelliah discloses the limitations of claim 12, other than the offering of services offered to employees of a business entity.  Valentino discloses using a virtual machine environment to provide such transactional services to employees over a network using terminals, modems and host computers.  *See,* Ex. 1007, col. 9, ll. 65 – col 10, l. 54.

In consideration of the above, we are persuaded that Petitioner has shown a reasonable likelihood of prevailing in demonstrating that claim 12 is obvious over the combination of  Chelliah and Valentino, and we institute *inter partes* bases on Petitioner's challenge to claim 12 as obvious over the combination of Chelliah and Valentino.

SUMMARY

I.      The Petition is GRANTED as to the following grounds:

Claims 1-7, 10, and 11 as anticipated under 35 U.S.C. §102 by Chelliah;

Claim 8 as obvious under 35 U.S.C. § 103 over the combination of Chelliah and Electronic Banking; and

Claim 12 as obvious under 35 U.S.C. § 103 over the combination of Chelliah and Valentino.

25

Case IPR2013-00194
Patent 8,108,492

II.    We do not authorize an *inter partes* review on the following grounds
       asserted by Petitioner:

       Claims 1-7, 10, and 11 as anticipated under 35 U.S.C. § 102 by
       Goradia;

       Claims 1-7, 10, and 11 as anticipated under 35 U.S.C. § 102 by
       Gifford;

       Claim 8 as obvious under 35 U.S.C. §103 over the combination of
       Goradia and Electronic Banking;

       Claim 8 as obvious under 35 U.S.C. § 103 over the combination of
       Gifford and Electronic Banking;

       Claim 12 as obvious under 35 U.S.C. § 103 over the combination of
       Goradia and Valentino; and

       Claim 12 as obvious under 35 U.S.C. § 103 over the combination of
       Gifford and Valentino.


ORDER

In consideration of the foregoing, it is hereby:

**ORDERED** that the Petition is granted;

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(a) an *inter partes*
review of the ´492 Patent is hereby instituted, commencing on the entry date of this
Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby
given of the institution of a trial.

**FURTHER ORDRED** that the trial is limited to the grounds identified in
Section I. of the above Summary, and no other grounds are authorized.

**FURTHER ORDERED** than an initial conference call with the Board is
scheduled for 2 PM Eastern Time on October 21, 2013. The parties are directed to

26

Case IPR2013-00194
Patent 8,108,492

the Office Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for

guidance in preparing for the initial conference call, and should come prepared to

discuss any proposed changes to the scheduling order entered herewith and any

motions the parties anticipate filing during the trial.

PETITIONER: (via electronic transmission)

Lori A. Gordon
Lgordon-PTAB@skgf.vom

Michael Q. Lee
Mlee-PTAB@skgf.com

PATENT OWNER: (via electronic transmission)

Bryan Boyle
bboyle@carrferrell.com

Gerald Dodson
jdodson@carrferrell.com

BB-67

# EXHIBIT C

Trials@uspto.gov           Paper No. 9
571-272-7822         Date Entered: September 19, 2013

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

SAP AMERICA, INC.
PETITIONER

v.

PI-NET INTERNATIONAL, INC.
PATENT OWNER
_____

Case IPR2013-00195
Patent 5,987,500
_____

Before, KARL D. EASTHOM, JONI Y. CHANG, and
BRIAN J. McNAMARA, *Administrative Patent Judges*.

McNAMARA, *Administrative Patent Judge*.

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

## BACKGROUND

Petitioner SAP America, Inc. requests *inter partes* review of claims 1-6, 10-12, 14-17, and 35 of U.S. Patent 5,987,500 ("the ´500 Patent") pursuant to 35 U.S.C. §§ 311 et seq. Pet. (Paper 2). Patent Owner, Pi-Net International, Inc. filed a Patent Owner's Preliminary Response under 37 C.F.R. § 42.107(b). We have jurisdiction under 35 U.S.C. § 314. Prelim. Resp. (Paper 7).

The standard for instituting an *inter partes* review is set forth in 35 U.S.C. § 314(a) which provides as follows:

> THRESHOLD -- The Director may not authorize an inter partes review to be instituted unless the Director determines that the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition.

Petitioner challenges claims 1-6, 10-12, 14-17, and 35 as unpatentable under 35 U.S.C. § 102. As discussed herein, we authorize *inter partes* review of claims 1-6, 10-12, 14-17 and 35.

## RELATED PATENTS AND PROCEEDINGS

The present Petition concerning the ´500 Patent is one of three filed by Petitioner concerning related patents. U.S. Patent 8,108,492 (the ´492 Patent) is the subject of a petition for *inter partes* review in proceeding IPR2013-00194 and U.S. Patent 8,037,158 (the ´158 Patent) is the subject of a petition for covered business method patent review in proceeding CBM2013-00013. The ´492 Patent, entitled "Web Application Network Portal," the ´500 Patent, entitled "Value-Added Network System for Enabling Real-Time, By-Directional Transactions on a Network" and the ´158 Patent, entitled "Multimedial Transaction Services"

BB-70

(collectively, the Subject Patents) share substantially the same specification, but claim different subject matter.

The Subject Patents disclose a "method and apparatus for providing real-time, two-way transactional capabilities on the Web." ´492 Patent, Abstract. *See also*, ´500 Patent, Abstract; ´158 Patent Abstract. The ´500 Patent is directed to a value-added network switch that includes a system for switching to a transactional application providing transactional services managed by a value-added network service provider, which keeps the transaction flow captive and performs the transactional services interactively and in real-time, in response to a user specification from a network application. Ex. 1001, claim 1. The ´500 Patent claims also are drawn to a system for transmitting a transaction request from the transactional application and processing the transaction request. *Id*.

The ´492 Patent is directed to a "method for enabling object routing" that involves "creating a virtual information store containing information entries and attributes associating each of the information entries and the attributes with an object identity, and assigning a unique network address to each of the object identities." (Abstract.) The claims generally recite a system and method in which a Web server lists on a Web page one or more Web applications (each of which can request a real-time Web transaction) as point-of-service applications; a value-added network switch that enables the real-time Web transactions; a service network that connects the Web server to a back-end transactional application; and a computer that executes the back-end transactional application for processing the transaction in real time. *See*, ´492 Patent, claim 1.

The ´158 Patent is directed to a method for enabling service management of the value-added network service, to perform Operations, Administration, Maintenance & Provisioning (OAM&P) functions on the services network. ´158

3

BB-71

Patent, Abstract, col. 8, ll. 56-67.  The claims recite a banking application based on a user's selection of a point-of service- application from a web page.  *See*, *id.*, claims 1-6.

<div align="center">THE PATENT DISCLOSURE</div>

The ´492 Patent is illustrative of the disclosure in the Subject Patents.[1]  The invention purports to facilitate real-time two-way transactions, as opposed to deferred transactions, e.g., e-mail.  ´492 Patent, col. 1, ll. 39-48.  The invention also purports to be an improvement over browse-only transactions, *id.,* col. 1, ll. 49-64*,* and  limited two-way services on the web through common gateway interface (CGI) applications customized for particular types of applications or services.  *Id.*, col. 1, l. 65-col. 2, l. 45.

The ´492 Patent describes a service network running on top of the Internet having five interacting components:  an exchange agent, an operator agent, a management agent, a management manager and a graphical user interface (GUI).  *Id.,* col. 6, ll. 1-5.

As shown in Figure 8, a user connects to a Web server.  *Id.,* col. 9, ll. 25-26.  The Web server runs the exchange component.  *Id.*  Exchange 501 creates and allows for the management or distributed control of the service network, operating within the boundaries on an internet protocol (IP) facilities network.  *Id.,* col. 6, ll. 28-30.

A user connected to the Web server running the exchange component issues a request for a transactional application.  *Id.* col. 9, ll. 25-26.  The Web server

---

[1] The specification of the ´500 Patent is the same as that of the ´492 Patent.  In this section of the decision only, the column and line references are those of the ´492 Patent.  Remaining column and line references in this decision refer to the ´500 Patent.

BB-72

Case IPR2013-00195
Patent 5,987,500

receiving the user's request to perform a real-time transaction hands the request over to the exchange agent the Web server is running. *Id.*, col. 6, ll. 8-11, col. 9. ll. 27-29. The exchange 501 includes a Web page 505 that uses a GUI to display a list of point-of-service (POSvc) applications 510 accessible to the user by the exchange. *Id.*, col. 6, ll. 18-20, ll. 39-41, col. 9., ll. 28-30. The POSvc applications are transactional applications that can execute the type of transaction the user is interested in performing. *Id.*, col. 6, ll. 22-23, ll. 41-44. Exchange 501 also includes a switching component and an object routing component. *Id.*, col. 6, ll. 20-22. When the user selects a POSvc application, the switching component in the exchange switches the user to the selected POSvc application. *Id.*, col. 9, ll. 32-33. The object routing component executes the user's request. *Id.*, col. 9, ll. 34-35. The exchange and a management agent thus perform the switching, object routing, application and service management functions. *Id.*, col. 6, ll. 30-38, col. 9, ll. 32-34.

The Exchange 501 and management agent together constitute a value-added network (VAN) switch, which provides multi-protocol object routing via a proprietary TransWeb<sup>TM</sup> Management Protocol (TMP), depending upon the services chosen. *Id.*, col. 7, ll. 52-54, ll. 62-65; col. 8, ll. 41-42. In one embodiment, TMP and distributed on-line service information data bases (DOLSIBs) perform object routing. *Id.*, col. 8, ll. 3-5, col. 9, ll. 34-37. In DOLSIBs, which are virtual information stores optimized for networking, information entries and attributes are associated with a networked object identity that identifies the information entries and attributes in the DOLSIB as networked objects. *Id.*, col. 8, ll. 7-13. Each networked object is assigned an internet address based on the IP address of the node at which the networked object resides. *Id.*,

5

BB-73

col. 8, ll. 13-15.  As a result, networked objects branch from a node in a hierarchical tree structure that establishes the individual object as an "IP-reachable" node on the internet, so that TMP can use this address to access the object from the DOLSIB.  *Id.,* col. 8, ll. 16-26.  Each object in the DOLSIB has a name, which is an administratively assigned object ID specifying an object type. *Id.*, col. 8, ll. 27-29.  The object type, together with the object instance, uniquely identifies a specific instantiation of the object, e.g., an instance of an object about car models, provides the user with specific information about a particular model. *Id.,* col. 8, ll. 31-35.  Each object in the DOLSIB also has a syntax, which defines the abstract data structure corresponding to that object type, and an encoding that defines how the object is represented by the object type syntax while being transmitted over the network.  *Id.,* col. 8, ll. 36-39.

The VAN switch 520 has a layered architecture as shown in Fig. 7. Boundary service 701 provides the interface between the VAN switch, the Internet and the web, multi-media end user devices and the interface to an on-line service provider.  *Id.,* col. 8, ll. 42-48.   Switching service 702, which is an OSI application layer switch, represents the core of the VAN switch.  *Id.,* col. 8, ll. 52-54. Interconnected application layer switches form the application network backbone and are described as a significant aspect of the Subject Patents.  *Id.*, col. 8, ll. 60-63.  Switching service 702 routes user connections to remote VAN switches and facilitates connectivity with the Internet (a public switched network) and private networks, including back office networks, such as banking networks.  *Id.,* col. 8, ll. 57-60.  Management service 703 contains tools used by the end users to manage network resources, including VAN switches, and provides applications that perform OAM&P functions, such as security management, fault management, performance management, and billing management.  *Id.,* col. 8, l. 64-col. 9, l. 8.

6

Case IPR2013-00195
Patent 5,987,500

Application service 704 contains application programs that deliver customer

services, including POSvc applications for banking, multi-media messaging,

conferencing, financial services. *Id.*, col. 9, ll. 9-14. Depending upon the type of

VAN service, the characteristics of the network elements will differ. *Id.,* col. 9, ll.

19-20.

## BASIS OF PETITION

Petitioner challenges claims 1-6, 10-12, 14-17, and 35 as anticipated under

35 U.S.C. § 102(a) by Chelliah et al. ("Chelliah", U.S. Patent 5,710,887 issued Jan.

20, 1998 Exhibit 1003), and by Gifford (U.S. Patent 5,724,424 issued Mar. 3, 1998

Exhibit 1004).

## ILLUSTRATIVE CLAIM

Independent claim 1 is illustrative of the claims of the ´500 Patent.

1. A configurable value-added network switch for
enabling real-time transactions on a network, said configurable
value-added network switch compromising:
    means for switching to a transactional application in
        response to a user specification from a network
        application, said transactional application providing a
        user with a plurality of transactional services managed
        by at least one value-added network service provider,
        said value-added network service provider keeping a
        transaction flow captive, said plurality of transactional
        services being performed interactively and in real time;
    means for transmitting a transaction request from said
        transactional application; and
    means for processing said application.

## CLAIM CONSTRUCTION

In an *inter partes* review, the Board construes claims using the broadest

reasonable interpretation. 37 C.F.R. §42.300(b). *See*, Office Patent Trial Practice

7

BB-75

Guide, 77 Fed. Reg. 48756, 48766 (Aug. 14, 2012), Patent Owner contends that, to avoid a taking without due process under the Fifth Amendment of the Constitution, existing patent claims must be construed during *inter partes* review in the same manner that any issued claims are construed, in accordance with well-established Markman principles. Prelim. Resp. 5-7. In an *inter partes* review, the Board considers the patentability of challenged claims, as opposed to the validity of issued claims. The Board extensively addressed the basis for applying the broadest reasonable construction standard in *inter partes* reviews in *SAP America, Inc. v. Versata Development Group, Inc.,* CBM2010-00001, Final Written Decision, Paper No. 70, pp. 7-19. In accordance with the principles expressed therein, we apply the broadest reasonable construction to the claims of the ´500 Patent.

The numerous claims constructions proposed by Petitioner and Patent Owner are summarized in the following chart:

| Term; claim #s where term used | Petitioner | Patent Owner |
| --- | --- | --- |
| Value-added network | A value-added network is a network that provides additional value or services relative to a network (e.g., a connection between two nodes). (Sirbu Decl. ¶ 15). Value-added services include, for example, packet switching, encryption, or authentication. (Sirbu Decl. ¶ 15.) Because the Internet is a packet-switched network, it is a "value-added network." Pet. 8. | |
| Value-added network | A "switch" is hardware | The VAN switch of the |

8

Case IPR2013-00195
Patent 5,987,500

| switch; 1/10/35 | and/or software module that facilitates the movement of data between two or more computers. (Sirbu Decl. ¶ 16.)  The ´500 Patent does not provide a definition contradicting this plain meaning.  (Sirbu Decl. ¶ 16.)  Thus, under the broadest reasonable interpretation, a "value-added network switch" at least encompasses a hardware and/or software module resident on one or more computers accessible over the Internet or the World Wide Web that facilitates the movement of data between two or more computers.  Sirbu Decl. ¶ 16;  Pet. 8. | present invention is implemented to function as a routing switch within the "application layer" of the OSI model (Ex. 1001, 4:49-51.)  Prelim. Resp. 7-11. |
| --- | --- | --- |
| Value-added network service provider; 1/10/35 | A value-added network service provider includes at least a party such as a merchant which provides services over a value-added network (e.g., the Internet or the WWW).  Sirbu Decl. ¶ 17; Pet. 9. | A value-added network service provider is a Web merchant, or provider of the POSvc Application on a Web page that provides transactional capabilities to users who desire to access the Web merchant's or value-added network service provider's services via the Web.  *See* Ex. 1001, 5:38-7:12; 9:2-16;  Prelim. Resp. 12. |
| Transactional application; 1/10/35 | A transaction application is an application that | |

9

| | | |
|---|---|---|
| | supports one or more transactions. *See* Sirbu Decl. ¶ 18. The '500 Patent further defines a POSvc application as "an application that can execute the type of transaction that the user may be interested in performing." Ex. 1001, 6:30-32. Thus, a "transactional application" is an application that allows a user to execute any type of interaction that the user may want to perform. Sirbu Decl. ¶ 19; Pet. 9. | |
| Transactional services; 1/10/35 | Transactional services include functionality that allows a user to perform a specific type of transaction. Sirbu Decl. ¶ 20; Pet. 10. | "[S]ervice… is an online service from an application (a POSvc Web application displayed on a Web page) offered as an online service on the online service network over the Web." *See,* Ex.1001, 1:18-21, 62…; 9:2-16…; Fig. 6A; Prelim Resp. 11-12. |
| Transaction link; 3/12/35 | A transaction link is any type of connection between a "network application" or a "user application" and a "transactional application." Sirbu Decl. ¶21; Pet. 10. | |
| Network application; 1/10/35 | A "network application" is any application that | Any application that communicates a user |

10

Case IPR2013-00195
Patent 5,987,500

| | | |
|---|---|---|
| | communicates a user specification using a network (e.g., a Web browser). Sirbu Decl. ¶22. Pet. 10-11. | specification using a network (e.g., a Web browser) is unreasonably broad in light of the specification. Prelim. Resp. 11.

"[N]etwork… refers to an online service network running on top of the Web . . . [f]or example, VAN service 704 (Ex. 1001, 9:2-16), such as the Web banking POSvc application 510…Figs. 5D and 6A." Prelim. Resp. 11.

"Network application" is the same as a POSvc application displayed on a web page, a POSvc Web application, or "user application." Prelim. Resp. 11. |
| Keeping a transaction flow captive; 1/10/35 | "[K]eeping a transaction flow captive" is maintaining control over the steps used to carry out a transaction. Sirbu Decl. ¶23. Pet. 11. | |
| Means for switching (to a transactional application); 1/2/35 | Means for switching is Switching service 702. Ex. 1001, 8:44-46; Pet. 11. | |
| Means for transmitting (a transaction request from said transactional application) 1/5/35 | Means for transmitting is Boundary service 701. Ex. 1001, 8:39-43; Pet. 11. | Means for transmitting a transaction request from said transactional application is the Exchange component as |

11

BB-79

Case IPR2013-00195
Patent 5,987,500

| | | defined in the '500 patent. Ex. 1001, 6:6-31; 6:60-62; Fig 5B; Prelim. Resp. 12-13. |
|---|---|---|
| Means for processing; 1/5/35 | Means for processing is Bank "Back Office." Ex. 1001, 6:54-65; Pet. 11. | |
| Means for receiving (said user specification); 2/4 | Means for receiving is the portion of switching service 702 that receives user communications over a network. Ex. 1001, 8:46-49; Pet. 11. | Means for receiving said user specification is a Web server. Ex. 1001, 5:64-67; Prelim. Resp. 13. |
| Means for enabling a switch (to the transactional application); 2 | Means for enabling a switch is the portion of switching service 702 that routes user connections Ex. 1001, 8:44-55; Pet. 11. | Means for enabling a switch to the transactional application is Boundary service 701 in the VAN Switch. Ex. 1001, 5:64-67; Prelim. Resp. 13. |
| Means for activating said transactional application; 2/3 | Means for activating said transactional application is the portion of switching service 702 that activates an application. Ex. 1001, 8:44-55; Pet. 11-12. | Means for activating said transactional application is a specific selected point- of-service application from the list of point-of- service applications displayed on a Web page. Ex. 1001, 9:19-25; 5:56-60; 5:64-6:3; 6:33-39; Fig 5C; Prelim. Resp. 13. |
| Means for creating a transaction link (between said network application and said transactional application); 3 | Means for creating a transaction link is the portion of the boundary service 701 that interfaces to the network application. Ex. 1001, 8:39-43; Pet. 12. | Means for creating a link between said network application and said transactional application is the object data structure (with information entries and attributes) displayed (e.g. checking account |

12

BB-80

| | | |
|---|---|---|
| | | object in POSvc…). Ex. 1001, 6:61-7:12; 7:60-8:1; Fig 5D; Prelim. Resp. 13-14. |
| Means for presenting (said user with a list of transactional applications); 4 | Means for presenting is the portion of the switching service 702 that outputs data to the user. Ex. 1001, FIG. 5C, 6:40-47; Pet. 12. | Means for presenting said user with a list of transactional applications is Web page and the POSvc Applications in the list displayed on the Web page. Ex. 1001,6:28-65; 9:18-25; Fig. 5C, 5D, 8; Prelim. Resp. 14. |
| Means for submitting (said user specification); 4 | Means for submitting is the portion of the switching service 702 that submits user specifications. Ex. 1001, FIG. 5C; 6:40-47; Pet. 12. | Means for submitting said user specification is an interactive data structure displayed on a Web page that includes information entries and attributes in a Web application displayed via the graphical user interface component. Ex. 1001, 6:7-7:12; 7:61-8:31; 9:22-25; Fig 5D; Prelim. Resp. 14. |
| Host means; 5/6/15/16/35 | Host means is the portion of the Bank "Back Office" that processes received requests, and/or includes a repository that stores data such as the Bank "Back Office" data repository. Ex. 1001, 6:54-65; Pet. 12 | Host means is not "means plus function." Prelim. Resp. 14. |
| Means for coupling; 5 | Means for coupling is an intermediary to the host means. Ex. 1001, 6:61-65; Pet. 12. | Means for coupling is a point-of-Service Application 510 on a Web page. Ex. 1001, 6:7-7:12; 7:60-8:31; 9:22-25; |

13

|  |  | Figs. 4B, 5C, 5D, 8; Prelim. Resp. 15. |
|---|---|---|
| Means for activating an agent to create a transaction link (between said user application and said transactional application); 35 | Means for activating an agent to create a transaction link is a graphical user interface. Ex. 1001, 9:22-23; Pet. 12 | Means for activating an agent to create a transaction link between said user application and said transactional application is information entries in an object in a Point-of-Service (POSvc) application on a Web page. Prelim. Resp. 13. |

Value-added network.  Patent Owner does not propose a construction for the term "value-added network."  Petitioner's proposed construction would characterize the connection between two nodes, i.e., the essence of a network, as a "value-added" feature and the Internet as a "value-added network" because it provides packet switching.  Ex. 1002, ¶ 15.  Packet switching, as the protocol by which nodes communicate, represents a core, underlying service rather than a value-added service.  Therefore, we do not adopt Petitioner's proposed construction.  Petitioner also notes that throughout the ´500 Patent, the term "value-added network" appears in conjunction with another term, i.e., "value-added network service provider" and "value-added network switch."  Pet. 7, Ex. 1002, ¶ 15.  We also note that the title of the '500 Patent refers to a "value-added network system."  Because "value-added network" is always used in the ´500 Patent in conjunction with another term, we do not construe "value-added network" separately.

Value-added network switch.  In construing the limitations of claim 1 in IPR2013-00194 concerning the ´492 Patent, we construed "value-added network switch" to mean *an OSI application layer switch having a switching component, an*

14

Case IPR2013-00195
Patent 5,987,500

*object routing component, and a management component.  See,* Paper No. 12, IPR2013-00194, Decision to Institute, Claim Construction.[2]

Value-added network service provider.  Petitioner's proposed definition would include all Internet Service Providers, including those who provide underlying network communications services, while Patent Owner's proposed definition would limit the term to merchants and providers of POSvc applications on a Web page.  Although the ´500 Patent does not define a value-added service provider, neither Petitioner's nor Patent Owner's proposal is consistent with the ´500 Patent specification.  The ´500 Patent refers to a service network running on top of a facilities network, namely the Internet, the Web or e-mail networks.  Ex. 1001, col. 5, ll. 47-49.  In IPR2013-00194, we construed a service network to mean a network on which services, other than underlying network communications services, are provided.  Therefore, we construe "value-added network service provider" to mean *a provider of services, other than underlying network communication services, on a network.*

Transactional application.  Patent Owner does not propose a construction for this term.  The ´500 Patent states that "[a] 'transaction' for the purposes of the present invention includes any type of commercial or other type of interaction that a user may want to perform."  Ex. 1001, col. 5, ll. 18-22.  Petitioner's proposed construction an application that supports one or more transactions (Pet. 9), would encompass broadly any interaction with a computer.  As used in the ´500 Patent we construe a "transactional application" to mean *an application accessed by a user to perform a commercial or other type of interaction.*

---

[2] In the ´500 Patent the term "value-added network switch" is used in the preamble of the claims.

