# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **PI-NET INTERNATIONAL, INC.,** )<br><br>)<br>**Plaintiff,** )<br><br>)<br>v. )<br><br>)<br>**JPMORGAN CHASE & CO.,** )<br><br>)<br>**Defendant.** )<br><br>) | **C.A. No. 1:12-cv-00282-SLR** |

## LODGING OF PRESENTATIONS AT HEARING

Plaintiff Pi-Net International, Inc. hereby files a copy of the presentation which was handed to the Court and used during the Markman and Dispositive Motions hearing held on April 15, 2014.

Respectfully Submitted,

*/s/ George Pazuniak*
George Pazuniak (DE Bar No. 478)
O'KELLY ERNST & BIELLI, LLC
901 North Market Street, Suite 1000
Wilmington, DE 19801
Tel: 302-478-4230
GP@del-iplaw.com

*Attorneys for Plaintiff Pi-Net Int'l, Inc.*

# Pi-Net Int'l v. JPMorgan Chase
## C.A. No. 12-282-RGA

Claim construction Hearing

April 15, 2014

Plaintiff Pi-Net's Presentation Material

# A.    Application Terms

a.    "Point of Service Application" (D.I. 74 at 63-78)

b.    "Web Application[s]" (D.I. 74 at 41-45)

c.    "Transactional Application" (D.I. 74 at 78-89)

d.    "Back-End Transactional Applications" and "The Selected Back-end Transactional Application" (D.I. 74 at 78-89)

e.    "Network Application" (D.I. 74 at 45-48)

f.    "Said User Application" (D.I. 74 at 112-114)

2

# Typical State of Art Web Site 1996



## Welcome to Amazon.com Books!

*One million titles,*
*consistently low prices.*

(If you explore just one thing, make it our personal notification service. We think it's very cool!)

### SPOTLIGHT! -- AUGUST 16TH

These are the books we love, offered at Amazon.com low prices. The spotlight moves **EVERY** day so please come often.

### ONE MILLION TITLES

Search Amazon.com's million title catalog by author, subject, title, keyword, and more... Or take a look at the books we recommend in over 20 categories... Check out our customer reviews and the award winners from the Hugo and Nebula to the Pulitzer and Nobel... and bestsellers are 30% off the publishers list...

### EYES & EDITORS, A PERSONAL NOTIFICATION SERVICE

Like to know when that book you want comes out in paperback or when your favorite author releases a new title? Eyes, our tireless, automated search agent, will send you mail. Meanwhile, our human editors are busy previewing galleys and reading advance reviews. They can let you know when especially wonderful works are published in particular genres or subject areas. Come in, meet Eyes, and have it all explained.

### YOUR ACCOUNT

Check the status of your orders or change the email address and password you have on file with us. Please note that you **do not** need an account to use the store. The first time you place an order, you will be given the opportunity to create an account.

Easttom Expert Report,
D.I. 150-2
at A-1284-1304

3

# Prior Art - Hyperlinking

## <u>Simple Hyperlinking</u>

- Web browser provides access to Web server
- User types URL
- Web server processes browser request and returns HTML file – could be website or a specific file
- Users can hyperlink to another file/page



FIG. 1A (PRIOR ART)

# Prior Art - Forms

**More Sophisticated – Using forms**

- Browser may ask for a form

- Server responds with HTML file that has form
  embedded in the HTML



5

# Prior Art - CGI



**FIG. 1B** (PRIOR ART)

**Prior Art CGI Systems**:

- Server received communication and forwarded user's input to the CGI program
- CGI operated outside and independent of, the Web server
- The CGI program returned data to the server, which passed it back to the client as an HTML file without doing anything to or with the CGI-generated information
- CGI had significant limitations
    - Significant overhead – a new CGI programs had to be invoked for each "hit" by user and then terminated
    - Limits to moving to other files at other Web servers
    - Safety – CGI is a program and users were running programs on backend systems

6

# Pi-Net Invention



FIG. 4B

Service Channel (Fig. 4B)

Back Office (Fig. 4B)

POS APP 510

FIG. 5D

7

# "Point of Service Application"

▸ **D.I. 74 at 63-78** (Pi-Net later amended text, without changing substance;  see Easttom Expert Report, D.I. 150-2 at  A-1312; and Bardash 2d Expert Report, DI-150-1 at A-1240)

▸ Term in '492 and '158 Patent claims

▸ <u>'492 Patent claim 1</u>:  "a Web server, including a processor and a memory, for offering one or more Web applications as respective **point-of-service applications** in a point-of-service application list on a Web page"

▸ <u>'158 Patent claim 1</u>:  "providing a point-of-service application as a selection within the Web page, wherein the point-of-service application provides access to both a checking and savings account"

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| "A transactional Web application displayed on a web page, and displaying an "object" data structure in the Web application with attributes and information entries" | This claim term is indefinite. |

8

# "Point of Service Application"

▸ The Pi-Net patents identify the Point-of-Service Applications as being "transactional applications":

> "POSvc applications 510 are transactional applications"

('492 Pat. at 6:22-23)

▸ The POSvc Applications mediate user transactions:

> "If user 100 desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user 100, as illustrated in FIG. 5D."

('492 Pat. at 6:55-58)

▸ POSvc Application is described in Figure 5

9

# "Point of Service Application"

POSvc Applications are listed on or within a web page; and

Each POSvc Application displays an "object" data structure with attributes and information entries



# "Point of Service Application"



FIG. 5D

"Once Bank POSvc application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank 'Back Office.' … As illustrated in FIG. 5D, once the connection is made between Bank POSvc application 510(1), for example, and Bank services, an operator agent on Web server 104 may be activated to ensure the availability of distributed functions and capabilities." ('492 Pat. at 6:65 to 7:9)

11

# "Point of Service Application"

- ▶ Term that was coined by the inventor
- ▶ Described in the specification text and in Figures 4B, 5C and 5D
- ▶ Pi-Net's construction is exactly what is shown in patent disclosure
- ▶ POSvc Application has an object data structure
  - ▪ Easttom Expert Report, D.I. 150-2 at A-1312
  - ▪ Bardash 2d Expert Report, DI-150-1 at A-1240



Plaintiff Presentation, April 15, 2014,  13

# "Web Application"

‣ D.I. 74 at 41-45

‣ "Web application" only in the '158 and '492 Patents; not in '500 Patent

‣ <u>'158 Patent claim 1 (only independent claim)</u>:

"A method for performing a real time Web transaction from a **Web application** over a digital network atop the Web, the method comprising:

providing a Web page for display on a computer system coupled to an input device;

providing a <u>point-of-service application as a selection within the Web page</u>, wherein the point-of-service application provides access to both a checking and savings account, the point-of-service application operating in a service network atop the World Wide Web;

accepting a first signal from the Web user input device to select the point-of-service application;

accepting subsequent signals from the Web user input device; and transferring funds from the checking account to the savings account in real-time utilizing a routed transactional data structure that is both complete and non-deferred, in addition to being specific to the point-of-service application, the routing occurring in response to the subsequent signals."

