**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

PI-NET INTERNATIONAL INC.,

                  Plaintiff,

      v.                                   Civ. No. 1:12-cv-00282-SLR

JPMORGAN CHASE & CO.,

                  Defendant.

---

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION
FOR ATTORNEY FEES PURSUANT TO 35 U.S.C. § 285 AND FED. R. CIV. P. 54(D)(2)**

**REDACTED VERSION – PUBLICLY FILED**

OF COUNSEL:

Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York  10036
Tel.:  (212) 735-3000
daniel.devito@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
andrew.gish@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

DATED:  June 11, 2014

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| PI-NET INTERNATIONAL INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>JPMORGAN CHASE & CO.,<br><br>                    Defendant. | Civ. No. 1:12-cv-00282-SLR |

**DEFENDANT'S BRIEF IN SUPPORT OF ITS MOTION**
**FOR ATTORNEY FEES PURSUANT TO 35 U.S.C. § 285 AND FED. R. CIV. P. 54(d)(2)**

OF COUNSEL:

Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel.: (212) 735-3000
daniel.devito@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
andrew.gish@skadden.com

Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware 19801
Tel.: (302) 651-3000
Fax: (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF PROCEEDINGS ..............................................................................1

I.      SUMMARY OF ARGUMENT ...........................................................................................1

II.     STATEMENT OF FACTS ..................................................................................................4

        A.      The Patents-In-Suit ................................................................................................4

        B.      Pi-Net's Infringement Suits ...................................................................................5

        C.      The *Markman* Proceedings And Summary Judgment Rulings ...............................6

III.    JPMC SHOULD BE AWARDED ITS REASONABLE ATTORNEY FEES. ................11

        A.      JPMC Is The Prevailing Party Under Section 285 Of The Patent Act. ................11

        B.      This Is An Exceptional Case, For Which JPMC Should Be Awarded Its
                Reasonable Attorney Fees...................................................................................11

                1.      *Octane Fitness* Has Fundamentally Altered the Calculus for
                        Determining Whether a Case Is Exceptional. ...........................................11

                2.      The Deficiencies in the Claims and Written Description of the
                        Patents-in-Suit Make the "Substantive Strength" of JPMC's
                        Defenses "Stand Out from Other Cases." ..................................................13

                        (a)     The Sheer Number of Defenses On Which JPMC Prevailed
                                Support an Exceptional Case Finding...........................................13

                        (b)     Pi-Net's Objectively Baseless Claim Construction Positions ........13

                        (c)     Pi-Net Explicitly Recognized the Intrinsic and Fatal
                                Deficiencies in the Patents-in-Suit...............................................15

                3.      Given the "Totality of the Circumstances," the Court Should
                        Exercise Its Discretion and Award Fees in this Case. ..............................17

IV.     CONCLUSION..................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*Brooks Furniture Manufacturing, Inc. v. Dutailier International, Inc.*,
  393 F.3d 1378 (Fed. Cir. 2005)...................................................................................................... 2

*Buckhannon Board & Care Home, Inc. v. West Virginia Department of Health & Human
  Resources*,
  532 U.S. 598 (2001) ..................................................................................................................... 11

*E.I. Dupont de Nemours & Co. v. Monsanto Corp.*,
  Nos. CIV. A. 92-625(LON), 93-263(LON), 1997 WL 361615 (D. Del. Feb. 20, 1997) ....... 11

*Eon-Net LP v. Flagstar Bancorp*,
  653 F.3d 1314 (Fed. Cir. 2011)................................................................................................... 18

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litigation*,
  Civ. No. 09-MD-2118-SLR, 2012 WL 95592 (D. Del. Jan. 12, 2012). .................................... 1

*Manildra Milling Corp. v. Ogilvie Mills, Inc.*,
  76 F.3d 1178 (Fed. Cir. 1996)..................................................................................................... 11

*MarcTec, LLC v. Johnson & Johnson*,
  664 F.3d 907 (Fed. Cir. 2012) .................................................................................................... 14

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
  134 S. Ct. 1749 (2014) ............................................................................... 1, 2, 11, 12, 13, 17

*Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*,
  707 F.2d 1376 (Fed. Cir. 1983).................................................................................................. 11

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
  726 F.3d 1306 (Fed. Cir. 2013).............................................................................................. 13, 14

### RULES AND REGULATIONS

35 U.S.C. § 112.................................................................................................................................. 2

35 U.S.C. § 285.................................................................................................................... 1, 2, 11

Fed. R. Civ. P. 54(d)(2)(B)(iii) ........................................................................................................ 1

## NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement suit brought by plaintiff Pi-Net International, Inc. ("Pi-Net") against defendant JPMorgan Chase & Co. ("JPMC").  On May 14, 2014, after construing the disputed claim terms from among the asserted patents (D.I. 163, 164), the Court granted JPMC's motion for summary judgment of invalidity and granted JPMC's motion for summary judgment of non-infringement, concluding that all 24 of the claims asserted against JPMC were invalid for indefiniteness, lack of enablement, and lack of written description.  (D.I. 165, 166)  In accordance with these rulings, on May 19, 2014, the Court entered judgment in JPMC's favor and against Pi-Net.  (D.I. 167)