15

BB-83

Case IPR2013-00195
Patent 5,987,500

Transactional services.  Petitioner broadly construes this term as providing the functionality to perform a transaction, while Patent Owner proposes that the term be limited to POSvc applications.  We construe "transactional services" to mean *services provided by executing a transactional application.*

Transaction link.  Patent Owner does not propose a construction for "transaction link," while Petitioner's proposed construction as "any type of connection" is unclear as to meaning of connection.  "Transaction link" is not discussed in the specification and appears only in the claims, which do not limit the type of link.  Therefore, the link could be a hardware connection or a coupling via software.  As discussed, *infra,* we construe "network application" to mean an application from which a user can request or specify a transactional application. Consistent with the claims, we construe "transaction link" to mean *any hardware or software coupling between an application from which a user can request or specify a transactional application and the specified transactional application.*

Network application.  Petitioner proposes that "network application" encompasses a web browser (Ex. 1002 ¶ 22) while Patent Owner asserts that the term refers to a POSvc application or user application.  Although "network application" is not described in the specification, claim 1 recites switching to a transactional application in response to a user specification from a network application.  The ´500 Patent refers to switching to a transactional application in response to a user specification from a World Wide Web application.  Ex. 1001, Abstract.  In this context, we understand "switching to a transactional application" to mean changing control of the processing from the World Wide Web application to the transactional application.  Thus, we construe "network application" as *an application from which a user can request or specify a transactional application.*

BB-84

Case IPR2013-00195
Patent 5,987,500

Keeping a transaction flow captive.  The meaning of this expression, which appears only in the claims, is not discussed in the '500 Patent specification.  Patent Owner does not propose a construction.  The claims using this expression, i.e., claims 1, 10 and 35, recite that the value-added network service provider keeps the transaction flow captive.  We agree with Petitioner's proposed construction of "keeping a transaction flow captive" to mean *maintaining control over the steps used to carry out a transaction*.

Means for switching (to a transactional application).  Patent Owner does not propose a construction for the "means for switching."  Petitioner proposes that the "means for switching" be construed to mean switching service 702.  Petitioner's proposed construction does not define switching service 702, which is part of the layered architecture of the VAN switch 520.  Ex. 1001, col. 8, ll. 34-35.  The switching function recited is switching to a transactional application.  As discussed, *supra*, we understand "switching to a transactional application" to mean changing control of the processing from the World Wide Web application to the transactional application.  The '500 Patent discloses that a user can connect to a local application accessible via a local VAN switch or be routed to an application accessible via a remote VAN switch.  Ex. 1001, col. 8, ll. 40-43.  The switching service 702 is an Open Systems Interconnection (OSI) application layer switch, represents the core of the VAN switch, and performs the routing of user connections to remote VAN switches, multiplexing, prioritization of tasks and flow control.  *Id.*, col. 8, ll. 44-49.  Switching service 702 also facilitates open systems connectivity between private and public networks.  *Id.,* col. 8, ll. 49-53.  In view of these disclosures, we construe "means for switching to a transactional application" to mean *an OSI application layer switch which routes user connections to a local*

17

BB-85

*application or other VAN switches, and facilitates opens systems connections to*
*public and private networks.*

Means for transmitting (a transaction request from said transactional
application). Petitioner's proposal for the construction of the "means for
transmitting" to mean boundary service 710 does not define the elements which
perform the function of the boundary service, which is part of the layered
architecture of the VAN switch. Ex. 1001, col. 8, ll. 34-35. Patent Owner's
construction of the "means for transmitting a transaction request from said
transaction application" as the exchange component in the patent is equally non-
specific as to which elements of the exchange component (described at col. 6, ll.
6-11 as including web page 505, POSvc application 510, a switching component and
a routing component) constitute the means for transmitting.

We understand that the ´500 Patent's references to the "exchange" and the
"exchange component" to have the same meaning. *See,* Ex. 1001, col. 5, ll. 56-58
(stating that five components interact to provide service network functionality, one
of the components being an exchange); *see also, id.* col. 6, ll. 1-5. As claimed, the
recited function is transmitting a transaction request from the transactional
application, i.e., after the user has selected a POSvc application presented to the
user via a web server or exchange web page. *Id.*, col. 6, ll. 28-57. Thus, the
limitation is not directed to a request for a transactional application, as described at
col. 9, ll. 19-23. The recited "means for transmitting" does not provide a
destination for the transaction request. In an example where the user selects a
banking POSvc application, the ´500 Patent states that the connection between the
user and the Bank services is managed by the exchange. *Id.*, col. 6, ll. 60-61. The
'500 Patent describes the VAN switch as including the exchange and a
management agent. *Id.*, 7, ll. 42-43. The ´500 Patent further states that the

18

Case IPR2013-00195
Patent 5,987,500

boundary service 701 provides the interface to the on-line service provider. *Id.*, col. 8, ll. 36-39. However, the ´500 Patent does not otherwise describe the interface or the on-line service provider. *Id.*, col. 8, ll. 39-40. In view of the foregoing, we construe the "means for transmitting a transactional request from said transactional application" to mean *an interface that connects a request from a transactional application to a processor that performs the requested transaction.*

Means for processing (said transaction request). Patent Owner does not propose a construction for this term. Petitioner's proposed construction, "Bank Back Office," refers to only one type of transaction. The switching service of the VAN switch facilitates connection to public and private networks, including "back office networks, such as banking networks." Ex. 1001, col. 8, ll. 51-52 (emphasis added). Figure 4B more generally illustrates resources used in back office processing. Because the recited function is processing the transaction request, which request, as previously discussed, is made from the transactional application, we construe the "means for processing" to mean *back office processing resources.*

Means for receiving (said user specification). The antecedent for said "user specification" is found in claim 1, which recites that the means for switching acts in response to a user specification from a network application. As discussed above, "network application" is an application from which a user can request or specify a transactional application to be activated. *Supra*, Claim Construction. Thus, the "means for receiving said user specification" performs the function of receiving from a network application the user's specification of a transactional application. Consistent with Patent Owner's proposed construction of the "mean for receiving said user specification" the ´500 Patent states that a web server receives a user's request for a transactional application. However, the ´500 Patent also states that the web server hands that request off to the exchange (Ex. 1001,

19

BB-87

col. 5, ll. 62-67; col. 9, ll. 18-21), which may reside on the web server or a separate computer system that resides on the Internet.  *Id.,* col. 6, ll. 13-17.  Thus, the web server receives the user's request for the specified transactional application from the network application and the exchange receives the user specification from the web server.  Because the claim does not recite the source from which the "means for receiving said user specification" receives that request, we look to the architectural aspects of the disclosure.  Architecturally, the exchange interfaces to the on-line service provider and connects to the local applications through boundary service 701.  *Id.*, col. 8, ll. 36-40.  We do not adopt Petitioner's proposed construction because the recited function is "receiving the user specification."  Switching service 702 performs routing, which occurs after receipt of the user specification.  In view of the foregoing, we construe the "means for receiving said user specification" to mean *either a web server or the elements of the VAN switch that perform the boundary service.*

Means for enabling a switch to the transactional application.  In the context of claim 2, we understand a switch to the transactional application to refer not to a physical device, but instead, to a change from an on-going activity to the transactional application.  The ordinary meaning of enable "is to make possible." Webster's Third New International Dictionary,  745 (1971).  Thus, the function recited in this claim term relates to making a change to a transactional application possible.  Patent Owner's proposed construction relates to an interface and does not "enable" such a change.  Consistent with Petitioner's proposed construction, changing to the user specified transactional application occurs as a result of the routing functions performed by the switching service to connect to the transactional application.  Therefore, we construe "means for enabling a switch to

the transactional application" to mean *the elements of the switching service that route connections to the user specified transactional application.*

Means for activating the transactional application. Petitioner's proposed construction relates to switching to the selected transactional application, rather than activating it. Applying Petitioner's approach, all the steps involved in requesting and selecting the transactional application and routing connections to it are necessary to carry out the function of activating the transactional application. Patent Owner proposes that the means for activating the transactional application is the selected POSvc itself. After the user requests a transactional application, selects a specific transactional application from a displayed list, and connects to the transactional requested application, the instructions in the application cause it to begin executing, thus activating the application. Because the "means for activating" is recited separately from other means through which the user selects and is connected to a transactional application, we agree with Patent Owner and construe the "means for activating the transactional application" as *the specific selected transactional application.*

Means for creating a transaction link (between said network application and said transactional application). The function performed in this limitation is creating the required transaction link. Other than in claim 3, the ´500 Patent does not mention a "transaction link." Although the subject matter Petitioner cites in the ´500 Patent to support its proposed construction of this term makes several references to a VAN switch, Ex. 1001, col. 8, ll. 39-43, Petitioner's proposed construction does not mention the characteristics of the VAN switch. The ´500 Patent specifically discloses that the VAN switch provides multi-protocol object routing, *id.,* col. 7, ll. 52-53, that the VAN switch includes the exchange and a management agent, *id.*, col. 7, ll. 42-44, and that the exchange includes a switching

21

component and an object routing component. *Id.*, col. 6, ll. 9-10. Patent Owner's proposal, that the means for creating a transaction link is the object data structure, does not perform the function of creating the transaction link. The '500 Patent discloses that when a user requests a transactional application the switching component switches the user to a selected POSvc application and the object routing component executes the user's request, i.e., the user's request for a transactional application. *Id.*, col. 9, ll. 20-28. Therefore, we construe the "means for creating a transaction link between said network application and said transactional application" as *an object routing component.*

Means for presenting (said user with a list of transactional applications). In the '500 Patent, the web server hands off the user's request for a transactional application to the exchange component, which activates a graphical user interface to present the user with a list of POSvc applications. Ex. 1001, col. 9, ll. 19-23. Therefore, we construe the "means for presenting said user with a list of transactional applications" to mean *a display of one or more transactional applications.*

Means for submitting (said user specification according to said user's selection from said list of transactional applications). The function recited in this means is submitting the user's specification according to the user's selection from the list. Thus, the limitation encompasses more that the user making a selection; the limitation includes submitting that selection. Patent Owner's proposed construction does not address the entire function performed, while Petitioner's proposed construction does not identify the part of the switching service which performs the function of submitting the user specification. In the '500 Patent, the user makes a selection from the list and the switching component switches the user to the selected POSvc. Ex. 1001, col. 1, ll. 23-24; Fig. 8. The "switching

BB-90

component" is not one of the five components that provide service network functionality, *id.*, 55-61, and the ´500 Patent does not define the term "switching component." However, exchange 501, which is part of the VAN switch, *id., col. 7, ll. 43-44, includes this undefined switching component. *Id., col. 6, ll. 9-10.

Within a VAN switch, boundary service 701 provides the interface to the on-line service provider. *Id., col. 8, ll. 39-40. However, because the ´500 Patent does not define "on-line service provider" it is not possible to determine if the boundary service is an interface to the provider of the transactional application, e.g., a value-added service provider, or to the web server through which the user requests a transactional application. The switching service 702, which represents the core of the VAN switch and is an OSI application layer switch, facilitates connectivity with private networks. *Id.*, col. 44-53. Therefore, we construe the "means for submitting said user specification according to said user's selection from said list of transactional applications" to mean *a display and the elements of the switching service and the boundary service that detect and route the user's selection*.

Host means. Petitioner limits this term to the Bank Back Office, while Patent Owner contends that the term is not a "means-plus-function" limitation. Claim 35 recites a "host means for processing said transaction request and retrieving data corresponding to said transaction request." Thus, we examine the ´500 Patent for structure that performs the functions of processing the transaction and retrieving data corresponding to the transaction request. Figures 4A and 4B of the ´500 Patent refer to Host TP Apps in the part of the figures designated "back office," although the ´500 Patent does not define such Host TP Apps. This discussion of the Bank Back Office in the ´500 Patent also refers to the ability to retrieve transactions and retrieve information from a data repository or legacy database.

Case IPR2013-00195
Patent 5,987,500

Ex. 1003, col. 6, ll. 40-65. We construe the "host means" to mean *a back office processor, including related information bases.*

Means for coupling (said means for transmitting to a host means). The "means for transmitting" in this limitation refers to the "means for transmitting a transaction request from said transactional application" recited in claim 1. We have construed this "means for transmitting" as an interface that connects a request from a transactional application to a processor that performs the requested transaction. We have construed the host means to include at least a back office processor. In view of the foregoing, we construe the "means for coupling said means for transmitting to a host means" as *an intermediary portion of the interface that connects a request from a transactional application to a back office processor.*

Means for activating an agent to create a transaction link (between said user application and said transaction application). The ´500 Patent refers to both an "operator agent" and a "management agent." *See* Ex. 1001, Figs. 5B and 5D, and related descriptions, respectively. Patent Owner's proposed construction assumes that a POSvc application uses software objects. Patent Owner's proposal is inconsistent with our construction of a POSvc application in IPR2013-00194 concerning the ´492 Patent, where we construed a POSvc application as a software program that facilitates execution of transactions requested by a user. *See* IPR2013-00194, Paper No. 12, Decision to Institute, Claim Construction. The present limitation is drawn to activating an agent to create a link, not to the actual creation of the link itself. A user activates the agent to create a link by selecting a transactional application through a graphical user interface. We construe the "means for activating an agent to create a transaction link between said user application and said transaction application" to mean *an interface through which a user selects a transactional application.*

24

Case IPR2013-00195
Patent 5,987,500

ART CITED IN PETITION

<u>Chelliah Ex. 1003</u>

To facilitate commercial transactions over a computer driven network,
Chelliah describes a computer architecture for on-line commerce that defines an
electronic infrastructure to enable a full range of transactions analogous to those
occurring in a physical structure, i.e., an electronic mall comprised of a collection
of electronic stores where each commercial transaction for goods and services from
an electronic store is to a participant in the electronic commerce architecture, e.g.,
a customer.  *See* Ex. 1003, col. 2, ll. 37-42; col. 3, ll. 7-11; col. 5, ll. 59-61; col. 6,
ll. 5-12.

<u>Gifford (Exhibit 1004)</u>

Gifford describes a system for purchasing goods or information over a
computer network in which merchant computers contain databases of digital
advertisements that buyer computers access to purchase the advertised product
after specifying a payment account.  Ex. 1004, Abstract, col. 3, ll. 14-23.  Payment
orders are backed by accounts in an external financial system network and the
payment system obtains authorizations in real-time.  *Id.*, Abstract.  The software
architecture is based on the hypertext conventions of the World Wide Web, using
HTML and Mosaic 2.0 and the hypertext transfer protocol (HTTP) with Uniform
Resource Locators (URLs).  *Id.*, col. 4, l. 61-col. 5, l. 3.

ANALYSIS

<u>Anticipation of Claims 1-6, 10-12, 14-17 and 35 by Chelliah</u>

<u>Claims 1 and 10</u>

Claim 1 recites a configurable value-added network switch.  Claim 10
recites a method for configuring a value-added network switch and recites steps
corresponding to the means limitations recited in claim 1.  Patent Owner argues

25

that Chelliah does not disclose a VAN switch. Chelliah discloses a system in which program objects may be distributed among various computers according to the business needs of the entities involved in the system to support the execution of a commercial transaction. Ex. 1003, col. 9, ll. 46-52. In Chelliah, a set of program objects, each of which is an integrated collection of data and functions that describes an entity or business function and the operations that can be performed by the entity or business functions, can access databases and can serve as interfaces to non-object oriented subsystems. *Id.*, col. 9, ll. 27-34. Chelliah discloses that such program objects may be implemented in the Common Object Request Broker Architecture (COBRA), which allows them to make requests and receive responses to provide interoperability between applications on different computers in distributed environments and connect with multiple object systems. *Id.* col. 9, ll. 35-47; col. 13, l. 65-col. 14, l. 24. Thus, we are persuaded that Chelliah discloses an OSI application layer switch having the switching, object routing and management components that characterize the claimed VAN switch, as we have construed that term.

Petitioner argues that Chelliah discloses the means for switching because the electronic storefronts 14, interfaces 22, 24 and sales representative factory 115 switch or route the customer to a transactional application (the sales representative program object) in response to a user specification received from a network application. Pet. 18. Patent Owner argues that Chelliah discloses neither a transactional application nor a network application, as claimed, because a transactional application is a point-of-service application displayed on a web page and a network application is a point-of-service application displayed on a web page. Prelim. Resp. 20. Patent Owner does not explain the difference between the transactional application and the network application.

BB-94

Chelliah's electronic mall can include stores composed of independent functional subsystems located at various platforms in an electronic space, including the Internet. Ex. 1003, col. 6, ll. 15-18. A customer, represented by a Participant Program Object, enters the electronic mall using an interface 13, such as a personal computer, and selects an icon to enter a particular electronic storefront 14, which invokes Internal Commerce Subsystems to represent the store's interactions with the customer. *Id.,* col. 6, ll. 26-43, col. 9, ll. 62-64. In Chelliah, the Sales Representative Factory 115 is a special-purpose program object whose purpose is to instantiate a Sales Representative Program Object 114. *Id.*, col. 13, ll. 40-43. The Participant Program Object communicates with the Sales Representative Program Object instantiated by the Sales Representative Factory. *Id.*, col. 10, ll. 31-35; col. 13, ll. 30-39. The Sales Representative Program Object, may endure only for the length of the customer interaction, e.g., in the case of immediate billing, or may be configured to last longer, e.g., in the case of scheduled billing, figuratively accompanies the customer through the store to provide pricing information, authorize purchases and discounts and complete a sale. *Id.*, col. 13, ll. 48-63.

We agree with Petitioner that Chelliah discloses the means for switching, i.e., an OSI application layer switch which routes user connections to a local application or other VAN switches and facilitates connection to public and private networks. In Chelliah communication between the Participant Program Object and the Sales Representative Object routes user connections to a selected transactional application, i.e., an application accessed by a user to perform a commercial or other type of transaction that provides the user a plurality of transactional services. These services are provided by executing the transactional application (e.g., authorizing purchases) managed by at least one value-added network provider, i.e.,

Case IPR2013-00195
Patent 5,987,500

a provider of network services other than underlying communication services on a network (the electronic store). Pet. 19-20. We further agree that Chelliah discloses that the value-added network service provider (the electronic store) keeps the transaction captive, i.e., maintains control over the steps used to carry out the transaction, and performs the transactional services interactively and in real time, i.e., non-deferred, at least in the case of immediate billing.

Chelliah also discloses a Payment Handler Interface Program Object 124 is responsive to the Sales Representative Program Object 114 to serve as a front-end call to convert an object oriented function call, such as a COBRA call, to an External Payment Handler 126. *Id.*, col. 11, ll. 40-46. Thus, we are persuaded that Chelliah discloses the means for transmitting a transaction request, i.e., the Payment Handler Interface, that connects a request from a transactional application (the Sales Representative Factory) to a means for processing the transaction request, i.e., back office processing services (the External Payment Handler).

In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 1and 10 as anticipated by Chelliah. Therefore, we institute *inter partes* review based on Petitioner's challenge to claims 1 and 10 as anticipated by Chelliah.

<u>Claims 2 and 11</u>

Claim 2 depends from claim 1 and recites a value-added network switch. The method steps recited in claim 11, which depends from clam 10, correspond to the means limitations recited in claim 2. Patent Owner's arguments concerning claim 2 are similar to its arguments concerning claim 1, i.e., Chelliah does not disclose a point-of-service application displayed on a web page.

Chelliah discloses that when the user accesses the electronic mall via the Internet and clicks on an icon to select an electronic storefront, the storefront

28

receives a user specification of a transactional application (i.e., the Sales Representative Factory associated with that storefront).  Thus, we agree that Chelliah discloses the means for receiving the user specification, i.e., a web server or the boundary service of a VAN switch.

Chelliah discloses that regardless of the interface a customer uses to interact with the electronic store, the Participant Program Object represents the customer in the commerce system.  Ex. 1003, col. 9, ll. 62-64.  The Participant Program Object communicates with a Customer Monitoring Object or the Sales Representative Program Object instantiated by the Sales Representative Factory.  *Id.,* col. 10, ll. 31-35; col. 13, ll. 30-39.  For at least this reason, we are persuaded that Chelliah discloses the means for enabling a switch to the transactional application, i.e., the elements of the switching service that route the connections to the user specified transactional application, which in Chelliah is Sales Representative Factory of the selected electronic storefront.

Chelliah also discloses that once created the Sales Representative Program Object initializes itself.  *Id.*, col. 13, ll. 38-39.  Thus, for at least this reason, we are persuaded that Chelliah discloses means for activating the transactional application.

In view of the forgoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 2 and 11 as anticipated by Chelliah.  Therefore, we institute *inter partes* review based on Petitioner's challenge to claims 2 and 11 as anticipated by Chelliah.

Claim 3 and 12

Claim 3 depends form claim 2 and recites a value-added network switch. The method steps recited in claim 12, which depends from claim 11, correspond to the means limitations recited in claim 3.  We have construed the means for creating

29

a transaction link between the network application and the transactional application as an object routing component. *See* supra, Claim Construction. Object routing is not limited to the specific object routing embodiment disclosed in the '500 Patent. Chelliah discloses creating a Participant Program Object to represent the customer in the commerce system at the time the customer registers with the electronic service from which he or she will interact with the commerce system. Ex. 1003, col. 9, ll. 61-63; col. 10, ll. 19-21. The Sales Representative Factory 115, i.e., the transactional application, passes a pointer to the Participant Program Object to the Sales Representative Program Object 114 to establish communication between Participant Object 112 and the Sales Representative Program Object 114. *Id.,* col. 14, ll. 19-26. For at least this reason, we are persuaded that Chelliah discloses the means for creating a transaction link, i.e., object routing.

In view of the forgoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 3 and 12 as anticipated by Chelliah. Therefore, we institute an *inter partes* review based on Petitioner's challenge to claims 3 and 12 as anticipated by Chelliah.

<u>Claims 4 and 14</u>

Claim 4 depends from claim 2 and recites a value-added network switch. The method steps recited in claim 14 correspond to the means limitations recited in claim 4. Chelliah discloses that upon entering the electronic mall, a user is presented with a display of electronic store icons, and selecting an icon initiates a transactional application (a Sales Representative Factory), each application being associated with a particular service provider (electronic store operator). Pet. 27-28. As discussed above, we have construed the means for submitting to be a display and the elements of the switching service boundary service which detect and route the user's selection. *Supra*, Claim Construction. In Chelliah, the user's selection

is received by the interface 26 and the Participant Program Object 112 is retrieved from the Participant Subsystem. Ex. 1003, col. 13, ll. 23-25. The Participant Program Object is then passed to the Sales Representative Factory 115, i.e., the transactional application. *Id.*, col. 13, ll. 27-32. For at least this reason, we are persuaded that Chelliah discloses the means for submitting the user specification.

In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 4and 14 as anticipated by Chelliah. Therefore, we institute an *inter partes* review based on Petitioner's challenge to claims 4 and 14 as anticipated by Chelliah.

Claims 5 and 15

Claim 5 depends from claim 1 and recites a value-added network switch. Claim 5 refers to means for coupling the means for transmitting the transaction request to a host means, while claim 15, which depends from claim 10, refers to the step of transmitting the transaction request to a host means. Because the method steps recited in claim 15 generally correspond to the means limitations recited in claim 5, we analyze them together. As discussed above, we have construed the "means for coupling said means for transmitting to said host means" as an intermediary portion of the interface that connects a request from a transactional application. *Supra*, Claim construction. As previously discussed, Chelliah discloses a transactional application as the Sales Representative Factory 115. We have construed a host means to include at least a back office processor, e.g., Payment Handler 126 in Chelliah. Chelliah discloses routing such requests with program objects. *See, id.,* col. 13, ll. 19 – col. 14, l. 38; Pet. 28-29. In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 5 and 15 as anticipated by Chelliah.

31

Therefore, we institute an *inter partes* review based on Petitioner's challenge to claims 5 and 15 as anticipated by Chelliah.

### Claims 6 and 16

Claim 6, which depends from claim 5, recites a value-added network switch. The method steps recited in claim 16, which depends from claim 15, correspond to the means limitations recited in claim 6. Claim 6, which depends from claim 5, recites that the host means contains data corresponding to the transaction request. We have construed the host means to include at least a back office processor, such as the Payment Handler disclosed in Chelliah. In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claims 6 and 16 as anticipated by Chelliah. Therefore, we institute an *inter partes* review based on Petitioner's challenge to claims 6 and 16 as anticipated by Chelliah.

### Claim 17

Claim 17 depends from claim 10 and recites that the value-added network service providers cooperate to provide the plurality of transactional systems to the user. Chelliah discloses External Commerce Systems offered by providers of services, other than underlying network communication services, on a network. *See*, Ex. 1003, col. 8, ll. 51-64; col. 10, l. 44- col. 11, l. 60. In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claim 17 as anticipated by Chelliah. Therefore, we institute an *inter partes* review based on Petitioner's challenge to claim 17 as anticipated by Chelliah.

### Claim 35

Claim 35 is drawn to a system comprising the means for switching and means for transmitting previously discussed with respect to claim 1, the means for

BB-100

activating previously discussed with respect to claim 3, and a host means for processing the transaction request and retrieving data corresponding to the transaction request. We have construed the host means to mean a back office processor including related information bases. *Supra,* Claim Construction. In the system disclosed by Chelliah, such a back office processor, including a related information base, is disclosed by the External Payment Handler 126, which is called by Payment Handler Interface 124. Pet. 38-39. In view of the foregoing, we are persuaded that there is a reasonable likelihood that Petitioner would prevail in challenging claim 35 as anticipated by Chelliah. Therefore, we institute an *inter partes* review based on Petitioner's challenge to claim 35 as anticipated by Chelliah.