- "Web application" in preamble and corresponds to POSvc Application in the body of claim.

- "Web application" is synonymous with "POSvc Application"

13

# "Web Application"

▸  '492 Patent claim 1:

"A system, comprising

a Web server, including a processor and a memory, for offering **one or more Web applications as respective point-of-service applications in a point-of-service application list** on a Web page;

each Web application of the one or more Web applications for requesting a real-time Web transaction;

a value-added network (VAN) switch running on top of a facilities network …, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;

a service network running on top of the facilities network for connecting through the Web server to a back-end transactional application; and

a computer system executing the Back-end transactional application for processing the transaction request in real-time."

- "Web application" is defined as a POSvc Application
- Addition of "web application merely emphasizes that a POSvc Application is an application operating over the World Wide Web
- "Web application" is synonymous with "POSvc Application"

14

# "Transactional Application"

- D.I. 74 at 78-89

- Term "transactional application" (w/o any modifier) is found only in '500 Patent.
- <u>'500 Patent claim 1</u>:

"means for switching to a **transactional application** in response to a user specification from a network application, **said transactional application** providing a user with a plurality of transactional services managed by at least one value-added network service provider….; [*and*]

means for transmitting a transaction request from **said transactional application**…"

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc Application on a Web page" | This claim term is indefinite. |

15

# "Transactional Application"

- The Pi-Net patents identify the Point-of-Service Applications as being "transactional applications":

  "POSvc applications 510 are transactional applications"

  ('492 Pat. at 6:22-23)

- The '492 and '158 Patents refer to POSvc Applications; the '500 Patent refers to transactional applications

- The '500 Patent claims comport with that description:

  "means for switching to a **transactional application** in response to a user specification from a network application, **said transactional application** providing a user with a plurality of transactional services managed by at least one value-added network service provider….; [*and*]

  means for transmitting a transaction request from **said transactional application**…"

16

# "Back-End Transactional Applications"; and "The Selected Back-End Transactional Application"

▶   "Back-End" found only in the '492 Patent

▶   <u>'492 Patent claim 1</u>:

"A system, comprising

a Web server, including a processor and a memory, for offering one or more <u>Web applications as respective point-of-service applications in a point-of-service application list</u> on a Web page;

each Web application of the one or more Web applications for requesting a real-time Web transaction;

a value-added network (VAN) switch running on top of a facilities network …, the VAN switch for enabling the real-time Web transactions from the one or more Web applications;

a service network running on top of the facilities network for **connecting through the Web server to a back-end transactional application**; and

a computer system **executing the Back-end transactional application for processing the transaction request** in real-time."

17

# "Back-End Transactional Applications"; and "The Selected Back-End Transactional Application"

▸  "Back-End" terms are found only in the '492 Patent

▸  <u>'492 Patent claim 10</u>:

"A method for ***

upon receipt from a Web server a selection of the Web application …, the Web application corresponding to **a respective <u>back-end</u> transactional application**, wherein **<u>the</u> back-end transactional application** is an application running at the back-office server of one or more Web merchants or at the back-end; …

wherein the request for Web merchant services is a request to connect to **<u>the</u> selected back-end transactional application** to perform an interactive real-time Web transaction from the Web application,

wherein **<u>the</u>** *[back-end]* **transactional application** is an on-line service provided by one or more Web merchants or the back-end; *** "

18

# "Back-End Transactional Applications"; and "The Selected Back-end Transactional Application"

▸  Back-end transactional applications are applications or application components in the "Back Office" (see Figures 4B and 5D) that execute the transactions from the "front-end" POSvc Applications.

▸ Dr. Bardash Expert Report, Ex. AA at A-1037

| Pi-Net's Construction | Defendants' Construction |
|---|---|
| "an application provided by the web merchant or value-added network service provider that corresponds to the front-end POSvc Application on a Web page" | This claim term is indefinite. |

19

# "Back-End Transactional Applications"; and "The Selected Back-End Transactional Application"



FIG. 4B

20

# "Back-End Transactional Applications"; and "The Selected Back-End Transactional Application"



Service Channel (Fig. 4B) – "Front-End"

Back Office (Fig. 4B) "Back-End"

FIG. 5D

"Once Bank POSvc application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank 'Back Office.' … As illustrated in FIG. 5D, once the connection is made between Bank POSvc application 510(1), for example, and Bank services, an operator agent on Web server 104 may be activated to ensure the availability of distributed functions and capabilities." ('492 Pat. at 6:65 to 7:9)

21

# "The Selected Back-End Transactional Application"

▸ D.I. 74 at 88-89

▸ Found only in '492 Patent claim 10:

A method for performing real-time Web transactions from a Web application, comprising:

receiving a request at a Web server, including a processor and a memory, for a real-time Web transaction from a Web application on a Web page, wherein the Web server is configured to hand over the request to a Value Added Network (VAN) switch;

offering a plurality of Web applications including the Web application on a Web page,

upon receipt from a Web server a selection of the Web application from the offered Web applications, the Web application corresponding to a *respective back-end transactional application*, wherein the back-end transactional application is an application running at the back-office server of one or more Web merchants or at the back-end; receiving a request for Web merchant services upon receipt by a Web server a selection of the Web application,

wherein the request for Web merchant services is a request to connect to **the selected back-end transactional application** to perform an interactive real-time Web transaction from the Web application….

22

# "The Selected Back-End Transactional Application"

▶ "The selected back-end transactional application" is the back-end transactional application corresponding to the POSvc Application that user has selected

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| "The selected application offered by the value-added network service provider or Web merchant that corresponds to the front-end POSvc Application on a Web page" | This claim term is indefinite. |

23

# "Application" Terms Are Not Indefinite

▸ No construction by JPMorgan, but only indefiniteness argument, which is erroneous

▸ A claim is indefinite only when it is "not amenable to construction" or "insolubly ambiguous"

- *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, 2014 WL 1370038 (D. Del. 2014);
- *Biosig Instruments, Inc. v. Nautilus, Inc.*, 715 F.3d 891, 898 (Fed. Cir. 2013)

▸ Here, as shown above, each of the "application " terms can be reasonably and meaningfully construed

▸ Each of the challenged "application" terms has clear meaning directly from specification text and drawings

24

# "Network Application"

▸ D.I. 74 at 45-48

▸ "Network Application is found only in '500 Patent.   <u>Claim 1</u>:

"A configurable value-added network switch for enabling real-time transactions on a network, … compromising:

means for switching to a transactional application in response to a user specification from a **network application**, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

means for transmitting a transaction request from said transactional application; and

means for processing said transaction request. "

▸ '500 Patent claim 10:

"A method for configuring a value-added network switch for enabling real-time transactions on a network, said method … compromising the steps of:

switching to a transactional application in response to a user specification from **a network application**, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

transmitting a transaction request from said transactional application; and

processing said transaction request."