## I.    SUMMARY OF ARGUMENT

JPMC should be awarded its reasonable attorney fees incurred during its successful defense against Pi-Net's infringement claims because, under the standard recently articulated by the Supreme Court for evaluating claims for attorney fees under 35 U.S.C. § 285, this is an exceptional case.[1]

Less than one month before the Court entered judgment in this case, the Supreme Court unanimously overturned the legal standard that had been used for nearly a decade to evaluate whether a case was "exceptional" under 35 U.S.C. § 285.  *See generally Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014).  Gone are the days when patent cases were deemed "exceptional" only if (1) there was litigation misconduct or fraud in procuring the

---

[1] Pursuant to Federal Rule of Civil Procedure 54(d)(2)(B)(iii), JPMC estimates that it has incurred more than ▮▮▮▮▮ in attorney fees defending against Pi-Net's infringement claims. To the extent that the Court finds that this case is exceptional and awards attorney fees, JPMC will submit a detailed itemization of fees spent in defense of this suit along with supporting documentation. *See, e.g., In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, Civ. No. 09-MD-2118-SLR, 2012 WL 95592, at *4 (D. Del. Jan. 12, 2012).

patents-at-issue, or (2) when the prevailing party proved by clear and convincing evidence that the infringement suit (a) was brought in subjective bad faith and (b) was objectively baseless. *Cf. Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (Fed. Cir. 2005), *abrogated by Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014).  Instead, an "exceptional" case for purposes of 35 U.S.C. § 285 "is *simply one that stands out from others* with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)."  *Octane Fitness*, 134 S. Ct. at 1756 (emphasis added).

There can be no doubt that JPMC's successful defense against Pi-Net's claims "stands out from other[]" infringement suits in multiple respects.  *Id.*  First, if there is one defining feature of the claims that were asserted against JPMC, it is their pervasive and insoluble ambiguity, which the Court recognized as clearly running afoul of the definiteness requirement of 35 U.S.C. § 112.  In fact, the Court determined that *over half* of the 31 disputed claim terms are indefinite, and that every asserted claim has *at least* one indefinite term.  Second, the disclosure that accompanies those claims is grossly inadequate to describe or enable them.  From the outset of this case, Pi-Net took the position that the asserted claims cover a pioneering invention that represents the foundation of all modern Web-based communications and interactions.  (*See, e.g.*, D.I. 1, ¶ 2 ("[T]he patents disclose the fundamental technology underlying Web commerce by use of Web applications.  The examples of the pioneering technology in the patents were directed to online banking and other financial services on the Web which are the same as in the [JPMC's] accused systems.")) Despite these inflated and grandiose claims, the written description is devoid of anything but the vaguest and barest outlines of an aspirational construct, which is internally inconsistent and devoid of any meaningful structure.  Remarkably, the sole inventor of the patents-in-suit and CEO of Pi-Net, Dr. Lakshmi Arunachalam, admitted that the specification is

2

████████████ and failed to accurately capture the nature of what she thought of as her invention.  (D.I. 146, Ex. DBB at 203:6-23)  Dr. Arunachalam thus did not need to await a claim construction or summary judgment decision to know that the specification did not support, describe, enable, or explain any allegedly inventive aspect of the patents-in-suit—let alone claims that were of the exceedingly broad scope that Pi-Net identified.  Most egregiously, despite its misleading trademark moniker, the only protocol identified for carrying out the claimed technology—the TransWeb Management Protocol™ ("TMP")—was *never disclosed* to the public, because it *never existed*.  (D.I. 165 at 17)

The disclosure of Pi-Net's asserted patents—the claims, the text of the written description, and the Figures—is so intrinsically defective that the Court held every asserted claims invalid for at least three separate and independent reasons.  (*See* D.I. 165)  Therefore, it is clear that this is not the "run-of-the-mill" patent case where a combination of previously unknown prior art references renders a patent claim invalid, or where a hard-fought battle over competing claim constructions results in a finding of non-infringement.  Here, the numerous intrinsic deficiencies in the patents-in-suit were so prominent and pervasive that they were *actually recognized* by the sole inventor, Dr. Arunachalam, and her employees.  It also means that JPMC had to expend ████████████ in attorney fees defending against claims that each failed to meet nearly every requirement of Section 112.

Although the Court's decision meant that it did not reach some of JPMC's defenses that more traditionally give rise to exceptional case findings, such as inequitable conduct (*see* D.I. 11, ¶ 36), the depth and breadth of the Court's invalidity findings, all of which are based on intrinsic deficiencies in the patents-in-suit, coupled with Pi-Net's own recognition of those deficiencies, strongly support an award of attorney fees in this case.  As a result, under the recently announced

standards of *Octane Fitness*, the Court should declare this an exceptional case, and award JPMC

its reasonable attorney fees.