### Anticipation of Claims 1-6, 10-12, 14-17 , and 35 by Gifford

Claim 1 of the ´500 Patent is drawn to a configurable "value-added network switch" for enabling real time transactions on a network. Claim 1 further recites that the VAN switch comprises a number of elements. Although the term VAN switch appears in the preamble of the claims of the ´500 Patent, Petitioner does not argue that the term "value-added network switch" is not a claim limitation. Instead, Petitioner argues that Gifford discloses the claimed VAN switch. Pet. 41-43. Petitioner points to merchant computers 63, 64, network 67, payment computer 68 and buyer computers 61, 62. *Id.* We have construed the term VAN switch to include a switching component, an object routing component and a management component.

Petitioner has not identified any object routing component in Gifford. Petitioner acknowledges that in Gifford switching is implemented when a user inquiry activates a link to create an HTTP request for a specific document with a

specified URL.  Pet. 43.  Petitioner does not point to any disclosure in Gifford of any form of object routing.

Since all of the challenged claims of the ´500 Patent are drawn to a VAN switch and Petitioner has not demonstrated any object routing component in Gifford, we are not persuaded that Petitioner has shown a reasonable likelihood of success in demonstrating that the challenged claims are anticipated by Gifford. Therefore, we do not institute an *inter partes* based on the challenges to the claims as anticipated by Gifford.

## SUMMARY

I. The Petition is GRANTED as to the grounds asserting claims 1-6, 10-12, 14-17, and 35 are anticipated under 35 U.S.C. § 102 by Chelliah.

II. We do not authorize an *inter partes* review on the grounds asserting that claims 1-6, 10-12, 14-17, and 35 are anticipated under 35 U.S.C. § 102 by Gifford.

## ORDER

In consideration of the foregoing, it is hereby:

**ORDERED** that the Petition is granted.

**FURTHER ORDERED** that pursuant to 35 U.S.C. § 314(a) an *inter partes* review of the ´500 Patent is hereby instituted, commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

**FURTHER ORDERED** that the trial is limited to the grounds identified in Section I of the above Summary, and no other grounds are authorized.

**FURTHER ORDERED** than an initial conference call with the Board is scheduled for 2 PM Eastern Time on October 21, 2013.  The parties are directed to

BB-102

Case IPR2013-00195
Patent 5,987,500

the Office Trial Practice Guide, 77 Fed. Reg. 48756, 48765-66 (Aug. 14, 2012) for
guidance in preparing for the initial conference call, and should come prepared to
discuss any proposed changes to the scheduling order entered herewith and any
motions the parties anticipate filing during the trial.


     PETITIONER: (via electronic transmission)

     Lori A. Gordon
     Lgordon-PTAB@skgf.vom

     Michael Q. Lee
     Mlee-PTAB@skgf.com

     PATENT OWNER: (via electronic transmission)

     Bryan Boyle
     bboyle@carrferrell.com

     Gerald Dodson
     jdodson@carrferrell.com

35

BB-103

# EXHIBIT  BC

**HIGHLY CONFIDENTIAL**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


PI-NET INTERNATIONAL, INC., )

        Plaintiff, )

        vs. ) No. C.A. No. 1:12-cv-00282-RGA

JPMORGAN CHASE & CO., )

        Defendant. )


        Deposition of RICHARD JOHN ROMANELLI,

taken before GREG S. WEILAND, CSR, RMR, CRR,

pursuant to the Federal Rules of Civil Procedure for

the United States District Court pertaining to the

taking of depositions, at Suite 2800, 155 North

Wacker Drive, in the City of Chicago, Cook County,

Illinois, commencing at 9:07 o'clock a.m., on the

1st day of October, 2013.



VOLUME I



THIS TRANSCRIPT AND THE EXHIBITS REFERENCED HEREIN

HAVE BEEN DESIGNATED HIGHLY CONFIDENTIAL PURSUANT TO

PROTECTIVE ORDER

**HIGHLY CONFIDENTIAL**

---

```
 1              (Witness sworn.)
 2          RICHARD JOHN ROMANELLI
 3    after being first duly sworn, testified as follows:
 4              EXAMINATION
 5    BY MR. PAZUNIAK:
 6        Q.  Please state your full name for the
 7    record.
 8        A.  My name is Richard John Romanelli.
 9        Q.  And what is your address?
10        A.  My home address?
11        Q.  Home address, yes.
12        A.  My home address is ████████████
██████  ████████████████
14        Q.  And by whom are you employed?
15        A.  JPMorgan Chase.
16        Q.  And what is your present position?
17        A.  My present position is an architecture
18    lead manager position.
19        Q.  Okay.  Now, can you just give us briefly
20    your educational background.
21        A.  I graduated Illinois State University.  I
22    graduated a Master's program at Northwestern
23    University.  And that's my ...
24        Q.  Okay.  And what degree did you get at
25    Illinois State University and in what year?
```

```
 1        A.  For whom?
 2        A.  Sorry?
 3        Q.  For whom?
 4        A.  For myself.
 5        Q.  Okay.  And did you have a name for your
 6    company?
 7        A.  No.  It was just a private startup
 8    company.
 9        Q.  Okay.  And what kind of -- well, before we
10    get to that, what other job titles and
11    responsibilities did you have with IBM between 1987
12    and 1994?  Perhaps you can just list it for us and
13    give us the approximate date range.
14        A.  Okay.  After testing, so this would have
15    been mid 1988, I was a developer, software developer
16    probably through about 1990, and then in 1990 I was
17    a staff and support position for the product that we
18    had, and then in 1992, I took a job again as a
19    development manager, a development lead I guess we
20    called them then.  And then in 1994 I left Austin.
21        Q.  And was there any particular product that
22    you were working on between, let's say, 1990 and
23    1994?
24        A.  Yes, there was.
25        Q.  And what was that?
```

```
 1        A.  I received a Bachelor of Science Degree in
 2    computer science in 1987.
 3        Q.  And in what specialization did you get
 4    your Master's and in what year?
 5        A.  My Master's Degree was a Master's of
 6    management degree in 1998.
 7        Q.  And after graduating Illinois State
 8    University, did you go to work?
 9        A.  I did.
10        Q.  And where was that?
11        A.  I started working at IBM.
12        Q.  In what location?
13        A.  I was in Austin, Texas.
14        Q.  And what was your position there?
15        A.  I started in the software development lab
16    as a, I believe as a tester in the testing group.
17        Q.  And how long did you stay with IBM?
18        A.  Could you be more specific about that?
19        Q.  How long did you retain your employment at
20    IBM?
21        A.  I stayed at IBM Austin until 1994.
22        Q.  And then what changed?
23        A.  I came to Chicago.
24        Q.  Still working for IBM?
25        A.  I was working as a consultant.
```

```
 1        A.  It was a DB2 on OS/2 product.
 2        Q.  That's a database?
 3        A.  Yes.
 4        Q.  Okay.  And how long were you a
 5    self-employed consultant?
 6        A.  I was a consultant from June '94 to August
 7    '95.
 8        Q.  And any specific areas that you provided
 9    consulting in?
10        A.  Not really.  I mean, could you be --
11        Q.  Okay.
12        A.  -- more specific about the question?
13        Q.  Can you tell us for whom you consulted
14    between June 1994 and August 1995?
15        A.  I actually was a consultant at IBM in
16    Chicago.
17        Q.  And what product were you working on?
18        A.  We were working with a customer.  There
19    was no product, per se.
20        Q.  Okay.  And what was the customer?
21        A.  The customer at the time was Bank of
22    America.
23        Q.  And was there any particular functionality
24    or end use that you were working on during that
25    year?
```

---

**HIGHLY CONFIDENTIAL**

1    A.   We had worked on a number of projects with
2  a varying capability set.  I'm trying to remember
3  right now what we were doing.
4        So is there a particular --
5    Q.   Anything to do with banking online during
6  that period of time?
7    A.   There were solutions that we had that
8  allowed customers to access the systems remotely.
9    Q.   Was there a name for that?
10   A.   I can't remember the name that we called
11 the product, but I can remember, you know, there
12 were modems and there was a server and that kind of
13 architecture.
14   Q.   Did you work on that product or
15 functionality yourself?
16   A.   I did.
17   Q.   Okay.  And what specifically did you do in
18 that area of work?
19   A.   So for one of the systems we established
20 the modem pool where customers could log in or dial
21 in to the system.  We established the service to
22 retrieve reporting data from the system from the
23 database and to monitor the system with health
24 checks and alerts for operational purposes.
25   Q.   And was that system still in operation as

[Page 14]

1  of August 1995?
2    A.   I believe it was.
3    Q.   Okay.  And do you know when it began?
4    A.   When it began?
5    Q.   That modem access to the banking system
6  that you were just describing.
7    A.   I don't remember the exact dates of when
8  it was implemented.  It was before August 1995.
9    Q.   Okay.  And what was your next job position
10 after August 1995?
11   A.   After -- in August 1995, I hired back with
12 IBM in the same position I was in basically but not
13 working directly for that company.
14   Q.   Okay.  And still in Chicago?
15   A.   Yes.
16   Q.   Still working on the same systems that you
17 had been working on before?
18   A.   Those, yes.
19   Q.   Okay.  And for how long did you stay with
20 IBM as an employee?
21   A.   Until June 2002.
22   Q.   And again, can you just take us very
23 briefly through your job titles and job
24 responsibilities and the approximate date ranges
25 from 1995 to June 2002?

[Page 15]

1    A.   So in 1995 approximately until about 1998
2  or 1999, I was in an architecture development role,
3  solution design and implementation.
4        In 1999, I was briefly on a different
5  account working internally with IBM.
6        And in 2000, I was in a -- I'm trying to
7  remember -- in a design architecture development
8  role again working for IBM at Bank of America.
9    Q.   Okay.  And did that hold true until 2002?
10   A.   Yes.
11   Q.   Okay.  And where did you go in June 2002?
12   A.   In June 2002 I started working at Bank One
13 as a Bank One employee.
14   Q.   Was there any particular reason you left
15 IBM to go to Bank One?
16   A.   No.
17   Q.   Okay.  And I take it you stayed with
18 Bank One and then eventually continued up through
19 the mergers to --
20   A.   That is correct.
21   Q.   -- your position?
22   A.   That is correct.
23   Q.   Okay.  Starting with June 2002 to the
24 present, could you again just give us your job
25 titles, your job functions and the approximate date

[Page 16]

1  range?
2    A.   From 2002 until approximately March of
3  2004 my role was in architecture, and then in 2004
4  until 2005 I was in the commercial treasury systems
5  area as a solution architect.
6        And in 2005 until present, I was in
7  various stages of the role that I'm in today,
8  starting as an architect on a team, going to a lead
9  role, and then going to the position that I'm in
10 today, a manager of managers.
11   Q.   And in your current role, what exactly are
12 the parameters of your jurisdiction?
13   A.   Parameters, can you be more specific
14 about --
15   Q.   Right.  What are you in charge of?  What
16 area of responsibility do you have?
17   A.   Okay.  So do you mean the work that we do
18 or the products that we do or --
19   Q.   Actually both, but yes.
20   A.   Okay.  So the work that we do as
21 architecture is twofold.  One is to evaluate the
22 demand and the new projects, the new requests that
23 come into the organization from the business or for
24 that matter any other requester and identify
25 solutions, identify existing assets that we can

[Page 17]

**HIGHLY CONFIDENTIAL**

1    Can you open Exhibit 190, which is a
2  document produced by JPMorgan as 70653-54.
3    MR. NEMEC:  George, I'm sorry to
4  interrupt.  We've been looking at this document, and
5  it appears that it may be subject to attorney/client
6  privilege or work product.  It may have been
7  inadvertently produced.  I'll investigate how it
8  came to be produced and what it is, but pending
9  that, I'll claw it back pursuant to the protective
10  order.
11    MR. PAZUNIAK:  Okay.  No problem.
12    MR. NEMEC:  There's factual information
13  contained in here, and it may be that you have some
14  allowable questions, so I don't want to shield any
15  discoverable information, but I just need to go on
16  record about this document.
17    MR. PAZUNIAK:  Okay.
18  BY MR. PAZUNIAK:
19    Q.  There is a reference in the document to
20  Covidea, C-o-v-e-d-i-a [sic].
21    Are you familiar with that term?
22    A.  I am familiar with the term.
23    Q.  And what is it -- am I pronouncing it
24  right, Covidea?
25    A.  I don't know the pronunciation.

[Page 34]

1    Excuse me, am I still looking at 190?
2    Q.  Well, actually this is independent of the
3  document.  I'm just asking you about the name and
4  the company.
5    A.  Okay.
6    Q.  So we're not asking you to be looking at
7  the document.
8    But there's actually a couple references
9  to Covidea in some of the documents, other
10  documents, and my question is, what familiarity do
11  you have with Covidea with respect to remote online
12  banking as it existed in 1996 or before that?
13    A.  My only familiarity with the term Covidea
14  or however it's pronounced is that it was used with
15  the Pronto system.  I don't even know what it is.  I
16  don't know if it's a company or a vendor package or
17  whatever it is.
18    Q.  Okay.  Fair enough.
19    A.  It's just a term.
20    Q.  Fair enough.  I have to ask you those
21  questions.  If you don't know, you don't know.
22    A.  Okay.
23    Q.  You don't have to explain.
24    (Exhibit 191 was identified.)
25

[Page 35]

1  BY MR. PAZUNIAK:
2    Q.  Let me ask you to now turn to Exhibit 191,
3  which is a document produced by Chase, and it begins
4  with 67139.  It's a book.
5    Do you have any familiarity with this
6  book?
7    A.  I might have scanned it or skimmed it.
8  I'm not intimate with the details of every page.
9    Q.  I have to find what I did with my notes on
10  it.
11    If I could ask you to go to the pages that
12  are marked as -- it's Page 16 of the PDF, Page 13 of
13  the book.
14    A.  Okay.  I'm using the PDF.  I don't know
15  what the book is.
16    Q.  So we're on Page 16, and there's a title
17  Product Innovation: PC Banking.
18    Do you see that?
19    A.  Yes.
20    Q.  Okay.  And that section goes on through
21  approximately Page 18 of the book or Page 21 of the
22  PDF.
23    Is that a section that you reviewed in
24  preparation for this deposition?
25    A.  It is not a section that I reviewed.

[Page 36]

1    Q.  Okay.  You mentioned -- I need to find
2  this because you mentioned Bank of America.  I think
3  Bank of America is mentioned in this section.  Maybe
4  it's the next book.
5    Yes.  If you turn to Page 19 of the PDF,
6  Page 16 of the book, you'll see that there is a
7  section Banking via the PC Using Dial-Up Software.
8    A.  Yes.
9    Q.  And there's a reference.  It says, "The
10  main companies that are working to develop home
11  banking software are Intuit, the maker of Quicken,
12  Microsoft, the maker of Microsoft Money, Bank of
13  America and NationsBank, who acquired Meca's
14  Managing Your Money Software from H&R Block, and
15  ADP, which acquired Peachtree Software," end quote.
16    Really names from the past.
17    Do you have any understanding of what is
18  being referred to here as the Bank of America
19  system?
20    A.  I do not know the specifics of what system
21  they're referring to here.
22    Q.  Okay.  Without reference to any particular
23  document or anything that we have talked about yet,
24  but in the broadest possible way, can you identify
25  any remote bank system that existed any time in 1996

[Page 37]

or prior to 1996 that allowed the customer or a consumer to remotely access a bank asset which did not involve using a modem and a telephone line?
MR. NEMEC: Objection to form.
THE WITNESS: Could you -- could someone repeat?
BY MR. PAZUNIAK:
**Q.** I'll restate it.
A. Yes.
**Q.** I'm taking your time to any time prior to let's say 1997, 1996 or prior to that, that time frame.
Can you identify any system by which a customer or end user could access remotely bank systems that did not use a modem and a telephone line?
A. From my own personal knowledge and experience on systems that I worked on, I never worked on a system that did not use that at the time, but I didn't work on every system, so I'm not sure that there were or weren't.
**Q.** Okay. Obviously I can only ask what you know.
A. Right, right. I'm not the authority on that in the industry or in every customer connection

[Page 38]

to, you know, the firm that I work with or have worked with in the past.
(Exhibit 192 was identified.)
BY MR. PAZUNIAK:
**Q.** Okay. I'll ask you to turn to 192, which is a document produced by JPMorgan as 67225, et cetera, and ask you if this is a document that you had reviewed in preparation for your testimony today.
A. I also skimmed this document, I believe.
**Q.** Okay. And I will direct you to Pages 18-19 of the PDF --
A. Okay.
**Q.** -- pages 16 and 17 of the document, and actually 18 to 20 of the PDF and 16 to 18 of the document, and there are descriptions of some of the systems that we had been talking about just now.
To the best of your knowledge, is the information contained on these three pages accurate to the best of your knowledge, or do you have any disagreement with anything that is said here?
A. I don't have any personal knowledge that would contradict anything that's said here.
**Q.** Okay. With that, let's just close out all those documents because I'm not going to go back to

[Page 39]

them. Closing them out will help, I think.
And I'll ask you if you can maneuver your way or navigate your pay to Part 2, and I will ask you to first, if you can, open up what is marked as X193.
(Exhibit 193 was identified.)
BY MR. PAZUNIAK:
**Q.** Exhibit 193 is JPM2111, and it's a single-page document, and at the left-hand corner it says, "This flow only depicts the systems involved to meet the business requirements listed for this project."
Can you by any chance tell us what is the project with which this document is associated?
A. I'm looking through the document right now.
I can't definitively say what project this would be for. I don't know what is different from, you know, what would be a document prior to this.
**Q.** Okay. Can you tell us whether Exhibit 193 correctly depicts, to the extent things are depicted, that is obviously not everything is shown, but to the extent that information is set forth here, whether this accurately reflects a way that mobile communications or mobile users can connect to

[Page 40]

CIG systems?
[redacted]
The rest of the document looks correct as far as the connections past that layer as far as correctly depicting connections from one system to another in a design document. I am not sure that all of these connections as stated in this document are this way today in production or whether this was a proposal of a design that was or wasn't implemented. I can't tell from this document.
[redacted]
(Exhibit 194 was identified.)
BY MR. PAZUNIAK:
**Q.** Let's open up Exhibit 194.
A. I have two Exhibit 194s.
**Q.** They should both be the same.
Do you mind if I just make sure?
A. One just says P8, maybe Page 8.

[Page 41]



1   other applications that we have on the application
2   server layer.
3

**[Page 122]**

1      Can you take us now through the sequence
2   of

**[Page 123]**

**HIGHLY CONFIDENTIAL**



[Page 126]

[33]  (Pages 126 to 129)



[Page 130]

[34]  (Pages 130 to 133)

**HIGHLY CONFIDENTIAL**



[Page 170]

[44] (Pages 170 to 173)

**HIGHLY CONFIDENTIAL**



[Page 174]

HIGHLY CONFIDENTIAL



[Page 178]

# EXHIBIT  BD

**HIGHLY CONFIDENTIAL**

[Page 1]

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

PI-NET INTERNATIONAL INC.,:

       Plaintiff,    :

                      :

   vs.            :

                      :

JPMORGAN CHASE & CO.,   :

       Defendant.    :  NO. 12-282-RGA

- - -

September 20, 2013

- - -

***HIGHLY CONFIDENTIAL***

    Oral deposition of CATHY MARINELLI taken
pursuant to notice, held the Law Offices of
Skadden, Arps, Slate, Meagher & Flom LLP, One
Rodney Square, Wilmington, DE 19899,
commencing at 9:00 a.m., on the above date,
before Jennifer P. Miller, Registered
Professional Reporter and Notary Public for
the State of Delaware.

**HIGHLY CONFIDENTIAL**



[Page 81]

1   from me to actually collect money from you to

2   pay you for the T-shirts.

3        Q.   Redacted

**HIGHLY CONFIDENTIAL**



# EXHIBIT  BE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

_____

PI-NET INTERNATIONAL, INC.,     )
    )
**Plaintiff,**    )
    )
    v.    )   **C.A. No. 12-282-RGA**
    )
**JPMORGAN CHASE & CO.,**    )
    )
**Defendant.**    )
_____)

**DECLARATION OF MICHAEL BARDASH**
**IN RESPONSE TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT**

I, Michael Bardash, hereby declare:

**<u>Background</u>**

1.    I have been advised by counsel for Pi-Net International, Inc. that Defendant JPMorgan Chase & Co. has moved for summary judgment of invalidity and non-infringement of the claims of U.S. Patent Nos. 5,987,500 ("the '500 Patent"); 8,108,492 ("the '492 Patent"); and 8,037,158 ("the '158 Patent"). Counsel has requested that I confirm and restate certain analyses and opinions that I have previously rendered in my prior declarations and expert reports in this case, but organized and focused on the certain assertions made by JPMorgan in its briefs in support of those motions. I have, in particular, been presented with briefs identified as D.I. 114 "Defendant's Brief In Support Of Its Motion For Summary Judgment Of Non-Infringement"; and D.I. 122 "Defendant's Brief In Support Of Its Motion For Summary Judgment Of Indefiniteness, Lack Of Enablement, And Lack Of Written Description Under 35 U.S.C. § 112."

2.      My current *curriculum vitae* is attached as an Appendix to this declaration.  I have

been previously deposed by JPMorgan in this case with respect to the opinions that I had

rendered in my expert reports.

## Materials Considered

3.      In connection with the preparation of this declaration, I have reviewed my prior

reports and declarations, the Pi-Net patents recited above, the briefs filed by JPMorgan, and the

materials cited in the declarations, reports and briefs.  I have been shown what has been marked

as Exhibits AA, AB and AC, with appendix numbers A-1001-1269, and these are the expert

reports that I have previously submitted in this matter.  I have also reviewed what is marked as

D.I. 66-1 (also marked as D.I. 64-1 in a related case) which is an affidavit that I had prepared and

executed about April 1, 2013 in connection with prior proceedings in this case.

## Facts and Opinion

4.      I understand that JPMorgan has repeatedly focused on my prior statements that

the Pi-Net inventions are directed to the "front-end" of an online banking or other merchant

system, and is not directed to what I have referred to as the "back-end" of the online systems.

My views remain as I had stated them previously.  It is incorrect, however, to assume or

conclude from that that I have ever ignored the limitations of the patent claims.  I believe that

any review of my expert reports will indicate that I have carefully considered every claim that I

understand to have been asserted in this case, and then considered and applied every limitation of

those claims, including the claim limitations directed to "Back-end transactional application for

processing the transaction request in real-time."  I have specifically considered all the limitations

in my expert reports directed to validity and infringement.

- 2 -

5.      In both D.I. 114 page 3 and D.I. 122 at page 3, JPMorgan makes the same following statement: "In other words, under Pi-Net's interpretation of the asserted claims, a Web browser transmits data to a 'Web server,' which relays that data to a 'Value Added Network (VAN) switch,' which relays the data to software called a 'back-end transactional application,' which then processes the requested transaction by accessing various back-end systems." I do not believe that this is an accurate summary. Indeed, the statement does not make sense, because typically information on a Web page derives from a Web server. I believe that it would be more appropriate to follow the actual disclosures of the patent which are reflected in Figure 5D of the patents (annotated below for ease of reference):



and say that the asserted claims in general require an Exchange, including a Value Added Network (VAN) switch, within a Web server, a POSvc Application displayed on a web page rendered by a Web browser from data transmitted from a Web server, and communication between the POSvc Application and a back-end transactional application, which then processes the requested transaction (either based on information within the application itself or as accessed from other back-end components).

- 3 -

**The Claims are Not Indefinite**

6.     JPMorgan makes the statement at pages 7-8 of D.I. 122 that:

For the reasons expressed by JPMorgan in the Markman Brief (D.I. 74), <u>there is
no genuine dispute</u> that the following terms are indefinite and cannot be
construed:

☐ "a routed transactional data structure that is both complete and non-deferred, in
addition to being specific to the point-of-service application"

☐ "point-of-service application[s]" and "point-of-service Web applications"

☐ "transactional application[s]" and "back-end transactional application[s]"

☐ "the selected back-end transactional application"

☐ "service network"

☐ "value-added network (VAN) switch"

☐ "switching"

☐ "management agent"

☐ "value-added network service provider"

☐ "value-added network system"

☐ "said user application"

☐ "means for receiving said user specification"

☐ "means for enabling a switch to said transactional application"

☐ "means for activating said transactional application"

☐ "means for presenting said user with a list of transactional applications"

☐ "means for submitting said user specification according to a user's selection of
said transactional application from said list of transactional applications"

☐ "means for coupling said means for transmitting to a host means"

☐ "means for switching to a transactional application in response to a user
specification from a network application"

☐ "means for activating an agent to create a transaction link between said user
application and said transactional application"

- 4 -

☐ "means for creating a transaction link between said network application and said transactional application"

7.      I am surprised to see that JPMorgan makes the statement  that "there is no genuine dispute that the following terms are indefinite and cannot be construed," because I have previously reviewed and provided constructions for all of the terms, as those terms would have been understood by a person of ordinary skill in the art as of 1995-96, and this is shown in my expert report at, for example, A-1012-53, 1153-54, 1218-50, and 1254-55, all of which I hereby reaffirm.   A person of ordinary skill in the art as of 1995-96 would have no trouble understanding the claim terms, once they read the patent specification (including drawings) to understand the inventions of the patent claims.