25

# "Network Application"

| Pi-Net's Construction | Defendant's Construction |
|---|---|
| POSvc Application [list] on a web page | Plain and ordinary meaning. |

▸ <u>Figure 5C</u>:



FIG. **5**C illustrates an example of a point-of-service (POSvc) application list.

('492 Patent at 3:29-30)

Exchange **501** processes the consumer's request and displays an exchange Web page **505** that includes a list of POSvc applications **510** accessible by exchange **501**.

An example of a POSvc application list is illustrated in FIG. **5**C. User **100** can thus select from POSvc applications Bank **510**(**1**), Car Dealer **510**(**2**) or Pizzeria **510**(**3**). Numerous other POSvc applications can also be included in this selection. If user **100** desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user **100**, as

('492 Patent at 6:39-41, 49-57)

26

# "Said User Application"

‣ <u>Found only in '500 Patent, claim 35</u>:

A configurable … network system … comprising:

means for switching to a transactional application in response to <u>a user specification from a network application</u>, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

means for activating an agent to create a transaction link <u>between **said user application** and said transactional application</u>….

‣ "SAID user application" must mean the "network application"

  ▪ Only two applications cited before in the claim – "network application" and "transactional application (or POSvc Application), and cannot be anything else

‣ Consistent with claim 3 of '500 Patent:

  ▪ "said means for activating said transactional application further includes means for creating a transaction link between <u>said network application</u> and said transactional application. "

27

# "Said User Application"

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| The "said user application" is the "network application." | This claim term is indefinite and lacks antecedent basis. |

28



B.    "Real Time"

29

# "Real Time"

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.  There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)

30

# "Real Time"

▸ D.I. 74 at 8-21

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| Plain and ordinary meaning. | "<u>in a non-deferred manner</u>, without assembling, disassembling, formatting, or reformatting the transaction information" |

▸ Claim language suggests "real-time" has ordinary meaning

  ▪ "for enabling the real-time Web transactions" ('500 Patent claims 1, 10, 35)

  ▪ "transactional services being performed interactively and in real time" (*id*)

  ▪ "performing real-time Web transactions" ('158 Patent claim 1)

  ▪ " requesting a real-time Web transaction," "processing the transaction request in real-time," and "enabling the real-time Web transactions" ('492 Patent claim 1)

31

# "Real Time"

Patent specification uses "real-time" as activity that would be conducted in person:

A true real-time, bi-directional transaction would allow a user to connect to a variety of services on the Web, and perform real-time transactions on those services. For example, although user 100 can browse car dealer Web page 105 today, the user cannot purchase the car, negotiate a car loan or perform other types of real-time, two-way transactions that he can perform with a live salesperson at the car dealership. Ideally, user 100 in FIG. 1A would be able to access car dealer Web page 105, select specific transactions that he desires to perform, such as purchase a car, and perform the purchase in real-time, with two-way interaction capabilities. CGI applications provide user 100 with a limited ability for two-way interaction with car dealer Web page 105, but due to the lack of interaction and management between the car dealer and the bank, he will not be able to obtain a loan and complete the purchase of the car via a CGI application. The ability to complete robust real-time, two-way transactions is thus not truly available on the Web today.

'492 Pat. at 2:26-38

32

# "Real Time"

Each Web merchant may choose the types of services that it would like to offer its clients. In this example, if Bank decided to include in their POSvc application access to checking and savings accounts, user **100** will be able to perform real-time transactions against his checking and savings accounts. Thus, if user **100** moves $500 from his checking account into his savings account, the transaction will be performed in real-time, in the same manner the transaction would have been performed by a live teller at the bank or an ATM machine. Therefore, unlike his prior access to his account, user **100** now has the capability to do more than browse his bank account. The ability to perform these types of robust, real-time transactions from a Web client is a significant aspect of the present invention.

'492 Pat. at 7:10-23

33

# "Real Time"

## -JPMC's construction violates claim construction law

▸ JPMC's construction is indefensible

- Would render claims internally inconsistent, because all Web, Internet, mobile and TCP/IP networks communications must "packetize" data JPMorgan has no support in specification

- Has no support in prosecution history

- Improperly "mixes & matches" words from prosecution history entirely out context

▸ Prosecution disclaimer rule is:

"our precedent requires that, in order for prosecution disclaimer to attach, the <u>disavowal must be both clear and unmistakable</u>.  Our cases also warn that, because the prosecution history represents an ongoing negotiation between the PTO and the inventor, 'it often lacks the clarity of the specification and thus is less useful for claim construction purposes.'"

*3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325-26 (Fed. Cir. 2013).

34

# "Real Time"

## -JPMC's violations of claim construction law

▷ JPMC's construction uses part of a sentence entirely out of context

- [e]ven if [the prior art] taught of completing a transaction, it was through the <u>use of CGI, which strips field-by-field from a Web form and sends it as standard I/O to the application that is local to the Back-End</u>, and that must *assemble/disassemble the information again*. The transaction is not completed in real-time. (App. E, '158 Patent Prosecution History at 188)

- [the prior art] deals with processing documents using CGI scripts, which the Applicant has clearly described in this present Application as well as in the parent patents that CGI involves <u>standard I/O and formatting and reformatting</u> at both ends so as to be compatible with HTML files is [a] 'deferred transaction', (as in . . . the Applicant's specification), not with true two-way or N-way, real-time transactional capabilities. (App. H, '894 Patent Prosecution History at 19)

▷ Not prosecution history disclaimer

- JPMC combines isolated words to create a sentence that the inventor never said
- JPMC's words are merely attributes of a specific disclaimed system
- Inventor never excluded systems merely because they "*assemble/disassemble the information*" or "format and reform"

35

# "Real-Time"

## - No Disclaimer or Disavowal

'"Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.' 'The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.' For example, in *SciMed*, the patentee described two different types of catheters in the prior art, those with dual lumens (side-by-side) and those with coaxial lumens. In discussing the prior art, the patentee disparaged the dual lumen configuration as larger than necessary and less pliable than the coaxial type. Further, the specification repeatedly described the "present invention" as a coaxial design. Finally, the specification stated: "The intermediate sleeve structure defined above [coaxial design] is the basic sleeve structure for all embodiments of the present invention contemplated and disclosed herein." This court held that collectively this amounted to disavowal of the dual lumen design."

> - *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) (internal citations omitted)

36

# "Real Time"

## –JPMC's errs in arguing prosecution history disclaimer

"No disavowal when the "statements in reference to the prior art did not narrow the meaning of the patent."