## II.      STATEMENT OF FACTS

### A.      The Patents-In-Suit

Pi-Net asserted three patents in this litigation: U.S. Patent Nos. 5,987,500 ("the '500

patent"); 8,037,158 ("the '158 patent"); and 8,108,492 ("the '492 patent") (collectively, "the

patents-in-suit").  Pi-Net accused JPMC of infringing a total of 24 claims: claims 1-6, 10-12,

14-16, and 35 of the '500 patent; claim 4 of the '158 Patent; and claims 1-8 and 10-11 of the '492

Patent (collectively, the "asserted claims").  Consistent with JPMC's interpretation of the asserted

claims, the Court found that "[t]he patents-in-suit generally claim a system and method for online

transactions, wherein a user takes an action at the 'front-end' that causes data to be routed through

a system and used a basis to execute a transaction at the 'back-end'" in real time.  (D.I. 165 at 2)

Thus, the claims all require both front-end and back-end components.  (*See* D.I. 165 at 21)

The patents-in-suit share a virtually identical written description, which consists of

roughly nine columns of text and fifteen figures.  Five of those figures (Figs. 1A through 4A)

illustrate prior art, while the remaining ten figures (Figs. 4B through 8) purport to describe

various embodiments of the alleged invention.  (*See, e.g.*, D.I. 66, Ex. C at 3:11-41)  Although

the claimed technology is directed to an allegedly novel implementation of a software switch

(i.e., the VAN Switch), the specification contains no algorithm, formula, or protocol (other than

the non-existent TMP protocol) to make and use that software-based switch.  (D.I. 165 at 20-21)

### B.      Pi-Net's Infringement Suits

Pi-Net first asserted infringement of the patents-in-suit in this district in a series of eight virtually identical complaints filed in March 2012 against multiple financial institutions.[2] Roughly one year later, at the time that *Markman* briefing was filed, half of those cases had been settled.  After claim construction briefing was complete, two additional sets of defendants settled, leaving only JPMC and Citizens Financial Group, Inc. ("CFG") as active defendants against Pi-Net.  After CFG's indemnitor, SAP America Inc. ("SAP"), filed for review of the patents-in-suit in the U.S. Patent & Trademark Office ("PTO"), Judge Andrews stayed the proceedings in CFG's case only, beginning in June 2013.  (Case No. 12-355-RGA, D.I. 82)[3] Thus, from June 2013 until the Court's entry of judgment in this case, JPMC was the only one of the original eight defendant groups sued by Pi-Net with an active case pending before this Court.

Over the course of 2013 and 2014, Pi-Net filed a number of additional patent infringement suits asserting one or more of the patents-in-suit, or related patents.  In all, Pi-Net filed six dozen patent infringement suits against financial institutions, online retailers, and other Web-based service providers.  Of those 72 cases, 17 have settled, 11 are stayed pending the outcome of SAP's *inter partes* and CBM reviews in the PTO, and 43 cases (not counting the suit

---

[2] *See Pi-Net Int'l Inc. v. Bank of Am., N.A., et al.*, Case No. 12-cv-280-RGA; *Pi-Net Int'l Inc. v. Wilmington Trust Co., et al.*, Case No. 12-cv-281-RGA; *Pi-Net Int'l Inc. v. JPMorgan Chase & Co.*, Case No. 12-cv-282-SLR; *Pi-Net Int'l Inc. v. WSFS Fin. Corp.*, Case No. 12-cv-352-RGA; *Pi-Net Int'l Inc. v. UBS Fin. Servs. Inc.*, Case No. 12-cv-353-RGA; *Pi-Net Int'l Inc. v. Sovereign Bank N.A.*, Case No. 12-cv-354-RGA; *Pi-Net Int'l Inc. v. Citizens Fin. Grp., Inc.*, Case No. 12-cv-355-RGA; *Pi-Net Int'l Inc. v. Capital One Fin. Corp.*, Case No. 12-cv-356-RGA.

[3] The PTO initiated a covered business method (or "CBM") review of the '158 patent, and *inter partes* review of the '500 patent and the '492 patent, having found that it was more likely than not that the asserted claims from the patents-in-suit are invalid.  (Case No. 12-355-RGA, D.I. 85) These proceedings remain pending, and are scheduled for oral argument before the PTO on June 16, 2014.  (Case No. 12-355-RGA, D.I. 86)

against JPMC) are actively pending.  (*See* Ex. EA)[4]  The 17 settlements that Pi-Net has entered

all include a fully paid up license that covers the patents-in-suit; those settlements ranged in

value from ███████████████.[5]  Pi-Net alleged that JPMC was liable for damages of at

least ████████—a value that is more than ████████ *times* greater than the highest

settlement amount from the 17 licenses that Pi-Net has entered since 2012.  (*See* D.I, 157, Ex.