8.      In any event, in my opinion, the claim limitations cited by JPMorgan in its brief are not indefinite.  All the claim limitations can be construed, as shown in my prior declaration (which I understand is of record as D.I. 66-1 in this case) and in my expert report (which I signed in the form of a declaration), both of which I incorporate here.  Further, those claim constructions, which I have incorporated here, result in definitions that provide sufficient particularity and clarity to inform persons of ordinary skill in the art of the bounds of the claim.  I further consider certain of these terms below, to the extent that they were addressed by JPMorgan in its brief.

**POSvc Applications, Web Applications, Network Applications**

9.      JPMorgan states at D.I. 122 page 8 that:  "All asserted claims require a point-of-service ("POSvc") application, a "Web application," or "a network application." Pi-Net contends that these three claim terms are synonymous, "with the term 'network application' being used in the '500 Patent, and 'Web application' and 'POSvc Application' being used in the '158 and '492

Patents." (D.I. 74 at 83)  In addition, all asserted claims of the '500 patent and the '492 patent

require either a "transactional application" or a "back-end transactional application." Pi-Net

contends that these two claim terms are likewise synonymous. (D.I. 64 at 14)."  The statement is

somewhat ambiguous or wrong, and needs to be corrected.

10.     I have defined "POSvc Application," as:

"A Web application displayed on a web page, and displaying an "object" data
structure in the Web application with attributes and provision for return of
information entries from the Web merchant's or value-added network service
provider's system corresponding to the Web transaction request at the Web
application based on inputs for the values of the attributes at the front-end POSvc
Application"

(A-1036).  I am aware that another expert, William Easttom, has shortened that definition,

without changing its substance, to the following:

"A transactional Web application displayed on a web page, and displaying an
"object" data structure in the Web application with attributes and information
entries"

(A-1238-44, 1312).  Both the "long" and "short" definitions say technically the same thing, and I

am happy to accept the shorter version because it is shorter, but either definition is correct and

appropriate.  In any event, I have previously explained my basis for viewing these as the correct

constructions (found at A-1238-44) and reaffirm that today.

11.     The term "Web application" is found in the '492 patent claims.  Claim 1 of the

'492 patent, states:

a Web server … for offering one or more Web applications as respective point-of-
service applications in a point-of-service application list on a Web page."

Thus, the '492 patent claims themselves define a "Web application" as being the same as a

"POSvc Application."  A person of ordinary skill in the art as of 1995-96 would have no trouble

understanding a claim that says that a Web application is a POSvc Application on a web page.

12.     The term "network application" is found in the '500 patent claims.  Claim 1 of the

'500 patent, states:

> <u>means</u> for switching to a transactional application in response to a <u>user</u>
> <u>specification from a network application</u>, said transactional application providing
> a user with a plurality of transactional services managed by at least one value-
> added network service provider.

Thus, the plain language of the '500 patent claims requires that the term "Network Application"

have the meaning of "POSvc Applications on a Web page," because the patent's description of

the "means" are the POSvc Applications."  Again, a person of ordinary skill in the art as of 1995-

96 would have no trouble understanding a claim that says that has POSvc Applications as the

structure for a "Network application."

13.     JPMorgan next argues that

> "Even if the Court determines that the Application Terms are amenable to
> construction and adopts Pi-Net's constructions for them, the Application Terms
> are nonetheless indefinite because Pi-Net's constructions fail to define the scope
> of these terms. See Halliburton, 514 F.3d at 1251 ("Even if a claim term's
> definition can be reduced to words, the claim is still indefinite if a person of
> ordinary skill in the art cannot translate the definition into meaningfully precise
> claim scope."). Pi-Net's proposed constructions for "POSvc application," "Web
> application," and "network application" provide no meaningful guidance to a
> person skilled in the art because they are purely and inescapably circular."

(D.I. 114 at 9).

14.     I do not see where these definitions are "purely and inescapably circular."  All

three terms mean, to use the shortened form provided by Mr. Easttom:

> "A transactional Web application displayed on a web page, and displaying an
> "object" data structure in the Web application with attributes and information
> entries"

(A-1238-44, 1312).  The constructions would not be circular even if the original, longer

definition was used:

- 7 -

"A Web application displayed on a web page, and displaying an "object" data structure in the Web application with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the Web application based on inputs for the values of the attributes at the front-end POSvc Application"

JPMorgan refers to the longer original definition and argues that "Pi-Net defines "Web application" strictly in terms of the coined term, "POSvc application," but then defines a "POSvc application" in terms of a "Web application."  I think that JPMorgan's semantic exercise is not something that would ever be viewed as reasonable by a person skilled in the art.  As I pointed out, the patent claims themselves define "Web application" and "Network application" as being simply different names for "POSvc Application."  Thus, all the terms ultimately have the same meaning as POSvc Application.

15.     If JPMorgan is concerned about the use of the words "Web application " or "POSvc Application" in the original definition, the shortened version provided by Mr. Easttom resolves and avoids any such "circularity."  I do not see why a person of ordinary skill in the art as of 1995-96 would have any trouble understanding what is encompassed by the original definition or the shortened definition of "A transactional Web application displayed on a web page, and displaying an "object" data structure in the Web application with attributes and information entries."  The key is that there is an application displayed on a Web page for conducting transactions that exposes an "object" data structure with attributes and information entries."  Any person skilled in the art in 1995-96 or today would understand the parameters of this straightforward concept.

16.     Next, JPMorgan argues that

"Pi-Net's proposed construction for "transactional application" and "back-end transactional application" only compounds this ambiguity.  Specifically, Pi-Net

defines these terms as "an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc Application on a Web page."  (D.I. 64 at 14)  Again, inserting Pi-Net's construction for "POSvc application" into its construction for "transactional application" only highlights the insoluble circularity of these constructions:

> an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc application on a web page displayed on a web page, and displaying an 'object' data structure in the POSvc application on a web page with attributes and provision for return of information entries from the Web merchant's or value-added network service provider's system corresponding to the Web transaction request at the POSvc application on a web page based on inputs for the values of the attributes at the front-end POSvc Application on a Web page.

([JPMorgan] insertions underlined) No amount of technical expertise can unravel this definition because it is drafted in terms of another wholly indefinite term.

(D.I. 122 at 10-11)  I addressed the limitation in my declaration in connection with claim construction.  (D.I. 66-1 at ¶¶ 23-34).  Again, a person of ordinary skill in the art would have no trouble understanding the terms, and would not view JPMorgan's qualms or semantic exercise as any impediment.  If JPMorgan is concerned that the proposed constructions are in some fashion "circular" or create inconsistencies when one definition is placed inside another, it remains a simple matter of wording, because there is no ambiguity or lack of clarity as to the actual meaning of the terms.

17.     In short, for the above reasons, the claims terms are definite, and the above definitions provide sufficient particularity and clarity to inform persons of ordinary skill in the art of the bounds of the claim terms.

**Back-End Transactional Applications**

18.     JPMorgan focuses heavily in both its invalidity and non-infringement briefs (D.I. 114 and 122) on what JPMorgan refers to as the "back-end systems" and "back-end claim elements."  (D.I. 114 at p. 8 etc.).  However, neither the '500 patent nor '158 patent claims used

- 9 -

the word "back-end." That term is found only in the '492 patent claims, and JPMorgan specifically refers to claims 1-8 of the'492 patent in this context.

19.     I believe it is important to focus on the specific claim language in addressing both the validity and infringement issues. The actual patent limitation in claims 1-8 of the '492 patent is "computer system executing the Back-end transactional application for processing the transaction request in real-time." I addressed this limitation in my declaration in connection with claim construction. (D.I. 66-1 at ¶¶ 23-34). JPMorgan never addresses my construction of the limitation, and never provides its own construction.

20.     In its briefs, JPMorgan, nevertheless, is apparently incorrectly construing "back-end transactional application" to be something different than, and exclusive of, what JPMorgan terms the "Middleware." (D.I. 114 5-6). That is incorrect. The Pi-Net patents include what JPMorgan terms the "Middleware" as part of the "back-end," and, as used in the Pi-Net patents, "middleware" can be a "back-end transactional application." This is plain from specific disclosures in the Pi-Net patents. First, the Pi-Net patents identified all processes beyond what the user could see and directly interact with as the "back-end" or the "back office." In other words, what the users could see was the "front-end" and anything beyond that was the "back-end." Thus the '492 Patent states:

> Once Bank POSvc application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank "Back Office." The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data. This connection between user 100 and Bank services is managed by exchange 501. As illustrated in **FIGURE 5D**, once the connection is made between Bank POSvc application 510(1), for example, and Bank services, an operator agent on Web server 104 may be activated to ensure the availability of distributed functions and capabilities.

(App. C at 6:65 – 7:9).

- 10 -

21.     Figure 5D cited in the above quoted excerpt shows that the "Back Office" is the space beyond the web server – i.e., where the computer system routes the user request from the web server for processing:



**Figure 5D**

22.     The vertical dotted line in Figure 5D effectively denotes the demarcation between the "front-end" and the "Back Office" or "back-end."

23.     The Pi-Net patents also show that a bank's "Middleware" was viewed as part of the back-office or back-end.  See Figures 4A and 4B.  Figure 4B shows that the POSvc Applications ("POS Apps") are abutting the "Back Office" which is where the counterpart back-end transactional application would be found – such as the "Middleware" and "Middleware Applications."  There is no limitations or restriction in the patents, and none are necessary, to be imposed on a "back-end transactional" application.  The applications can be of any type so long as they can respond to the POSvc



- 11 -

Application and object routing.  In short, a person of ordinary skill in the art as of 1995-96 or today would not have any trouble understanding what is encompassed by a back-end transactional application.

24.     Thus, the claim limitation "Back-end transactional application for processing the transaction request in real-time" refers to and includes what is termed "middleware."

**Relationship Of The POSvc Application (Front-End) To "The Back-End Transactional Application For Processing The Transaction Request In Real-Time"**

25.     Another error that permeates JPMorgan's briefs is the concept that one starts with the POSvc Application and then extends the technology to the "back-end transactional application."  I believe that this is the correct or most efficient way of approaching the Pi-Net patent disclosures and claims.  A person of ordinary skill in the art in 1995-96 reading the Pi-Net patents would view and approach the inventions in the opposite direction.

26.     In both its invalidity and non-infringement briefs (D.I. 114 and 122) it appears that JPMorgan is approaching the issues in reverse of the proper approach.  Specifically, as I have previously stated, Pi-Net does not purport to have invented and it did not to invent the internal applications that have been used by banks and other merchants.  For example, the inventor pointed out in her application that the prior art already provided a way of providing access to banking application via the Web by using the prior art CGI systems.  Thus Figure 1B of the Pi-Net patents shows users accessing banking applications via the Web using CGI:



# FIG. 1B (PRIOR ART)

27.     The person of ordinary skill in the art would also look at Figures 4A and 4B, and

see that the inventor was intending to permit banks and other merchants to continue using their

existing "back-office" systems, including their existing 'transactional applications."  This is

shown in Figures 4A and 4B of the patents.  Those Figures show that the "Back Office" part is

unchanged between the prior art and the invention, and the only difference between the prior art

(Figure 4A) and the invention (Figure 4B) is the box labeled as "Exchange, Web Page and POS

APPS [POSvc Applications]:"



28.     Thus, as I have stated in my prior declaration and in my expert reports, in view of the entire disclosure of the Pi-Net patents, as reflected in the above Figures, it is plain to a person of ordinary skill in the art that the point of the invention was to make existing back-end transactional applications or similar future back-end transactional applications available via the Web in a more efficient and robust manner.

This distinction between the approach in the Pi-Net patents and JPMorgan's approach in its briefs is that the Pi-Net patents start with existing (or future similar) "back-end applications,"

and then teach how to create a corresponding POSvc Application and object routing to access

those existing "back-end applications" (configured obviously to be responsive to the object

routing).   JPMorgan, on the other hand, views that one should start with a POSvc Application,

and then create a corresponding "back-end transactional application" specific to the new POSvc

Application.  That appears to me to be an irrational and inefficient approach, which requires one

to unnecessarily "re-invent the wheel."

29.      In short, for the above reasons, the claims terms are definite, and the above

definitions provide sufficient particularity and clarity to inform persons of ordinary skill in the

art of the bounds of the claim terms.

### Written Description – VAN Switch

30.      Next, JPMorgan argues that

No reasonable jury reviewing the specification of the patents-in-suit could
conclude that the inventor had possession of the technology recited in the asserted
claims as of November 1995 for at least two reasons. First, although all asserted
claims of the '500 patent and the '492 patent require a "VAN Switch," the
specification shows that the inventor had nothing more than a vague idea of the
functions that a VAN Switch could perform. It lacks any description of how those
functions could be achieved and any evidence indicating that the inventor was in
possession of a protocol for executing such functions. Second, although each and
every claim requires certain "back-end" elements, there is no evidence from the
specification that the inventor was ever in possession of any such "back-end"
elements.

(D.I. 122 at 11).  JPMorgan then makes the incorrect statement that I had conceded the report of

JPMorgan's expert, Ms. Susan Spielman, asserting that there was lack of written description for

the term "Van Switch."  (D.I. 122 at 11).  This is very surprising, because my second report had

a section entitled "**E. THE ADEQUACY OF THE WRITTEN DESCRIPTION…**," which is

found beginning at A-1217.  In that report, I specifically challenged Ms. Spielman's general

observations (A-1217-18), and devoted an entire section to the Van Switch, which started at A-

1218 and ended twelve (12) pages later at A-1230.  That section is entitled "**2. VAN Switch.**" In

that section, I demonstrated in great detail point-by-point that Ms. Spielman erred with respect to

almost every statement relating to the VAN Switch.  I reaffirm today that is my opinion.   For at

least the reasons detailed in my second report at A-1217 through A-1230, Ms. Spielman erred in

her assertions that "a person of skill in the art as of the date of the alleged invention would not

have understood from the specification of the patents-in-suit that the patentee had possession of a

VAN Switch configurable to perform 'real-time' transactions."

     31.     JPMorgan thereafter continues with arguments that do not appear to correlate to

anything said by Ms. Spielman in her report, and which appear to be new arguments.  These new

arguments are as erroneous as those stated by Ms. Spielman.  Thus, JPMorgan says:

> The only embodiment of a "VAN switch 520 [that] provides multi-protocol object
> routing" disclosed in the specification is "via a proprietary protocol,
> TransWebTM Management Protocol (TMP)." (Ex. C at 7:62-65) … But the
> patents-in-suit do not provide any meaningful description of what TMP actually
> was.  Nor do they indicate that a pre-existing protocol, like SNMP or HTTP (a
> protocol for Web-based communications), could be used alone to implement the
> claimed invention.  Indeed, the only embodiments of VAN Switching or object
> routing discussed in the specification explicitly require TMP alone or in
> combination with other protocols or payloads. (See Ex. C at 8:3-8)  Faced with a
> patent disclosure that describes "VAN Switching and Object Routing" solely with
> regard to a propriety protocol (TMP) that was never actually designed,
> implemented, or depicted in the patents-in-suit, Pi-Net tries to rewrite the
> specification. Pi-Net's expert argues that the TransWebTM Management Protocol
> is not a "protocol" at all, and instead "is merely a shorthand for the general
> protocol that is described in the patent." (Ex. AC at 9)  Even if true, it simply begs
> the question of what protocols are available to implement the VAN Switching and
> Object Routing that are required by the asserted claims.  Pi-Net can point to no
> evidence that the inventor possessed or identified any protocol that was (or could
> be) used to implement a VAN Switch or perform "object routing."  Thus, no
> reasonable jury could find that the inventor possessed a system with a VAN
> Switch or a method of performing "object routing."

(D.I. 122 at 12-13).  These statements are wrong, as shown below.

32.     I begin with the construction of VAN Switch.  I noted in my first report that Pi-Net and the PTO had proposed constructions of VAN Switch, and that the two differed mainly in choice of words and in detail, but not fundamentally (i.e., as a practical matter, both constructions provide basically the same parameters, although the PTO construction was more general).  (A-1039)  I applied those constructions in detail in my second report describing how a person of ordinary skill in the art, whether in 1995-96 or today, would recognize that the patentee invented the VAN Switch, whether as construed by Pi-Net or the PTO.  (A-1218-30)

33.     JPMorgan appears to be concerned that the inventor did not disclose a "protocol," as JPMorgan views it, and highlights that the Pi-Net patents mistakenly cited the "TransWeb[TM] Management Protocol," which never reached fruition.  There are two reasons why JPMorgan errs in arguing lack of written description.  Preliminarily, however, I think it useful to define the word "protocol."  Microsoft Computer Dictionary is one reliable source of common understanding of terms used in information technology.  (Appendix 2)  The Third Edition (1997 [which best reflects a skilled artisan's understandings as of 1995-96]) refers "protocol" to "communication protocol," which the dictionary then defines as follows:

> "communications protocol" n. A set of rules or standards designed to enable computers to connect with one another and to exchange information with as little error as possible. The protocol generally accepted for standardizing overall computer communications is a seven-layer set of hardware and software guidelines known as the OSI (Open Systems Interconnection) model. A somewhat different standard, widely used before the OSI model was developed, is IBM's SNA (Systems Network Architecture). The word protocol is often used, sometimes confusingly, in reference to a multitude of standards affecting different aspects of communication, such as file transfer (for example, XMODEM and ZMODEM), handshaking (for example, XON/XOFF), and network transmissions (for example, CSMA/CD). See also ISO/OSI model, SNA.

Further, when following up the reference to "ISO/OSI model" in the above definition, one finds the following:

- 17 -

"ISO/OSI model"  n. …. A layered architecture (plan) that standardizes levels of service and types of interaction for computers exchanging information through a communications network. The ISO/OSI reference model separates computer-to-computer communications into seven protocol layers, or levels, each building upon the standards contained in the levels below it. The lowest of the seven layers deals solely with hardware links; the highest deals with software interactions at the application-program level.

34.     With the definition of "protocol" in mind, we address the relationship of "protocol" to "VAN Switch."  First, in my opinion, the term VAN Switch, construed according to either Pi-Net or the PTO, does not infer any particular protocol, and neither the Pi-Net nor the PTO constructions infer any particular protocol.  Specifically, the patent points out that the "VAN switch 520 provides multi-protocol object routing, depending upon the specific VAN services chosen."  (Appendix C at 7:62-63).  Thus, critical feature of the VAN Switch is the object routing, and not the particular method of doing that.  Second, if protocol was mandated, the Pi-Net patents state explicitly that the invention operates at the OSI Model layer 7.  The Microsoft dictionary acknowledges that the OSI Model is a recognized, albeit general, protocol. Thus, the Pi-Net patent depicts the OSI Model in Figure 3, and then states, *inter alia*, that:

Application layer 307 provides a means for application programs to access the OSI environment.  As described above, the present invention is implemented to function as a routing switch in application layer 307.  Application layer routing creates an open channel for the management, and the selective flow of data from remote databases on a network.

(Appendix C at 5:21-27).  Thus, JPMorgan's "protocol" arguments would not suggest to a skilled artisan that the inventor did not have possession of the claimed subject matter, and an objective inquiry of Pi-Net's specification by a person of ordinary skill in the art would show a sufficient and understandable description of the claimed inventions (as construed as per my expert reports) so to that skilled artisan would know that the inventor actually invented the invention claimed.

- 18 -

35.     Next, JPMorgan asserts that "the specification offers no structural diagrams, figures, or narrative descriptions that provide any insight into the actual architecture that would evidence possession of such an allegedly novel <u>physical</u> structure."  This is the first time that I have come across any suggestion by JPMorgan or anyone else that the Pi-Net patented inventions require any particular physical structure.  No physical structure is called-out in the patent claims directly, and no one, to my knowledge, has proposed any claim constructions that require any particular physical structure.  Pi-Net's construction of VAN Switch does say "a structure connecting the object sender and the object receiver . . .," but my understanding of this term is that it is consistent with the concept of "structure" as used in means-plus-function limitations.  A "structure" associated with a means-plus-function functional element is usually a virtual structure in information technology, and not a physical structure, to the best of my knowledge.  In any event, Pi-Net patents do describe general physical structures such as computer systems, which is all that is necessary to practice the inventions.

36.     Next, JPMorgan cites the case of *Lockwood v. Am. Airlines, Inc*., 107 F.3d 1565, 1572 (Fed. Cir. 1997) and argues that the patent specification can show possession of the claimed invention only by describing all of its limitations using "such descriptive means as words, structures, figures, diagrams, formulas, etc., that fully set forth the claimed invention." (D.I. 122 at 14)  I am not a lawyer and cannot address the law.  However, to use JPMorgan's phraseology, the "words, structures, figures, [and] diagrams" in the Pi-Net patents fully set forth the claimed inventions, and particularly the VAN Switch.  For the VAN Switch, I again refer to my second report (A-1218-30).

37.     JPMorgan argues that my analysis refers only to "a number of abstract, conceptual drawings."  (D.I. 122 at 14)  I note that the arguments are made without any citation

- 19 -

to any technical evidence such as publications, expert reports or other documents.  It is unclear

why JPMorgan argues that the description is insufficient.  I note that JPMorgan refers to a term

that is not part of the VAN Switch -- "management manager." (D.I. 122 at 14)  The VAN Switch

does include "Management service 703" which the patent describes as follows:

> contains tools such as Information Management Services (IMS) and application
> Network Management Services (NMS). These tools are used by the end users to
> manage network resources, including VAN switches. Management service 703
> also provides applications that perform Operations, Administration, Maintenance
> & Provisioning (OAM&P) functions.  These OAM&P functions include security
> management, fault management, configuration management, performance
> management and billing management.  Providing OAM&P functions for
> applications in this manner is another significant aspect of the present invention.

(Appendix C at 8:64 to 9:8).  These management services would have been easily recognizable

and understood by persons of ordinary skill in the art in 1995-96.  After all, there were already

operating systems, Web servers, Web browsers, Web sites, CGI, CORBA, JAVA and any

number of other technical developments, all of which had developed management services

associated with them.  Management services were known, and were part of the skill set of a

person of ordinary skill.

38.     Next, JPMorgan points to two abstract drawings in the Pi-Net patents.  (D.I. 122

at 14).  I agree that these were designed to explain more abstract concepts.  However, an

understanding of abstract concepts helps in implementation of inventions, and, in any event,

there are many other descriptions and figures in the patents beyond the two abstract drawings.

Again, what may not be apparent to the writer of D.I. 122 can be (and is) very understandable to

one of ordinary skill in the art.

### **Written Description – Alleged "Back-End" Elements**

39.     Next, JPMorgan mistakenly argues that

- 20 -

> Each of the asserted claims of the '492 patent specifically and explicitly recites limitations directed to "back-end" systems for executing transactions.

(D.I. 122 at 15).  This is incorrect.  The only reference to a "back-end" in Claims 1-8 of the '492 patent is the limitation "a computer system executing the Back-end transactional application for processing the transaction request in real-time."  This is a specific limitation, and it should not be generalized into something that it is not, as is the import of JPMorgan's argument.  Similar errors appear in JPMorgan's overgeneralization of the claims of the '500 and '158 patents.

40.     JPMorgan then further errs in arguing that:

> There is no evidence in the specification that the inventor possessed the "back-end" or back office systems explicitly required by the asserted claims.  For instance, Pi-Net's experts contend that Figure 5D shows object routing to the "back-end," which consists in that figure of "Data Repository 575."  (Ex. AA at 8-9)

(D.I. 122 at 16).  These arguments are erroneous, as noted above, JPMorgan's reference to "'back-end' or back office systems" has no apparent tie or relationship to specific patent claims.  Thus, the only reference to a "back-end" in Claim 1 of the '492 patent is the limitation "a computer system executing the Back-end transactional application for processing the transaction request in real-time."  JPMorgan has not suggested that the inventor did not possess the claimed invention, which is "a computer system executing the Back-end transactional application for processing the transaction request in real-time."  Second, there is no expert report or other record support for the argument, even if JPMorgan had made it, and so it is difficult for me to address the point without such reference.

41.     JPMorgan then further errs in arguing that:

> the only way of accessing this back-end system, as explained in the patents-in-suit, is through the use of the non-existent protocol, TMP.  (Ex. C at 9:35-36)

(D.I. 122 at 16).  As I noted earlier, it is incorrect to say that "the only way of accessing this back-end system, as explained in the patents-in-suit, is through the use of the non-existent protocol, TMP."  "TMP" was at most a suggested preferred embodiment in the specification, but is not necessary to the practice of the invention.