- *Grober v. Mako Products, Inc.*, 686 F.3d 1335, 1342-43 (Fed. Cir. 2012)

"Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable."

- *3M Innovative Properties Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013)

▸ Pi-Net's construction is consistent with claims, specification and prosecution history

▸ JPMC's construction violates multiple claim construction rules

37

# C.    "Object Routing" and "Routed Transactional Data Structure"

38

# "Object Routing"

▸ D.I. 74 at 26-34

▸ "Object routing" appears only in dependent claim 4 of '158 Patent

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| "Communicating between a POSvc Application and a back-end transactional application individual data structure with information entries and attributes (i.e., objects) over the application layer of the OSI model." | "system for transmitting data on a network using the TransWeb Management Protocol in which a unique IP address is hierarchically assigned to each network object, *e.g.*, including each bank account" |

39

# "Object Routing"

▸ D.I. 74 at 26 - 34

▸ Object routing is shown in Pi-Net patents:



40

# "Object Routing"

"The words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history.  There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution."

> *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)

▸ No disavowal

  ▪ *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012)
  ▪ See slides 35 & 36, *supra*

41

# "Object Routing"

▸ Preliminarily, JPMorgan's construction creates confusion, because it is unclear what is meant by "the TransWeb Management Protocol"

▸ Pi-Net never defined "object routing" as requiring "the TransWeb Management Protocol" or "a unique IP address is hierarchically assigned to each network object"

▸ "[E]ven where a patent describes only a single embodiment, claims will not be "read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction."

- *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004)

▸ Pi-Net disclosure refers to TMP as one embodiment:

One embodiment of the present invention utilizes TMP and distributed on-line service information bases (DOLSIBs) to perform object routing.

('492 Pat at 8:3-5)

42

# "Object Routing"

▸ Neither "TMP" nor concept of "unique IP address … hierarchically assigned to each network object" is cited anywhere in prosecution history of the '158 patent or any other Pi-Net application as related to "object routing"

▸ JPMorgan distorts record by citing arguments directed to unrelated claims.

▸ Argument cited by JPMorgan related to the claim 36 and its dependents:

> 36.     (New)  A method for enabling object routing on a network, said method for enabling object routing comprising the steps of:
>
>             associating an object identity with information entries and attributes, wherein the object
>                     identity represents a networked object;
>
>         storing said information entries and said attributes in a virtual information store; and
>
>         assigning a unique network address to said object identity.

43

# "Routed Transactional Data Structure"

▸ D.I. 74 at 54-63

▸ "Routed Transactional Data Structure" appears only in independent claim 1 of '158 Patent:

"transferring funds from the checking account to the savings account in real-time utilizing **a routed transactional data structure**"

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| "A data structure with information entries and attributes displayed in a POSvc Application on a Web page for the specified real-time Web transaction from the specific Web application, which is routed from the front-end POSvc Application on a Web page over an online service network on the Web to a Back Office transactional application or application of a value-added network service provider or Web merchant" | This claim term is indefinite. |

44

# "Routed Transactional Data Structure"

- Terms is not indefinite, because it is amenable to reasonable construction

- Skilled artisan would immediately recognize the term's meaning
  - See Declaration of Dr. Bardash, D.I. 66-1 at pp. 17 – 21 (¶¶ 40-52)
- It refers to the "object" used in object routing:



45

# D.  "Value-added Network (VAN) Switch" and "Switching"

46

# "Value-added Network (VAN) Switch"

▸ D.I. 74 at 94 - 100

▸ "Value-added Network (VAN) Switch" appears in '500 Patent and "492 Patent

  - "A configurable **value-added network switch** for enabling real-time transactions on a network …"  ('500 Patent claim 1 Preamble)
  - "A method for configuring a **value-added network switch** for enabling real-time transactions on a network…" ('500 Patent claim 10 Preamble)

  - "**a value-added network (VAN) switch** running on top of a facilities network selected from a group consisting of the World Wide Web, the Internet and an e-mail network, the **VAN switch** for enabling the real-time Web transactions from the one or more Web applications…" ('492 Patent claim 1)

  - "receiving a request at a Web server, including a processor and a memory, for a real-time Web transaction from a Web application on a Web page, wherein the Web server is configured to hand over the request to a **Value Added Network (VAN) switch**…" ('492 Patent claim 10)

47

# "Value-added Network (VAN) Switch"

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| Value-Added Network: means an online service network comprising a Web application (i.e., POSvc application).<br><br>Switch: Structure connecting the object sender and the object receiver between the POSvc Application on a web page and the transactional application at the OSI Application layer.<br><br>Value Added Network (VAN) Switch is thus a structure connecting the object sender and the object receiver between the POSvc Application on a web page and the transactional application at the OSI Application layer on an online service network comprising a Web application (i.e., POSvc application). | This claim term is indefinite. |

48

# "Value-added Network (VAN) Switch"

The United States Patent and Trademark Office's Patent Trial and Appeal Board has provided an alternate definition:

- "an OSI application layer switch having a switching component, object routing component and management component."

  D.I 141,  Exhibit BB at BB-82-83

PTO's definition is more general than that proposed by Pi-Net

(See Expert Report of Dr. Michael Bardash, Appendix AA at A-1039)

49

# "Switching"

▶ D.I. 74 at 100-104

▶ "Switching" appears in '500 Patent and "492 Patent

▶ "switching to a transactional application in response to a user specification from a network application" ('500 Patent claim 10)

▶ "switching utilizing the VAN switch to the back-end transactional application in response to receiving the request from the Web server…" ('492 Patent claim 10)

50

# "Switching"

| Pi-Net's Construction | JPMorgan's Construction |
|---|---|
| "Application layer switching at the application layer 7 of the OSI model connecting the object sender and the object receiver between the POSvc Application on a webpage and the transactional application" | This claim term is indefinite. |

▸ Pi-Net's construction comports with the decision of U.S. Patent and Trademark Office's Patent Trial and Appeal Board re the '492 Patent

  ▪ D.I 141, Exhibit BB at BB-45-51

51

# E.  Means-Plus-Function Terms in the '500 Patent

52

# Means-Plus-Function
## - JPMorgan's Indefiniteness Argument

▸ "We must also remember that 'a challenge to a claim containing a means-plus-function limitation as lacking structural support requires a finding, by clear and convincing evidence, that the specification lacks disclosure of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function.'"

> *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC,* 2014 WL 1344515 (Fed. Cir. 2014)

▸ The specification can express the algorithm "in any understandable terms including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure."