AF at 5)

      JPMC and Pi-Net completed their *Markman* briefing on May 15, 2013, and, in

accordance with the schedule originally set by Judge Andrews, completed all fact discovery,

including discovery of JPMC's electronic files and depositions of all fact witnesses, and all

expert discovery.  (D.I. 17, D.I. 95)  This case was reassigned from Judge Andrews on April 8,

2014.  It was then scheduled for a final pre-trial conference on May 21, 2014, with trial set to

begin less than two weeks thereafter, on June 2, 2014.  (D.I. 162)  In addition to the arguments

set forth in JPMC's summary judgment motions and supporting briefs (as further discussed

below), JPMC intended to advance additional arguments at trial based on at least (1) non-

infringement, and (2) inequitable conduct in the procurement of the patents-in-suit.  (*See, e.g.,*

D.I. 11; D.I. 157, Ex. AK)

      **C.**    **The *Markman* Proceedings And Summary Judgment Rulings**

      JPMC's *Markman* position underscored the atypical nature of this case—it was based on

the contention that "almost every term of the patents-in-suit is insolubly ambiguous, and,

---

[4] Exhibits EA through EI are attached to the Transmittal Declaration of Robert S. Saunders, submitted herewith.

[5] In 2009, WebXchange, a company that is also solely owned by Dr. Arunachalam and is related to Pi-Net, entered into a settlement agreement covering the patents-in-suit for ████████.  (D.I. 157, Ex. AM at 14)

therefore, that every claim in suit is invalid for indefiniteness." (D.I. 74 at 1; Ex. EB at 21) But

as JPMC articulated in its *Markman* brief, this position was compelled by the unusually defective

disclosure of the patents-in-suit:

> "This is not simply a case where the claim terms lack definitional support in the specification: the patents-in-suit suffer from a dearth of disclosure, internal inconsistencies, and insoluble ambiguity," such that "the claims simply *cannot be interpreted* in any logical manner in light of the intrinsic record."

(D.I. 74 at 2 (emphasis in original)) JPMC identified two different categories of indefinite terms:

(1) the means-plus-function terms found in the '500 patent and the '492 patent that lacked

corresponding algorithmic structure and (2) several other terms that were so vague and/or

undefined as to leave the Court with the "impossible task of creating something out of nothing to

attempt to determine the bounds of Pi-Net's right to exclude." (D.I. 74 at 2)

The Court held a *Markman* hearing on April 15, 2014, and issued its *Markman* decision

on May 14, 2014. (D.I. 163) The Court essentially accepted JPMC's position for both categories

of indefinite terms, and concluded that, as JPMC had argued, each and every asserted claim was

indefinite. As for the first category, the Court concluded that all twelve of the means-plus-

function limitations from the asserted claims were indefinite because no algorithm was disclosed

in the patents-in-suit, and all of these limitations recite functions that are "more complex than the

type of function that can be performed by a general purpose computer with no special

programming." (D.I. 163 at 12-28) This finding alone invalidated 6 claims of the '500 patent,

and 8 asserted claims from the '492 patent. As for the second category, the Court found that four

claim terms ("VAN Switch"; "VAN system"; "switching"; and "service network") were also

indefinite. (D.I. 163 at 3-8, 31) The Court's indefiniteness findings are summarized below:

| Term | Asserted Claims | Finding |
|------|-----------------|---------|
| "means for switching to a transactional application in | '500 patent: 1, 35 | Indefinite – no algorithm |

| | | |
|---|---|---|
| response to a user specification from a network application" | | |
| "means for transmitting a transaction request from said transactional application" | '500 patent: 1, 35 | Indefinite – no algorithm |
| "means for processing said transaction request" | '500 patent: 1, 5, 35 | Indefinite – no algorithm |
| "computer system . . . for processing the transaction request in real-time" | '492 patent: 1, 8 | Indefinite – no algorithm |
| "means for receiving said user specification" | '500 patent: 2, 4 | Indefinite – no algorithm |
| "means for enabling a switch to said transactional application" | '500 patent: 2 | Indefinite – no algorithm |
| "means for activating said transactional application" | '500 patent: 2, 3 | Indefinite – no algorithm |
| "means for presenting said user with a list of transactional applications" | '500 patent: 4 | Indefinite – no algorithm |
| "means for submitting said user specification according to a user's selection of said transactional application" | '500 patent: 4 | Indefinite – no algorithm |
| "means for coupling said means for transmitting to a host means" | '500 patent: 5 | Indefinite – no algorithm |
| "means for activating an agent to create a transaction link . . ." | '500 patent: 35 | Indefinite – no algorithm |
| "means for creating a transaction link . . ." | '500 patent: 3 | Indefinite – no algorithm |
| "VAN Switch" | '500 patent: 1-7, 10-12, 14-16 '492 patent: all claims | Indefinite – insolubly ambiguous |
| "VAN System" | '500 patent: 35 | Indefinite – insolubly ambiguous |
| "switching" | '500 patent: 10, 11 '492 patent: 3, 10 | Indefinite – insolubly ambiguous |
| "service network" | '158 patent: 4 '492 patent: 1, 6, 10 | Indefinite – insolubly ambiguous |