42.    JPMorgan then further errs in arguing that:

Moreover, the specification never provides any description of the "back-end transactional application"—this phrase appears only in the claims.  Nor is there any description or diagram showing the back-end software, hardware, algorithms, or other physical structures that were (or could be) part of the "back-end transactional application" required by all claims of the '500 and '492 patents.

(D.I. 122 at 16).  As I noted earlier in paragraphs 15-19 earlier, the "back-end transactional application" is taught both specifically and inherently in the disclosure.  A person of ordinary skill in the art would recognize that the inventor had possession of that limitation.

43.    In view of the existing technology known to a person of ordinary skill in the art, the patent disclosures, including the Figures and text, provided sufficient information that the inventor had possession of a "back-end transactional application."  For example, I cited earlier Figure 4B of the patents which showed the POSvc Application interacting with existing middleware and middleware applications, which are "back-end transactional applications," and it was within the skill of the ordinary artisan in 1995-96 to use the disclosure in the patent, and particularly the description of the object structure and object routing to write a front-end POSvc Application that was a counterpart to, and connected via the webserver to, the bank's existing middleware and/or middleware applications sown in Figure 4B.

44.    JPMorgan next argues that:

Finally, although the specification makes reference to a "real-time" transaction involving the movement of $500 from a checking account to a savings account (Ex. C at 7:10-23), the only accompanying description is a *functional* one from

- 22 -

the perspective of a user, with no description of the specific back-end architecture and elements (*see id.*).  As Pi-Net's counsel represented to the Court, the inventor did not "know what banks do in the back office," such as how to actually perform a transfer of funds from one account to another. (Ex. DAX at 40:4-16)  But "what banks do in the back office" falls directly within the scope of the asserted claims. The specification does not evidence any possession of these back office systems.

(D.I. 122 at 16)

45.     JPMorgan's statement is confusing and unclear, because the comment is not directed to any particular claim limitation, and there are no claims directed to "what banks do in the back office."  In any event, in the 1995-96 time frame, banks already had the internal middleware and/or middleware applications to transfer funds, such as when the request was made at a teller who interacted with a computer, or potentially through the use of automated teller machines (ATMs).  Those transactions were in real-time.  The Pi-Net patents now add a Web-based POSvc Application front-end counterpart to those existing middleware systems, and act on those systems through the Web using an object structure and object routing.  The inventor clearly possessed that concept, and the description was sufficient for a person skilled in the art, such as bank IT personnel, to implement the concept.

### The Pi-Net Claims are Enabled

46.     JPMorgan devotes the remainder of its brief, pages 17-20, to arguing that the claims are not enabled.  Again, the arguments are made essentially without any reference to any expert report or any other record, and, thus, it is difficult to address the generalized assertions in the brief without any technical back-up or specification.

47.     JPMorgan's single reference to the record does not say that the claims are not enabled.  JPMorgan refers to one paragraph of Ms. Spielman report, Ex. AJ at ¶ 52, and one section of the deposition of Mr. Easttom, Ex. AO at 306-08, and says:

> In this case, no reasonable jury could conclude that anything less than undue experimentation would be needed to implement the claimed invention—in particular because both Ms. Spielman (one of JPMorgan's technical experts) and Mr. Easttom (one of Pi-Net's technical experts) *agree that considerable experimentation and effort* would be necessary to implement the technology in the asserted claims. (*See* Ex. AJ at ¶ 52 (opining that a person could not design a system as required by the asserted claims, "without engaging in substantial and significant efforts at trial and error"); Ex. AO at 306-08 (opining based on "countless real world examples" that it was "just too hard" prior to about 2003 to design and implement web applications))

(D.I. 122 at 17).

48.    The cited paragraph of Ms. Spielman's expert report refers only to the VAN

Switch and says that

> in my opinion a person of skill in the art as of the date of the alleged invention would not have been able to make or use a VAN Switch (or any sort of a switch or system capable of performing "real time" transactions) without engaging in substantial and significant efforts at trial and error. The patents-in-suit would have provided essentially no guidance in that effort; a person of skill in the relevant art would have been starting, effectively, from scratch.

(A-2133).  However, as I pointed out in my responsive report, Ms. Spielman made the statement

without addressing any particular construction of the term "VAN Switch" and I detailed the

errors in her analysis of the VAN Switch.

49.    Similarly, Mr. Easttom's report never said anything remotely supporting

JPMorgan's statement.  In the cited portion of his deposition, he was addressing questions

directed to combining various dissimilar items of prior art technologies.  (Ex. AO at 306-08, A-

2503).  He never addressed the sufficiency of the Pi-Net patent disclosures.  Second, he testified

about how hard it is to Web design systems from scratch.  However, there is a huge difference

between a hard task and "undue experimentation."  Building an airliner or a bridge across a river

from existing blueprints may be a hard task, but it would not qualify as "undue experimentation."

Mr. Easttom was talking in the cited section about "creating a web application," which is hard

- 24 -

work, but, in fact, any person skilled in the art had technology to do it, and a huge number of

websites and web applications were created in the 1995-96 time frame and in the years that

followed.  There were already thousands of web sites in existence in 1995.  Thus, Mr. Easttom's

testimony says only that implementing web applications requires a lot of hard work, but he does

not say that practicing the Pi-Net patent required "undue experimentation," and the two are very

different concepts.

50.     JPMorgan next says that

a person of skill in the art would know only that she would need to invent her own
new protocol to implement the claimed technology, because the "proprietary
protocol" (TMP) disclosed in the patents-in-suit never actually existed. (Ex. AB at
14)

(D.I. 122 at 18).  JPMorgan supports that statement by citation to my expert report.  However, I

never said what JPMorgan attributes to me, and confirm that I reject JPMorgan's

mischaracterization of my report.

51.     Next, JPMorgan asserts that "the patents-in-suit provide only a conceptual

overview of what functions a VAN Switch should perform, with no details of how to actually

make and use an operational VAN Switch."  (D.I. 122 at 18).  I disagree that the patent provides

only a conceptual overview.  In my opinion, there is sufficient information for the skilled artisan

to practice the patented technologies.

52.     Next, JPMorgan again refers to undefined "back-end systems" which I again note

are unclear in what particular claim language they are addressing.  (D.I. 122 at 18).

53.     JPMorgan then makes the statement that the "specification provides no guidance

on how to configure those back-end applications to 'correspond' to front-end applications (as Pi-

Net's proposed construction for this term necessitates), or to execute a diversity of transactions in

real-time." (D.I. 122 at 18)  I think that JPMorgan has it backwards.  The issue is not building a

"back-end transactional application" corresponding to the front-end POSvc Application, but the

opposite.  "Back-end transactional applications" operating in real-time already existed in 1995 in

the banking and other industries.  The Pi-Net patents teach the building of a a front-end POSvc

Application that corresponds to the back-end application.  When properly viewed, it is plain that

JPMorgan's comments are in error.

54.     JPMorgan then refers to the so-called "*Wands* Factors."  (D.I. 122 at 7, 17, 19).

JPMorgan, however, does not cite where Ms. Spielman or any other expert for JPMorgan

addressed these *Wands* Factors, and, to my knowledge and information, they are never addressed

in the any expert report presented by JPMorgan.  Further, I again note that JPMorgan does not

address any particular limitation or claim in its discussion.

55.     JPMorgan then addresses my comments in response to Ms. Spielman's report,

where I pointed out the many deficiencies of her assertions, not the least was the lack of any

cogent analysis supporting her statements.  I understand that the burden is on JPMorgan to prove

by clear and convincing evidence that the individual claims of the patents in suit are not enabled.

Pi-Net does not have the burden of proving validity or enablement.  Therefore, I addressed Ms.

Spielman's assertions, and was not trying to independently prove enablement. In any event, I

disagree that specific examples in the patent specification are particularly relevant in information

technology patents.  In my patents, I sometime provided examples and sometimes not.  An

example is relevant only for a particular environment, and anyone trying to practice an

information technology invention will implement that invention in their particular environment,

which is unlikely to be the same environment as the patent example.  It really is more important

to have the basic fundamental facts and understanding of the functional concepts, such as provided in the Pi-Net patents, then to see specific examples.

56.     In my opinion, as I stated and detailed in my second report, I believe that the Pi-Net claims are enabled to one of ordinary skill in the art.

## Infringement of the Pi-Net Patent Claims

### "Back-End Transactional Applications"

57.     JPMorgan argues that I ignored the claim requirements for "Back-end transactional applications," because, allegedly, I did not consider the "back-end" to be part of the invention.  (D.I. 114 at pp. 10-11)  That is incorrect.  Although, as I have stated earlier in this declaration, I believe that the novelty of the Pi-Net inventions is focused on the front-end POSvc Applications and object routing using the VAN Switch from the POSvc Application to the back-end transactional application, I have considered and applied all the claim limitations, including "back-end transactional applications."  I note also in passing that JPMorgan cites excerpts from my report that related a specific limitation in the '500 patent dealing with the Exchange component, which does not recite a "back-end."

58.     I particularly pointed in my expert report to where and how JPMorgan's Accused Instrumentalities met the limitation of a "back-end transactional limitation for processing the transaction request in real-time."  Preliminarily, that limitation is properly construed as "an application provided by the web merchant or value-added network service provider [i.e., JPMorgan] that corresponds to the front-end POSvc Application on a Web page."  (D.I. 64 at 14).

59.     I am somewhat surprised that JPMorgan has chosen to challenge this particular limitation, because the Accused Instrumentalities so plainly and inherently meet and necessarily

Redacted

Redacted

Redacted





65.   Redacted













Redacted

Redacted

78. 

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of February 2014.

Michael Bardash

# CURRICULUM VITAE

## Michael Bardash

**Summary of experience:**

I have over 25 years of experience in the software development and technology space.  Solving problems that require a combination of strong mathematical or analytical skills and disciplined engineering practices has become one of my specialties.  I have led relatively large (up to 40 people) development groups on scalable financial and public sector projects, and so I have become familiar with the architectural and project management issues associated with multi-tier systems.

**Education**

*Ph.D.*  Cornell University 1/89 (Electrical Engineering)

   Major - Quantum Electronics

   Minors – General Physics, Information Theory

*B.S.* SUNY at Albany 6/82

   Major – Mathematics

   Minor – Computer Science

**Architecture Skills**

- SOA
- Agile
- Performance Based and Metric Based Project and Contract Planning
- N-Tier architecture, Distributed Applications, Data Communication
- High Availability and Business Continuity Design
- Cloud Computing Application and System Design
- Object Oriented Analysis and Design
- LAMP stack, Spring based development, JEE, SOA (ReST and SOAP),

**Software, Tools & Utilities**

- **Operating Systems:** Linux,/Unix (most flavors), Windows NT,  VRTX,  VMS, RSX-11
- **Languages:** Java, C/C++,  C#, XML, SQL, Legacy Languages( Pascal, Fortran, PL1, Algol….) Various Assemblers
- **Database and Database Tools:** Oracle, Mysql, Sybase, SQL Server,  Hibernate, MyBatis

- **Internet:** Apache Technology Stack (Web server, Tomcat, Axis, Maven…), ReST (Jersey), SOAP, IIS

- **GUI:** Web driven applications, .NET Applications, GWT, Dojo, HTML 5

- **Middleware:** Apache web front, .NET, IBM WebSphere, BEA WebLogic, JMS( various flavors), IONA Orbix and OrbixWeb,, MQSeries.

- **OOA/OOD:** RationalSuite

- **Configuration Management:** Subversion (with Cruise Control or Hudson integration), CVS, Source Safe, RCS, SCCS.

- **Unit Testing:** JUnit, Cobertura, Insure, Purify, Quantify, PureLink, PureCoverage, jdb, gdb, dbx

- **Development Tools:** Eclipse, Visual Studio .NET


## SELECTED PROJECTS and EMPLOYMENT HISTORY

**QEL System Services**                                    **Mar 2007 - Present**

**Executive Vice President/Co-owner**

I am currently serving as the chief architect for all of the new financial and trademark systems at the US Patent and Trademark Office USPTO.  My responsibilities there include Enterprise Architecture and Analysis, establishment of best practices, mentoring for developers, overall system design, replacement of legacy systems with standards based components, development help (as needed).  The main goals that I am focused on at the USPTO are: the creation of new storefronts, applications, and payment strategies, the retirement of over 30 antiquated payment and trademark systems; definition of core business services; and creation of an overall roadmap for migrating from the current systems to a SOA based architecture.

Together with my partners, I built a team that has developed an order management and commission building application called Accountrax.  The package is used by independent and mid size brokerage firms.  Accountrax is web driven, it is live and it is currently providing both real time (via FIX) and end of day service for our customers.  Real time order and trade information is captured electronically via FIX feeds.  We also collect after hours data from exchanges, clearing houses, OMS providers, and other third party sources.   We provide back-office systems for our customers, delivering statistical and billing information, establishing a full audit trail of all transactions, performing compliance functions, and allowing round the clock access to customer data via the internet.  The system was built by a small group of the best developers available.  Along with the other technical partner, I assembled and led the team, oversaw all aspects of the architecture, and served as the technical lead and lead developer (everyone within the organization has technical responsibilities).  The operating environment consists of several Linux servers running J2EE extensions.  FIX connectivity is accomplished via quickfix (Quickfixj – the native java version of Quickfix) and all data is stored in a MySQL database.

**Interactive Data Corporation**                                    <u>June 2005 – July 2007</u>

**Director of Fixed Income Pricing Systems**

For a two year period, I was the director of development and QA for a team that totaled 30 full time employees and another 5 consultants.  The application suite responsible for producing evaluations for both corporate and structured bonds was a large set of stove-piped applications written primarily in C/C++.  The development group was in fact also the production support group, and this was and is a problem that continually plagues the team.  My technical responsibilities were primarily, to bring "best practices" to the development, to create a common architecture for all evaluations, to eventually replace the current legacy systems with a unified platform, to consolidate the fixed income pricing methodologies.  As management, I was also responsible for hiring/firing, definition of the teams personnel structure, cooperation with the project management office and "business line", producing design and implementation estimates for the group, and guaranteeing that the quality of our work overall was up to par. Finally, I also participated in strategic planning for fixed income products.

**QEL Inc.**                                                        <u>Sept. 2000- May 2005</u>

**CEO**

As an early adopter of REST based system development I formed a small group that built financial and commercial applications that used Java stack technology to create applications that delivered web-services to thin and medium weight client applications..

- Project and finance manager for a number of projects

- Technical Lead in-charge of architecture and design for Apache based web-stack

- Development of an internal data abstraction system that pre-dated Hibernate and that was more effective than Top-Link.

- Development of best practices as a consultant for corporate clients

**ISG**                                                             <u>Sept. 1999 – Sept. 2000</u>

**Specialist / Team Lead**

I was one of three that produced a working architecture, detail designs, and 'proof of concept' implementation for a middleware platform/infra-structure.  These were produced for the fixed income division of Donaldson, Lufkin, and Jenrette.  The platform allowed all back office systems (over 30) to coherently inter-operate.  The back office systems were developed independently by separate application groups, and consequently were using different platforms without any common standards.  The developed architecture allowed all applications to be joined together in a minimally invasive fashion.  We used a "best of breed" approach in uniting IONA'a

Orbix version of CORBA and OrbixTalk multicast publish/subscribe package, MQ Series messaging, Netscape's LDAP (lightweight directory access protocol) implementation, various XML/DOM implementations, Java/C++ object mapping tools, and variety of object oriented design tools.   Platforms included Sun Solaris, Linux, Tandem, and Windows.Lead a team of three developers in design and development an Object Oriented communication framework to send and receive objects across the network.  The system was developed using Fusion Methodology, C++, Sybase, threads, IPC and PIPES middleware.

**QEL**                                                                                      **May. 1997 – Sept 1999**

**Consulting Engineer/Tech Lead**

I had an ongoing consulting engagement with the Brokerage Booth Support System (BBSS) development team at SIAC.  Including responsibility for portions of the systems higher level architecture based on my earlier involvement in the development of a corporate database design for the entire New York Stock Exchange.  Eventually, this may serve as the central data model for all of the exchange's applications and services. I was part of an architecture team that extracted the rules from the current BBSS system and designed and developed a corresponding prototype system in an Enterprise Java Beans (EJB) environment.  One of our main tasks was "verifying" the architecture and evaluating the "big ticket items." The largest part of this process was the evaluation of several different EJB application servers including IBM's WebSphere and BEA's WebLogic servers.

The team built a scaled down version of most of New York Stock Exchange's systems.  These systems were described using proper object and relational modeling.  A complete set of applications was written using several instances of each EJB server under test in conjunction with a high performance Oracle database server.  Typically there were between 2 and 5 instances of the application server running support for as many as several hundred clients.  Other products being evaluated include TP monitors and message oriented middleware MOM products.  In the past, I had been involved in middleware development for distributed object oriented applications, system wide class design and implementation, and application programming interface (API) design and implementation.  The primary API's that I developed provided database-like functionality and transaction routing information for applications that handle order processing for the New York Stock Exchange.  I've also developed all of the interfaces, intermediate implementation (CORBA servers), and simple clients for a pilot project.  The development environments at SIAC included HPUX and Linux using Java, C++ and C, and Windows NT using Java.

**ISYS**                                                                                      **July 1995 - Aug. 1997**

**Lead Architect**

I was the lead design engineer and program manager for a laboratory information system within ISYS (a New Jersey based company).  The program employed between 5 and 8 people

(depending upon the project phase) and required that designed software components be built by 4 "outside" companies.  The system is a distributed system using a CORBA 2.0 object request broker to handle client/server interaction.  I was responsible for designing the overall architecture, developing the interprocess interfaces, and handling system level issues.  All object interfaces are specified using IDL (interface definition language).  Additionally, I've written an IDL compiler that generates a variety of libraries with object interfaces and implementations that give application programmers the tools to manipulate complex data structures in a multilanguage and multiplatform environment. Further, it provides the routines to create and manipulate database objects.  The compiler is written using Lex/Yacc and C++ and creates C and C++ source code and C, C++, and PASCAL header files.  I have also written several of the applications for the servers.  These are all written in C++.


**Columbia University**

**Assistant Professor**                                                  **Mar.  1991 - June 1994**

- At Columbia I designed and implemented four major systems: a steroetactic radiosurgery treatment planning system, a departmental scheduling and billing system, a Monte Carlo system for modeling the interaction of radiation with DNA, and a small system for deconvolving detector spatial responses from actual measured data. For all of these systems, I was responsible for all phases of design and implementation.  Some of these systems leveraged the emerging internet technology that allowed for collaboration, super-computing resource sharing, and information dissemination.

- The stereotactic system read CAT scan data and allowed users to draw structures and perform dose calculations on the CAT scan study. Cross sections of both the CAT scan study and the calculated dose distribution can be displayed in any arbitrary plane.  The system consisted of several tasks and was written in C on a DECStation 3100 running Ultrix and a Sun station running Sun OS.  The image display used low level X11/Xlib and the GUI was written using the DECWindows tools.

- The scheduling and billing system was a large database program that allowed the department to keep track of all doctors', patients', and facilities' schedules along with any associated billing.  The system is written in C and runs on a variety of VAX/VMS type machines.  The system currently provides service for the department and allows an unlimited number of simultaneous users.

- The Monte Carlo routines performed large-scale calculations and modeling.  The main calculation engine was written in standard C and ran on a DECStation 3100 or a CRAY.  The user interface was written using Xlib and DECWindows functions.  Interprocess communication used Unix IPC calls.

- The detector deconvolution system used fast fourier transform routines to perform basic analysis on data measured using known fixed detectors.  The system acquired data using a PC running DOS and the data was analyzed using a set of C programs running on a DECStation 3100.

## PUBLICATIONS

PEER REVIEWED ARTICLES:

Dosimetry Of Small Stereotacticfields Using Deconvolution Techniques. Bardash, M.J., Zaider, M., Amols, H.I., et. al. 36th AAPM Meeting, Anaheim, Med. Phys. 21;970 (1994)

"Biological, Chemical, and Physical Interactions of Radiation with Biological Molecules." Plenum Press, 1995. Edited by Matesh N. Varma and Aloke Chatterjee.Chapter; M. Zaider, M. Bardash and A. Fung.

"Molecular Damage Induced Directly And Indirectly By Ionizing Radiation," Zaider M., Bardash M., Fung A., DNA.Int J Radiat Biol. 1994 Nov;66(5):459-65.

"Charged-particle transport in biomolecular media: the third generation," Zaider M, Fung A, Bardash M., Basic Life Sci. 1994;63:77-91; discussion 91-2.

The definition of transient and secular radioactive equilibrium, Amols HI, Bardash M., Med Phys. 1993 Nov-Dec;20(6):1751-9.

"Indirect Radiation Damage Calculations in the Presence of OH Radical Scavengers," M. Bardash, M.Zaider. Nuclear Instrumentation 1/1994

"A Stochastic Treatment of Radiation Damage to DNA From Indirect Effects," M. Bardash, M. Zaider. International Journal of Micro-Dosimetry. 3/93

"Rapid Dose Calculations for Stereotactic Radiosurgery," M. Bardash, H.I. Amols, S. Kohn, M.K. Martel, C.S. Wuu, M. Sisti, C.H.Chang. Medical Physics. 10/92

"An Acoustooptic Spectrometer System Used to Monitor Combustion Processes." M Bardash, G. Wolga. Applied Optics. 25. October 1989

ABSTRACTS:

"A Stochastic Treatment of Radiation Damage to DNA From Indirect Effects." M. Bardash, M. Zaider. Abstracts of Papers for the Fortieth Annual Meeting of the Radiation Research Society. Salt Lake City, Utah. 1992 p80.

"Rapid Dose Calculations for Stereotactic Radiosurgery," H.I. Amols, M. Bardash, S. Kohn, M.K. Martel, C.S. Wuu, M. Sisti, C.H.Chang. Editor - J.S.Laughlin. Medical Physics. San Francisco. May/June 1991 Volume 18 No. 3. p603.

"Temperature and Concentration Determinations From Exhaust Gas Streams Using Tunable Acoustooptic Filters." M.Bardash, G. Wolga. American Combustion and Flame Conference Proceedings. San Francisco 1986.

OTHER/TRADE:

Servlets and EJBs: Friends or foes?  Max Dolgicer, Gerhard Bayer, Michael Bardash, July 1, 2002 (http://adtmag.com/articles/2002/07/01/servlets-and-ejbs-friends-or-foes.aspx)

The Right Java Tool for the Right Job. Max Dolgicer, Gerhard Bayer, Michael Bardash, Sept 1. 2002 ( http://adtmag.com/articles/2002/09/01/the-right-java-tool-for-the-right-job.aspx)

The Particle Physics Data Grid, Proposal for FY 1999 Next Generation Internet Funding


PATENTS:

8,350,225  Solid state tissue equivalent detector, main component for a light-weight tissue equivalent microdosimeter

6,278,117  Solid state radiation detector with tissue equivalent response

5,703,923  Three dimensional imaging system using laser generated ultrashort x-ray pulser

5,602,894  Three-dimensional imaging system using laser generated ultrashort x-ray pulses

GRANTS:

A Solid State Tissue Equivalent Detector for Microdosimetry, NASA, NNX09CC51P, 2009

# EXHIBIT  BF

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v.  ) | **C.A. No. 12-282-RGA** |
| ) | |
| **JPMORGAN CHASE & CO.,** ) | |
| ) | |
| **Defendant.** ) | |

**DECLARATION OF GEORGE PAZUNIAK IN RESPONSE TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT BASED ON LACHES**

I, George Pazuniak, Esq. declare as follows:

1.      I am an attorney admitted to practice before the Supreme Court of the State of Delaware, and am counsel to Plaintiff Pi-Net International Inc. ("Plaintiff" or "Pi-Net").  I am over twenty-one years of age and am not under any legal disability.

2.      I make this declaration view of the motion filed by Defendant JPMorgan Chase & Co. ("Defendant" or "JPMorgan") for Partial Summary Judgment Of Laches For U.S. Patent No. 5,987,500, D.I. 111.

3.      JPMorgan filed its Brief In Support Of Its Motion For Partial Summary Judgment Of Laches For U.S. Patent No. 5,987,500 (D.I. 112) ("Brief"), in support of its motion based on laches, in which Defendant cited certain evidence.  These are addressed here.

1

4.      The following documents cited in the Brief (D.I. 112) had never been produced in discovery of this case or otherwise disclosed of this case, and were first disclosed with the service of the Brief:  Exhibits DAB, DAM, DAW, and DBE.

5.      The following documents cited in the Brief (D.I. 112) had never been produced or otherwise disclosed during the fact discovery period of this case, and were first disclosed after the close of fact discovery:  Exhibits DAC, DAD, DAE, DAF, DAG, DAH, DAI, DAJ, DAK, DAL, DAN, DAO, and DAP.  When the documents were produced, JPMorgan did not provide any explanation of the purpose of the documents, and specifically did not disclose that the documents were related to JPMorgan's laches defense.