> *Finisar Corp. v. DirecTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed.Cir.2008)

▸ After the *Markman* briefing, the U.S. Patent and Trademark Office's Patent Trial and Appeal Board has considered most of the means-plus-function elements of the '500 Patent, and has identified the structure corresponding to the elements in the specification

> Exhibit BB at BB-69-103

53

# Means-Plus-Function
## -   View of Skilled Artisan

▸ Federal Circuit "assess[es] whether a claim limitation recites sufficient structure to avoid means-plus-function claiming from the vantage point of an ordinarily skilled artisan."

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1364 (Fed. Cir. 2013)

▸ "For a claim to be definite, a recited algorithm, or other type of structure for a section 112(f) claim limitation, need not be so particularized as to eliminate the need for any implementation choices by a skilled artisan; but it must be sufficiently defined to render the bounds of the claim—declared by section 112(f) to cover the particular structure and its equivalents—understandable by the implementer."

*Ibormeith IP, LLC v. Mercedes-Benz USA, LLC*, 732 F.3d 1376, 1379 (Fed. Cir. 2013)

▸ "[W]hen applying "§ 112, ¶ 6, knowledge of one skilled in the art can be called upon to flesh out a particular structural reference in the specification for the purpose of satisfying the statutory requirement of definiteness."

*Creo Products, Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1347 (Fed. Cir. 2002)

54

# Means-Plus-Function

▸ '500 Patent Claim 1:

    A configurable value-added network switch for enabling real-time transactions on a network, said configurable value-added network switch compromising:

    means for switching to a transactional application in response to a user specification from a network application, said transactional application providing a user with a plurality of transactional services managed by at least one value-added network service provider, said value-added network service provider keeping a transaction flow captive, said plurality of transactional services being performed interactively and in real time;

    means for transmitting a transaction request from said transactional application; and

    means for processing said transaction request.

55

# Means-Plus-Function

"Means for Transmitting a Transaction Request from Said Transactional Application" (D.I. 60; D.I. 66; D.I. 67; D.I. 160)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to transmit a request for a transaction from the transactional application.<br>Structure is the Exchange component, as defined in the Patent. | This claim term is indefinite. | an interface that connects a request from a transactional application to a processor that performs the requested transaction.<br>Ex. BB at BB-86-87 |

Pi-Net's and PTO's constructions overlap, because "the Exchange includes an 'interface that connects a request from a transactional application to a processor that performs the requested transaction.'" (Dr. Bardash Rpt., A-1022-23)

56

# "Means for Transmitting a Transaction Request from Said Transactional Application"



POSvc Application 510 is the "transactional application"

57

# "Means for Transmitting a Transaction Request from Said Transactional Application"

Court stated:

"The Court is skeptical of Pi-Net's position that the Exchange, as opposed to a computer or computer program, is the proper structure for this term because the Exchange exists on either a web server or computer system.  See '500 patent, 6: 14-16 (explaining that the Exchange can reside either on a web server or "on a separate computer system that resides on the Internet")."  (D.I. 160 at p. 8 fn. 3)


Court's concern is accommodated by PTO's construction, except language should be:

"an interface that connects a request from a transactional application to a processor that performs the [requested transaction] transaction request.

58

# "Means for Transmitting a Transaction Request from Said Transactional Application"

Further, and alternately, the '500 Patent says the function is performed by a "web server 104," which is a well-known structure:

"An example of a POSvc application list is illustrated in FIG. 5C. …  If user 100 desires to perform a number of banking transactions, and selects the Bank application, a Bank POSvc application will be activated and presented to user 100, as illustrated in FIG. 5D.  For the purposes of illustration, exchange 501 in FIG. 5D is shown as running on a different computer system (Web server 104) from the computer systems of the Web merchants running POSvc applications (computer system 200).  Exchange 501 may, however, also be on the same computer system as one or more of the computer systems of the Web merchants.

"Once Bank POSvc application 510 has been activated, user 100 will be able to connect to Bank services and utilize the application to perform banking transactions, thus accessing data from a host or data repository 575 in the Bank 'Back Office.'"

App. C at 6:51-7:2

59

# "Means for Transmitting a Transaction Request from Said Transactional Application"

- JPMorgan's arguments of indefiniteness are not availing

- JPMorgan presented no expert evidence at all – not even in expert reports

- Indefiniteness is determined from perspective of a skilled artisan, and cannot be proven merely by counsel's assertions

  - "[w]hether a patent adequately sets forth structure corresponding to a claimed function necessitates consideration of the disclosure of the specification from the viewpoint of one skilled in the art."

  - *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. 2014)

- To use JPMorgan's terminology the term can be re-construed without material change as:

  "a general-purpose computer programmed to provide an interface that connects a request from a transactional application to a processor that performs the transaction requested."

60

# "Means for Transmitting a Transaction Request from Said Transactional Application"

▸ *Function Media, L.L.C. v. Google, Inc.* 708 F.3d 1310 (Fed. Cir. 2013).

- Every case turns on its own claim limitation. The "adequacy of a particular description is a case-specific conclusion, not an all-purpose rule of law."
  - *Elcommerce.com, Inc. v. SAP AG,* 2014 WL 685622 (Fed. Cir. 2014)

- Issue in *Function Media* was "means for transmitting said presentations <u>to a selected media venue of the media venues</u>."

- Patentee argued (only) that "PGP software" was the structure

- Court held specification provided name of software but no description of how it worked

- *Function Media* did not create a new paradigm means-plus-function claiming that use a computer

61

# Means-Plus-Function

## "Means for processing said transaction request"
(D.I. 60; D.I. 66; D.I. 67; D.I. 160)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to process the transaction request.<br>Structure is a general processor for reasons stated in the briefing before the Court. The general processor can be "a processor 202" as described in the Patent. "Processor 202 may be any of a wide variety of general purpose processors or microprocessors" which has the ability to process instructions and data from a data storage medium, and execute an instruction stream. | This claim term is indefinite. | "means for processing" [means] back office processing resources.<br><br>Ex. BB at BB-87 |

62

# "Means for processing said transaction request"

▸ Court has noted that the

Federal Circuit has explicitly recognized "processing" as a function capable of being performed by a general purpose computer. *In re Katz*, 639 F.3d at 1316 ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' discussed below, those functions can be achieved by any general purpose computer without special programming."); *see also SoftView LLC v. Apple Inc.*, 2013 WL 4758195, at *11 (finding that a general purpose computer without special programming could perform the "processing means" function).

(D.I. 160 at 9)

63

# "Means for processing said transaction request"

▸ Patent describes the structures that process requests:



FIG. 5D



FIG. 4B

The invention is to start with existing legacy systems and provide access to the legacy systems:

   "The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data."

App. C, at 7:2-4

64

# "Means for processing said transaction request"

- JPMorgan's arguments of indefiniteness are not availing

- JPMorgan presented no expert evidence at all – not even in expert reports

- Indefiniteness is determined from perspective of a skilled artisan, and cannot be proven merely by counsel's assertions

  - "[w]hether a patent adequately sets forth structure corresponding to a claimed function necessitates consideration of the disclosure of the specification from the viewpoint of one skilled in the art."