In addition to finding that the above 16 claim terms were indefinite, the Court also concluded that each and every one of the 24 asserted claims was invalid for both lack of written description and lack of enablement.  (*See* D.I. 165)  Consistent with the views of the inventor,

and the positions that JPMC advanced during summary judgment, the Court concluded that the

claims were invalid for lack of enablement for four separate reasons (D.I. 165):

- **Real-Time**:  Though each and every asserted claim requires that a "real time" transaction be enabled, "the specification presents [only] an abstract concept of real-time transactions," and does not permit a person of ordinary skill in the art to "make and use" the claimed VAN Switch to accomplish a real-time transaction.  (D.I. 165 at 17)

- **TMP**:  Because the lone embodiment of the claimed technology depended on the use of a non-existent protocol, the TransWeb Management Protocol™, "a person of skill in the art would essentially had to have developed her own protocol to implement and operate the claimed VAN Switch" because the specification provides no guidance in that regard.  (D.I. 165 at 18)

- **CGI**:  "The specification distinguishes the prior CGI art, but is devoid of direction, guidance, and/or working examples of how the supposed superior invention is to be implemented."  (D.I. 165 at 19)

- **Lack of Software**:  "The specification implicates, but does not describe, how to make or use point-of-service applications[,] transactional applications . . ., or back end transactional applications," all of which would require special-purpose software, which is neither discussed nor depicted in the patents-in-suit.  (D.I. 165 at 18-19)

In addition, the Court concluded that the asserted claims were invalid for failure to satisfy

the written description requirement for four separate reasons:

- **VAN Switch**:  "The specification describes the VAN Switch in conflicting and overlapping ways," such that there is no evidence from the intrinsic record that the inventor possessed such a VAN Switch.  (D.I. 165 at 20)

- **Lack of Protocol**:  Because the specification referred only to a protocol that never existed, the specification does not evidence possession of a structure that could perform transactions "using TMP or any other protocol."  (D.I. 165 at 21)

- **Front-End Components**:  The specification shows only abstract, block diagrams for the front-end, POSvc applications.  (D.I. 165 at 21)

- **Back-End Components**:  Like the front-end components, although "[e]ach of the asserted claims implicates the back-end transactional application, which processes the user's request . . ., the specification offers only a block diagram of a 'back-office.' . . . Nowhere in the specification does the inventor indicate that she had possession of such a system or the applications that process the user's request."  (D.I. 165 at 21)

In other words, the specification does not show possession of or provide an enabling disclosure for any aspect of the claimed technology—not the front end applications, not the VAN Switch, not the back end applications, not the use of any components to perform "real-time" transactions.  In short, there was nothing in the intrinsic disclosure to provide any guidance to a person of ordinary skill in the art.  Thus, in addition to the 16 reasons that the asserted claims are indefinite, there are 8 additional reasons that the asserted claims are invalid for violating other aspects of Section 112.  That means that there were as many reasons that the asserted claims were invalid (24) as there were asserted claims (24).  The bases upon which the Court invalidated the asserted claims are summarized below:

| Claim | Number of Indefinite Terms | Lack of Enablement | Lack of Written Description | Total Number of Invalidity Bases |
|---|---|---|---|---|
| '500 Claim 1 | 4 | X | X | 6 |
| '500 Claim 2 | 6 | X | X | 8 |
| '500 Claim 3 | 7 | X | X | 9 |
| '500 Claim 5 | 5 | X | X | 7 |
| '500 Claim 6 | 5 | X | X | 7 |
| '500 Claim 10 | 2 | X | X | 4 |
| '500 Claim 11 | 2 | X | X | 4 |
| '500 Claim 12 | 2 | X | X | 4 |
| '500 Claim 15 | 2 | X | X | 4 |
| '500 Claim 16 | 2 | X | X | 4 |
| '500 Claim 17 | 2 | X | X | 4 |
| '500 Claim 35 | 5 | X | X | 7 |
| '158 Claim 4 | 1 | X | X | 3 |
| '492 Claim 1 | 3 | X | X | 5 |
| '492 Claim 2 | 3 | X | X | 5 |
| '492 Claim 3 | 4 | X | X | 6 |
| '492 Claim 4 | 3 | X | X | 5 |
| '492 Claim 5 | 3 | X | X | 5 |
| '492 Claim 6 | 3 | X | X | 5 |
| '492 Claim 7 | 3 | X | X | 5 |
| '492 Claim 8 | 3 | X | X | 5 |
| '492 Claim 10 | 4 | X | X | 6 |
| '492 Claim 11 | 4 | X | X | 6 |

As the foregoing table illustrates, the Court found that, at a minimum, all asserted claims were invalid for at least three reasons—while other claims, such as claim 3 of the '500 patent, were invalid for *nine separate reasons*.