6.      Defendant JPMorgan also submitted the Declaration Of Dr. William F. Mann III (Exhibit DAW).  Prior to JPMorgan's service of his declaration, Dr. Mann had never been identified in this case in any disclosure, discovery response or in any other manner.  Further, the information in his declaration had never been disclosed in this case.

7.      Defendant JPMorgan had filed an Answer pleading in part that Patent No. 5,987,500 ("'500 Patent") was unenforceable on the basis of laches, and specifically, JPMorgan Chase & Co.'s Answer To Pi-Net International, Inc.'s Complaint (D.I. 11), stated at ¶ 39: "Plaintiff is barred from enforcing the '500 Patent against JPMC pursuant to the doctrine of laches."

8.      In view of this pleading, Pi-Net served Interrogatory No. 4, which stated:

> To the extent not specifically identified in Defendant's initial disclosure of invalidity contentions, state in detail and with particularity each and [sic] allegation that any asserted claim of any patent-in-suit is invalid or unenforceable, or which you may argue precludes any liability in this case (provided that any information specifically provided in response to Interrogatory No. 2 need not be repeated).

(Exhibit BG at p. 8).  JPMorgan's only response to this interrogatory was as follows:

2

JPMC objects to this interrogatory as unduly burdensome to the extent that the information requested is already within the knowledge of Pi-Net. JPMC additionally objects to this interrogatory to the extent that it contains discrete subparts within the meaning of FED. R. CIV. P. 33. Each subpart should count separately towards the total permissible number of interrogatories. JPMC further objects to this interrogatory to the extent that it calls for information subject to a claim of privilege or immunity, including the attorney-client privilege, the attorney work-product doctrine, or any other applicable evidentiary privilege or immunity from disclosure. JPMC further objects to this Interrogatory to the extent it seeks expert testimony or evidence prior to the time for such disclosure set forth in the Court's Scheduling Order.

Subject to these objections and JPMC's General Objections, JPMC responds as follows: All such allegations that JPMC has formulated at this time are listed in Defendants' Initial Invalidity Contentions and JPMC's Answer (D.I. 11). However, JPMC reserves the right to amend its response as it formulates additional allegations.

(Exhibit BG at pp. 8-9).

9.     With respect to Defendant JPMorgan's statement in its above interrogatory response that "All such allegations that JPMC has formulated at this time are listed in Defendants' Initial Invalidity Contentions and JPMC's Answer (D.I. 11)," JPMorgan did not mention or refer to laches in Defendants' Initial Invalidity Contentions, and "JPMC's Answer (D.I. 11)" stated with respect to laches only the following:  "Plaintiff is barred from enforcing the '500 Patent against JPMC pursuant to the doctrine of laches."

10.     In addition to the interrogatory, Pi-Net also served several document requests. Document Request No. 11 requested:

All technical articles, marketing and/or sales materials, brochures, and press releases concerning any of the Accused Instrumentalities.

(Exh. BH at 11).  JPMorgan responded to this request as follows:

JPMC objects to this request as overly broad, unduly burdensome and duplicative of prior requests, including but not limited to Request Nos. 1-5, and 8-10. Subject to the foregoing and to the extent not previously produced, JPMC will produce non-privileged documents relating to the Accused Instrumentalities enumerated in Plaintiff's submission to Defendant served on or about November 9, 2012, if any, responsive to this Request.

3

(Exh. BH at 11).

      10.    Pi-Net served Document Request No. 17, which requested:

      All documents concerning the cost to develop, use, and/or maintain the Bank Website. To the extent such metrics are pulled from an electronic database or otherwise available in spreadsheet or database format, they should be produced as .csv or .xls files (or the like) in electronic format.

(Exh. BH at 13).   JPMorgan responded to this request as follows:

      JPMC objects to this request as overly broad, unduly burdensome and duplicative of prior requests, including but not limited to Request No. 16. JPMC further objects to this request to the  extent that it seeks information that is not relevant to any claim or defense of a party to this lawsuit or the subject matter of this action, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing and to the extent not previously produced, JPMC will produce non-privileged documents relating to the Accused Instrumentalities enumerated in Plaintiff's submission to Defendant served on or about November 9, 2012, if any, responsive to this Request.

(Exh. BH at 13-14).

      11.    Pi-Net served Document Request No. 18, which requested:

      All documents concerning the cost to develop, use, and/or maintain the Accused Instrumentalities. To the extent such metrics are pulled from an electronic database or otherwise available in spreadsheet or database format, they should be produced as .csv or .xls files (or the like) in electronic format.

(Exh. BH at 14).   JPMorgan responded to this request as follows:

      JPMC objects to this request as overly broad, unduly burdensome and duplicative of prior requests, including but not limited to Request Nos. 16-17. JPMC further objects to this request to the  extent that it seeks information that is not relevant to any claim or defense of a party to this lawsuit or the subject matter of this action, and is not reasonably calculated to lead to the discovery of admissible evidence. Subject to the foregoing and to the extent not previously produced, JPMC will produce non-privileged documents relating to the Accused Instrumentalities enumerated in Plaintiff's submission to Defendant served on or about November 9, 2012, if any, responsive to this Request.

(Exh. BH at 14).

      12.    Pi-Net served Document Request No. 26, which requested:

> All documents concerning the enforceability of any one or more claims of the Patents-in-Suit, including documents which may be relied upon in asserting arguments concerning the unenforceability of any one or more claims of the Patents-in-Suit at trial or in the course of any other proceeding.

(Exh. BH at 18).  JPMorgan responded to this request as follows:

> JPMC objects to this request as duplicative of prior requests, including Request Nos. 24-25. JPMC further objects to this request to the extent it seeks documents and things that are already in the custody, control, or possession of Pi-Net, or outside the custody, control, or possession of JPMC. Subject to the foregoing and to the extent not previously produced, JPMC will produce non-privileged documents, if any, responsive to this Request.

(Exh. BH at 18).

13.     Exhibits BE and BF are true and correct copies of the discovery responses served by Defendant JPMorgan on Plaintiff Pi-Net.

14.     In accordance with Fed.R.Civ.P. Rule 56(d), counsel states that JPMorgan's contentions in the summary judgment motion are entirely new, and had never been suggested in any disclosure prior to the filing of the motion.  Dr. Mann had not been identified as a witness or a knowledgeable person.  The documents relied upon had not been produced during fact discovery.  Any attempt to respond to JPMorgan's evidence and motion would require discovery, including depositions of JPMorgan under Fed.R.Civ.P. Rule 26, requests for more documents, and discovery of why JPMorgan had withheld the contentions and evidence until the present.  In addition, because JPMorgan now asserts that there is a presumption of prejudice, it will be necessary for Pi-Net to prepare a showing demonstrating that JPMorgan was not prejudiced.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of February, 2014, in Wilmington, Delaware.

George Pazuniak

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PI-NET INTERNATIONAL, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 12-282-RGA |
| | ) | |
| JPMORGAN CHASE & CO. | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT JPMORGAN CHASE & CO.'S
FIRST AMENDED RESPONSES AND OBJECTIONS TO
PLAINTIFF'S FIRST SET OF INTERROGATORIES (NOS. 1-5)**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, defendant JPMorgan

Chase & Co. ("JPMC" or "Defendant") by and through its undersigned counsel, hereby

responds and objects to the First Set of Interrogatories (Nos. 1-5) (the "Interrogatories")

of plaintiff Pi-Net International, Inc. ("Pi-Net" or "Plaintiff"), dated May 21, 2013.

**GENERAL RESPONSES**

1.      JPMC's responses to the Interrogatories are based on the best

information available to it at the time of drafting, within the limitations and subject to the

objections set forth herein.

2.      The responses set forth below are for the purposes of discovery

only, and JPMC neither waives nor intends to waive, but expressly reserves, any and all

objections it may have to the relevance, competence, materiality, admission,

admissibility, or use at trial of any information produced, identified, or referred to herein,

or to the introduction of any evidence at trial relating to the subjects covered by such responses.

3.     The fact that JPMC is willing to answer or does not object to any interrogatory does not constitute an admission or acknowledgment that an interrogatory is proper, that the information it seeks is relevant or admissible or is within the proper bounds of discovery, or that interrogatories for similar information or subject matter will be treated in a similar fashion.  Furthermore, by making these responses, JPMC does not concede that it is in possession of any information responsive to any particular Interrogatory, or that any non-privileged, responsive information actually exists.

4.     JPMC reserves the right at any time to revise, correct, add to, supplement, or clarify any of the responses propounded herein.  JPMC further expressly reserves its right to rely, at any later time including trial, upon additional information not included in its specific responses.

## GENERAL OBJECTIONS

1.     JPMC objects to the Interrogatories to the extent that they call for information subject to a claim of privilege or immunity, including the attorney-client privilege, the attorney work-product doctrine, or any other applicable evidentiary privilege or immunity from disclosure.  The inadvertent provision of any information subject to such privileges or immunities is not intended to relinquish any privilege or immunity and shall not be deemed to constitute a waiver of any applicable privilege or immunity.

2.     JPMC objects to the Interrogatories to the extent that they purport to impose discovery obligations beyond those set forth in the Federal Rules of Civil

Procedure, the Local Rules of the District of Delaware, and the Court's Scheduling Order (D.I. 24).

3.      JPMC objects to the Interrogatories to the extent that they are so vague, ambiguous, or confusing as not to be susceptible to a reasoned interpretation or response.

4.      JPMC objects to the Interrogatories to the extent that they call for information unknown to JPMC.

5.      JPMC objects to the Interrogatories to the extent that they seek information not relevant to the claims or defenses of either party nor reasonably calculated to lead to the discovery of evidence relevant to the subject matter involved in the above-captioned action.

6.      JPMC objects to the Interrogatories to the extent that they are duplicative, cumulative, or seek information that may be obtained from other sources or through other means of discovery that are more convenient, more efficient, more practical, less burdensome and/or less expensive.

7.      JPMC objects to the Interrogatories to the extent that they are overly broad, overly expansive, oppressive and/or unduly burdensome and would impose upon JPMC an unreasonable burden of inquiry.

8.      JPMC expressly reserves the right to object to further discovery into the subject matter of the Interrogatories.

9.      JPMC objects to the Interrogatories as unduly burdensome to the extent that information requested is already known to Pi-Net, can be determined by referring to documents within the possession, custody and control of Pi-Net, or is within

the public domain or otherwise more readily or equally available to Pi-Net and thus more conveniently obtained by Pi-Net.

10.     JPMC objects to the Interrogatories to the extent that they contain discrete subparts within the meaning of FED. R. CIV. P. 33.  Each interrogatory, and all parts and subparts, should count separately towards the total permissible number of interrogatories.

## SPECIFIC RESPONSES AND OBJECTIONS

Each of the foregoing General Responses and Objections are incorporated by reference into each and every specific response set forth below.  Notwithstanding the specific response to any Interrogatory, JPMC does not waive any of its General Responses or Objections.  Subject to the General Responses and Objections, and without waiver, modification or limitation thereof, JPMC's responses and objections to the Interrogatories are set forth below.

**INTERROGATORY NO. 1:**

For each Accused Instrumentality, describe in detail the process, including all intervening or intermediate processes, by which client or user request for any service (including any input by the client or user on a webpage of the Accused Instrumentality on the Bank Website) is communicated or sent to the ultimate receiving agent or application, including, without limitation on the foregoing, how Defendant's systems construct a SOAP request, processes any SOAP messages, and the process by which a response is created and delivered to the client or user; with each step or function referenced to a document production number sufficient to describe the step or function, and with each step or function referencing the architecture of both the hardware and software currently used to implement the Accused Instrumentality.

**RESPONSE TO INTERROGATORY NO. 1:**



**INTERROGATORY NO. 2:**

Explain fully and completely the basis for your contention that you have not infringed and are not infringing (either literally or under the doctrine of equivalents) each of the asserted claims of the Patents-in-Suit directly, contributorily, or by inducement, including an identification of each claim element that you allege is not fully met by each Accused Instrumentality; and for each claim for which Plaintiff had provided an infringement claim chart, identify each limitation of each asserted claim of the patents-in-suit that you contend is not literally contained in the Accused Instrumentality and explain the legal and factual basis for each such contention.

**RESPONSE TO INTERROGATORY NO. 2:**

JPMC objects to this interrogatory as unduly burdensome to the extent that the

information requested is already within the knowledge of Pi-Net.  JPMC additionally

objects to this interrogatory to the extent that it contains discrete subparts within the

meaning of FED. R. CIV. P. 33.  Each subpart should count separately towards the total

permissible number of interrogatories.  JPMC further objects to this interrogatory to the

extent that it calls for information subject to a claim of privilege or immunity, including

the attorney-client privilege, the attorney work-product doctrine, or any other applicable

evidentiary privilege or immunity from disclosure.

Subject to these objections and JPMC's General Objections, JPMC responds as

follows:  JPMC is incapable of responding to this interrogatory before the Court has

construed the claims at issue.  JPMC will supplement this response after the Court issues

its Markman order.

**INTERROGATORY NO. 3:**

Identify and describe in detail, including identifying all documents and the
persons most knowledgeable with respect to the subject of this request, when and how
you first gained knowledge of each of the Patents-in-Suit.

**RESPONSE TO INTERROGATORY NO. 3:**

Without waiving its right to object to this interrogatory, JPMC responds as

follows:  Having conducted a reasonably diligent investigation, JPMC learned of the

Patents-in-Suit upon receipt of the Complaint in this action (D.I. 1).

**INTERROGATORY NO. 4:**

To the extent not specifically identified in Defendant's initial disclosure of
invalidity contentions, state in detail and with particularity each and [sic] allegation that
any asserted claim of any patent-in-suit is invalid or unenforceable, or which you may
argue precludes any liability in this case (provided that any information specifically
provided in response to Interrogatory No. 2 need not be repeated).

**RESPONSE TO INTERROGATORY NO. 4:**

JPMC objects to this interrogatory as unduly burdensome to the extent that the

information requested is already within the knowledge of Pi-Net.  JPMC additionally

objects to this interrogatory to the extent that it contains discrete subparts within the

meaning of FED. R. CIV. P. 33.  Each subpart should count separately towards the total

permissible number of interrogatories.  JPMC further objects to this interrogatory to the

extent that it calls for information subject to a claim of privilege or immunity, including

the attorney-client privilege, the attorney work-product doctrine, or any other applicable

evidentiary privilege or immunity from disclosure.  JPMC further objects to this

Interrogatory to the extent it seeks expert testimony or evidence prior to the time for such

disclosure set forth in the Court's Scheduling Order.

Subject to these objections and JPMC's General Objections, JPMC responds as

follows: All such allegations that JPMC has formulated at this time are listed in

Defendants' Initial Invalidity Contentions and JPMC's Answer (D.I. 11).  However,

JPMC reserves the right to amend its response as it formulates additional allegations.

**INTERROGATORY NO. 5:**

To the extent that Defendant asserts that any software, program, hardware or other
aspect, including any part of the source code and any part of any module, of any Accused
Instrumentality is found in any prior art reflected in Defendant's initial disclosures of
invalidity contentions or any prior art which Defendant asserts or will assert in the future
("asserted prior art"), identify in detail and with particularity each and every aspect,
process, function, hardware and software implementation that is common to both an
Accused Instrumentality and to the asserted prior art, with each such identification
accompanied by reference to a document production number and the identity of the
person most knowledgeable thereof.

**RESPONSE TO INTERROGATORY NO. 5:**

JPMC objects to this interrogatory as unduly burdensome to the extent that the

information requested is within the knowledge of Pi-Net.  JPMC additionally objects to

this interrogatory to the extent that it contains discrete subparts within the meaning of

FED. R. CIV. P. 33.  Each subpart should count separately towards the total permissible

number of interrogatories.  JPMC further objects to this interrogatory to the extent that it

calls for information subject to a claim of privilege or immunity, including the attorney-

client privilege, the attorney work-product doctrine, or any other applicable evidentiary

privilege or immunity from disclosure.  JPMC further objects to this Interrogatory to the extent it seeks expert testimony or evidence prior to the time for such disclosure set forth in the Court's Scheduling Order.

Subject to these objections and JPMC's General Objections, JPMC responds as follows:  The technology embodied in the Accused Instrumentalities is present in all prior art the listed in Defendants' Initial Invalidity Contentions.  However, to the best of JPMC's present knowledge, the Accused Instrumentalities are not literally found in any prior art listed in Defendants' Initial Invalidity Contentions, nor in any prior art which JPMC presently intends to assert in the future.  However, the prior art and the Accused Instrumentalities may contain equivalent structures and/or perform equivalent functions. Moreover, JPMC's investigation of the prior art is ongoing, and JPMC reserves the right to amend or supplement this response in light of that investigation or in light of the Court's Markman decision.

*/s/ Robert S. Saunders*

Robert S. Saunders (ID No. 3027)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636
Tel:  (302) 651-3000
Fax:  (302) 651-3001
Rob.Saunders@skadden.com

*Of Counsel*
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
Daniel.Devito@skadden.com
Douglas.Nemec@skadden.com
Edward.Tulin@skadden.com
Andrew.Gish@skadden.com

*Attorneys  for Defendant JPMorgan
Chase & Co.*

DATED:  October 4, 2013

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **C.A. No. 12-282-RGA** |
| ) | |
| **JPMORGAN CHASE & CO.,** ) | |
| ) | |
| **Defendant.** ) | |

**SECOND DECLARATION OF GEORGE PAZUNIAK**

I, George Pazuniak, Esq. declare as follows:

1.      I am an attorney admitted to practice before the Supreme Court of the State of Delaware, and am counsel to Plaintiff Pi-Net International Inc. ("Plaintiff" or "Pi-Net").  I am over twenty-one years of age and am not under any legal disability.

2.      I make this declaration view of the answering brief filed by Defendant JPMorgan Chase & Co. ("JPMC"), which is titled <u>Defendant's Brief In Opposition To Plaintiff's Motion To Exclude The Expert Testimony Of Dawn Hall</u>, and is D.I. 128.

3.      Exhibit BJ is a true and correct copy of the <u>JPMorgan Chase & Co.'s Initial Disclosures</u> which were served in this case by Defendant JPMC.  To the best of my knowledge and recollection, Richard John Romanelli  was not disclosed in JPMC's Initial Disclosures or in any other document, until he was disclosed as a witness responsive to certain topics in Pi-Net's Notice of Deposition under Rule 30(b)(6).

1

4.      To the best of my knowledge and recollection, JPMC had never disclosed any alleged Chase CGI-specification online banking system, and had never disclosed or even mentioned non-infringing alternatives prior to the service of answering expert reports, , and had never produced any documents suggesting or mentioning any CGI use at Chase or Bank One.

5.      I have reviewed the available record of the *Daubert* motion addressed in *St. Clair Intellectual Prop. Consultants, Inc. v. Acer, Inc.*, 935 F. Supp. 2d 779, 781 (D. Del. 2013) ("*St. Clair v. Acer case*").

6.      Exhibit BK is a true and correct copy of <u>Plaintiff St. Clair Intellectual Property Consultants, Inc.'s Brief In Support Of Its Motion To Limit The Testimony Of John C. Jarosz Regarding The Hypothetical Negotiation, The Benefits That The Patents Provide To Users, Speculative Non-Infringing Alternatives, And Damage Caps Based On Dissimilar Transactions Or The Cost Of Non-Infringing Alternatives</u>, as downloaded from the PACER of the *St. Clair v. Acer* case.

7.      Exhibit BL is a true and correct copy of <u>Brief In Opposition To St. Clair's Motion To Limit The Testimony Of John C. Jarosz</u>, as downloaded from the PACER of the *St. Clair v. Acer* case.

8.      As reflected in Exhibit BK at 18 and Exhibit BL at 14-15, Defendant had served an expert report of Dr. Darrell Long that identified and evaluated the acceptability of a non-infringing alternative.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 26th day of February, 2014, in Wilmington, Delaware.

George Pazuniak

# EXHIBIT  BJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| PI-NET INTERNATIONAL, INC., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civil No. 1:12-cv-00282-RGA |
| | : | |
| JPMORGAN CHASE & CO., | : | |
| | : | JURY TRIAL REQUESTED |
| Defendant. | : | |
| | : | |

## JPMORGAN CHASE & CO.'S INITIAL DISCLOSURES

Defendant JPMorgan Chase & Co. ("JPMC") provides the following initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

## RESERVATION OF RIGHTS

In making these disclosures, JPMC does not waive its right to object, pursuant to applicable federal and local rules, to the deposition or trial testimony of any of the individuals listed below.  JPMC also reserves all of its rights to object to the admissibility, materiality, or relevance of the information disclosed herein.  JPMC's investigation concerning this case is continuing, and JPMC reserves the right to identify other individuals and documents, if necessary, as discovery and investigation continue in accordance with Federal Rule of Civil Procedure 26(e).

## DISCLOSURES

**A.**     **Individuals Likely To Have Discoverable Information.**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i), JPMC discloses the following individuals likely to have discoverable information that JPMC may use to support its claims or defenses.  In addition to the list below, individuals identified in the documents produced by

JPMC may have discoverable information.  JPMC reserves the right to supplement or amend this list in accordance with Federal Rule of Civil Procedure 26(e), including the identification of experts and their opinions.  As noted, JPMC's investigation concerning this case is continuing, and JPMC also reserves the right to supplement or amend these disclosures as discovery and investigation continue.

(1)  Cathy Marinelli.  Ms. Marinelli can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Ms. Marinelli is likely to have information about chase.com.

(2)  Michael O'Leary.  Mr. O'Leary can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. O'Leary is likely to have information about chase.com.

(3)  Scott Laforce.  Mr. Laforce can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Laforce is likely to have information about J.P. Morgan ACCESS.

(4)  David Markley.  Mr. Markley can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Markley is likely to have information about J.P. Morgan ACCESS.

(5)  Robert Matles.  Mr. Matles can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York

10036, telephone (212) 735-3000.  Mr. Matles is likely to have information about J.P. Morgan ACCESS.

(6)  Stewart Halliday.  Mr. Halliday can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Halliday is likely to have information about J.P. Morgan ACCESS.

(7)  Brad Fenn.  Mr. Fenn can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Fenn is likely to have information about J.P. Morgan ACCESS.

(8)  Jeremy Dobrick.  Mr. Dobrick can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Dobrick is likely to have information about J.P. Morgan ACCESS.

(9)  Adam Singer.  Mr. Singer can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Singer is likely to have information about jpmorgansecurities.com.

(10)  Maryann Sharkey.  Ms. Sharkey can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Ms. Sharkey is likely to have information about jpmorgan.com.

(11) Dr. Lakshmi Arunachalam. Upon information and belief, Dr. Arunachalam can be contacted through counsel for Plaintiff. Dr. Arunachalam is likely to have information about the prosecution of the patents-in-suit and related patents.

(12) James H. Salter. Upon information and belief, Mr. Salter can be contacted through the office of Schwegman, Lundberg & Woessner, 1600 TCF Tower, 121 South Eighth Street, Minneapolis, Minnesota 55402, telephone (612) 373-6900. Mr. Salter is likely to have information about the prosecution of the patents-in-suit and related patents.

(13) Dr. Clifford H. Kraft. Upon information and belief, Dr. Kraft can be contacted through the office of PATENTTHEORETICS, 320 Robin Hill Drive, Naperville, Illinois 60540, telephone (800) 230-4037. Dr. Kraft is likely to have information about the prosecution of the patents-in-suit.

(14) Tam Thanh Pham. Upon information and belief, Ms. Pham can be contacted through the office of Lewis and Roca LLP, 40 N. Central Avenue, Suite 1900, Phoenix, Arizona 85004, telephone (602) 262-5311. Ms. Pham is likely to have information about the prosecution of the patents-in-suit.

(15) Kenneth N. Nigon. Upon information and belief, Mr. Nigon can be contacted through the office of RatnerPrestia, Suite 301, 1235 Westlakes Drive, Berwyn, Pennsylvania 19312, telephone (610) 407-0700. Mr. Nigon is likely to have information about the prosecution of the patents-in-suit and related patents.

**B.      Documents.**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(ii), JPMC identifies the following categories of documents that may be used to support its claims or defenses. These documents, to the extent that they are in the possession, custody, or control of JPMC, are believed to be located at either JPMC's offices or the offices of its counsel of record, Skadden,

4

Arps, Slate, Meagher & Flom LLP, located at Four Times Square, New York, New York 10036. JPMC's investigation concerning this case is continuing, and JPMC reserves the right to identify, produce, and rely upon further documents and things in support of its positions as such further documents and things may be discovered.

| CATEGORY OF DOCUMENT | LOCATION |
|---|---|
| Documents related to JPMC's accused products. | JPMC's Facilities |
| Documents related to prior art. | JPMC's Facilities, Skadden |

**C.     Computation Of Damages.**

At this time, JPMC has not asserted a claim for damages.  JPMC reserves the right to supplement this section if necessary.