    - *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. 2014)

65

# Means-Plus-Function

"Means for Switching to a Transactional Application in Response to a User Specification from a Network Application"

(D.I. 74 at 117-18)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to switch to a transactional application in response to a user specification from a network application.<br><br>Structure is the "Switching Service 702," which is "a routing switch within the 'application layer' of the OSI model" "in application layer 307." | This claim term is indefinite. | "we construe 'means for switching to a transactional application' to mean an OSI application layer switch which routes user connections to a local application or other VAN switches, and facilitates opens systems connections to public and private networks."<br><br>Ex. BB at BB-85-86 |

66

# "Means for Switching to a Transactional Application in Response to a User Specification from a Network Application"



The list of available POSvc Applications is the "network application."

POSvc Applications are the individual "transactional applications."

67

# "Means for Switching to a Transactional Application in Response to a User Specification from a Network Application"

- There is no material difference between Pi-Net's proposed construction and that proposed by the PTO  (Dr. Bardash Rpt. Ex. AA at A-1043)

- The Pi-Net and PTO constructions are fully supported by the specification:

   "Switching service 702 is an OSI application layer switch. Switching service 702 thus represents the core of the VAN switch.  It performs a number of tasks including the routing of user connections to remote VAN switches, described in the paragraph above, multiplexing and prioritization of requests, and flow control. Switching service 702 also facilitates open systems' connectivity with both the Internet (a public switched network) and private networks including back office networks, such as banking networks. Interconnected application layer switches form the application network backbone. These switches are one significant aspect of the present invention."

   ('500 Patent at 8:44-55; App. C at 8:52-63).

68

# "Means for Switching to a Transactional Application in Response to a User Specification from a Network Application"

- JPMorgan's arguments of indefiniteness are not availing

- JPMorgan presented no expert evidence at all – not even in expert reports

- Indefiniteness is determined from perspective of a skilled artisan, and cannot be proven merely by counsel's assertions

  - "[w]hether a patent adequately sets forth structure corresponding to a claimed function necessitates consideration of the disclosure of the specification from the viewpoint of one skilled in the art."

  - *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. 2014)

69

# Means-Plus-Function

"Means for Receiving Said User Specification" (D.I. 74 at 119)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is receiving said user specification.<br><br>Structure is a Web server. | This claim term is indefinite. | either a web server or the elements of the VAN switch that perform the boundary service.<br><br>Ex. BB at BB-87-88 |

70

# "Means for Receiving Said User Specification"

- JPMorgan's arguments of indefiniteness are not availing

- JPMorgan presented no expert evidence at all – not even in expert reports

- Indefiniteness is determined from perspective of a skilled artisan, and cannot be proven merely by counsel's assertions

    - "[w]hether a patent adequately sets forth structure corresponding to a claimed function necessitates consideration of the disclosure of the specification from the viewpoint of one skilled in the art."

        - *Elcommerce.com, Inc. v. SAP AG*, 2014 WL 685622 (Fed. Cir. 2014)

71

# Means-Plus-Function

"Means for Enabling a Switch to Said Transactional Application"
(D.I. 74 at 120-121)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Structure is Boundary Service 701 in the VAN Switch. "Specifically, boundary service 701 provides the interfaces between VAN switch 520, the Internet and the Web, and Multi-media end user devices such as PCs…. Boundary service 701 also provides the interface to the on-line service provider." | This claim term is indefinite. | the elements of the switching service that route connections to the user specified transactional application. Ex. BB at BB-88-89 |

72

# "Means for Enabling a Switch to Said Transactional Application"

▸ Term found only in dependent claim 2 of the '500 Patent

▸ Described in the specifications:

As described above, exchange **501** and management agent **601** together constitute a VAN switch. FIG. **7** illustrates conceptually the layered architecture of VAN switch **520**. Specifically, boundary service **701** provides the interfaces between VAN switch **520**, the Internet and the Web, and multi-media end user devices such as PCs, televisions or telephones. Boundary service **701** also provides the interface to the on-line service provider.

App. C at 8:43-48

73

# Means-Plus-Function

"Means for Activating Said Transactional Application"

(D.I. 74 at 122-123)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to activate the transactional application.<br><br>Structure is the selected Point-of-Service application from the list of Point-of-Service applications displayed on the graphical user interface on a web page. | This claim term is indefinite. | the specific selected transactional application.<br><br>Ex. BB at BB-89 |

74

# Means-Plus-Function

"Means for Creating a Transaction Link Between Said Network Application and Said Transactional Application"

(D.I. 74 at 124-129)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to create a transaction link between the network application and the transactional application.<br><br>Structure is the object data structure (with information entries and attributes) displayed (e.g. checking account object in POSvc application 510 in Fig. 5D) in the selected Point-of-Service application as displayed by Web server on web page. "As illustrated in FIG. 5D, once the connection is made between POSvc application 510(1), for example, and services, an operator agent on Web server 104 may be activated to ensure the availability of distributed functions and capabilities." | This claim term is indefinite. | an object routing component<br><br> Ex. BB at BB-89-90 |

75

# Means-Plus-Function

"Means for Activating an Agent to Create a Transaction Link Between Said User Application and Said Transactional Application"

(D.I. 74 at 124-129)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to activate an agent to create a transaction link between the user application and the transactional application.<br><br>Structure is information entries in an object in a Point-of-Service (POSvc) application on a Web page. | This claim term is indefinite. | an interface through which a user selects a transactional application<br><br> Ex. BB at BB-92 |

76

# Means-Plus-Function

"Means for Presenting Said User With a List of Transactional Applications" (D.I. 74 at 130-131)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is to present user with a list of transactional applications. Structure is the webpage that includes POSvc Applications, as depicted in Figures 5C and 5D. | This claim term is indefinite. | a display of one or more transactional applications  Ex. BB at BB-90 |

77

## Means-Plus-Function

"Means for Submitting Said User Specification According to a User's Selection of Said Transactional Application from Said List of Transactional Applications" (D.I. 74 at 131-133)

| Pi-Net's Construction | JPMorgan's Construction | PTO's Construction |
|---|---|---|
| Function is submitting said user specification according to a user's selection of said transactional application from said list of transactional applications.<br><br>Structure is the interactive data structure displayed on a Web page that includes information entries and attributes in a Web application displayed via the graphical user interface component. | This claim term is indefinite. | a display and the elements of the switching service and the boundary service that detect and route the user's selection<br><br>Ex. BB at BB-90-91 |

78

# "Means for Submitting Said User Specification According to a User's Selection of Said Transactional Application from Said List of Transactional Applications"

‣ Term found only in dependent claim 4 of the '500 Patent

‣ Described in the specifications:

> Exchange **501** processes the consumer's request and displays an exchange Web page **505** that includes a list of POSvc applications **510** accessible by exchange **501**. A POSvc application is an application that can execute the type of transaction that the user may be interested in performing. The POSvc list is displayed via the graphical user interface component. One embodiment of the present invention supports HyperText Markup Language as the graphical user interface component. Virtual Reality Markup Language and Java™ are also supported by this embodiment. A variety of other graphical user interface standards can also be utilized to implement the graphical user interface.