## III.   JPMC SHOULD BE AWARDED ITS REASONABLE ATTORNEY FEES.

### A.   JPMC Is The Prevailing Party Under Section 285 Of The Patent Act.

Under Section 285 of the Patent Act, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. There can be no question that JPMC is the prevailing party in this case; the Court explicitly entered judgment "in [JPMC's] favor and against [Pi-Net]." (D.I. 167) This fact conclusively establishes JPMC as the prevailing party. *See Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 603 (2001) (noting that Black's Law Dictionary defines "'prevailing party' as a party in whose favor a judgment is rendered") (internal quotation marks omitted). And although the Court's decision granting summary judgment was based primarily on invalidity findings, "as a matter of law, a party who has a competitor's patent declared invalid meets the definition of 'prevailing party.'" *Manildra Milling Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1183 (Fed. Cir. 1996); *see also E.I. Dupont de Nemours & Co. v. Monsanto Corp.*, Nos. CIV. A. 92-625(LON), 93-263(LON), 1997 WL 361615, at *1-2 (D. Del. Feb. 20, 1997).

### B.   This Is An Exceptional Case, For Which JPMC Should Be Awarded Its Reasonable Attorney Fees.

#### 1.   *Octane Fitness* Has Fundamentally Altered the Calculus for Determining Whether a Case Is Exceptional.

For much of the last decade, the appropriateness of awarding attorney fees was governed by the "rigid and mechanical formulation" set forth by the Federal Circuit in 2005. *Octane Fitness*, 134 S. Ct. at 1754 (citing *Brooks Furniture*). The Supreme Court unanimously rejected that "framework" as "unduly rigid, [because] it impermissibly encumbers the statutory grant of

11

discretion to district courts." *Id.* at 1755.  Instead, the sole "constraint" on a district court's discretion to award attorney fees in patent cases is that such awards be reserved solely for "exceptional" cases, which the Supreme Court defined as "uncommon," "rare," "not ordinary," or "not run-of-the-mill."  *Id.* at 1756 (internal quotation marks and citations omitted).  The analytical framework under Section 285 is "inherently flexible" (*id.*)—and if this section is not to be rendered superfluous, then it must confer authority to grant attorney fees even when the losing party has not "acted in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Id.* at 1758 (internal quotation marks and citations omitted); *accord Orthopedic Equip. Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1384 (Fed. Cir. 1983) ("A finding of fraud or inequitable conduct during the prosecution of a patent is not necessary to constitute an 'exceptional' case under this section, as it may be exceptional for some other reason, but an award of attorney fees is within the discretion of the trial judge.").  Here, there is ample evidence that the "substantive strength of [JPMC's] litigating position (considering both the governing law and the facts of the case)," makes this a case that "stands out from others," particularly in light of the damaging admissions made by the sole inventor of the patents-in-suit at her depositions.  *Octane Fitness* at 1756.[6]

---

[6] For the reasons set forth in JPMC's Answer, JPMC maintains that Pi-Net procured at least the '500 patent through bad faith, inequitable conduct before the PTO.  (D.I. 11 at ¶ 36)  However, because that issue was not resolved by the Court before judgment was entered in JPMC's favor, it is not a basis for JPMC's motion for attorney fees.

> **2.     The Deficiencies in the Claims and Written Description of the Patents-in-Suit Make the "Substantive Strength" of JPMC's Defenses "Stand Out from Other Cases."**
>
> > **(a)     The Sheer Number of Defenses On Which JPMC Prevailed Support an Exceptional Case Finding.**

Under the *Octane Fitness* standard, the evidence overwhelmingly establishes that the substantive strength of JPMC's positions on indefiniteness, lack of written description, and lack of enablement of the patents-in-suit, presents the rare case where the asserted claims were invalid, on average, for *half-a-dozen independent reasons*.  As outlined in the tables above, this is not merely a case where JPMC prevailed, but rather is a case where JPMC prevailed on literally *dozens* of its arguments, and succeeded in invalidating individual claims for as many as *nine separate reasons*.  (D.I. 165)  Not only was every claim invalid for indefiniteness, but every claim was also invalid for lack of written description *and* lack of enablement.  (D.I. 165)

Pi-Net's "exceptionally meritless claims," standing alone, make this case sufficiently uncommon so as to "warrant a fee award."  *Octane Fitness* at 1757.  But as discussed below, the particular strength of JPMC's position, coupled with Pi-Net's own recognition of the inherent and unavoidable weakness in the disclosure of the patents-in-suit, render this a most unusual and exceptional case.

> > **(b)     Pi-Net's Objectively Baseless Claim Construction Positions**

Although Pi-Net repeatedly contended that the patents-in-suit were a pioneering invention, (*see* D.I. 1, ¶ 2; D.I. 74 at 1), it also argued that the allegedly inventive crux of means-plus function terms of the '500 and '492 patents (i.e., "real-time" transactions), could be performed using only off-the-shelf, general computer processors that were widely available in the mid-1990s (D.I. 66 at 12).  Pi-Net was tied into argumentative knots on this point because of the dearth of supporting disclosure.  In addition, the constructions that Pi-Net proposed for

13

"coined" terms failed to account for or explain the conflicting and contradictory descriptions in the specification.  No term exemplifies this fatal failure better than "VAN Switch."  As the Court recognized, the specification offers "overlapping and competing," and "conflicting" definitions for the VAN Switch that could not have been reconciled by a person of skill in the art.  (D.I. 163 at 6; D.I. 165 at 20)  As such, Pi-Net's claims for infringement were objectively baseless.  *See, e.g.*, *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1327 (Fed. Cir. 2013) ("When patentees have sought unreasonable claim constructions divorced from the written description, this court has found infringement claims objectively baseless."); *accord MarcTec, LLC v. Johnson & Johnson*, 664 F.3d 907, 919 (Fed. Cir. 2012) ("Because the specification and prosecution history clearly refute [the patentee's] proposed claim construction, the district court did not err in finding that [the] infringement claims were objectively baseless.").