**D.     Insurance and Indemnity Agreements.**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iv), JPMC is unaware, at this time, of any indemnity or insuring obligations under which any person or entity carrying on an insurance business may be liable to satisfy part or all of a judgment entered in this action or to indemnify or reimburse for payments made to satisfy the judgment.

**E.     Expert Witnesses.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), JPMC has not designated expert witnesses at this time.

DATED:  August 14, 2012

Respectfully submitted,

*/s/ Robert S. Saunders*
Robert S. Saunders (ID No. 3027)
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636

Tel:  (302) 651-3000
Fax:  (302) 651-3001
Rob.Saunders@skadden.com

*Of Counsel*
Daniel A. DeVito
Douglas R. Nemec
Andrew D. Gish
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
Daniel.Devito@skadden.com
Douglas.Nemec@skadden.com
Andrew.Gish@skadden.com

*Attorneys  for Defendant JPMorgan Chase
& Co.*

6

# EXHIBIT  BJ

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PI-NET INTERNATIONAL, INC., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | : Civil No. 1:12-cv-00282-RGA |
| | : |
| JPMORGAN CHASE & CO., | : |
| | : JURY TRIAL REQUESTED |
| Defendant. | : |
| | : |

## JPMORGAN CHASE & CO.'S INITIAL DISCLOSURES

Defendant JPMorgan Chase & Co. ("JPMC") provides the following initial disclosures pursuant to Federal Rule of Civil Procedure 26(a)(1).

## RESERVATION OF RIGHTS

In making these disclosures, JPMC does not waive its right to object, pursuant to applicable federal and local rules, to the deposition or trial testimony of any of the individuals listed below.  JPMC also reserves all of its rights to object to the admissibility, materiality, or relevance of the information disclosed herein.  JPMC's investigation concerning this case is continuing, and JPMC reserves the right to identify other individuals and documents, if necessary, as discovery and investigation continue in accordance with Federal Rule of Civil Procedure 26(e).

## DISCLOSURES

**A.** **Individuals Likely To Have Discoverable Information.**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(i), JPMC discloses the following individuals likely to have discoverable information that JPMC may use to support its claims or defenses.  In addition to the list below, individuals identified in the documents produced by

JPMC may have discoverable information.  JPMC reserves the right to supplement or amend this list in accordance with Federal Rule of Civil Procedure 26(e), including the identification of experts and their opinions.  As noted, JPMC's investigation concerning this case is continuing, and JPMC also reserves the right to supplement or amend these disclosures as discovery and investigation continue.

(1)  Cathy Marinelli.  Ms. Marinelli can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Ms. Marinelli is likely to have information about chase.com.

(2)  Michael O'Leary.  Mr. O'Leary can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. O'Leary is likely to have information about chase.com.

(3)  Scott Laforce.  Mr. Laforce can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Laforce is likely to have information about J.P. Morgan ACCESS.

(4)  David Markley.  Mr. Markley can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Markley is likely to have information about J.P. Morgan ACCESS.

(5)  Robert Matles.  Mr. Matles can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York

10036, telephone (212) 735-3000.  Mr. Matles is likely to have information about J.P. Morgan ACCESS.

(6)  Stewart Halliday.  Mr. Halliday can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Halliday is likely to have information about J.P. Morgan ACCESS.

(7)  Brad Fenn.  Mr. Fenn can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Fenn is likely to have information about J.P. Morgan ACCESS.

(8)  Jeremy Dobrick.  Mr. Dobrick can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Dobrick is likely to have information about J.P. Morgan ACCESS.

(9)  Adam Singer.  Mr. Singer can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Mr. Singer is likely to have information about jpmorgansecurities.com.

(10)  Maryann Sharkey.  Ms. Sharkey can be contacted through the office of JPMC's attorneys at Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York 10036, telephone (212) 735-3000.  Ms. Sharkey is likely to have information about jpmorgan.com.

(11)  Dr. Lakshmi Arunachalam.  Upon information and belief, Dr. Arunachalam can be contacted through counsel for Plaintiff.  Dr. Arunachalam is likely to have information about the prosecution of the patents-in-suit and related patents.

(12)  James H. Salter.  Upon information and belief, Mr. Salter can be contacted through the office of Schwegman, Lundberg & Woessner, 1600 TCF Tower, 121 South Eighth Street, Minneapolis, Minnesota 55402, telephone (612) 373-6900.  Mr. Salter is likely to have information about the prosecution of the patents-in-suit and related patents.

(13)  Dr. Clifford H. Kraft.  Upon information and belief, Dr. Kraft can be contacted through the office of PATENTTHEORETICS, 320 Robin Hill Drive, Naperville, Illinois 60540, telephone (800) 230-4037.  Dr. Kraft is likely to have information about the prosecution of the patents-in-suit.

(14)  Tam Thanh Pham.  Upon information and belief, Ms. Pham can be contacted through the office of Lewis and Roca LLP, 40 N. Central Avenue, Suite 1900, Phoenix, Arizona 85004, telephone (602) 262-5311.  Ms. Pham is likely to have information about the prosecution of the patents-in-suit.

(15)  Kenneth N. Nigon.  Upon information and belief, Mr. Nigon can be contacted through the office of RatnerPrestia, Suite 301, 1235 Westlakes Drive, Berwyn, Pennsylvania 19312, telephone (610) 407-0700.  Mr. Nigon is likely to have information about the prosecution of the patents-in-suit and related patents.

**B.    Documents.**

Pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(ii), JPMC identifies the following categories of documents that may be used to support its claims or defenses.  These documents, to the extent that they are in the possession, custody, or control of JPMC, are believed to be located at either JPMC's offices or the offices of its counsel of record, Skadden,

Arps, Slate, Meagher & Flom LLP, located at Four Times Square, New York, New York 10036. JPMC's investigation concerning this case is continuing, and JPMC reserves the right to identify, produce, and rely upon further documents and things in support of its positions as such further documents and things may be discovered.

| CATEGORY OF DOCUMENT | LOCATION |
|---|---|
| Documents related to JPMC's accused products. | JPMC's Facilities |
| Documents related to prior art. | JPMC's Facilities, Skadden |

**C.    Computation Of Damages.**

At this time, JPMC has not asserted a claim for damages.  JPMC reserves the right to supplement this section if necessary.

**E.    Expert Witnesses.**

Pursuant to Federal Rule of Civil Procedure 26(a)(2)(A), JPMC has not designated expert witnesses at this time.

DATED:  August 14, 2012

Respectfully submitted,

/s/ Robert S. Saunders
Robert S. Saunders (ID No. 3027)
**SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP**
One Rodney Square
P.O. Box 636
Wilmington, Delaware  19899-0636

Tel:  (302) 651-3000
Fax:  (302) 651-3001
Rob.Saunders@skadden.com

*Of Counsel*
Daniel A. DeVito
Douglas R. Nemec
Andrew D. Gish
**SKADDEN, ARPS, SLATE,**
  **MEAGHER & FLOM LLP**
Four Times Square
New York, New York  10036
Tel:  (212) 735-3000
Fax:  (212) 735-2000
Daniel.Devito@skadden.com
Douglas.Nemec@skadden.com
Andrew.Gish@skadden.com

*Attorneys  for Defendant JPMorgan Chase & Co.*

# EXHIBIT  BK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.,** | Civil Action No. 09-354-LPS |
| *Plaintiff,* | Civil Action No. 09-704-LPS |
| v. | CONSOLIDATED CASES |
| **ACER, INC., et. al.,** | |
| *Defendants.* | |
| **MICROSOFT CORPORATION,** | |
| *Plaintiff,* | Civil Action No. 10-282-LPS |
| v. | |
| **ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.,** | REDACTED VERSION |
| *Defendant.* | |

**PLAINTIFF ST. CLAIR INTELLECTUAL PROPERTY CONSULTANTS, INC.'S
BRIEF IN SUPPORT OF ITS MOTION TO
LIMIT THE TESTIMONY OF JOHN C. JAROSZ
REGARDING THE HYPOTHETICAL NEGOTIATION, THE BENEFITS THAT THE
PATENTS PROVIDE TO USERS, SPECULATIVE NON-INFRINGING
ALTERNATIVES, AND DAMAGE CAPS BASED ON DISSIMILAR TRANSACTIONS
OR THE COST OF NON-INFRINGING ALTERNATIVES**

May 25, 2012
 Redacted Version Filed: June 7, 2012
OF COUNSEL:
R. Terrance Rader
Charles W. Bradley
Glenn E. Forbis
Rader, Fishman & Grauer PLLC
39533 Woodward Avenue
Bloomfield Hills, MI  48304
(248) 594-0600
rtr@raderfishman.com
cwb@raderfishman.com
gef@raderfishman.com

BAYARD, P.A.

Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, Suite 900
P.O. Box 2513 0
Wilmington, DE  19899-5130
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
*Attorneys for Plaintiff*
*St. Clair Intellectual Property Consultants, Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

NATURE AND STAGE OF PROCEEDINGS .......................................................................... 1

SUMMARY OF ARGUMENT ................................................................................................... 2

STATEMENT OF FACTS ........................................................................................................... 4

LEGAL STANDARD ................................................................................................................... 8

ARGUMENT ................................................................................................................................ 10

I.    The Omnibus Hypothetical Construct is Wrong as to the Timing
      and Participants ................................................................................................................ 10

      A.    Jarosz uses an Incorrect Hypothetical Negotiation Date ......................................... 10

      B.    Jarosz Improperly Opines to a Single Omnibus Hypothetical
            Negotiation for All Four Patented Technologies for All Six Defendants ............... 12

      C.    Jarosz Improperly Opines to an Omnibus Lump Sum Royalty
            Without An Evaluation of the Royalty Base for Each Defendant's Use of the
            Patents ..................................................................................................................... 13

II.   Jarosz Improperly Avoided Key *Georgia Pacific* Factors Related to
      the Benefits of the Patents, Implicitly Assuming Non-infringement
      and Invalidity ................................................................................................................. 15

III.  Jarosz Uses Speculative and Unsupported Non-Infringing Alternatives
      and a Conclusory and Incompetent "Opinion" of Acceptability ..................................... 16

IV.   Jarosz's Assertion of a Patent Portfolio Purchase Price as the "Most"
      Defendants should Pay for a Reasonable Royalty is Wrong ........................................... 19

CONCLUSION ............................................................................................................................ 20

St. Clair Intellectual Property Consultants, Inc. ("St. Clair") respectfully requests that this Court limit the testimony of Mr. John Jarosz. His proffered testimony concerning an omnibus lump sum reasonable royalty on an un-apportioned basis for the four different technologies and for the six Defendants is unreliable under *Daubert* and Fed. R. Civ. P. 702/703 and 402/403. Jarosz uses the wrong hypothetical negotiation date and construct, uses unsound methodology, advances opinions that are conclusory and contrary to Federal Circuit law, and fails to consider important evidence of the benefit of use of the patented technology.

## NATURE AND STAGE OF PROCEEDINGS

St. Clair filed a Complaint for patent infringement of seven patents on four technologies on May 15, 2009 against computer manufacturers Acer, Inc., Acer America Corp., Dell Inc., Gateway Companies, Inc., Gateway, Inc., and Lenovo (US) Inc. (D.I. 1; C.A. No. 09-0354.) St. Clair filed a second Complaint for patent infringement on September 18, 2009 against Apple Inc., Toshiba Corp., Toshiba America Information Systems, Inc., and Toshiba America Inc. (D.I. 1; C.A. No. 09-0704.) Microsoft Corp. filed for Declaratory Judgment on April 7, 2010 on four of the seven patents-in-suit. (D.I. 1; C.A. No. 10-0282.) Intel's intervention in the suit was granted on June 4, 2010 and St. Clair filed counterclaims on June 28, 2010 (D.I. 191; C.A. No. 09-0354). The suit against defendant Apple was transferred to a co-pending litigation against smartphone and tablet manufacturers on June 13, 2011. (D.I. 63; C.A. No. 09-0704.) Microsoft request for consolidation was granted on June 24, 2010 (D.I. 25) and C.A. Nos. 09-0354, 09-704, and 10-0282 were consolidated on June 13, 2011. The current defendants are Acer/Gateway, Toshiba, Dell, Lenovo, Intel and Microsoft.

Fact and expert discovery closed on December 16, 2011, and April 27, 2012, respectively. During the infringement contention process, St. Clair reduced the asserted claims to 25. During a telephonic hearing on November 12, 2010, Judge Stark ordered that within fifteen (15) days after the claim construction order, plaintiff was to reduce the claims to 15 and defendants were to identify representative products. The claim construction issues are currently pending. No date for trial has been set. Pursuant to the current Scheduling Order, motions for summary judgment and for *Daubert* rulings are due on May 25, 2012.

**SUMMARY OF ARGUMENT**

1.      Proffered testimony of Jarosz should be precluded under *Daubert* and Fed. R. Civ. P. 702/703 and 402/403.  First, Jarosz should not be permitted to use an incorrect hypothetical date and a single hypothetical negotiation for four different patented technologies and six defendants, resulting in an omnibus lump sum royalty payment for all patents in suit and all Defendants on an un-apportioned basis.  Jarosz should also not be allowed to opine on speculative non-infringing alternatives and conclusory assertions of acceptability for such alternatives – or to represent that the cost of such alternatives is the "most" that a defendant would pay for the hypothetical license. Finally, Jarosz should not be permitted to testify to market transactions without the requisite comparability analysis required under Federal Circuit law, nor can Jarosz assert that royalty to license the patented technology is limited by the cost of the patent portfolio to St. Clair and the negotiation of a sale to IV.

2.      Jarosz uses the <u>wrong hypothetical negotiation</u> date as a matter of law.  He, in fact, uses only one first infringement date rather than the four dates relevant to the four patented technologies at issue.  For the Fung PM Patents, the date of the hypothetical negotiation is, as a matter of law, triggered by the date of the introduction of the new product Windows XP Service Pack 2 (which indisputably added the intelppm.sys driver). See *Boston Scientific Corp. v. Cordis Corp.*, 777 F. Supp. 2d 783, 791-92 (D. Del. 2011) (concluding the date the hypothetical negotiation, under Federal Circuit law, was the market entry of a later product at issue even though an earlier product infringed the same patent for the same reasons).

3.      Jarosz opines on a <u>single omnibus lump sum royalty for the four different patented</u> <u>technologies and for all six different defendants on an un-apportioned basis</u>.  The hypothetical construct of a single negotiation concerning six different defendants and four different technologies is improper.  Using that construct, Mr. Jarosz incorrectly opines to a single un-apportioned lump sum royalty without a determination of the extent of use of the patented technologies by the Defendants.  The question of a reasonable royalty for each of the four patented technologies and the corresponding applicable royalty base for each of the six Defendants are facts

in dispute for the jury to decide, but Jarosz does not even provide the jury with information of a royalty rate or a royalty base for the six defendants, individually or collectively.

4.      Jarosz royalty analysis is also flawed.  Two of the most important pieces of evidence to determine a reasonable royalty are prior licenses to the patented technology and <u>the benefit achieved through the use of the patented technology by the infringing products</u>.  While the patents-in-suit have not been licensed, a mountain of qualitative and quantitative evidence from the Defendants and public sources establishes substantial benefits are achieved by power management as implemented by the Defendants.  Though such benefits are central to *Georgia Pacific* factors, Jarosz unjustifiably avoids the problematic evidence that contravenes his low-ball royalty opinion.

5.      The power management feature in the infringing computers <u>results in a substantial reduction in the level of energy used by computers</u>, leading to significant energy cost savings, thermal heat reduction, and fan noise reduction.  In notebook computers, the energy reduction further leads to extended battery life and/or maintaining acceptable battery life with the use of faster processors and/or smaller batteries to decrease the size and weight of the notebook.  These substantial benefits and the importance of these benefits to customers are well-documented ███████████████ ████████████████████████████████████ (*See, e.g.*, Ex. 1, Wagner Supp. Rep., ¶¶ 57-73, 98-99, 109-146; 217-219; 221; 224; 226-235; Ex. 2, Wagner Reply Rep., ¶¶ 5-19 (and evidence cited therein).)  Consistent with the Defendants' ████████████ the only regression analysis in this case confirmed that consumers value and pay for the benefit of additional battery life. (*See* Ex. 3, Knittel Rep., ¶¶ 1, 3, 34-40; Ex. 1, Wagner Supp. Rep., ¶¶ 6-7.)

6.      Though he did not dispute the significance of the benefit of power management, Jarosz avoided all of the substantial evidence of the benefits of the use of the accused power management feature of Defendants' products, even those measured and reported by ████████ Without any analysis and contrary to substantial evidence otherwise, Jarosz improperly speculates that neither Defendants nor consumers "benefited at all, or in any meaningful way, from the alleged use of the patented technology."  (Ex. 4, Jarosz Rep., at 146.)  His refusal to accept the necessary assumption that Defendants' use of power management infringed valid patents is contrary to the

methodology for the *Georgia Pacific* analysis.  See *Sri International Inc. v. Internet Security Systems, Inc.*, 2011 U.S. Dist. LEXIS 125550 (D. Del. October 31, 2011) (excluding expert testimony that patents had minor value and noting the impropriety of alleging invalidity in damages testimony).

7.      Similarly, Jarosz advances an unsupported and conclusory opinion about the acceptability and commercial viability of <u>speculative and unsupported non-infringing alternatives</u> and improperly opines – contrary to law – that the cost of the non-infringing alternative represents the "most" that Defendants would agree to pay in a hypothetical license.  Jarosz unduly relies on non-infringing alternatives that strips functionality from the accused power management feature. Jarosz asserts with no analysis or apparent support that the loss of the functionality would be acceptable – contrary to the documents showing the value of such power management features.

8.      The only relevant (albeit only marginally relevant) information on which Jarosz was willing to rely is relevant, at best, to the catch-all Georgia Pacific factor 15.  Even then, his analysis is woefully incorrect.  He relies heavily on the ███████████████████████ ████████████████████████████████████ but does so without i) the requisite comparability analysis between the ████████████ and the hypothetical negotiation and without ii) properly using ██████████████████████████████ adequate to compensate for the use of the patented technology.  He ignored documentation, testimony, and basic valuation principles showing that the cost to acquire a patent is not the "most" that a hypothetical royalty should be and, in fact, does not readily translate at all to the royalty for the license to use a patent.

## STATEMENT OF FACTS

1.      St. Clair has accused computer products of infringement of seven patents on four technologies. Four of the patents in suit involve system power management:  U.S. Patents 5,710,929; 6,079,025; 5,892,959; and 5,758,175 (collectively, the "Fung PM Patents"). [1]  U.S. Patent 5,961,617 (the "'617 Patent") relates to video frame buffer compression; U.S. Patent 5,630,163 (the "'163 Patent") relates to common bus technology; and U.S. Patent 5,613,130 (the

---

[1]  In order to streamline the issues, other than the hypothetical negotiation date and construct, the present motion focuses on the power management technology of the Fung PM Patents.

"'130 Patent") relates PCI ExpressCard technology. Four of the Defendants in this case are manufacturers of computer systems, i.e., Acer/Gateway, Lenovo, Dell, and Toshiba. The other two defendants, i.e., Microsoft and Intel, are suppliers to the computer manufacturers.

2.      The asserted claims of the Fung PM Patents all include the following features:

(i) monitoring activity of the computer system; and (ii) in response to detecting a certain level of inactivity, changing the power state of the computer system. The lower level power states are characterized by (a) de-coupling power from predefined groups of computer devices; (b) lowering the operating frequency of the CPU; (c) reducing the CPU frequency to zero; or (d) various combinations of (a), (b) and (c).  (Ex. 5, Mangione-Smith Rep., p. 12.)

3.      When determining damages, the jury will have determined the Defendants to have infringed the Fung PM Patents and will have agreed with the technical experts of St. Clair that "the asserted claims are directly infringed by the Computer Defendants' computer systems that include one of the Intel CPUs having Enhanced Intel SpeedStep Technology (EIST) or the AMD CPUs having PowerNow! or Cool'n'Quiet technology, and also having pre-installed Windows XP with Service Pack 2, or later, Windows Vista, or Windows 7."  (Ex. 5, Mangione-Smith Rep., at 29.) "Microsoft's Windows operating systems monitor the system activity level, and, in response to detecting various levels of inactivity, Windows sends instructions to the computer system's CPU to change the power state of the computer."  (*Id.*)

4.      A wealth of information exists as to the value of the accused power management of Defendants products.  For example, substantial evidence is available that power management is crucial to computers that have high performance, power-hungry CPUs.  Intel notes that mobile users █████████████████████████████████████████████████████████

███████  (Ex. 6, The Battery Challenge.)  For example, Microsoft notes that ███████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████ ” (Ex.
5, Mangione-Smith Rep., at 8; Ex. 8, Drake Rep., at 48-50; Ex. 9, Power Management.)

5.      The benefit of power management is manifested in the reduction of energy usage of the
computer in both desktops and laptops.  In addition to the reduction of energy usage and
significant energy cost savings, power management provides additional benefits such as thermal
heat reduction, and fan noise reduction.  (*See, e.g.*, Ex. 10, Power Efficiency and Management; Ex.
11, Introduction and Intel Developer Forum Opening Keynote 8/23/05, at 15.)  According to
Microsoft, power management benefits ████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████ Energy savings depend on the computer configuration and the
consumers' particular usage of a computer but have consistently been calculate to be in the range
of ████████ with calculations vetted by Microsoft employees of about ████████ ████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ (*See* Ex.
5, Mangione-Smith Rep., pp. 16-23; Ex. 2, Wagner Reply Rep., ¶¶ 8-11; Ex. 8, Drake Rep., pp. 27-
28, 69-76; Ex. 13, Microsoft Stipulation, ¶ 5 and Exhibit E thereto, including MSSC 07013960-97,
MSSC_0701409-10, and MSSC_0697580-81.)

6.      For notebook computers – in addition to the energy savings achieved when the laptop is
plugged into the wall – energy reduction, in turn, leads to additional benefits.  (*See, e.g.*, Ex. 10,
Power Efficiency and Management.)  A reduction in energy usage translates to increased battery
life and/or maintaining acceptable battery life with the use of faster processors and/or smaller
batteries to decrease the size and weight of the notebook.  (Ex.14, Mobile Battery Solutions Guide
for Windows Vista, at 6; Ex. 15, Napa Platform Selling Guide, at 171; Ex. 16, Bass Dep., 72:24-
76:6; Ex. 17, Wagner Dep., 500:7-501:6.)

7.      These substantial benefits and the importance of these benefits to customers are well-
documented in ████████████████████████████████████████████████████

█████ (*See, e.g.*, Ex. 1, Wagner Supp. Rep., ¶¶ 57-73, 98-99, 109-146; 217-219; 221; 224; 226-
235; Ex. 2, Wagner Reply Rep., ¶¶ 5-19; Ex. 18, Benefits of Power Management Documents.)  In
addition, the only regression analysis in this case confirmed that consumers do pay for the benefit of
additional battery life.  (*See* Ex. 3, Knittel Rep., ¶¶ 1, 3, 34-40; Ex. 2, Wagner Reply Rep., ¶¶ 6-7.)  To
█████████████████████████████████" was the most desired consumer laptop configuration
improvement █████████████████████████████████.  (Ex. 19, Impact of "Idle"
Software on Battery Live, at 4.)  ████████████████████████
████████████████████████████ (Ex. 15, Napa Platform
Selling Guide, at 171.)

8.    The reduction in energy use manifests itself in other important benefits such as reducing heat
generated by the computer, reducing the energy and noise of a fan to ameliorate heat, and meeting
energy efficiency regulatory programs implemented by the U.S. EPA in its Energy Star program.
(*See* Ex. 20, Energy Star Program Requirements for Computers.)  The impact on the environment
of reducing energy usage is an increasingly important benefit.  According to the Energy Star
program,  "[i]f all computers sold in the U.S. met ENERGY STAR requirements, the savings in
energy cost would grow to $1.8 billion each year, reducing greenhouse gas emissions equivalent to
those from more than 2 million vehicles."  (Ex. 21, Computers:  ENERGY STAR, at 1.)