App. C at 6:41-50

79

F.  "computer system executing the Back-end transactional application for processing the transaction request in real-time"

80

# "computer system executing the Back-end transactional application for processing the transaction request in real-time"

▸ JPMorgan alleges term is indefinite

▸ "Back-end transactional application" and "real-time" were previously defined

▸ Remainder of term should have ordinary meaning.  See Dr. Bardash Decl., DI 66-1 at 11- 14.

▸ Patent says that the "computer" system is the bank's legacy systems:



**FIG.  4B**

The invention is to start with existing legacy systems and provide access to the legacy systems:

"The Bank Back Office comprises legacy databases and other data repositories that are utilized by the Bank to store its data."

App. C, at 7:2-4

81

# G. "keeping a transaction flow captive"

82

# "Keeping a transaction flow captive"

▸ JPMorgan alleges term is indefinite

▸ Term means:

- "maintain continuous control (over a real-time Web transaction)."
- See Dr. Bardash Decl., DI 66-1 at 15- 17.

83

# Pi-Net Invention

- Pi-Net concept
  - Start with legacy back office systems
  - Create Web Applications to access
  - Client – provider interaction occurs in the provider's **Web server** space
  - Client and provider communicate by routing "networked objects"
  - List of "POSvc Applications" options presented to user
  - System switches to a user-selected POSvc Application – corresponding to a transactional application that user want to conduct
  - Server displays a object data structure to the user with which to interact
  - The user input in being made directly in an application





84

# Pi-Net Int'l v. JPMorgan Chase
## C.A. No. 12-282-SLR

Summary Judgment and *Daubert* Motions

April 15, 2014

Plaintiff Pi-Net's Presentation Material

## A. Plaintiff's *Daubert* Motion

- Striking Expert Testimony of Susan Spielman

2

# Striking Expert Testimony of Susan Spielman

▸ Opening Brief:   D. I. 116

▸ JPMorgan Answering Brief:   D.I.  126

▸ Pi-Net Reply Brief:   D.I. 138


▸ Expert report on invalidity fails basic under FRE Rule 702 and *Daubert*

3

# Striking Expert Testimony of Susan Spielman

‣ All validity issues turn on the claimed inventions, as construed by the Court

‣ Court ordered all expert reports to incorporate in the alternative all claim constructions of record:

"Any expert reports shall be in the alternative for whatever competing constructions the parties have. If the Court construes the disputed terms in an unanticipated way, the parties will have fourteen days to supplement any expert report." (D.I. 90).

4

# Striking Expert Testimony of Susan Spielman

▸ Report inadmissible because Ms. Spielman rendered all her invalidity opinions without even attempting to construe any claims

   - *Oxford Gene Tech. Ltd. v. Mergen Ltd.*, 345 F. Supp. 2d 431, 436-37 (D. Del. 2004)

   - *Asahi Glass Co., Ltd. v. Guardian Indus. Corp.*, 2011 WL 4459606 (D. Del. 2011):

   "An expert witness who has been proffered to opine on the validity of a patent must follow the required steps of a validity analysis, that is, to construe the asserted claims of the patent to determine their subject matter, and then to perform a limitation-by-limitation comparison of each claim to each prior art reference. ***

   The court agrees with plaintiffs that Dr. Horn's opinions on written description and enablement are not helpful to the jury in these regards.  As an initial matter, Dr. Horn did not first provide a claim construction against which the adequacy of the description could be measured."

   - *See also Medisim Ltd. v. BestMed LLC*, 861 F. Supp. 2d 158, 171 (S.D.N.Y. 2012) (expert "lacks a reliable foundation and must be stricken" for failure to consider claim construction).

5

# Striking Expert Testimony of Susan Spielman

▷ Separate from failing to construe claims, Ms. Spielman's proposed testimony is not in accord with the law

- o Written Description challenge is merely prejudicial *ad hominem*, without reference to any applicable principle

- o Enablement challenge does not address the *Wands* factors

- o And, does not address undue experimentation

- o On indefiniteness, Ms. Spielman never addressed whether claims can be reasonably construed

6

# Striking Expert Testimony of Susan Spielman

- Ms. Spielman criticizes patent for non-statutory reasons that are inadmissible at trial

  - "have the vaguest and most ambiguous claims that I have ever seen,"

  - "not written using the vernacular and terminology" recognizable by a person of ordinary skill in the art,

  - "divorced from the frame of reference [of] a person of ordinary skill in the art"

  - claim terms violate §112, because they are "not defined anywhere in the patent specification.

- "Irrelevant evidence is not admissible."  FRE Rule 402

- JPMorgan itself argued that "The proponent of expert testimony has the burden of establishing the reliability of his or her testimony." (D.I. 110 at 8).

- Yet, JPMorgan has failed to support the relevance or admissibility of Ms. Spielman's prejudicial *ad hominem*

7

## B. Plaintiff's *Daubert* Motion

- Striking Expert Testimony of Michael Siegel

8

# Striking Expert Testimony of Michael Siegel

▶ Opening Brief:   D. I. 118

▶ JPMorgan Answering Brief:   D.I.  127

▶ Pi-Net Reply Brief:   D.I. 139

▶ Three issues:

- Proposed testimony that 3 references anticipate when each is missing at least one limitation
- Proposed testimony on obviousness without any analysis of combination of references
- Proposed testimony as to facts and conclusions for which witness has no foundation to testify

9

# C. Plaintiff's *Daubert* Motion

- Striking Expert Testimony of Dawn Hall (Damages)

10

# Striking Expert Testimony of Dawn Hall

▸ Opening Brief:   D. I. 120

▸ JPMorgan Answering Brief:   D.I.  128

▸ Pi-Net Reply Brief:   D.I. 140

▸ Expert report fails basic requirements of FRE Rule 702 and *Daubert*

11

# Striking Expert Testimony of Dawn Hall

▶ Ms. Hall cannot present purported evidence of acceptable non-infringing alternatives

- Unsupported by any evidence

- Entire basis of Ms. Hall's proposed testimony is statement in report that

  "Chase (Bank One) used CGI to implement its online banking systems as of approximately 2000-2001…." (A-2285)

  based solely on "Discussions with Rick Romanelli 11/20/2013."