Indeed, even under the now-defunct *Brooks Furniture* framework, the Federal Circuit has affirmed attorney fee awards under similar circumstances.  *See, e.g.*, *Taurus*, 726 F.3d at 1326-30.  In *Taurus*, the Federal Circuit was faced with an appeal from an exceptional case finding, and an accompanying award of attorney fees.  *Id.* at 1326.  The primary issue in that case was whether patent claims that related generally to "a computer system for managing product knowledge related to products offered for sale by a selling entity" were described "from the viewpoint of the database manager, not from the viewpoint of a web surfer."  *Id.* at 1314, 1320. The Federal Circuit affirmed the district court's determination that "the written description provides no support for Taurus's unreasonably broad construction and instead limits the [claims] to those with sufficient *internal* access to the data model to allow the creation and editing of relationship information."  *Id.* at 1327.  In so doing, the Court noted that "reasonable minds can differ on claim construction positions," but that when a claim construction is "divorced" from the

14

specification entirely, the advancement of that construction can support an exceptional case finding. *Id.* Just as in *Taurus*, Pi-Net attempted to re-write the claim limitations to fill in gaping holes in the specification of the patents-in-suit, and just as in *Taurus*, the objectively baseless nature of those proposed constructions should give rise to an exceptional case finding.

**(c)      Pi-Net Explicitly Recognized the Intrinsic and Fatal Deficiencies in the Patents-in-Suit.**

Dr. Arunachalam and her employees have long been aware of the issues with the patents-in-suit—indeed, during her deposition in this case in September of 2013, Dr. Arunachalam went so far as to note that it was ███████████████████████ the specification of the patents-in-suit was.  (D.I. 146, Ex. DBB at 205:7)  Dr. Arunachalam explained that ███████████



(D.I. 146, Ex. DBB at 203:3-23 (emphasis added))  But if Dr. Arunachalam recognized that there were critical, intrinsic deficiencies with the patents-in-suit that should have been corrected, then the proper course of action would have been to pursue reissuance of the patent in the PTO.[7] Instead, Pi-Net plunged headfirst into a series of patent infringement litigations, apparently hoping that the incentive for defendants to settle for nuisance amounts would allow Pi-Net to avoid having to correct the fundamental errors and gaps in the patent disclosure or risk the PTO concluding that Dr. Arunachalam's alleged invention was not patentable after all.

Nor was Dr. Arunachalam alone in her assessment of the efforts that led to the patents-in-suit.  For instance, one of Dr. Arunachalam's former employees, Daniel Maier, testified in 2010:



---

[7] Pi-Net also explicitly recognized that PTO was an available avenue for correcting the problems with the patents-in-suit.  (*See* Ex. EE at WXC000063053) ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ )  Indeed, Dr. Arunachalam considers herself to be highly skilled at patent law. (Ex. EF at 913-14 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮ ))



(Ex. EC at 18-19 (emphasis added))  Another of Dr. Arunachalam's former employees, Barry Plotkin, worked with Dr. Arunachalam during the time that she was first trying to develop embodiments based on the patents-in-suit.  He testified that ████████████████████

████████████████████████████████████████:



(Ex. ED at 78-79 (emphasis added)); *see also id.* at 30 (characterizing the provisional patent application upon which the patents-in-suit are based as ██████████████████

████ ))  Both Dr. Arunachalam and her employees recognized that there was essentially "nothing" there—that the patents-in-suit did not accurately capture the scope and content of Dr. Arunachalam's inventive concepts (to the extent there were any such concepts).  It is thus no surprise that the Court invalidated each and every claim based on intrinsic deficiencies in the patent disclosure; Pi-Net's own evidence confirms the existence of these exceptional deficiencies.

### 3. Given the "Totality of the Circumstances," the Court Should Exercise Its Discretion and Award Fees in this Case.

As yet, there is little guidance from sister courts regarding how the pronouncements from *Octane Fitness* should be interpreted.  However, it is clear that this Court should look to the "totality of the circumstances," and consider "the need in particular circumstances to advance

considerations of compensation and deterrence." *Octane Fitness*, 134 S. Ct. at 1756 & 1756 n.6 (internal quotation marks and citations omitted).