9.    The ACPI ("Advanced Configuration and Power Interface Specification") has become the
central scheme for managing power in PC computers. ACPI-based power management is an
operating system directed to provide a more robust and reliable experience than prior power
management systems.  The ACPI "intended to enable and promote Operating System (e.g.
Microsoft Windows) management of system and device power consumption."  (Ex. 8, Drake Rep.,
at 7-8.)  The ACPI specification itself details the problems associated with the earlier attempts at
power management, which did not include an Operating System activity monitor.  Id., pp. 8-9

10.    An early attempt to address issues with power management was the Advanced Power
Management (APM) specification. There were numerous problems with APM, which made it
unreliable. (Ex. 22, Building the Power-Efficient PC, at 15; Ex. 1, Wagner Supp. Rep., Section

V.A.1.a.)  According to Intel, APM power management savings came "at the expense of system stability, connectivity, and/or performance," which "led most users to disable APM functions." (Ex. 1, Wagner Supp. Rep.,  at 1, 13; Ex. 23, A Brief Tutorial on Power Management in Computer System, at 8.)  The ACPI addressed several of the fundamental problems of APM by providing for the transfer of control of power management from the BIOS to the operating system defined multiple power and performance states for the system, processor and devices.  (Ex. 22, at 2-3, 25.) Intel describes ACPI as "enabling robust power management."  (*Id.*, at 15.)

11.    On behalf of St. Clair, Michael Wagner determined that the per-unit reasonable royalty was ▮▮▮ per infringing unit for the Fung PM Patents, ▮▮▮ per unit for infringement of the '163 Patent, ▮▮▮ per unit for the '617 Patent, and ▮▮▮ per unit for the '130 Patent. ( Ex. 1, Wagner Supp. Rep., at 2.)  The royalty base is different for each patented technology and for each Defendant.  Among other things, Wagner evaluated 1) substantial internal documentation of the benefits determined by the Defendants attributed to the accused power management feature in their products, 2) testing conducted to quantify a portion of the benefit of the use of the Fung PM Patents, and 3) Dr. Christopher Knittel's hedonic regression analysis of the value of additional battery life.

12.    On behalf of Defendants, Jarosz opined that an omnibus lump sum royalty to all Defendants for all four technologies would be no more than ▮▮▮, based on an alleged range of ▮▮▮ (representing the alleged cost of the allegedly acceptable, non-infringing alternative) to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ The key inputs into the alleged omnibus royalty opinion is 1) the alleged cost of the allegedly acceptable, non-infringing alternative; 2) the alleged imputed value of the patents in suit based on St. Clair's cost to purchase the patent portfolio; and 3) ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ (Ex. 4, Jarosz Rep., at 6, 143-151.)

## LEGAL STANDARD

The Court is obligated to serve as gatekeeper where expert opinion evidence is offered to determine whether an expert opinion is grounded in objective underlying scientific methodology, as opposed to mere speculation or conjecture.  *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579

Jarosz cannot ignore substantial evidence of benefit in the accused products by inappropriately presuming a lack of infringement and invalidity.

For damages testimony, the experts "must acknowledge the patents' validity." Testimony that "the inventions at bar offered only a minor incremental improvement over what was known in the art" and thus are of negligible value is "dangerously close to an obviousness opinion." *SRI*, 2011 U.S. Dist. LEXIS 125550, at *11-13. The excluded opinions in *SRI* describing the patented improvement as "minor" and "negligible" are the same as Jarosz makes in this case; Jarosz similarly alleges in a "conclusory" manner that is "not based on the use of the patented technology (as a combination of elements) in the accused products."[5] See *Id.* at *12. Here, like the excluded *SRI* expert, Jarosz alleges that "there is little evidence that the defendants actually benefitted from use of the patents-in-suit," (Ex. 4, Jarosz Rep., at 155-156) and:

> it is not clear that the Accused Computer Manufacturers benefited at all, or in any meaningful way, from the alleged use of the patented technology. It also is not clear that consumers that purchased the accused products benefited from the alleged use of the patented technology. (Ex. 4, Jarosz Rep., at 146; see also Ex. 32, Jarosz Dep., 65:2-65:6, 69:16-19.)

Such statements by Jarosz should be excluded as conclusory, contrary to the evidence and contrary to the requirement to assume infringement and validity in the calculation of damages. Further, without a determination of the benefits achieved by the infringer – which is relevant to Georgia Pacific factors 8, 9, 10, and 11 – Jarosz royalty opinion is fundamentally incomplete.

### III. Jarosz Uses Speculative and Unsupported Non-Infringing Alternatives and a Conclusory and Incompetent "Opinion" of Acceptability

First, Jarosz is wrong – as a matter of law – that a non-infringing alternative is the "most" that a defendant would pay in a hypothetical negotiation. While his ultimate opinion is higher than the alleged cost of the alleged acceptable, non-infringing alternative, he states that the "most" that "the Accused Computer Manufacturers should have paid for access to all of the patents-in-suit" would have been the cost of the non-infringing alternatives calculated to be ██████████

---

[5] As described further in the concurrent *Daubert* Motion, Dr. Bass should be excluded for several reasons, including a direct reliance on the obviousness discussion of the Defendants' technical experts to opine that the Fung PM Patents contributed little, if any, to power management.

██████████████████ (Ex. 4, Jarosz Rep., at 159.) Testimony even alluding to non-infringing alternatives as the "most" or maximum reasonable royalty should be precluded as contrary to clear Federal Circuit law. In *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008), the Federal Circuit stated that defendant "is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, non-infringing alternative. We have previously considered and rejected such an argument." Jarosz should be precluded from testifying that "a user of certain patented technology would pay no more for access to that technology than its avoided costs" of a design-around. (Ex. 4, Jarosz Rep., at 147.)

Second, and even worse, the proffered testimony of the alleged acceptable non-infringing alternatives should be excluded because the alternatives are speculative and the assertion of acceptability is conclusory and contrary to the evidence. As acknowledged by Jarosz: "To be relevant, the Cost Approach requires the alternative technology to be acceptable technically, commercially and financially." (*Id.*) However, all of the proposed non-infringing alternatives strip functionality from the infringing power management feature. Yet, Jarosz asserts in a conclusory fashion that "several non-infringing alternates" were available and "would have been acceptable in the marketplace." (*Id.*, at 156.) Some are plainly inadequate such as the APM, which was widely recognized as a failure that lead consumers to disable power management and was the reason for the promulgation of ACPI.[6] Jarosz is also inconsistent: he stated that Windows XP was infringing to support the 2001 hypothetical date but then uses Windows XP as a non-infringing alternative.[7] He cannot have it both ways in the same hypothetical negotiation analysis.

Jarosz also relied upon an alleged alternative for all of the claims, namely, a "computer system configured to have two modes, specifically: 1) S0 with operating power remaining coupled to all devices and 2) S4 in which a user-initiated action or scenario based power management

---

[6] (*See* Statement of Facts, ¶¶ 9-10.) Jarosz also admitted that he did not evaluate whether ACPI enabled wider adoption of power management. (Ex. 32, Jarosz Dep., 80:2-4.)

[7] Also, as described above, Windows XP is alleged to have had the capability of infringing if the computer manufacturer took certain action (and if it functioned properly which is questionable given the need for the "hot fix" driver). If the computer manufacturers took the necessary action (and Intel and Microsoft witnesses could not identify any that did), then the computer system was infringing; if they did not, important processor control functionality would be lacking.

caused the transition from S0 to S4." (*Id.*, at 148.) Jarosz' assertion of commercial "acceptability" is conclusory: he provides no support and even admitted in deposition that he does not have a technical understanding of ACPI states. (Ex. 32, Jarosz Dep., 76:10-14, 77:19-20, 78:25-79:22.)

Nor did or could the technical expert Darrell Long evaluate the acceptability of the stripped-down power management alternative. Dr. Long merely alleged that he believed the loss of the S3 state and the loss of an automatic S4 state would be acceptable to him but admitted to having no particular expertise to judge the commercial acceptability, other than his professed ability "at picking things that people like" given his good "stock portfolio."[8] (Ex. 33, Long Dep., 184: 17-24, 185:16-186:23, 187:12-189:4.)

Further, Long asserts that acceptability for the S4 state would have been achievable because he speculated that the engineers "could make S4 nearly as fast [to resume] as S3 and save more power." (*Id.*, 188:19-189:15, 192:18-23.) Such speculation should be excluded. Microsoft documents show ████████████████████████████████████████████ ████████████████████████ (Ex. 34, Windows "Longhorn" Power Management, at 3.) This court recently excluded proffered testimony regarding possible "design arounds" to the patented technology as wholly speculative and, consequently, not helpful to the trier of fact. *SRI Int'l Inc. v. Internet Sec. Sys.*, 2011 U.S. Dist. LEXIS 125550, at *7 (D. Del. Oct. 31, 2011).

Even were it not speculative, no evaluation was made of the acceptability of the lost functionality of the ACPI S3 sleep state and automatic transitions for the ACPI S4 hibernation state. To the contrary, as stated by Microsoft:

> The most effective method to reduce power consumption when the system is not in use is to put the system in a low-power Sleep state. The use of Sleep as a low power mode is preferred over Hibernate and shutdown from the user experience viewpoint

---

[8] The ACPI S3 sleep state "corresponds to the processor being put to sleep while memory contents are maintained in order to provide for relatively quick recovery to the active state." (Ex. 5, Mangione-Smith Rep., at 28.) ACPI S3 state, sometimes called "suspend to RAM," is a deep power-savings mode that shuts down almost everything except for the barest trickle of power needed to keep the contents of RAM and to monitor for a wake-up action such as a mouse movement or a tapping a key. ACPI S4 state is the hibernation state where the computer context is written to the hard drive and all activity is stopped. A key press or mouse movement does not wake up the computer and the resume period is longer than waking from the S3 state, but the contents of the hibernation file enables the system to be restored to the same condition prior to hibernation.

because the suspend and resume latencies for Sleep are much shorter. Additionally, desktop and mobile PCs consume very little power when in a low power Sleep state. Desktop PCs typically consume less than 5 watts and mobile PCs less than 1 watt. (Ex. 35, Optimizing Windows Vista Platforms for Energy Efficiency, at MSSC_0289792.)

The additional S3 state has near-off power levels with a fast resume time – and the importance of

S3 and its fast transitions into and out of sleep ████████████████████████████████████

(*See, e.g.*, Ex. 22, A Brief Tutorial on Power Management in Computer Systems, at 3, 17; Ex. 36,

Views on PC Mobility at MSSC_0570247 ████████████████████████████████ Ex.

37, Power Management Forum, MSSC_0000169-175) █████████████████████████

████████████████████████ Jarosz's conclusory opinion on the non-infringing alternatives

should be excluded as being conclusory and contrary to the evidence.

## IV.  Jarosz's Assertion of a Patent Portfolio Purchase Price as the "Most" Defendants should Pay for a Reasonable Royalty is Wrong

Jarosz's reliance on ██████████████████████████████████████████████

████████████████████████████ is legally, economically and factually incorrect. Jarosz

alleges that the "total reasonable royalties in this case are, at most, between ███████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ (Ex. 4, Jarosz Rep., at

69.)  Jarosz also alleges that a patent Sale is "more valuable than fewer rights" and overstates the

reasonable royalty because, "all other things being equal, the defendants would not pay as much

for a non-exclusive license to manufacture and sell the accused products that what was paid, or

was asked or bid, for exclusive worldwide rights for computers and other applications."  (Ex. 4,

Jarosz Rep., at 143.)  A price to purchase of patents, however, is <u>not</u> a maximum value of a license

and inconsistent with the structure of the agreement where the intent was to monetize the patents

for a return on investment, as well as share proceeds with the inventors.

Jarosz does not conduct the requisite comparability analysis: reliance on the patent

transaction requires an analysis of the technical and economic comparability to the hypothetical

negotiation.  See *Wordtech Sys. v. Integrated Network Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed.

Cir. 2010).  This is particularly true where Defendants are relying upon a patent portfolio purchase

which is fundamentally different than a license.  A comparability analysis must account for the

May 25, 2012
Redacted Version Filed: June 7, 2012

OF COUNSEL:
R. Terrance Rader
Charles W. Bradley
Glenn E. Forbis
Rader, Fishman & Grauer PLLC
39533 Woodward Avenue
Bloomfield Hills, MI  48304
(248) 594-0600
rtr@raderfishman.com
cwb@raderfishman.com
gef@raderfishman.com

BAYARD, P.A.

/s/ Stephen B. Brauerman
Richard D. Kirk (rk0922)
Stephen B. Brauerman (sb4952)
222 Delaware Avenue, Suite 900
P.O. Box 2513 0
Wilmington, DE  19899-5130
(302) 655-5000
rkirk@bayardlaw.com
sbrauerman@bayardlaw.com
*Attorneys for Plaintiff*
*St. Clair Intellectual Property Consultants, Inc.*

# EXHIBIT  BL

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ST. CLAIR INTELLECTUAL PROPERTY    )
CONSULTANTS, INC.,                 )
                                   )    C.A. No. 09-354-LPS
                Plaintiff,         )    (Consolidated)
                                   )
        v.                         )    **JURY TRIAL DEMANDED**
                                   )
ACER, INC., *et al.*,              )    **PUBLIC VERSION**
                                   )
                Defendants.        )

## BRIEF IN OPPOSITION TO ST. CLAIR'S
## MOTION TO LIMIT THE TESTIMONY OF JOHN C. JAROSZ

Richard L. Horwitz (#2246)
David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19899
Tel: (302) 984-6000
rhorwitz@potteranderson.com
dmoore@potteranderson.com
bpalapura@potteranderson.com
*Attorneys for Defendants Acer Inc.,*
*Acer America Corporation, Gateway, Inc.,*
*Dell, Inc., Lenovo (United States), Inc.,*
*Toshiba Corporation, Toshiba America*
*Information Systems, Inc., and Toshiba*
*America, Inc.*

Dated: August 31, 2012
Public Version Dated: September 7, 2012
1073276 / 34449

# TABLE OF CONTENTS

I.     Nature and Stage of Proceedings ...................................................................1

II.    Summary of the Argument..........................................................................2

III.   Statement of Facts ....................................................................................4

IV.   Applicable Law .........................................................................................5

V.     Argument ...................................................................................................6

      A.      The Timing and Participants in Mr. Jarosz's Hypothetical Negotiation are Proper ......................................................................6

           1.      The Date Of First Infringement Was At Least As Early As 2001 .........................................................................................6

           2.      The Parties Would Have Had One, Not Four, Hypothetical Negotiations ........................................................9

           3.      All Of The Parties Would Have Been Present At The Negotiation.....................................................................10

      B.      Mr. Jarosz Did Not Need To Identify A Royalty Base .........................11

      C.      Jarosz Fully Considered Georgia Pacific Factors 8 Through 11 ...........12

      D.      The Non-Infringing Alternatives Considered By Jarosz Are Not "Speculative" or "Unsupported".............................................................14

      E.      Jarosz's Consideration of Other Offers For Sale is Proper....................18

VI.   Conclusion ...............................................................................................20

St. Clair cannot even identify with any consistency what "benefits" of the Fung patents Mr. Jarosz supposedly ignored. In fact, St. Clair criticizes Mr. Jarosz for not considering supposed "benefits" that have nothing to do with its damages theory. St. Clair first argues that Mr. Jarosz "turned a blind eye to crucial information *about the benefits of power management*," but does not identify *what* information was supposedly ignored, or whether it is directed to "power management" in general or specifically to the accused technology ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮ [D.I. 680 at 15 (emphasis added)]. In the next paragraph, St. Clair states that the Fung patents "provide foundational power management technology *that aligns with the ACPI specification* that was adopted industry wide," and also that the Fung patents provided the first operating-system based power management "with sleep and clock speed reduction features *that was reliable and robust*." *Id.* (emphasis added). Mr. Fung did not invent "power management" or the ACPI specification, and (until now) has not argued that P-state transitions resulted in increased reliability and robustness.

In sum, St. Clair's characterization of Mr. Jarosz's testimony as "inappropriately presuming a lack of infringement and invalidity" and "avoiding" *Georgia Pacific* Factors 8-11 is flatly contradicted by the record. [D.I. 680 at 16]. Accordingly, St. Clair's request to exclude "such statements" should be denied.

### D. The Non-Infringing Alternatives Considered By Jarosz Are Not "Speculative" or "Unsupported"

St. Clair also seeks to exclude wholesale a set of non-infringing alternatives, which are identified in the expert report of Dr. Long [Ex. G, Long Rep. at pp. 107-123] and incorporated into Mr. Jarosz's report as part of his analysis, claiming that they are "speculative" and "unsupported." [D.I. 680 at 16-19]. St. Clair's attack is again misguided.

14

First, St. Clair boldly states that "Mr. Jarosz is wrong – as a matter of law – that a non-infringing alternative is the 'most' that a defendant would pay in a hypothetical negotiation," citing *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359 (Fed. Cir. 2008), *mandate recalled and partially amended*, 557 F.3d 1377 (Fed. Cir. 2009). Mr. Jarosz does not suggest that reasonable royalty damages must be "capped" at the cost of available non-infringing alternatives, as St. Clair contends. St. Clair's attempt to set up a straw man, using an out of context quotation of one sentence from Mr. Jarosz's report, is belied by Mr. Jarosz's identification a royalty payment that is **greater than** the cost of the cheapest available non-infringing alternatives discussed in his report. The relevant portion of Mr. Jarosz's report states:

> The Market Approach suggests that total reasonable royalties in this case are, at most, between ▮▮▮▮▮▮▮▮ for the defendants. I was not able to quantify the Income Approach in this case. The qualitative evidence, however, suggests that the portion of the profits of the accused products attributable to the patented technology is ▮▮▮▮▮▮▮▮ The Cost Approach suggests that the most that the Accused Computer Manufacturers should have paid for access to all of the patents-in-suit would have been between ▮▮▮▮▮▮▮▮

[Pl. Br., Ex. 4, Jarosz Rep. at 159]. Mr. Jarosz then concludes that he has "chosen a royalty payment of ▮▮▮▮▮ for the defendants." [*Id.*]

St. Clair claims that *Mars* supports the exclusion of "[t]estimony even alluding to non-infringing alternatives as the 'most' or maximum reasonable royalty." [D.I. 680 at 16-17]. But St. Clair misrepresents the holding in *Mars*, where the Federal Circuit held that (a) the district court determined there were no available and acceptable non-infringing alternatives, and (b) even if the district had found available and acceptable non-infringing alternatives, an accused infringer "***may*** be liable for damages, including reasonable royalty damages, that exceed the amount that the infringer could have paid to avoid alternatives." *Mars, Inc.*, 527 F.3d at 1372-73 (emphasis added). This holding, that reasonable royalty damages are *not necessarily* "capped" at the cost

15

of implementing the cheapest available and acceptable non-infringing alternative, is not tantamount to a proscription against expert testimony that the cost of implementing non-infringing alternatives may be considered as part of the reasonable royalty analysis.

St. Clair's second argument is that Mr. Jarosz's "assertion of acceptability" for certain non-infringing alternatives "is conclusory and contrary to the evidence." [D.I. 680 at 17]. This argument also misses the mark. Most importantly, St. Clair *ignores* Mr. Jarosz repeated references to the underlying factual support found in the report of Dr. Darrell Long.

For example, Mr. Jarosz states that "Dr. Long has identified a number of acceptable, non-infringing alternatives that were available at the time of the hypothetical negotiation." [Pl. Br., at Ex. 4, Jarosz Rep. at 147]. Mr. Jarosz considers six of these non-infringing alternatives as part of his examination "of the costs to construct or purchase an alternative technology that performs the same function as the patented technology, but which does not infringe the patent or patents-in-suit." [*Id.*] Each non-infringing alternative considered by Mr. Jarosz finds support in Dr. Long's technical analysis, which St. Clair has not sought to strike or exclude. Dr. Long's technical analysis on these non-infringing alternatives is supported by a host of documents, testimony from industry experts, and Dr. Long's own extensive experience. [Ex. G, Long Rep. at 107-123]. St. Clair's objection does not establish the alternatives would not be commercially acceptable, an issue that is typically left for the jury to determine. *Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.*, No. 03-1431, 2006 WL 1390416, at *7 (N.D. Cal. May 18, 2006) ("While [Plaintiff] hotly debates whether the 2008H model is, in fact, a viable alternative to the 2008K, this is not an issue for the Court to determine under a Daubert review. Whether there is a noninfringing substitute is a question of fact.").

Instead of raising a Daubert issue with regard to Mr. Jarosz's testimony, St. Clair's objection is a collateral attack on three of the six non-infringing alternatives identified by Dr. Long.[7] Rather than directly challenging Dr. Long's detailed report and testimony regarding the technical issues related to these three non-infringing alternatives, St. Clair asserts that *Mr. Jarosz's* analysis of the commercial acceptability of these non-infringing alternatives is "conclusory and contrary to the evidence." [D.I. 680 at 17]. St. Clair's arguments ignore Dr. Long's report, and only discuss Dr. Long's deposition testimony regarding one of the six non-infringing alternatives. [D.I. 680 at 18-19]. St. Clair's criticisms of particular non-infringing alternatives also ring hollow. Despite repeatedly characterizing the non-infringing alternatives considered in Mr. Jarosz's report as "speculative," at no point does St. Clair suggest that alternatives such as implementing ███████████████████████████ or ██████████████████ █████████████████ Instead, St. Clair argues that "Jarosz unduly relies on non-infringing alternatives that strips [sic] functionality from the accused *power management feature*," without identifying the particular "power management feature" that is supposedly omitted. [D.I. 680 at 4 (emphasis added)].

St. Clair's position appears to be that no power management technology other than that which the Fung patents are asserted to cover would be acceptable, because any such alternative would not include all of the functionality of the Fung patents' "power management feature." But

---

[7] St. Clair's brief does not voice any argument regarding three other non-infringing alternatives identified by Dr. Long and considered by Mr. Jarosz: ████████████ ████████████████████████████████████████████ ████████████████████████████████████ [Pl. Br. at Ex. 4, Jarosz Rep. at 147-48; *see also* Ex. G, Long Report at 110-112, 117-123]. St. Clair also does not make any argument against the non-infringing alternatives considered in Mr. Jarosz's report for the other patents-in-suit.

this position is contrary to law. "It is, of course, unnecessary that an acceptable non-infringing alternative possess every feature of the patented product, for, 'by definition, non-infringing products do not represent an embodiment of the invention.'" *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 658 F. Supp. 2d 630, 641 (M.D. Pa. 2009) (*quoting SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991)).

### E. Jarosz's Consideration of Other Offers For Sale is Proper

Finally, St. Clair seeks to exclude Mr. Jarosz from testifying about the cost of the patent acquisition by St. Clair, as well as the bid and ask prices from the ▓▓▓▓▓▓▓▓▓▓▓▓▓ negotiations, as data points informing his conclusion about a reasonable royalty. [D.I. 680 at 19-20]. St. Clair argues that Mr. Jarosz's consideration of these data points as part of his analysis is "legally, economically and factually incorrect." Yet St. Clair cites no law, facts or economics in support of either this conclusory statement or its arguments that Mr. Jarosz's testimony about prior offers for sale should be excluded.

Contrary to St. Clair's arguments that Mr. Jarosz's reliance on the purchase price of the patents in suit should be excluded [D.I. 680 at 19-20], the Federal Circuit has given the fact finder discretion to consider facts related to the acquisition of the patents-in-suit as part of a damages case, and to accept or reject those facts. *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1347 (Fed. Cir. 2011) ("[T]he weight to be given to [facts surrounding the sale of the patent] 'was a task for the jury, and a reasonable jury could have chosen to give little weight to this evidence.'"). The Federal Circuit has also suggested the use of the sale price of a company's assets – including the patents at issue – provides a useful check on the reasonably royalty rate. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 871 (Fed. Cir. 2001) reversed on other grounds, 545 U.S. 193 (2005). In *Integra*, the Court observed that a $15 million damages award

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:
Kai Tseng
Craig R. Kaufman
Michael C. Ting
FREITAS, TSENG & KAUFMAN LLP
100 Marine Parkway, Suite 200
Redwood City, CA 94065
Tel: (650) 593-63000
*Attorneys for Defendants Acer Inc.,*
*Acer America Corporation, and*
*Gateway, Inc.*

Constance S. Huttner
VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103
Tel: (212) 234-0040

Christopher V. Ryan
VINSON & ELKINS LLP
2801 Via Fortuna, Suite 100
Austin, TX 78746
Tel: (512) 542-8400
*Attorneys for Defendant Dell, Inc. and*
*Lenovo (United States), Inc.*

Jeffrey K. Sherwood
Leslie Jacobs
Cameron W. Westin
DICKSTEIN SHAPIRO LLP
1825 Eye Street NW
Washington, DC 20006-5403
Tel: (202) 420-3602
*Attorneys for Defendants Toshiba*
*Corporation, Toshiba America Information*
*Systems, Inc., and Toshiba America, Inc.*

By: /s/ David E. Moore
    Richard L. Horwitz (#2246)
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19899
    Tel: (302) 984-6000
    rhorwitz@potteranderson.com
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
*Attorneys for Defendants Acer Inc.,*
*Acer America Corporation, Gateway, Inc., Dell,*
*Inc., Lenovo (United States), Inc., Toshiba*
*Corporation, Toshiba America Information*
*Systems, Inc., and Toshiba America, Inc.*

Dated: August 31, 2012

Public Version Dated: September 7, 2012

1073276/34449