- But Mr. Romanelli:

  - Had not been at JPMorgan / Chase in 2000-2001(he was employed by an unrelated company) (Exh. BC at 15-16);

  - Had never been identified as a witness with knowledge about the 2001/01 period, about CGI or about damages (*Cf.* Rule 26(a)(1)(A)); and

  - Cannot testify as an expert, because no disclosure (*Cf.*, Rule 26(a)(2)(C))

12

# Striking Expert Testimony of Dawn Hall

▶ Ms. Hall cannot present purported evidence of acceptable non-infringing alternatives based on anything Dr. Siegel said

- Nothing about CGI as an alternative in any expert report
- No foundation for Dr. Siegel to opine on the issue

▶ Ms. Hall has no basis to testify that cost of alternative would have been only $200,000

▶ Ms. Hall's proposed testimony is merely unadulterated speculation by a person who admits lack of any qualification as to what are acceptable non-infringing alternatives or what would have cost JPMorgan to implement any alleged alternative

13

# Striking Expert Testimony of Dawn Hall

▶ Ms. Hall cannot testify about Pi-Net's lump-sum settlement agreements (D.I. 120 at 14-16; D.I. 140 at 9-10)

- *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012)
- *Wordtech Sys., Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1320 (Fed. Cir. 2010)
- *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) ("a lump-sum damages award cannot stand solely on evidence which amounts to little more than a recitation of royalty numbers.")
- *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case.")

▶ Ms. Hall cannot testify about JPMorgan's alleged licensing policies (D.I. 120 at 16-18; D.I. 140 at 10)

14

# D.  Defendant JPMorgan's Summary Judgment Motions - Laches

15

# Summary Judgment Motion - Laches

‣ Pi-Net Filings:  D.I.  132, 133,159

‣ JPMorgan's Motion should be stricken

‣ Complete failure to comply with Federal Rules

> <u>Two Separate Sections of Fed.R.Civ.P. Rule 26(a)(1)(A)</u>:
>
> (A) In General. … a party must, without awaiting a discovery request, provide to the other parties:
>
> (i) the name … of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses….;
>
> (ii) a copy … of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses …

‣ JPMorgan did not identify witnesses, and did not produce "all documents … in its possession… [that it] may use to support its claims or defenses….

16

# Summary Judgment Motion - Laches

‣ Federal Rules Compel Striking of Laches Defense

> <u>Fed.R.Civ.P. Rule 37(c)</u>:
>
> Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

‣ Rule is mandatory

‣ Further, JPMorgan has not attempted to justify failure and failure to produce is not harmless

17

# Summary Judgment Motion - Laches

‣ Further, JPMorgan withheld its defense in discovery

‣ JPMorgan pled laches in terms of "unenforceability"

   ▪ "Plaintiff is barred from <u>enforcing</u> the '500 Patent against JPMC pursuant to the doctrine of laches." (D.I. 11 at ¶ 39)

‣ Pi-Net requested all details of defense in Interrogatory No. 4:

   ▪ …[S]tate in detail and with particularity each … allegation that any asserted claim of any patent-in-suit is invalid or <u>unenforceable</u>, <u>or which you may argue precludes any liability in this case</u>…. (Exhibit BG at p. 8; see D.I. 133 at 7-8).

‣ JPMorgan answered:

   ▪ … JPMC responds as follows: All such allegations that JPMC has formulated at this time are listed in Defendants' Initial Invalidity Contentions and JPMC's Answer (D.I. 11). However, JPMC reserves the right to amend its response as it formulates additional allegations.   (Exhibit BG at pp. 8-9).

18

# Summary Judgment Motion - Laches

▸ Laches is "an equitable defense to a claim for patent infringement."

   *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.Cir.1992)

▸ JPMorgan's equitable defense should be stricken, because JPMorgan acted inequitably

▸ Prejudice to Pi-Net

   ▪ Pi-Net denied discovery of JPMorgan's allegations that Pi-Net knew or should have known of JPMorgan's infringement

      ○ *Wanlass v. Gen. Elec. Co.*, 148 F.3d 1334, 1337 (Fed. Cir. 1998) ("The period of delay begins at the time the patentee has actual or constructive knowledge of the defendant's potentially infringing activities.")

   ▪ Pi-Net did not have opportunity to develop evidence of exact dates of JPMorgan's infringement, which is critical in light of Pi-Net's "other litigation" exception.

      ○ *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1033 (Fed. Cir. 1992)

19

# E.  Defendant JPMorgan's Summary Judgment Motions - Validity

20

# Summary Judgment - Validity

▸ Pi-Net Answering Brief, D.I. 131

▸ JPMorgan filed the Motion without any declaration.

- JPMorgan does not even rely on the expert reports of Susan Spielman or Dr. Michael Siegal, its invalidity experts, citing only two specific conclusory sentences in Ms. Spielman report. (D.I. 122 at 11, 17).

- JPMorgan few cites to documents and deposition testimony are tied together only by counsel's *ipse dixit*

▸ All assertions in JPMorgan's brief are disputed point-by-point with citation to the record in Declaration of Dr. Michael Bardash in Response to Defendant's Motions for Summary Judgment. (Exh. BE)

21

# F.  Defendant JPMorgan's Summary Judgment Motions – Infringement

22

# Summary Judgment - Infringement

‣ Pi-Net Answering Brief, D.I. 130

‣ JPMorgan filed the Motion without any declaration.

  ▪ JPMorgan does not even rely on the expert reports of Susan Spielman or Dr. Michael Siegal, its invalidity experts, citing only two specific conclusory sentences in Ms. Spielman report. (D.I. 122 at 11, 17).

  ▪ JPMorgan few cites to documents and deposition testimony are tied together only by counsel's *ipse dixit*

‣ All assertions in JPMorgan's brief are disputed point-by-point with citation to the record in Declaration of Dr. Michael Bardash in Response to Defendant's Motions for Summary Judgment. (Exh. BE)

23

## G.  Defendant JPMorgan's *Daubert* Motion – Porter (Damages)

24

# JPMorgan's *Daubert* Motion – Porter (Damages)

‣ Pi-Net Answering Brief, D.I.  129

‣ Porter did everything required by precedent

‣ All JPMorgan arguments go to weight, not admissibility

‣ JPMorgan essentially argues that a patentee cannot never prove damages

  ▪ patentee is entitled to "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284.

  ▪ "[A]ny reasonable royalty analysis necessarily involves an element of approximation, and uncertainty," and is an inexact science

    ○ *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857-58 (Fed. Cir. 2010) aff'd, 131 S. Ct. 2238 (U.S. 2011), and cases cited at D.I 129 at pp. 9-10.

‣ Compare Mr. Porter's detailed research and analysis to Ms. Hall's "report" – if JPMorgan asserts that Ms. Hall's report is admissible, it cannot challenge Mr. Porter's report

25