Considerations of both compensation and deterrence both weigh strongly in favor of granting JPMC its attorney fees here. Unlike JPMC, which is one of the nation's largest banks with more than 80,000 employees, Pi-Net has (at most) ▮ employees,[8] and does not practice any of the technology that is claimed in the patents-in-suit.[9] JPMC and Pi-Net are not, and have never been, competitors. This meant that JPMC (and its other similarly situated defendants, such as the six financial institutions originally sued alongside JPMC, and which settled before the close of discovery) faced considerably higher discovery costs and business disruptions from this litigation than Pi-Net. Parties such as Pi-Net, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[10] are able to take advantage of these structural disparities by "exploiting the high cost to defend complex litigation to extract a nuisance value settlement." *Eon-Net LP v. Flagstar Bancorp*, 653 F.3d 1314, 1327 (Fed. Cir. 2011). In *Eon-Net*, the Federal Circuit recognized that "[a]s a non-practicing entity, [the patentee] was generally immune to counterclaims for patent infringement, antitrust, or unfair competition because it did not engage in business activities that would potentially give rise to those claims," and thus "[i]ts patents protected only settlement receipts [and licensing revenue], not its own products." *Id.* at 1327-28.

Like Pi-Net, the patentee in *Eon-Net* had filed "nearly [100] identical patent infringement complaints against a plethora of diverse defendants," but the district court was unable "to see the

---

[8] *See* D.I. 146, Ex. DBB at 66, 69.

[9] *See* Ex. EG at 7 ( ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ").

[10] Ex. EI at 65-66, 87-89.

lack of merit of the patentee's infringement allegations" prior to engaging in "excessive claim construction analysis."  *Id.* at 1326-27.  Such was the case here as well—indeed, given Pi-Net's undisputed knowledge of the fatal deficiencies in the patents-in-suit, Pi-Net was apparently counting on the fact that JPMC (and the other defendants) would settle the case rather than spend the money to take this case to the dispositive motion phase.  That explains Pi-Net's strategy of entering into "nuisance value" settlements with more than a dozen defendants, for amounts that were *at least* ████████████████ *lower* than Pi-Net's claim for damages against JPMC, and far below the cost to litigate this case through trial.  (*See* D.I. 157, Ex. AM at 14-18)  Pi-Net knew that most parties would weigh the costs and benefits of taking a low-cost license to the technology against the expense of trial and conclude, like most of the defendants that were originally sued alongside JPMC, that it was easier and more efficient just to settle this litigation. This sort of exploitation of the court system to extract settlements and preserve patents that even the inventor concedes are "very poorly written" should be strongly discouraged through the application of Section 285.

Although the Court determined that Pi-Net's asserted claims were invalid for myriad reasons, it was not until late in the litigation—virtually on the eve of trial—that JPMC had the opportunity to present many of those arguments.  Pi-Net was thus able to exploit the very ambiguities that were fatal to its claims.  Awarding JPMC its reasonable attorney fees would not only make JPMC "whole," and compensate it for extensive out-of-pocket expenses, time, and effort to defend against Pi-Net's baseless claims, but would also help to level the playing field between non-practicing entities such as Pi-Net, and attractive litigation targets like JPMC.  Thus, in order to deter Pi-Net from continuing to assert objectively baseless claims in district courts across the country, an award of attorney fees is particularly warranted in this case.

## IV.    CONCLUSION

Under the *Octane Fitness* standards, the facts of this case fit squarely within what constitutes an exceptional case.  The patents-in-suit were entirely devoid of disclosure to support the asserted claims, as best exemplified by the facts that the lone embodiment of the claimed technology, the TMP protocol, *never existed*, that the VAN Switch (required by all but one of the asserted claims) was described exclusively in conflicting and contradictory terms, and that Pi-Net indisputably lacked possession of any "back end" systems for carrying out the claimed technology.  The intrinsic deficiencies in the patents-in-suit were well-known and acknowledged by Dr. Arunachalam, Pi-Net's CEO, and multiple Pi-Net employees who acknowledged the deficiencies underlying the claimed technology.  Despite those facts, Pi-Net not only pursued this case to the courtroom steps, but also has filed six dozen other lawsuits based on patents in the same family.  To compensate for JPMC's expenditures in having these patents declared invalid, to deter Pi-Net from pursuing similarly baseless suits, and to reflect the exceptional nature of this case, JPMC respectfully requests that it be awarded its reasonable attorney fees under Section 285.

DATED:  June 2, 2014

OF COUNSEL:
Daniel A. DeVito
Douglas R. Nemec
Edward L. Tulin
Andrew D. Gish
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square
New York, New York 10036
Tel.:  (212) 735-3000
daniel.devito@skadden.com
douglas.nemec@skadden.com
edward.tulin@skadden.com
andrew.gish@skadden.com

Respectfully submitted,

*/s/ Robert S. Saunders*
Robert S. Saunders (ID No. 3027)
Jessica Raatz Kunz (ID No. 5698)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
920 N. King Street, 7th Floor
Wilmington, Delaware  19801
Tel.:  (302) 651-3000
Fax:  (302) 651-3001
rob.saunders@skadden.com
jessica.kunz@skadden.com

*Attorneys for Defendant JPMorgan Chase & Co.*